No. 25-11881

# In the United States Court of Appeals for the Eleventh Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ET AL.,
*Plaintiffs-Appellees,*

V.

JAMES UTHMEIER, IN HIS OFFICIAL CAPACITY AS FLORIDA ATTORNEY GENERAL,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

## APPELLANT'S MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

June 9, 2025

*Counsel for Appellant*

*CCIA v. Uthmeier*
*Eleventh Circuit Case No. 25-11881*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant certifies that, to the best of his knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Allen, Tony

2. Alter, Adam

3. Bell, Daniel

4. Boyle, David

5. Cleland, Bartlett

6. Clement, Paul D.

7. Computer & Communications Industry Association

8. Costello, David M.

9. DeMott, Joseph J.

10. DeSousa, Jeffrey Paul

11. Fitzpatrick, Hon. Martin A.

12. Golembiewski, Kevin A.

13. Guard, John M.

14. Kilby, Douglas L.

15. Lamia, Christine

C-1 of 3

16.    Mead, Grace Lee

17.    Monson, Darrick W.

18.    Moody, Ashley

19.    Murphy, Erin

20.    Murphy, Hannah E.

21.    NetChoice, LLC

22.    Pallaki, Mitchell K.

23.    Patel, Anita

24.    Schenck, Robert S.

25.    Schruers, Matthew

26.    Spears, Sara E.

27.    Twenge, Jean

28.    Uthmeier, James

29.    Veitch, Alexandra N.

30.    Waczewski, James

31.    Walker, Hon. Mark

32.    Whitaker, Henry C.

33.    Wynosky, Kevin J.

34.    Xi, James

*CCIA v. Uthmeier*
*Eleventh Circuit Case No. 25-11881*

Snap, Inc. (SNAP), Meta Platforms, Inc. (META), and Alphabet Inc. (GOOGL)

are publicly traded companies that have an interest in the outcome of this case or appeal.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

      A.    Children and Social Media ............................................................... 3

      B.    HB3 ................................................................................................... 6

      C.    Procedural History ........................................................................... 7

ARGUMENT ............................................................................................................ 8

I.     Florida is likely to succeed in overturning the preliminary injunction. .......................................................................................... 8

      A.    Plaintiffs lack prudential standing to assert the First Amendment rights of children. ............................................................ 8

      B.    *Younger* bars Plaintiffs' First Amendment challenge. .................. 12

      C.    HB3 does not violate the First Amendment. .................................. 15

II.    The equities support a stay. ......................................................................... 21

CONCLUSION ....................................................................................................... 22

CERTIFICATE OF COMPLIANCE ...................................................................... 23

CERTIFICATE OF SERVICE ............................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*31 Foster Child. v. Bush*,
  329 F.3d 1255 (11th Cir. 2003) ....................................................................12

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ....................................................................................20

*Brown v. Ent. Merch. Ass'n*,
  564 U.S. 786 (2011) ....................................................................................20

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) ..........................................................................16, 18, 19

*For Your Eyes Alone v. City of Columbus*,
  281 F.3d 1209 (11th Cir. 2002) ....................................................................14

*Granite State Outdoor Advert. v. Clearwater*,
  351 F.3d 1112 (11th Cir. 2003) ....................................................................10

*Haitian Refugee Ctr. v. Baker*,
  950 F.2d 685 (11th Cir. 1991) ....................................................................... 8

*Harris v. Evans*,
  20 F.3d 1118 (11th Cir. 1994) ................................................................. 10, 11

*Hicks v. Miranda*,
  422 U.S. 332 (1975) ....................................................................................13

*J.D.B. v. North Carolina*,
  564 U.S. 261 (2011) ....................................................................................19

*JMM Corp. v. District of Columbia*,
  378 F.3d 1117 (D.C. Cir. 2004) ....................................................................14

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ...................................................................................9, 11

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
  528 U.S. 32 (1999) ............................................................................................. 9

*Lackey v. Stinnie*,
  145 S. Ct. 659 (2025) ........................................................................................13

*Maryland v. King*,
  567 U.S. 1301 (2012) ........................................................................................22

*Mata Chorwadi, Inc. v. City of Boynton Beach*,
  66 F.4th 1259 (11th Cir. 2023) .................................................... 8, 9, 10, 11, 12

*Moody v. NetChoice*,
  603 U.S. 707 (2024) .......................................................................................1, 22

*New Ga. Project v. Att'y Gen. of Ga.*,
  106 F.4th 1237 (11th Cir. 2024) .................................................................. 12, 14

*NRA v. Bondi*,
  133 F.4th 1108 (11th Cir. 2025) ...................................................................3, 15

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................................19

*TikTok v. Garland*,
  145 S. Ct. 57 (2025) .........................................2, 3, 15, 16, 17, 18, 19, 20, 21

*Tokyo Gwinnett v. Gwinnett Cnty.*,
  940 F.3d 1254 (11th Cir. 2019) ........................................................................14

*United States v. O'Brien*,
  391 U.S. 367 (1968) ..........................................................................................16

*Virginia v. Am. Booksellers*,
  484 U.S. 383 (1988) ..........................................................................................11

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .................................................................................... 18, 21

*Wise Enters. v. Athens-Clarke Cnty.*,
217 F.3d 1360 (11th Cir. 2000) ......................................................................18

*Younger v. Harris*,
401 U.S. 37 (1971) ...........................................................................................12

**Statute**

Fla. Stat. § 501.1736 ....................................................................... 2, 3, 6, 7, 9, 19

**Other Authorities**

*Attorney General Subpoenas Roblox for Child Protection Policies and Procedures*, Office of the
Attorney General (Apr. 16, 2025), https://perma.cc/5XW6-W376 ........................... 8

Evan Spiegel, Snap CEO, Resp. to Sen. Judiciary Comm. Questions (Feb. 28,
2024),  https://tinyurl.com/55amwdfc ............................................................... 6

Fla. H.R., Staff Final Bill Analysis, H.B. 3 (Mar. 28, 2024) ..............................21

FTC, *A Look Behind the Screens*, 2024 WL 4272104 (Sep. 1, 2024) ..................... 6

Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm
Kids and Democracy*, NPR (October 5, 2021), https://tinyurl.com/yc4zex93 .............. 5

Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*,
New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh...................................... 5

## INTRODUCTION

Social media is facing a reckoning. Because of whistleblowers and leaked internal documents, the public has learned that social-media companies have for years deployed design features that addict children, with full awareness of the damage that compulsive use inflicts on their mental health. In the words of the Biden Administration's Surgeon General, "[o]ur children have become unknowing participants in a decades-long experiment." DE51-9 at 11; *see also Moody v. NetChoice*, 603 U.S. 707, 733 (2024) ("'[T]oday's social media pose" unique "dangers" to "adolescents' mental health.").

In 2023, the Surgeon General—noting that America is "experiencing a national youth mental health crisis"—called on lawmakers to "act swiftly" to "limit[] the use of [addictive] features" by platforms. DE51-9 at 13, 15. Florida answered that call and enacted HB3 with broad bipartisan support. Under HB3, if a platform chooses to use infinite scroll, autoplay, or other enumerated addictive features, the platform cannot contract with children under 14 years old, and it must obtain parental consent before contracting with 14- and 15-year-olds.

Last week, after HB3 had been in effect for months and Florida started enforcing it, the district court held that HB3 likely violates children's First Amendment rights and granted Plaintiffs—trade associations that represent tech companies—a universal

1

preliminary injunction. DE94 at 57-58. In so doing, the district court halted a pending state enforcement action.

The injunction should be stayed pending appeal because Florida has a strong likelihood of overturning it, and if left in place, it will irreparably harm Florida and its citizens. Florida is likely to prevail because Plaintiffs lack prudential standing to assert the rights of children, *Younger* bars their claims, and HB3 survives First Amendment scrutiny. The district court held that intermediate scrutiny applies and assumed that Florida has a significant interest in protecting children's mental health, yet at tailoring, it conjured strict scrutiny. Relying on cases that applied strict scrutiny, it quibbled with the Legislature's policy judgments and dinged HB3 because less-restrictive alternatives may exist. *See, e.g.*, DE94 at 51 (rather than HB3, "the appropriate response" to addictive design features "is a public education campaign" about "the risks of social media"). But under intermediate scrutiny, the question is whether HB3 "serve[s]" Florida's "interest" in protecting children "in a direct and effective way." *TikTok v. Garland*, 145 S. Ct. 57, 70 (2025).

It does. HB3 enumerates specific features found by the Florida Legislature (and the U.S. Surgeon General) to be addictive, and it applies only if platforms choose to use the features. Fla. Stat. § 501.1736(1)(e)4. Among those platforms, HB3 targets only platforms that present a heightened risk of addicting children—platforms on which at least 10% of daily users under age 16 are logged on for more than 2 hours per day. *Id.*

§ 501.1736(1)(e)2. Even then, HB3 does not prohibit children from accessing the platform. Instead, it bars the platform from contracting with them for accounts so that the platform cannot easily target them with addictive features. *Id.* § 501.1736(1)(a), (2)(a), (3)(a).

The district court should not have "displace[d] the [Legislature's] judgment" with its "own" and enjoined that "content-neutral regulation[]." *TikTok*, 145 S. Ct. at 71.

## BACKGROUND

### A.    Children and Social Media

To maximize profits, social-media companies use design features that cause "excessive use and behavioral dysregulation"—including "[p]ush notifications, autoplay, infinite scroll, [and] quantifying and displaying popularity (i.e., 'likes')." DE51-9 at 9. Those features "overstimulate the reward center in the brain" and "trigger pathways comparable to addiction," causing "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." *Id.*; *accord* DE51-2 ¶¶ 29-45.

Although the features can addict anyone, children "are particularly at risk, as their developing brains are more susceptible to the reward-driven mechanisms underlying the[] features." DE51-2 ¶ 46; *see also* DE63-3 at 127:14-22; DE51-9 at 5. Children have an undeveloped "prefrontal cortex," which "is responsible for, among other things, planning, decisionmaking, and problem solving." *NRA v. Bondi*, 133 F.4th 1108, 1151

3

(11th Cir. 2025) (en banc) (Rosenbaum, J., concurring). As a result, children struggle with "impulse control," "delayed gratification," and "moderating the influence of societal pressures, such as those on social media." *Id.* That makes them particularly vulnerable to platforms' addictive features. Adolescents average 5 hours per day on social media with nearly half reporting "almost constant[]" online use. DE51-1 ¶¶ 9, 13; DE51-2 ¶ 18. More than a third feel "addicted" to social media and almost 75% report feeling "manipulate[d]" to spend more time on it than they intend. DE51-9 at 9-10.

That manipulation has severe consequences. "[C]ompulsive or uncontrollable" social-media use can cause "sleep problems, attention problems, and feelings of exclusion," all of which put children at risk of "depression, anxiety, and neuroticism." DE51-9 at 10; DE51-1 ¶ 20; DE51-2 ¶ 16. As child social-media use proliferated over the last 15 years, adolescent depression rates more than doubled, and associated behaviors like self-harm and suicide "skyrocketed." DE51-1 ¶¶ 15-18, 23; *see also* DE63-1 at 201:19-21.

Studies reveal that the correlation is no coincidence: Compulsive social-media use is a causal factor. DE51-1 ¶¶ 34, 47. There is "a causal path from social media use to depression and low well-being." DE51-1 ¶ 59. Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression. DE51-1 ¶¶ 39, 47; DE51-9 at 6.

Even so, platforms have resisted efforts to research or mitigate their products' effects. Research on the danger that platforms' practices pose to children has proven difficult because the platforms do not allow "access to data" and insist on a "lack of transparency." DE51-9 at 11. Or as one former product manager at a social-media company put it, "executives hide research about the social network's risks to keep its business humming."[1] Meta, which operates Facebook and Instagram, is a prime example. A whistleblower revealed internal research showing that many of Instagram's youngest users "felt addicted to the app," "lacked the wherewithal to limit their use of it," and reported "that the app contributed to their depression and anxiety."[2] Rather than roll back the features it knew were addictive, Meta pressed on and even sought to expand its products to younger children. It explored "whether there might be a way to engage children during play dates."[3]

Because addiction to social media has fueled the Nation's "youth mental health crisis," DE51-9 at 13; DE51-1 ¶ 26, the U.S. Surgeon General called on policymakers to develop "health and safety standards" for platforms and adopt policies that "limit access . . . to social media for all children." DE51-9 at 15. The Surgeon General

---

[1] Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (October 5, 2021), https://tinyurl.com/yc4zex93.

[2] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[3] *Id.*

specifically recommended policies that "strengthen[] and enforce[e] age minimums" and that "limit[] the use of features that attempt to maximize time, attention, and engagement." *Id.*

Policy intervention is necessary because platforms' own interventions have proven inadequate. Platforms have long had parental controls, but they have made no dent in child addiction. *See* DE63-3 at 183:16-23. That is both because parents do not use them and because they are ineffective. Few parents use SnapChat's controls, for example. *See* Evan Spiegel, Snap CEO, Resp. to Sen. Judiciary Comm. Questions, at 1-2 (Feb. 28, 2024), https://tinyurl.com/55amwdfc. And parental controls are difficult to manage, DE51-3 ¶¶ 51-61; they do not address the features that make platforms addictive, DE51-2 ¶¶ 48-50; and platforms do not implement them with fidelity. *See* FTC, *A Look Behind the Screens*, 2024 WL 4272104, at *9 (Sep. 1, 2024) (Facebook has "misled parents about their ability to control" their child's accounts).

### B.    HB3

HB3 went into effect on January 1, 2025. It regulates addictive features by prohibiting platforms that use them from contracting with children. If a platform decides to use the features, HB3 limits its ability to "enter[] into a contract" with a child "to become an account holder." Fla. Stat. § 501.1736(2)(a), (3)(a).

Codified at Florida Statutes § 501.1736, HB3 defines the "social media platform[s]" subject to its provisions as those that: (1) allow "users to upload content

or view the content or activity of other users"; (2) employ "algorithms that analyze user data or information on users to select content for users"; (3) use an "addictive feature[]," defined as "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]uto-play," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content"; and (4) have at least 10% of their "daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the platform. *Id.* § 501.1736(1)(e).

If a platform satisfies all those criteria, Section 501.1736(2) prohibits it from "entering into a contract with" a child under 14 "to become an account holder." And Section 501.1736(3) requires the platform to obtain parental consent before "entering into a contract" with "a minor who is 14 or 15" "to become an account holder."

### C.    Procedural History

Plaintiffs brought this pre-enforcement challenge and moved for a preliminary injunction in October 2024. DE1; DE4; DE5. In March 2025, the district court denied the motion and dismissed Plaintiffs' complaint because they failed to establish Article III standing. DE72 at 13; DE73. Plaintiffs then filed a new complaint and a "renewed" motion for preliminary injunction. DE74; DE75.

A few weeks later, while Plaintiffs' "renewed" motion was still pending, Florida filed a state enforcement action against Plaintiffs' member Snap, in part for violating

7

HB3. Compl. at 32-34, *OAG v. Snap*, 2025-CA-0258 (Fla. Cir. Ct. Apr. 21, 2025). Separately, Florida subpoenaed Roblox, which is not a member of Plaintiffs. *Attorney General Subpoenas Roblox for Child Protection Policies and Procedures*, Office of the Attorney General (Apr. 16, 2025), https://perma.cc/5XW6-W376.

On June 3, 2025, the district court granted Plaintiffs' "renewed" preliminary-injunction motion, DE94 at 1, and denied a stay pending appeal. DE94 at 56-57. The court universally enjoined HB3—sweeping relief that not even Plaintiffs requested.

## ARGUMENT

The preliminary injunction must be stayed pending appeal because Florida has "a strong likelihood" of success. *Haitian Refugee Ctr. v. Baker*, 950 F.2d 685, 687 (11th Cir. 1991). The equities likewise support Florida.

### I. FLORIDA IS LIKELY TO SUCCEED IN OVERTURNING THE PRELIMINARY INJUNCTION.

#### A. Plaintiffs lack prudential standing to assert the First Amendment rights of children.

The district court enjoined HB3 solely because, in its view, the law violates the First Amendment rights of children. *See* DE94 at 28 n.12 (disclaiming reliance on platforms' First Amendment rights); DE94 at 55 (same for adults' rights). But to assert the rights of children, Plaintiffs had to overcome the prudential "prohibition o[n] asserting third-party rights"—which they failed to do. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1264 (11th Cir. 2023).

Because Plaintiffs bring a First Amendment challenge, they could have overcome the prohibition by invoking "overbreadth" standing or "jus tertii standing" (that is, third-party standing). *Id.* at 1265. But Plaintiffs established neither prudential-standing "exception[.]" *Id.* For starters, *Mata Chorwadi* forecloses overbreadth standing. There, "hotel owners" asserted the rights of their "guests," but this Court held that the owners could not "rely on" overbreadth standing because the challenged law did not "apply to guests." *Id.* "[O]n its face," the law "impose[d] penalties only on the owners." *Id.*; *see also L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40-41 (1999) (plaintiff could not use overbreadth to assert the rights of "potential customers" who faced "[n]o threat of prosecution"). Same here. HB3 does not regulate children—it imposes penalties only on platforms. Fla. Stat. § 501.1736(5)-(6).

Nor did Plaintiffs establish that they have third-party standing to assert the rights of children. Third-party standing requires a plaintiff to show that it "has a 'close' relationship with" the third parties and that "there is a 'hindrance' to" them "protect[ing] [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Yet Plaintiffs offered no evidence suggesting that there is a "hindrance" to children "protect[ing] [their] own" First Amendment "interests." *Id.* Indeed, Plaintiffs did not even contest that children face no hindrance. *See* DE88 at 26 n.8. On top of that, Plaintiffs made no showing that they or their members have a "close relationship" with children. *Kowalski*, 543 U.S. at 130. They did not establish that tech conglomerates and

children whom they are trying to addict to their products have "aligned" interests. *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994) (en banc).

The district court did not disagree. Rather, it excused Plaintiffs' failure to establish either "exception[]," *Mata Chorwadi*, 66 F.4th at 1265, concluding that different rules apply in First Amendment cases. According to the district court, "[w]hen a plaintiff has standing and a cause of action to assert its own First Amendment rights, it can also raise the rights of third parties[.]" DE94 at 24; DE94 at 25 n.10 (stating that prudential standing "rules" are "relaxed in the First Amendment context"). That is wrong. In First Amendment cases, prudential standing is "relaxed" in that plaintiffs have an additional tool—overbreadth standing—for overcoming the prohibition on asserting a third party's rights. *See Granite State Outdoor Advert. v. Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003). But if overbreadth standing is unavailable, plaintiffs must satisfy the requirements of third-party standing. *See Mata Chorwadi*, 66 F.4th at 1265; *Harris*, 20 F.3d at 1121.

Eschewing that precedent, the district court determined that Plaintiffs can assert children's rights simply because a "causal connection" exists between "enforcement of" HB3 against platforms and "any violation" of children's rights. DE94 at 24-25. The court, in other words, truncated the Supreme Court's test for third-party standing. Under the Supreme Court's test, a "causal connection" between enforcement against the plaintiff and violations of third-party rights is necessary (but not necessarily

sufficient) to establish a close relationship with the third party. *See Mata Chorwadi*, 66 F.4th at 1266; *Kowalski*, 543 U.S. at 130. Yet even if the plaintiff establishes a close relationship, it must satisfy the hindrance requirement. *Kowalski*, 543 U.S. at 130; *Harris*, 20 F.3d at 1122. The district court's "relaxed" test eliminates the hindrance requirement and waters down the close-relationship requirement in First Amendment cases. DE94 at 25 n.10 (declining to follow *Kowalski* because it was not "a First Amendment case").

Even assuming that district courts can ignore *Kowalski* in First Amendment cases, they cannot ignore this Court's en banc decision in *Harris*, which required First Amendment plaintiffs who lacked overbreadth standing to satisfy the hindrance requirement. That requirement, *Harris* explained, is often "the central consideration" in third-party-standing cases. 20 F.3d at 1124. And because the third parties there could "assert their own First Amendment rights if they wish[ed] to do so," this Court denied the plaintiffs prudential standing. *Id.* That analysis controls.

The district court attempted to justify its truncated third-party-standing test using overbreadth cases. Citing *Virginia v. American Booksellers*, 484 U.S. 383 (1988), the court said that a "causal connection" is enough for prudential standing because the prohibition on asserting third-party rights is "relaxed" in First Amendment cases. DE94 at 24-25 & n.10. That misunderstands First Amendment doctrine. Prudential standing is "relaxed" in First Amendment cases because plaintiffs can invoke overbreadth standing. But when overbreadth standing does not apply, courts have no license to

dilute third-party standing. *Mata Chorwadi*, 66 F.4th at 1265. That is why in *Harris* this Court required First Amendment plaintiffs to satisfy the third-party-standing test where overbreadth standing was unavailable. 20 F.3d at 1122 n.5.

### B.    *Younger* bars Plaintiffs' First Amendment challenge.

Florida is also likely to prevail in this appeal because *Younger v. Harris*, 401 U.S. 37 (1971) bars Plaintiffs' action. *Younger* requires abstention because an injunction prohibiting enforcement of HB3 will have "the effect of restraining" Florida's ongoing "prosecution" of Snap in state court.[4] *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003).

The district court did not abstain under *Younger* because it concluded that "proceedings of substance on the merits [took] place" in federal court before the Snap action began in April 2025. DE94 at 8-9. But that is true only if the district court "meaningfully engaged the merits of [Plaintiffs'] claims" before Florida sued Snap. *New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237, 1244 (11th Cir. 2024). It did not. Before then, the court had issued no rulings related to the merits—it ruled only on Article III standing. DE72 at 1; DE73 at 1. The parties had conducted no merits discovery. *See* DE49 at 1-2 (forbidding merits discovery while Plaintiffs' preliminary-injunction

---

[4] Snap recently removed the action to federal court, and the case was transferred to Chief Judge Walker, who is also presiding over this case. But the removal is baseless, and Florida has already moved for remand. *See* Mot. to Remand, *OAG v. Snap*, No. 25-cv-676-MW-HTC (N.D. Fla. May 30, 2025), ECF No. 14.

motion was pending). The court had held no evidentiary hearings. And the case was still at the pleadings stage, as the court had stayed Florida's deadline for answering Plaintiffs' amended complaint. DE80.

The district court held that substantial merits proceedings nevertheless occurred because it "was prepared to" address the "merits" during the first round of preliminary-injunction litigation. DE94 at 10-11. The parties, the court explained, had conducted discovery "relevant to the merits" and "discuss[ed] the merits." *Id.* But merely being prepared to opine on the merits is not a proceeding of substance on the merits. That is doubly true in preliminary-injunction litigation, the "purpose" of which is to "balance the equities as the litigation moves forward," not make "decisions on the underlying merits." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025).

Nor is it enough that the parties conducted some discovery and discussed the merits. For one, the parties did not even engage in merits discovery. The district court's suggestion otherwise runs headlong into its own order directing the parties to conduct only "limited" preliminary-injunction discovery and *prohibiting* merits discovery. *See* DE49 at 1-2. For another, the merits are always preliminarily "discussed" during preliminary-injunction litigation, yet courts consistently apply *Younger* when—as here—preliminary relief is denied. *See, e.g., Hicks v. Miranda*, 422 U.S. 332, 348 (1975) (no proceedings of substance where the plaintiffs requested a TRO, the parties submitted a dozen affidavits and other evidence, and the TRO was denied); *id.* at 353 n.1 (Stewart,

13

J., dissenting) (summarizing the procedural history); *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1126 (D.C. Cir. 2004) (no proceedings of substance where the district court "deni[ed]" a "motion for a preliminary injunction" based on *Younger* and lack of "injury").

Finally, *Tokyo Gwinnett v. Gwinnett Cnty.*, 940 F.3d 1254 (11th Cir. 2019), and *For Your Eyes Alone v. City of Columbus*, 281 F.3d 1209 (11th Cir. 2002), which declined to apply *Younger*, do not support the district court's ruling. *See* DE94 at 11-12. The district court concluded that the "history of this case" is similar to those cases even though both cases had proceeded past the pleadings stage before the state enforcement action began. "[N]either opinion," the district court reasoned, "emphasized" that fact. DE94 at 12. That is incorrect. Both did. *Tokyo Gwinnett*, 940 F.3d at 1272 (calling the defendant's answer a "significant event[]" that counseled against abstention); *For Your Eyes Alone*, 281 F.3d at 1218 (emphasizing that "the City had filed its answer" and moved "for summary judgment" "by the time the City commenced the prosecution").

If anything, *Tokyo Gwinnett* and *For Your Eyes Alone* show that the district court should have abstained. Unlike those cases, this case never got off the starting blocks. It was stalled at the pleadings stage, and the district court only "meaningfully engaged" Article III standing, not "the merits." *New Ga. Project*, 106 F.4th at 1244.

### C.    HB3 does not violate the First Amendment.

Standing and *Younger* aside, the district court will likely be reversed on the merits. The court erred in applying heightened scrutiny because HB3 regulates commercial activity and is not aimed at suppressing speech. But even if heightened scrutiny applied, HB3 plainly survives. While the district court acknowledged that HB3 is subject to at most intermediate scrutiny because it is content-neutral, the court applied something more akin to strict scrutiny. It ignored that under intermediate scrutiny, courts owe considerable deference to the Legislature's reasoned policy judgments. *TikTok*, 145 S. Ct. at 71.

**1.** HB3 does not trigger heightened scrutiny. Heightened scrutiny applies to a law that either "directly regulates protected expressive activity" or regulates non-expressive activity but "impose[s] a disproportionate burden upon" "First Amendment activities." *Id.* at 65-66. Here, there is no disputing that HB3 does not *directly* regulate expression; it simply prohibits platforms that use addictive features from contracting with certain children. Contracting—especially with children—is commercial activity that has been regulated since the Founding. *See NRA*, 133 F.4th at 1118. Thus, as in *TikTok*, Plaintiffs' challenge "more closely approximate[s] a claim that [HB3's] prohibitions" "impose[] a disproportionate burden upon" expression. 145 S. Ct. at 66. And for the same reasons that the Supreme Court in *TikTok* expressed skepticism that the law disproportionality

15

burdened expression (and declined to endorse the D.C. Circuit's conclusion that it did), HB3 does not disproportionately burden expression.[5]

First, HB3 does not "focus" on suppressing any expression. *Id.* In *TikTok*, TikTok and some of its users challenged a federal statute that required TikTok to either divest U.S. operations from Chinese control or effectively cease operating. *See id.* at 62. That law, the Court determined, "focus[ed]" on TikTok's corporate control by "a foreign government," not expression. *Id.* at 66. HB3 too focuses on non-expressive activity: platforms' use of addictive features. The district court itself recognized that HB3 does not target expression by regulating "features that are designed and operate to undermine a person's ability to exercise their will in determining the amount of time that they choose to spend engaging with an activity." DE94 at 41; *see* DE86 at 44-45 (listing cases holding similarly).

Second, there are "causal steps between [HB3] and the alleged burden on protected speech." *TikTok*, 145 S. Ct. at 66. The alleged burden in *TikTok* and here is

---

[5] The district court surmised that HB3 regulates semi-expressive conduct because the contracts HB3 regulates are "inextricable" from "accessing a forum for speech" such that the contracts have a "speech element." DE94 at 31-32. That argument, which not even Plaintiffs advanced, fails. The Supreme Court has said that conduct has an "expressive element" only when the conduct *itself* expresses an idea—such as burning a draft card to protest the draft or sleeping in a park to protest the plight of the homeless. *See United States v. O'Brien*, 391 U.S. 367, 376-77 (1968); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984). Nobody contends that the contracts platforms enter with children are *themselves* expressive.

16

that users will not be able to access covered platforms. But in both cases, any limit on access results from the platforms' decisions, not the law. The law in *TikTok* barred access only if TikTok chose not to divest from Chinese control. Similarly, a child will be prevented from accessing a platform covered by HB3 only if the platform chooses to use addictive features and condition access on users' contracting for an account.

The district court had no answer to this. It simply claimed in a footnote that *TikTok* is distinguishable because it was "commercially infeasible" for TikTok to divest. DE94 at 31 n.17. But that only means that the alleged burden on speech in this case is even more attenuated from HB3 than in *TikTok*. In *TikTok*, all agreed that "the Act effectively ban[ned] TikTok" because it was practically impossible for TikTok to divest by the statutory deadline. 145 S. Ct. at 66. Plaintiffs, however, provided no evidence that it is practically impossible for covered platforms to operate without addictive features. So here, any burden on children's access to platforms is even more attributable to platforms' independent business decisions than it was in *TikTok*.

**2.** Even if heightened scrutiny applies, HB3 survives. As the district court rightly concluded, HB3 is content-neutral and thus subject at most to intermediate scrutiny. DE94 at 35-39. But though the court purported to apply intermediate scrutiny, it required strict-scrutiny-style tailoring.

A law survives intermediate scrutiny if it is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for

17

communication." *Clark*, 468 U.S. at 293. That test is more deferential than strict scrutiny. It allows legislatures to draw "deductions and inferences" from "[in]complete empirical support" to make "predictive judgments," which courts "must accord substantial deference." *TikTok*, 145 S. Ct. at 69. And it does not require the law to be "the least speech-restrictive means of advancing the Government's interests." *Id.* at 70. Rather, the law survives if the Legislature "could reasonably have determined that its interests overall would be served less effectively without the [regulation] than with it." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989).

The district court was right that protecting children from addiction and its associated mental-health harms is likely a significant governmental interest, *see* DE94 at 41, but its tailoring analysis bucked intermediate-scrutiny precedent. HB3 "clearly serve[s] [Florida's] interest in a direct and effective way." *TikTok*, 145 S. Ct. at 70. As in *TikTok*, "[r]ather than ban[ning]" platforms from providing children accounts "outright, [HB3] imposes a conditional" regulation. *Id.* at 71. Its restrictions apply only "until" a platform refrains from using addictive features to manipulate children into consuming its product more than they want to. *Id.*; *see also, e.g.*, *Wise Enters. v. Athens-Clarke Cnty.*, 217 F.3d 1360, 1365 (11th Cir. 2000) (upholding a law under intermediate scrutiny because it "d[id] not prohibit" an expressive activity, "but only restrict[ed] [it] in" places that chose to sell alcohol).

As explained above, HB3 enumerates the design features found by the Legislature and the U.S. Surgeon General to be addictive, *see* DE51-2 ¶¶ 29-45; DE51-9 at 9-11; and it applies only if a platform decides to use the features. Fla. Stat. § 501.1736(1)(e)4. Among those platforms, HB3 targets only platforms that present a higher risk of addicting children—platforms where at least 10% of daily active users under age 16 log on more than 2 hours per day. *Id.* § 501.1736(1)(e)2. Even then, HB3 does not prohibit children from accessing the platform. It instead prohibits the platform from giving them accounts so that the platform cannot easily target them with addictive features.[6] *Id.* § 501.1736(1)(a), (2)(a), (3)(a). That restriction is further tailored to a child's age: HB3 recognizes that "a 7-year-old is not a 1[4]-year-old" and allows older children (14- and 15-year-olds) to have an account with parental consent. *J.D.B. v. North Carolina*, 564 U.S. 261, 280 (2011).

But as far as the district court was concerned, none of that mattered. It ignored HB3's nuances and treated the law as a "categorical[]" access ban. DE94 at 45 n.27. The court relied heavily on *Packingham v. North Carolina*, where the Supreme Court held that a law categorically prohibiting sex offenders from "access[ing]" social media failed

---

[6] The district court's observation that platforms can still expose children without accounts to some of the addictive features is yet another example of the court departing from intermediate scrutiny. DE94 at 46 n.28. Even if some exposure might still occur, a law does not fail intermediate scrutiny just because it is "imperfect," *Clark*, 468 U.S. at 297, or "underinclusive." *TikTok*, 145 S. Ct. at 70.

intermediate scrutiny.[7] 582 U.S. 98, 101, 105 (2017). Yet *Packingham* is far afield. There, a State banned sex offenders from accessing all social media to protect children from predators. *Id.* at 101. HB3, by contrast, includes a reticulated definitional scheme, which zeroes its restrictions on the activities that cause compulsive use by children. It does not ban children from social media. HB3 allows access in a variety of ways that pose a lesser risk of addiction: Children can create accounts on platforms that forgo addictive features; platforms can choose to allow full access to children without accounts; and parents can allow their child to access social media through their own accounts. But the district court glossed over all that, ignoring that—like the law in *TikTok* and unlike the law in *Packingham*—HB3 imposes only "conditional" restrictions. *TikTok*, 145 S. Ct. at 71.

Compounding that error, the district court then did precisely what is forbidden in intermediate-scrutiny analysis: It "parade[d] a series of alternatives" and "displace[d] the [Legislature's] judgment [about] content-neutral regulations with [its] own." *Id.* The court relied on *Ashcroft v. ACLU*, 542 U.S. 656 (2004)—a strict-scrutiny case—and explained that HB3 is not narrowly tailored because Florida could have relied on "individuals to voluntarily restrict" child exposure to addictive design features. DE94 at 48-49. In other words, by the district court's lights, the Constitution requires Florida

---

[7] The court also relied on *Brown v. Ent. Merch. Ass'n*—a strict-scrutiny case. 564 U.S. 786, 799 (2011); DE94 at 42, 51 n.31.

to rely on companies that have designed their products to addict children and misled the public to offer parental controls that parents can effectively use. DE94 at 49-50. And if that fails, as it already has, *see supra* at 6, Florida should simply do "a public education campaign" about "the risks of social media." DE94 at 51-52.

Even setting aside that those alternatives are plainly less "effective" than HB3 at combatting child addiction, the question is whether the Legislature "could reasonably have determined that its interests overall would be served less effectively" by the alternatives. *Ward*, 491 U.S. at 801. The Legislature not only *could have* determined that—it expressly did. The Legislature considered parental controls and found that they would be less effective than HB3. *See* Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 6-7 (Mar. 28, 2024). The district court did not even purport to find that determination unreasonable—it just disagreed. Yet whether the court "agree[s] with the [Legislature's] conclusion that its chosen regulatory path is best or most appropriate" is irrelevant under intermediate scrutiny. *TikTok*, 145 S. Ct. at 71. The court's "displace[ment]" of the Legislature's "judgment" about the relative effectiveness of the regulatory options was inconsistent with its duty to afford the Legislature "latitude" "to design regulatory solutions to address content-neutral interests." *Id.*

## II.    THE EQUITIES SUPPORT A STAY.

A stay is necessary to avoid irreparable harm to Florida and its citizens. First, "any time a State is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Even more so here since the injunction upends ongoing state enforcement proceedings. Second, the injunction—which applies universally beyond Plaintiffs' members—puts millions of kids at risk by allowing platforms to ignore HB3 and continue practices that pose grave "dangers" to "adolescents' mental health." *Moody*, 603 U.S. at 733.

## CONCLUSION

This Court should stay the preliminary injunction.

Dated: June 9, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

*/s/ Kevin A. Golembiewski*
JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

22

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,181 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

**CERTIFICATE OF SERVICE**

I certify that on June 9, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

23