No. 25-11881

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————

COMPUTER & COMMUNICATIONS INDUSTRY
ASSOCIATION; NETCHOICE,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant*.

————————

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

————————

## APPELLEES' OPPOSITION TO MOTION TO STAY
## PRELIMINARY INJUNCTION PENDING APPEAL

————————

PAUL D. CLEMENT
ERIN E. MURPHY
  *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

June 20, 2025

No. 25-11881, *CCIA, et al. v. Attorney General, State of Florida*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, Appellees hereby certify that the Computer & Communications Industry Association (CCIA) has no parent corporation and that no publicly held corporation owns ten percent or more of its stock. Appellees certify that NetChoice has no parent corporation and that no publicly held corporation owns ten percent or more of its stock.

Appellees also certify that, pursuant to 11th Cir. R. 26.1-1(a)(3), there are no additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal that were omitted from the appellants' certificate.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................. 1

BACKGROUND .............................................................................. 2

ARGUMENT ................................................................................... 6

I.     Florida Is Unlikely To Succeed On The Merits Of Its Appeal ...................... 6

       A.     HB3 Violates the First Amendment ..................................... 6

       B.     Florida's Standing Argument Lacks Merit ........................... 14

       C.     The District Court Did Not Abuse Its Discretion by Declining
              to Abstain ......................................................................... 17

II.    The Equities Favor Maintaining The Injunction ......................................... 21

CONCLUSION ............................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*31 Foster Children v. Bush*,
 329 F.3d 1255 (11th Cir. 2003) ............................................................19

*Ashcroft v. ACLU*,
 542 U.S. 656 (2004) ..........................................................................7

*Brown v. Ent. Merchs. Ass'n*,
 564 U.S. 786 (2011) .............................................. 6, 13, 14, 15

*Carafano v. Metrosplash.com*,
 339 F.3d 1119 (9th Cir. 2003) ............................................................8

*Craig v. Boren*,
 429 U.S. 190 (1976) ..........................................................................15

*Elrod v. Burns*,
 427 U.S. 347 (1976) ..........................................................................21

*Erznoznik v. Jacksonville*,
 422 U.S. 205 (1975) ............................................................................6

*FEC v. Cruz*,
 596 U.S. 289 (2022) ..........................................................................14

*For Your Eyes Alone v. Columbus*,
 281 F.3d 1209 (11th Cir. 2002) .......................................... 18, 19

*Harris v. Evans*,
 20 F.3d 1118 (11th Cir. 1994) ............................................................16

*Hicks v. Miranda*,
 422 U.S. 332 (1975) ..........................................................................20

*HM Florida-ORL v. Governor*,
 137 F.4th 1207 (11th Cir. 2025) .................................................7, 14

*JMM v. D.C.*,
 378 F.3d 1117 (D.C. Cir. 2004) ............................................................19

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)..................................................................... 15, 16

*Mata Chorwadi v. Boynton Beach*,
    66 F.4th 1259 (11th Cir. 2023)................................................... 15, 16

*McCullen v. Coakley*,
    573 U.S. 464 (2014).........................................................................11

*Moody v. NetChoice*,
    603 U.S. 707 (2024)........................................................................6, 7

*NetChoice v. Fitch*,
    134 F.4th 799 (5th Cir. 2025)...........................................................14

*NetChoice v. Griffin*,
    2024 WL 1262476 (W.D. Ark. 2024) ...............................................18

*NetChoice v. Griffin*,
    2025 WL 978607 (W.D. Ark. 2025) ...................................................7

*NetChoice v. Reyes*,
    748 F.Supp.3d 1105 (D. Utah 2024) ............................................7, 10

*NetChoice v. Yost*,
    2025 WL 1137485 (S.D. Ohio 2025)............................................7, 18

*New Ga. Project v. Att'y Gen.*,
    106 F.4th 1237 (11th Cir. 2024) ................................................. 20, 21

*Otto v. Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ...........................................................8

*Packingham v. N.C.*,
    582 U.S. 98 (2017)..................................................6, 7, 8, 11, 12, 13

*Sorrell v. IMS Health*,
    564 U.S. 552 (2011).................................................................8, 9, 11

*State v. Packingham*,
    368 N.C. 380 (2015) .........................................................................8

*Steffel v. Thompson*,
    415 U.S. 452 (1974)...................................................................21

*TikTok v. Garland*,
    145 S.Ct. 57 (2025).....................................................................9

*Tokyo Gwinnett v. Gwinnett Cnty.*,
    940 F.3d 1254 (11th Cir. 2019) ............................................ 17, 19, 20

*U.S. v. O'Brien*,
    391 U.S. 367 (1968)...................................................................11

*U.S. v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000)...................................................................13

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988)............................................................. 14, 15

*Younger v. Harris*,
    401 U.S. 37 (1971)......................................................................5

**Statutes**

Fla. Stat. §501.1736(1)(e) ...........................................................3, 10

Fla. Stat. §501.1736(2)(a) .............................................................4

Fla. Stat. §501.1736(3)(a) .............................................................4

Fla. Stat. §501.1736(4)(a) .............................................................4

Fla. Stat. §501.1736(4)(b) .............................................................4

**Regulation and Rule**

Fla. Admin. Code r.2-43.002(3) .......................................................7

FRAP 8(a)(2)(C) .......................................................................22

**Other Authority**

Order, *NetChoice v. Fitch*,
    No. 1:24-cv-170 (S.D. Miss. June 18, 2025)..........................................7

# INTRODUCTION

Florida House Bill 3 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors.  Books, movies, rock music, and video games have all been accused of endangering minors in the past.  Today, there are similar debates about "social media."  While the government may certainly take part in those debates, the First Amendment does not take kindly to government efforts to resolve them.  The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs: with their parents.

Florida, like other states in recent years, has taken it upon itself to try to restrict minors' access to some of the most popular "social media" services.  It enacted HB3, which completely bars minors under 14 from creating accounts on certain "social media" websites and requires 14- and 15-year-olds to obtain parental consent to do so.  In a thorough 58-page opinion, the district court preliminarily enjoined Florida from enforcing HB3.  In doing so, it joined the judicial consensus across the country holding that such laws violate the First Amendment.

Florida offers no good reason to stay that decision.  Florida is unlikely to succeed on the merits of its appeal.  While it has a legitimate interest in protecting minors who use "social media" websites, restricting or eliminating their access entirely is not a narrowly tailored means of achieving that interest.  Decades of

Supreme Court precedent forecloses Florida's argument that Plaintiffs lack standing to assert the First Amendment rights of their members' users. And the district court did not abuse its discretion by declining to abstain from resolving this more-than-six-month-old lawsuit because Florida initiated a state-court proceeding against one of Plaintiffs' members a few weeks ago for the obvious purpose of trying to frustrate resolution of this case.

Florida's motion is all the more meritless because of the lopsided equities. Florida does not dispute that a stay will irreparably harm Plaintiffs' members. Nor could it—Florida has already attempted to enforce HB3 against one of them and threatened more lawsuits soon. Florida, on the other hand, has never proceeded as if its interests demand immediate enforcement. Indeed, it was content to stay enforcement while it insisted on taking extensive discovery against Plaintiffs' members and engaged in other stall tactics to delay resolution of their preliminary-injunction motion. This Court will consider the merits of Florida's appeal soon enough. There is no reason to grant the extraordinary relief of a stay in the meantime.

## BACKGROUND

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree "social media" websites are appropriate for minors. In a Nation that values the First Amendment, the preferred approach is to

let parents decide what is appropriate for their children.  Parents can decide whether to let their children use computers, tablets, and smartphones in the first place.  And those who do have many ways to control what they see and do.  Dist.Ct.Dkt.76 at 6-11 (discussing various device-, network-, browser-, and application-level tools).

Notwithstanding the wealth of tools available to help parents tailor and monitor Internet access, Florida has taken it upon itself to decide what is appropriate for minors on the Internet.  In March 2024, Florida enacted HB3, which dramatically restricts minors' access to certain "social media platforms."  HB3 defines "[s]ocial media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activit[ies] of other users."  Fla. Stat. §501.1736(1)(e).  But rather than regulate all online services that allow users to share and view content, HB3 limits the definition to services that minors enjoy using the most.  An online service qualifies as a "social media platform" only if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on it, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has "one or more addictive features."  *Id.*  HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play," and "[l]ive-streaming."  *Id*.

HB3 prohibits minors under 14 from creating accounts on "social media platforms" altogether. §501.1736(2)(a). And it prohibits 14- and 15-year-olds from creating an account "unless the minor's parent or guardian provides consent for the minor to become an account holder." §501.1736(3)(a). HB3 specifies that if its parental-consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating accounts altogether. §§501.1736(4)(a), (4)(b)(1).

In October 2024, Plaintiffs brought this challenge to HB3. They asked the district court to preliminarily enjoin Florida from enforcing HB3's account-creation ban and parental-consent requirement before those provisions were set to take effect in January 2025. Although courts across the country have enjoined similar laws without discovery, Florida insisted that it needed sweeping discovery just to respond to Plaintiffs' motion, and that it was willing to stay enforcement to obtain it. Dist.Ct.Dkt.34 at 2. The district court acquiesced and gave the state "great latitude to explore" a list of 110 proposed topics. Dist.Ct.Dkt.35 at 3; Dist.Ct.Dkt.34 at 4-45. The parties then engaged in several months of discovery in preparation for the preliminary-injunction briefing and hearing. *See* Dist.Ct.Dkts.51-4 to -7; Dist.Ct.Dkts.63-1 to -3; Dist.Ct.Dkts.47, 61 at 1-3.

Remarkably, Florida challenged Plaintiffs' standing, arguing that they had not demonstrated that any of their members were likely covered by HB3—even though

4

Florida officials had singled out some by name when enacting HB3. The district court agreed with Florida that Plaintiffs failed to show standing because they did not offer evidence on every single one of HB3's coverage criteria—while noting that result "may seem counterintuitive or even absurd." Dist.Ct.Dkt.72 at 2. Plaintiffs promptly filed an amended complaint and renewed preliminary-injunction motion curing the purported deficiency, providing revised declarations proving that Snapchat and others indeed satisfy each criteria. Dist.Ct.Dkts.74-76. Though Florida insisted that it needed yet another round of discovery, it refused to continue to stay enforcement—and then promptly used the same standing evidence it forced Plaintiffs to submit to sue Snap in state court mere hours before responding to the renewed preliminary-injunction motion. Dist.Ct.Dkt.86-1. The state then insisted that its late-breaking state-court lawsuit required the district court to abstain from resolving this months-old lawsuit under *Younger v. Harris*, 401 U.S. 37 (1971).

The court rejected that position and granted Plaintiffs' motion to enjoin Florida from enforcing HB3. Dkt.10-2 ("Op."). It declined to abstain given the "substantial proceedings on the merits" that had occurred "before the state-court proceedings began." Op.12. It held that Plaintiffs have standing to assert the First Amendment rights of their members' users. Op.23-25. And it held that the account-creation prohibition and parental-consent requirement likely violate the First Amendment. Op.25-53.

## ARGUMENT

## I.    Florida Is Unlikely To Succeed On The Merits Of Its Appeal.

### A.    HB3 Violates the First Amendment.

1. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'"  *Moody v. NetChoice*, 603 U.S. 707, 733 (2024).  And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen."  *Packingham v. N.C.*, 582 U.S. 98, 104 (2017).  Today, those places include the "vast democratic forums of the Internet," including "social media" websites.  *Id.* The Supreme Court has therefore held that the First Amendment limits the government's power to restrict access to those websites.  *Id.* at 106-08.

That rule applies with full force to efforts to restrict minors' access to such websites.  While "a State possesses legitimate power to protect children from harm," that "does not include a free-floating power to restrict the ideas to which children may be exposed."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011).  Courts thus routinely invalidate government efforts to protect minors from the purportedly harmful effects of new forms of media.  In *Brown*, for example, the Supreme Court held that a California law prohibiting the sale of violent video games to minors without parental consent violated the First Amendment.  *Id.* at 804-05; *see also, e.g.*, *Erznoznik v. Jacksonville*, 422 U.S. 205, 217-18 (1975).  Even when the government restricts access to speech that is *not* protected as to minors, courts have struck down

6

such laws if they impede the First Amendment rights of adults. *E.g., Ashcroft v. ACLU*, 542 U.S. 656, 665-67, 673 (2004); *HM Florida-ORL v. Governor*, 137 F.4th 1207, 1239 (11th Cir. 2025).

Applying that precedent, courts across the country have enjoined state efforts to restrict minors' access to "social media platforms"—including parental-consent requirements like those in HB3. *E.g.,* Order, *NetChoice v. Fitch*, No. 1:24-cv-170 (S.D. Miss. June 18, 2025); *NetChoice v. Griffin*, 2025 WL 978607 (W.D. Ark. 2025); *NetChoice v. Yost*, 2025 WL 1137485 (S.D. Ohio 2025); *NetChoice v. Reyes*, 748 F.Supp.3d 1105 (D. Utah 2024). The district court correctly did so here as well. By restricting (and in some cases, completely prohibiting) minors from creating accounts on "social media platforms," HB3 burdens access to a sweeping amount of First Amendment activity. *See Packingham*, 582 U.S. at 108. Moreover, HB3 does not just burden the rights of minors who wish to access that activity. By effectively requiring adults to verify their age before creating an account, *see* Fla. Admin. Code r.2-43.002(3), HB3 burdens the rights of adults too. *See Ashcroft*, 542 U.S. at 665. And it burdens the First Amendment rights of Plaintiffs' members, as it impedes their ability to disseminate speech to would-be users. *See Moody*, 603 U.S. at 735-38.

Florida does not dispute that adults and minors alike use websites like YouTube and Snapchat to engage in protected First Amendment activity. Nor does it dispute that HB3's principal effect is to restrict certain users from doing so. It

nevertheless tries to evade First Amendment scrutiny by insisting that HB3 regulates the "commercial activity" of "contracting" to create an account. Mot.15. That ignores that creating an account (a personalized profile containing information the user chooses to present) is itself speech. *See Carafano v. Metrosplash.com*, 339 F.3d 1119, 1124 (9th Cir. 2003). But that aside, this Court has repeatedly held that the First Amendment may not be evaded by isolating some purportedly "non-speech" component of protected activity. *E.g., Otto v. Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020). A law that precludes publishing books, for example, does not become any more tolerable if it accomplishes that end by banning entering a contract to "purchas[e] or us[e] ink." *Sorrell v. IMS Health*, 564 U.S. 552, 571 (2011). Just as with library cards, newspaper subscriptions, or any other "conduct" necessary to access speech, people create the accounts HB3 targets to gain access to websites "where they can speak and listen." *Packingham*, 582 U.S. at 104.

That is precisely why the Supreme Court held that when the government restricts access to "social media," it "prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108. It did so, moreover, while reversing a decision holding that a statute prohibiting sex offenders from "access[ing] certain carefully-defined Web sites" was "a regulation of conduct," not speech. *State v. Packingham*, 368 N.C. 380, 386 (2015). Florida tries to distinguish *Packingham* on the theory that North Carolina's law "banned" access to "social

media," whereas HB3 merely restricts account creation. Mot.20. But "burden[s]" on speech trigger First Amendment scrutiny just as much as "bans." *Sorrell*, 564 U.S. at 565-66. In any event, HB3 does more than just burden access to speech. While Florida notes that users can still engage in *some* activity on *some* websites without an account, Mot.20, it does not dispute that many forms of interaction on "social media" can happen *only with an account*. After all, people do not just use "social media" to browse content anonymously. They use it to engage in *social* interaction possible only with an account—e.g., commenting on a friend's Instagram post or sending videos to classmates on Snapchat.

*TikTok v. Garland*, 145 S.Ct. 57 (2025), does not help Florida. That case involved a statute that prohibited foreign-adversary ownership of TikTok. The Court did not hold that the First Amendment did not apply—it assumed that it did. *Id.* at 65-66. That aside, the "unique" law at issue there is nothing like HB3, as it regulated TikTok's "corporate control," not access to expressive activity. *Id.* True, the law may ultimately require TikTok to shutter if it cannot find a buyer. But that is an incidental effect of the prohibition on foreign-adversary ownership. Here, by contrast, HB3's speech restrictions are no incidental effect of conduct regulation. As Florida admits, the entire point of HB3 is to limit the time that minors spend on websites accessing *speech*. While Florida insists that HB3's restrictions apply only when a website "chooses to use addictive features," Mot.17, restricting access to

9

speech forums that use certain features to disseminate speech is still a restriction on speech.  Under Florida's logic, a state could restrict access to news websites like MiamiHerald.com that utilize so-called "addictive features" like seamless pagination, push notifications, and autoplay without even triggering First Amendment scrutiny.  For that matter, a state could ban the sale of books that end in cliffhangers or are part of a continuing series too.  Mot.16.  Florida does not even try to grapple with the implications of its position.

2. Because HB3 restricts large swaths of speech, heightened scrutiny applies.  Indeed, while the district court "tentatively conclude[d]" that intermediate scrutiny is appropriate, Op.38, strict scrutiny should ultimately apply because HB3 is content based.  It singles out websites that permit users to "upload content or view the content or activity of other users." §501.1736(1)(e)(1).  In other words, HB3 targets websites "based on the 'social' subject matter 'of the material [they] disseminate[].'"  *Reyes*, 748 F.Supp.3d at 1122-23.

HB3's speaker-based distinctions reinforce that conclusion.  Services like Disney+ and Hulu employ many of the same so-called "addictive features" to keep users engaged.  Email and messaging services do as well.  Yet HB3 does not apply to those services.  §501.1736(1)(e).  The only apparent difference is that the former do not permit users to "upload content or view the content or activity of other users"—*viz.*, they do not have the type of *social* content that websites regulated by

10

HB3 feature.  While Florida tries to justify the differential treatment on the theory that "social media" is "more addictive," Op.36, that just underscores that HB3 is content based twice over:  As Florida explained below, it thinks that "social media" is particularly "addictive" because "social media" delivers *content* that supposedly leads to addiction.  Dist.Ct.Dkt.51 at 2, 4-6, 29; Dist.Ct.Dkt.50 at 3.

3. Regardless of what form of heightened scrutiny applies, HB3 cannot satisfy it.  Strict scrutiny requires Florida to demonstrate that HB3 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  Intermediate scrutiny requires Florida to demonstrate that HB3 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06.  The state's interest, moreover, must be "unrelated to the suppression of free expression." *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968).

Start with Florida's professed interest in protecting minors from alleged "addiction" to "social media."  Mot.18.  While protecting minors is certainly a laudable goal, the state's specific interest here is not unrelated to the suppression of expression.  After all, HB3 does not seek to protect minors from addiction to non-speech products like "drugs and gambling."  Dist.Ct.Dkt.86 at 53.  Rather, it seeks to protect minors from alleged "addiction" to websites *where they access, engage in, and interact with speech*.  The state has no legitimate interest in restricting access to speech just because minors find it especially appealing. *See Sorrell*, 564 U.S. at 576.

11

Florida could not validly restrict access to Disney+ because it offers too many engaging cartoons.

At any rate, HB3 "burden[s] substantially more speech than is necessary" to further Florida's interest. *Packingham*, 582 U.S. at 106. HB3 does not single out any speech (let alone *unprotected* speech) that might pose special risks to minors. It instead restricts minors from accessing *all* speech on "social media" websites, regardless whether that speech has *any* capacity to lead to, e.g., "mental-health harms." HB3 thus hinders access not just to potentially harmful content, but to valuable sources for "exploring the vast realms of human thought and knowledge." *Id.* at 107.

Florida claims that HB3 targets "platforms that present a higher risk of addicting children"—i.e., websites that minors use most. Mot.19. But singling out websites that minors especially enjoy is a First Amendment vice, not a virtue. And while Florida notes that users can still view *some* content on *some* websites without an account, Mot.19-20, it does not dispute that much of the "social" aspect of "social media" can happen only with an account. Moreover, that argument underscores that HB3 is underinclusive too. Minors who access "social media" without an account (or with a parent's account) will still encounter so-called "addictive features" like infinite scroll, livestreaming, and autoplay. HB3 also leaves services with materially indistinguishable—indeed, sometimes identical—content and functionality

uncovered just because they are preferred by a smaller percentage of minors and/or typically used for fewer hours a day.  HB3 exempts services like Disney+ and Hulu even though they employ many of the same so-called "addictive features."  And Florida is "perfectly willing" to let minors access supposedly harmful services "so long as one parent … says it's OK," which "is not how one addresses a serious social problem."  *Brown*, 564 U.S. at 802.

On top of all that, there are less restrictive alternatives available.  *See Packingham*, 582 U.S. at 107.  Parents already have many tools to protect their minors on the Internet, including refusing to give them smartphones in the first place. If Florida thinks these tools are "less effective," Mot.21,[1] a campaign promoting them is less restrictive.  *See U.S. v. Playboy Ent. Grp.*, 529 U.S. 803, 823 (2000). Moreover, Florida nowhere explains why HB3's separate requirement that services terminate minors' accounts at their parents' behest (which Plaintiffs have not challenged under the First Amendment) is not enough—even though that issue featured prominently in the district court's analysis.  Op.49.  While Florida

---

[1] Florida misleadingly states that the "Legislature … found that [parental tools] would be less effective than HB3."  Mot.21.  The Legislature did no such thing. Florida cites a snippet of a staff report—not formal legislative findings codified in HB3.  And that staff report does not find parental controls "less effective."  While the report cites two studies suggesting that such controls "*may* … be counterproductive" because they harm trust between parent and child, it also notes that such controls "may also help protect children."  Dist.Ct.Dkt.51-11 at 6-7.

repeatedly accuses the district court of second-guessing its judgment, Mot.19-20, even under intermediate scrutiny "a prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *FEC v. Cruz*, 596 U.S. 289, 306 (2022). That Florida insists on layering access restrictions on top of that one underscores that its real concern is that some parents choose not to use available tools. But the First Amendment does not tolerate speech restrictions "in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804; *see also HM Florida*, 137 F.4th at 1245.

### B.    Florida's Standing Argument Lacks Merit.

Florida insists that Plaintiffs lack standing to assert the First Amendment rights of their members' users. Every court that has considered that argument has rejected it. *E.g., NetChoice v. Fitch*, 134 F.4th 799, 805-07 (5th Cir. 2025). Rightly so. Decades of precedent foreclose it.

*Virginia v. American Booksellers Association*, 484 U.S. 383 (1988), is on point. There, several organizations of booksellers and two bookstores brought a pre-enforcement First Amendment challenge to a Virginia statute that made it unlawful for booksellers to knowingly display explicit material to minors. *Id.* at 387-88 & n.3. Virginia argued that the plaintiffs lacked standing to bring their First Amendment challenge because they asserted only the "rights of bookbuyers." *Id.* at 392-93. The Supreme Court disagreed. While "the usual rule is that a party may

14

assert only a violation of its own rights," in "the First Amendment context 'litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* The Court therefore had no problem with the booksellers' associations or bookstores "alleg[ing] an infringement of the First Amendment rights of bookbuyers." *Id.* at 388 n.3, 393 & n.6.

*American Booksellers* hardly stands alone. The plaintiffs in *Brown* were organizations that represented the video game and software industries, not minors asserting a First Amendment right to purchase violent video games without their parents' consent. 564 U.S. at 789-90. Although the Court did not specifically address standing, it allowed the association plaintiffs to assert the First Amendment rights of minors, and repeatedly emphasized their rights in striking down California's law. *Id.* at 795 n.3, 805. Even outside the First Amendment context, moreover, the Court has repeatedly held that plaintiffs have "standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *see also Craig v. Boren*, 429 U.S. 190, 195 (1976); *Mata Chorwadi v. Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023).

Florida tries to distinguish *American Booksellers* as an "overbreadth standing" case, insisting that Plaintiffs cannot "rely on" "overbreadth standing" because HB3 "does not regulate children." Mot.9, 11-12. But whatever Florida means by "overbreadth standing," Virginia's law did not regulate children either; it imposed obligations on *booksellers*. The Court nevertheless held that the bookseller associations could assert the rights of bookbuyers.

Florida's cases are inapposite. *Mata Chorwadi* held that a hotel lacked standing to assert the First Amendment rights of its guests because enforcement of the statute against the hotel was unlikely to implicate the guests' First Amendment rights. 66 F.4th at 1265. Here, by contrast, enforcement of HB3 against Plaintiffs' members will unquestionably restrict the First Amendment rights of their users. Indeed, that is HB3's core purpose. *Kowalski* involved an attempt by plaintiffs to assert the equal protection and due process rights of third parties to challenge a statute that directly regulated those third parties. 543 U.S. at 127-28; *see also Harris v. Evans*, 20 F.3d 1118, 1120 (11th Cir. 1994) (en banc) (similar). In that context, it makes sense to ask whether anything hindered the third parties from asserting their own rights; after all, they are the ones directly regulated. But as *Kowalski* itself recognizes, the analysis is different when "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights" and where the "First Amendment" is involved. 543 U.S. at 130.

16

**C.    The District Court Did Not Abuse Its Discretion by Declining to Abstain.**

Florida's abstention argument is both remarkable and meritless. *Younger* abstention is generally appropriate only when the state-court lawsuit is filed first, *Tokyo Gwinnett v. Gwinnett Cnty.*, 940 F.3d 1254, 1266-67 (11th Cir. 2019), which is not the case here. The narrow exception Florida invokes is limited to instances when the first-in-time federal action has not "moved beyond the 'embryonic stage.'" *Id.* at 1271. To assess whether a first-in-time federal action is in its "embryonic stage," "courts look to 'the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences [or hearings] held, and any change in the parties' position as a result of the federal litigation,'" as well as "the filing of motions, even if the district court did not rule on the motions." *Id.* at 1267, 1272. A district court's assessment of whether those factors warrant abstention is left to its sound discretion. *Id.* at 1266.

The district court acted well within that discretion in rejecting *Younger* abstention here. Plaintiffs filed this lawsuit more than seven months ago. The parties briefed, and the court resolved, two motions, both involving significant discussion of Plaintiffs' claims. Dist.Ct.Dkts.4-5, 51, 63; Dist.Ct.Dkts.50, 62, 66. Plaintiffs then filed an amended complaint, Dist.Ct.Dkt.74, and the parties completed briefing on a third motion, which again involved substantial argument on the merits of Plaintiffs' First Amendment claim. Dist.Ct.Dkts.75-76, 87. And that is to say

17

nothing of the substantial discovery in which the parties have engaged on the merits of Plaintiffs' First Amendment claim—at the *state's* insistence, no less.[2]  The court imposed no limits on the topics Florida could explore, Dist.Ct.Dkt.35 at 3, and Florida took full advantage in deposing each of Plaintiffs' declarants for hours, Dist.Ct.Dkts.51-4 to -7.  Plaintiffs deposed three experts the state produced. Dist.Ct.Dkts.63-1 to -3.  And the parties exchanged initial disclosures, a first round of interrogatories, requests for admission, and requests for production and responses to the same.  Dist.Ct.Dkts.47, 61 at 1-2.  On top of all that, the court held multiple conferences and a lengthy hearing on Plaintiffs' claims, which included consideration of both the law and the evidence.  Dist.Ct.Dkt.70.

In short, the parties have done far more than just "beg[i]n actively litigating [their] position[s] in federal court."  *For Your Eyes Alone v. Columbus*, 281 F.3d 1209, 1218 (11th Cir. 2002).  This action thus fits comfortably within the long line of cases that have rejected requests to abstain from resolving a first-in-time federal

---

[2] Florida does not dispute that much of that discovery involved the merits.  It nevertheless suggests that none of it is relevant to the abstention analysis because it was conducted at the preliminary-injunction stage.  But Florida never explains why that matters, particularly where the significant discovery that the parties conducted at the preliminary-injunction stage far exceeds the merits-stage discovery that other courts needed to *permanently* enjoin similar laws.  *See NetChoice v. Griffin*, 2024 WL 1262476, at *4 (W.D. Ark. 2024) (ordering "minimal discovery" into just eight topics); *Yost*, 2025 WL 1137485, at *5, *24 (permanently enjoining Ohio law after no discovery).

suit. *See Tokyo*, 940 F.3d at 1272 (no abstention when plaintiff had filed a complaint and an amended complaint, and parties had briefed a motion to dismiss and filed initial disclosures); *For Your Eyes*, 281 F.3d at 1213-14, 1220 (no abstention when parties were in the midst of briefing two motions on the merits and court had resolved a motion for a temporary restraining order after an evidentiary hearing).

Florida insists that no "proceedings of substance on the merits" have occurred because this Court resolved the parties' first two motions on standing grounds. Mot.12. But that was also the case in *Tokyo*. The district court twice granted motions to dismiss on jurisdictional grounds, first finding the matter moot, and then finding that the plaintiff lacked standing to assert certain claims. Yet this Court held that the district court abused its discretion by abstaining. 940 F.3d at 1259-61, 1272. As the Court explained, the evidence the parties presented in connection with a request for a temporary restraining order, the briefing on a motion to dismiss, and the filing of initial disclosures all demonstrated that the first-in-time federal action had proceeded far beyond the nascent stage that might justify deferring to a second-in-time state action. *Id.* at 1272. This case follows *a fortiori*.

Florida's cases do not aid its cause. Some do not even involve a first-in-time federal suit. *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1275 (11th Cir. 2003); *JMM v. D.C.*, 378 F.3d 1117, 1126 (D.C. Cir. 2004). And the rest involve federal suits that had barely progressed beyond their filing. *See Hicks v. Miranda*, 422 U.S.

332, 348-49 (1975) (finding abstention warranted when state action was filed one day after federal complaint was served); *New Ga. Project v. Att'y Gen.*, 106 F.4th 1237, 1240, 1244 (11th Cir. 2024) (finding abstention proper where state campaign-finance commission had recommended the attorney general initiate a prosecution four weeks before the federal lawsuit was filed, and no briefing had been completed on any motion in federal court).  Here, by contrast, the only thing nascent is the state's late-breaking enforcement action.  Put simply, there is no reason to abandon the federal courts' "virtually unflagging obligation to exercise … jurisdiction." *Tokyo*, 940 F.3d at 1266-67.

That is particularly true given that the state-court proceeding appears to have been initiated in a bad-faith effort to frustrate Plaintiffs' ability to litigate their federal claims in federal court.  *Younger* abstention is inappropriate when "the state was strategically seeking to evade federal-court jurisdiction."  *New Ga.*, 106 F.4th at 1245-46.  While the district court declined to base its decision "on a finding of bad faith," Op.12 n.5, Florida's behavior smacks of gamesmanship.  After persuading the court to deny Plaintiffs' initial preliminary-injunction motion on the theory that it was unclear whether HB3 covered any of Plaintiffs' members, Florida turned around and used the more detailed declaration it forced Plaintiffs to file in support of their renewed motion to support a state-court enforcement action against Snap under HB3. Dist.Ct.Dkt.86-1 ¶¶47, 139-41.  And Florida filed that action mere hours before

20

responding to Plaintiffs' renewed motion, for the evident purpose of enabling it to make a late-breaking abstention request. Because that cannot be understood as anything other than a "strategic[] [attempt] to evade federal-court jurisdiction," *New Ga.*, 106 F.4th at 1246, to reward Florida's tactics with abstention would "turn federalism on its head," *Steffel v. Thompson*, 415 U.S. 452, 472 (1974).

## II.    The Equities Favor Maintaining The Injunction.

The other stay factors favor keeping the injunction in place. Florida does not dispute that a stay will irreparably injure Plaintiffs' members. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the harm here is not just to members, but to millions of adults and minors who could be cut off from vital channels of communication. If the injunction is stayed, moreover, members will face a choice between exposing themselves to massive liability for disseminating speech or taking costly and burdensome steps that will drastically curtail access to their services. The threat of enforcement is not just hypothetical. Florida has already sued Snap and threatened Meta.

Maintaining the status quo will cause little (if any) harm to Florida. The state has not proceeded as if its interests demand immediate enforcement. The legislature delayed HB3's effective date by more than nine months. And Florida was content to stay enforcement while it spent months taking needless discovery on Plaintiffs'

preliminary-injunction motion.  Even after the court enjoined the law, moreover, Florida waited nearly a week to file this motion (though it still did not bother to confer with Plaintiffs first, *see* FRAP 8(a)(2)(C)), which it did not file on an expedited basis.  None of that bespeaks the kind of urgency that could justify the extraordinary measure of a stay pending appeal.

## CONCLUSION

This Court should deny the motion.

Respectfully submitted,

June 20, 2025

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

1.  This opposition complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because this brief contains 5,191 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This opposition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.

June 20, 2025

<u>s/Erin E. Murphy</u>
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy