# In the United States Court of Appeals for the Eleventh Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ET AL.,

*Plaintiffs-Appellees,*

V.

JAMES UTHMEIER, IN HIS OFFICIAL CAPACITY AS FLORIDA ATTORNEY GENERAL,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

## APPELLANT'S INITIAL BRIEF

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

August 13, 2025

*Counsel for Appellant*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Appellant certifies that, to the best of his knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1.  Allen, Tony

2.  Alter, Adam

3.  Bell, Daniel

4.  Boyle, David

5.  Cleland, Bartlett

6.  Clement, Paul D.

7.  Computer & Communications Industry Association

8.  Costello, David M.

9.  DeMott, Joseph J.

10. DeSousa, Jeffrey Paul

11. Fitzpatrick, Hon. Martin A.

12. Golembiewski, Kevin A.

13. Guard, John M.

14. Kilby, Douglas L.

15. Lamia, Christine

16.   Mead, Grace Lee

17.   Monson, Darrick W.

18.   Moody, Ashley

19.   Murphy, Erin

20.   Murphy, Hannah E.

21.   NetChoice, LLC

22.   Pallaki, Mitchell K.

23.   Patel, Anita

24.   Schenck, Robert S.

25.   Schruers, Matthew

26.   Spears, Sara E.

27.   Twenge, Jean

28.   Uthmeier, James

29.   Veitch, Alexandra N.

30.   Waczewski, James

31.   Walker, Hon. Mark

32.   Whitaker, Henry C.

33.   Wynosky, Kevin J.

34.   Xi, James

Snap, Inc. (SNAP), Meta Platforms, Inc. (META), and Alphabet Inc. (GOOGL)

are publicly traded companies that have an interest in the outcome of this case or appeal.

## ORAL ARGUMENT STATEMENT

The district court entered a universal preliminary injunction barring enforcement of HB3, a Florida consumer-protection law that limits children's exposure to addictive design features on internet platforms. *See* Fla. Stat. § 501.1736. The district court permitted Plaintiffs NetChoice and Computer & Communications Industry Association (CCIA) to assert the rights of children and determined that the law likely violates children's First Amendment rights. The preliminary injunction thwarted a pending state enforcement action against a platform that was openly violating HB3.

The Attorney General of Florida believes that oral argument would assist the Court in deciding the consequential questions presented.

# TABLE OF CONTENTS

ORAL ARGUMENT STATEMENT ........................................................................ i

TABLE OF AUTHORITIES ............................................................................. iv

STATEMENT OF JURISDICTION ..................................................................... x

STATEMENT OF THE ISSUES ....................................................................... xi

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE CASE ............................................................................ 3

    A.    Children and Social Media ........................................................ 3

    B.    HB3 ........................................................................................ 8

    C.    Procedural History ................................................................ 10

STANDARD OF REVIEW ............................................................................... 14

SUMMARY OF THE ARGUMENT ................................................................... 15

ARGUMENT ................................................................................................. 18

I.    Plaintiffs' First Amendment challenge is not justiciable. ..................... 18

    A.    Plaintiffs do not have prudential standing to assert the First
        Amendment rights of children ................................................. 18

    B.    *Younger* bars Plaintiffs' First Amendment challenge. ................. 24

II.    HB3 does not violate children's First Amendment rights. ................... 27

    A.    HB3 regulates addictive design features, not children's
        speech. ................................................................................. 27

    B.    HB3 satisfies intermediate scrutiny. ....................................... 35

    C.    At minimum, HB3's protections for children younger than
        14 years old are not facially unconstitutional. ......................... 41

III.    Even if Plaintiffs are entitled to a preliminary injunction, the district
        court exceeded its equitable powers in universally enjoining HB3.....................45

CONCLUSION .............................................................................................................47

CERTIFICATE OF COMPLIANCE.............................................................................49

CERTIFICATE OF SERVICE.......................................................................................49

# TABLE OF AUTHORITIES

## Cases

*31 Foster Child. v. Bush*,
329 F.3d 1255 (11th Cir. 2003) ................................................. 24

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) .................................................................. 30

*Arcara v. Cloud Books*,
478 U.S. 697 (1986) ......................................................... 28, 31, 34

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .................................................................. 38

*Bellotti v. Baird*,
443 U.S. 622 (1979) .................................................................. 42

*Bethel Sch. Dist. No. 403 v. Fraser*,
478 U.S. 675 (1986) .................................................................. 44

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ......................................................... 33, 38, 43

*CAMP Legal Def. Fund v. City of Atlanta*,
451 F.3d 1257 (11th Cir. 2006) .................................................. 18

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) ............................................................. 35, 39

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .................................................................. 46

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ............................................................. 42, 43

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ................................................................... 2

*For Your Eyes Alone v. City of Columbus*,
281 F.3d 1209 (11th Cir. 2002) ...................................................... 26

*Free Speech Coal. v. Paxton*,
145 S. Ct. 2291 (2025) ............................ 3, 10, 17, 27, 33, 36, 37, 38, 39, 40, 41, 43, 45

*Gary v. Warner Robins*,
311 F.3d 1334 (11th Cir. 2002) ............................................... 31, 32

*Granite State Outdoor Advert. v. Clearwater*,
351 F.3d 1112 (11th Cir. 2003) ............................................... 20, 21

*Harris v. Evans*,
20 F.3d 1118 (11th Cir. 1994) .............................................. 20, 21, 22

*Hicks v. Miranda*,
422 U.S. 332 (1975) ............................................................... 25, 26

*Indigo Room v. Fort Myers*,
710 F.3d 1294 (11th Cir. 2013) ............................................... 31, 32

*J.D.B. v. North Carolina*,
564 U.S. 261 (2011) .......................................................................37

*JMM Corp. v. District of Columbia*,
378 F.3d 1117 (D.C. Cir. 2004) ....................................................26

*Johnson & Johnson Vision Care v. 1-800 Contacts*,
299 F.3d 1242 (11th Cir. 2002) ....................................................14

*Johnson v. City of Opelousas*,
658 F.2d 1065 (5th Cir. 1981) ............................................... 43, 44

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) .......................................................... 15, 19, 21

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
528 U.S. 32 (1999) .......................................................................19

*Lackey v. Stinnie*,
  145 S. Ct. 659 (2025) ........................................................ 25

*Leathers v. Medlock*,
  499 U.S. 439 (1991) .......................................................... 34

*Leonard v. Ala. State Bd. of Pharm.*,
  61 F.4th 902 (11th Cir. 2023) ......................................... 27

*Mahmoud v. Taylor*,
  145 S. Ct. 2332 (2025) ..................................................... 44

*Mata Chorwadi v. City of Boynton Beach*,
  66 F.4th 1259 (11th Cir. 2023) .................... 15, 18, 19, 20, 21, 22

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) ...................................................... 32, 33

*Moody v. NetChoice*,
  603 U.S. 707 (2024) ........................................................ 1, 45

*Morgan v. Swanson*,
  659 F.3d 359 (5th Cir. 2011) ........................................... 44

*NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ....................................... 23

*Ne. Ohio Coal. for the Homeless v. Blackwell*,
  467 F.3d 999 (6th Cir. 2006) ........................................... 23

*NetChoice v. Fitch*,
  134 F.4th 799 (5th Cir. 2025) ......................................... 45

*New Ga. Project v. Att'y Gen. of Ga.*,
  106 F.4th 1237 (11th Cir. 2024) ............................. 16, 24, 27

*Noble Prestige Ltd. v. Galle*,
  83 F.4th 1366 (11th Cir. 2023) ....................................... 14

*Norwegian Cruise Line v. Fla. Dep't of Health*,
   50 F.4th 1126 (11th Cir. 2022) ....................................... 30

*NRA v. Bondi*,
   133 F.4th 1108 (11th Cir. 2025) .......................... 2, 4, 29, 43

*Pa. Psychiatric Soc. v. Green Spring Health Servs.*,
   280 F.3d 278 (3d Cir. 2002) .......................................... 23

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ................................................ 30, 38

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) ............................................... 42, 44

*Project Veritas v. Schmidt*,
   125 F.4th 929 (9th Cir. 2025) ......................................... 45

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ............................................ 30, 36, 40

*Students Engaged in Advancing Texas v. Paxton*,
   765 F. Supp. 3d 575 (W.D. Tex. 2025) ................................. 19

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................. 11

*Swain v. Junior*,
   961 F.3d 1276 (11th Cir. 2020) ....................................... 14

*TikTok v. Garland*,
   145 S. Ct. 57 (2025) ............. 3, 17, 28, 30, 31, 32, 33, 34, 35, 36, 39, 41

*Tokyo Gwinnett v. Gwinnett Cnty.*,
   940 F.3d 1254 (11th Cir. 2019) ....................................... 26

*Trump v. CASA*,
   145 S. Ct. 2540 (2025) ............................................ 17, 46

*UAW v. Brock,*
477 U.S. 274 (1986) ................................................................. 23

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.,*
517 U.S. 544 (1996) ................................................ 17, 23, 46

*Virginia v. Am. Booksellers,*
484 U.S. 383 (1988) ................................................................. 22

*Virginia v. Hicks,*
539 U.S. 113 (2003) ................................................................. 34

*Walker-Serrano ex rel. Walker v. Leonard,*
325 F.3d 412 (3d Cir. 2003) .................................................. 44

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ........................................................... 36, 40

*Wise Enters. v. Athens-Clarke Cnty.,*
217 F.3d 1360 (11th Cir. 2000) ............................................. 36

*Wood v. Fla. Dep't of Educ.,*
142 F.4th 1286 (11th Cir. 2025) ............................................ 14

*Young Apartments v. Town of Jupiter,*
529 F.3d 1027 (11th Cir. 2008) ............................................. 20

**Statutes**

15 U.S.C. § 6502 ......................................................... 10, 35

2024 Fla. Sess. Law Serv. Ch. 2024-42 (H.B. 3) .................... 8

Book of the Gen. Laws and Liberties of Mass. (1649) ....... 43

Cal. Civ. Code § 1798.99.31 ........................................... 10

Del. Code Ann. tit. 6, § 1204C ....................................... 10

Fla. Stat. § 501.1736 ............................ 1, 4, 9, 10, 19, 28, 37, 42, 46

La. Stat. Ann. § 51:1753 .......................................................................................10

Miss. Code Ann. § 45-38-7 ...................................................................................10

N.Y. Gen. Bus. Law § 1501 ...................................................................................10

T.C.A. § 47-18-5703 ..............................................................................................10

**Other Authorities**

*Attorney General Subpoenas Roblox for Child Protection Policies and Procedures*, Office of the
Attorney General (Apr. 16, 2025) ..................................................................12

Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit
Documents Allege*, NPR (Oct. 11, 2024) ........................................................7

Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104 (Sep. 1, 2024) .........8

Juries verdict agst Alice Thomas, Volume 29: Records of the Suffolk Cnty. Ct. 1671-
1680 Part 1 ......................................................................................................43

Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO,
to Senate Judiciary Comm. (Feb. 28, 2024) ...................................................8

*Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology,"* CBS News
(Nov. 9, 2017) .................................................................................................4

Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm
Kids and Democracy*, NPR (Oct. 5, 2021) .....................................................6

*Snap Inc. Terms of Service*, Snap (Apr. 7, 2025) ...........................................28, 29

*Snapchat Ads Transparency*, Snap (Aug. 13, 2025) .............................................28

Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*,
New Yorker (Sept. 30, 2021) ..........................................................................6

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. DE74 at 21. They raised a First Amendment challenge and requested a preliminary injunction against the Attorney General of Florida. DE74 at 39, 63. The district court lacked authority to grant that relief because Plaintiffs do not have prudential standing and *Younger v. Harris*, 401 U.S. 37 (1971) bars their action.

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). The district court granted a preliminary injunction on June 3, 2025, DE94, and the Attorney General appealed the same day. DE95.

## STATEMENT OF THE ISSUES

In 2024, the Florida Legislature passed HB3, which regulates internet platforms that target children with addictive design features. HB3 limits those platforms' ability to contract with children below certain ages. Plaintiffs challenged the law under the First Amendment and requested a preliminary injunction. The district court found that HB3 is content-neutral and subject to at most intermediate scrutiny but still concluded that the law is not sufficiently tailored and universally enjoined it.

The issues presented are:

**I.A.** In First Amendment cases, plaintiffs can assert the rights of third parties if they establish overbreadth or third-party standing. *Mata Chorwadi v. City of Boynton Beach*, 66 F.4th 1259, 1264-65 (11th Cir. 2023). Plaintiffs—trade associations of tech companies—assert the First Amendment rights of children who use the companies' platforms. Though Plaintiffs satisfied the requirements for neither overbreadth nor third-party standing, the district court concluded that they have prudential standing, finding it sufficient that a "causal connection" exists between enforcement of HB3 against platforms and "any violation" of children's rights. DE94 at 24-25.

Do Plaintiffs have prudential standing to assert children's rights?

**I.B.** Under *Younger v. Harris*, 401 U.S. 37 (1971), a district court must abstain if injunctive relief would interfere with a state enforcement action that was filed before proceedings of substance on the merits took place in federal court. Florida filed a state

action enforcing HB3 against one of Plaintiffs' members while this case was still at the pleadings stage and before the district court issued any rulings related to the merits. The court concluded that injunctive relief would interfere with that enforcement action.

Does *Younger* apply?

**II.** "The First Amendment" prohibits the "government" from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Free Speech Coal. v. Paxton*, 145 S. Ct. 2291, 2302 (2025). HB3—which the district court determined is content-neutral—regulates addictive design features on platforms to protect children's mental health. If a platform chooses to use the features, and it exposes children to them multiple hours each day, then HB3 prohibits the platform from contracting with children under 14 years old, and it requires parental consent before the platform contracts with 14- and 15-year-olds.

Does HB3 violate children's First Amendment rights?

**III.** Equitable relief must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *see Trump v. CASA*, 145 S. Ct. 2540, 2552 (2025). Plaintiffs established injury for only one of their members (Snap). The district court did not limit its injunction to remedying that injury. It universally enjoined Florida from enforcing HB3 against any platform—including platforms that are not members of Plaintiffs.

Did the district court exceed its equitable authority?

**INTRODUCTION**

The country is facing a "youth mental health crisis." DE51-9 at 13. Rates of adolescent depression, anxiety, suicide, and self-harm have skyrocketed. It is no secret that social-media companies' business practices are playing a significant role. *See Moody v. NetChoice*, 603 U.S. 707, 733 (2024). Because of whistleblowers and leaked internal documents, the public has learned that social-media companies have for years deployed design features that addict children to their products, with full awareness of the damage that compulsive use inflicts on their mental health.

States across the country have taken steps to hold platforms accountable and protect kids—including Florida. After the Biden Administration's Surgeon General called on lawmakers to "act swiftly" to "limit[] the use of [addictive] features" by platforms, DE51-9 at 13, 15, Florida passed HB3 with overwhelming bipartisan support. Under HB3, if a platform uses infinite scroll, autoplay, or other enumerated addictive features and exposes a significant percentage of its child users to those features more than two hours per day, it may not contract with children younger than 14, and it must obtain parental consent before contracting with 14- and 15-year-olds. *See* Fla. Stat. § 501.1736.

Since HB3's enactment, no children, parents, or social-media users have challenged it—only Plaintiffs have. Plaintiffs are trade associations of tech companies that "roam the country" challenging internet regulations they dislike. *FDA v. All. for*

1

*Hippocratic Med.*, 602 U.S. 367, 379 (2024). They claim that HB3 violates children's First Amendment rights, but the First Amendment is not a shield for platforms' predatory business practices. If platforms insist on using addictive design features to supercharge their advertising revenues, States can regulate the platforms to protect kids, whose still-developing brains make them especially vulnerable to the features. *See NRA v. Bondi*, 133 F.4th 1108, 1151 (11th Cir. 2025) (en banc) (Rosenbaum, J., concurring).

No one seriously disputes that platforms' business practices are wreaking havoc on children's mental health. The district court "d[id] not doubt" that platforms' use of addictive features raises "sincere concerns." DE94 at 2. And Plaintiffs did not even try to rebut Florida's expert testimony establishing that the features are manipulating children and ravaging their mental health. Still, after HB3 was in effect for months and Florida started enforcing it, the district court universally enjoined the law—sweeping relief that Plaintiffs did not even request.

For several reasons, the preliminary injunction must be reversed. Plaintiffs lack prudential standing to assert children's rights, the district court should have abstained under *Younger*, and HB3 does not violate children's First Amendment rights. Though the district court recognized that HB3 is content-neutral and subject to at most intermediate scrutiny, it applied something more like strict scrutiny in finding that HB3 is insufficiently tailored. Relying on strict-scrutiny cases, the court quibbled with the Florida Legislature's policy judgments and enjoined HB3 because, in its view, "parental

controls" and "a public education campaign" about "the risks of social media" are "appropriate," less-restrictive alternatives. DE94 at 50-52. Yet courts cannot "displace the [Legislature's] judgment" with their "own" when passing on a "content-neutral regulation[]" like HB3. *TikTok v. Garland*, 145 S. Ct. 57, 71 (2025). "[E]ven assuming [alternative] approaches are equally or more effective, under intermediate scrutiny a regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Free Speech Coal. v. Paxton*, 145 S. Ct. 2291, 2318 (2025).

As the Supreme Court explained just weeks ago in *Free Speech Coalition*, laws "protecting children" on the internet do not fail intermediate scrutiny simply because the State could have instead "encourag[ed] parents to" use parental controls. *Id.* The First Amendment does not require States to sit on their hands and hope "public education campaign[s]" and parental "control tools" devised by tech companies will protect the next generation of children from addiction. DE94 at 51.

## STATEMENT OF THE CASE

### A.    Children and Social Media

To maximize profits, social-media companies use design features that cause "excessive use and behavioral dysregulation"—including "[p]ush notifications,

autoplay, infinite scroll, [and] quantifying and displaying popularity." DE51-9 at 9.[1]

Infinite scroll is "[c]ontinuously loading content" as a "user scrolls down the page"; "push notifications" are "alerts" sent to users about activity on a platform; "[a]uto-play" is starting a video automatically, without the user having to click a button; and displaying popularity is publicly showing "the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content." Fla. Stat. § 501.1736(1)(e)4. Those features use psychological "hooks"—like "unpredictable" feedback and eliminating "stopping cues"—that foster "compulsive overuse." DE51-2 ¶¶ 20-21. The features "overstimulate the reward center in the brain" and "trigger pathways comparable to addiction," causing "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." DE51-9 at 9; *accord* DE51-2 ¶¶ 29-47.

Although the features can addict anyone, children "are particularly at risk, as their developing brains are more susceptible to the reward-driven mechanisms underlying the[] features." DE51-2 ¶ 46; *see also* DE63-3 at 127:14-22; DE51-9 at 5. Children have an undeveloped "prefrontal cortex," which "is responsible for, among other things, planning, decisionmaking, and problem solving." *NRA*, 133 F.4th at 1151 (Rosenbaum,

---

[1] *See also Sean Parker: Facebook Takes Advantage of "Vulnerability in Human Psychology*," CBS News (Nov. 9, 2017), https://tinyurl.com/4zb7s9d2 (explaining that platforms use manipulative features to "consume as much of [users'] time and conscious attention as possible").

J., concurring). As a result, children struggle with "impulse control," "delayed gratification," and "moderating the influence of societal pressures, such as those on social media." *Id.* That makes them particularly vulnerable to platforms' use of psychological hooks. Adolescents average five hours per day on social media with nearly half reporting "almost constant[]" online use. DE51-1 ¶¶ 9, 13; *see also* DE51-2 ¶ 18. More than a third feel "addicted" to social media and almost 75% report feeling "manipulate[d]" to spend more time on it than they intend. *See* DE51-9 at 9-10, 10 n.68.

That manipulation has severe consequences. "[C]ompulsive or uncontrollable" social-media use can cause "sleep problems, attention problems, and feelings of exclusion," all of which put children at risk of "depression, anxiety, and neuroticism." DE51-9 at 10; *see also* DE51-1 ¶ 20; DE51-2 ¶ 16. As child social-media use proliferated over the last 15 years, child depression rates more than doubled, and associated behaviors like self-harm and suicide "skyrocketed." DE51-1 ¶¶ 15-20, 23; *see also* DE63-1 at 201:19-21.

Studies reveal that the correlation is no coincidence: Compulsive social-media use is a "causal" factor for those harms. DE51-1 ¶¶ 34, 47. There is "a causal path from social media use to depression and low well-being." DE51-1 ¶ 59. Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression. DE51-1 ¶¶ 39, 47; DE51-9 at 6.

Much like tobacco companies years ago, platforms have resisted efforts to research or mitigate their products' effects. Research on the danger that platforms' practices pose to children has proven difficult because platforms do not allow "access to data" and insist on a "lack of transparency." DE51-9 at 11. As one former product manager at a social-media company put it, "executives hide research about the social network's risks to keep its business humming."[2] Meta, which operates Facebook and Instagram, is a prime example. A whistleblower revealed internal research showing that many of Instagram's youngest users "felt addicted to the app," "lacked the wherewithal to limit their use of it," and reported "that the app contributed to their depression and anxiety."[3] Rather than roll back the features it knew were addictive, Meta pressed on and even sought to expand its products to younger children. It explored "whether there might be a way to engage children during play dates."[4]

Leaked documents from TikTok showed that it too "was aware its many features designed to keep young people on the app led to a constant and irresistible urge to keep opening the app" and that such "compulsive usage correlates with a slew of negative mental health effects like loss of analytical skills, memory formation, contextual

---

[2] Shannon Bond & Bobby Allyn, *Whistleblower Tells Congress that Facebook Products Harm Kids and Democracy*, NPR (Oct. 5, 2021), https://tinyurl.com/yc4zex93.

[3] Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh.

[4] *Id.*

thinking, conversational depth, empathy, and increased anxiety."[5] TikTok acknowledged that features like infinite scroll were likely to addict children, stating that "across most engagement metrics, the younger the user, the better the performance" because "[m]inors do not have executive function to control their screen time."[6] Although TikTok has publicly touted some features ostensibly aimed at reducing the platform's addictive effects—like allowing parents to set time limits and prompting users to take a break—TikTok determined that those features "had little impact" and were "not altogether effective."[7] But that did not matter, because TikTok adopted the features solely to give it "a good talking point with policymakers."[8]

Because addiction to social media has fueled the Nation's youth "mental health crisis," DE51-9 at 13, DE51-1 ¶ 26, the Biden Administration's Surgeon General called on policymakers to develop "health and safety standards" for platforms and to adopt policies that "limit access . . . to social media for all children." DE51-9 at 15. The Surgeon General specifically recommended policies that "strengthen[] and enforc[e] age minimums" and that "limit[] the use of features that attempt to maximize time, attention, and engagement." *Id.*

---

[5] Bobby Allyn et al., *TikTok Executives Know About App's Effect on Teens, Lawsuit Documents Allege*, NPR (Oct. 11, 2024), https://tinyurl.com/4e5un4ru.

[6] *Id.*

[7] *Id.*

[8] *Id.*

Policy intervention is necessary because platforms' own interventions have proven inadequate. Platforms have long had parental controls, but they have made no dent in child addiction. *See* DE63-3 at 183:16-23. That is both because parents do not use them and because they are ineffective. Few parents use Snapchat's controls, for example.[9] And parental controls are difficult to manage, DE51-3 ¶¶ 51-61; they do not address the features that make platforms addictive, DE51-2 ¶¶ 48-50; and platforms do not implement them with fidelity. *See* Fed. Trade Comm'n, *A Look Behind the Screens*, 2024 WL 4272104, at *9 (Sept. 1, 2024) (Facebook has "misled parents about their ability to control" their children's accounts).

**B.    HB3**

HB3 was enacted on March 25, 2024, with an effective date of January 1, 2025. 2024 Fla. Sess. Law Serv. Ch. 2024-42 (H.B. 3). It regulates addictive features by prohibiting certain platforms that use them from contracting with children. If a platform decides to use the features and the platform presents a heightened risk of

---

[9] *See* Response to Questions for the Record from Evan Spiegel, Snap Co-Founder & CEO, to Senate Judiciary Comm. at 1-2 (Feb. 28, 2024), https://tinyurl.com/55amwdfc; DE51-6 at 149-151.

sustained exposure to children, HB3 limits its ability to "enter[] into a contract" with a child "to become an account holder." Fla. Stat. § 501.1736(2)(a), (3)(a).

Codified at Florida Statutes § 501.1736, HB3 defines the "social media platform[s]" subject to its provisions as those that (1) allow "users to upload content or view the content or activity of other users"; (2) employ "algorithms that analyze user data or information on users to select content for users"; (3) use an "addictive feature[]," defined as "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]uto-play," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content"; and (4) have at least 10% of their "daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the platform. *Id.* § 501.1736(1)(e). If a platform satisfies all those criteria, Section 501.1736(2) prohibits it from "entering into a contract with" a child under 14 "to become an account holder." And Section 501.1736(3) requires the platform to obtain parental consent before "entering into a contract" with "a minor who is 14 or 15" "to become an account holder."

If a platform "knowingly and recklessly violates" the statute, either "the minor account holder" or the Florida Department of Legal Affairs may sue the platform. *Id.* § 501.1736(5)-(6). The statute does not penalize platform users; it regulates only platforms. *Id.* Nor does it prohibit platforms from providing access to children. HB3

requires only that a platform either refrain from the conduct that makes it a covered "social media platform"—like using addictive features—or refrain from requiring children to enter contracts to access its product. *Id.* § 501.1736(2)(a).

HB3 is part of a broader regulatory framework protecting children online. In 1998, Congress passed the Children's Online Privacy Protection Act (COPPA), which requires platforms to obtain parental consent before collecting data from children under 13 years old. *See* 15 U.S.C. § 6502. And in recent years, as more children started accessing the internet on cellphones rather than on supervised computers, *see Free Speech Coal.*, 145 S. Ct. at 2314, States have passed a variety of laws protecting children from the dangers posed by social media and other platforms.[10]

## C. Procedural History

Plaintiffs are "Internet trade associations whose members" include tech giants like Google and Meta. DE72 at 5. They challenged HB3 and moved for a preliminary injunction in October 2024, seven months after HB3 was enacted. DE1; DE4; DE5. Plaintiffs asked the court to preliminarily enjoin HB3's enforcement "against [their] members," claiming that it violates the First Amendment. DE76 at 20, 34. The district

---

[10] *See, e.g.*, T.C.A. § 47-18-5703 (limits on social-media platforms contracting with children); Miss. Code Ann. § 45-38-7 (same); N.Y. Gen. Bus. Law § 1501-1502 (limits on "addictive feeds" and push "notifications"); Cal. Civ. Code § 1798.99.31(b)(7) (limits on targeting children with deceptive practices); Del. Code Ann. tit. 6, § 1204C (limits on advertising to children); La. Stat. Ann. § 51:1753(2) (same).

court set oral argument for February 2025, DE35 at 2, and in the meantime stayed merits discovery, ordering the parties to conduct only "limited discovery . . . for purposes of preparing for the motion." DE49 at 1.

In January 2025, Florida moved to dismiss the case and responded to Plaintiffs' preliminary-injunction motion. Florida attached to the response expert declarations, which explained how platforms' design features manipulate children and harm their mental health. *See* DE51-2; DE51-1. In its filings, Florida argued not only that HB3 is constitutional but also that Plaintiffs lacked standing because they failed to identify any "members who will be injured by" the law. DE50 at 2; DE51 at 12. Plaintiffs relied on associational standing to satisfy Article III, so they had to show that at least one of their members has an injury in fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Yet Plaintiffs offered no evidence that any member operates a platform that satisfies all HB3's criteria and is therefore subject to the law. The district court allowed Plaintiffs to submit "supplemental declarations" responding to Florida's arguments, DE35 at 2, but they declined to do so, leaving Florida's associational-standing argument and expert evidence about platforms' addictive features unrebutted. *See* DE72 at 7 n.4.

Because Plaintiffs failed to allege an injury to any of their members, the district court denied their preliminary-injunction motion and dismissed their complaint without prejudice. DE72 at 13; DE73. "[I]t may seem . . . absurd," the court lamented, "to conclude that there is no case or controversy," "[b]ut the Supreme Court and the

Eleventh Circuit have developed a rigorous, fact-intensive test for standing" for plaintiffs who "are not a religious organization or a church." DE72 at 2; DE71 at 63:20-23.

After dismissal, Florida began addressing the harms that platforms are inflicting on children. It filed a state enforcement action against Plaintiffs' member Snap, which was openly violating HB3, Compl. at 32-34, *OAG v. Snap*, 2025-CA-0258 (Fla. Cir. Ct. Apr. 21, 2025), and moved for a temporary injunction requiring Snap to comply with the law. Mot. for Temp. Inj., *OAG v. Snap*, 2025-CA-0258 (Fla. Cir. Ct. May 1, 2025). Separately, Florida subpoenaed Roblox, which is not a member of Plaintiffs. *Attorney General Subpoenas Roblox for Child Protection Policies and Procedures*, Office of the Attorney General (Apr. 16, 2025), https://perma.cc/5XW6-W376.

Meanwhile, Plaintiffs filed an amended complaint and a "renewed" motion for a preliminary injunction barring enforcement "against [their] members." DE76 at 1, 34. The amended complaint raised a facial First Amendment claim, and it challenged HB3 "as applied to CCIA and NetChoice members who operate 'social media platforms' as defined by" HB3. DE74 ¶ 148. Plaintiffs, however, pressed only their facial "First Amendment Claim" in their renewed motion. *See* DE76 at 16. They argued that "all aspects of HB3, in every application," are unconstitutional, DE88 at 42, because HB3 is not sufficiently tailored. *See* DE76 at 26-32; *accord* DE5 at 1-2, 29; DE51-10 at 16:17-17:18 (Plaintiffs representing that they were "assuming" Florida's interest and arguing

only that "HB3 is just not narrowly tailored"). Their motion was, in effect, a motion for reconsideration. It was "substantively identical" to their first preliminary-injunction motion and merely sought to provide additional standing evidence. DE79 at 1, 3.

In June 2025, after HB3 had been in effect for several months, the district court granted Plaintiffs' "renewed" motion. DE94 at 1. It universally enjoined HB3, despite Plaintiffs having requested only injunctive relief for their members. DE94 at 57. The court determined that Plaintiffs have standing; that *Younger* abstention does not apply; and that HB3 likely violates children's First Amendment rights. Plaintiffs, the court held, satisfied Article III by establishing associational standing, and had prudential standing to assert children's rights because a "causal connection" exists between "enforcement" of HB3 against platforms and "any violation" of children's rights. DE94 at 24-25. As for *Younger*, the court concluded that abstention is not required even though Plaintiffs' First Amendment challenge interferes with Florida's action against Snap because "substantial proceedings on the merits" occurred in this case before Florida sued Snap. DE94 at 12. Finally, the court found that HB3 is content-neutral and subject to intermediate scrutiny but that it nevertheless violates children's First Amendment rights. DE94 at 34. The law is not sufficiently tailored, the court reasoned, because "parental control and supervision tools" are more "appropriate" and less restrictive alternatives. *See* DE94 at 47-53.

Florida appealed the same day the court entered the preliminary injunction, DE95, and moved for a stay in this Court six days later. That motion is pending.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to [it] outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284-85 (11th Cir. 2020). "If the [plaintiff] is unable to establish a likelihood of success on the merits, a court need not consider the remaining" elements. *Johnson & Johnson Vision Care v. 1-800 Contacts*, 299 F.3d 1242, 1247 (11th Cir. 2002).

This Court reviews the decision to enter a preliminary injunction for abuse of discretion but reviews the underlying legal conclusions de novo. *Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1374 (11th Cir. 2023). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1289, 1293 (11th Cir. 2025).

## SUMMARY OF THE ARGUMENT

HB3 is a quintessential consumer-protection regulation: It protects Florida's most vulnerable citizens from product designs that harm their mental health. The district court erred in universally enjoining the law. Plaintiffs are unlikely to succeed on their First Amendment challenge both because it is not justiciable and because HB3 does not violate the First Amendment. Even if Plaintiffs were entitled to a preliminary injunction, the district court still erred because it exceeded its equitable authority in granting universal relief.

**I.** Plaintiffs' First Amendment challenge is not justiciable because Plaintiffs lack prudential standing to assert the rights of children—third parties with whom Plaintiffs have no relationship—and *Younger* bars the challenge in any event.

**A.** Plaintiffs failed to overcome the prudential "prohibition o[n] asserting third-party rights." *Mata Chorwadi v. City of Boynton Beach*, 66 F.4th 1259, 1264 (11th Cir. 2023). Since they bring a First Amendment challenge, they could have overcome the prohibition by invoking "overbreadth" or "jus tertii" (third-party) "standing." *Id.* at 1265. Yet they established neither prudential-standing "exception." *Id.* They cannot rely on overbreadth to assert children's rights because HB3 "imposes penalties only on" platforms, not children. *Id.* And Plaintiffs satisfied neither of the requirements for third-party standing. They did not establish that they have a "close relationship" with children or that children face a "hindrance" to protecting their own First Amendment rights.

15

*Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Plaintiffs did not even contest that children are able to protect their own interests.

**B.** *Younger* bars Plaintiffs' First Amendment challenge because the challenge interferes with Florida's state enforcement action against Snap. The district court agreed that the challenge interferes with that action, but it held that abstention is not required because substantial proceedings on the merits took place in federal court before Florida sued Snap. DE94 at 12. But "proceedings of substance on the merits" have occurred in a federal case only if the district court has "meaningfully engaged the merits of the claims." *New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237, 1244 (11th Cir. 2024). And that did not happen before Florida sued Snap. The district court had issued no rulings related to the merits; the parties had conducted only limited discovery; the court had held no evidentiary hearings; and the case was still at the pleadings stage.

**II.** Nor does HB3 violate children's First Amendment rights. It does not even trigger heightened scrutiny because it regulates addictive design features, not children's speech. Even the district court recognized that HB3 does not target expression but rather "features that are designed and operate to undermine a person's ability to exercise their will in determining the amount of time that they choose to spend engaging with" social-media companies' products. DE94 at 41.

Even if HB3 triggers heightened scrutiny, it easily survives. As the district court rightly concluded, HB3 does not regulate speech based on its content and thus at most

is subject to intermediate scrutiny. DE94 at 39. HB3 satisfies that more deferential standard of review. Because HB3 applies only to platforms that target children with addictive design features, "it cannot be said that" any portion—let alone "a substantial portion"—"of the burden that [the law] imposes fails to advance [Florida]'s goal[]" of protecting children. *Free Speech Coal. v. Paxton*, 145 S. Ct. 2291, 2318 (2025).

Though the district court held that intermediate scrutiny applies, it conjured strict scrutiny in its actual analysis. It found that HB3 is not narrowly tailored because it believed there was a less restrictive way to protect children. The Florida Legislature, the court surmised, could have combatted child addiction by relying on tech companies to provide parental "control tools" and then engaging in "a public education campaign" to promote them. DE94 at 49-51. The district court's reliance on its own policy judgment about the effectiveness of parental controls was always inappropriate under intermediate scrutiny. *See TikTok v. Garland*, 145 S. Ct. 57, 69-70 (2025). That is even clearer now that the Supreme Court expressly rejected the district court's reasoning in *Free Speech Coalition*. *See* 145 S. Ct. at 2318.

**III.** Last, even if Plaintiffs were entitled to a preliminary injunction, the district court exceeded its equitable authority by universally enjoining HB3. The court had authority only to preliminarily enjoin enforcement against Snap. Because Plaintiffs are associations "assert[ing] [their] members' injury," *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 551-52 (1996), an injunction provides them "complete

relief" if it remedies their members' injury, *Trump v. CASA*, 145 S. Ct. 2540, 2557 (2025), and Snap is the only member for whom Plaintiffs presented evidence of a justiciable injury. Plaintiffs did not show that any other member is even subject to HB3.

## ARGUMENT

### I. PLAINTIFFS' FIRST AMENDMENT CHALLENGE IS NOT JUSTICIABLE.

#### A. Plaintiffs do not have prudential standing to assert the First Amendment rights of children.

The district court enjoined HB3 solely because, in its view, the law violates children's First Amendment rights. *See* DE94 at 28 n.12 (disclaiming reliance on platforms' First Amendment rights). But to assert the rights of children, Plaintiffs had to overcome the prudential "prohibition o[n] asserting third-party rights"—which they failed to do. *Mata Chorwadi*, 66 F.4th at 1264.

**1.** Because Plaintiffs bring a First Amendment challenge, they could have overcome the prohibition by invoking "overbreadth" or "jus tertii" (third-party) "standing." *Id.* at 1265; *see also CAMP Legal Def. Fund v. City of Atlanta*, 451 F.3d 1257, 1270-71 (11th Cir. 2006). Overbreadth "allows a litigant to" assert the rights of third parties who are "deter[red] . . . from engaging in protected expression" because the challenged statute subjects them to a credible threat of enforcement. *Mata Chorwadi*, 66 F.4th at 1265. Third-party "standing allows litigants who challenge a statute in their own right to assert 'concomitant' rights of third parties when those third parties' rights would

be violated by the enforcement of the challenged restriction against the litigant." *Id.* But Plaintiffs established neither prudential-standing "exception[.]" *Id.*

For starters, *Mata Chorwadi* forecloses overbreadth standing. There, "hotel owners" asserted the rights of their "guests," but this Court held that the owners could not "rely on" overbreadth because the challenged law did not "apply to guests." *Id.* "[O]n its face," the law "impose[d] penalties only on the owners." *Id.*; *see also L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40-41 (1999) (plaintiff could not use overbreadth to assert the rights of "potential customers" who faced "[n]o threat of prosecution"). Same here. HB3 does not regulate children—it imposes penalties only on platforms. Fla. Stat. § 501.1736(5)-(6).

Nor did Plaintiffs establish that they have third-party standing to assert the rights of children. Third-party standing requires a plaintiff to show that it "has a 'close' relationship with" the third parties and that "there is a 'hindrance' to" them "protect[ing] [their] own interests." *Kowalski*, 543 U.S. at 130. Yet Plaintiffs offered no evidence suggesting that there is a "hindrance" to children "protect[ing] [their] own" First Amendment "interests." *Id.* Indeed, Plaintiffs did not even contest that children face no hindrance. *See* DE88 at 26 n.8; *accord Students Engaged in Advancing Texas v. Paxton*, 765 F. Supp. 3d 575, 582 (W.D. Tex. 2025) (challenge to a Texas social-media law brought by "minors").

Plaintiffs also failed to show that they or their members have a "close relationship" with children. *Kowalski*, 543 U.S. at 130. They did not establish that tech companies and children whom they are trying to addict to their products have "aligned" interests. *Harris v. Evans*, 20 F.3d 1118, 1123 (11th Cir. 1994) (en banc). This Court has recognized that a business "should not be permitted to attack a" law "on behalf of its" customers if the law is "generally intended to protect the health and safety of" the customers "against" the business. *Young Apartments v. Town of Jupiter*, 529 F.3d 1027, 1043 (11th Cir. 2008). That is the case here because HB3 protects children from harms inflicted by platforms' use of manipulative design features. Children—unlike tech companies that profit off behavioral addiction—may "like" a policy that enables them to access social media without being exposed to the features, *Harris*, 20 F.3d at 1123, considering that many children report feeling "manipulated" and "addicted" by the features. DE51-9 at 9-10.

The district court excused Plaintiffs' failure to establish either "exception[]," *Mata Chorwadi*, 66 F.4th at 1265, concluding that different rules apply in First Amendment cases. According to the district court, "[w]hen a plaintiff has standing and a cause of action to assert its own First Amendment rights, it can also raise the rights of third parties[.]" DE94 at 24; DE94 at 25 n.10 (stating that prudential standing "rules" are "relaxed in the First Amendment context"). That is wrong. In First Amendment cases, prudential standing is "relaxed" in that plaintiffs have an additional tool—

overbreadth standing—for overcoming the prohibition on asserting a third party's rights. *See Granite State Outdoor Advert. v. Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003); *CAMP*, 451 F.3d at 1271-72. But if overbreadth is unavailable, plaintiffs must satisfy the requirements for third-party standing. *See Mata Chorwadi*, 66 F.4th at 1265.

Ignoring that precedent, the district court determined that Plaintiffs can assert children's rights simply because a "causal connection" exists between "enforcement of" HB3 against platforms and "any violation" of children's rights. DE94 at 24-25. The court, in other words, truncated the Supreme Court's test for third-party standing. Under the Supreme Court's test, a "causal connection" between enforcement against the plaintiff and violations of third-party rights is necessary (but not necessarily sufficient) to establish a close relationship with the third party. *See Mata Chorwadi*, 66 F.4th at 1266; *Kowalski*, 543 U.S. at 130. Yet even if the plaintiff establishes a close relationship, it must satisfy the hindrance requirement. *Kowalski*, 543 U.S. at 130; *Harris*, 20 F.3d at 1122. The district court's "relaxed" test eliminates the hindrance requirement and waters down the close-relationship requirement in First Amendment cases. DE94 at 25 n.10 (declining to follow *Kowalski* because it was not "a First Amendment case").

Even assuming that district courts can ignore *Kowalski* in First Amendment cases, they cannot ignore this Court's en banc decision in *Harris*, which required First Amendment plaintiffs who lacked overbreadth standing to satisfy the hindrance requirement. That requirement, *Harris* explained, is often "the central consideration" in

third-party-standing cases. 20 F.3d at 1124. And because the third parties there could "assert their own First Amendment rights if they wish[ed] to do so," this Court denied the plaintiffs prudential standing. *Id.* That analysis controls.

The district court attempted to justify its truncated third-party-standing test using overbreadth cases. Citing *Virginia v. American Booksellers*, 484 U.S. 383 (1988), the court said that a "causal connection" is enough for prudential standing because the prohibition on asserting third-party rights is "relaxed" in First Amendment cases. DE94 at 24-25 & n.10. That misunderstands First Amendment doctrine. Again, prudential standing is "relaxed" in First Amendment cases because plaintiffs can invoke overbreadth. But when overbreadth standing does not apply, courts have no license to dilute third-party standing. *Mata Chorwadi*, 66 F.4th at 1265. That is why in *Harris* this Court required First Amendment plaintiffs to satisfy the third-party-standing test where overbreadth was unavailable. 20 F.3d at 1122 n.5.

**2.** Even if the district court were right about third-party standing in First Amendment cases, that still would not mean that *Plaintiffs*—trade associations that have nothing to do with social-media users—would have prudential standing to assert the rights of children. Plaintiffs are already relying on a different prudential-standing exception—associational standing. DE94 at 16. In also invoking third-party standing, they ask this Court to bless what the Third Circuit has dubbed "derivative standing," where an association sues on behalf of its members using associational standing and

then invokes third-party standing to assert the rights of nonmembers with whom only its members have a relationship. *Pa. Psychiatric Soc. v. Green Spring Health Servs.*, 280 F.3d 278, 291-93 (3d Cir. 2002). This Court should reject that invitation.

An association cannot string together associational and third-party standing to assert the rights of parties who are multiple "steps removed" from the association. *Id.* at 294-95 (Nygaard, J., dissenting); *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1013 (6th Cir. 2006) (McKeague, J., concurring). Associational standing is a vehicle only for "enforc[ing] the rights of . . . members." *NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008). It is a "strand" of "representational standing" that allows an association to enforce the rights of members—even though they are "absent third parties"—because the association has a "particular," "recognized" "relationship[]" with them. *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 557 (1996). Given the close relationship between an association and its members, the "concrete adverseness" that federal courts require is presumed when an association brings a claim "on behalf of its directly affected members." *UAW v. Brock*, 477 U.S. 274, 289 (1986). That presumption stretches to its breaking point when an association seeks to represent members who would, in turn, be representing the interests of nonmembers—here, child social-media users—if they sued.

Though Florida raised this defect below, DE86 at 34-36, the district court altogether ignored it. *See* DE94 at 15-25.

## B.   *Younger* bars Plaintiffs' First Amendment challenge.

Standing aside, Plaintiffs' First Amendment challenge is not justiciable because *Younger* bars it. *Younger* requires abstention because an injunction prohibiting enforcement of HB3 "restrain[s]" Florida's state enforcement action against Snap. *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003).[11]

The district court did not abstain under *Younger* because it determined that "proceedings of substance on the merits [took] place" in federal court before the Snap action began. DE94 at 8-9. But "proceedings of substance on the merits" have occurred only if a court has "meaningfully engaged the merits of [the] claims." *New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237, 1244 (11th Cir. 2024). The district court had not done that before the Snap action. Florida sued Snap shortly after the court denied Plaintiffs' first preliminary-injunction motion. At that time, the court had issued no rulings related to the merits—it had ruled only on Article III standing. DE72 at 1; DE73 at 1. The parties had conducted no merits discovery. *See* DE49 at 1-2 (forbidding merits discovery and allowing only "limited discovery" to "prepar[e] for the motion for preliminary injunction"); DE51-10 at 20:18-23. The court had held no evidentiary hearings. And

---

[11] Snap has removed the enforcement action to the Northern District of Florida, but the removal is baseless. Florida moved for remand, and the district court denied the motion on August 13, 2025—the day of this filing—finding that Snap is a federal officer because two federal agencies ran limited advertising campaigns on Snapchat. *See* Order at 2, *OAG v. Snap*, No. 25-cv-676-MW-HTC (N.D. Fla. Aug. 13, 2025), ECF No. 36. That ruling was error. Florida's enforcement action against Snap belongs in state court.

the case was still at the pleadings stage, as the court had stayed Florida's deadline for answering Plaintiffs' amended complaint. DE80.

The district court concluded that substantial merits proceedings nevertheless occurred because it "was prepared to" address the "merits" during the first round of preliminary-injunction litigation. DE94 at 10-11. The parties, the court explained, had conducted discovery "relevant to the merits" and "discuss[ed] the merits." *Id.* But merely being prepared to opine on the merits is not a proceeding of substance on the merits. That is doubly true in preliminary-injunction litigation, the "purpose" of which is to "balance the equities as the litigation moves forward," not make "decisions on the underlying merits." *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025).

Nor is it enough that the parties conducted some discovery and discussed the merits. For one, the parties did not even engage in merits discovery. The district court's suggestion otherwise runs headlong into its own order directing the parties to conduct only "limited" preliminary-injunction discovery and *prohibiting* merits discovery. *See* DE49 at 1-2; DE112 (lifting the "stay of merits discovery" after granting the preliminary injunction). For another, the merits are always "discussed" during preliminary-injunction litigation, yet courts consistently apply *Younger* when—as here—preliminary relief was denied. *See, e.g.*, *Hicks v. Miranda*, 422 U.S. 332, 348 (1975) (no proceedings of substance where the plaintiffs requested a TRO, the parties submitted a dozen affidavits and other evidence, and the TRO was denied); *id.* at 353 n.1 (Stewart, J., dissenting)

(summarizing the procedural history); *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1126 (D.C. Cir. 2004) ("Although the District [of Columbia] did not file its Superior Court action against [plaintiff] until two months after [plaintiff] filed its federal complaint," no proceedings of substance had occurred "because the only thing that had transpired . . . was the denial of [plaintiff]'s motion for a preliminary injunction on the basis of *Younger* and the absence of . . . injury.").

Finally, *Tokyo Gwinnett v. Gwinnett Cnty.*, 940 F.3d 1254 (11th Cir. 2019), and *For Your Eyes Alone v. City of Columbus*, 281 F.3d 1209 (11th Cir. 2002), which declined to apply *Younger*, do not support the district court's ruling. *See* DE94 at 11-12. The district court concluded that the "history of this case" is similar to those cases even though both cases had proceeded past the pleadings stage before the state enforcement action began. "[N]either opinion," the district court reasoned, "emphasized" that fact. DE94 at 12. That is incorrect. Both did. *Tokyo Gwinnett*, 940 F.3d at 1272 (calling the defendant's answer a "significant event[]" that counseled against abstention); *For Your Eyes Alone*, 281 F.3d at 1218 (emphasizing that "the City had filed its answer" and moved "for summary judgment" "by the time the City commenced the prosecution").

If anything, *Tokyo Gwinnett* and *For Your Eyes Alone* show that the district court abused its discretion in not applying *Younger*. Unlike those cases, this case never got off the starting blocks. It was stalled at the pleadings stage, and the district court had only "meaningfully engaged" Article III standing, not "the merits." *New Ga. Project*, 106 F.4th

at 1244. "[I]t is always an abuse of discretion for a court to [wrongly] apply" the law, and the district court did just that in holding that substantial merits proceedings had occurred. *Leonard v. Ala. State Bd. of Pharm.*, 61 F.4th 902, 907 (11th Cir. 2023).

## II. HB3 DOES NOT VIOLATE CHILDREN'S FIRST AMENDMENT RIGHTS.

Even if Plaintiffs' First Amendment challenge is justiciable, Plaintiffs failed to establish a substantial likelihood of success because HB3 does not violate children's First Amendment rights. HB3 protects Florida's children from the devastating mental-health effects of addictive design features by limiting platforms that use them from contracting with children. That law does not trigger heightened scrutiny because it regulates product design, not children's speech. But even assuming that HB3 is subject to intermediate scrutiny as the district court held, it survives. The district court misapplied intermediate scrutiny. It found HB3 insufficiently tailored because it believed that parental tools would be an effective, less-restrictive alternative. Yet "under intermediate scrutiny a regulation" is not "invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Free Speech Coal.*, 145 S. Ct. at 2318.

### A. HB3 regulates addictive design features, not children's speech.

Heightened scrutiny applies if a law either "directly regulate[s] protected expressive activity" or regulates non-expressive activity but "impose[s] a disproportionate burden upon" "First Amendment activities." *TikTok*, 145 S. Ct. at 65-

66; *Arcara v. Cloud Books*, 478 U.S. 697, 704 (1986). HB3 does neither. It directly regulates commercial activity and targets addictive design features, not children's speech.

**1.** There is no disputing that HB3 does not directly regulate expression. It merely limits covered platforms from "entering into a contract" with certain children. Fla. Stat. § 501.1736(2)(a), (3)(a). That directly regulates a commercial transaction.

Most platforms allow access to their products only if users enter complex contracts that guarantee the platforms access to vast amounts of users' sensitive personal data. For example, Snap requires users—including children—to "form a legally binding contract" with it.[12] That contract requires children to (1) authorize Snap to "collect" and "obtain" personal information "about [them],"[13] including their "activity" on other "websites and platforms," data stored on their mobile "device," and their "location information"[14]; (2) "grant Snap and [its] affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute [their content], including the name, image, likeness, or voice of anyone featured in it"[15]; (3) acknowledge that they

---

[12] *Snap Inc. Terms of Service*, Snap (Apr. 7, 2025), https://www.snap.com/terms.

[13] *Id.*

[14] *Snapchat Ads Transparency*, Snap (Aug. 13, 2025), https://values.snap.com/privacy/ads-privacy.

[15] *Snap Inc. Terms of Service*, Snap (Apr. 7, 2025), https://www.snap.com/terms.

"may be exposed to content that might be offensive, illegal, misleading, or otherwise inappropriate" and release Snap from all warranties and liability "to the extent permitted by law"[16]; (4) limit Snap's "aggregate liability" to "the greater of $100 USD or the amount [the user] [has] paid" Snap in the past twelve months[17]; (5) submit any disputes to "binding individual arbitration" and waive all rights to participate in a "class action" or "jury trial"[18]; and (6) "consent to . . . personal jurisdiction" in Los Angeles.[19]

HB3 directly regulates subjecting young children to such contracts when the contracts expose them to addictive design features. The Florida Legislature determined that when platforms deploy the features to exploit children's developing brains, children below a certain age lack the capacity to weigh the risks and benefits necessary to decide for themselves whether to form a contractual relationship with the platforms. And contracting—especially with children—is commercial activity that has been regulated since the Founding. *See NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (en banc); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 499 (1996) (distinguishing between "the State's power to regulate commercial transactions" and speech).

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

That is one reason why this case is different from *Packingham v. North Carolina*, *see* DE76 at 19, where the Supreme Court applied heightened scrutiny to a law that made it a crime for a sex offender "to access" a social-media platform. 582 U.S. 98, 101 (2017). That law was a direct regulation of speech—it made it a felony for a sex offender to post or read posts on social media. HB3 does nothing of the sort. Children are free to speak and interact on social media. They can access any speech they want and post whatever they want. All the law does is limit platforms' ability to enter contracts with them that expose them to addictive design features.[20]

**2.** HB3 does not impose a "disproportionate burden upon" expression either. *TikTok*, 145 S. Ct. at 65. The law is "directed at commerce or conduct"—platforms' use of addictive design features—and at most only "incidental[ly] burdens" children's speech. *Norwegian Cruise Line v. Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022); *see also Indigo Room v. Fort Myers*, 710 F.3d 1294, 1299-1300 (11th Cir. 2013); *Gary v. Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002). Any burden on children's speech

---

[20] The district court surmised that HB3 might regulate semi-expressive conduct because the contracts are "inextricable" from "accessing a forum for speech" such that the contracts have "an expressive element." DE94 at 32. Not even Plaintiffs argued that. For good reason: Conduct has an "expressive component" only if "the conduct *itself*"—rather than "the speech that accompanies it"—expresses an idea, and platforms' contracts are not *themselves* expressive. *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006) (emphasis added). Regardless, no record evidence supports the district court's conclusion that contracting for an account is "inextricable" from "accessing" a platform. While many platforms choose to require contracts before granting full access, Plaintiffs presented no evidence that doing so is necessary.

results from a platform's business decision to use the features. The district court itself recognized that HB3 does not target expression but instead the "features that are designed and operate to undermine a [child]'s ability to exercise their will in determining the amount of time that they choose to spend" online. DE94 at 41.

Although the Supreme Court "has not articulated a clear framework for determining whether a regulation of non-expressive activity . . . disproportionately burdens" expression, it has identified some relevant factors. *TikTok*, 145 S. Ct. at 66. It matters whether the law's "focus" is preventing expression and whether there are "causal steps between the [law] and the alleged burden on protected speech." *See id.* If a law's focus is unrelated to expression, and any burden on speech arises only if other events occur—such as a business choosing to engage in "unlawful conduct"—then the law is not "directed at" expression and does not trigger heightened scrutiny. *Arcara*, 478 U.S. at 707; *TikTok*, 145 S. Ct. at 66.

*TikTok* and this Court's decisions in *Indigo Room* and *Gary* are illustrative. In *TikTok*, TikTok and some of its users challenged a federal statute that required TikTok to either divest U.S. operations from Chinese control or effectively cease operating in the U.S. *TikTok*, 145 S. Ct. at 62. Although the Court ultimately did not decide whether the statute imposed a disproportionate burden on expression, it declined to endorse the D.C. Circuit's conclusion that it did, because the statute was "different in kind from the regulations of non-expressive activity that [the Supreme Court] ha[s] subjected to First

Amendment scrutiny." *Id.* at 65. The law's "focus" was TikTok's corporate ownership, not users' speech. And because TikTok would be banned only if it failed to divest, the failure to divest was a "causal step[]" between the law and the alleged burden on speech. *Id.*

In *Indigo Room* and *Gary*, this Court held that laws prohibiting persons under 21 from entering alcohol-serving establishments do not disproportionately burden speech even if they have the effect of preventing young people from engaging in nude dancing or attending political rallies. *Indigo Room*, 710 F.3d at 1299-1300; *Gary*, 311 F.3d at 1340. Those laws did not implicate the First Amendment because they were focused on exposure to alcohol, not expression, and there were causal steps between the laws and the burden on expression—the speech forums' decisions to serve alcohol.

On the flip side, if a law regulating commercial activity on its face singles out speech and has the effect of burdening it with no intervening causal steps, it more likely imposes a disproportionate burden on expression. For example, in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, the Supreme Court held that a tax on the use of paper and ink that was crafted to apply to only "a few of the largest newspapers in the state" triggered First Amendment scrutiny. 460 U.S. 575, 592 (1983). Even though taxing paper and ink is not a direct regulation of expression, it was apparent that the regulation was focused on expression. *Id.* at 585. The gerrymandered nature of the tax, which was "without parallel in [Minnesota's] tax scheme," was not "justified by

some special characteristic of the press" and thus applied to certain newspapers just because they were newspapers. *Id.* at 582, 585.

Likewise, the law in *Brown v. Entertainment Merchants Association* directly regulated only commercial activity: the sale or rental of violent video games to minors. 564 U.S. 786, 789 (2011). But that regulation targeted particular content (violent speech) for the avowed purpose of preventing minors' exposure to it. *See id.* Because the regulation's focus was violent speech and it directly burdened that expression, it imposed a disproportionate burden. *See also Free Speech Coal.*, 145 S. Ct. at 2309 (applying heightened scrutiny to an age-verification law that on its face targeted particular speech).

HB3, like the laws in *TikTok*, *Indigo Room*, and *Gary*, does not disproportionately burden expression. First, HB3's focus is not children's speech but platforms' use of design features that Florida's unrebutted expert testimony showed are harming children. If two social-media platforms were identical in all respects except that one used the features and the other did not, HB3 would impose no restrictions on the latter even though both platforms provide the same speech to children. So just like the law in *TikTok* "focus[ed]" on TikTok's corporate control by "a foreign government," 145 S. Ct. at 66, and the laws in *Gary* and *Indigo Room* focused on exposure to alcohol, HB3 focuses on a particular business practice—product designs that have been shown to harm children.

Second, there are "causal steps between [HB3] and the alleged burden on protected speech." *Id.* The alleged burden here, as in *TikTok*, is that users will not be able to speak and access speech on covered platforms. But in both cases, any limit on access results from the platforms' chosen business practices, not the law. Because the law in *TikTok* barred access only if TikTok chose not to divest from Chinese control, the failure to divest was a "causal step" between the law and the alleged burden on expression. *Id.* Similarly, a child will be prevented from accessing a platform under HB3 only if the platform chooses to use addictive features and condition access on users' contracting for an account. Platforms are thus "punished" for that "nonexpressive *conduct*" under HB3, "not [their or their users'] speech." *Virginia v. Hicks*, 539 U.S. 113, 123 (2003).

The district court found that HB3 triggers heightened scrutiny because it regulates "contract[s] made for the purpose of accessing speech." DE94 at 29. But a law does not implicate the First Amendment just because it regulates businesses that host or facilitate speech. If there is some basis for regulating the businesses other than "suppressing[] particular ideas," the law will not trigger heightened scrutiny. *Leathers v. Medlock*, 499 U.S. 439, 453 (1991); *Arcara*, 478 U.S. at 704. Consider a law prohibiting children from subscribing to newspapers that use an ink known to cause cancer. That law would not trigger First Amendment scrutiny because its focus is toxic ink, not expression, and the newspaper's decision to use toxic ink is a causal step between the

law and the burden on children's access to speech. HB3 is no different. The First Amendment is not a refuge for tech giants that choose to use design features that are toxic to children's mental health. *See* DE51-2 ¶¶ 29-45; DE51-9 at 9.[21]

## B. HB3 satisfies intermediate scrutiny.

But the Court ultimately "need not" decide whether HB3 triggers First Amendment scrutiny because it satisfies scrutiny in any event. *See TikTok*, 145 S. Ct. at 66. As the district court rightly concluded, HB3 does not regulate speech based on its content and so at most is subject to intermediate scrutiny. DE94 at 35-39. It easily satisfies that standard.

A law survives intermediate scrutiny if it is "narrowly tailored to serve a significant governmental interest." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). That test does not require a law to be "the least speech-restrictive means of advancing the [State]'s interests." *TikTok*, 145 S. Ct. at 70. Rather, a law is sufficiently tailored if the legislature "could reasonably have determined that its interests overall

---

[21] The district court's rationale would even imperil COPPA, which requires platforms "to obtain verifiable parental consent" before collecting data from children under 13. 15 U.S.C. § 6502(b)(A)(ii). That regulation focuses on child privacy, and it only burdens children's speech if platforms decide to condition access to their product on users' allowing collection of their data. Yet COPPA, which has never been challenged under the First Amendment, poses serious First Amendment problems under the district court's decision. Because many social-media companies condition access on collecting user data, COPPA has the effect of limiting children's access to "account[s]." DE94 at 32.

would be served less effectively without the" regulation, *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989), and if "it cannot be said that a substantial portion of the burden that [the law] imposes fails to advance [the legislature]'s goals." *Free Speech Coal.*, 145 S. Ct. at 2318. Under intermediate scrutiny, the effectiveness of the possible means the State could have chosen to achieve its interests "is a judgment for the [legislature], not the courts." *Rumsfeld v. FAIR*, 547 U.S. 47, 67 (2006). Legislatures are allowed to draw "deductions and inferences" from "[in]complete empirical support" to make "predictive judgments," which courts "must accord substantial deference." *TikTok*, 145 S. Ct. at 69-70.

The district court was right that protecting children from addiction and associated mental-health harms is likely a significant governmental interest that is unrelated to the suppression of expression, *see* DE94 at 41, but the court's tailoring analysis bucked intermediate-scrutiny precedent. HB3 "clearly serve[s] [Florida's] interest in a direct and effective way." *TikTok*, 145 S. Ct. at 70. As in *TikTok*, HB3 "imposes [only] a conditional" regulation, not an "outright" ban. *Id.* at 71. Its restrictions apply only "unless and until" a platform refrains from using design features that manipulate children into compulsively consuming its product. *Id.*; *see also, e.g.*, *Wise Enters. v. Athens-Clarke Cnty.*, 217 F.3d 1360, 1365 (11th Cir. 2000) (upholding a law under intermediate scrutiny because it "d[id] not prohibit" an expressive activity, "but only restrict[ed] [it] in" places that chose to sell alcohol).

HB3 enumerates the design features found by the Florida Legislature and the U.S. Surgeon General to facilitate addiction, *see* DE51-2 ¶¶ 29-45, DE51-9 at 9-11, and it applies only if a platform decides to use those features. Fla. Stat. § 501.1736(1)(e)4. Among those platforms, the Legislature further tailored HB3 by targeting only those platforms that present a higher risk of addicting children—platforms where at least 10% of daily active users under age 16 log on more than 2 hours per day. *Id.* § 501.1736(1)(e)2. Even then, HB3 does not prohibit children from accessing the platform. It instead prohibits the platform from contracting with them for accounts so that the platform cannot target them with addictive features. *Id.* § 501.1736(1)(a), (2)(a), (3)(a). That restriction is further tailored to a child's age. HB3 recognizes that "a 7-year-old is not a 1[4]-year-old." *J.D.B. v. North Carolina*, 564 U.S. 261, 280 (2011). It does not apply to children over 15, and 14- and 15-year-olds may contract for accounts with parental consent.

Because HB3 zeroes in on platforms that target children with addictive design features, "it cannot be said that" any portion—let alone "a substantial portion"—"of the burden that [the law] imposes fails to advance [the Legislature]'s goal[]" of protecting children. *Free Speech Coal.*, 145 S. Ct. at 2318.

But as far as the district court was concerned, none of that mattered. It ignored HB3's nuances and treated the law as a "categorical[]" access ban. DE94 at 45 n.27. The court relied heavily on *Packingham*, where the Supreme Court held that a law

categorically prohibiting sex offenders from "access[ing]" social media failed intermediate scrutiny.[22] 582 U.S. at 101, 107. But *Packingham* is far afield. There, North Carolina banned sex offenders from accessing all social media—from "Facebook" to "LinkedIn"—to protect children from predators. *Id.* at 101, 106-07. A substantial portion of the burden imposed by that "sweeping law" failed to advance North Carolina's goal of protecting children from predators. *Id.* at 108. An interest in protecting children from other users, however, is different than an interest in protecting children from harmful features that platforms are themselves using. So even if HB3 were a "categorical[]" ban that stopped children from accessing social media, *Packingham* would have no bearing on whether a substantial portion of HB3's burden fails to advance Florida's interest. *Free Speech Coal.*, 145 S. Ct. at 2318.

Yet HB3 is not a categorical access ban. It has a reticulated definitional scheme, which targets the activities that cause compulsive use by children. It does not ban children from social media. HB3 allows access in a variety of ways that pose a lesser risk of addiction: Children can create accounts on platforms that forgo addictive features; parents can allow their child to access social media through their own accounts; and platforms can choose to allow full access to children without accounts. If tech

---

[22] The court also relied on *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786 (2011), and *Ashcroft v. ACLU*, 542 U.S. 656 (2004)—cases that applied strict scrutiny. DE94 at 42, 49, 51 n.31.

companies decide to bar children from accessing their platforms rather than simply

dropping their addictive features or allowing children access without requiring them to

enter contracts, then the platforms—not HB3—are prohibiting children's access. But

the district court glossed over all that, ignoring that—like the law in *TikTok* and unlike

the law in *Packingham*—HB3 imposes only "conditional" restrictions.[23] *TikTok*, 145 S.

Ct. at 71.

Nowhere did the district court find that "a substantial portion of the burden" on

children's speech imposed by HB3 "fails to advance [Florida's] goals." *Free Speech Coal.*,

145 S. Ct. at 2318. Instead, the court did precisely what is forbidden in intermediate-

scrutiny analysis: It "parade[d] a series of alternatives" and "displace[d] the

[Legislature's] judgment [about] content-neutral regulations with [its] own." *TikTok*,

145 S. Ct. at 71. The court relied on *Ashcroft v. ACLU*, 542 U.S. 656 (2004)—a strict-

scrutiny case—and explained that HB3 is not narrowly tailored because Florida could

have relied on "individuals to voluntarily restrict" child exposure to addictive features.

---

[23] The district court's observation that platforms can still expose children without accounts to some of the addictive features is yet another example of the court departing from intermediate scrutiny. DE94 at 46 n.28. Even if some exposure might still occur, a law does not fail intermediate scrutiny just because it is "imperfect," *Clark*, 468 U.S. at 297, or "underinclusive." *TikTok*, 145 S. Ct. at 70. And in any event, Florida "ha[d] a reasonable basis" to conclude that addictive features pose an even greater risk to children when the platforms also use contracts to secure vast amounts of children's personal data and to shield themselves from liability for the harm they cause children. *Free Speech Coal.*, 145 S. Ct. at 2318.

DE94 at 48-49. In other words, by the district court's lights, the Constitution requires Florida to rely on companies that have designed their products to addict children and misled the public about it to offer parental controls that parents can effectively use. DE94 at 49-50. And if that fails, as it already has, *see supra* 4-8, Florida should simply do "a public education campaign" about "the risks of social media." DE94 at 51-52.

The Supreme Court has since rejected that analysis as "unpersuasive." *Free Speech Coal.*, 145 S. Ct. at 2318. In *Free Speech Coalition*, the plaintiffs argued that a Texas law requiring age verification on sexually explicit websites failed intermediate scrutiny because Texas could instead "encourag[e] parents" to take advantage of parental controls. *Id.* But "even assuming" parental controls would be "equally or more effective," the Court explained, the law survived because under intermediate scrutiny, it is irrelevant that "the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* (quoting *Ward*, 491 U.S. at 800).

That is because under intermediate scrutiny, the relative effectiveness of the State's regulatory options "is a judgment for [the Legislature], not the courts." *FAIR*, 547 U.S. at 67. The question is simply whether a legislature "could reasonably have determined that its interests overall would be served less effectively" without the law. *Ward*, 491 U.S. at 801. The Florida Legislature not only *could* have determined that—it expressly did. The Legislature considered parental controls and rejected them. *See* DE51-11 at 6-7. The district court did not even purport to find that decision

unreasonable—it just disagreed. Yet whether the court "agree[s] with the [Legislature's] conclusion that its chosen regulatory path is best or most appropriate" is irrelevant under intermediate scrutiny. *TikTok*, 145 S. Ct. at 71. The court's "displace[ment]" of the Legislature's "judgment" about the relative effectiveness of the regulatory options was inconsistent with its duty to afford the Legislature "latitude" "to design regulatory solutions to address content-neutral interests." *Id.*; *Free Speech Coal.*, 145 S. Ct. at 2318.

In sum, HB3 does not violate children's First Amendment rights. Under *TikTok*, *Free Speech Coalition*, and decades of First Amendment precedent, it satisfies intermediate scrutiny.

## C.  At minimum, HB3's protections for children younger than 14 years old are not facially unconstitutional.

For all the reasons above, every application of HB3 is constitutional. But even if that were not so, the district court still erred in enjoining Section 501.1736(2), HB3's restriction on certain platforms contracting with children under 14 years old, because Plaintiffs did not establish that the provision is facially unconstitutional.[24] Section 501.1736(2) has a variety of applications. It can, for example, be enforced against a

---

[24] Though Plaintiffs pressed only their facial challenge in their renewed preliminary-injunction motion, the district court considered their as-applied challenge as well. *See* DE94 at 25-28 (citing Plaintiffs' complaint, which raises an as-applied challenge, and then addressing the challenge). That was improper. Florida had no opportunity to address the as-applied challenge since Plaintiffs did not advance it during the preliminary-injunction litigation. *See* DE94 at 57 n.33 (acknowledging that Florida understood Plaintiffs to press only their facial challenge).

platform that uses all the enumerated addictive features when the platform provides an account to a 5-year-old. *See* Fla. Stat. § 501.1736(2). It can also be enforced against the platform when it provides an account to a 6-year-old, a 7-year-old, and so on. *See id.* Even assuming that some of Section 501.1736(2)'s applications are invalid, the provision has a broad sweep of constitutional applications. It can be validly enforced against a platform when it provides accounts to children of "tender years," *Prince v. Massachusetts*, 321 U.S. 158, 169-70 (1944), because those children are even more vulnerable to platforms' addictive features, *see* DE51-2 ¶ 46, and they have more limited First Amendment interests. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.11 (1975) ("[T]he age of the minor is a significant factor" in determining the First Amendment interests at stake.).

"The [Supreme] Court long has recognized that the status of minors under the law is unique in many respects." *Bellotti v. Baird*, 443 U.S. 622, 633 (1979) (plurality op.); *Prince*, 321 U.S. at 169-70. "[A]lthough children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability." *Bellotti*, 443 U.S. at 635. "[E]ven where there is an invasion of protected freedoms[,] the power of the [S]tate to control the conduct of children reaches beyond the scope of its authority over adults." *Id.* at 636. "It is well settled," for instance, "that a State . . . can adopt more stringent controls on communicative materials available to youths than on those

available to adults" because "[t]he First Amendment rights of minors are not coextensive with those of adults." *Erznoznik*, 422 U.S. at 212, 214 n.11. States can impose "restraints on minors which would be unconstitutional [under the First Amendment] if placed on adults" when the restraints are "based on" the "peculiar vulnerability of children." *Johnson v. City of Opelousas*, 658 F.2d 1065, 1073 (5th Cir. 1981).

That precedent accords with history and tradition. *See Free Speech Coal.*, 145 S. Ct. at 2303 (considering "[h]istory, tradition, and precedent" in determining the scope of children's First Amendment rights). States have always had more power to regulate children's activities. At the Founding, children were viewed as "lack[ing] the reason and judgment necessary to be trusted with legal rights." *NRA*, 133 F.4th at 1117. So the Founding generation "imposed age limits on all manner of activities." *Id.* at 1123. Children could not enlist in the military without parental consent. *Id.* at 1117. States "set age limits restricting marriage without parental consent." *Brown*, 564 U.S. at 834 (Thomas, J., dissenting). And children did not have access to the same speech as adults. "Parents controlled children's access to information, including books," *NRA*, 133 F.4th at 1117, and States prohibited "[e]ntertaining . . . [c]hildren" without parental consent. Juries verdict agst Alice Thomas, Volume 29: Records of the Suffolk Cnty. Ct. 1671-1680 Part 1, pp. 82-83, available at https://tinyurl.com/3r8hw435; *see also* Book of the Gen. Laws and Liberties of Mass. 137 (1649) (penalizing "entertain[ing]" children "to the dishonour of God and grief of their parents").

This longstanding "power" to regulate "children's activities" is at its zenith for children of "tender years." *Prince*, 321 U.S. at 168-70. The State has a greater interest in protecting those children because they are more vulnerable to "emotional excitement and psychological or physical injury." *Id.* at 170; *see also Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683-84 (1986) (some "speech could well be seriously damaging to" young children but not high-school students); *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2355 n.8 (2025) (similar). Young children also have narrower First Amendment interests because they "are at a stage in which learning how to develop relationships and behave in society is as or even more important than their forming particular views on controversial topics." *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417 (3d Cir. 2003); *Morgan v. Swanson*, 659 F.3d 359, 386-87 (5th Cir. 2011) (en banc) ("elementary students" are still learning "the most basic social and behavioral tasks").

Under this history, tradition, and precedent, HB3's protections for children under 14 years old are not facially unconstitutional. Florida can at the very least enforce Section 501.1736(2) against covered platforms when they provide accounts to young children. That provision is a valid exercise of the State's longstanding "power" to regulate the "activities" of children of "tender years" to protect them from "danger[.]" *Prince*, 321 U.S. at 168-70. Even if those children have a First Amendment interest in internet accounts that expose them to addictive features, the State is "justif[ied]" in protecting them because of their unique "vulnerability." *Johnson*, 658 F.2d at 1073.

The district court conceded that "[p]erhaps six-year-olds do not have . . . a First Amendment interest" in contracting for internet accounts, but it deemed that irrelevant because HB3 applies to children as old as 13, who do have "First Amendment rights." DE94 at 45 n.27. That, however, ignores that the court could not find Section 501.1736(2) facially unconstitutional unless Plaintiffs showed that its supposedly unconstitutional applications to older children substantially "outweigh" its constitutional applications to younger children. *Moody v. NetChoice*, 603 U.S. 707, 724-25 (2024).

Yet Plaintiffs did "not even attempt" to make that showing. *Free Speech Coal.*, 145 S. Ct. at 2308 n.7. They just declared that "all aspects of HB3, in every application" are unconstitutional. DE88 at 42. That failure requires vacatur of the preliminary injunction as to Section 501.1736(2). *See NetChoice v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025) (vacating a preliminary injunction that Plaintiffs obtained because they did not meet their burden under *Moody*); *Project Veritas v. Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025) (en banc) (The plaintiff "fail[ed] to meet its burden" under *Moody* "because it ma[de] little effort to identify and weigh the . . . statute's lawful and unlawful applications.").

III. **EVEN IF PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION, THE DISTRICT COURT EXCEEDED ITS EQUITABLE POWERS IN UNIVERSALLY ENJOINING HB3.**

The district court erred in awarding universal relief. Plaintiffs did not even request such sweeping relief; they asked only for an injunction protecting their

"members." DE75 at 2. Worse, the district court's sua sponte universal injunction far exceeded its equitable authority, which is limited to remedying "the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *Trump v. CASA*, 145 S. Ct. 2540, 2557 (2025) (rejecting the use of universal injunctions as exceeding the scope of federal courts' equitable authority). The court only had authority to preliminarily enjoin enforcement against Snap. Plaintiffs are associations "assert[ing] [their] members' injury," *Brown Grp.*, 517 U.S. at 551-52, and Snap is the only member for whom they established a justiciable injury.

The district court found that "Snap and Google" are injured because Plaintiffs showed that they are subject to HB3 and face a threat of enforcement, DE94 at 22, but the court was wrong in finding that Plaintiffs established injury for Google. To establish that Google is subject to HB3, Plaintiffs had to offer evidence that Google operates a platform that meets the law's 2-hour usage requirement. *See* Fla. Stat. § 501.1736(1)(e)2 (a platform is only covered by HB3 if "[t]en percent or more of the daily active users who are younger than 16 years of age spen[t] on average 2 hours per day or longer on the" platform "on the days when using the" platform "during the previous 12 months"). The only evidence that Plaintiffs offered on behalf of Google was a declaration from a YouTube employee (Google owns YouTube), and the declarant admitted that she was unsure whether HB3 applies to YouTube. DE76-4 ¶ 10. Despite her confessed lack of knowledge, the declarant offered the equivocal, conclusory assertion that "there is

reason to believe . . . YouTube may be covered by the Act" because "there is a potential way to calculate the threshold that might result in" YouTube meeting the 2-hour usage requirement. *Id.* That statement, which the district court itself admitted was "somewhat vague," DE94 at 20, was not enough to establish that Google is subject to HB3 and requires injunctive relief.

Plaintiffs, in short, did not meet their burden for injunctive relief, but even if they did, the injunction should be limited to remedying the only injury Plaintiffs produced evidence of—Snap's.

## CONCLUSION

This Court should reverse the preliminary injunction.

Dated: August 13, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

*/s/ Kevin A. Golembiewski*
JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,113 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on August 13, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General
