No. 25-11881

# In the United States Court of Appeals for the Eleventh Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,
ET AL.,
*Plaintiffs-Appellees*,

V.

JAMES UTHMEIER, IN HIS OFFICIAL CAPACITY AS FLORIDA
ATTORNEY GENERAL,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

## APPENDIX VOLUME 1

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

August 13, 2025

*Counsel for Appellant*

App. 1

## Index

Docket/Tab#

**Volume 1**

District Court Docket Sheet ................................................................................ A

Complaint ............................................................................................................. 1

Declaration of Jean Twenge, Ph.D. ............................................................... 51-1

Declaration of Adam Alter, Ph.D. ................................................................. 51-2

Declaration of Tony Allen ............................................................................... 51-3

U.S. Surgeon General's Advisory on Social Media and Youth Mental Health ...... 51-9

**Volume 2**

Preliminary Injunction Hearing Transcript .................................................... 71

Order Denying Motion for Preliminary Injunction ..................................... 72

Order Granting Motion to Dismiss ................................................................ 73

Amended Complaint .......................................................................................... 74

**Volume 3**

Order Granting Renewed Motion for Preliminary Injunction ................... 94

Attorney General's Notice of Appeal ............................................................ 95

# Tab A

APPEAL

# U.S. District Court
## Northern District of Florida (Tallahassee)
### CIVIL DOCKET FOR CASE #: 4:24-cv-00438-MW-MAF

COMPUTER & COMMUNICATIONS INDUSTRY
ASSOCIATION et al v. UTHMEIER
Assigned to: JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE MARTIN A FITZPATRICK
related Case: 3:25-cv-00676-MW-HTC
Case in other court:  UNITED STATES COURT OF APPEALS
                      FOR THE ELEVENTH CI, 25-11881-F
Cause: 28:1331 Fed. Question

Date Filed: 10/28/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION**

represented by **ERIN E MURPHY**
CLEMENT & MURPHY PLLC -
ALEXANDRIA VA
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email: erin.murphy@clementmurphy.com
*ATTORNEY TO BE NOTICED*

**GRACE LEE MEAD**
STEARNS WEAVER MILLER - MIAMI
FL
150 W FLAGLER STREET
SUITE 2200
MIAMI, FL 33130
305-789-3559
Fax: 305-789-3395
Email: gmead@stearnsweaver.com
*ATTORNEY TO BE NOTICED*

**HANNAH ELEANOR MURPHY**
STEARNS WEAVER MILLER -
TALLAHASSEE FL
106 E COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL 32301
850-354-7629
Email: hmurphy@stearnsweaver.com
*ATTORNEY TO BE NOTICED*

**JAMES XI**
CLEMENT & MURPHY PLLC -
ALEXANDRIA VA

App. 4

706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email: james.xi@clementmurphy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JOSEPH JOHN DEMOTT**
CLEMENT & MURPHY PLLC -
ALEXANDRIA VA
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email: joseph.demott@clementmurphy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**KEVIN JOSEPH WYNOSKY**
CLEMENT & MURPHY PLLC -
ALEXANDRIA VA
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email:
kevin.wynosky@clementmurphy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**MITCHELL KESHAVA PALLAKI**
CLEMENT & MURPHY PLLC -
ALEXANDRIA VA
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8891
Email:
mitchell.pallaki@clementmurphy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PAUL D CLEMENT**
CLEMENT & MURPHY PLLC -
ALEXANDRIA VA
706 DUKE STREET
ALEXANDRIA, VA 22314
202-742-8900
Email: paul.clement@clementmurphy.com
*ATTORNEY TO BE NOTICED*

**DOUGLAS LAMAR KILBY**
STEARNS WEAVER MILLER -
TALLAHASSEE FL
106 E COLLEGE AVENUE
SUITE 700
TALLAHASSEE, FL 32301

App. 5

850-329-4847
Email: dkilby@stearnsweaver.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NETCHOICE**                                    represented by **ERIN E MURPHY**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **GRACE LEE MEAD**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **HANNAH ELEANOR MURPHY**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **JAMES XI**
                                                  (See above for address)
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **JOSEPH JOHN DEMOTT**
                                                  (See above for address)
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **KEVIN JOSEPH WYNOSKY**
                                                  (See above for address)
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **MITCHELL KESHAVA PALLAKI**
                                                  (See above for address)
                                                  *PRO HAC VICE*
                                                  *ATTORNEY TO BE NOTICED*

                                                  **PAUL D CLEMENT**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

                                                  **DOUGLAS LAMAR KILBY**
                                                  (See above for address)
                                                  *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ASHLEY BROOKE MOODY**                          represented by **ANITA J PATEL**
*TERMINATED: 02/20/2025*                          FLORIDA ATTORNEY GENERALS
                                                  OFFICE
                                                  PL-01 THE CAPITOL
                                                  TALLAHASSEE, FL 32399

App. 6

850-414-3694
Email: anita.patel@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**CHRISTINE EDWARDS LAMIA**
FLORIDA ATTORNEY GENERAL'S
OFFICE
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-414-3300
Fax: 850-488-4872
Email: christine.lamia@myfloridalegal.com
*TERMINATED: 05/29/2025*

**DANIEL WILLIAM BELL**
FLORIDA ATTORNEY GENERALS
OFFICE
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
786-473-2923
Email: daniel.bell@myfloridalegal.com
*TERMINATED: 02/03/2025*

**DARRICK WILLIAM MONSON**
FLORIDA ATTORNEY GENERAL'S
OFFICE
107 W GAINES STREET
TALLAHASSEE, FL 32399
850-414-3683
Email:
darrick.monson@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**DAVID MATTHEW COSTELLO**
BOIES SCHILLER & FLEXNER LLP - FT
LAUDERDALE FL
401 E LAS OLAS BLVD
STE 1200
FT LAUDERDALE, FL 33301
954-356-0011
Email: dcostello@bsfllp.com
*TERMINATED: 06/27/2025*

**HENRY CHARLES WHITAKER**
FLORIDA OFFICE OF THE ATTORNEY
GENERAL
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399-1050
850-414-3688
Email: henry.whitaker@myfloridalegal.com
*TERMINATED: 01/16/2025*

**JAMES PAUL WACZEWSKI**
WACZEWSKI LAW GROUP -

App. 7

TALLAHASSEE, FL
2520-2 BARRINGTON CIRCLE
TALLAHASSEE, FL 32308
850-524-2100
Fax: 850-383-6604
Email: james@waczewskilaw.com
*ATTORNEY TO BE NOTICED*

**JOHN MATTHEW GUARD**
FLORIDA ATTORNEY GENERAL'S
OFFICE
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-245-0140
Email: johnmguard@hotmail.com
*TERMINATED: 06/25/2025*

**KEVIN A GOLEMBIEWSKI**
OFFICE OF THE ATTORNEY GENERAL
3507 E FRONTAGE ROAD
SUITE 200
TAMPA, FL 33607
813-287-7900
Email:
kevin.golembiewski@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**SARA ELIZABETH SPEARS**
FLORIDA ATTORNEY GENERAL'S
OFFICE
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-414-3300
Email: sara.spears@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES UTHMEIER**
*IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF
FLORIDA*

represented by **ANITA J PATEL**
FLORIDA ATTORNEY GENERALS
OFFICE
COMPLEX LITIGATION
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-414-3694
Email: anita.patel@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**CHRISTINE EDWARDS LAMIA**
(See above for address)
*TERMINATED: 05/29/2025*

**DARRICK WILLIAM MONSON**
FLORIDA ATTORNEY GENERAL'S
OFFICE

App. 8

OFFICE OF THE SOLICITOR GENERAL
107 W GAINES STREET
TALLAHASSEE, FL 32399
850-414-3683
Email:
darrick.monson@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**DAVID MATTHEW COSTELLO**
(See above for address)
*TERMINATED: 06/27/2025*

**JAMES PAUL WACZEWSKI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JEFFREY PAUL DESOUSA**
FLORIDA ATTORNEY GENERALS
OFFICE
107 WEST GAINES STREET
TALLAHASSEE, FL 32399
850-414-3830
Email: jeffrey.desousa@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

**JOHN MATTHEW GUARD**
FLORIDA ATTORNEY GENERAL'S
OFFICE
EXECUTIVE STAFF
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-245-0140
Email: johnmguard@hotmail.com
*TERMINATED: 06/25/2025*

**KEVIN A GOLEMBIEWSKI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SARA ELIZABETH SPEARS**
FLORIDA ATTORNEY GENERAL'S
OFFICE
COMPLEX LITIGATION
PL-01 THE CAPITOL
TALLAHASSEE, FL 32399
850-414-3300
Email: sara.spears@myfloridalegal.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 10/28/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AFLNDC-9113404.), filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, |

App. 9

| | | NETCHOICE. (Attachments: # 1 Summons for Defendant) (KILBY, DOUGLAS) (Entered: 10/28/2024) |
|---|---|---|
| 10/28/2024 | 2 | CIVIL COVER SHEET. (KILBY, DOUGLAS) (Entered: 10/28/2024) |
| 10/28/2024 | 3 | Summons Issued as to ASHLEY BROOKE MOODY. (baf) (Entered: 10/28/2024) |
| 10/29/2024 | 4 | PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 10/29/2024 (baf). (Entered: 10/29/2024) |
| 10/29/2024 | 5 | PLAINTIFFS' MEMORANDUM IN SUPPORT OF 4 MOTION FOR PRELIMINARY INJUNCTION filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (KILBY, DOUGLAS) Modified title on 10/29/2024 (baf). (Entered: 10/29/2024) |
| 10/29/2024 | 6 | ORDER SETTING CONFERENCE SCHEDULE - Pending before this court are Plaintiff's Complaint, ECF No. 1 , and Plaintiff's Motion for Preliminary Injunction, ECF No. 4 . Plaintiffs shall serve Defendant with a copy of this Order, the Complaint, and the Motion for Preliminary Injunction before noon, 12:00 p.m. (ET) on Friday, **11/1/2024**, so the parties can confer prior to the scheduling conference. The parties shall file a proposed briefing schedule with respect to the motion for preliminary injunction by Wednesday, **11/6/2024**. The Clerk shall set this matter for a telephonic scheduling conference on Friday, **11/8/2024** , at 4:00 p.m. (ET). Signed by CHIEF JUDGE MARK E WALKER on 10/29/2024. (baf) (Entered: 10/29/2024) |
| 10/29/2024 | 7 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **11/8/2024 04:00 PM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call Judge Walkers Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **855-244-8681** When prompted for an access code, enter: **2309 453 2428#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is compromised by these devices.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 10/29/2024) |
| 10/30/2024 | 8 | NOTICE of Appearance by PAUL D CLEMENT on behalf of COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (CLEMENT, PAUL) (Entered: 10/30/2024) |
| 10/30/2024 | 9 | NOTICE of Appearance by ERIN E MURPHY on behalf of COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (MURPHY, ERIN) (Entered: 10/30/2024) |
| 10/30/2024 | 10 | MOTION to Appear Pro Hac Vice by Joseph J. DeMott.( Filing fee $ 219 receipt number AFLNDC-9119398.) by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (MURPHY, HANNAH) (Entered: 10/30/2024) |
| 10/30/2024 | 11 | MOTION to Appear Pro Hac Vice by James Y. Xi.( Filing fee $ 219 receipt number AFLNDC-9119412.) by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (MURPHY, HANNAH) (Entered: 10/30/2024) |

App. 10

| 10/30/2024 | 12 | MOTION to Appear Pro Hac Vice by Mitchell K. Pallaki.( Filing fee $ 219 receipt number AFLNDC-9119425.) by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (MURPHY, HANNAH) (Entered: 10/30/2024) |
|---|---|---|
| 10/30/2024 | 13 | ORDER ADMITTING JOSEPH DEMOTT PRO HAC VICE - This Court has considered, without hearing, the Motion to Appear Pro Hac Vice. ECF No. 10 . The motion is GRANTED. Joseph J. DeMott has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 10/30/2024. (baf) (Entered: 10/31/2024) |
| 10/30/2024 | 14 | ORDER ADMITTING MITCHELL PALLAKI PRO HAC VICE - This Court has considered, without hearing, the Motion to Appear Pro Hac Vice. ECF No. 12 . The motion is GRANTED. Mitchell K. Pallaki has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 10/30/2024. (baf) (Entered: 10/31/2024) |
| 10/30/2024 | 15 | ORDER ADMITTING JAMES XI PRO HAC VICE - This Court has considered, without hearing, the Motion to Appear Pro Hac Vice. ECF No. 11 . The motion is GRANTED. James Y. Xi has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 10/30/2024. (baf) (Entered: 10/31/2024) |
| 10/31/2024 | 16 | NOTICE OF FILING RETURNS OF SERVICE AND COMPLIANCE WITH 6 ORDER SETTING CONFERENCE SCHEDULE by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (Attachments: # 1 Exhibit Return of Service, # 2 Exhibit Return of Service) (KILBY, DOUGLAS) Modified title on 10/31/2024 (baf). (Entered: 10/31/2024) |
| 11/05/2024 | 17 | NOTICE of Appearance by ANITA J PATEL on behalf of ASHLEY BROOKE MOODY (PATEL, ANITA) (Entered: 11/05/2024) |
| 11/05/2024 | 18 | NOTICE of Appearance by CHRISTINE EDWARDS LAMIA on behalf of ASHLEY BROOKE MOODY (LAMIA, CHRISTINE) (Entered: 11/05/2024) |
| 11/05/2024 | 19 | NOTICE of Appearance by SARA ELIZABETH SPEARS on behalf of ASHLEY BROOKE MOODY (SPEARS, SARA) (Entered: 11/05/2024) |
| 11/05/2024 | 20 | NOTICE of Appearance by JAMES PAUL WACZEWSKI on behalf of ASHLEY BROOKE MOODY (WACZEWSKI, JAMES) (Entered: 11/05/2024) |
| 11/05/2024 | 21 | NOTICE of Appearance by DARRICK WILLIAM MONSON on behalf of All Defendants (MONSON, DARRICK) (Entered: 11/05/2024) |
| 11/05/2024 | 22 | NOTICE of Appearance by HENRY CHARLES WHITAKER on behalf of ASHLEY BROOKE MOODY (WHITAKER, HENRY) (Entered: 11/05/2024) |
| 11/05/2024 | 23 | NOTICE of Appearance by KEVIN A GOLEMBIEWSKI on behalf of ASHLEY BROOKE MOODY (GOLEMBIEWSKI, KEVIN) (Entered: 11/05/2024) |
| 11/06/2024 | 24 | NOTICE of Appearance by DANIEL WILLIAM BELL on behalf of ASHLEY BROOKE MOODY (BELL, DANIEL) (Entered: 11/06/2024) |
| 11/06/2024 | 25 | JOINT REPORT ON PARTIES' MEET AND CONFER REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, ASHLEY BROOKE MOODY (KILBY, DOUGLAS) Modified title on 11/7/2024 (baf). (Entered: 11/06/2024) |
| 11/07/2024 | 26 | NOTICE of Supplemental Authority by ASHLEY BROOKE MOODY (Attachments: # 1 Supplemental Authority) (MONSON, DARRICK) (Entered: 11/07/2024) |

App. 11

| 11/08/2024 | 27 | NOTICE of Appearance by JOHN MATTHEW GUARD on behalf of ASHLEY BROOKE MOODY (GUARD, JOHN) (Entered: 11/08/2024) |
|---|---|---|
| 11/08/2024 | 28 | RESPONSE TO DEFENDANT'S 26 NOTICE OF SUPPLEMENTAL AUTHORITY by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (KILBY, DOUGLAS) Modified title on 11/8/2024 (baf). (Entered: 11/08/2024) |
| 11/08/2024 | 30 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 11/8/2024. The parties are to file an amended Joint Report by noon on Friday, November 15, 2024. A telephonic scheduling hearing is scheduled for 4:00 pm on Friday, November 15, 2024, but will be cancelled if the Joint Report schedule is adopted by the Court. (Court Reporter Megan Hague.) (kjw) (Entered: 11/08/2024) |
| 11/12/2024 | 29 | NOTICE OF HEARING: Telephonic Scheduling Conference set for **11/15/2024 04:00 PM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call Judge Walker's Conference Line (see below).<br><br>Conference Call Information:<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **855-244-8681**. When prompted for an access code, enter: **2309 453 2428**. Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking.<br><br>*s/ Kimberly Westphal*<br>Deputy Clerk<br><br>The quality of the audio connection is compromised by the use of cell phones or speakerphones and counsel are requested not to use those devices during the call.<br><br>(kjw) (Entered: 11/12/2024) |
| 11/15/2024 | 31 | ORDER RESETTING HEARING AND EXTENDING DEADLINE TO FILE JOINT REPORT - The parties have contacted this Court's chambers requesting a brief extension of the deadline to file their amended joint report. Accordingly, based on the parties' request, the deadline to file their amended joint report is extended to on or before 5:00 p.m. (ET) on Monday, **11/18/2024**. The Clerk shall CANCEL the telephonic scheduling conference set for today, November 15, 2024, at 4:00 p.m. (ET). The telephonic scheduling conference is RESET for Tuesday, **11/19/2024**, at 11:00 a.m. (ET). Signed by CHIEF JUDGE MARK E WALKER on 11/15/2024. (baf) (Entered: 11/15/2024) |
| 11/15/2024 | 32 | INITIAL SCHEDULING ORDER: Fed.R.Civ.P. 7.1 Corporate Disclosure Statement Deadline set for **11/29/2024**. Rule 26 Meeting Report due by **12/30/2024**. Discovery due by **3/14/2025**. Dispositive Motions to be filed by **4/4/2025**. Status Report due by **12/16/2024**. Signed by CHIEF JUDGE MARK E WALKER on 11/15/2024. (baf) (Entered: 11/15/2024) |
| 11/15/2024 | 33 | NOTICE OF RESCHEDULED TELEPHONIC HEARING: Telephonic Scheduling Conference reset for **11/19/2024 11:00 AM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call Judge Walkers Conference Line (see below)<br><br>Conference Call Information |

App. 12

You may dial into the conference call up to five minutes before start time. Call in number: **855-244-8681** When prompted for an access code, enter: **2309 453 2428#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is compromised by these devices.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 11/15/2024)

| | | |
|---|---|---|
| 11/18/2024 | 34 | AMENDED JOINT REPORT ON PARTIES' MEET AND CONFER REGARDING 4 PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION by ASHLEY BROOKE MOODY. (GOLEMBIEWSKI, KEVIN) Modified title on 11/19/2024 (baf). (Entered: 11/18/2024) |
| 11/19/2024 | 35 | ORDER SETTING PRELIMINARY INJUNCTION HEARING AND BRIEFING SCHEDULE - Accordingly, given both sides' preference for their proposed briefing schedule, this Court adopts the joint proposed schedule set out in ECF No. 34 . Plaintiffs shall make their declarants available for deposition before January 1, 2025. Defendant's response to the motion and any declarations in support thereof are due on or before **1/13/2025**. Defendant's motion to dismiss is also due on or before **1/13/2025**. Defendant will make her experts available for deposition between January 13, 2025, and February 10, 2025. Plaintiffs' response to the motion to dismiss, reply in support of their motion for preliminary injunction, and any supplemental declarations in support of the reply brief are due on or before **2/14/2025**. Defendant's reply in support of her motion to dismiss is due on or before **2/21/2025**. The hearing on Plaintiffs motion for preliminary injunction is set for Friday, **2/28/2025**, at 9:00 a.m. (ET). Signed by CHIEF JUDGE MARK E WALKER on 11/19/2024. (baf) (Entered: 11/19/2024) |
| 11/19/2024 | 36 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 11/19/2024. Parties discuss case status, reassignment and schedule for 4 Motion for Preliminary Injunction. Ruling by Court: Court adopts 34 Proposed Schedule. Supplemental declarations, if any, due by 1/13/25 for defendant and 2/14/25 for Plaintiff. Depositions are limited to five hours. Preliminary Injunction hearing set for 2/28/25 at 9:00 a.m. Order to follow (Court Reporter Megan Hague (USDC-Tallahassee)). (vkm) (Entered: 11/19/2024) |
| 11/19/2024 | 37 | NOTICE OF HEARING Re: 4 MOTION for Preliminary Injunction: Motion Hearing set for **2/28/2025 09:00 AM** before CHIEF JUDGE MARK E WALKER. Joseph Woodrow Hatchett United States Courthouse and Federal Building, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301.<br><br>NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp access, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.<br><br>s/ Victoria Milton McGee<br>Courtroom Deputy Clerk (vkm) (Entered: 11/19/2024) |
| 11/27/2024 | 38 | Corporate Disclosure Statement/Certificate of Interested Persons by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) (Entered: 11/27/2024) |

App. 13

USCA11 Case: 25-11881    Document: 24-1    Date Filed: 08/13/2025    Page: 14 of 229

| 12/16/2024 | 39 | FIRST JOINT STATUS REPORT ON DISCOVERY. (KILBY, DOUGLAS) Modified to edit title on 12/17/2024 (rcb). (Entered: 12/16/2024) |
|---|---|---|
| 12/17/2024 | | Set Deadline- Status Report due by **1/16/2025**. (rcb) (Entered: 12/17/2024) |
| 12/19/2024 | 40 | MOTION to Appear Pro Hac Vice by Kevin Wynosky.( Filing fee $ 219 receipt number AFLNDC-9188459.) by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (Attachments: # 1 Exhibit) (MURPHY, HANNAH) (Entered: 12/19/2024) |
| 12/20/2024 | 41 | ORDER ADMITTING KEVIN WYNOSKY PRO HAC VICE - This Court has considered, without hearing, the Motion to Appear Pro Hac Vice. ECF No. 40 . The motion is GRANTED. Kevin Wynosky has fulfilled the requirements of the Local Rules for admission and is admitted pro hac vice as counsel for Plaintiffs. Signed by CHIEF JUDGE MARK E WALKER on 12/20/2024. (baf) (Entered: 12/20/2024) |
| 12/20/2024 | 42 | JOINT MOTION TO EXTEND DEADLINE TO FILE RULE 26(f) JOINT REPORT AND SERVE RULE 26(a)(1) INITIAL DISCLOSURES by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 12/23/2024 (baf). (Entered: 12/20/2024) |
| 12/20/2024 | 43 | ORDER GRANTING EXTENSION - This Court has considered, without hearing, the joint motion for extension of the deadline to file the Rule 26(f) Joint Report and serve Rule 26(a)(1) initial disclosures. ECF No. 42 . The joint motion is GRANTED. The parties deadlines to file the joint report required by Rule 26(f) and to serve initial disclosures are both extended to on or before **1/10/2025**. Signed by CHIEF JUDGE MARK E WALKER on 12/20/2024. (baf) (Entered: 12/20/2024) |
| 12/23/2024 | 44 | PLAINTIFFS' MOTION FOR PROTECTIVE ORDER by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (Attachments: # 1 Exhibit, # 2 Exhibit) (KILBY, DOUGLAS) Modified title on 12/23/2024 (baf). (Entered: 12/23/2024) |
| 12/23/2024 | 45 | ORDER GRANTING MOTION FOR PROTECTIVE ORDER - This Court has considered, without hearing, Plaintiffs' unopposed motion for protective order. ECF No. 44 . The unopposed motion is GRANTED. The proposed protective order, ECF No. 44 -1 is incorporated by reference and binding on the parties as of the date of this Order. Signed by CHIEF JUDGE MARK E WALKER on 12/23/2024. (baf) (Entered: 12/23/2024) |
| 01/09/2025 | 46 | NOTICE of Appearance by GRACE LEE MEAD on behalf of COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (MEAD, GRACE) (Entered: 01/09/2025) |
| 01/10/2025 | 47 | ATTORNEY GENERAL'S INITIAL RULE 26(a)(1) DISCLOSURES by ASHLEY BROOKE MOODY. (PATEL, ANITA) Modified title on 1/13/2025 (baf). (Entered: 01/10/2025) |
| 01/10/2025 | 48 | JOINT REPORT OF RULE 26(f) CONFERENCE by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 1/13/2025 (baf). (Entered: 01/10/2025) |
| 01/13/2025 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 48 JOINT REPORT OF RULE 26(f) CONFERENCE. (baf) (Entered: 01/13/2025) |
| 01/13/2025 | 49 | ORDER ON JOINT SCHEDULING REPORT. Signed by CHIEF JUDGE MARK E WALKER on 1/13/2025. (baf) (Entered: 01/13/2025) |

App. 14

| | | |
|---|---|---|
| 01/13/2025 | 50 | MOTION TO DISMISS PLAINTIFFS' 1 COMPLAINT by ASHLEY BROOKE MOODY. (Internal deadline for referral to judge if response not filed earlier: **1/27/2025**). (GOLEMBIEWSKI, KEVIN) Modified title on 1/14/2025 (baf). (Entered: 01/13/2025) |
| 01/13/2025 | 51 | OPPOSITION TO 4 MOTION FOR A PRELIMINARY INJUNCTION filed by ASHLEY BROOKE MOODY. (Attachments: # 1 Exhibit Jean Twenge Declaration, # 2 Exhibit Adam Alter Declaration, # 3 Exhibit Tony Allen Declaration, # 4 Exhibit Cleland Deposition Transcript, # 5 Exhibit Schruers Deposition Transcript, # 6 Exhibit Boyle Deposition Transcript Redacted, # 7 Exhibit Veitch Deposition Transcript, # 8 Exhibit Plaintiffs' Discovery Responses, # 9 Exhibit U.S. Surgeon General Social Media Advisory, # 10 Exhibit Nov. 19, 2024 Status Conference Transcript, # 11 Exhibit Fla. H.R., Staff Final Bill Analysis, H.B. 3) (MONSON, DARRICK) Modified title on 1/14/2025 (baf). (Entered: 01/13/2025) |
| 01/14/2025 | 52 | NOTICE OF FILING OF UNREDACTED COPIES OF 51 OPPOSITION TO 4 MOTION FOR A PRELIMINARY INJUNCTION AND EXHIBITS ( 51 -6). (Attachments: # 1 Exhibit - ECF 51 - OPPOSITION TO 4 MOTION FOR A PRELIMINARY INJUNCTION (Unredacted), # 2 Exhibit - ECF 51 -6: Boyle Deposition Transcript (Unredacted)) (baf) (Entered: 01/14/2025) |
| 01/16/2025 | 53 | MOTION to Withdraw as Attorney *Henry Whitaker* by ASHLEY BROOKE MOODY. (WHITAKER, HENRY) (Entered: 01/16/2025) |
| 01/16/2025 | 54 | ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL - This Court has considered, without hearing, Defendant Moody's motion to withdraw Henry C. Whitaker as counsel in this case. ECF No. 53 . Defendant Moody does not object to the withdrawal and her representation will continue uninterrupted. Accordingly, the motion is GRANTED. The Clerk shall disconnect Mr. Whitaker from CM/ECF in this case. Signed by CHIEF JUDGE MARK E WALKER on 1/16/2025. (baf) Attorney HENRY CHARLES WHITAKER terminated in this case. (Entered: 01/16/2025) |
| 01/21/2025 | | Set/Reset 32 Deadlines: Status Report due by **2/14/2025**. (baf) (Entered: 01/21/2025) |
| 01/27/2025 | 55 | NOTICE of Appearance by DAVID MATTHEW COSTELLO on behalf of ASHLEY BROOKE MOODY (COSTELLO, DAVID) (Entered: 01/27/2025) |
| 01/29/2025 | 56 | DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY by ASHLEY BROOKE MOODY re 51 Response in Opposition to Motion,, (Attachments: # 1 Supplement Authority) (GOLEMBIEWSKI, KEVIN) Modified title on 1/30/2025 (baf). (Entered: 01/29/2025) |
| 01/31/2025 | 57 | MOTION TO WITHDRAW AS COUNSEL by ASHLEY BROOKE MOODY. (BELL, DANIEL) Modified title on 2/3/2025 (baf). (Entered: 01/31/2025) |
| 02/03/2025 | 58 | ORDER GRANTING MOTION TO WITHDRAW AS COUNSEL - This Court has considered, without hearing, Defendant Attorney General of Florida's motion to withdraw Daniel W. Bell as counsel in this case. ECF No. 57 . Defendant Attorney General does not object to the withdrawal and representation will continue uninterrupted. Accordingly, the motion is GRANTED. The Clerk shall disconnect Mr. Bell from CM/ECF in this case. Signed by CHIEF JUDGE MARK E WALKER on 2/3/2025. (baf) Attorney DANIEL WILLIAM BELL terminated in this case. (Entered: 02/03/2025) |
| 02/03/2025 | 59 | DOCKET ANNOTATION BY COURT: The Clerk's Office in the Tallahassee Division received two volumes (binders) of "Defendant's Unredacted Courtesy Copy of Preliminary Injunction Papers for February 28, 2025 Hearing". Both binders provided to chambers. (baf) (Entered: 02/03/2025) |

App. 15

USCA11 Case: 25-11881    Document: 24-1    Date Filed: 08/13/2025    Page: 16 of 229

| | | |
|---|---|---|
| 02/03/2025 | 60 | DOCKET ANNOTATION BY COURT: Clerk's Office received one 3-ring binder with courtesy copies of 4 Plaintiff's Motion for Preliminary Injunction, 5 Plaintiff's Memorandum In Support of 4 Motion for Preliminary Injuction along with supporting documents. Binder has been provided to chambers. (baf) (Entered: 02/03/2025) |
| 02/14/2025 | 61 | STATUS REPORT *Second Status Report on Discovery* by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, ASHLEY BROOKE MOODY. (KILBY, DOUGLAS) (Entered: 02/14/2025) |
| 02/14/2025 | 62 | PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S 50 MOTION TO DISMISS PLAINTIFFS' COMPLAINT filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 2/14/2025 (baf). (Entered: 02/14/2025) |
| 02/14/2025 | 63 | PLAINTIFFS' REPLY IN SUPPORT OF 4 MOTION FOR PRELIMINARY INJUNCTION filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (Attachments: # 1 Exhibit Deposition of Twenge, # 2 Exhibit Deposition of Allen, # 3 Exhibit Deposition of Alter) (KILBY, DOUGLAS) Modified title on 2/14/2025 (baf). (Entered: 02/14/2025) |
| 02/14/2025 | | Set 32 Deadlines/Hearings Status Report due by **3/17/2025**. (baf) (Entered: 02/14/2025) |
| 02/18/2025 | 64 | DOCKET ANNOTATION BY COURT: The Clerk's Office received a courtesy hard copy of ECF No. 63 PLAINTIFFS' REPLY IN SUPPORT OF 4 MOTION FOR PRELIMINARY INJUNCTION in the format of a 3 ring binder. Binder will be provided to chambers. (baf) (Entered: 02/18/2025) |
| 02/19/2025 | 65 | DEFENDANT'S NOTICE OF FILING ERRATA SHEETS FOR THE DEPOSITION TRANSCRIPTS OF TONY ALLEN, ADAM ALTER AND JEAN TWENGE by ASHLEY BROOKE MOODY re 63 PLAINTIFFS' REPLY IN SUPPORT OF 4 MOTION FOR PRELIMINARY INJUNCTION (Attachments: # 1 Jean Twenge Errata, # 2 Adam Alter Errata, # 3 Tony Allen Errata) (PATEL, ANITA) Modified title on 2/20/2025 (baf). (Entered: 02/19/2025) |
| 02/21/2025 | 66 | REPLY IN SUPPORT OF 50 MOTION TO DISMISS PLAINTIFFS' COMPLAINT filed by JAMES UTHMEIER. (MONSON, DARRICK) Modified title on 2/24/2025 (baf). (Entered: 02/21/2025) |
| 02/24/2025 | 67 | DOCKET ANNOTATION BY COURT: The Clerk's Office received one binder containing courtesy copies of docket entries 50 , 62 and 66 . Binder will be provided to chambers. (baf) (Entered: 02/25/2025) |
| 02/25/2025 | 68 | NOTICE of Appearance by JEFFREY PAUL DESOUSA on behalf of JAMES UTHMEIER (DESOUSA, JEFFREY) (Entered: 02/25/2025) |
| 02/25/2025 | 69 | ORDER ON HEARING PROCEDURE. Signed by CHIEF JUDGE MARK E WALKER on 2/25/2025. (baf) (Entered: 02/25/2025) |
| 02/28/2025 | 70 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER:Motion Hearing held on 2/28/2025. Court hears argument regarding Plaintiff's 4 Motion for Preliminary Injunction. Order to follow (Court Reporter Megan Hague (megan.a.hague@gmail.com) USDC-Tallahassee). (vkm) (Entered: 03/10/2025) |
| 03/11/2025 | 71 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Preliminary Injunction Proceedings held on 2/28/2025, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850-443-9797. |

App. 16

| | | *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.*<br><br>Redaction Request due **3/18/2025**. Release of Transcript Restriction set for **6/16/2025**. (mah) (Entered: 03/11/2025) |
|---|---|---|
| 03/13/2025 | 72 | ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION - Because Plaintiffs have not met their burden to show that at least one of their members has an injury in fact sufficient to confer Article III standing, they have not demonstrated a substantial likelihood of establishing standing for purposes of their preliminary injunction motion. Accordingly, Plaintiffs' motion, ECF No. 4 , is DENIED. Signed by CHIEF JUDGE MARK E WALKER on 3/13/2025. (baf) (Entered: 03/14/2025) |
| 03/17/2025 | 73 | ORDER GRANTING MOTION TO DISMISS - Defendant's motion to dismiss, ECF No. 50 , is GRANTED. Plaintiffs' complaint is DISMISSED without prejudice for lack of standing. If Plaintiffs intend to file an amended complaint, they shall do so on or before Monday, **3/31/2025**. Signed by CHIEF JUDGE MARK E WALKER on 3/17/2025. (baf) (Entered: 03/17/2025) |
| 03/19/2025 | | Reset 32 Deadlines: Status Report due by **4/16/2025**. (baf) (Entered: 03/19/2025) |
| 03/28/2025 | 74 | FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF against JAMES UTHMEIER, filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 3/31/2025 (baf). (Entered: 03/28/2025) |
| 03/28/2025 | 75 | PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 3/31/2025 (baf). (Entered: 03/28/2025) |
| 03/28/2025 | 76 | PLAINTIFFS' MEMORANDUM IN SUPPORT OF 75 RENEWED MOTION FOR PRELIMINARY INJUNCTION filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (Attachments: # 1 Boyle Declaration, # 2 CCIA Declaration, # 3 NetChoice Declaration, # 4 Veitch Declaration) (KILBY, DOUGLAS) Modified title on 3/31/2025 (baf). (Entered: 03/28/2025) |
| 03/31/2025 | 77 | ORDER SETTING CONFERENCE SCHEDULE - The parties shall file a proposed briefing schedule with respect to the renewed motion for preliminary injunction by Wednesday, **4/2/2025**, at 5:00 p.m. (ET). The Clerk shall set this matter for a telephonic scheduling conference on Thursday, **4/3/2025**, at 9:00 a.m. (ET). Signed by CHIEF JUDGE MARK E WALKER on 3/31/2025. (baf) (Entered: 03/31/2025) |
| 03/31/2025 | 78 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **4/3/2025 09:00 AM** before CHIEF JUDGE MARK E WALKER.<br><br>ALL PARTIES are directed to call Judge Walker's Conference Line (see below)<br><br>Conference Call Information<br><br>You may dial into the conference call up to five minutes before start time. Call in number: **855-244-8681** When prompted for an access code, enter: **2309 453 2428#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is compromised by these devices. |

App. 17

s/Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 03/31/2025)

| 04/02/2025 | 79 | PROPOSED BRIEFING SCHEDULE ON 75 PLAINTIFFS' RENEWED MOTION FOR A PRELIMINARY INJUNCTION filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, JAMES UTHMEIER, NETCHOICE. (KILBY, DOUGLAS) Modified title on 4/3/2025 (baf). (Entered: 04/02/2025) |
|---|---|---|
| 04/03/2025 | 80 | ORDER SETTING BRIEFING SCHEDULE FOR RENEWED MOTION FOR PRELIMINARY INJUNCTION - At a hearing on April 3, 2025, this Court considered the parties' proposed briefing schedule, ECF No. 79 . This Court adopts the following schedule. Defendant's response to the renewed motion for preliminary injunction and any declarations in support thereof are due on or before Friday, **4/18/2025**. Plaintiffs reply in support of their renewed motion for preliminary injunction and any supplemental declarations in support thereof are due on or before Wednesday, **4/23/2025**. There is no word limit on any of these briefs. The deadlines for any motion to dismiss and related briefing are stayed. Signed by CHIEF JUDGE MARK E WALKER on 4/3/2025. (baf) (Entered: 04/03/2025) |
| 04/03/2025 | 81 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 4/3/2025. Parties discuss case status and schedule for 75 Renewed Motion for Preliminary Injunction. Court adopts defendant's schedule in 79 Proposed Briefing Schedule, allows one hour depositions to be taken by the week of 4/7/25, and removes word limit. Preliminary injunction hearing, if necessary, will be set on an expedited basis at a later date. Order to follow (Court Reporter Megan Hague (megan.a.hague@gmail.com) USDC-Tallahassee). (vkm) (Entered: 04/03/2025) |
| 04/04/2025 | 82 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Telephonic Status Conference Proceedings held on 4-3-2025, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850-443-9797. *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.* Redaction Request due **4/11/2025**. Release of Transcript Restriction set for **7/10/2025**. (mah) (Entered: 04/04/2025) |
| 04/09/2025 | 83 | JOINT MOTION TO AMEND BRIEFING SCHEDULE ON PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION by JAMES UTHMEIER. (PATEL, ANITA) Modified title on 4/9/2025 (baf). (Entered: 04/09/2025) |
| 04/09/2025 | 84 | ORDER GRANTING JOINT MOTION TO AMEND BRIEFING SCHEDULE - This Court has considered, without hearing, the parties' joint motion to amend the briefing schedule on Plaintiffs' renewed motion for preliminary injunction. ECF No. 83 . The motion is GRANTED. Plaintiff may depose Ms. Veitch on April 17, 2025. Defendant's response deadline is extended to on or before **4/21/2025**. Plaintiffs' reply deadline is extended to on or before **4/28/2025**. Signed by CHIEF JUDGE MARK E WALKER on 4/9/2025. (baf) (Entered: 04/09/2025) |
| 04/16/2025 | 85 | THIRD JOINT STATUS REPORT ON DISCOVERY by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 4/16/2025 (baf). (Entered: 04/16/2025) |
| 04/16/2025 | | Set/Reset 32 Deadlines: Status Report due by **5/16/2025**. (baf) (Entered: 04/16/2025) |
| 04/21/2025 | 86 | OPPOSITION TO 75 PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION filed by JAMES UTHMEIER. (Attachments: # 1 Exhibit State Complaint |

App. 18

Against Snap, # 2 Exhibit Boyle Deposition Transcript, # 3 Exhibit Veitch Redacted Deposition Transcript, # 4 Exhibit Cleland Deposition Transcript, # 5 Exhibit Schruers Deposition Transcript, # 6 Errata Cleland Errata) (GOLEMBIEWSKI, KEVIN) Modified title on 4/22/2025 (baf). (Entered: 04/21/2025)

| 04/22/2025 | 87 | OPPOSITION TO 75 PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION (UNREDACTED). (Attachments: # 1 Exhibit Veitch Unredacted Deposition Transcript, # 2 - Cover Letter) (baf) (Entered: 04/22/2025) |
| 04/28/2025 | 88 | PLAINTIFFS' REPLY IN SUPPORT OF 75 RENEWED MOTION FOR PRELIMINARY INJUNCTION filed by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 4/28/2025 (baf). (Entered: 04/28/2025) |
| 05/13/2025 | 89 | PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (MURPHY, ERIN) Modified title on 5/14/2025 (baf). (Entered: 05/13/2025) |
| 05/14/2025 | 90 | RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY by JAMES UTHMEIER re 89 PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY. (MONSON, DARRICK) Modified title on 5/15/2025 (baf). (Entered: 05/14/2025) |
| 05/16/2025 | 91 | STATUS REPORT *Fourth Joint Status Report on Discovery* by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) (Entered: 05/16/2025) |
| 05/16/2025 |  | Set Deadline- Status Report due by **6/16/2025**. (rcb) (Entered: 05/16/2025) |
| 05/29/2025 | 92 | MOTION TO WITHDRAW AS COUNSEL FOR DEFENDANT by JAMES UTHMEIER. (LAMIA, CHRISTINE) Modified title on 5/29/2025 (baf). (Entered: 05/29/2025) |
| 05/29/2025 | 93 | ORDER GRANTING MOTION TO WITHDRAW - The motion, ECF No. 92 , is GRANTED. The Clerk shall disconnect Christine E. Lamia from CM/ECF on this matter. Signed by CHIEF JUDGE MARK E WALKER on 5/29/2025. (baf) (Attorney CHRISTINE EDWARDS LAMIA terminated in this case.) (Entered: 05/29/2025) |
| 06/03/2025 | 94 | ORDER GRANTING RENEWED MOTION FOR PRELIMINARY INJUNCTION. Plaintiffs' renewed motion for a preliminary injunction, ECF No. 75 , is GRANTED. Defendant Uthmeier must take no steps to enforce §§ 501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1), Fla. Stat. until otherwise ordered. Signed by CHIEF JUDGE MARK E WALKER on 6/3/2025. (kjw) (Entered: 06/03/2025) |
| 06/03/2025 | 95 | NOTICE OF APPEAL as to 94 ORDER GRANTING RENEWED MOTION FOR PRELIMINARY INJUNCTION by JAMES UTHMEIER. ( Filing fee $605 Receipt Number AFLNDC-9497529.) (MONSON, DARRICK) Modified title on 6/4/2025 (baf). (Entered: 06/03/2025) |
| 06/03/2025 | 96 | Appeal Instructions re: 95 Notice of Appeal : The Transcript Request Form is available on the Internet at https://www.flnd.uscourts.gov/form/eleventh-circuit-transcript-information-form **PLEASE NOTE** Separate forms must be filed for each court reporter in both the district court and the appeals court. Transcript Order Form due by **6/17/2025**. (baf) (Entered: 06/04/2025) |
| 06/03/2025 | 97 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals as to 95 Notice of Appeal. (baf) (Entered: 06/04/2025) |

App. 19

| 06/03/2025 | | Set Deadlines re 95 Notice of Appeal : Clerk to check status of Appeal on **9/2/2025**. Certificate of Readiness (FRAP 11) due by **6/17/2025**. (baf) (Entered: 06/04/2025) |
|---|---|---|
| 06/05/2025 | 98 | USCA PROCEDURAL LETTER AND CASE NUMBER for 95 NOTICE OF APPEAL as to 94 ORDER GRANTING RENEWED MOTION FOR PRELIMINARY INJUNCTION. APPEAL No. 25-11881-F. (baf) (Entered: 06/05/2025) |
| 06/06/2025 | 99 | TRANSCRIPT REQUEST by JAMES UTHMEIER before Judge Mark Walker, (PATEL, ANITA) (Entered: 06/06/2025) |
| 06/16/2025 | 100 | FIFTH JOINT STATUS REPORT ON DISCOVERY by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE. (KILBY, DOUGLAS) Modified title on 6/16/2025 (baf). (Entered: 06/16/2025) |
| 06/16/2025 | | Set/Reset 32 Deadline: Status Report due by **7/16/2025**. (baf) (Entered: 06/16/2025) |
| 06/17/2025 | 101 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Northern District of Florida certifies that the record is complete for purposes of this appeal re: 95 Notice of Appeal. Appeal No. 25-11881-F. The entire record on appeal is available electronically. (baf) (Entered: 06/17/2025) |
| 06/25/2025 | 102 | MOTION TO WITHDRAW AS COUNSEL by JAMES UTHMEIER. (GUARD, JOHN) Modified title on 6/26/2025 (baf). (Entered: 06/25/2025) |
| 06/25/2025 | 103 | ORDER GRANTING MOTION TO WITHDRAW - The motion, ECF No. 102 , is GRANTED. The Clerk shall disconnect John Guard from CM/ECF on this matter. Signed by JUDGE MARK E WALKER on 6/25/2025. (baf) Attorney JOHN MATTHEW GUARD terminated in this case. (Entered: 06/25/2025) |
| 06/26/2025 | 104 | MOTION to Withdraw as Attorney by JAMES UTHMEIER. (COSTELLO, DAVID) (Entered: 06/26/2025) |
| 06/27/2025 | 105 | ORDER GRANTING MOTION TO WITHDRAW - The motion, ECF No. 104 , is GRANTED. The Clerk shall disconnect David Costello from CM/ECF on this matter. Attorney DAVID MATTHEW COSTELLO terminated. Signed by JUDGE MARK E WALKER on 6/27/2025. (baf) (Entered: 06/27/2025) |
| 07/16/2025 | 106 | SIXTH JOINT STATUS REPORT ON DISCOVERY by JAMES UTHMEIER. (SPEARS, SARA) Modified title on 7/17/2025 (baf). (Entered: 07/16/2025) |
| 07/16/2025 | 107 | MOTION FOR SCHEDULING ORDER by JAMES UTHMEIER. (SPEARS, SARA) Modified title on 7/17/2025 (baf). (Entered: 07/16/2025) |
| 07/16/2025 | 108 | CORRECTED MOTION FOR SCHEDULING ORDER by JAMES UTHMEIER. (SPEARS, SARA) Modified title on 7/17/2025 (baf). (Entered: 07/16/2025) |
| 07/16/2025 | 109 | NOTICE *of Position* by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (WYNOSKY, KEVIN) (Entered: 07/16/2025) |
| 07/17/2025 | 110 | ORDER DENYING MOTION AND SETTING EXPEDITED RESPONSE DEADLINE. Pending before this Court is Defendant's motion for scheduling order, ECF No. 107 , and Defendant's corrected motion for scheduling order, ECF No. 108 . Inasmuch as Defendant has filed a corrected motion, the original motion, ECF No. 107 , is DENIED as moot. Plaintiffs shall file an expedited response to the corrected motion **on or before Monday, 7/21/2025**. Signed by JUDGE MARK E WALKER on 7/17/2025. (kjw) (Entered: 07/17/2025) |
| 07/17/2025 | | SetDeadlines as to 108 Second MOTION Scheduling Order. (Internal deadline for referral to judge if response to motion not filed earlier: **7/21/2025**). (kjw) (Entered: 07/17/2025) |

App. 20

USCA11 Case: 25-11881    Document: 24-1    Date Filed: 08/13/2025    Page: 21 of 229

| 07/21/2025 | 111 | PLAINTIFFS' OPPOSITION TO DEFENDANT'S 108 CORRECTED MOTION FOR SCHEDULING ORDER by COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE (KILBY, DOUGLAS) Modified title on 7/22/2025 (baf). (Entered: 07/21/2025) |
|---|---|---|
| 07/24/2025 | | Set/Reset 32 Deadline: Status Report due by **8/15/2025**. (baf) (Entered: 07/24/2025) |
| 07/28/2025 | 112 | ORDER GRANTING CORRECTED MOTION FOR SCHEDULING ORDER - This Court concludes that Defendant has the better of the argument in favor of proceeding with discovery, and thus, the motion, ECF No. 108 , is GRANTED. The stay of merits discovery is hereby lifted. On or before **8/7/2025**, the parties shall confer and file an updated joint Rule 26 report, after which this Court will enter a scheduling and mediation order. Signed by JUDGE MARK E WALKER on 7/28/2025. (baf) (Entered: 07/28/2025) |
| 08/06/2025 | 113 | UNOPPOSED MOTION TO EXTEND DEADLINE FOR UPDATED 26(f) REPORT by NETCHOICE. (KILBY, DOUGLAS) Modified title on 8/7/2025 (baf). (Entered: 08/06/2025) |
| 08/06/2025 | 114 | ORDER GRANTING 113 UNOPPOSED MOTION TO EXTEND DEADLINE FOR UPDATEDRULE 26(F) REPORT. The unopposed motion, ECF No. 113 , is GRANTED. The parties'deadline to submit their updated Rule 26(f) report is extended to on or before **8/12/2025**. Signed by JUDGE MARK E WALKER on 8/6/2025. (rcb) (Entered: 08/06/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/11/2025 07:23:44 | | | |
| **PACER Login:** | jennahodges | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:24-cv-00438-MW-MAF |
| **Billable Pages:** | 15 | **Cost:** | 1.50 |

App. 21

**1**

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida,<br><br>  *Defendant*. | Case No. _____ |

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

App. 23

**<u>INTRODUCTION</u>**

1.    Florida House Bill 3 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors.  Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors.  Today, similar debates rage about "social media" websites.  These debates are important, and the government may certainly take part in them.  But the First Amendment does not take kindly to government effort to resolve them.  The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs:  with their parents.

2.    Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services.  Courts across the country have unanimously rejected those efforts as inconsistent with the First Amendment.  And rightly so.  While states certainly have a legitimate interest in protecting minors who use such services, restricting the ability of minors (and adults) to access them altogether is not a narrowly tailored means of advancing any such interest.  In a Nation that values the First Amendment, the preferred response is to let parents decide what speech and mediums their minor children may access—including by utilizing the many available tools to monitor their activities on the Internet.

3.      Like the laws that have preceded it, HB3 violates the First Amendment. The Act bans anyone under 14 from creating or holding an account on certain "social media platforms" altogether, and it requires 14- and 15-year-olds to obtain a parent's consent before doing so.  By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Florida has "with one broad stroke" restricted—and, for those under 14, prohibited—access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

4.      Again, while Florida certainly has a legitimate interest in protecting minors, it is not obvious what HB3 is designed to "protect" minors from.  The law does not focus on any particular content that may pose special risk to minors.  Nor does it focus on identifying specific means of or forums for communication that those seeking to take advantage of minors have proven more likely to use.  HB3's definition of "social media platform" instead appears designed to restrict access to websites that minors especially enjoy using—specifically, websites that facilitate significant amounts of First Amendment activity.  Indeed, whether a service is covered turns in part on how long minors spend on it and whether it employs tools designed to bring to their attention content they might like.  But by that metric, the state could restrict access to the most popular segments of nearly any medium for

constitutionally protected speech, be it enticing video games, page-turning novels, or binge-worthy TV shows. Burdening protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

5. In all events, the state cannot begin to show that its draconian access restrictions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they can do on those services, and how often they can use them. Florida may wish that more Floridians shared its own views about whether minors should use "social media platforms." But while the state may take many steps to protect minors from harm, including by persuading parents to take advantage of tools to limit their minor children's access to "social media platforms," it may not take matters into its own hands and restrict access itself. After all, "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

6. For these reasons and others, the Court should declare Section 1 of HB3 unconstitutional and enjoin the Attorney General of Florida from enforcing it.

## **THE PARTIES**

7. Plaintiff Computer & Communications Industry Association (CCIA) is a nonprofit membership association that represents a broad cross-section of

companies in the computer, Internet, information technology, and telecommunications industries.  CCIA's members include (among others) Google, LLC, and Meta Platforms, Inc.  A full list of CCIA's members is located here: https://tinyurl.com/mvh4tv2n.  For more than 50 years, CCIA has promoted open markets, open systems, and open networks.  CCIA serves the interests of its members, which share a commitment to the vital First Amendment protections that HB3 undermines.  CCIA brings this action on its members' behalf to vindicate their First Amendment rights and the First Amendment rights of their users and to prevent the economic and other injuries that HB3 will cause them absent judicial relief.

8.     Plaintiff NetChoice is a nonprofit trade association for Internet companies.  NetChoice's members include (among others) Google, LLC, Meta Platforms, Inc., and Snap Inc.  A full list of NetChoice's members is located here: https://tinyurl.com/3vdmvstv.  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful. NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that HB3 undermines.  NetChoice brings this action on its members' behalf to vindicate their First Amendment rights and the First Amendment rights of their members' users and to prevent the economic and other injuries that HB3 will cause members absent judicial relief.

9.    CCIA and NetChoice have standing to bring their challenges on at least two grounds.

10.    First, CCIA and NetChoice have associational standing to challenge the Act because: (1) some of their members have standing to sue in their own right; (2) challenging the Act is germane to CCIA's and NetChoice's associational purposes; and (3) their members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *7 (D. Utah Sept. 10, 2024); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *7-9 (W.D. Tex. Aug. 30, 2024); *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at *5-6 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 548-50 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9 (W.D. Ark. Aug. 31, 2023).

11.    Second, CCIA and NetChoice have standing to assert both their own First Amendment rights and the First Amendment rights of their members' current and prospective users. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Paxton*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 716 F.Supp.3d at 550-51; *Griffin*, 2023 WL 5660155, at *11-12.

12.    Defendant Ashley Brooke Moody is the Attorney General of Florida. HB3 charges the Florida Department of Legal Affairs—of which the Attorney

General is the head—with its enforcement.  *See* HB3, §1(5) (to be codified at Fla. Stat. §501.1736(5)).[1]  Attorney General Moody is a resident of Florida.  CCIA and NetChoice sue Attorney General Moody for declaratory and injunctive relief in her official capacity as the Attorney General of Florida.

## JURISDICTION AND VENUE

13.    CCIA's and NetChoice's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  The Court therefore has jurisdiction under 28 U.S.C. §1331.

14.    Venue is proper in this district under 28 U.S.C. §1391 because the defendant performs her official duties in the Northern District of Florida and is therefore considered to reside in this district as a matter of law.

## BACKGROUND

15.    CCIA and NetChoice are Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat.  These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107.  "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104.

---

[1] For ease of reference, this complaint cites provisions of HB3 §1 based on the locations in Title XXXIII, Chapter 501 of Fla. Stat. at which they are to be codified upon their effective date.

YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.  And on Snapchat, users can deepen connections with friends and family by communicating with each other in fun and casual ways.

16.    Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics.  Minors use online services to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges.  Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression.  Others use them to raise awareness about social causes and to participate in public discussions on salient topics of the day.  Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized at home, or are seeking support from others who understand their experiences.  *See* Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), https://tinyurl.com/t2rejxyx.

17.    Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, YouTube, and Snapchat are appropriate for minors.  Concerns that new means of communication may be harmful to minors, however, are hardly new.  The

same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

18.   In the 1800s, for example, "penny dreadful" publications were condemned for glorifying criminals and were blamed for youthful delinquency by the media and parents alike.  *See* James B. Twitchell, *Preposterous Violence: Fables of Aggression in Modern Culture* 169 (1989).  Decades later, comic books were derided as "particularly injurious to the ethical development of children."  *Juvenile Delinquency (Comic Books), Hearings Before the Subcommittee to Investigate Juvenile Delinquency*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham).  Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community."  *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952).  Television too.  *See, e.g.*, Surgeon General's Scientific Advisory Committee on Television and Social Behavior, *Television and Growing Up: The Impact of Televised Violence, Report to the Surgeon General*, U.S. Pub. Health Serv. (1971), https://tinyurl.com/39xcysnk; *Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary*, 83d Cong., 2d Sess. (1954).  In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem.  *See* I. Molotsky, *Hearing on Rock*

*Lyrics*, N.Y. Times (Sept. 10, 1985), https://tinyurl.com/yrknwwf8.  A decade later, families and lawmakers alike raised concerns about the harmful effects of the Internet.  *See* H.R. Rep. No. 105-775, p.7 (1998).  Concerns about violent video games followed soon after.  *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789-90 (2011).

19.    As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors.  Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it contains racial epithets; others think it is a uniquely valuable piece of literature.  *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb.  Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons.  *See Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr.  Some think that video games are unduly violent.  *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh.  Others say that smartphones are too addictive.  *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum.  Opinions likewise differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like

Facebook and YouTube.

20.   There are certainly legitimate concerns underlying both sides of these debates, and the government may have a role in empowering parents with tools and information to make their own judgments about what speech is appropriate for their own minor children.   But when the government has crossed the line into deciding for itself which constitutionally protected speech minors may access, courts have invalidated such efforts as inconsistent with the First Amendment.  *See, e.g.*, *Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games to minors without parental consent); *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975) (invalidating law prohibiting display of movies containing nudity at drive-in theaters).   After all, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may the government bar public dissemination of protected materials to them."  422 U.S. at 212-13 (citation omitted).

21.   Indeed, even restrictions on access to speech that is *not* constitutionally protected as to some or all minors have rarely survived scrutiny, as they often impede the First Amendment rights of adults.  *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Reno v. ACLU*, 521 U.S. 844 (1997)

(invalidating law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet).  As courts have explained in striking down such laws, tools that enable parents to decide for themselves what speech their minor children may access are virtually always "less restrictive" than imposing "universal restrictions at the source."  *Ashcroft*, 542 U.S. at 667.

22.    In short, in a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children, including by using tools that make it easier for them to restrict access should they choose to do so.  And while the government may have some role to play in facilitating access to such tools, it has rarely needed to do so since market forces typically drive industries to be responsive to parents' concerns.  The movie, music, and video game industries, for example, have all developed sophisticated ratings systems to assist parents.

23.    The same is true of the Internet.  Plaintiffs' members and others have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it.  Parents who wish to limit minors' access to online services like Instagram and YouTube, or to filter or monitor the content to which they are exposed, have many options at their disposal.

24.    *Device-level restrictions.*  Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place.  And

those who choose to let them use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long minors can spend on their iPhones, iPads, and MacBooks. *See, e.g.*, Apple, *Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch*, https://tinyurl.com/uxfnna4y (last visited Oct. 18, 2024). It also provides them with tools to control what applications (*e.g.*, Facebook, YouTube, and Snapchat) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. *Id.* Google, Microsoft, and Samsung similarly offer parental controls for their devices. *See* Google, Family Link, *Help Keep Your Family Safer Online*, https://tinyurl.com/mr4bnwpy (last visited Oct. 18, 2024); Microsoft, *Getting Started with Microsoft Family Safety*, https://tinyurl.com/yc6kyruh (last visited Oct. 18, 2024); Samsung, *Set Up Family Groups and Parental Controls with Your Samsung Account*, https://tinyurl.com/3ynpc7hc (last visited Oct. 25, 2024). And many third-party applications allow parents to control and monitor minors' use of Internet-connected devices and online services. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2024, Tested by Our Editors*, CNN underscored (Mar. 11, 2024), https://tinyurl.com/s6bje2jd.

25. ***Network-level restrictions***. Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices,

ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. *See, e.g.*, Verizon, *Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family*, https://tinyurl.com/ycyxy6x6 (last visited Oct. 18, 2024); AT&T, *AT&T Secure Family App*, https://tinyurl.com/d995ya2u (last visited Oct. 18, 2024); T-Mobile, *Family Controls and Privacy*, https://tinyurl.com/57run7ac (last visited Oct. 18, 2024); Comcast Xfinity, *Parental Controls for Xfinity Internet and TV*, https://tinyurl.com/2rwyt7mv (last visited Oct. 18, 2024). Most wireless routers (the devices that provide wireless Internet throughout a home) contain parental control settings as well. *See* Molly Price & Ry Crist, *Take a Moment to Set Up Parental Controls on Your Router*, CNET (Sept. 24, 2024), https://tinyurl.com/mtvdwypu. Parents can use those settings to block specific websites and applications (Facebook, YouTube, etc.) if they do not want their minor children to access them. *See, e.g.*, Netgear, *NETGEAR Smart Parental Controls*, https://tinyurl.com/me3ksfvu (last visited Oct. 18, 2024). They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long their minor children can spend on a particular website or service. *Id.* And they can set individualized content filters for their minor children and monitor the websites they visit and services they use. *Id.*

26. ***Browser-level restrictions.*** Parental controls on Internet browsers offer another layer of protection. Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites minors can access. *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox*, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022). Microsoft offers "Kids Mode," which allows access to only a pre-approved list of websites. *See* Microsoft, *Learn More About Kids Mode in Microsoft Edge*, https://tinyurl.com/59wsev2k (last visited Oct. 18, 2024). Google has a similar feature. It also provides parents with "activity reports," allowing them to see what apps and websites their minor children are accessing the most. Google, *Google's Parental Controls – Google Safety Center*, https://tinyurl.com/kwkeej9z (last visited Oct. 18, 2024).

27. ***Application-level restrictions.*** On top of all that, CCIA and NetChoice members provide parents with many tools to decide what their minor children can see and do on their services. And they have devoted extensive resources to developing policies and practices to protect minors who use them.

28. For starters, services operated by CCIA and NetChoice members, including Facebook, Instagram, and Snapchat, prohibit minors under 13 from accessing their main services. Some members offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger

14

than 13. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Oct. 23, 2024); YouTube Help, What Is a Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Oct. 23, 2024).  These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

29.    CCIA and NetChoice members also expend significant resources curating the content users post on their services to ensure that it is appropriate for adults and teens alike.  Members restrict the publication of (among other things) violent and sexual content, bullying, and harassment.  Some prohibit content that encourages body shaming and promote content that encourages a positive self-image.  Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens.  CCIA and NetChoice members implement their policies through algorithms, automated editing tools, and human review.  If a member determines that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it.  And members can (and do) suspend or ban accounts that violate their policies.

30.    CCIA and NetChoice members also provide users with tools to curate the content they wish to see.  Users can generally choose whom to follow.  Users can generally block or mute other users and control who may see and interact with their

own content.  Some members provide users with tools to exclude specific categories of content they wish to avoid.  Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group (or blocking them altogether).  Instagram users can select a "not interested" button to filter out content they do not wish to see.  They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

31.    CCIA and NetChoice members empower parents to monitor teens' online activities on their services.

32.    Snapchat's "family center" allows parents to see their teen's friends list and who they have been messaging, review their privacy settings, and manage parental controls.

33.    Facebook offers supervision tools that parents and guardians can use. Parents can see how much time their teens have spent on the Facebook app.  They can set scheduled breaks for them and see their Facebook friends.  Parents can also review some of their teens' privacy settings and content preferences and see the people and pages they have blocked.  *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited Oct. 4, 2024).

34.    Instagram enables parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and

monitor accounts followed by their teens and the accounts that follow them.  Parents

can also review the accounts blocked by their teens, as well as their teens' privacy,

messaging, and sensitive content settings.  *See, e.g.*, Instagram, Help Center, *About*

*Supervision on Instagram*, https://tinyurl.com/zxxmmbhb (last visited Oct. 4, 2024).

Instagram recently announced that minors under 18 will automatically be placed into

"Instagram Teen Accounts," which default to the strictest privacy settings and have

limitations on who can contact teens, which content they can see, and what time of

day they receive notifications.  Minors under 16 will need a parent's permission to

relax any of these Instagram Teen Account settings.  Instagram will also provide

additional supervision features, including features that allow parents to monitor with

whom their teens are chatting and what they are seeing.  *See, e.g.*, Instagram,

*Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind*

*for Parents*, https://tinyurl.com/22fwuzz9 (last visited Oct. 4, 2024).

35.    YouTube offers a "supervised experience" for teens (separate from the

supervised experience for minors younger than 13), allowing parents (1) to receive

email notifications when a teen uploads a video or starts a livestream; (2) to gain

insights into their teens' channel activity (such as uploads, comments, and

subscriptions); and (3) to choose whether to link accounts between a parent and teen.

YouTube, *More Choices for Kids, Tweens, and Teens from YouTube*,

https://tinyurl.com/2dpetf76 (last visited Oct. 24, 2024).    YouTube has also

developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and reminding teens to take a break or go to bed. *Id.*

36.  CCIA and NetChoice members also restrict communications between adults and teens on their services, if they allow such communications at all.

37.  Facebook, Instagram, and Snapchat, for example, all take steps to limit adults from messaging teens to whom they are not connected. *See, e.g.*, Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan. 25, 2024), https://tinyurl.com/2ucma8sv.  Snapchat's default settings permit direct messages only between people who are already friends on the platform or established contacts in both users' phones, and Snapchat does not recommend minors as friend connections unless one has the other as an existing phone contact or they share mutual friends.   Snap   Inc.,   *Snapchat   Safeguards   for   Teens*, https://tinyurl.com/mvas8784 (last visited Oct. 25, 2024).

38.  Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected.  And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

39. Some CCIA and NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them. If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult.

40. YouTube and other members do not offer private messaging between users at all.

## FLORIDA HOUSE BILL 3

41. Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Florida has taken it upon itself to decide what is appropriate for minors on the Internet. Earlier this year, Florida enacted HB3, which dramatically restricts minors' access to "social media platforms," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services.

42. HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activit[ies] of other users." Fla. Stat. §501.1736(1)(e). But instead of regulating all online

19

services that allow users to share and view content, the Act limits the definition to the online services that minors enjoy using the most—i.e., the services that facilitate the most First Amendment activity.  An online service qualifies as a "social media platform" only if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the service "on the days when using" the service, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has "one or more addictive features."  *Id.*  HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play functions," and "[l]ive-streaming functions." *Id*.  The Act excludes any service on which "the exclusive function is e-mail or direct messaging." *Id.*

43.    Section 1 of HB3 imposes several restrictions on access to "social media platforms" that are relevant here:[2]

44.    ***Restrictions on minors under 14.***  HB3 prohibits minors under the age of 14 from creating accounts on "social media platforms" altogether.  *Id.* §501.1736(2)(a).  It also requires "social media platforms" to terminate any existing accounts held by minors under age 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely

---

[2] CCIA and NetChoice challenge only Section 1 of HB3.  For ease of reference, future references to "HB3" or "the Act" refer only to Section 1 unless otherwise stated.

younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b)(1). Account holders have 90 days to dispute the termination. *Id.*

45. An "account holder" is "a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state." *Id.* §501.1736(1)(a). "If a social media platform allows an account holder to use the social media platform, the parties have entered into a contract." *Id.* §501.1736(8).

46. ***Restrictions on 14- and 15-year-olds.*** HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). It also requires "social media platforms" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." *Id.* §501.1736(3)(b)(1). The account holder has 90 days to dispute the termination. *Id.* HB3 specifies that if its parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §§501.1736(4)(a), (4)(b)(1).

47. HB3 does not explain how a "social media platform" is supposed to identify who is a "parent or guardian." But the regulations enacted by the Florida Attorney General require "social media platform[s]" to "conduct reasonable parental verification" in "determining whether someone is a parent." Fla. Admin. Code §2-43.002(2). "Reasonable parental verification" means "any method that is reasonably calculated at determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means," which "may include" "requesting from a child the child's parent's name, address, phone number, and e-mail address," "contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship," and "utilizing any commercially reasonable method regularly used by the government or business to verify that parent's identity and age." *Id.* §2-43.001(12).

48. HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or reckless[ly]" violate its provisions. Fla. Stat. §501.1736(5). HB3 authorizes the Florida Attorney General to enforce the law, and it imposes a civil penalty of up to $50,000 per violation. Fla. Stat. §501.1736(5). The regulations implementing HB3 specify that a "social media platform" commits a "knowing or reckless violation" if "it, based on the facts or circumstances readily available to" it, "should reasonably

have been aroused to question whether the person was a child and thereafter failed to perform reasonable age verification." Fla. Admin. Code §2-43.002(3)(a).

49.   And the implementing regulations all but mandate that a "social media platform" implement whatever the state deems to be "reasonable age verification" for all users, as the regulations state that the Attorney General "will not find [a knowing or reckless violation] … has occurred if a social media platform establishes it has utilized a reasonable age verification method with respect to all who access the social media platform." *Id.* §2-43.002(3)(b). "Age verification" methods that satisfy this standard are "any commercially reasonable method of age verification approved by the commercial entity," Fla. Stat. §501.1737(1)(i); "commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party" organized, owned, and operated in the United States, *id.* §501.1738(1); or "method of verifying age that is regularly used by the government or businesses for the purpose of age and identity verification." Fla. Admin. Code §2-43.002(1).

50.   HB3 also includes a private right of action authorizing minors (or their representatives) to sue a "social media platform" for letting them create an account. Fla. Stat. §501.1736(6)(a). A minor account holder may recover up to $10,000 in damages for each violation of the Act. *Id.*

51.   HB3 is set to take effect on January 1, 2025. HB3 §5.

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### (42 U.S.C. §1983)

52.     CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

53.     "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104.  Today, those places include the "vast democratic forums of the Internet." *Id.* The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors.

54.     In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment.  The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors. *See id.* at 106.  While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied. *Id.* at 107-08.  By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition

24
App. 47

unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07.

Such websites, the Court explained, are for many the principal sources for knowing

current events, speaking, listening, and "otherwise exploring the vast realms of

human thought and knowledge." *Id.* at 107. For the government to "foreclose access

to social media altogether is to prevent the user from engaging in the legitimate

exercise of First Amendment rights." *Id.* at 108.

55.    That rule applies with full force to efforts to restrict minors' access to

such services. The Supreme Court has repeatedly held that "minors are entitled to a

significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13,

and "may not be regarded as closed-circuit recipients of only that which the State

chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S.

503, 511 (1969). Courts have therefore routinely invalidated government efforts to

protect minors from the purportedly harmful effects of new forms of media by

restricting their access to constitutionally protected speech.

56.    In *Brown*, for example, the Supreme Court held that a California law

that prohibited the sale of violent video games to minors without parental consent

violated the First Amendment. 564 U.S. at 804-05. And in *Erznoznik*, the Court

held the First Amendment prohibited a City of Jacksonville ordinance barring the

display of movies containing nudity at drive-in theaters. 422 U.S. at 217-18; *accord*

*Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689-91 (1968) (invalidating

ordinance restricting dissemination of films deemed "not suitable for young persons"); *Joseph Burstyn*, 343 U.S. at 501-02 (invalidating law authorizing denial of license to show films deemed "sacrilegious").

57.    Unsurprisingly given that body of precedent, courts around the country have universally enjoined state efforts to restrict minors' access to "social media platforms," including laws that require teens to obtain parental consent to access them. *See, e.g.*, *Reyes*, 2024 WL 4135626; *Paxton*, 2024 WL 4051786; *NetChoice, LLC v. Bonta*, 2024 WL 3838423 (9th Cir. Aug. 16, 2024); *Fitch*, 2024 WL 3276409; *Yost*, 716 F.Supp.3d 539; *Griffin*, 2023 WL 5660155.

58.    HB3 should be enjoined for the same reasons. The provisions prohibiting some minors from creating accounts on "social media platforms" altogether, *see* Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (4)(a), (4)(b)(1), and the provisions requiring other minors to obtain parental consent to create accounts on "social media platforms," *id.* §§501.1736(3)(a), (3)(b)(1), are unconstitutional, as they violate the First Amendment both on their face and as applied to CCIA and NetChoice members who operate "social media platform[s]" as defined by the Act.[3]

---

[3] While all of Section 1 is unconstitutional because HB3's definition of "social media platform" is unconstitutionally vague, *see* Count II *infra*, Plaintiffs' First Amendment challenge is only to the provisions prohibiting minors under 14 from creating accounts on "social media platforms," the provisions requiring 14- and 15-year-olds to obtain parental consent before doing so, and the backup provisions prohibiting 14- and 15-year-olds from creating accounts (which kick in only if the

59.     Those provisions plainly restrict core First Amendment activity.  They completely prohibit minors under age 14 from creating accounts on the websites it covers.  Fla. Stat. §§501.1736(2)(a), (2)(b)(1).  That makes HB3 even more restrictive than the laws enjoined in *Reyes*, *Fitch*, *Yost*, and *Griffin*—none of which completely *bans* access to covered services.  By prohibiting minors under age 14 from creating accounts at all, Florida has "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Packingham*, 582 U.S. at 107.

60.     Requiring 14- and 15-year-olds to obtain parental consent before creating accounts likewise restricts core First Amendment activity.  Fla. Stat. §§501.1736(3)(a), (3)(b)(1).  As numerous courts have concluded, requiring minors to obtain parental consent before accessing "social media" abridges First Amendment rights.  *See, e.g.*, *Reyes*, 2024 WL 4135626 at *20; *Fitch*, 2024 WL 3276409 at *14; *Yost*, 716 F.Supp.3d at 551; *Griffin*, 2023 WL 5660155 at *17.  And the Supreme Court has already held that the government lacks "the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3.  Otherwise, "it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in

---

parental-consent provisions are enjoined).   *See* Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), (4)(b)(1).

favor of greater rights for minors." *Id.* It could even "be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.* The state plainly has no such authority: demanding parental consent requires parents to intervene to undo the state's exercise of governmental authority to restrict speech. *Id.*; *Yost*, 716 F.Supp.3d at 558.

61.    Potentially anticipating these challenges, HB3 specifies that if the court enjoins the parental consent requirement, then it shall be severed and replaced with a provision banning access by 14- and 15-year-olds altogether. Fla. Stat. §501.1736(4)(a), (4)(b)(1). That would make the First Amendment problem even more glaring, as that would just prevent even more minors "from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. And it confirms that the state's real goal is not to aid parental authority, but to override it.

62.    HB3 also burdens the First Amendment rights of *adults* to access covered services, as it effectively requires adults to prove their age to do so. HB3's implementing regulations specify that it is a "knowing or reckless" violation of the law for a "social media platform" not to conduct a "reasonable age verification" when it suspects (or reasonably should suspect) that the account holder is "a child." Fla. Admin. Code §2-43.002(3). And the implementing regulations effectively compel covered services to implement whatever the state deems to be "reasonable age verification procedures" for all users. *Id.* §2-43.002(3)(b). As courts have

repeatedly reaffirmed, requiring adults to verify their age before accessing speech significantly burdens First Amendment rights. *See, e.g., Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 849; *Griffin*, 2023 WL 5660155 at *17; *Yost*, 716 F.Supp.3d at 552; *Fitch*, 2024 WL 3276409, at *12. By forcing adults to either surrender sensitive personal information to access protected speech or forgo that First Amendment activity entirely, such requirements "discourage users from accessing" online services and "completely bar" some adults from doing so. *Reno*, 521 U.S. at 856.

63.    The unique aspects of online services like Facebook and YouTube only heighten the First Amendment values at stake. While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech, HB3 also restricts users' ability to engage in their own speech and associate with like-minded individuals. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982). On top of that, HB3's access restrictions interfere with the First Amendment rights of CCIA and NetChoice members to disseminate both their own and third-party speech to their users—restricting their own First Amendment rights as well. *See Moody*, 144 S.Ct. 2383; *Reyes*, 2024 WL 4135626, at *8; *Yost*, 716 F.Supp.3d at 551-52.

64.    In fact, HB3 is even more problematic than the laws invalidated in *Brown*, *Erznoznik*, *Ashcroft*, and *Playboy*. Some of those laws at least involved an attempt (albeit an unsuccessful one) to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for

adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. But Section 1 of HB3 does not endeavor to confine its restrictions to anything that even arguably approaches unprotected speech. It instead restricts—and sometimes even prohibits—access to "social media platforms" even if all a teenager wants to do is to attend church services on Facebook or view educational materials on YouTube.

65. Because HB3 restricts access to large swaths of constitutionally protected speech, it is subject to heightened scrutiny. *See Packingham*, 582 U.S. at 103. Indeed, the sweeping nature of its restrictions demands strict scrutiny. If California had restricted access to *all* video games out of concern that video games might be addictive, that would have made the First Amendment violation even more glaring. *See Brown*, 564 U.S. at 794. So too if Jacksonville had prohibited the public display of all movies based on a concern "that motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression," *Joseph Burstyn*, 343 U.S. at 502. *See Erznoznik*, 422 U.S. at 217-18.

66. Florida's decision to restrict minors' access to a particular medium of protected expression, based on features that are not meaningfully different from features found on all manner of mediums for speech, reinforces the need for strict scrutiny, as it renders HB3 content based. The law singles out certain "social media platforms" because the state is concerned about the *content* minors may encounter on those services. As the House Speaker explained at the bill's signing ceremony

30
App. 53

(which the Governor livestreamed on Facebook), HB3 seeks to address services that are "curating *content* for your children which is encouraging them to stay on just a few more hours longer every day *and is leading them and nudging them in a particular direction*."  Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t (emphases added).

67.    HB3's speaker distinctions reinforce that conclusion.  Courts are deeply skeptical of laws that "distinguish[] among different speakers," as a speaker and her speech are so often "interrelated" that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content."  *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  That principle has particular force when a law singles out for disfavored treatment some but not all in the business of disseminating speech.  *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983).

68.    HB3 facially "distinguish[es] among different speakers."  *Citizens United*, 558 U.S. at 340.  The definition of "social media platform" singles out a subset of online services for disfavored treatment, while exempting others.  And those speaker distinctions are an obvious proxy for content discrimination.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).  While the law purports to address "addictive features," it does not restrict access to all mediums that employ similar

features to engage their audience. The law leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they employ the same so-called "addictive features," like personalized algorithms, push notifications, and autoplay. *See Reyes*, 2024 WL 4135626 at \*15 & n.157. The state's only evident justification for restricting access to Facebook and YouTube while leaving many other mediums for speech untouched is the state's apparent belief that the covered websites deliver *content* the state thinks is particularly harmful. *See* Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.

69. Regulation based on these so-called "addictive features"—i.e., how long users remain engaged—is particularly suspect, as the judgment that minors are spending too much time on certain media, whether it be comic books, video games, television, or websites, is inherently content based. And singling out forms of speech that have proven particularly popular imposes a particularly significant First Amendment burden, as it distinctly burdens the content that people find most valuable. Letting the government make such decisions would be devastating to First Amendment values—which is precisely why whether and what limits to put on screen time or video games or the like is a matter that has traditionally been reserved to parents, not to the government "subject only to a parental veto." *Brown*, 564 U.S.

at 795 n.3.

70.  But whether strict or intermediate scrutiny applies, Florida at the very least must demonstrate that HB3 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 103.  Florida cannot do so.

71.  To the extent Florida seeks to justify HB3's restrictions on the theory that they "give[] parents a greater ability to protect their children," Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a, that argument fails at least twice over.  For one thing, the law is radically overrestrictive judged by that interest, as it prohibits some minors from creating accounts on "social media platform[s]" *even if their parents approve*.  Fla. Stat. §§501.1736(2)(a), (b)(1), (4)(a), (4)(b)(1).  That Florida has taken that extreme step raises a serious concern that its true goal is to impose "what the State thinks parents *ought* to want," which is not a permissible ground for government interference with First Amendment rights.  *Brown*, 564 U.S. at 804.

72.  But that aside, Florida's conception of how it may help parents "protect their children" reflects a fundamental misunderstanding of the proper role of government in family decision-making.  The Supreme Court has consistently held that parents—not the state—have the primary right and responsibility to guide their minor children's upbringing.  And the Supreme Court has expressed serious "doubts

that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802.

73.    To the extent Florida seeks to justify HB3 on the ground that it helps protect minors from "predators," Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a, that does not work either, as the law is radically overrestrictive judged by that interest.  *See Fitch*, 2024 WL 3276409, at *14.  In *Packingham*, North Carolina argued that barring convicted sex offenders from accessing "social media" was necessary to protect minors from predators.  582 U.S. at 106.  The Court acknowledged the importance of that interest, but it nevertheless concluded that the law could not withstand intermediate scrutiny because the state had a narrower way to achieve its goals:  It could "prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor."  *Id.* at 107.  If the First Amendment prohibits barring convicted sex offenders from using websites, laws restricting or even prohibiting innocent users' access to those same websites cannot possibly be narrowly tailored.

74.    Nor can Florida justify HB3 on the theory that it has an important interest in protecting minors from alleged "dangers" of "social media," such as

"addiction," "higher rates of depression" and "self-harm."  Press Conference at 6:54-6:58, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t; Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a.  Even assuming the state could produce evidence that its concerns are real rather than conjectural, HB3 is both wildly overinclusive and underinclusive judged by that interest.  The law does not single out any particular speech (let alone any *unprotected* speech) that might pose special risks to minors.  It instead restricts (and sometimes forecloses) minors' ability to access any speech on these services at all, regardless of whether the content has *any* capacity to lead to "depression" or "self-harm."

75.    HB3 thus hinders access not just to potentially harmful content, but to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107.  Indeed, it would even preclude minors from accessing content and resources on these services that could help them cope with mental health struggles.  On top of that, the Act has the practical effect of hindering adults from accessing the same online services, even though the state has no legitimate reason to do so.  *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-

57. That is breathtakingly overbroad measured against *any* interest the state could assert. *See Fitch*, 2024 WL 3276409, at *12.

76. Conversely, HB3 is "wildly underinclusive when judged against" any of the justifications the state has proffered. *Brown*, 564 U.S. at 802. The Act leaves many online services with materially indistinguishable—indeed, sometimes literally identical—content and functionality uncovered just because they are preferred by a smaller percentage of minors and/or typically used for fewer hours a day. The law exempts services like Disney+, Hulu, and Roblox, even though they employ many of the same features HB3 denigrates as "addictive." The legislative record contains no evidence that "requiring social media companies to compel minors to push 'play,' hit 'next,' and log in for updates will meaningfully reduce the amount of time they spend on social media platforms." *Reyes*, 2024 WL 4135626, at *15. And Florida is "perfectly willing" to let minors access supposedly harmful services to their hearts' content "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802.

77. At bottom, the law seems to be animated by Florida's concern that minors are spending what the state views as "too much" time on "social media platforms." In a word, HB3 is an internet-rationing statute that restricts minors in Florida from accessing speech that their peers elsewhere may access. It is highly doubtful that the state has a legitimate interest in restricting minors' ability to access and interact with mediums for protected speech just because it thinks they are

spending too much time doing so. Some minors undoubtedly spend two hours a day reading graphic novels, playing video games, listening to podcasts or music, watching movies, or binging television series. That hardly empowers Florida to insert itself into homes throughout the state and second-guess the parenting choices of its residents about what content and in what quantity is appropriate for their minor children.

78. But even assuming that is an important state interest, Florida cannot begin to demonstrate that it lacks less restrictive alternatives than restricting minors' (and adults') access to "social media platforms." When it comes to concerns about the Internet, the Supreme Court has repeatedly emphasized that enabling people to voluntarily restrict content at the *receiving* end is less restrictive than restricting access at the source. *See, e.g.*, *Ashcroft*, 542 U.S. at 666-67; *Playboy*, 529 U.S. at 815. After all, "targeted blocking enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners." 529 U.S. at 815.

79. Here, too, parents already have ample tools at their disposal to restrict minors' access to "social media platforms"—which unlike the services in those cases, involve speech that is constitutionally *protected* as to minors—should they want to do so. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 2024 WL 4135626, at *13; *Fitch*, 2024 WL 3276409, at *11; *Yost*, 716 F.Supp.3d at 560. To be sure, parents

may not always choose to utilize those tools in the ways Florida wishes they would. But to the extent Florida is concerned that parents do not understand how to utilize them, it "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access … but cannot do so." *Brown*, 564 U.S. at 803. After all, it is manifestly less restrictive to educate parents about what tools are available and how to use them, and "a court should not presume parents, given full information, will fail to act." *Playboy*, 529 U.S. at 824.

80. The state also has plenty of other far less restrictive alternatives to address any concerns it may have about specific content, like expanding its recently enacted digital literacy curriculum for public-school students or developing an easily accessible curriculum for parents. *See* Fla. Stat. §1003.42(2)(*o*)(5) (as added by Fla. H.B. 379 (2023)). Instead, Florida chose the bluntest possible instrument: a near-total ban on access for teens and onerous restrictions for adults. That is the antithesis of narrow tailoring.

81. Indeed, HB3 is so poorly tailored when judged against any *legitimate* interest the state may have that it seems Florida's real concern is that not all parents share its views about the propriety of "social media platforms" for minors. But to the extent that is the concern that HB3 is designed to address, the law's "effect is only in support of what the State thinks parents *ought* to want," which, again, is not a permissible ground for government interference with First Amendment rights.

*Brown*, 564 U.S. at 804.

82.   Unless declared invalid and enjoined, the Act's access ban and parental consent requirements will unlawfully deprive Plaintiffs' members and their users of their fundamental First Amendment rights and will irreparably harm Plaintiffs, their members, and their members' users.

## COUNT TWO
### Unconstitutional Vagueness
### (42 U.S.C. §1983)

83.   CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

84.   "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). So when

39

a law "reaches a substantial amount of constitutionally protected conduct," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982), it must speak "only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963).

85.   HB3 fails to speak with the requisite specificity.  The Act's primary provision governing the scope of its coverage defines "[s]ocial media platform" as "an online forum, website, or application" (1) that allows users to "upload content" or view content from other users; (2) where ten percent or more of the daily active users who are younger than 16 years of age spend on average two hours per day or longer "on the online forum, website, or application"; (3) that "[e]mploys algorithms" that analyze user data or information on users to select content for users; and (4) that has one or more "addictive features," including "push notifications" to "inform a user about specific activities or events related to the user's account."  Fla. Stat. §501.1736(1)(e).  These criteria are riddled with ambiguities, rendering both the definition and the operative provisions that employ it unconstitutionally vague.

86.   For one thing, what does it mean to "upload content"—a term left undefined?  *Id.* §501.1736(1)(e)(1).  Any online service that requires a user to create an account will require a user to upload at least *some* information as a part of the account registration process (i.e., a username and password).  Does filling in such information, or providing one's name, cellphone number, and/or email or mailing address, qualify as "uploading content"?  What about a site with a search bar that

allows users to type in a query and then responds with results that match that search? Has the user, by typing in a search bar, "uploaded content"? Sites and applications that facilitate purchases require a user to provide payment information. Is that "uploading content" within the meaning of HB3? If so, there are countless sites—ranging from Spotify to C-SPAN—that could satisfy this criterion. And what if a site allows a user to upload content in one area—for example, a comments section on an article, or a chatbox for technical support—but nowhere else? HB3 does not answer any of these questions.

87.    The requirement that a website "[e]mploys algorithms" analyzing user data is equally vague. *Id.* §501.1736(1)(e)(3). An algorithm is "a step-by-step procedure for solving a problem or accomplishing some end." *Algorithm*, Merriam-Webster.com, https://tinyurl.com/ywn4f6x4 (last visited Oct. 24, 2024). Computer code gives a computer step-by-step instructions for how to perform and complete a given task. Thus, *all* computer code can be considered an algorithm at some level. For example, many sites require a user to log in to see certain content. Such sites require code that contains an algorithmic "if, then" instruction: If the user is logged in, then display the content; if not, then do not display the content. Would such a site "employ algorithms" in such a way that fulfills HB3's criterion? Again, HB3 does not say.

88.    Finally,    the    provision    addressing    "push    notification[s]"    is

indecipherable. HB3 states that a push notification qualifies as an "addictive feature" if it "inform[s] a user about specific activities or events related to the user's account." Fla. Stat. §501.1736(1)(e)(4)(b). That could mean that push notifications qualify as "addictive features" only if they provide an update about "specific activities or events" that relate to a user's account. Or it could reach updates about "events related to a user's account," rendering the statute far more expansive. For example, any push notification about a breaking news event would fall within this broader reading, because breaking news always involves some kind of "specific activity."

89. Even the narrower potential reading of the definition of an "addictive" push notification remains impermissibly vague. What does it mean for a notification to be "related to a user's account"? If, for example, a user expresses a preference for a given sports team as a part of the user's account or profile, does notifying the user of breaking news about that team "relate to" that user's account? Or must the notification relate to an *online* event or activity, such as a liked photo or a new follower, that relates to the user's account? What if the notification has to do with the account, but has nothing to do with content the website disseminates—say, a notification stating that there was a suspicious login attempt on the account? Again, HB3 answers none of these questions.

90. Given these difficulties with determining who is covered by the Act, it

is bound to chill even more speech, as some websites will inevitably change the way they disseminate content to try to avoid having to comply with the law.

91.    Because the vagueness problems in the law's definition of "social media platform" infect all of Section 1, all of Section 1 is unconstitutional.

92.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiffs' members and Internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiffs, their members, and their members' users.

## COUNT THREE
### Preemption
### (42 U.S.C. §1983)

93.    CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

94.    The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §6501 *et seq.*, regulates online services' collection and use of personal information from minor children.  COPPA defines a "child" as an "individual under the age of 13."  15 U.S.C. §6501(1).  The Federal Trade Commission ("FTC") has authority to enforce COPPA and has promulgated regulations implementing it.  *See* 16 C.F.R. §312.1 *et seq.*

95.    COPPA makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is

collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" by the FTC. 15 U.S.C. §6502(a)(1). These regulations generally require a website operator "to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children." 16 C.F.R. §312.5(a). But the regulations also enumerate several circumstances in which a child's or parent's personal information may be collected and used without parental consent. *See id.* §312.5(c).

96. COPPA expressly precludes any state from "impos[ing] any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in [COPPA] that is inconsistent with the treatment of those activities or actions under" §6502 and the FTC regulations promulgated under it. 15 U.S.C. §6502(d).

97. HB3's imposition of liability for retaining "personal information held by the social media platform relating to the terminated account," Fla. Stat. §501.1736(2)(b)(4), (3)(b)(4), (4)(b)(4), squarely conflicts with COPPA's statutory and regulatory "treatment of those [same] activities," 15 U.S.C. §6502(d). COPPA expressly *permits* website operators to retain "personal information from children" if they first "obtain verifiable parental consent," 16 C.F.R. §312.5(a), but HB3 imposes liability for retaining such information even if there is parental consent.

98.  COPPA also permits website operators to retain minor children's personal information for certain enumerated purposes *without* parental consent. *See* 16 C.F.R. §312.5(c)(1)-(8). For example, parental consent is not required if an online service collects certain information from minor children to "[p]rotect the security or integrity of its Web site or online service," "[t]ake precautions against liability," "[r]espond to judicial process," or, under certain circumstances, "provide information to law enforcement agencies." *Id.* §312.5(c)(6). In addition, an online service may collect a form of "individually identifiable information" known as a "persistent identifier"—e.g., "a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier," any of which "can be used to recognize a user over time and across different Web sites or online services"—without parental consent, so long as the information "is used for the sole purpose of providing support for the [online service's] internal operations." *Id.* §§312.2, 312.5(c)(7).

99.  Because HB3's prohibition on retaining "personal information held by the social media platform relating to the terminated account," Fla. Stat. §§501.1736(2)(b)(4), (3)(b)(4), (4)(b)(4), squarely conflicts with COPPA's statutory and regulatory scheme, it is expressly preempted under §6502(d).

## PRAYER FOR RELIEF

CCIA and NetChoice pray for the following relief from the Court:

1. A declaration, pursuant to 28 U.S.C. §2202, that Section 1 of HB3 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

2. A preliminary injunction enjoining Attorney General Moody, as well as all officers, agents, and employees subject to her supervision, direction, or control, from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1) against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

3. A permanent injunction enjoining Attorney General Moody, as well as all officers, agents, and employees subject to her supervision, direction, or control, from enforcing Section 1 of HB3 against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

4. Such costs and reasonable attorneys' fees to which CCIA and NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5. Any further relief that the Court deems just and proper.

October 28, 2024

Respectfully submitted,

/s/ *Douglas L. Kilby*

| | |
|---|---|
| Paul D. Clement | Douglas L. Kilby |
| Erin E. Murphy | Florida Bar No. 73407 |
| James Y. Xi (*PHV application forthcoming*) | Hannah E. Murphy |
| | Florida Bar No. 1032759 |
| Joseph J. DeMott (*PHV application forthcoming*) | Abby Corbett |
| | Florida Bar No. 31332 |
| Mitchell K. Pallaki (*PHV application forthcoming*) | STEARNS WEAVER MILLER |
| | WEISSLER ALHADEFF & |
| CLEMENT & MURPHY, PLLC | SITTERSON, P.A. |
| 706 Duke Street | Highpoint Center |
| Alexandria, VA 22314 | 106 East College Avenue, Suite 700 |
| (202) 742-8900 | Tallahassee, FL 32301 |
| paul.clement@clementmurphy.com | (850) 580-7200 |
| erin.murphy@clementmurphy.com | dkilby@stearnsweaver.com |
| james.xi@clementmurphy.com | |
| joseph.demott@clementmurphy.com | |
| mitchell.pallaki@clementmurphy.com | |

*Counsel for Plaintiffs Computer & Communications*
*Industry Association and NetChoice*

47

51-1

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA**

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and NETCHOICE,
LLC,

      Plaintiffs,

v.

ASHLEY BROOKE MOODY, in her official
capacity as Attorney General of the State of Florida,

      Defendant.

Case No.: 4:24-cv-438-MW-MAF

_____/

**DECLARATION OF JEAN M. TWENGE, Ph.D.**

I, Jean M. Twenge, declare:

**I.     Introduction**

1.  I am at least 18 years of age and am competent to testify. I have personal knowledge of the statements contained in this declaration.

2.  I have been asked by the Defendant to provide my expert opinion on trends in social media use among adolescents, connections between social media use and mental health, and the need for age restrictions on social media use as provided in Fla. Stat. 501.1736 (HB 3). The opinions expressed herein are based on my education, training, research, and years of experience as a personality and social psychologist as well as familiarity with the research literature.

**II.    Personal background and qualifications**

3.  I am a Professor of Psychology at San Diego State University. I have authored or co-authored 147 peer-reviewed scientific journal articles on topics including trends in adolescent mental health, social media use and mental health, screen time and behavioral issues among children, generational differences in teen independence, causal effects of social rejection, screen media and sleep deprivation, and trends in happiness and life satisfaction. In 2021, 2022, 2023, and 2024, Clarivate Analytics included me on its list of the top .1% of highly cited scientists.

4.  I have also authored or co-authored 15 books. These include *iGen* (2017), one of the first works to document the scope of the adolescent mental health crisis and to argue it was linked to technology use. An excerpt of the book in *Atlantic* magazine was among the most-read articles of 2017. My most recent book is *Generations* (2023, paperback 2025), which details the impact of

App. 72

technological change on all six living American generations. I am also the co-author of two undergraduate textbooks (*Personality Psychology* and *Social Psychology*) that are revised every few years, requiring me to keep up with the emerging research in both fields. I regularly teach a course in personality psychology and have previously taught courses in research methods (including at the graduate level), social psychology, cultural psychology, introductory psychology, and the history of psychology. In fall 2025, I will teach a course on generations and technology as a visiting professor at the University of Florida. On December 6, 2023, I gave a presentation to the Florida House of Representatives Regulatory Reform and Economic Development Subcommittee on the mental health effects of social media.

5.   I began my time at San Diego State as an assistant professor in 2001, earning tenure in 2005 and promoted to full professor in 2009. I received my Ph.D. in personality psychology from the University of Michigan, Ann Arbor, in 1998 and completed post-doctoral studies in social psychology at Case Western Reserve University from 1999 to 2001. In 1993, I graduated from the University of Chicago with a B.A. in sociology and psychology and an M.A. in social sciences. A current copy of my true and correct Curriculum Vitae is attached to this report as Exhibit A. I am compensated for my work on this case. I have not testified as an expert witness at trial or deposition in the past four years.

### III.   Summary of findings

6.   Key findings from my analysis, detailed in the report below, include:
   • Daily social media use among U.S. 13- and 14-year-olds rose sharply between 2008 and 2017. By 2023, social media use among U.S. teens averaged 4.8 hours a day.
   • Time series studies strongly suggest that increases in digital media use, including social media, are a key cause of increases in adolescent depression, loneliness, self-harm, and suicide.
   • Correlational studies find that the more hours a day a teen or child uses social media, the more likely they are to be depressed or unhappy. These links are usually stronger for social media than for other media such as TV or gaming.
   • Experimental studies demonstrate that participants who eliminate or reduce social media for two weeks or more are less lonely and less depressed than those who continue their normal use, demonstrating a causal path from social media use to lower psychological well-being.
   • Increases in self-harm, suicide, and depression since 2010 are larger among 12- to 15-year-olds than among 16- to 17-year-olds. Associations between social media use and depression/low well-being are larger among adolescents 15 or younger than among those 16 or 17 years old.
   • Thus, the research literature on social media use and mental health supports the prohibition of anyone under the age of 14 from having an account and requiring 14- and 15-year-olds to obtain parental consent to become an account holder, as required by Fla. Stat. 501.1736 (HB 3).

### IV. Overview and definitions

7. This declaration will cover the research literature on 1) trends in time spent on social media, 2) associations between time spent on social media and mental health across time series,

2

App. 73

correlational, and experimental studies, and 3) how the association between social media use and mental health differs between younger adolescents and older adolescents. I will primarily rely on studies and datasets that are nationally representative and that have large sample sizes for all types of studies except experimental studies, where large nationally representative studies, to my knowledge, are not available.

8. Indicators of poor mental health or poor psychological well-being can include unhappiness, low life satisfaction, low self-esteem, behavioral difficulties, anxiety, loneliness, depression, and self-harm behavior. Social media is defined somewhat differently from one dataset to another, but is usually referred to as "social networks" or "social media," with examples of specific apps sometimes given (including Facebook and Instagram). For example, in the large survey of U.S. teens called Monitoring the Future, since 2018, teens are asked how much time they spend "on social networking sites like Facebook, Twitter, Instagram, etc.?" None of the studies cited below that measure social media use include streaming services (such as Disney+, Netflix, or Hulu) in the wording of their survey items on social media.

**V. Increases in social media use among teens**

9. According to the Pew Center for Research, 24% of U.S. teens said they were online "almost constantly" by 2015 (Lenhart, 2015). By 2024, that had nearly doubled, to 46% (Faverio & Sidoti, 2024).

10. From 2008 to 2017, the nationally representative Monitoring the Future dataset asked U.S. teens if they used social media sites (specifically, "social networking websites (like Facebook)")  "almost everyday," "at least once a week," "once or twice a month," "a few times a year," or "never." In 2008, 47% of 8th graders, 13 and 14 years old, used social media almost every day. By 2017, 78% used social media almost every day (Twenge et al., 2019b, and additional analyses performed for this declaration).

11. After 2018, Monitoring the Future asked about social media use ("social networking sites like Facebook, Twitter, Instagram, etc.") in hours per day, from none to 9 or more hours a day. Among 8th grade girls 2018-2023, 11% spent 9 or more hours a day using social media.

12. In the international PISA dataset, which employed a different measure of social media use, 9% of U.S. girls ages 15 and 16 spent 7 or more hours a day using social media in 2022. Similar or higher numbers appeared in other nations, including the UK (9%), Argentina (15%), Saudi Arabia (13%), and Thailand (10%). In contrast, the number of girls who were heavy users was lower in many European countries (5% in Germany, 7% in Italy, 6% in Ireland) and in most countries in Asia (5% in Hong Kong, 3% in Japan, 4% in South Korea).

13. According to Gallup, by 2023, U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat; Rothwell, 2023).

**VI. Increases in mental health issues among teens**

14. In this declaration, I will review three types of evidence for the association between social media use and mental well-being: time series studies, correlational studies, and experiments. I will begin with time series studies, which examine trends over time in populations. Time series studies are sometimes called "natural experiments" as they can demonstrate the consequences of changes in the environment.

15. In the early 2010s, something began to go wrong in the lives of teens. Symptoms of depression, loneliness, and unhappiness all increased among American adolescents beginning in the early 2010s (Keyes et al., 2019; Mojtabai et al., 2016; Twenge et al., 2018, 2019a). Between 2011 and 2019, rates of major depression doubled among U.S. teens (see Figure 1). Between 2011 and 2022, rates of depression increased 132% among teen girls and 134% among teen boys.



Figure 1: Major depressive episode in the last year, U.S. 12- to 17-year-olds

4

Source: National Survey on Drug Use and Health, U.S. Department of Health and Human Services; analysis in Twenge, 2025

16. These statistics are derived from a yearly study commissioned by the U.S. Department of Health and Human Services designed to determine the rates of depression in the U.S. population as a whole, regardless of interaction with the healthcare system or physician diagnoses. Major depressive episode is defined using the criteria of the American Psychiatric Association's Diagnostic and Statistical Manual.

17. Behaviors linked to depression, such as self-harm, also increased among U.S. adolescent girls. Between 2010 and 2022, emergency room admissions for self-harm increased 192% among 15- to 19-year-old girls and young women (thus nearly tripling) and an incredible 411% among 10- to 14-year-old girls (thus more than quintupling; see Figure 2). Self-harm is assessed via emergency room admissions in data kept by the U.S. Centers for Disease Control.



Figure 2: Emergency department admissions for self-harm behaviors, U.S. girls and young women, 2001-2022

5

Source: WISQARS database, Centers for Disease Control

18. Suicide rates have also skyrocketed among American children and teens (see Figure 3). The suicide rate among 10- to 14-year-old boys increased 166% between 2010 and 2022 and the suicide rate among 10- to 14-year-old girls increased 217%. If the suicide rate had stayed at its 2007 low, 3,604 more American 10- to 14-year-olds would be alive today.



Figure 3: Suicide rate of U.S. 10- to 14-year-olds, 1981-2022
Source: WISQARS database, Centers for Disease Control

19. The early 2010s was also a key time for technological change. Teen smartphone ownership grew from 23% in 2011 to 37% in 2013, reaching 73% by 2015 (Lenhart, 2015; Madden et al., 2013). Smartphones with front-facing cameras (which make it easier to take selfies) were introduced in 2010. Facebook bought Instagram – dramatically increasing its user base – in 2012. Teens' social media use also increased over this time.

6

20. Thus, during the years teens started to spend more time on social media, their rates of depression, self-harm, and suicide began to skyrocket. This may have occurred because social media displaced time that was once spent on other activities more beneficial for mental health. For example, sleep deprivation also increased beginning around 2012, and not getting enough sleep is strongly related to depression and other mental health issues, including in experiments that can demonstrate causation from shortened sleep to mental health issues (Scott et al., 2021). Time spent on social media specifically has been linked to shortened sleep among adolescents (Hisler et al., 2020). This is especially relevant for younger age groups as children and adolescents require more sleep than adults, and the younger the child or adolescent, the more sleep they need given growth and development, especially of the brain.

21. In addition, time spent with friends in-person plummeted as social media became more popular (Twenge et al., 2017, 2019c).

22. Teen users' experiences on social media, including unflattering social comparison, cyberbullying, sexual solicitation, and other dangers, are also possible mechanisms behind why teen depression rose as teens spent more time on social media (e.g., Dönmez & Soylu, 2019; Hu et al., 2021; Steers et al., 2014).

23. Similar trends in adolescent mental health have appeared in countries outside the U.S. The number of young Australians with high levels of psychological distress skyrocketed between 2012 and 2019, in a very similar pattern to the U.S. data (see Figure 4).

7



Figure 4: Australians ages 16 to 24 with high or very high levels of psychological distress, by gender, 2002-2019
Source: Data tables for *Australia's Health 2022: Data insights*. Australian Government. NOTE: Psychological distress was measured using the K10, a validated 10-item measure of symptoms of anxiety and depression.

24. Similar to the trends in the U.S., self-harm behaviors increased among Australian adolescent girls beginning in the early 2010s (see Figure 5). Self-harm also increased among adolescent boys, though their base rate was lower.

8

App. 79



Figure 5: Intentional self-poisonings among 15- to 19-year-olds, Australia, 2006-2016
Source: Cairns et al. (2019) analysis of data on calls to Poison Information Centers in New South Wales and Victoria, Australia.

25. Australia is not an isolated example. Several studies have found that loneliness and anxiety increased among teens in many countries around the world beginning after 2012, especially in Europe, Latin America, and other English-speaking countries such as Canada, the UK, and New Zealand. Teen loneliness and anxiety increased the most in countries with the largest increases in internet time and smartphone access (Boer et al., 2023; Twenge et al., 2021). These international results mean the cause of the increase in teen depression cannot be something unique to the U.S. Instead, it must be something impacting teens in many different countries. The analyses matching changes in technology use with increases in teens' anxiety and loneliness suggest that technology use is a primary cause.

9

26. The rise of smartphones and social media in the early 2010s is the most plausible cause of the adolescent mental health crisis. The trends in technology use had a broad impact on teens' day to day lives, radically changing the way they spent their time outside of school.

27. In fact, that was the conclusion of a focus group of adolescent girls convened by Meta as part of their internal research. "Teens blame Instagram for increases in the rate of anxiety and depression. This reaction was unprompted and consistent across all groups," noted the report (Wells et al., 2021).

28. It should be noted that the effects of social media operate at the group level, not just the individual level. Even a teen who does not use social media is impacted when most of their peers use social media: They may feel left out and excluded from some interactions, and it will be more difficult to find friends to see in person if communicating via social media is now the norm. This is a strength of the time series studies: They capture the impact of social media at the group level, demonstrating the outcomes of a natural experiment.

29. Overall, the time series data strongly supports the conclusion that changes in teens' technology use, including social media, is a primary cause of the rise in teen depression, anxiety, loneliness, self-harm, and suicide.

## VII. Correlational studies on social media use and mental well-being

30. Correlational studies, which are studies that examine people's real-life experiences, have consistently found that the more hours a day a teen spends on social media, the more likely they are to be depressed or unhappy. A meta-analysis of 21 correlational studies found that the risk of depression increased by 13% for each hour increase in social media use among adolescents (Liu et al., 2022). Nearly all correlational studies show that more time on social media is linked to more depression, unhappiness, low life satisfaction, or low well-being (Haidt et al., 2024).

31. Kelly et al. (2019) is an example of a correlational analysis in the area. The analysis used a large nationally representative sample from the U.K., the Millennium Cohort Study. In 2015, when its participants were 14 to 15 years old, the study asked them how many hours a day they spent using social media. They also answered 13 questions on a validated scale measuring symptoms of depression; teens who scored above a cutoff level were classified as having clinically relevant depression.

32. The results showed that girls who were heavy users of social media were three times more likely to be depressed than non-users, and boys were twice as likely (Kelly et al., 2019; see Figure 6).

10



Figure 6: Hours of social media use and depression, U.K. teens, by gender
Source: Millennium Cohort Study. Analyses by Kelly et al. (2019)

33. Particularly among girls, depression steadily increases as social media use increases in a dose-response manner. For boys, elevated risk did not appear until social media use moved beyond 3 hours a day; for girls it began to appear at less than an hour and rose from there.

34. These analyses controlled for a number of possible third variables, including family income, family structure, and age. This step ensures that the associations were not caused by these factors.. The analyses also controlled for symptoms of depression at age 11, meaning the link was not caused by depressed teens spending more time on social media (Kelly et al., 2019).

35. Participants in the Millennium Cohort Study were also asked if, in the last year, they had ever hurt themselves on purpose, a measure of self-harm behavior. Girls who were heavy users of social media were twice as likely to have self-harmed than non-users, and boys who were heavy users were nearly twice as likely (Twenge & Farley, 2021; see Figure 7).

11

App. 82



Figure 7: Hours per day of social media use and self-harm behaviors, UK teens, by gender
Source: Millennium Cohort Study. Analyses by Twenge & Farley (2020)

36. These analyses were controlled for family income, family structure, ethnicity, parent educational attainment, parent employment, number of siblings in the household, whether the participant had a long-standing illness, and parent verbal intelligence (Twenge & Farley, 2020). That rules out these factors as third variables that might confound the results.

37. Links between TV watching and depression are considerably weaker than those between social media use and depression (Robertson et al., 2022; Twenge et al., 2018; Twenge & Farley, 2021). Links between electronic gaming hours and depression are also generally weaker than those between social media use and depression (Robertson et al., 2022; Twenge & Farley, 2021).

38. A U.S. dataset, Monitoring the Future, included a question on hours per week of social media use beginning in 2013. Teens, especially girls, who spent more hours a day on

12

social media were more likely to be unhappy. These analyses were controlled for race/ethnicity, grade, and mother's education level (Twenge & Martin, 2020; see Figure 8).



Figure 8: Hours per week of social media use and unhappiness, U.S. teens (8th and 10th graders) Source: Monitoring the Future. Analyses by Twenge & Martin (2020).

39. In another nationally representative U.S. sample, adolescents who spent 3 or more hours a day using social media were twice as likely to have significant symptoms of anxiety or depression than non-users (Riehm et al., 2019).

40. Similar links between social media use and depression appear among 9- and 10-year-old children. Both boys and girls who spent more than two hours a day on social media were twice as likely to suffer from depressive disorders or anxiety disorders than those who spent less time. Watching online videos more than two hours a day was also linked to a near-doubling of depressive disorders among children (Robertson et al., 2022).

13

App. 84

41. Thus, the correlational evidence consistently demonstrates that the more time a child or teen spends on social media, the more likely it is that they will be depressed, have low well-being, or be unhappy. These associations are significant; in many studies, twice as many heavy users of social media are depressed compared to non-users.

## VIII. Experiments on social media use and mental well-being

42. To definitively show scientific causation from social media use to depression, it is necessary to do a random-assignment experiment (also known as a randomized controlled trial or an A/B test). In this design, participants are randomly assigned to an experimental or control group and outcomes are measured.

43. The most common type of experiment examining social media and mental health randomly assigns some participants to give up or reduce their social media use (the experimental group) and others to continue their usual use (the control group). One of the largest experiments using this design randomly assigned nearly 3,000 adults to deactivate their Facebook account for four weeks (the experimental group) versus keeping an active Facebook account (the control group). At the end of the four weeks, those who deactivated their Facebook account had less anxiety and depression compared to those who continued with their normal Facebook use (see Figure 9). They were also happier and had higher life satisfaction (Allcott et al., 2020).



14

App. 85

Figure 9: Differences in psychological well-being between adults who deactivated Facebook and those who did not, standard deviations
Source: Allcott et al. (2020)

44. Another experiment randomly assigned college undergraduates to limit their social media use to 30 minutes a day or less (the experimental group) or to use social media as usual (the control group). After three weeks, those who reduced their social media use were less depressed and less lonely than the control group (Hunt et al., 2018; see Figure 10).



Figure 10: Differences in psychological well-being between college students who reduced their social media use and those who did not, standard deviations
Source: Hunt et al. (2018).
Note: Difference in standard deviations (*d*) calculated from two-group $F$ and sample size.

45. A recent experiment randomly assigned Danish families with children ages 4 to 17 to hand over smartphones and tablets and reduce their leisure screen use to three hours a week or less for a period of two weeks (the experimental group). This group received non-internet-enabled cell phones that could call and text. Others continued their screen use as usual (control group). Parents were asked to report on their children's emotional and behavioral issues using a validated measure. At the end of the two weeks, children and adolescents in the experimental group had declined more than the control group in total emotional and behavioral difficulties,

15

internalizing symptoms such as anxiety and depression, and externalizing symptoms such as anger and acting out (see Figure 11; Schmidt-Persson et al., 2024).



Figure 11: Differences in psychological well-being between youth who reduced screen time and those who did not, in standard deviations
Source: Schmidt-Persson et al. (2024)
Note: Difference in standard deviations ($d$) calculated from mean change and standard deviations from each group weighted by sample size

46. Nearly all experiments that follow participants for two weeks or more find improvements in mental health or well-being among those who give up or reduce social media use (Haidt, 2024).

47. These studies show a causal path from social media use to depression and low well-being. Thus, they suggest that a substantial amount of the link between social media use and depression found in correlational studies can be attributed to social media use causing depression and low psychological well-being rather than depression causing social media use or the link being caused by other factors. Most of these experiments involve adults rather than adolescents, but given the stronger links between social media use and well-being among younger populations, it is highly likely that experiments of this nature would show similar if not stronger impacts among adolescents.

16

## IX. The need for age restrictions for social media

48. Social media is more strongly linked to negative outcomes among children and younger teens compared to older teens. This evidence comes from two primary sources: Time series studies and correlational studies.

49. First, the increases in emergency room admissions for self-harm 2010-2022 were larger among 10- to 14-year-old girls (411%, quintupling) than among 15- to 19-year-old girls and young women (192%, nearly tripling; see Figure 2, previously). Second, increases in suicide have been larger among 12- to 15-year-olds than among 16- to 17-year-olds: 140% from 2007 to 2022 for the younger group, compared to 66% for the older (see Figure 12).



Figure 12: Suicide rate among U.S. adolescents, by age group, 2001-2022
Source: Centers for Disease Control, WISQARS database

17

50. Third, increases in clinical-level depression since 2011 have been larger among 12- to 15-year-olds (a 172% increase 2011-2022) than among 16- to 17-year-olds (94% increase 2011-2022; see Figure 13). The pattern also holds when 2021 is used as the endpoint: depression increased 153% among 12- to 15-year-olds and 127% for 16- to 17-year-olds).



Figure 13: Percent of U.S. adolescents with clinical-level depression in the last 12 months, by age group. Source: National Study of Drug Use and Health.

51. Thus, both symptoms of depression and behaviors linked to depression (self-harm and suicide) have increased more among younger adolescents compared to older adolescents during the period when smartphone and social media use surged. This suggests that the increased use of digital media, including social media, had a more pronounced impact on the mental health of those 15 and under compared to those 16 and older.

52. Associations between social media use and poor mental health are larger among younger teens than among older teens. For example, UK teens who spent more time using social

18

App. 89

media were less satisfied with their lives, and this association was larger among younger adolescents compared to older adolescents (Orben et al., 2022; see Figure 14). Among girls, the association was considerably larger at age 12-15 than ages 16 or 17. Among boys, the strongest link between social media use and low life satisfaction appeared at age 15. The researchers concluded that there are "windows of developmental sensitivity to social media. that may be caused by maturational processes such as puberty, when, for example, social comparison on social media may have a larger impact.



Figure 14: Hours per day of social media use and life satisfaction, by gender and age
Source: Orben et al. (2022)

53. A similar pattern appears in the U.S. Monitoring the Future dataset. In my own recent analyses of data on 8th grade girls (13 and 14 years old) 2018-2023, heavy social media users were 55% more likely to have high depressive symptoms than non-users. Among 10th grade girls (15 and 16 years old), heavy users were instead 26% more likely to have high depressive symptoms than non-users, an effect about half the size of that for 13- and 14-year-old girls.

19

54. Similarly, links between social media use and body image issues are stronger among adolescents compared to adults, as shown in a large meta-analysis (Saiphoo & Vahedi, 2019).

55. Thus, in large nationally representative datasets in both the UK and U.S., the association between social media use and depression, low well-being, and body image issues is stronger among younger adolescents than older adolescents.

56. There are also impacts on the developing brains of children and adolescents. Twelve-year-olds who habitually checked social media showed increased activity in the social reward portions of the brain over the course of two years (Maza et al., 2023).

57. Compared to older adolescents and young adults, early adolescents (ages 12 to 15) were more likely to predict that they would not be liked by others and to experience decreases in self-esteem after social rejection (Rodman et al., 2017). Thus, early adolescents are more sensitive to feedback on social media.

58. Adolescent brains have a less-developed prefrontal cortex (leading to less self-control and more impulsive behavior), greater activity in the amygdala (associated with experiencing emotions more acutely), and greater activity in the ventral striatum (which responds to social rewards; Crone & Konijn, 2018). Adolescents, especially early adolescents, are also more susceptible to peer influences than adults (Van Hoorn et al., 2016). Thus, adolescents are more sensitive to a wide array of experiences on social media including social reward processing, peer pressure, risk-taking, problematic use, and emotion-based processing (Crone & Konijn, 2018).

## X. Conclusions

59. Daily social media use among U.S. teens increased during the 2010s, and by 2023 11% of 13- to 14-year-old girls spent 9 or more hours a day using social media and teens spent an average of 5 hours a day on the apps. Time series studies show that teen depression increased in tandem with smartphone and social media use, with no other explanation fitting the data, especially internationally. Correlational studies consistently show that the more hours a teen or child spends using social media, the more likely it is they are depressed or unhappy, and those correlations are stronger than for other media such as TV or gaming. Experimental studies find that reducing social media and screen use reduces depression and increases well-being, demonstrating a causal path from social media use to depression and low well-being. These research findings establish a clear link between social media use and depression/low well-being, including studies that can show causation, not just correlation. Associations between social media use and depression, low well-being, and body image issues are larger among teens 15 and under compared to those 16 and older, especially among girls. Early adolescent brains are particularly susceptible to experiences on social media such as peer influences and reward processing. Thus, the research literature on social media use and mental health supports the prohibition of anyone under the age of 14 from having an account and requiring 14- and 15-year-olds to obtain parental consent to become an account holder, as required by Fla. Stat. 501.1736 (HB 3).

**XI. Signature**

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of January, 2025 in San Diego, CA.

*Jean Twenge*

Jean Twenge

21

## References

Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The welfare effects of social media. *American Economic Review, 110*, 629–676.

Boer, M., Cosma, A., Twenge, J. M., Inchley, J., Jericek Kalnscek, H., & Stevens, G. W. J. M. (2023). National-level schoolwork pressure, family structure, internet use, and obesity as drivers of time trends in adolescent psychological complaints between 2002 and 2018. *Journal of Youth and Adolescence, 52*, 2061-2077.

Cairns, R., Karanges, E. A., Wong, A., Brown, J. A., Robinson, J., Pearson, S.-A., Dawson, A. H., & Buckley, N. A. (2019). Trends in self-poisoning and psychotropic drug use in people aged 5-19 years: a population-based retrospective cohort study in Australia. *BMJ Open, 9(2)*, e026001.

Crone, E. A., & Konijn, E. A. (2018). Media use and brain development during adolescence. *Nature Communications, 9*, 588.

Dönmez, Y. E., & Soylu, N. (2019). Online sexual solicitation in adolescents: Socio-demographic risk factors and association with psychiatric disorders, especially posttraumatic stress disorder. *Journal of Psychiatric Research, 117*, 68–73.

Faverio, M., & Sidoti, O. (2024, December 12). Teens, social media, and technology 2024. Pew Research Center.

Haidt, J., Twenge, J. M., & Rausch, Z. (2024). Social media and mental health: A collaborative review. Publicly posted Google doc.

Hisler, G., Twenge, J. M., & Krizan, Z. (2020). Associations between screen time and short sleep duration among adolescents varies by media type: Evidence from a cohort study. *Sleep Medicine*, *66*, 92-102.

Hu, Y., Bai, Y., Pan, Y., & Li, S. (2021). Cyberbullying victimization and depression among adolescents: A meta-analysis. *Psychiatry Research, 305*.

Hunt, M. G., Marx, R., Lipson, C., & Young, J. (2018). No more FOMO: Limiting social media decreases loneliness and depression. *Journal of Social and Clinical Psychology, 37*, 751–768.

Kelly, Y., Zilanawala, A., Booker, C., & Sacker, A. (2019). Social media use and adolescent mental health: Findings from the UK Millennium Cohort Study. *EClinical Medicine*.

Keyes, K. M., Gary, D., O'Malley, P. M., Hamilton, A., & Schulenberg, J. (2019). Recent increases in depressive symptoms among US adolescents: Trends from 1991 to 2018. *Social Psychiatry and Psychiatric Epidemiology, 54*, 987–996.

Lenhart, A. (2015, April 9). Teens, social media, & technology overview 2015. Pew Research Center.

Liu, M., Kamper-DeMarco, K. E., Zhang, J., Xiao, J., Dong, D., & Xue, P. (2022). Time spent on social media and risk of depression in adolescents: A dose-response meta-analysis. *International Journal of Environmental Research and Public Health, 19*(9).

Madden, M., Lenhart, A., Duggan, M., Cortesi, S., & Gasser, U. (2013, March 13). Teens and technology 2013. Pew Research Center.

Maza, M. T., Fox, K. A., Kwon, S.-J., Flannery, J. E., Lindquist, K. A., Prinstein, M. J., & Telzer, E. H. (2023). Association of habitual checking behaviors on social media with longitudinal functional brain development. *JAMA Pediatrics, 177*, 160–167.

Mojtabai, R., Olfson, M., & Han, B. (2016). National trends in the prevalence and treatment of depression in adolescents and young adults. *Pediatrics, 138*(6).

Orben, A., Przybylski, A. K., Blakemore, S.-J., & Kievit, R. A. (2022). Windows of developmental sensitivity to social media. *Nature Communications, 13*, 1649.

Riehm, K. E., Feder, K. A., Tormohlen, K. N., Crum, R. M., Young, A. S., Green, K. M., Pacek, L. R., La Flair, L. N., & Mojtabai, R. (2019). Associations between time spent using social media and internalizing and externalizing problems among US youth. *JAMA Psychiatry, 76*, 1266–1273.

Robertson, L., Twenge, J. M., Joiner, T. E., & Cummins, K. (2022). Associations between screen time and internalizing disorder diagnoses among 9- to 10-year-olds. *Journal of Affective Disorders*, *311*, 530-537.

Rodman, A. M., Powers, K. E., & Somerville, L. H. (2017). Development of self-protective biases in response to social evaluative feedback. *Proceedings of the National Academy of Sciences of the United States of America, 114*, 13158–13163.

Rothwell, J. (2023, October 13). Teens spend average of 4.8 hours on social media per day. Gallup.Saiphoo, A. N., & Vahedi, Z. (2019). A meta-analytic review of the relationship between social media use and body image disturbance. *Computers in Human Behavior, 101*, 259–275.

Saiphoo, A. N., & Vahedi, Z. (2019). A meta-analytic review of the relationship between social media use and body image disturbance. *Computers in Human Behavior, 101*, 259–275.

Schmidt-Persson, J., Rasmussen, M. G. B., Sorensen, S. O., Mortensen, S. R., Olesen, L. G., Brage, S., Kristensen, P. L., Bilenberg, N., & Grontved, A. (2024). Screen media use and mental health of children and adolescents: A secondary analysis of a randomized clinical trial. *JAMA Network Open, 7*, e2419881.

Scott, A. J., Webb, T. L., Martyn-St James, M., Rowse, G., & Weich, S. (2021). Improving sleep quality leads to better mental health: A meta-analysis of randomised controlled trials. *Sleep Medicine Reviews, 60*, 101556.

Steers, M.-L. N., Wickham, R. E., & Acitelli, L. K. (2014). Seeing everyone else's highlight reels: How Facebook usage is linked to depressive symptoms. *Journal of Social and Clinical Psychology, 33*, 701–731.

Twenge, J. M. (2017). *iGen: Why Today's Super-Connected Kids Are Growing Up Less Rebellious, More Tolerant, Less Happy – and Completely Unprepared for Adulthood*. New York: Atria Books.

Twenge, J. M. (2025). *Generations: The Real Differences between Gen Z, Millennials, Gen X, Boomers and Silents—and What They Mean for America's Future*. Updated paperback edition. New York: Atria Books.

Twenge, J. M., & Farley, E. (2021). Not all screen time is created equal: Associations with mental health vary by activity and gender. *Social Psychiatry and Psychiatric Epidemiology*, *56*, 207-217.

Twenge, J. M., Haidt, J., Blake, A. B., McAllister, C., Lemon, H., & LeRoy, A. (2021). Worldwide increases in adolescent loneliness. *Journal of Adolescence*, *93*, 257-269.

Twenge, J. M., Joiner, T. E., Rogers, M. L., & Martin, G. N. (2018). Increases in depressive symptoms, suicide-related outcomes, and suicide rates among U.S. adolescents after 2010 and links to increased new media screen time. *Clinical Psychological Science*, *6*, 3-17.

Twenge, J. M., Krizan, Z., & Hisler, G. (2017). Decreases in self-reported sleep duration among U.S. adolescents 2009-2015 and links to new media screen time. *Sleep Medicine*, 39, 47-53.

23

Twenge, J. M., & Martin, G. N. (2020). Gender differences in associations between digital media use and psychological well-being: Evidence from three large datasets. *Journal of Adolescence*, *79*, 91-102.

Twenge, J. M., Martin, G. N., & Campbell, W. K. (2018). Decreases in psychological well-being among American adolescents after 2012 and links to screen time during the rise of smartphone technology. *Emotion*, *18*, 765-780.

Twenge, J. M., Cooper, A. B., Joiner, T. E., Duffy, M. E., & Binau, S. G. (2019a). Age, period, and cohort trends in mood disorder indicators and suicide-related outcomes in a nationally representative dataset, 2005-2017. *Journal of Abnormal Psychology, 128*, 185-199.

Twenge, J. M., Martin, G. N., & Spitzberg, B. H. (2019b). Trends in U.S. adolescents' media use, 1976-2016: The rise of digital media, the decline of TV, and the (near) demise of print. *Psychology of Popular Media Culture*, *8*, 329-345.

Twenge, J. M., Spitzberg, B. H., & Campbell, W. K. (2019c). Less in-person social interaction with peers among U.S. adolescents in the 21st century and links to loneliness. *Journal of Social and Personal Relationships*, *36*, 1892-1913.

Van Hoorn, J., Dijk, E., Meuwese, R., Rieffe, C., & Crone, E. A. (2016). Peer influence on prosocial behavior in adolescence. *Journal of Research on Adolescence, 26*, 90–100.

Wells, G., Horowitz, J., & Seetharaman, D. (2021, September 14). Facebook knows Instagram is toxic for teen girls, company documents show. *Wall Street Journal*.

24

**JEAN M. TWENGE**
Curriculum Vitae
December, 2024

Dept. of Psychology
San Diego State University
5500 Campanile Drive
San Diego, CA 92182-4611
E-mail: jtwenge@sdsu.edu

## EDUCATION

Ph.D.  in Psychology, University of Michigan, Ann Arbor, 1998
> Honors: National Science Foundation Graduate Fellowship, Rackham Dissertation Fellowship

M.A., Social Sciences, University of Chicago, 1993
B.A., Psychology and Sociology, University of Chicago, 1993
> Honors: Phi Beta Kappa, National Merit Scholarship, College Honors Scholarship, Alumni Association Award for Extracurricular Achievements

## EMPLOYMENT HISTORY

Professor, San Diego State University, Department of Psychology, 2009-present
Associate Professor, San Diego State University, Department of Psychology, 2005-2009
Assistant Professor, San Diego State University, Department of Psychology, 2001-2005
Post-Doctoral Researcher, Case Western Reserve University, 1999-2001
Visiting Assistant Professor, Gustavus Adolphus College, Department of Psychology, 1998

## GRANTS FUNDED

Russell Sage Foundation grant, Co-PI. Title: The effect of the Great Recession on young people's values and behaviors. Project # 92-12-04. Funding period January 2012-January 2014.

National Institutes of Health M-RISP program grant. Title: Social exclusion, emotion regulation, self-control, and impulsive behavior: Testing a mediational model. Grant number: 1 R24 MH65515. Funding period April 2003-February 2006.

National Institutes of Health Individual Post-Doctoral National Research Service Award. Title: The effects of social rejection on behavior. Grant number: 1 F32 MH12329. Funding period May 2000-August 2001.

Twenge    2

## PUBLICATIONS  (Total = 192)
Scopus *h* index = 79
Scopus total citations = 25,734
Google Scholar *h* index = 107
Google Scholar total citations = 79,651
**Clarivate Analytics highly cited list (top .1%), 2021, 2022, 2023, 2024**

## 1. Authored books (15)

15. Myers, D. G., & **Twenge, J. M.** (2025). *Social Psychology*. 15th edition. (undergraduate textbook). New York: McGraw-Hill Education.

14. **Twenge, J. M.** (2025). *Generations: The Real Differences between Gen Z, Millennials, Gen X, Boomers and Silents—and What They Mean for America's Future*. 2nd edition. New York: Atria Books.

13. **Twenge, J. M.** (2023). *Generations: The Real Differences between Gen Z, Millennials, Gen X, Boomers and Silents—and What They Mean for America's Future*. New York: Atria Books. Approximate number of copies sold: 38,000

12. Myers, D. G., & **Twenge, J. M.** (2022). *Social Psychology*. 14th edition. (undergraduate textbook). New York: McGraw-Hill Education.

11. Myers, D. G., & **Twenge, J. M.** (2021). *Exploring Social Psychology*. 9th edition. (undergraduate textbook). New York: McGraw-Hill Education.

10. **Twenge, J. M.,** & Campbell, W. K. (2019). *Personality Psychology: Understanding Yourself and Others*. 2nd Edition. (undergraduate textbook). Upper Saddle River, NJ: Pearson Education.

9. Myers, D. G., & **Twenge, J. M.** (2018). *Social Psychology*. 13th edition. (undergraduate textbook). New York: McGraw-Hill Education.

8. **Twenge, J. M.** (2017). *iGen: Why Today's Super-Connected Kids Are Growing Up Less Rebellious, More Tolerant, Less Happy – and Completely Unprepared for Adulthood*. New York: Atria Books. Approximate number of copies sold: 166,000

7. Myers, D. G., & **Twenge, J. M.** (2017). *Exploring Social Psychology*. 8th edition. (undergraduate textbook) New York: McGraw-Hill Education.

6. **Twenge, J. M.,** & Campbell, W. K. (2016). *Personality Psychology: Understanding Yourself and Others*. (undergraduate textbook). Upper Saddle River, NJ: Pearson Education.

5. Myers, D. G., & **Twenge, J. M.** (2015). *Social Psychology*. 12th edition. (undergraduate textbook). New York: McGraw-Hill Education.

4. **Twenge, J. M.** (2014). *Generation Me: Why Today's Young Americans Are More Confident, Assertive, Entitled--and More Miserable Than Ever Before.* 2nd edition. New York: Atria Books. Approximate number of copies sold: 12,000

3. **Twenge, J. M.** (2012). *The Impatient Woman's Guide to Getting Pregnant.* New York: Atria Books. Approximate number of copies sold: 70,000

2. **Twenge, J.M.**, & Campbell, W. K. (2009). *The Narcissism Epidemic: Living in the Age of Entitlement.* New York: Atria Books. Approximate number of copies sold: 81,000

1. **Twenge, J. M.** (2006). *Generation Me: Why Today's Young Americans Are More Confident, Assertive, Entitled--and More Miserable Than Ever Before.* New York: Free Press. Approximate number of copies sold: 112,000

## 2. Journal articles (147)
*Student authors in italics*

147. **Twenge, J. M**., Wells, B. E., *Le, J., &* Rider, G. N. (2024). Increases in self-identifying as transgender among U.S. adults, 2014-2022. *Sexuality Research and Social Policy.*

146. **Twenge, J. M**., Wells, B. E., & *Le, J.* (2024). Increases in LGB identification among U.S. adults, 2014-2021. *Sexuality Research and Social Policy, 21,* 863-878.

145. Walsh, L. C., *Regan, A.,* **Twenge, J. M.,** & Lyubomirsky, S. (2023). What is the optimal way to give thanks? Comparing the effects of gratitude expressed privately, one-to-one via text, or publicly on social media. *Affective Science*, *4*, 82-91.

144. *Boer, M.,* Cosma, A., **Twenge, J. M.**, Inchley, J., Jericek Kalnscek, H., & Stevens, G. W. J. M. (2023). National-level schoolwork pressure, family structure, internet use, and obesity as drivers of time trends in adolescent psychological complaints between 2002 and 2018. *Journal of Youth and Adolescence, 52*, 2061-2077. (Times cited: 5)

143. *Udupa, N. S.*, **Twenge, J. M**., *McAllister, C.,* & Joiner, T. E. (2023). Increases in poor mental health, mental distress, and depression symptoms among U.S. adults, 1993–2020. *Journal of Mood and Anxiety Disorders*, 100013.

142. **Twenge, J. M.,** & Hamilton, J. L. (2022). Linear correlation is insufficient as the sole measure of associations: The case of technology use and mental health. *Acta Psychologica*, *229*, e103696. (Times cited: 4)

141. *Robertson, L.,* **Twenge, J. M.,** Joiner, T. E., & Cummins, K. (2022). Associations between screen time and internalizing disorder diagnoses among 9- to 10-year-olds. *Journal of Affective Disorders*, *311*, 530-537. (Times cited: 5)

140. Krokstad, S., Weiss, D., Rangul, V., Kvaloy, K., Ingul, J., **Twenge, J.,** & Sund, E. (2022). Divergent decennial trends in mental health according to age reveal poorer mental health for young people: Repeated cross-sectional population-based surveys from the HUNT Study, Norway. *BMJ Open*, *12*, e057654. (Times cited: 24)

139. Twenge, J. M., Haidt, J., *Lozano, J.,* & Cummins, K. M. (2022). Specification curve analysis shows that social media use is linked to poor mental health, especially among girls. ***Acta Psychologica***, 224, 103512. (Times cited: 32)

138. *Tong, B.,* Devendorf, A., Panaite, V., Miller, R., Kashdan, T. B., Joiner, T. E., **Twenge, J. M.,** Karver, M., Janakiraman, R., & Rottenberg, J. (2022). Future well-being among United States youth who attempted suicide and survived. ***Behavior Therapy***, 53, 481-491. (Times cited: 2)

137. *Shawcroft, J., Gale, M.,* Coyne, S. M., **Twenge, J. M.,** Carroll, J., Wilcox, B., & James, S. (2022). Teens, screens, and quarantine: An analysis of adolescent media use and mental health prior to and during Covid-19. ***Heliyon***, 8, e09898. (Times cited: 3)

136. **Twenge, J. M.,** & Cooper, A. B. (2022). The expanding class divide in happiness in the United States, 1972-2016. ***Emotion***, 22, 701-713. (Times cited: 9)

135. **Twenge, J. M.,** Haidt, J., *Blake, A. B., McAllister, C., Lemon, H.,* & *LeRoy, A.* (2021). Worldwide increases in adolescent loneliness. ***Journal of Adolescence***, *93*, 257-269. (Times cited: 77)

134. *McAllister, C.,* Hisler, G. C., *Blake, A. B.,* **Twenge, J. M.,** *Farley, E.,* & Hamilton, J. L. (2021). Associations between adolescent depression and self-harm behaviors and screen media use in a nationally representative time-diary study. ***Research on Child and Adolescent Psychopathology,*** *49*, 1623-1634. (Times cited: 10)

133. Hisler, G. C., & **Twenge, J. M.** (2021). Sleep characteristics of U.S. adults before and during the COVID-19 pandemic. ***Social Science & Medicine***, 276, 113849. (Times cited: 41)

132. **Twenge, J. M.**, & *Blake, A. B.* (2021). Increased support for same-sex marriage in the U.S.: Disentangling age, period, and cohort effects. ***Journal of Homosexuality***, 68, 1774-1784. (Times cited: 20)

131. Twenge, J.M., *McAllister, C.,* & Joiner, T. E. (2021). Anxiety and depressive symptoms in U.S. Census Bureau assessments of adults: Trends from 2019 to fall 2020 across demographic groups. ***Journal of Anxiety Disorders***, 83, 102455. (Times cited: 19)

130. **Twenge, J. M.**, Konrath, S. H., Cooper, A. B., Foster, J. D., Campbell, W. K., & *McAllister, C.* (2021). Egos deflating with the Great Recession: A cross-temporal meta-analysis and within-campus analysis of the Narcissistic Personality Inventory, 1982-2016. ***Personality and Individual Differences***, 179, 110947. (Times cited: 7)

129. **Twenge, J. M.,** & *Farley, E.* (2021). Not all screen time is created equal: Associations with mental health vary by activity and gender. ***Social Psychiatry and Psychiatric Epidemiology***, *56*, 207-217. (Times cited: 90)

128. **Twenge, J. M.,** & Joiner, T. E. (2020). U.S. Census Bureau-assessed prevalence of anxiety and depressive symptoms in 2019 and during the 2020 COVID-19 pandemic. ***Depression and Anxiety,*** *37*, 954-956. (Times cited: 285)

127. Hisler, G. C., Hasler, B. P., Franzen, P. L., Clark, D. B., & **Twenge, J. M.** (2020). Screen media use and sleep disturbance symptom severity in children. ***Sleep Health***, *6*, 731-742. (Times cited: 15)

126. **Twenge, J. M.,** Haidt, J., Joiner, T. E., & Campbell, W. K. (2020). Underestimating digital media harm. ***Nature Human Behavior***, *4*, 346-348. (Times cited: 64)

125. **Twenge, J. M.,** & Joiner, T. E. (2020). Mental distress among U.S. adults during the COVID-19 pandemic. ***Journal of Clinical Psychology***, *76*, 2170-2182. (Times cited: 184)

124. **Twenge, J. M.,** & Spitzberg, B. H. (2020). Declines in non-digital social interaction among Americans, 2003-2017. ***Journal of Applied Social Psychology***, 50, 363-367. (Times cited: 27)

123. **Twenge, J. M.** (2020). Possible reasons Americans are not having sex as much as they used to. ***JAMA Network Open***, 3(6), pp. e203889. (Times cited: 4)

122. *Hisler, G.*, **Twenge, J. M.,** & Krizan, Z. (2020). Associations between screen time and short sleep duration among adolescents varies by media type: Evidence from a cohort study. ***Sleep Medicine***, *66*, 92-102. (Times cited: 70)

121. Twenge, J. M. (2020). Increases in depression, self-harm, and suicide among U.S. adolescents after 2012 and links to technology use: Possible mechanisms. ***Psychiatric Research & Clinical Practice***, 2, 19-25. (Times cited: 58)

120. Twenge, J. M., & *Martin, G. N.* (2020). Gender differences in associations between digital media use and psychological well-being: Evidence from three large datasets. ***Journal of Adolescence***, *79*, 91-102. (Times cited: 172)

119. **Twenge, J. M**., Joiner, T. E., Rogers, M. L., & *Martin, G. N.* (2020). Considering all of the data on digital media use and depressive symptoms: Response to Ophir et al. ***Clinical Psychological Science***, *6*, 456-457. (Times cited: 6)

118. **Twenge, J. M.,** *Blake, A. B.,* Haidt, J., & Campbell, W. K. (2020). Commentary: Screens, teens, and psychological well-being: Evidence from three time-use-diary studies. ***Frontiers in Psychology***. https://doi.org/10.3389/fpsyg.2020.00181 (Times cited: 12)

117. **Twenge, J. M.** (2020). Why increases in adolescent depression may be linked to the technological environment. ***Current Opinion in Psychology***, *32*, 89-94. (Times cited: 82)

116. *Duffy, M. E.,* **Twenge, J. M.,** & Joiner, T. E. (2019). Trends in mood and anxiety symptoms and suicide-related outcomes among US undergraduates, 2007-2018: Evidence from two national surveys. ***Journal of Adolescent Health***, 65, 590-598. (Times cited: 282)

115. **Twenge, J. M.,** *Martin, G. N.,* & Spitzberg, B. H. (2019). Trends in U.S. adolescents' media use, 1976-2016: The rise of digital media, the decline of TV, and the (near) demise of print. ***Psychology of Popular Media Culture***, *8*, 329-345. (Times cited: 326)

114. **Twenge, J. M.** (2019). More time on technology, less happiness? Associations between digital media use and psychological well-being. ***Current Directions in Psychological Science,*** *28*, 372-379. (Times cited: 121)

113. **Twenge, J. M.,** Campbell, W. K., & Sherman, R. A. (2019). Declines in vocabulary among American adults within levels of educational attainment, 1974-2016. ***Intelligence***, *76*, 101377. (Times cited: 11)

112. Grubbs, J. B, Exline, J. J., Campbell, W. K., *McCain, J.,* & **Twenge, J. M.** (2019). Emerging adult reactions to labeling regarding age-group differences in narcissism and entitlement. ***PLoS ONE***, 0215637. (Times cited: 14)

111. **Twenge, J. M.,** & Campbell, W. K. (2019). Digital media use is linked to lower psychological well-being: Evidence from three datasets. ***Psychiatric Quarterly,*** *90*, 311-331. (Times cited: 129)

110. **Twenge, J. M.,** Spitzberg, B. H., & Campbell, W. K. (2019). Less in-person social interaction with peers among U.S. adolescents in the 21st century and links to loneliness. ***Journal of Social and Personal Relationships***, *36*, 1892-1913. (Times cited: 204)

109. **Twenge, J. M.,** *Hisler, G. C.,* & Krizan, Z. (2019). Associations between screen time and sleep duration are primarily driven by portable electronic devices: Evidence from a population-based study of U.S. children ages 0 to 17. ***Sleep Medicine***, *56*, 211-218. (Times cited: 83)

108. **Twenge, J. M**., Cooper, A. B., Joiner, T. E., *Duffy, M. E*., & *Binau, S. G.* (2019). Age, period, and cohort trends in mood disorder indicators and suicide-related outcomes in a nationally representative dataset, 2005-2017. ***Journal of Abnormal Psychology,*** *128*, 185-199. (Times cited: 706)

107. **Twenge, J. M.,** & Park, H. (2019). The decline in adult activities among U.S. adolescents, 1976-2016. ***Child Development,*** *90*, 638-654. (Times cited: 137)

106. Grubbs, J.B., Exline, J.J., Campbell, W.K., Pargament, K.I., & **Twenge, J.M.** (2018). God owes me: The role of divine entitlement in predicting struggles with a deity. ***Psychology of Religion and Spirituality,*** *10,* 356-367. (Times cited: 13)

105. **Twenge, J. M.,** & Campbell, W. K. (2018). Associations between screen time and lower psychological well-being among children and adolescents: Evidence from a population-based study. ***Preventative Medicine Reports,*** *12,* 271-283. (Times cited: 330)

104. **Twenge, J. M.,** *Martin, G. N.,* & Campbell, W. K. (2018). Decreases in psychological well-being among American adolescents after 2012 and links to screen time during the rise of smartphone technology. ***Emotion***, *18*, 765-780. (Times cited: 323)

103. **Twenge, J. M**., Joiner, T. E., Rogers, M. L., & *Martin, G. N.* (2018). Amount of time online is problematic if it displaces face-to-face social interaction and sleep. ***Clinical Psychological Science***, 6, 456-457. (Times cited: 8)

102. **Twenge, J. M.,** & Campbell, W. K. (2018). Cultural individualism is linked to later onset of adult-role responsibilities across time and regions. ***Journal of Cross-Cultural Psychology***, *49*, 673-682. (Times cited: 9)

101. **Twenge, J. M**., Joiner, T. E., Rogers, M. L., & *Martin, G. N.* (2018). Digital media may explain a substantial portion of the rise in depressive symptoms among adolescent girls: Response to Daly. ***Clinical Psychological Science***, *6*, 296-297. (Times cited: 11)

100. **Twenge, J. M**., Joiner, T. E., Rogers, M. L., & *Martin, G. N.* (2018). Increases in depressive symptoms, suicide-related outcomes, and suicide rates among U.S. adolescents after 2010 and links to increased new media screen time. ***Clinical Psychological Science***, *6*, 3-17. (Times cited: 757)

99. *Wegman, L. A.,* Hoffman, B. J., Carter, N. T., **Twenge, J. M.,** & *Guenole, N.* (2018). Placing job characteristics in context: Cross-temporal meta-analysis of changes in job characteristics since 1975. ***Journal of Management***, *44,* 352-386. (Times cited: 86)

98. **Twenge, J. M.**, Krizan, Z., & *Hisler, G.* (2017). Decreases in self-reported sleep duration among U.S. adolescents 2009-2015 and links to new media screen time. ***Sleep Medicine***, 39, 47-53. (Times cited: 145)

97. **Twenge, J. M.**, Sherman, R. A., & Wells, B. E. (2017). Declines in sexual frequency among American adults, 1989-2014. ***Archives of Sexual Behavior***, *46*, 2389-2401. (Times cited: 97)

96. **Twenge, J. M**., *VanLandingham, H.,* & Campbell, W. K. (2017). The seven words you can never say on television: Increases in the use of swear words in American books 1950-2008. ***Sage Open***. (Times cited: 20)

95. Park, H., Greenfield, P M., & **Twenge, J. M.** (2017). American undergraduate students' value development during the Great Recession. ***International Journal of Psychology***, *52*, 28-39. (Times cited: 15)

94. *Donnelly, K.,* & **Twenge, J. M.** (2017). Masculine and feminine traits on the Bem Sex-Role Inventory, 1993-2012: A cross-temporal meta-analysis. ***Sex Roles,*** *76*, 556-565. (Times cited: 181)

93. Campbell, W. K., **Twenge, J. M.,** & Carter, N. (2017). Support for marijuana (cannabis) legalization: Untangling age, period, and cohort effects. ***Collabra: Psychology,*** 3(1), 2. (Times cited: 11)

92. Campbell, S. M., Campbell, W. K., & **Twenge, J. M.** (2017). Fuzzy but useful constructs: Making sense of the differences between generations. ***Work, Aging, and Retirement***, *3*, 130-139. (Times cited: 44)

91. **Twenge, J. M.,** Carter, N, T., & Campbell, W. K. (2017). Age, time period, and birth cohort differences in self-esteem: Reexamining a cohort-sequential longitudinal study. ***Journal of Personality and Social Psychology***, *112*, e9-e17. (Times cited: 44)

90. **Twenge, J. M.**, Sherman, R. A., & Wells, B. E. (2017). Sexual inactivity during young adulthood is more common among U.S. Millennials and iGen: Age, period, and cohort effects on having no sexual partners after age 18. ***Archives of Sexual Behavior,*** *46*, 433-440. (Times cited: 67)

89. **Twenge, J. M.**, *Dawson, L.,* & Campbell, W. K. (2016). Still standing out: Children's names in the U.S. during the Great Recession and correlations with economic indicators. ***Journal of Applied Social Psychology,*** *46*, 663-670. (Times cited: 27)

88. **Twenge, J. M.**, *Honeycutt, N.,* Prislin, R., & Sherman, R. A. (2016). More polarized but more Independent: Political party identification and ideological self-categorization among U.S. adults, college students, and late adolescents, 1970-2015. ***Personality and Social Psychology Bulletin,*** *42*, 1364-1383. (Times cited: 56)

87. **Twenge, J. M.,** & *Donnelly, K*. (2016). Generational differences in American students' reasons for going to college, 1971-2014: The rise of extrinsic motives. ***Journal of Social Psychology***, 156, 620-629. (Times cited: 31)

86. **Twenge, J. M.,** Sherman, R. A., & Wells, B. E. (2016). Changes in American adults' reported same-sex sexual experiences and attitudes. ***Archives of Sexual Behavior,*** *45*, 1713-1730. (Times cited: 125)

85. **Twenge, J. M.,** Sherman, R. A., & Lyubomirsky, S. (2016). More happiness for young people and less for mature adults: Time period differences in subjective well-being in the United States, 1972-2014. ***Social Psychological and Personality Science,*** *7,* 131-141. (Times cited: 42)

84. **Twenge, J. M.,** Sherman, R. A., Exline, J. J., & *Grubbs, J. B.* (2016). Declines in American adults' religious participation and beliefs, 1972-2014. ***Sage Open,*** 1-13. (Times cited: 44)

83. *Donnelly, K*., **Twenge, J. M.,** Clark, M. A., *Shaikh, S., Beiler-May, A.,* & Carter, N. T. (2016). Attitudes toward women's work and family roles in the United States, 1976-2013. ***Psychology of Women Quarterly,*** *40,* 41-54. (Times cited: 126)

82. Leckelt, M., Back, M. D., Foster, J. D., Hutteman, R., Jaeger, G., *McCain, J.,* **Twenge, J. M.,** & Campbell, W. K. (2016). Entering adulthood in a recession tempers later narcissism – but only in men. ***Journal of Research in Personality***, 60, 8-11. (Times cited: 12)

81. **Twenge, J. M.,** Sherman, R. A., & Wells, B. E. (2015). Changes in American adults' sexual behavior and attitudes. ***Archives of Sexual Behavior***, *44*, 2273-2285. (Times cited: 240)

80. Campbell, W. K., Campbell, S., *Siedor, L. E.,* & **Twenge, J. M.** (2015). Generational differences are real and useful. ***Industrial and Organizational Psychology: Perspectives on Science and Practice,*** *8,* 324-331. (Times cited: 69)

79. **Twenge, J.M.,** Carter, N. T., & Campbell, W. K. (2015). Time period, generational, and age differences in tolerance for controversial beliefs and lifestyles in the U.S., 1972-2012. ***Social Forces****, 94,* 379-399. (Times cited: 49)

78. **Twenge, J. M.,** Exline, J. J., *Grubbs, J. B., Sastry, R.,* & Campbell, W. K. (2015). Generational and time period differences in American adolescents' religious orientation, 1966-2014. ***PLoS ONE****,* 10 (5): e0121454. (Times cited: 73)

77. **Twenge, J. M.** (2015). Time period and birth cohort differences in depressive symptoms in the U.S., 1982-2013. ***Social Indicators Research,*** *121,* 437-454. (Times cited: 102)

76. Jackson, B., Richman, L. S., *LaBelle, O., Lempereur, M. S.,* & **Twenge, J. M.** (2015). Experimental evidence that low social status is most toxic to well-being when internalized. ***Self and Identity****, 14,* 157-172. (Times cited: 10)

75. **Twenge, J. M.,** Campbell, W. K., & Carter, N. T. (2014). Declines in trust in others and confidence in institutions among American adults and late adolescents, 1972-2012. ***Psychological Science****, 25*, 1914-1923. (Times cited: 145)

74. **Twenge, J. M.,** Miller, J. D., & Campbell, W. K. (2014). The narcissism epidemic: Commentary on "Modernity and Narcissistic Personality Disorder." ***Personality Disorders: Theory, Research, and Treatment****, 5,* 227-229. (Times cited: 26)

73. *Grubbs, J. B.,* Exline, J. J., & **Twenge, J. M.** (2014). Psychological entitlement and ambivalent sexism: Understanding the role of entitlement in predicting two forms of sexism. ***Sex Roles,*** *70,* 209-220. (Times cited: 29)

72. *Park, H.,* **Twenge, J. M.,** & Greenfield, P. M. (2014). The Great Recession: Implications for adolescent values and behavior. ***Social Psychological and Personality Science****, 5,* 310-318. (Times cited: 65)

71. **Twenge, J. M.**, & Kasser, T. (2013). Generational changes in materialism and work centrality, 1976-2007: Associations with temporal changes in societal insecurity and materialistic role-modeling. ***Personality and Social Psychology Bulletin****, 39,* 883-897. (Times cited: 166)

70. **Twenge, J. M.,** Campbell, W. K., & *Gentile, B.* (2013). Changes in pronoun use in American books and the rise of individualism, 1960-2008. ***Journal of Cross-Cultural Psychology****, 44,* 406-415. (Times cited: 95)

69. **Twenge, J. M.** (2013). Overwhelming evidence for Generation Me: A reply to Arnett. *Emerging Adulthood, 1,* 21-26. (Times cited: 10)

68. **Twenge, J. M.** (2013). The evidence for Generation Me and against Generation We. *Emerging Adulthood, 1*, 11-16. (Times cited: 115)

67. **Twenge, J. M.** (2013). Does online social media lead to social connection or social disconnection? *Journal of College and Character, 14,* 11-20.

66. **Twenge, J. M.** (2013). Teaching Generation Me. *Teaching of Psychology, 40*, 66-69. (Times cited: 36)

65. **Twenge, J. M.,** Campbell, W. K., & *Gentile, B.* (2012). Male and female pronoun use in U.S. books reflects women's status, 1900-2008. *Sex Roles, 67,* 488-493. (Times cited: 52)

64. **Twenge, J. M.,** Campbell, W. K., & *Gentile, B.* (2012). Generational increases in agentic self-evaluations among American college students, 1966-2009. *Self and Identity, 11,* 409-427. (Times cited: 125)

63. **Twenge, J. M.,** Campbell, W. K., & *Gentile, B.* (2012). Increases in individualistic words and phrases in American books, 1960-2008. *PLoS ONE, 7,* e40181. (Times cited: 113)

62. *Gentile, B.,* **Twenge, J. M.,** *Freeman, E. C.,* & Campbell, W. K. (2012). The effect of social networking websites on positive self-views: An experimental investigation. *Computers in Human Behavior, 28,* 1929-1933. (Times cited: 138)

61. **Twenge, J.M.,** Campbell, W.K., & *Freeman, E. C.* (2012). Generational differences in young adults' life goals, concern for others, and civic orientation, 1966-2009. *Journal of Personality and Social Psychology, 102*, 1045-1062. (Times cited: 403)

60. **Twenge, J. M.** (2011). Generational differences in mental health: Are children and adolescents suffering more, or less? *American Journal of Orthopsychiatry, 81*, 469-472. (Times cited: 47)

59. Jackson, B., **Twenge, J. M.,** *Souza, C., Chiang, J.*, & Goodman, E. (2011). Low subjective social status promotes ruminative coping. *Journal of Applied Social Psychology, 41,* 2434-2456. (Times cited: 8)

58. DeWall, C. N., *Pond, R. S.,* Campbell, W. K., & **Twenge, J. M.** (2011). Tuning in to psychological change: Linguistic markers of psychological traits and emotions over time in popular U.S. song lyrics. *Psychology of Aesthetics, Creativity, and the Arts, 5,* 200-207. (Times cited: 145)

57. **Twenge, J. M.** (2011). The duality of individualism: Attitudes toward women, Generation Me, and the method of cross-temporal meta-analysis. *Psychology of Women Quarterly, 35,* 193-196. (Times cited: 22)

Twenge    11

56. DeWall, C. N., **Twenge, J. M.,** Baumeister. R. F., Koole, S. L., *Marquez, A., & Reid, M.* W. (2011). Automatic emotion regulation after social exclusion: Tuning to positivity. ***Emotion***, *11,* 623-636. (Times cited: 96)

55. **Twenge, J. M.**, Campbell, S. M., Hoffman, B. R., & Lance, C. E. (2010). Generational differences in work values: Leisure and extrinsic values increasing, social and intrinsic values decreasing. ***Journal of Management***, *36,* 1117-1142. (Times cited: 851)

54. *Gentile, B.,* **Twenge, J. M.**, & Campbell, W. K. (2010). Birth cohort differences in self-esteem, 1988-2008: A cross-temporal meta-analysis. ***Review of General Psychology***, *14,* 261-268. (Times cited: 119)

53. **Twenge, J. M.** (2010). A review of the empirical evidence on generational differences in work attitudes. ***Journal of Business and Psychology***, *25*, 201-210. (Times cited: 500)

52. DeWall, C. N., **Twenge, J. M.,** Bushman, B. J., *Im, C.,* & Williams, K. D. (2010). A little acceptance goes a long way: Applying social impact theory to the rejection-aggression link. ***Social Psychological and Personality Science***, *1,* 168-174. (Times cited: 102)

51. **Twenge, J. M.,** *Gentile, B.,* DeWall, C. N., *Ma, D. S., Lacefield, K., & Schurtz, D. R.* (2010). Birth cohort increases in psychopathology among young Americans, 1938-2007: A cross-temporal meta-analysis of the MMPI. ***Clinical Psychology Review***, *30,* 145-154. (Times cited: 350)

50. **Twenge, J. M.**, & Campbell, W. K. (2010). Birth cohort differences in the Monitoring the Future dataset and elsewhere: Further evidence for Generation Me. ***Perspectives on Psychological Science***, *5,* 81-88. (Times cited: 71)

49. **Twenge, J. M.**, & Foster, J. D. (2010). Birth cohort increases in narcissistic personality traits among American college students, 1982-2009. ***Social Psychological and Personality Science,*** *1*, 99-106. (Times cited: 285)

48. **Twenge, J. M.**, *Abebe, E. M.,* & Campbell, W. K. (2010). Fitting in or standing out: Trends in American parents' choices for children's names, 1880-2007. ***Social Psychological and Personality Science,*** *1,* 19-25. (Times cited: 107)

47. **Twenge, J. M. (**2009**)**. Status and gender: The paradox of progress in an age of narcissism. ***Sex Roles***, *61,* 338-340. (Times cited: 32)

46. **Twenge, J. M.** (2009). Generational changes and their impact in the classroom: Teaching Generation Me. ***Medical Education***, *43,* 398-405. (Times cited: 235)

45. *Gentile, B.,* Grabe, S., *Dolan-Pascoe, B.,* **Twenge, J. M.**, *Wells, B. E., & Maitino, A.* (2009). Gender differences in domain-specific self-esteem: A meta-analysis. ***Review of General Psychology***, *13,* 34-45. (Times cited: 205)

44. **Twenge, J. M.** (2009). Change over time in obedience: The jury's still out, but it might be decreasing. ***American Psychologist***, *64,* 28-31. (Times cited: 25)

Twenge    12

43. DeWall, C. N., **Twenge, J. M.**, Gitter, S. A., & Baumeister, R. F. (2009). It's the thought that counts: The role of hostile cognition in shaping aggressive responses to social exclusion. ***Journal of Personality and Social Psychology***, *96,* 45-59. (Times cited: 236)

42. **Twenge, J. M.**, & Foster, J. D. (2008). Mapping the scale of the narcissism epidemic: Increases in narcissism 2002-2007 within ethnic groups. ***Journal of Research in Personality,*** *42,* 1619-1622. (Times cited: 133)

41. **Twenge, J. M.**, & Campbell, S. M. (2008). Generational differences in psychological traits and their impact on the workplace. ***Journal of Managerial Psychology,*** *23,* 862-877. (Times cited: 391)

40. **Twenge, J. M.,** & Campbell, W. K. (2008). Increases in positive self-views among high school students: Birth cohort changes in anticipated performance, self-satisfaction, self-liking, and self-competence. ***Psychological Science,*** *19,* 1082-1086. (Times cited: 117)

39. **Twenge, J. M.,** *Konrath, S.,* Foster, J. D., Campbell, W. K., & Bushman, B. J. (2008b). Further evidence of an increase in narcissism among college students. ***Journal of Personality,*** *76*, 919-927. (Times cited: 93)

38. **Twenge, J. M.,** *Konrath, S.,* Foster, J. D., Campbell, W. K., & Bushman, B. J. (2008a). Egos inflating over time: A cross-temporal meta-analysis of the Narcissistic Personality Inventory. ***Journal of Personality***, *76,* 875-901. (Times cited: 644)

37. Vohs, K. D., Baumeister, R. F., Schmeichel, B. J., **Twenge, J. M.**, *Nelson, N. M.,* & Tice, D. M. (2008). Making choices impairs subsequent self-control: A limited resource account of decision making, self-regulation, and active initiative. ***Journal of Personality and Social Psychology***, *94*, 883-898. (Times cited: 596)

36. Twenge, J. M. (2008). Generation Me, the origins of birth cohort differences in personality traits, and cross-temporal meta-analysis. ***Social and Personality Psychology Compass,*** *2,* 1440-1454. (Times cited: 6)

35. Baumeister, R. F., Brewer, L. E., Tice, D. M., & **Twenge, J. M.** (2007). Thwarting the need to belong: Understanding the interpersonal and inner effects of social exclusion. ***Social and Personality Psychology Compass***, *1*. (Times cited: 9)

34. **Twenge, J. M.**, *Zhang, L.,* Catanese, K. R., *Dolan-Pascoe, B., Lyche, L. F.,* & Baumeister, R. F. (2007). Replenishing connectedness: Reminders of social activity reduce aggression after social exclusion. ***British Journal of Social Psychology***, *46,* 205-224. (Times cited: 115)

33. **Twenge, J. M.**, & *Im, C.* (2007). Changes in the need for social approval, 1958-2001. ***Journal of Research in Personality***, *41,* 171-189. (Times cited: 110)

32. **Twenge, J. M.**, Baumeister, R. F., DeWall, C. N., Ciarocco, N. J., & *Bartels, J. M.* (2007). Social exclusion decreases prosocial behavior. ***Journal of Personality and Social Psychology***, *92,* 56-66. (Times cited: 807)

31. Campbell, W. K., Krusemark, E. A., Dyckman, K. A., Brunell, A. B., McDowell, J. E., **Twenge, J. M.**, & Clementz, B. A. (2006). A magnetoencephalography investigation of neural correlates for social exclusion and self-control. ***Social Neuroscience***, *1,* 124-134. (Times cited: 46)

30. Leary, M. R., **Twenge, J. M.**, & Quinlivan. E. (2006). Interpersonal rejection as a determinant of anger and aggression. ***Personality and Social Psychology Review***, *10,* 111-132. (Times cited: 464)

29. Quinn, D. M., *Kallen, R.W.,* **Twenge, J. M.**, & Fredrickson, B. L. (2006). The disruptive effect of self-objectification on performance. ***Psychology of Women Quarterly,*** *30,* 59-64. (Times cited: 132)

28. *Wells, B. E.,* & **Twenge, J. M.** (2005). Changes in young people's sexual behavior and attitudes, 1943-1999: A cross-temporal meta-analysis. ***Review of General Psychology***, *9,* 249-261. (Times cited: 137)

27. **Twenge, J. M.**, & King, L. A. (2005). A good life is a personal life: Relationship fulfillment and work fulfillment in judgments of life quality. ***Journal of Research in Personality***, *39,* 336-353. (Times cited: 26)

26. Baumeister, R. F., DeWall, C. N., Ciarocco, N. J., & **Twenge, J. M.** (2005). Social exclusion impairs self-regulation. ***Journal of Personality and Social Psychology***, *88,* 589-604. (Times cited: 894)

25. **Twenge, J. M.**, *Zhang, L.*, & *Im, C.* (2004). It's beyond my control: A cross-temporal meta-analysis of increasing externality in locus of control, 1960-2002. ***Personality and Social Psychology Review***, *8,* 308-319. (Times cited: 271)

24. Foster, J. D., Campbell, W. K., & **Twenge, J. M.** (2003). Individual differences in narcissism: Inflated self-views across the lifespan and around the world. ***Journal of Research in Personality***, *37,* 469-486. (Times cited: 436)

23. **Twenge, J. M.**, *Catanese, K. R.,* & Baumeister, R. F. (2003). Social exclusion and the deconstructed state: Time perception, meaninglessness, lethargy, lack of emotion, and self-awareness. ***Journal of Personality and Social Psychology***, *85,* 409-423. (Times cited: 491)

22. **Twenge, J. M.**, Campbell, W. K., & Foster, C. A. (2003). Parenthood and marital satisfaction: A meta-analytic review. ***Journal of Marriage and the Family***, *65,* 574-583. (Times cited: 545)

21. **Twenge, J. M.**, & Campbell, W. K. (2003). "Isn't it fun to get the respect that we're going to deserve?" Narcissism, social rejection, and aggression. ***Personality and Social Psychology Bulletin,*** *29,* 261-272. (Times cited: 526)

20. **Twenge, J. M.**, & Nolen-Hoeksema, S. (2002). Age, gender, race, socioeconomic status, and birth cohort differences on the Children's Depression Inventory: A meta-analysis. ***Journal of Abnormal Psychology,*** *111,* 578-588. (Times cited: 749)

19. Baumeister, R. F., **Twenge, J. M.,** & *Nuss, C. K.* (2002). Effects of social exclusion on cognitive processes: Anticipated aloneness reduces intelligent thought. ***Journal of Personality and Social Psychology,*** *83,* 817-827. (Times cited: 581)

18. **Twenge, J. M.**, *Catanese, K. R.,* & Baumeister, R. F. (2002). Social exclusion causes self-defeating behavior. ***Journal of Personality and Social Psychology,*** *83,* 606-615. (Times cited: 347)

17. Baumeister, R. F., & **Twenge, J. M.** (2002). Cultural suppression of female sexuality. ***Review of General Psychology,*** *6,* 166–203. (Times cited: 191)

16. **Twenge, J. M.**, & Crocker, J. (2002). Race and self-esteem: Meta-analyses comparing Whites, Blacks, Hispanics, Asians, and American Indians and comment on Gray-Little and Hafdahl (2000). ***Psychological Bulletin,*** *128,* 371-408. (Times cited: 432)

15. **Twenge, J. M.**, & Crocker, J. (2002). Race and self-esteem revisited: Reply to Hafdahl and Gray-Little (2002). ***Psychological Bulletin,*** *128,* 417-420. (Times cited: 6)

14. Miner-Rubino, K. N., **Twenge, J. M.**, & Fredrickson, B. L. (2002). Trait self-objectification in women: Affective and personality correlates. ***Journal of Research in Personality, 36,*** 147-172. (Times cited: 136)

13. **Twenge, J. M.**, & Campbell, W. K. (2002). Self-esteem and socioeconomic status: A meta-analytic review. ***Personality and Social Psychology Review,*** *6,* 59-71. (Times cited: 369)

12. **Twenge, J. M.**, Baumeister, R. F., Tice, D. M., & *Stucke, T. S.* (2001). If you can't join them, beat them: Effects of social exclusion on aggressive behavior. ***Journal of Personality and Social Psychology,*** *81,* 1058-1069. (Times cited: 983)

11. **Twenge, J. M.**, & Campbell, W. K. (2001). Age and birth cohort differences in self-esteem: A cross-temporal meta-analysis. ***Personality and Social Psychology Review,*** *5,* 321-344. (Times cited: 380)

10. **Twenge, J. M.** (2001). Changes in women's assertiveness in response to status and roles: A cross-temporal meta-analysis, 1931-1993. ***Journal of Personality and Social Psychology,*** *81,* 133-145. (Times cited: 287)

9. **Twenge, J. M.** (2001). Birth cohort changes in extraversion: A cross-temporal meta-analysis, 1966-1993. ***Personality and Individual Differences,*** *30,* 735-748. (Times cited: 121)

8. **Twenge, J. M.** (2000). The age of anxiety? Birth cohort change in anxiety and neuroticism, 1952-1993. *Journal of Personality and Social Psychology, 79,* 1007-1021. (Times cited: 557)

7. **Twenge, J. M.** (1999). Mapping gender: The multifactorial approach and the organization of gender-related attributes. *Psychology of Women Quarterly, 23,* 485-502. (Times cited: 69)

6. **Twenge, J. M.**, & Zucker, A. N. (1999). What is a feminist? Attributions and stereotypes in closed and open-ended responses. *Psychology of Women Quarterly, 23,* 591-605. (Times cited: 80)

5. Fredrickson, B. L., Roberts, T., Noles, S., Quinn, D. M., & **Twenge, J. M.** (1998). That swimsuit becomes you: Objectification theory, mathematical performance, and disordered eating. *Journal of Personality and Social Psychology, 75,* 269-284. (Times cited: 773)

4. **Twenge, J. M.**, & Manis, M. (1998). First name desirability and adjustment: Self-satisfaction, others' ratings, and family background. *Journal of Applied Social Psychology, 28,* 41-51. (Times cited: 16)

3. **Twenge, J. M.** (1997c). "Mrs. His Name": Women's preferences for married names. *Psychology of Women Quarterly, 21,* 417-429. (Times cited: 50)

2. **Twenge, J. M.** (1997b). Changes in masculine and feminine traits over time: A meta-analysis. *Sex Roles, 36,* 305-325. (Times cited: 502)

1. **Twenge, J. M.** (1997a). Attitudes toward women, 1970-1995: A meta-analysis. *Psychology of Women Quarterly, 21,* 35-51. (Times cited: 282)


## 3. Book chapters, book reviews, and reports (41)

43. **Twenge, J. M.,** Peeples, D., Shafi, R. M. A., Boers, E., Hale, L., & Weigle, P. (2025). Social media and depressive symptoms. In D. A. Christakis and L. Hale (Eds.), *Handbook of Children and Screens* (pp. 137-140). New York: Springer.

42. Kruzan, K. P., Nesi, J., Hamilton, J. L., Vidal, C., **Twenge, J. M.,** Peeples, D., & Niederkrotenthaler, T. (2025). Media influences on self-harm, suicidality, and suicide. In D. A. Christakis and L. Hale (Eds.), *Handbook of Children and Screens* (pp. 141-148). New York: Springer.

**41. Twenge, J. M.** (2025). Technology and cultural change. In D. Gilbert, S. T. Fiske, E. Finkel, & Mendes, W. B. (Eds.), *The Handbook of Social Psychology.* Princeton, NJ: Princeton University Libraries.

**40. Twenge, J. M.,** Wang, W. Erickson, J., & Wilcox, W. B. (2022). The difference family structure makes in teens' tech use. Institute for Family Studies Report.

39. Morell, C., Candeub, A., **Twenge, J. M.,** & Wilcox, W. B. (2022). Protecting teens from Big Tech: Five policy ideas for states. Institute for Family Studies Report.

**38. Twenge, J. M.,** James, S., Carroll, J., & Wilcox, W. B. (2021). Teens and school satisfaction in 2021. Institute for Family Studies Report.

**37. Twenge, J. M.,** Coyne, S., Carroll, J., & Wilcox, W. B. (2020). U.S. teens in quarantine: Mental health, screen time, and family connection. Institute for Family Studies Report.

**36. Twenge, J. M.** (2019). The sad state of happiness in the United States and the role of digital media. In Helliwell, J. F., Layard, R., & Sachs, J. D. (Eds.), *World Happiness Report 2019*. New York: Sustainable Development Solutions Network.

35. Campbell, W. K., & **Twenge, J. M.** (2015). Narcissism, emerging media, and society. In Rosen, L. D., Cheever, N., & Carrier, L. M. (Eds.), *Handbook of Psychology, Technology, and Society* (pp. 358-370). Hoboken, NJ: Wiley-Blackwell.

**34. Twenge, J. M.** (2015). The rise of the self and the decline of intellectual and civic interest. In A. Bellow and M. Bauerlein (Eds.), *The State of the American Mind* (pp. 123-135). Philadelphia, PA: Templeton Press.

**33. Twenge, J. M.** (2015). The age in which we live and its impact on the person. In Brandscombe, N., and Reynolds, K. (Eds)., *The Psychology of Change*: *Life Contexts, Experiences, and Identities* (pp. 44-58). New York: Psychology Press.

32. Gentile, B., Wood, L., **Twenge, J. M.,** Hoffman, B. J., & Campbell, W. K. (2015). The problem of generational change: Why cross-sectional designs are inadequate for investigating generational differences. In C. E. Lance & R. J. Vandenberg (Eds.), *More Statistical and Methodological Myths and Urban Legends: Doctrine, Verity and Fable in Organizational and Social Sciences* (pp. 101-111). New York: Routledge.

**31. Twenge, J. M.,** Campbell, W. K., & Gentile, B. (2014). Birth cohort differences in personality. In R. J. Larsen and M. L. Cooper (Eds.), *APA Handbook of Personality and Social Psychology, Vol. 4: Personality Processes and Individual Differences* (pp. 535-551). Washington, DC: American Psychological Association.

30. Gentile, B., Campbell, W. K., & **Twenge, J. M.** (2014). Generational cultures. In Cohen, A. B. (Ed.), *Culture reexamined: Broadening our understanding of social and evolutionary influences* (pp. 31-48). Washington, DC: American Psychological Association.

29. Campbell, S. M., & **Twenge, J. M.** (2014). Is it kids today or just the fact that they're kids? Disentangling generational differences from age differences. In Parry, E. (Ed.), *Generational Diversity at Work: New Research Perspectives*. New York: Palgrave Macmillan.

Twenge     17

28. Baumeister, R.F., Masicampo, E.J., & **Twenge, J.M.** (2013). The social self. In Tenner, H., Suls, J., &  I. Weiner (Ed.), *Handbook of psychology*, *Volume 5: Personality and social psychology (2nd Edition).* (pp. 247-273). New York: Wiley.

27. DeWall, C. N., & **Twenge, J.M.** (2013). Rejection and aggression: Explaining the paradox. In *The Oxford Handbook of Social Exclusion*. (pp. 113-120). New York: Oxford University Press.

26. Myers, D. G., & **Twenge, J. M.** (2013). The self in a social world. In D. G. Myers, Social Psychology, 11h Edition (textbook). New York: McGraw-Hill.

25. Myers, D. G., & **Twenge, J. M.** (2013). Aggression: Hurting others. In D. G. Myers, Social Psychology, 11h Edition (textbook). New York: McGraw-Hill.

**24. Twenge, J. M.,** & Campbell, S. M. (2012). Who are the Millennials? Empirical evidence for generational differences in work values, attitudes, and personality. In Ng, E., Lyons, S., & Schweitzer, L. (Eds.), *Managing the New Workforce: International perspectives on the Millennial Generation*. Northampton, MA: Edward Elgar.

**23. Twenge, J. M.** (2011). Narcissism and culture. In Campbell, W. K., & Miller, J. D. (Eds.), *The Handbook of Narcissism*. New York: Wiley.

22. Foster, J. D., & **Twenge, J. M.** (2010). Narcissism and relationships: From light to dark. In Cupach, W., & Spitzberg, B. (Eds.), The Dark Side of Close Relationships. New York: Routledge.

**21. Twenge, J. M.** (2010). Time-lag study. In N. J. Salkind (Ed.), The Encyclopedia of Research Design. (pp. 1517-1519). Thousand Oaks, CA: Sage.

20. Myers, D. G., & **Twenge, J. M.** (2010). The self in a social world. In D. G. Myers, Social Psychology, 10th Edition (textbook). New York: McGraw-Hill.

**19. Twenge, J.M.,** & Campbell, S. M. (2009). Generation Me and the changing world of work. In Linley, P. A., Harrington, S., & Page, N. (Eds.), The Oxford Handbook of Positive Psychology and Work (pp. 25-35). Oxford: Oxford University Press.

**18. Twenge, J.M.** (2008). Emerging Adulthood: The Winding Road from the Late Teens Through the Twenties [Book Review]. American Journal of Psychology, 121, 682-687.

**17.** Sczesny, S., Bosak, J., Diekman, A. B., & **Twenge, J. M.** (2008). Dynamics of sex role stereotypes. In Y. Kashima, K. Fiedler, & P. Freytag (Eds.), Stereotype Dynamics: Language-Based Approaches to the Formation, Maintenance, and Transformation of Stereotypes. (pp. 135-161). Mahwah, NJ: Lawrence Erlbaum.

**16. Twenge, J. M.** (2008). Social exclusion, motivation, and self-defeating behavior: Why break-ups lead to drunkenness and ice cream. In J. Shah and W. Gardner (Eds.), Handbook of Motivation Science. (pp. 508-517). New York: Guilford.

**15. Twenge, J. M.** (2007). Self-esteem. In R. F. Baumeister & K. D. Vohs (Eds.), The Encyclopedia of Social Psychology. Thousand Oaks, CA: Sage.

**14. Twenge, J. M.** (2007). Gender differences. In R. F. Baumeister & K. D. Vohs (Eds.), The Encyclopedia of Social Psychology. Thousand Oaks, CA: Sage.

**13. Twenge, J. M.** (2007). Locus of control. In R. F. Baumeister & K. D. Vohs (Eds.), The Encyclopedia of Social Psychology. Thousand Oaks, CA: Sage.

**12. Twenge, J. M.** (2007). The socially excluded self. In C. Sedikides & S. Spencer (Eds.), The Self. (pp. 311-323). New York: Psychology Press.

**11. Twenge, J. M.** (2006). Self-esteem and individualism across time and cultures. In M. Kernis (Ed.), Self-esteem: issues and answers. (pp. 417-424). New York: Psychology Press.

10. Blackhart, G. C., Baumeister, R. F., & **Twenge, J. M.** (2006). Rejection's impact on self-defeating, prosocial, antisocial, and self-regulatory behaviors. In K. D. Vohs & E. J. Finkel (Eds.), Self and Relationships: Connecting Intrapersonal and Interpersonal Processes. (pp. 237-253). New York: Guilford.

**9. Twenge, J. M.** (2005). When does social rejection lead to aggression? The influence of situations, narcissism, emotion, and replenishing connections. In K. D. Williams, J. P. Forgas, & W. von Hippel (Eds.), The social outcast: Ostracism, social exclusion, rejection, and bullying. (pp. 201-212). New York: Psychology Press.

**8. Twenge, J. M.**, & Baumeister, R. F. (2004). Social exclusion increases aggression and self-defeating behavior while reducing intelligent thought and prosocial behavior. In D. Abrams, J. Marques, & M. A. Hogg (Eds.), The social psychology of inclusion and exclusion. (pp. 27-46). New York: Psychology Press.

**7. Twenge, J. M.** (2003). A theoretical and thought-provoking review of personality psychology. [Review of the book Personality: Determinants, dynamics, and potentials.] Contemporary Psychology: APA Review of Books, 48, 90-91.

6. Baumeister, R. F., & **Twenge, J. M.** (2003). The social self. In T. Millon & M. J. Lerner (Eds.), Handbook of psychology: Personality and social psychology, Vol. 5 (pp. 327-352). New York: John Wiley & Sons.

5. Baumeister, R. F., **Twenge, J. M.**, & Ciarocco, N. J. (2002). The inner world of rejection: Effects of social exclusion on emotion, cognition, and self-regulation. In J. P. Forgas & K. D. Williams (Eds.), The social self: Cognitive, interpersonal, and intergroup perspectives. (pp. 161-174). New York: Psychology Press.

4. Tice, D. M., **Twenge, J. M.,** & Schmeichel, B. J. (2002). Threatened selves: Social exclusion and prosocial and antisocial behavior. In J. P. Forgas & K. D. Williams (Eds.), The social self: Cognitive, interpersonal, and intergroup perspectives. (pp. 175-187). New York: Psychology Press.

**3. Twenge, J. M.,** & Baumeister, R. F. (2002). Self-control: A limited yet renewable resource. In Y. Kashima, M. Foddy, & M. Platow (Eds.), <u>Self and identity: Personal, social, and symbolic</u> (pp. 57-70). Mahwah, NJ: Erlbaum.

**2. Twenge, J. M.** (2002). Birth cohort, social change, and personality: The interplay of dysphoria and individualism in the 20th century. In D. Cervone & W. Mischel (Eds.), <u>Advances in Personality Science</u>. (pp. 196-218). New York: Guilford. (Times cited: 5)

1. Baumeister, R. F., & **Twenge, J. M.** (2001). Personality and social behavior. In N. J. Smelser & P. B. Baltes, Eds., <u>International encyclopedia of the social & behavioral sciences</u>, Vol. 16. (pp. 11276-11281). New York: Elsevier.


**PRESENTATIONS** (updated through 2019 only)

Twenge, J. M. (2019, October). Digital media use and mental health among adolescents: Evidence from four large datasets. Symposium talk, American Academy of Child and Adolescent Psychiatry, Chicago, IL.

Twenge, J. M. (2019, April). Teaching iGen: Reaching the smartphone generation in the classroom. <u>Invited talk</u>, Western Psychological Association, Pasadena, CA.

Twenge, J. M. (2018, July). iGen: Understanding the smartphone generation. <u>Invited talk,</u> Orygen Mental Health, Sydney Opera House, Sydney, Australia.

Twenge, J. M. (2018, May). Teaching iGen: Reaching the smartphone generation in the classroom. <u>Invited talk,</u> Association for Psychological Science annual convention, San Francisco, CA.

Twenge, J. M. (2018, March). Cultural trends shaping iGen: Individualism, insecurity, and in no hurry to grow up. <u>Invited talk</u>, Girard Lecture, Scripps College, Claremont, CA.

Twenge, J. M. (2018, March). iGen: Understanding the smartphone generation. <u>Invited talk,</u> Leadership conference, Foundation for Jewish Camp, Baltimore, MD.

Twenge, J. M. (2018, March). Cultural trends shaping iGen: Individualism, insecurity, and in no hurry to grow up. <u>Invited talk</u>, American Experience Distinguished Lecture, University of Pittsburgh, Pittsburgh, PA.

Twenge, J. M. (2018, March). Decreases in psychological well-being and increases in depression among adolescents since 2011 and links to smartphones. Paper presented at the Society for Personality and Social Psychology annual conference, Atlanta, GA.

Twenge, J. M. (2018, March). Trends in mental health for teens. <u>Invited talk</u>, California Student Mental Wellness Conference, Sacramento, CA.

Twenge, J. M. (2018, February). iGen: Teaching today's young people. <u>Invited talks</u>, Colorado College, Colorado Springs, CO.

Case 4:24-cv-00438-MW-MAF   Document 51-1   Filed 01/13/25   Page 44 of 65
USCA11 Case: 25-11881   Document: 24-1   Date Filed: 08/13/2025   Page: 115 of 229

Twenge   20

Twenge, J. M. (2018, January). iGen: Understanding the smartphone generation. Invited talk, TEDx conference, Laguna Blanca School, Santa Barbara, CA.

Twenge, J. M. (2018, January). iGen: Understanding today's young people. Invited talk, Edgewater Conference, Tucson, AZ.

Twenge, J. M. (2017, December). Cultural trends shaping iGen: Individualism, insecurity, and in no hurry to grow up. Invited talk, Claremont Graduate University, Claremont, CA.

Twenge, J. M. (2017, December). iGen: Understanding today's young people. Invited talk, University of Utah Student Affairs Retreat, Salt Lake City, UT.

Twenge, J. M. (2017, November). Trends in mental health for teens. Invited talk, Suicide Prevention Conference, Provo, UT.

Twenge, J. M. (2017, October). iGen: Understanding today's young people. Invited talk, Florida Southern College board of trustees.

Twenge, J. M. (2017, April). iGen: Teaching today's young people. Invited talks, Hartnell College, Salinas, CA.

Twenge, J. M. (2017, April). iGen: Understanding today's young people. Invited talk, symposium on emerging adulthood, Dartmouth College.

Twenge, J. M. (2017, February). Generation Me: Teaching today's young people. Invited talk, McGraw-Hill Education technology symposium, New Orleans, LA.

Twenge, J. M. (2016, November). iGen: Understanding today's students. Invited talk, Boston College.

Twenge, J. M. (2016, November). Welcome to Aggieland Generation Z: Maximizing Student Success for the Next Generation. Invited talk, Texas A&M University.

Twenge, J. M. (2016, November). Modern culture and individualism: Has self-focus made us better or worse?  Invited talk, Texas A&M University Psychology Department.

Twenge, J. M. (2016, August). Generation Me: Teaching and working with today's young people. Invited talk, University of Illinois at Urbana-Champaign.

Twenge, J. M. (2016, April). Modern culture and individualism: Has self-focus made us better or worse? Invited talk, Western Psychological Association annual conference, Long Beach, CA.

Twenge, J.M. (2016, February). Generation Me: Teaching and working with today's young people. Invited talk, Kansas State University, Manhattan, KS.

Twenge, J.M. (2016, February). Generation Me: Teaching and working with today's young people. Invited talk, Houston Community Colleges, Houston, TX.

Twenge, J. M. (2016, January). Cultural increases in individualism: The why behind generational differences. Paper presented at the Society for Personality and Social Psychology annual conference, San Diego, CA.

Twenge, J. M. (2016, January). Generational differences in sexual attitudes and behaviors: The surprising sexuality of Millennials. Paper presented at the Sexuality Preconference of the Society for Personality and Social Psychology annual conference, San Diego, CA.

Twenge, J.M. (2016, January). Generation Me: Teaching and working with today's young people. Invited talk, Hartnell College, Salinas, CA.

Twenge, J. M. (2015, October). Generation Me and modern culture: Has individualism made us better or worse? Invited talk, College of St. Rose, Albany, NY.

Twenge, J.M. (2015, August). Generation Me: Teaching and working with today's young people. Invited talk, SDSU Social Work Annual Field Instructor's Orientation Meeting, San Diego, CA.

Twenge, J.M. (2015, May). Generation Me: Teaching and working with today's young people. Invited talk, Student Diversity Summit, Mira Costa College, Carlsbad, CA.

Twenge, J. M. (2015, April). Generation Me and modern culture: Has individualism made us better or worse? Invited keynote, Carolinas Psychology Conference, Raleigh, NC.

Twenge, J. M., (2015, February). Generation Me and modern culture: Has individualism made us better or worse? Invited talk, Kalispell Community College Speaker Series.

Twenge, J. M. (2014, October). Modern culture and individualism: Has self-focus made us better or worse? Invited talk, University of California, Riverside.

Twenge, J. M. (2014, August). Modern culture and individualism: The pernicious spread of narcissism or the welcome growth of equality? Invited plenary talk presented at the annual convention of the American Psychological Association, Washington, DC.

Twenge, J.M. (2014, May). Generational differences in the workplace: Managing Millennials. Invited workshop presented at the Society of Industrial/Organizational Psychology, Honolulu, HI.

Twenge, J. M. (2014, May). The narcissism epidemic: Causes and consequences. Invited talk presented at the Happiness and Its Causes conference, Sydney, Australia.

Grubbs, J. B., Exline, J. J., Campbell, W. K., Twenge, J. M., Pargament, K. I., & Hall, T. W. (2014, April). Everyone owes me, including God! An examination of spiritual entitlement. Paper presented at the Midyear Meeting on Religion and Spirituality, Biola University, La Mirada, CA.

Twenge, J. M. (2014, April). Generation Me, cultural change, and the rise of individualism. Invited talk presented as the 2014 University of San Diego Haney lecture.

Twenge, J. M. (2014, March). Modern culture and individualism: The pernicious spread of narcissism or the welcome growth of equality? Invited talk presented at Florida Atlantic University.

Twenge, J. M. (2014, March). Generation Me: The rise of individualism. Invited talk presented at the University of Central Arkansas.

Twenge, J.M. (2014, February). Modern culture and individualism: The pernicious spread of narcissism or the welcome growth of equality? Invited talk presented at the University of California, San Diego.

Twenge, J. M. (2014, February). Generation Me: Teaching and working with today's young people. Invited talk presented at the Learning and the Brain conference, San Francisco, CA.

Twenge, J. M. (2014, February). Generation Me: Teaching and working with today's young people. Invited talk presented at the San Diego Navy Medical Center.

Twenge, J. M. (2014, February). Generation Me: Teaching and working with today's young people. Invited talk presented at the McGraw Hill Technology Faculty Retreat, Amelia Island, Florida.

Twenge, J. M. (2013, October). Generation Me: Changes in self-views and mental health. Invited talk presented to the First Marine Quarterly Force Preservation Board, Camp Pendelton, CA.

Twenge, J. M. (2013, September). Generation Me: Working with today's young people. Invited talk presented at the Human Resources Leadership Forum, Waltham, MA.

Twenge, J. M. (2013, August). Generation Me: Understanding today's young people. Invited talk presented at Otis College of Art and Design, Los Angeles, CA.

Twenge, J. M. (2013, August). Generation Me: Understanding today's young people. Invited talk presented at the Colorado College opening convocation, Colorado Springs, CO.

Twenge, J. M. (2013, August). Teaching Generation Me: Entitlement and other challenges. Invited talk presented at the American Psychological Association conference, Honolulu, HI.

Twenge, J. M. (2013, July). Generation Me: Understanding today's young people. Invited talk presented at the Colorado College Board of Trustees meeting, Vail, CO.

Twenge, J. M. (2013, July). Generation Me: Understanding today's young people. Invited talk presented at the annual conference of the Association of Government Accountants, Dallas, TX.

Twenge, J. M. (2013, June). Methodology for studying the psychological impact of cultural evolution. Workshop presented at the annual conference of the International Association for Cross-Cultural Psychology, UCLA.

Twenge, J. M. (2013, April). Generation Me: Understanding today's young people. Invited talk presented at Bryant University, Providence, RI.

Twenge, J. M. (2013, April). Generation Me: Understanding today's young people. Invited talk presented at Luther College, Decorah, IA.

Twenge, J. M. (2013, April). The Narcissism Epidemic: Evidence from individuals and cultural changes. Invited talk presented at Luther College, Decorah, IA.

Twenge, J. M. (2013, April). Generation Me: How cultural change creates generation gaps. Invited talk presented at Rutgers University, New Brunswick, NJ.

Twenge, J. M., & Greenfield, P. (2013, March). The Great Recession: Effects on young people's values and behaviors. Invited talk presented at the Russell Sage Foundation, New York, NY.

Twenge, J. M. (2013, March). Generation Me: Working with today's young people. Invited talk presented at Wake Forest University, Winston-Salem, NC.

Twenge, J. M. (2013, February). Generation Me: The growth of individualism. Invited talk presented at the MCT Human Resources conference, Istanbul, Turkey.

Twenge, J. M. (2013, January). Generation Me: Understanding the personality and values of today's young people. Invited talk presented at the Dalton Institute Conference, Florida State University, Tallahassee, FL.

Twenge, J. M. (2012, October). Generation Me: Understanding today's young people. Invited talks presented at Stephen F. Austin State University, Nacodoches, TX.

Twenge, J. M. (2012, October). Motivating the Millennial workforce. Invited talk presented at the annual conference of the National Association of State Chief Information Officers, San Diego, CA.

Twenge, J. M. (2012, October). Generation Me: Understanding today's young people. Invited talk presented at the Iowa State University Extension and Outreach Annual Conference, Ames, IA.

Twenge, J. M. (2012, August). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk, Opening University Convocation, University of Texas at Dallas, Richardson, TX.

Twenge, J. M. (2012, July). Generations and the workplace. Invited talk presented at the annual conference of the Association of Government Accountants, San Diego, CA.

Twenge, J. M. (2012, June). Generation Me: Recruiting and working with today's young professionals. Invited talk presented at the Forte Foundation Annual Sponsor Meeting, Anderson School of Management, UCLA, Los Angeles, CA.

Twenge, J. M. (2012, June). Generation Me: Understanding today's young people. Invited talk presented at the annual conference of Donate Life America, Chicago, IL.

Twenge, J. M. (2012, April). Why cross-sectional studies cannot identify generational differences. Talk presented at the annual conference of the Society for Industrial-Organizational Psychology, San Diego, CA.

Twenge, J. M. (2012, April). Generation Me: Understanding today's young people. Invited talk presented at the Army Aviation Association of America conference, Nashville, TN.

Twenge, J. M. (2012, April). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk, Bradley University, Peoria, IL.

Twenge, J. M. (2012, February). Generation Me: Understanding today's young people. Keynote address at the Association of College Honor Societies conference, San Diego, CA.

Twenge, J. M. (2012, February). Teaching and mentoring Generation Me. Keynote address presented at the Cabin Fever Faculty Development Workshop sponsored by the Faculty of Medicine, University of Calgary, Kananaskis Village, Alberta, Canada.

Twenge, J. M. (2012, February). Generation Me: Understanding today's young people. Keynote address presented at the Cabin Fever Faculty Development Workshop sponsored by the Faculty of Medicine, University of Calgary, Kananaskis Village, Alberta, Canada.

Twenge, J. M. (2012, January). Generational changes in community feeling. Symposium panel organizer and talk presented at the annual conference of the Society for Personality and Social Psychology, San Diego, CA.

Twenge, J. M. (2011, November). The Narcissism Epidemic: Implications for education and the workplace. Invited talks (President's Lecture and two workshops) presented at Western Connecticut State University, Danbury, CT.

Twenge, J. M. (2011, November). Generation Me: Understanding today's students. Invited talk presented at the Mayo Clinic, Phoenix, AZ.

Twenge, J. M. (2011, November). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the College Reading & Learning Association, San Diego, CA.

Twenge, J. M. (2011, October). Debate: Are today's emerging adults narcissistic or generous? <u>Invited talk</u> presented at the annual conference of the Society for the Study of Emerging Adulthood, Providence, RI.

Twenge, J. M. (2011, October). Generation Me: Understanding today's young people. <u>Invited talk</u> presented at the University of the Incarnate Word, San Antonio, TX.

Twenge, J. M. (2011, October). Generational differences in personality traits and work attitudes. <u>Invited talk</u> presented at the Rady School of Management, University of California at San Diego, San Diego, CA.

Twenge, J. M. (2011, September). Generations in the workplace (Or: Who are the Millennials?) <u>Invited talk</u> presented at the Georgia Summit of education professionals, Augusta, GA.

Twenge, J. M. (2011, September). Generations in the workplace (Or: Who are the Millennials?) <u>Invited talk</u> presented via webconference to Michigan Tech University, Houghton, MI.

Twenge, J. M. (2011, September). Generations in the workplace (Or: Who are the Millennials?) <u>Invited talk</u> presented via webconference to Universidad InterAmericana de Puerto Rico, San German, PR.

Twenge, J. M. (2011, August). Generation Me: Teaching today's students. <u>Invited talk</u> presented to the faculty of California Lutheran University, Ventura, CA.

Twenge, J. M. (2011, July). Generation Me: Understanding today's students. <u>Invited talk</u> presented at the Noel-Levitz annual conference on Student Recruitment, Marketing, and Retention, Denver, CO.

Twenge, J. M. (2011, July). Generation Me: Understanding today's students. <u>Invited talk</u> presented at the University of Nevada at Las Vegas.

Twenge, J. M. (2011, July). Generation Me: Understanding today's young people. <u>Invited talk</u> presented at the annual conference of the Fraternity Executives Association, Chicago, IL.

Twenge, J. M. (2011, April). The Narcissism Epidemic: The age of entitlement and what we can do about it. <u>Invited talks</u> presented at Baylor University, Waco, TX.

Twenge, J. M. (2011, April). Generational differences in mental health: Are children and adolescents suffering more, or less? <u>Invited talk</u> presented at the annual Greenville Family Symposium, American Orthopsychiatry Association, Greenville, SC.

Twenge, J. M. (2011, April). Generation Me: Understanding today's young people. <u>Invited talk</u> presented at the annual conference of the Washington State Student Services Commission conference, Wenatchee, WA.

Twenge, J. M. (2011, April). Generation Me: Understanding today's young people. <u>Invited talks</u> presented at the University of the Incarnate Word, San Antonio, TX.

Twenge, J. M. (2011, March). Generation Me: Understanding today's young people. Invited talks presented at the University of Georgia, Athens, GA.

Twenge, J. M. (2011, April). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented at a conference of the Alberta Teaching Association, Edmonton, Alberta, Canada.

Twenge, J. M. (2011, March). The Narcissism Epidemic: The culture of entitlement and what we can do about it. Invited talk presented at the annual conference of the International Society for the Study of Personality Disorders, Melbourne, Victoria, Australia.

Twenge, J. M. (2011, February). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented at the annual conference of the National Association of Campus Activities, St. Louis, MO.

Twenge, J. M. (2011, February). Generation Me: Understanding today's young people. Invited talks presented at Western Illinois University, DeKalb, IL.

Twenge, J. M. (2011, January). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented at Calvin College, Michigan.

Twenge, J. M. (2011, January). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented at the Clairbourn School, San Gabriel, CA.

Twenge, J. M. (2010, November). Generations and the workplace (Or, who are the Millennials?) Invited talk presented at the U.S. Navy Medicine West Training Group, Miramar Air Station.

Twenge, J. M. (2010, November). Generation Me: Teaching today's young people. Keynote presented at the Rural Clinical Faculty Development Workshop, Faculty of Medicine and Dentistry, University of Alberta.

Twenge, J. M. (2010, November). Generation Me: Understanding today's young people. Invited talk presented at Geneva College, Beaver Falls, PA.

Twenge, J. M. (2010, November). The Narcissism Epidemic: What's happening to American culture? Invited talk presented at Geneva College, Beaver Falls, PA.

Twenge, J. M. (2010, November). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented at the annual conference of the Lehigh Valley Student Services Association, Lehigh, PA.

Twenge, J. M. (2010, October). Generation Me: The psychology and technology of today's young people. Invited talks presented at Blinn College, Bryan, TX, and Brenham, TX.

Twenge, J. M. (2010, October). The Narcissism Epidemic: The age of entitlement and what we can do about it. Keynote address presented at the annual conference of the Michigan Community College Student Association, Petoskey, MI.

App. 121

Twenge, J. M. (2010, October). Generations and the workplace (Or, who are the Millennials?) Invited talk presented at the meeting of the U.S. Navy Medicine West Board of Governors, San Diego, CA.

Twenge, J. M. (2010, September). Generation Me: Understanding today's young people. Keynote for the Mizzou Reads Program 2010, University of Missouri, Columbia.

Twenge, J. M. (2010, August). Generation Me: Teaching and working with today's young people. Invited talk presented at Samuel Merritt University, Oakland, CA.

Twenge, J. M. (2010, August). Reality TV and narcissism. Paper presented at the annual conference of the American Psychological Association, San Diego, CA.

Twenge, J. M. (2010, August). The Narcissism Epidemic: Evidence from culture and individuals. Paper presented at the annual conference of the American Psychological Association, San Diego, CA.

Twenge, J. M. (2010, June). Generations and the workplace. Invited talk presented at the conference of the Youth ChalleNGe program, San Diego, CA.

Twenge, J. M. (2010, June). Generation Me: Recruiting and inspiring young people. Invited talk presented at the annual conference of the Association of Public and Land-Grant Universities, State College, PA.

Twenge, J. M. (2010, June). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented to the Department of Energy, Washington, DC.

Twenge, J. M. (2010, June). Generation Me: Bridging the gap with today's young people. Invited talk presented to senior leadership of the U.S. Coast Guard, San Diego, CA.

Twenge, J. M. (2010, May). The Narcissism Epidemic: The age of entitlement and what we can do about it. Invited talk presented at the conference of Lutheran high school principals, Chula Vista, CA.

Twenge, J.M. (2010, April). The Narcissism Epidemic and how it's spreading through our culture. Keynote presented at the Behavioral Sciences Conference of the North and the University of Alaska at Anchorage Honors College Undergraduate Research and Discovery Symposium, Anchorage, AK.

Twenge, J. M. (2010, March). Generation Me: Working with today's young people. Invited talk presented at the annual national conference of the National Association of Student Personnel Administrators, Chicago, IL.

Twenge, J. M. (2010, January). Cultural products, behavior, and self-reports across time: Generations as culture. Paper presented at the conference of the Society for Personality and Social Psychology, Las Vegas, Nevada.

Twenge, J. M. (2010, January). Generation Me: Recruiting and inspiring young people. Invited talk presented to U.S. Army officers at Fort Jackson, South Carolina.

Twenge, J. M. (2009, December). Generation Me: Working with today's young people. Invited talks presented at California State Polytechnic University, Pomona, Pomona, CA.

Twenge, J. M. (2009, November). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the National Association of Student Personnel Administrators, Region IV East, Chicago, IL.

Twenge, J. M. (2009, September). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the National Council for Marketing & Public Relations, Pacific Region, Carlsbad, CA.

Twenge, J. M. (2009, July). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the Illinois Sheriffs' Association, Peoria, IL.

Twenge, J. M. (2009, July). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the Texas Association for State Senior College and University Business Officers, Austin, TX.

Twenge, J. M. (2009, June). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the Florida Association of Blood Banks, Orlando, FL.

Twenge, J. M. (2009, June). Generation Me: Reaching today's young people. Invited talk presented at the Marine Recruit Depot, San Diego, CA.

Twenge, J. M. (2009, May). Generation Me: Teaching today's young people. Invited talk presented at the annual conference of the Association for Psychological Science, San Francisco, CA.

Twenge, J. M. (2009, May). Generation Me: Working with today's young people. Invited talk presented at the Illinois State Police Academy, Springfield, IL.

Twenge, J. M. (2009, May). The Narcissism epidemic: Evidence from the culture and individuals. Invited talk presented at the annual conference of the Midwestern Psychological Association, Chicago, IL.

Twenge, J. M. (2009, April). Generation Me: Parenting today's young people. Invited talk presented to the Parent-Teacher Association, Burbank Unified School District, Burbank, CA.

Twenge, J. M. (2009, April). Generation Me: Working with today's young people. Invited talk presented at MiraCosta College, Carlsbad, CA.

Twenge, J. M. (2009, April). The Narcissism Epidemic: Evidence from the culture and individuals. Keynote address presented at the annual Undergraduate Research Conference, San Marcos, CA.

Twenge, J. M. (2009, April). Generation Me: Working with today's young people. Invited talk presented at Southern Connecticut State University, New Haven, CT.

Twenge, J. M. (2009, March). Generation Me: Working with today's young people. Invited talk presented for social workers coordinated by the University of Oklahoma, Norman, OK.

Twenge, J. M. (2009, March). Generation Me: Working with today's young people. Invited talk presented at Northern Arizona University, Flagstaff, AZ.

Twenge, J. M. (2009, February). Generation Me: Working with today's young people. Invited talk presented at the National Conference on Law and Higher Education, Orlando, FL.

Twenge, J. M. (2009, February). Generation Me: Working with today's young people. Invited talk presented at the annual conference of Running USA, La Jolla, CA.

Twenge, J. M. (2009, February). Generation Me: Working with today's young people. Invited talk presented at Texas Christian University, Ft. Worth, TX.

Twenge, J. M. (2009, February). Generation Me: Working with today's young people. Invited talk presented at the annual conference of the National Association of College and University Chaplains, Austin, TX.

Twenge, J. M. (2009, February). Generation Me: Working with today's young people. Invited talk presented at West Texas A&M University, Amarillo, TX.

Twenge, J. M. (2008, November). Fast track to success: Onboarding Net Gen talent. Invited talk presented at nGenera member meeting, Orlando, FL.

Twenge, J. M. (2008, November). Generation Me: Birth cohort changes in personality, attitudes, and psychopathology. Invited talk presented to the Department of Psychology, University of California at Riverside, Riverside, CA.

Twenge, J. M. (2008, October). Generation Me: Teaching and working with today's young people. Invited talk presented at Endicott College, Beverley, MA.

Twenge, J. M. (2008, October). Generation Me: Working with today's young people. Keynote address presented at the Blaine House conference on Volunteerism. Bangor, ME.

Twenge, J. M. (2008, September). Generation Me: Working with today's young people. Keynote address presented at the Conference of the California Association of Private Postsecondary Schools. Los Angeles, CA.

Twenge, J. M. (2008, August). Generation Me: Teaching and working with today's young people. Invited talk presented at Judson University, Elgin, IL.

Twenge, J. M. (2008, August). Generation Me: Teaching and working with today's young people. Invited talk presented at Ivy Tech Community College, South Bend, IN.

Twenge, J. M. (2008, August). Generation Me: Teaching and working with today's young people. Invited talk presented at Jacksonville University, Jacksonville, FL.

Twenge, J. M. (2008, August). Generation Me: Teaching and working with today's young people. Invited talk presented at Cooper Mountain College, Joshua Tree, CA.

Twenge, J. M. (2008, July). Generation Me: Who Millennials are and why. Invited talk presented at the McGraw Hill companies, New York, NY.

Twenge, J. M. (2008, July). Generation Me: Working with today's young people. Invited talk presented at the annual conference of Accuity, Inc. Las Vegas, NV.

Twenge, J. M. (2008, June). Generation Me: Working with today's young people. Keynote address presented at the conference of the National Association of College Auxiliary Services, Milwaukee, WI.

Twenge, J. M. (2008, June). Generation Me: Teaching and working with today's young people. Invited talk presented to Student Development staff at the University of California, San Diego.

Twenge, J. M. (2008, June). Generation Me: Working with today's young people. Invited talk presented at Grand Rounds, Department of Pediatrics, UCLA-Harbor Medical Center, Torrance, CA.

Twenge, J. M. (2008, May). Generation Me: Teaching and working with today's young people. Invited talk presented at University of Colorado at Colorado Springs.

Twenge, J. M. (2008, May). Generation Me: Teaching and working with today's young people. Invited talk presented at Hobart and William Smith Colleges, Geneva, NY.

Twenge, J. M. (2008, May). Generation Me: Teaching and working with today's young people. Invited talk presented at University of California at Riverside.

Twenge, J. M. (2008, May). Generation Me and the psychology of today's young people. Invited talk presented at University of California at Los Angeles.

Twenge, J. M. (2008, May). Generations at work. Panel discussion presented at the Talent 2.0 conference of nGenera, Toronto, ON, Canada.

Twenge, J. M. (2008, May). Generation Me: Working with today's young people. Invited talk presented at the Stenberg College Career Fair, Vancouver, BC, Canada.

Twenge, J. M. (2008, May). Generation Me: Teaching and working with today's young people. Invited talk presented at Northeastern Illinois University, Chicago, IL.

Twenge, J. M. (2008, April). Generation Me: Working with today's young people. Invited talk presented at the management conference for the staff of Ruby's Restaurants, Palm Springs, CA.

Twenge, J. M. (2008, April). Generation Me: Working with today's young people. Invited talk presented to the OCTANe Orange County business group, Irvine, CA.

Twenge, J. M. (2008, April). Generation Me: Teaching and working with today's young people. Invited talk presented at California State University at San Marcos.

Twenge, J. M. (2008, April). Generation Me: Teaching and working with today's young people. Invited talk presented at the University of North Dakota, Grand Forks, ND.

Twenge, J. M. (2008, April). Generation Me: Teaching and working with today's young people. Invited talk presented at Mt. San Jacinto College, Menifee, CA.

Twenge, J. M. (2008, April). Generation Me: Working with today's young people. Invited talk presented at the Western region conference of the American Camp Association, Los Angeles, CA.

Twenge, J. M. (2008, April). Generation Me and the psychology of today's young people. Invited talk presented at the conference of the Western Psychological Association, Irvine, CA.

Gentile, B. C., Grabe, S., Dolan-Pascoe, B., Twenge, J. M., & Wells, B. E. (2008, April). Gender differences in domain-specific self-esteem: A meta-analysis. Poster presented at the conference of the Western Psychological Association, Irvine, CA.

Cuervo, D. G., & Twenge, J. M. (2008, April). Effects of social exclusion on aggression and attributions to ethnicity. Poster presented at the conference of the Western Psychological Association, Irvine, CA.

Twenge, J, M. (2008, April). Generation Me: Teaching and working with today's young people. Invited talk presented at the conference of the National Association of State Universities and Land Grant Colleges, San Diego, CA.

Twenge, J. M. (2008, March). Generation Me: Working with today's young people. Invited talk presented at Nielsen Business Global Shop, Chicago, IL.

Twenge, J. M. (2008, March). Generation Me: Teaching and working with today's young people. Invited talk presented at Southern Methodist University. Dallas, TX.

Twenge, J. M. (2008, March). Generation Me: Counseling and advising today's young people. Invited talk presented at Southern Methodist University counseling department, Plano, TX.

Twenge, J.M. (2008, February). Generation Me and the rise in narcissism, 1979-2006. Poster presented at the conference of the Society for Personality and Social Psychology, Albuquerque, NM.

Twenge, J. M. (2008, February). Generation Me: Working with today's young people Invited talk presented to the executives meeting of the Association of Accounting Marketing, New York, NY.

Twenge, J. M. (2008, February). Generation Me and the controversy over the rise in narcissism. Panel discussion presented at the Youth Pulse Mashup, Santa Monica, CA.

Twenge, J. M. (2008, February). Generation Me: Teaching and working with today's young people. Invited talk presented at the State University of New York at Fredonia.

Twenge, J, M. (2008, May). Generation Me: Working with and marketing to today's young people. Invited talk presented at the Home Design Magazine conference, Nielsen Business Media, Pebble Beach, CA.

Twenge, J. M. (2008, February). Generation Me: Working with today's young people. Invited talk presented at the conference of the Western Association of Chamber Executives, San Diego, CA.

Twenge, J. M. (2008, January). Generation Me: Teaching today's young people. Invited talk presented for faculty development, Glendale Unified School District, Glendale, CA.

Twenge, J. M. (2008, January). Generation Me: Teaching and working with today's young people. Invited talk presented for faculty development, Stenberg College, Vancouver, BC, Canada.

Twenge, J. M. (2008, January). Generation Me: Working with today's young people. Invited talk presented for the U.S. Army Rangers, Fort Benning, GA.

Twenge, J. M. (2008, January). Generation Me: Teaching and working with today's young people. Invited talk presented at the Fashion Institute for Design and Marketing, Los Angeles, CA.

Twenge, J. M. (2007, December). Generation Me: How when you were born influences your personality and outlook on life. Invited talk presented at Occidential College, Los Angeles, CA.

Twenge, J. M., (2007, December). Generation Me: How when you were born influences your personality and outlook on life. Invited talk presented to the New York State BOCES for high school teachers, Geneva, NY.

Twenge, J. M. (2007, November). Generation Me: Working with today's young people. Invited talk presented at PepsiCo, Purchase, NY.

Twenge, J. M. (2007, November). Birth cohort differences in personality: Generation Me becomes Generation Depressed. Invited talk presented at Washington University in St. Louis.

Twenge, J. M. (2007, November). Generation Me and birth cohort differences in personality. Invited talk presented at the University of Georgia.

Twenge, J. M. (2007, November). Generation Me: How when you were born influences your personality and outlook on life. Invited talk presented at Wesleyan College, Macon, GA.

Twenge, J. M. (2007, October). Generation Me: Teaching and working with today's young people. Invited talk presented at Nichols College, Dudley, MA.

Twenge, J. M. (2007, October). Generation Me: Teaching and working with today's young people. Invited talk presented at Glendale College, Glendale, CA.

Twenge, J. M. (2007, September). Generation Me: The psychology of today's young people… and implications for attracting blood donors and young staff. Invited talk presented at the conference of the National Association of Blood Banks, Denver, CO.

Twenge, J. M. (2007, August). Generation Me: Teaching and working with today's young people. Invited talk presented at Winona State University, Winona, MN.

Twenge, J. M. (2007, August). Generation Me: Understanding today's young people. Invited talk presented at the Congregational Development conference, Governing Board of Discipleship, United Methodist Church, Overland Park, KS.

Twenge, J.M. (2007, June). Generation Me students and campus ministry. Invited talk presented at the National Campus Ministry Association, Nashville, TN.

Twenge, J. M. (2007, May). Working with, teaching, and understanding "Generation Me." Invited talks presented at Colorado College, Colorado Springs, CO.

Twenge, J. M. (2007, April). Generation Me and individualism in today's society. Invited talk presented to the Inside Edge, Irvine, CA.

Twenge, J. M. (2007, April). Working with "Generation Me." Keynote address presented at the Michigan Association for College Admissions Counselors, Grand Rapids, Michigan.

Twenge, J. M. (2007, March). "Generation Me." (Parts I and II).  Invited talks presented at the Tri-State Camping Conference, Atlantic City, NJ.

Jackson, B., Twenge, J., Chiang, J., Souza, C., & Goodman, E.  (2007, March).  Internalizing social status: An experimental test of ruminative coping among college women. Paper presented at the Association of Women in Psychology Conference, San Francisco, CA.

Twenge, J. M. (2007, March). Working with "Generation Me." Keynote address presented at the Pacific Division conference of the National Academic Advising Association, San Diego, CA.

Twenge, J. M. (2007, March). Working with "Generation Me." Invited talk presented at the conference of the National Association of College and University Business Officers, San Diego, CA.

Twenge, J. M. (2007, February). Working with and teaching "Generation Me." Invited talk presented at the workshop "Why Don't You Get Me? Bridging the Generations." University of San Diego, San Diego, CA.

Twenge, J. M. (2007, February). Working with and teaching Generation Me. Invited talk presented to the conference of the Academic Senate for California Community Colleges, Redwood City, CA.

Ma, D., Reid, M., & Twenge, J. M. (2007, January). Social exclusion impairs emotion regulation. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Memphis, Tennessee.

Marquez, A., & Twenge, J. M. (2007, January). Social Rejection and Positive Mood Boosting. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Memphis, Tennessee.

Jackson, B., Twenge, J., Chiang, J., Souza, C., & Goodman, E. (2007, January). Subjective social status: Psychological consequences in a laboratory setting. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Memphis, Tennessee.

Twenge, J. M. (2007, January). Teaching and working with Generation Me. Invited talk presented at faculty and staff conference, Grossmont College, El Cajon, CA.

Twenge, J. M. (2006, October). Generation Me: Working with today's young people. Invited talk presented at the California Interscholastic Federation conference, San Diego, CA.

Twenge, J. M. (2006, August). The bad behavior of socially rejected people and how it might be prevented. Invited talk presented at the University of Southern California.

Twenge, J. M. (2006, August). Generation Me, or why do the freshmen seem so different? Invited talk presented at staff and faculty conference, Grossmont College, El Cajon, CA.

Twenge, J. M. (2006, July). Preventing aggression after social rejection. Paper presented at the annual meeting of the International Society for Research on Aggression, Minneapolis, MN.

Twenge, J. M. (2006, June). Generation Me. Invited talk presented at the summer meeting of the Educause Center for Applied Research, Coronado, CA.

Twenge, J. M. (2006, May). Why do the freshmen seem so different? Invited talk presented to the Office of Student Affairs, University of Akron, Akron, OH.

Twenge, J. M. (2006, April). Why do the freshmen seem so different? Invited talk presented at the annual conference of the American Association of Collegiate Registrars and Admissions Officers, San Diego, CA.

Twenge, J. M. (2006, January). Situational moderators of aggression after social rejection. Paper presented at the annual meeting of the Society for Personality and Social Psychology, Palm Springs, CA. Session chair, "Aggression: Causes and Consequences."

Reid, M. W., & Twenge, J. M. (2006, January). Searching for agent blue: Birth cohort changes in depressive affect, a cross-temporal meta-analysis. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Palm Springs, CA.

Lee, L., Twenge, J. M., & Gallo, L. C. (2006, January). Cardiovascular and emotional responses in the face of social exclusion: Moderation by adult attachment orientation. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Palm Springs, CA.

Krusemark, E. A., Dyckman, K. A., Brunell, A. B., McDowell, J. E., Clementz, B. A., Campbell, W. K., & Twenge, J. M. (2006, January). Neural substrates of social rejection and self regulation. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Palm Springs, CA.

Twenge, J. M. (2005, October). How generations really differ: The treasures in the stacks. Invited talk presented at the annual conference of the Association of Mental Health Librarians, San Diego, CA.

Twenge, J. M. (2005, October). Why does social rejection lead to aggression? Paper presented at the annual meeting of the Society for Experimental Social Psychology, San Diego, CA. (Session chair, "The Effect of Rejection and Ostracism on Aggression: Causes and Consequences").

Twenge, J. M. (2005, March). The psychology of social exclusion. Invited talk presented at Free University, Amsterdam.

Twenge, J. M. (2005, March). Individualism and despair: Birth cohort changes in self-esteem, need for social approval, women's assertiveness, extraversion, anxiety, and locus of control. Invited talk presented at Free University, Amsterdam.

Twenge, J. M. (2005, February). The effects of social rejection on behavior and emotion. Invited talk presented at University of North Carolina at Chapel Hill.

Twenge, J. M. (2005, January). Emotion regulation after social rejection. Paper presented at the annual meeting of the Society for Personality and Social Psychology, New Orleans, LA. (Session chair, "Coping with Ostracism and Social Rejection")

Twenge, J. M., & Im, C. (2005, January). Changes in socially desirable responding, 1958-2001. Poster presented at the annual meeting of the Society for Personality and Social Psychology, New Orleans, LA.

Reid, M. W., & Twenge, J. M. (2005, January). Uncontrollable laughter: Social exclusion and emotion regulation. Poster presented at the annual meeting of the Society for Personality and Social Psychology, New Orleans, LA.

Wells, B. E., & Twenge, J. M. (2005, January). Changes in young people's sexual behavior and attitudes, 1943-1999: A cross-temporal meta-analysis. Poster presented at the annual meeting of the Society for Personality and Social Psychology, New Orleans, LA.

Twenge, J. M. (2004, December). The effects of social rejection on behavior and emotion. Invited talk presented at University of Kansas.

Twenge, J. M. (2004, December). The effects of social rejection on behavior and emotion. Invited talk presented at University of Texas at Arlington.

Twenge, J. M. (2004, December). Social exclusion: Behavior, inner processes, and emotion. Invited talk presented at University of Iowa.

Twenge, J. M. (2004, November). Social exclusion: Behavior, inner processes, and emotion. Invited talk presented at University of Florida.

Twenge, J. M. (2004, November). Social exclusion and positive mood boosting. Invited talk presented at the University of California at Santa Barbara.

Twenge, J. M. (2004, October). Social exclusion: Behavior, inner processes, and emotion. Invited talk presented at University at Buffalo SUNY.

Twenge, J. M. (2004, October). Individualism and despair: Birth cohort changes in self-esteem, need for social approval, women's assertiveness, extraversion, anxiety, and locus of control. Invited talk presented at the University of California at Riverside.

Twenge, J. M. (2004, September). Affect regulation after social exclusion. Invited talk presented at the University of Chicago.

Twenge, J. M. (2004, April). Individualism and despair: Birth cohort changes in personality and life outlook, 1931-2002. Invited talk, keynote speaker for the Carolinas Psychology Conference, Raleigh, NC.

Twenge, J. M. (2004, March). When does social rejection lead to aggression? The influence of situations, narcissism, emotion, and replenishing connections. Invited talk presented at the annual Sydney Symposium of Social Psychology, Sydney, Australia.

Twenge, J. M. (2004, January). Cultural and social antecedents of self-esteem: Race, birth cohort, and socioeconomic status. Paper presented at the annual meeting of the Society for Personality and Social Psychology, Austin, TX.

Twenge, J. M. (2004, January). Anticipated interaction eliminates aggression after social rejection. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Austin, TX.

Twenge, J. M., Cacho, J. C., & MacDonald, D. (2004, January). Aggression after social rejection: The effects of defensive denial of emotion and social situations. Invited talk presented at the Groups and Intergroup Processes preconference, annual meeting of the Society for Personality and Social Psychology, Austin, TX.

Twenge, J. M. (2003, November). Social exclusion and prosocial behavior. Invited talk presented at the University of California at San Diego.

Twenge, J. M. (2003, October). Consequences of social rejection. Invited talk presented at Florida State University, Tallahassee, FL.

Twenge, J. M. (2003, October). Social exclusion and prosocial behavior. Invited talk presented at the Preconference on the Self, annual meeting of the Society for Experimental Social Psychology, Boston, MA.

Twenge, J. M., & Im, C. (2003, February). Emotion regulation after social rejection and its effect on aggressive behavior. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Los Angeles, CA.

Catanese, K. R., Twenge, J. M., & Baumeister, R. F. (2003, February). Mirror, mirror on the wall: Avoiding self-awareness after social exclusion. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Los Angeles, CA.

Ciarocco, N. J., Twenge, J. M., & Baumeister, R. F. (2003, February). Helping the in face of rejection: Social exclusion hampers prosocial acts. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Los Angeles, CA.

Twenge, J. M. (2002, November). Birth cohort changes in anxiety, self-esteem, and the need for social approval and locus of control. Invited talk presented at the University of Nevada at Reno.

Twenge, J. M. (2002, October). Social exclusion and prosocial behavior. Invited talk presented at the University of California at Los Angeles.

Twenge, J. M. (2002, June). Individualism and despair: Birth cohort changes in anxiety, assertiveness, extraversion, and self-esteem during the 20th century. Invited talk presented at the annual meeting of the American Psychological Society, New Orleans, LA.

Catanese, K. R., Twenge, J. M., & Baumeister, R. F. (2002, June). Put off by social exclusion: Rejection causes procrastination. Poster presented at the annual meeting of the American Psychological Society, New Orleans, LA.

Twenge, J. M. (2002, May). Culture, time, and the self: Birth cohort differences in self-esteem. Invited talk presented at the University of California at Irvine.

Twenge, J. M. (2002, February). Social exclusion causes decreased prosocial behavior. Invited talk presented at the University of California at Riverside.

Twenge, J. M. (2002, February). The search for respect: Narcissism and violence. Paper presented at the annual meeting of the Society for Personality and Social Psychology, Savannah, GA. (Session chair, "The Puzzle of School Violence")

Twenge, J. M. (2002, February). Meta-analyses of race and self-esteem: Comparing Whites, Blacks, Hispanics, Asians, and American Indians. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Savannah, GA.

Twenge, J. M. (2002, January). Culture, time, and the self: Birth cohort differences in self-esteem. Invited talk presented at the Self and Identity preconference, annual meeting of the Society for Personality and Social Psychology, Savannah, GA.

Twenge, J. M. (2001, February). If you can't join them, beat them: Social exclusion and antisocial behavior. Paper presented at the annual meeting of the Society for Personality and Social Psychology, San Antonio, TX.

Twenge, J. M. (2001, February). The age of anxiety? Birth cohort change in anxiety and neuroticism, 1952-1993. Invited talk presented at the inaugural meeting of the Association for Research in Personality, San Antonio, TX.

Twenge, J. M. (2000, October). If you can't join them, beat them: Antisocial responses by socially excluded individuals. Paper presented at the annual meeting of the Society for Experimental Social Psychology, Atlanta, GA.

Baumeister, R. F., & Twenge, J. M. (2000, February). Decision fatigue: Resources are depleted after making many choices. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Nashville, TN.

Twenge, J. M. (2000, February). Changes in self-reported anxiety, 1952-1993: A cross-temporal meta-analysis. Poster presented at the annual meeting of the Society for Personality and Social Psychology, Nashville, TN.

Miner-Rubino, K. N., Twenge, J. M., & Fredrickson, B. F. (1999, August). Self-objectification: Gender, personality, and emotional correlates. Poster presented at the annual meeting of the American Psychological Association, Boston, MA.

Twenge, J. M. (1997, August). Changes in self-esteem over time. Poster presented at the annual meeting of the American Psychological Association, Chicago, IL.

Twenge, J. M. (1997, May). Masculine and feminine attributes: Which are most important? Poster presented at the annual meeting of the Midwestern Psychological Association, Chicago, IL.

Twenge, J. M. (1996, August). Attitudes toward women, 1970-1995: A quantitative analysis. Poster presented at the annual meeting of the American Psychological Association, Toronto, Canada.

Twenge, J. M. (1996, May). Sex differences in assertiveness, anxiety, and sociability 1920-1995: A meta-analysis. Paper presented at the annual meeting of the Midwestern Psychological Association Conference, Chicago, IL.

Twenge, J. M. (1996, May). Attitudes toward women scale scores over time. Poster presented at the annual meeting of the Midwestern Psychological Association Conference, Chicago, IL.

Twenge, J. M. (1996, May). Are men really that bad? Male guilt, male bashing, and the new politics of gender in America. Paper presented at the annual meeting of the Midwestern Psychological Association Conference, Chicago, IL.

Twenge, J. M. (1995, August). Twenty years of change: Differences in Bem Sex-Role Inventory means across time, regions, and schools. Poster presented at the annual meeting of the American Psychological Association Conference, New York.

Twenge, J. M. (1995, May). Can you judge a book by its cover? Appearance Behaviors and Masculinity/Femininity. Paper presented at the annual meeting of the Midwestern Psychological Association Conference, Chicago, IL.

Twenge, J. M. (1995, May). Changes in Sex Roles across Generations and Regions: A Quantitative Analysis. Paper presented at the annual meeting of the Midwestern Psychological Association Conference, Chicago, IL.

Twenge, J. M. (1994, May). Single earrings and flowing dresses: Appearance, personality, and gender. Paper presented at the University of Michigan Graduate Psychology Conference, Ann Arbor, MI.

Twenge   40

## SELECTED MEDIA APPEARANCES AND MENTIONS
(updated through 2015 only)

Associated Press, November 2015
Time.com, June 2015
Time.com, May 2015
*Washington Post*, May 2015
*New York Times* (Science section, profile), August 2013
Associated Press, July 2013
CBS This Morning, July 2013
Good Morning America, June 2013
*The Atlantic*, June 2013
*Time* magazine, May 2013
BBC news, January 2013
Associated Press, March 2012
*Chronicle of Higher Education,* March 2012
*New York Times* (Business section), September 2011
*New York Times Magazine*, August 2011
*New York Magazine*, July 2011
Associated Press, June 2011
*The Atlantic*, June 2011
*New York Times,* April 2011
*Time* magazine, December 2010
*New York Times,* November 2010
*New York Times,* August 2010
*New York Times,* July 2010
Associated Press, January 2010
CNN, January 2010
The Dr. Phil Show, December 2009
*Chronicle of Higher Education*, October 2009
Today show, April 2009
*New York Times*, April 2009
*Newsweek*, April 2009
*Time* magazine, April 2009
*USA Today*, April 2009
*New York Times*, January 2008
Morning Edition, National Public Radio, May 2007
Associated Press, February 2007
Day to Day, National Public Radio, February 2007
NBC Nightly News, February 2007
Day to Day, National Public Radio, May 2006
Today show, April 2006
*Washington Post*, April 2006
Numerous appearances on local San Diego radio and TV, 2001-present

## PROFESSIONAL AND OTHER ACTIVITIES

App. 135

Twenge    41

Editorial Board, Social Psychological and Personality Science
Editorial Board, Self and Identity
Ad hoc reviewer, Psychological Bulletin
Ad hoc reviewer, Journal of Personality and Social Psychology
Ad hoc reviewer, Personality and Social Psychology Bulletin
Ad hoc reviewer, Psychological Science
Ad hoc reviewer, Perspectives on Psychological Science
Ad hoc reviewer, Journal of Research in Personality
Ad hoc reviewer, European Journal of Social Psychology
Ad hoc reviewer, Basic and Applied Social Psychology
Ad hoc reviewer, Personality and Social Psychology Review
Ad hoc reviewer, Psychology of Women Quarterly
Ad hoc reviewer, Sex Roles
Ad hoc reviewer, Journal of Applied Social Psychology
Ad hoc reviewer, Journal of Social and Personal Relationships
Ad hoc reviewer, Journal of Consulting and Clinical Psychology
Opinion page columnist, Chicago Maroon, University of Chicago, 1992-1993
Opinion page columnist, Michigan Daily, University of Michigan, 1993-1996

51-2

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
TALAHASSEE DIVISION**

|  |  |  |
|---|---|---|
| **COMPUTER &<br>COMMUNICATIONS INDUSTRY<br>ASSOCIATION and NETCHOICE,** | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Case No. 4:24-cv-004380-MW-MAF |
| **ASHLEY BROOKE MOODY,** in her<br>official capacity as Attorney General of the<br>State of Florida**.** | ) ) ) ) | |
| *Defendant.* | ) ) ) ) | |

**EXPERT DECLARATION OF PROFESSOR ADAM L. ALTER**
**January 13, 2025**

App. 138

## TABLE OF CONTENTS

I.      QUALIFICATIONS ................................................................................................ 1

II.     ASSIGNMENT ...................................................................................................... 3

III.    SUMMARY OF OPINIONS .................................................................................. 4

IV.     CASE BACKGROUND ......................................................................................... 4

    A.  Computer and Communications Industry Association ......................................... 4

    B.  NetChoice ............................................................................................................ 5

    C.  Florida House Bill 3 ............................................................................................ 5

V.      SOCIAL MEDIA USE POSES A SIGNIFICANT RISK OF BEHAVIORAL
    ADDICTION ........................................................................................................... 6

    A.  The nature and prevalence of behavioral addiction ............................................ 6

    B.  The "hooks" of addictive technology ................................................................ 11

VI.     THE FIVE FEATURES IDENTIFIED BY HB 3 ARE CORRECTLY DESCRIBED
    AS ADDICTIVE .................................................................................................. 16

    A.  Infinite Scrolling .............................................................................................. 16

    B.  Push Notifications ............................................................................................. 17

    C.  Personal Interactive Metrics ............................................................................. 19

    D.  Autoplay ............................................................................................................ 22

    E.  Live-streaming .................................................................................................. 24

    F.  Social media poses increased risk to adolescents ............................................ 27

VII.    IN-APP CONTROL MEASURES ARE INSUFFICIENT TO PREVENT SOCIAL
    MEDIA ADDICTION .......................................................................................... 28

    A.  Instagram Teen Accounts ................................................................................. 29

    B.  Similar features from YouTube and Snap ........................................................ 29

EXHIBIT A – CURRICULUM VITAE ........................................................................ 31

EXHIBIT B – PREVIOUS EXPERT TESTIMONY .................................................... 39

Expert Declaration of Adam L. Alter, Ph.D.

## I. QUALIFICATIONS

1.      I am a Professor of Marketing and the Stansky Teaching Excellence Faculty Fellow at New York University's Stern School of Business, New York. I also hold an affiliated appointment as a Professor in the New York University psychology department. I have held both positions since July 2009. I received my B.Sc. (Honors Class I, University Medal), majoring in psychology, from the University of New South Wales, in Sydney, Australia, in 2004, and an M.A. and Ph.D. in social and cognitive psychology from Princeton University, in 2006 and 2009, respectively. At Princeton University, I held a Fellowship in the Woodrow Wilson Society of Scholars, and the Procter Dissertation Fellowship, awarded to a handful of Princeton graduate students across all disciplines each year. My academic career extends almost twenty-five years, including teaching positions at the University of New South Wales, Princeton University, and New York University's Stern School of Business. I have taught courses at undergraduate, graduate (MBA and executive MBA), and doctoral levels, and delivered lectures and keynotes at, among other institutions, Harvard University, Yale University, MIT, Stanford University, the University of Pennsylvania, Carnegie Mellon University, and the University of Chicago.

2.      My academic research focuses broadly on the social and cognitive psychology behind human judgment and decision-making. Particularly relevant to the present matter, I examine the addictiveness of certain screen-based technologies, including a number of social media platforms. My research on addictive technologies culminated in the book *IRRESISTIBLE*, which I published in 2017, and which led to consulting and policymaking engagements on the topic of online engagement and behavior with various federal and state governments around the world, and a position as advisor to the World Economic Forum on Virtual and Augmented Reality, Artificial Intelligence, and Blockchain. In the almost eight years since the publication of

*IRRESISTIBLE*, I have continued to teach, conduct research, and consult on related topics. Among other products of this work, I delivered a related TED talk at the TED2017 conference in Vancouver, Canada, which has been viewed almost five-million times, and was voted by TED as among the ten best talks of 2017. I have also written or been featured in various op-eds and popular translations of the ideas in *IRRESISTIBLE*, and on related topics, at outlets including *The New York Times, WIRED, NPR, The Washington Post, New York, Popular Science,* and *PBS.*

3.      I am also the principal of Moment Consulting, a marketing and business consulting firm. I have consulted, first as a sole proprietor, and more recently on behalf of my firm, for more than twenty years. In my capacity as a consultant, I have applied my academic research to a broad range of contexts across a variety of industries and markets. Among other companies and organizations, I have consulted for or advised Proctor and Gamble, Amazon, Google, Microsoft, Tripadvisor, Robinhood, DonorsChoose, Calm, Sony, LinkedIn, Citigroup, American Express, Goldman Sachs, TD Bank, Deloitte, Prudential, Fidelity, and J.P. Morgan.

4.      In addition to *IRRESISTIBLE* (Penguin Press, 2017), I am the author of *DRUNK TANK PINK* (Penguin Press, 2013), and *ANATOMY OF A BREAKTHROUGH* (Simon and Schuster, 2023), which broadly examine the forces that drive consumer behavior and human decision-making. These books are the culmination of decades of industry and academic research, and consulting engagements with dozens of firms and entrepreneurs.

5.      I have published more than thirty academic journal articles, including original research and reviews, as well as a similar number of popular translations of academic work for publications including the *New York Times, New Yorker, Wall Street Journal, Washington Post, Economist, WIRED, Popular Science,* and *Atlantic.* I have served as an editor, and on the editorial boards, of several academic journals in the disciplines of marketing, consumer behavior,

Expert Declaration of Adam L. Alter, Ph.D.                    2

App. 141

and psychology, including *Journal of Consumer Research, Journal of Consumer Psychology,* and *Journal of Experimental Social Psychology.* I am a Fellow of the Association for Psychological Science, and on the boards of the Psychology of Technology Institute, the Global Association of Applied Behavioral Scientists, and the Center for Digital Wellbeing.

6.    My complete curriculum vitae, and list of publications, is included as Exhibit A to this report.

7.    I have been employed as an expert witness in approximately twenty legal matters. A list of cases for which I have been deposed or testified is included as Exhibit B.

8.    My compensation for work on this case is at my normal hourly rate of $1,300 per hour and is not dependent on the outcome of this case, or on any opinions I express in this matter. Others at Global Business Experts Group/Voluble Insights ("GBX/Voluble"), a litigation expert witness consultancy, performed part of the work for this assignment at my direction and under my supervision. The compensation that GBX/Voluble receives is also not dependent on the outcome of this case.

## II. ASSIGNMENT

9.    I have been retained by the Office of the Attorney General for the State of Florida to provide my expert opinion on the addictiveness of social media platforms. Specifically, I have been asked to explain the phenomenon of *behavioral addiction*, as well as the factors that contribute to making online platforms and behaviors addictive for their users. I have also been asked to assess whether certain features associated with social media platforms identified by the Florida legislature in *Florida House Bill 3: Online Protections for Minors* ("HB 3") are accurately described as addictive in nature.

**III. SUMMARY OF OPINIONS**

10.     Based on my expertise and analysis of the issues in this case, my opinions are as follows:

A.  Social media use poses a significant risk of behavioral addiction, especially among young people. Behavioral addiction describes the failure or struggle to resist engaging in behaviors or experiences that are compelling in the short run but harmful in the long run. Behavioral addictions to digital technology and social media have become increasingly common in the past several years.

B.  Social media platforms use a number of psychological "hooks" to increase usage. The hooks include the elimination of behavioral **stopping cues**, compelling **goals** that are just beyond reach, unpredictable positive **feedback**, unresolved tensions that demand resolution (**cliffhangers**), strong social connections (**social interaction**), and **scarcity** (the sense that opportunities or experiences are available for limited periods of time**). These hooks exploit natural human tendencies and psychological needs to keep social media users engaged longer than they may have intended.

C.  The five features identified by HB 3 are correctly described as addictive. Each feature employs at least one psychological hook to capture attention and drive engagement, inevitably contributing to overuse of social media and increasing the risk of behavioral addiction.

D.  Social media platforms have introduced new systems or features ostensibly designed to address problematic social media consumption. However, these measures are insufficient to prevent social media addiction, and in many cases do not actually address the features of social media platforms that drive addictive or problematic use.

**IV. CASE BACKGROUND**

**A.  Computer and Communications Industry Association**

11.     The Computer and Communications Industry Association ("CCIA") describes itself as an "international, not-for-profit trade association representing a broad cross section of communications and technology firms."[1] Its membership consists of major technology and social media companies, including Meta, X (formerly Twitter), and Google (including its subsidiary, YouTube).[2] According to its website, the organization was founded in 1972 to advocate for the interests of the computer and telecommunications industry and continues to advocate on its

---

[1]     https://ccianet.org.
[2]     https://ccianet.org; Complaint for Declaratory and Injunctive Relief, Computer & Communications Industry Association and NetChoice v. Ashley Brooke Moody, ¶ 15.

Expert Declaration of Adam L. Alter, Ph.D.                    4

behalf today on topics such as competition, content moderation, copyright, cybersecurity, emerging tech, innovation policy, internet governance, patents, privacy, telecom, and trade.[3]

### B. NetChoice

12.     NetChoice is a "non-profit trade association for Internet companies."[4] Its membership is similar to that of the CCIA, including Meta, X, and Google (including its subsidiary, YouTube), as well as others, such as Snap Inc.[5] Founded in 2001 and supported by "a coalition of online businesses facing barriers to e-commerce," the organization's stated mission is to "make the Internet safe for free enterprise and free expression."[6]

### C. Florida House Bill 3

13.     I understand that in March 2024, *Florida House Bill 3: Online Protections for Minors* was passed by the Florida legislature, and approved by the Governor.[7] HB 3 regulates "social media platforms," as defined by the law.

14.     HB 3 defines a "social media platform" as "an online forum, website, or application" with the following characteristics: (1) it allows users to upload content or view uploaded content/activity of others,[8] (2) it is used for at least 2 hours per day on average (on the days it is used) by at least 10% of the daily active users under 16 years old;[9] (3) it uses content-selection algorithms that analyze user data,[10] and (4) it has *any* of a list of five "addictive features,"

---

[3]     https://ccianet.org.
[4]     Complaint for Declaratory and Injunctive Relief, Computer & Communications Industry Association and NetChoice v. Ashley Brooke Moody, ¶ 8.
[5]     https://netchoice.org/about/#our-mission.
[6]     https://netchoice.org/about/#our-mission.
[7]     https://www.flsenate.gov/Session/Bill/2024/3.
[8]     Florida House Bill 3: Online Protections for Minors (HB 3), p. 4, lines 76-77.
[9]     This average is to be measured during the previous 12 months; for platforms that have existed for fewer than 12 months, the average is to be measured during the previous month. See HB 3, p. 4, lines 78-84.
[10]    HB 3, p. 4, lines 85-86.

Expert Declaration of Adam L. Alter, Ph.D.                                    5

App. 144

identified as infinite scrolling, push notifications, personal interactive metrics, autoplay video, and live streaming. [11]

15.    HB 3 goes on to define each of those five terms. First, "infinite scrolling" is defined as either "continuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page," or "seamless content, or the use of pages with no visible or apparent end or page breaks."[12] Second, it identifies "push notifications" as alerts that are sent by the platform to "inform a user about specific activities or events related to the user's account."[13] Third, "personal interactive metrics" are defined as metrics that show "the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content."[14] Fourth, "auto-play video" is defined as video that "begins to play without the user first clicking on the video or on a play button for that video."[15] And, fifth, it defines "live-streaming" as a function that "allows a user or advertiser to broadcast live video content in real-time." [16]

## V.  SOCIAL MEDIA USE POSES A SIGNIFICANT RISK OF BEHAVIORAL ADDICTION

### A.  The nature and prevalence of behavioral addiction

16.    While the existence of substance-related addictions—such as addiction to alcohol, nicotine, or illicit drugs—is widely recognized among the general public, the idea of behavioral addiction is less commonly understood. However, extensive psychological and behavioral research has identified a host of behaviors and experiences to which people can become addicted

---

[11]    HB 3, pp. 4–5, lines 87–105.
[12]    HB 3, p. 4, lines 88–93.
[13]    HB 3, p. 4, lines 94–96.
[14]    HB 3, p. 4, lines 97–100.
[15]    HB 3, p. 5, lines 101–103.
[16]    HB 3, p. 5, lines 104 – 105.

Expert Declaration of Adam L. Alter, Ph.D.                                    6

with varying degrees of severity. In general, behavioral addictions arise when users (a term

adopted by many social media companies to describe their customers) fail or struggle to resist

engaging in behaviors or experiences that are compelling in the short run despite harming their

personal and social well-being in the long run. Harms associated with social media use among

children, teens, and adolescents may include, but are not limited to: depression;[17] anxiety;[18]

physical inactivity and its consequences, including obesity and diminished cardiovascular

health;[19] unhealthy sleep patterns and sleep deprivation;[20] body objectification and dysmorphia;[21]

and social isolation and the formation of weaker social ties.[22] Just as with alcohol, nicotine, and

illicit drugs, many users recognize that the long-term costs of engaging in such behaviors and

experiences outweighs their short-term benefits, but nonetheless feel compelled to continue using

---

[17]  See, for example, Twenge, J. M., Joiner, T. E., Rogers, M. L., & Martin, G. N. (2018). "Increases in depressive symptoms, suicide-related outcomes, and suicide rates among U.S. adolescents after 2010 and links to increased new media screen time." *Clinical Psychological Science*, 6, 3-17; and Liu, M. Kamper-DeMarco, K. E., Zhang, J., Xiao, J., Dong, D., & Xue, P. (2022). "Time Spent on Social Media and Risk of Depression in Adolescents: A Dose-Response Meta-Analysis," *International Journal of Environmental Research and Public Health*, 1-17.

[18]  See, for example, Vannucci, A., Flannery, K. M., & Ohannessian, C. M. (2017). "Social media use and anxiety in emerging adults." *Journal of Affective Disorders*, 207, 163-166; Primack, B.A., Shensa, A., Escobar-Viera, C.G., Barrett, E.L., Sidani, E. L., Colditz, J.B., & James, A. E. (2017). "Use of multiple social media platforms and symptoms of depression and anxiety: A nationally-representative study among U.S. young adults." *Computers in Human Behavior*, 69, 1-9.

[19]  See, for example, Nagata, J. M., Smith, N., Alsamman, S., Lee, C. M., Dooley, E. E., Kiss, O., Ganson, K. T., Wing, D., Baker, F. C., & Gabriel, K. P. (2023). "Association of physical activity and screen time with body mass index among US adolescents." *JAMA Network Open*, 6(2), 1-12. While this study examines the effects of screen time generally rather than social media in particular, other research shows that a substantial proportion of U.S. teens' and tweens' total screen time is spent on platforms covered by HB 3 (See, e.g., Rideout, V., Peebles, A., Mann, S., & Robb, M. B. (2022) "The Common Sense Census: Media Use by Tweens and Teens, 2021." Common Sense Media.)

[20]  See, for example, Scott, H., Biello, S. M., & Woods H. C. (2019). "Social media use and adolescent sleep patterns: cross-sectional findings from the UK millennium cohort study." *BMJ Open*, 9(9), 1-9.

[21]  See, for example, Tang, Y., Xu, M., Tan, Z., & Liu Y. (2024). "The impact of social network use on adolescent depression: the chain mediation between self-objectification and body satisfaction." *Frontiers in Psychology*, 15, 1-11; and Hawes T., Zimmer-Gembeck M. J., & Campbell S. M. (2020). "Unique associations of social media use and online appearance preoccupation with depression, anxiety, and appearance rejection sensitivity." *Body Image*, 33, 66-76.

[22]  See, for example, Primack, B. A., Shensa, A., Sidani, J. E., Whaite, E. O., Lin, L. Y., Rosen, D., Colditz, J. B., Radovic, A., & Miller, E. (2017). "Social media use and perceived social isolation among young adults in the U.S." *American Journal of Preventive Medicine*, 53(1), 1-8; Hu, J. M., Balow, S., Meng, J., Ellithorpe, M., & Meshi, D. (2024). "Social Network Density Mediates the Association Between Problematic Social Media Use and Depressive Symptoms." *International Journal of Human-Computer Interaction*, 1-6.

Expert Declaration of Adam L. Alter, Ph.D.                    7

them.[23] The elements of diminished self-control and long-term harm outweighing short-term benefit are common to both substance-related and behavioral additions.[24] However, rather than seeking the physical effects that accompany the ingestion of a particular substance, behavioral addicts seek certain psychological or emotional experiences produced when engaging in certain behaviors. Paradigmatic examples of addictive behaviors include gambling, sex, exercise, work, and engagement with various kinds of digital media.[25]

17.    In the past two decades, there has also been increased recognition of behavioral addiction in clinical contexts, driven in part by an expanded understanding of the ways behavioral addictions resemble well-known substance-based ones. For example, recent research has indicated that there are neurological patterns common to both addictive behavior and the ingestion of an addictive drug (such as those associated with the production of serotonin and dopamine),[26] suggesting that "repetitive use of substances or engagement in a behavioral addiction following an urge may reflect a unitary process."[27] In 2009, the world's first treatment center for Internet and gaming addiction—reSTART academy[28]—opened outside Seattle,

---

[23]    Neuroscientist Kent Berridge describes this hallmark of addictive behavior as the divergence or separation of "wanting" and "liking." For example, Berridge and his colleagues note that: "In the case of addiction, these systems somehow become disconnected, causing the individual to continue to crave things that no longer bring pleasure. Such dissociation might also possibly contribute to other types of compulsive behaviors, such as binge eating and gambling" (from Kringelbach, M. L., & Berridge K. C. (2012). "The joyful mind." *Scientific American,* 40-45, p. 45).

[24]    Alter, A. (2017). *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, p. 20; Grant, J. E., Potenza, M. N., Weinstein, A., & Gorelick, D. A. (2010). "Introduction to behavioral addictions." *The American Journal of Drug and Alcohol Abuse*, 36(5), 233-241, p. 234.

[25]    See, e.g., Sussman, S. (Ed.). (2020). *The Cambridge Handbook of Substance and Behavioral Addictions*. Cambridge University Press.

[26]    Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, pp. 70-72; Grant, J. E., Potenza, M. N., Weinstein, A., & Gorelick, D. A. (2010). "Introduction to behavioral addictions." *The American Journal of Drug and Alcohol Abuse*, 36(5), 233-241, p. 235.

[27]    Grant, J. E., Potenza, M. N., Weinstein, A., & Gorelick, D. A. (2010). "Introduction to behavioral addictions." *The American Journal of Drug and Alcohol Abuse*, 36(5), 233-241, p. 235.

[28]    https://www.restartlife.com/.

Expert Declaration of Adam L. Alter, Ph.D.                                         8

Washington.[29] In 2013, a behavioral addiction—Gambling Disorder—was officially added for the first time to the American Psychiatric Association's *DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS*,[30] and in 2019, the World Health Organization added the category of "disorders due to addictive behaviors" to the 11th edition of its *INTERNATIONAL CLASSIFICATION OF DISEASES*.[31]

18.     Behavioral addictions to digital technology and social media have become increasingly common in the past several years. For example, a 2022 meta-analysis on the global prevalence of digital addiction found worldwide prevalence rates of 26.99% for smartphone addiction and 17.42% for social media addiction.[32] Other research examining social media use by age has found even higher rates. For example, a 2019 study of U.S. social media users found that 40% of users aged 18-22 and 37% of users aged 23-38 reported being addicted to social media.[33] Similarly, a 2022 study reported that 54% of users aged 13-17 years said they would find it "very hard" or "somewhat hard" to give up social media.[34] From 2015 to 2023, the share of U.S. teens who reported being online "almost constantly" nearly doubled, from 24% to 46%.[35]

19.     As discussed below, this high rate of behavioral addiction may be driven by the unique features employed by highly interactive and personalized forms of digital technology and social

---

[29]     Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, p. 17.

[30]     American Psychiatric Association, (2013). *Diagnostic and Statistical Manual of Mental Disorders (5th ed.)*. Arlington, VA: American Psychiatric Association, p. 585.

[31]     See Brand, M., & Potenza, M. N. (2023). "Behavioral addictions in the ICD-11: An important debate that is anticipated to continue for some time," *Journal of Behavioral Addictions*, 12(3), 585-589.

[32]     Meng, S. Q., Cheng, J. L., Li, Y. Y., Yang, X. Q., Zheng, J. W., Chang, X. W., Shi, Y., Chen, Y., Lu, L., Sun, Y., Bao, Y. P., & Shi, J. (2022). "Global prevalence of digital addiction in general population: A systematic review and meta-analysis." *Clinical Psychology Review*, 92.

[33]     Dixon, S. J. (2022). "Share of online users in the United States who report being addicted to social media as of April 2019, by age group." Statsita. https://www.statista.com/statistics/1081292/social-media-addiction-by-age-usa/.

[34]     https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.

[35]     https://www.pewresearch.org/internet/2023/12/11/teens-social-media-and-technology-2023/.

Expert Declaration of Adam L. Alter, Ph.D.                    9

media. These features influence the ways in which users engage with and derive psychological rewards from the platforms. In this respect, social media is categorically different from streaming services such as Hulu and Disney+. While both social media and streaming services share some similarities—for example, both provide users with visual entertainment that can provide a dopamine release[36] and, in turn, motivate an addiction—streaming services primarily provide a less interactive and more solitary experience used to relax, relieve boredom, or escape,[37] whereas social media platforms provide a product which is far more active and socially engaging. Features unique to social media,[38] such as feedback in the form of likes and comments, the constant lure of notifications, and goal-setting related to one's own uploaded content (e.g., view counts and new follower tallies) create a blurred boundary between media use and offline life, which is absent from streaming services. Because of these features, the psychological rewards and motivations for using social media are more entangled in social pressures, creating an especially potent draw on time and attention.

20.    Importantly, the fact that addictive or problematic use of social media has reached a record high does not imply that every person who spends more time on Instagram or Snapchat than he or she would like necessarily has a medical disorder, nor does it imply that the majority of U.S. teens require addiction counselling or treatment. Like addiction in general, the severity and impact of a behavioral addiction on one's life falls along a spectrum, and addiction to digital

---

[36]    https://www.nbcnews.com/better/health/what-happens-your-brain-when-you-binge-watch-tv-series-ncna816991; https://www.jeffersonhealth.org/your-health/living-well/the-addictiveness-of-social-media-how-teens-get-hooked.

[37]    Castro, D., Rigby, J. M., Cabral, D., Nisi, V. (2021). "The binge-watcher's journey: Investigating motivations, contexts, and affective states surrounding Netflix viewing." Convergence: The International *Journal into New Media Technologies*, 27(1), 3-20.

[38]    See Section VI.

Expert Declaration of Adam L. Alter, Ph.D.                                10

App. 149

technology is a widespread social malady, rather than a narrowly-contained medical problem.[39]

At the same time, it would be a mistake to assume that social media addiction is not a serious

problem merely because it affects so many people. On the contrary, it is common because many

social media platforms are designed to short-circuit the various self-control mechanisms that

might otherwise protect the population, en masse, from compulsive overuse. Moreover, the fact

that social media overuse affects a considerable proportion of the population indicates that the

problem transcends particular personality types or background characteristics, and that instead

the problem resides within the platforms or experiences themselves.

### B.  The "hooks" of addictive technology

21.    Research on behavioral addiction has identified a number of characteristics that tend to

raise the possibility that a product might become addictive for a subset of its users. In the context

of social media and other digital technology, these characteristics function as psychological

"hooks," grabbing users' attention and keeping them engaged in the platform. Several of the

hooks I outline here are identified in my 2017 book *IRRESISTIBLE*, and some are drawn from

work both I and others have done before and after *IRRESISTIBLE*'s publication. In the case of

social media addiction, the most relevant hooks include, but are not limited to: the elimination of

behavioral **stopping cues**, compelling **goals** that are just beyond reach, unpredictable positive

**feedback**, unresolved tensions that demand resolution (**cliffhangers**), strong social connections

(**social interaction**), and **scarcity**. I describe each hook in turn in the following paragraphs.

22.    **Elimination of stopping cues:** Stopping cues signal that an ongoing activity has reached

---

[39]    See, e.g., Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, p. 23. By analogy, nicotine and alcohol addiction among underage users are significant public health concerns, despite the fact that nicotine and alcohol might affect and cause harm to different users along a spectrum of severity.

Expert Declaration of Adam L. Alter, Ph.D.                                    11

its natural endpoint, thereby nudging users to switch tasks or otherwise terminate that activity. Traditional media incorporate natural stopping cues, which nudge consumers of those media to terminate that activity, and to consider moving on to another in its place. These stopping cues are sometimes implied, as with the end of a chapter in a novel, and sometimes explicit, as with the rolling credits that follow an hour-long episode within a television series that broadcasts one episode each week. Though historically it was sometimes possible to bypass these stopping cues (by, for example, reading an entire book in one sitting), the fact that such stopping cues are built into the structure of traditional media dampens consumption rates by default.[40] In general, humans are "cognitive misers," tending to default to cognitive strategies that produce just-good-enough outcomes with as little effort as possible.[41] When an activity has eliminated stopping cues, staying engaged with that activity becomes the cognitively-easy default, leading people to inhabit a state of autopilot that can only be overridden with considerable cognitive effort.

23.     **Goals:** Humans are naturally motivated to pursue goals, and are often particularly driven by round numbers and other intrinsically satisfying milestones. For example, data on marathon finish times show that many more people finish marathons in the few minutes before the four hour mark than in the few minutes after it, demonstrating the motivational power of trying to finish a marathon in under four hours.[42] Contemporary digital technology has generated an ever-expanding menu of numerical goals placing demands on users' time and energy, from high scores to daily step-counts to increases in followers, views, likes, and so on. In particular, as with

---

[40]     On the power of defaults to drive behavior, see, for example: Johnson, E. J., & Goldstein, D. (2003). "Do Defaults Save Lives?" *Science*, 302, 1338–1339; McKenzie, C. R. M., Liersch, M. J., & Finkelstein, S. R. (2006). "Recommendations implicit in policy defaults," *Psychological Science*, 17, 414–420.

[41]     Stanovich, K. E. (2020). "Why humans are cognitive misers and what it means for the great rationality debate." In *Routledge Handbook of Bounded Rationality*, Routledge, pp. 196-206. See also Fiske, S. T., & Taylor, S. E. (2017). *Social Cognition: From Brains to Culture* (3rd edition). SAGE Publications.

[42]     Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, pp. 95-97.

Expert Declaration of Adam L. Alter, Ph.D.                                          12

the four-hour marathon landmark, round-numbered milestones (e.g., 100; 500; 1,000; 10,000; etc.) function as outsized motivational goals, compelling people to commit considerable time and energy to achieving those milestones.[43]

24.      **Feedback:** Humans have a natural tendency to seek and maintain control over their environments, and they exert that control when making both daily decisions and monumental life choices.[44] One consequence of the need to control is that humans constantly seek feedback from the environment, both to learn whether they are approaching desired outcomes and to reinforce the perception of control itself.[45] Feedback indicating that one has control over one's environment has also been identified as a contributor to the development of habitual behavior,[46] which can include the regular use of social media platforms. A core feature of social media platforms is the feedback users receive from one another, in the form of Likes, comments, re-posts, views, and so on. This feedback is discrete, quantifiable, and often instantaneous, making it highly engaging and rewarding.

25.      **Cliffhangers:**  Broadly, a cliffhanger is a psychological experience of tension that demands a resolution. Commonly used as a story-telling device at the end of a book chapter or TV episode, cliffhangers drive engagement because they combine the suspense of not knowing what comes next with the expectation that tension will eventually be resolved in the next chapter or episode. The psychological tension characteristic of cliffhangers is both thrilling and

---

[43]   On round numbers in motivation and goal behavior, see, for example: Alter, A. L., & Hershfield, H. E. (2014). "People search for meaning when they approach a new decade in chronological age." *Proceedings of the National Academy of Sciences, 111,* 17066-17070; Pope D., & Simonsohn, U. (2011) "Round numbers as goals: evidence from baseball, SAT takers, and the lab." *Psychological Science, 22,* 71-79.

[44]   Leotti, L. A., Iyengar, S. S., & Ochsner, K. N. (2010). "Born to choose: The origins and value of the need for control." *Trends in Cognitive Sciences*, 14(10), 457-463.

[45]   Eitam, B., Kennedy, P. M., & Tory Higgins, E. (2013). "Motivation from control." *Experimental Brain Research*, 229, 475-484.

[46]   Nafcha, O., Higgins, E. T., & Eitam, B. (2016). "Control feedback as the motivational force behind habitual behavior." *Progress in Brain Research*, 229, 49-68.

Expert Declaration of Adam L. Alter, Ph.D.                    13

motivating, two cognitive effects which can be exploited to keep a person engaged with digital technology longer than they would be otherwise.[47] Cliffhangers capitalize on the human need for closure, which, despite varying in intensity across individuals, cultures, and situations, indicates that people tend to become preoccupied with ideas or narratives that remain unfinished or unresolved.[48] Social media regularly deploys cliffhangers through features such as autoplay, which continually begins new videos for users and thus continually introduces new, incomplete content that requires resolution. Videos on social media platforms frequently begin with intriguing, open-ended scenarios and clickbait-laden titles, such as "everyone told me not to do this, but it actually worked," or "I opened this box, and you won't believe what I found inside." Since these videos begin automatically, thereby opening a loop that cannot be closed until the videos provide narrative resolution, social media users feel compelled to spend more time engaged with the platform than they originally intended.

26.    **Social Interaction:** Humans are an inherently social species that requires and thrives on social feedback and connection. At a fundamental level, humans have a "need to belong," which drives them to form social connections, and to resist the dissolution of social bonds.[49] Researchers have also identified the maintenance of strong social relationships as a contributor to better health and longevity.[50] In both childhood and adulthood, people tend to be sensitive to

---

[47]    Alter, A. (2017), "Chapter 8. Cliffhangers." *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books.

[48]    See, e.g., Kruglanski, A. W., & Webster, D. M. (1996). "Motivated closing of the mind: 'Seizing' and 'freezing'". *Psychological Review*, 103, 263–283; see also the so-called Zeigarnik Effect, which describes the tendency for people to fixate on unresolved tasks or goals: Zeigarnik, B. (1938). "On finished and unfinished tasks." In W. D. Ellis (Ed.), *A source book of Gestalt psychology*, 300–314. Kegan Paul, Trench, Trubner & Company: London.

[49]    Baumeister, R. F., & Leary, M. R. (1995). "The need to belong: Desire for interpersonal attachments as a fundamental human motivation." *Psychological Bulletin*, 117(3), 497-529.

[50]    See, e.g., House, J. S., Landis, K. R., & Umberson, D. (1988). "Social relationships and health." *Science*, 241(4865), 540-545; Yang, Y. C., Boen, C., Gerken, K., Li, T., Schorpp, K., & Harris, K. M. (2016). "Social relationships and physiological determinants of longevity across the human life span." *Proceedings of the National Academy of Sciences*, 113(3), 578-583.

how others feel about them and the sorts of appraisals they deliver. Though generally healthy and beneficial, the drive for social connection can be weaponized, just as, say, humans' evolved drive for calorie-dense foods has produced an obesity epidemic in the developed world.[51] Just as snack food companies provide unprecedented access to high-calorie, satiating foods, social media platforms provide users with bottomless opportunities for instantaneous social interaction.

27.     **Scarcity:** The final psychological hook relevant to the addictiveness is a sense of scarcity accompanying the experience. When physical products, services, and experiences are perceived as limited or scarce, consumers tend to find them more attractive relative to otherwise similar but abundant alternatives, and are therefore more willing to expend time, money, and other valuable resources to acquire those commodities.[52] Many forms of content on social media platforms— including, for example, live-streamed content and transiently available video posts—are temporally scarce, which means they exist for limited periods of time before disappearing or being relegated to archives where their value to users declines. This eternal sense of scarcity that attaches itself to social media content imbues that content with social value, and draws users to return to social media platforms at a more rapid cadence than they might were the content refreshed and archived less frequently.[53]

---

[51]     See, e.g., Folwarczny, M., Otterbring, T., Sigurdsson, V., Tan, L. K., & Li, N. P. (2023). "Old minds, new marketplaces: How evolved psychological mechanisms trigger mismatched food preferences." *Evolutionary Behavioral Sciences*, 17(1), 1-21.

[52]     On scarcity as a source of motivation, see, for example: Lynn, M. (1989), "Scarcity effects on desirability: Mediated by assumed expensiveness?" *Journal of Economic Psychology*, 10, 257–274; Lynn, M. (1991). "Scarcity effects on value: A quantitative review of the Commodity Theory literature." *Psychology and Marketing*, 8, 43–57; Sharma, E., & Alter, A. L. (2012). "Financial deprivation prompts consumers to seek scarce goods." *Journal of Consumer Research*, 39, 545-560; Verhallen, T. M. M. (1982), "Scarcity and consumer choice behavior." *Journal of Economic Psychology*, 2, 37–60; Verhallen, T. M. M., & Robben, H. S. J. (1994), "Scarcity and preference: An experiment on unavailability and product evaluation." *Journal of Economic Psychology*, 15, 1–27.

[53]     On the link between scarcity and the fear of missing out on limited experiences, see, for example: Przybylski, A. K., Murayama, K, DeHaan, C. R., & Gladwell, V. (2013). "Motivational, emotional, and behavioral correlates of fear of missing out." *Computers in Human Behavior*, 29, 1841–1848; Alfina, S. H., & Dien M

28.     The psychological hooks described above rely on natural human inclinations or tendencies that govern how they think, feel, and behave, and how they interact with each other and their environments. All addictive digital technology platforms incorporate one or more of these hooks, and in so doing exploit near-universal psychological needs in the service of extending and intensifying engagement with those platforms.

## VI. THE FIVE FEATURES IDENTIFIED BY HB 3 ARE CORRECTLY DESCRIBED AS ADDICTIVE

29.     Each of the five addictive features identified by HB 3 uses some combination of the list of hooks identified in the previous section to capture attention and drive engagement, inevitably contributing to overuse of social media and increasing the risk of behavioral addiction.

### A.  Infinite Scrolling

30.     HB 3 defines "infinite scrolling" as either "continuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page," or "seamless content, or the use of pages with no visible or apparent end or page breaks."[54] The core psychological hook that drives the addictiveness of infinite scrolling is the elimination of natural stopping cues used to demarcate episodes of use.[55] A social media platform that includes infinite scrolling has no natural stopping point, and consumption is designed to be unbounded. Without stopping cues, people tend to allow an episode of use to continue by default, only moving on to a new experience when exerting agency to overcome a kind of *behavioral inertia*.[56]

---

(2023). "FOMO related consumer behaviour in marketing context: A systematic literature review," *Cogent Business & Management*, 10, 1-21.

[54]  HB 3, p. 4, lines 88–93.

[55]  Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, pp. 183-190.

[56]  For a general discussion on inertia and behavior, see Gal, D. (2006). "A psychological law of inertia and the illusion of loss aversion." *Judgment and Decision Making*, 1(1), 23-32; Kahneman, D., Knetsch, J. L., &

Expert Declaration of Adam L. Alter, Ph.D.                    16

31.    Research demonstrates that the infinite scrolling feature contributes to overuse of social media. For example, a study of the effects of technology-mediated social interaction on circadian rhythms noted that "[p]articipants also express that social media keeps them up longer than planned, for common reasons such as 'endless scrolling' social feeds that make them 'feel like an addict, obligated' to 'need to know what's going on.'"[57] Another study of smartphone usage behavior observed that participants feel they get "caught in the loop" of smartphone use, noting that "certain apps that feature a 'feed' that allows for continuous scrolling" tended to lead users to "spend much more time on their phone than they originally intended."[58]

## B.  Push Notifications

32.    HB 3 defines push notifications as alerts that are sent by the platform to "inform a user about specific activities or events related to the user's account."[59]  These notifications are visual, auditory, or haptic alerts (e.g., bursts of vibration)[60] designed to capture attention and inform social media users of some change or update on the platform. As such, they exploit users' natural tendency to seek and attend to environmental feedback, serving as distractors that monopolize attention. The effectiveness of push notifications is borne out in academic research. For example, researchers examining the disruptiveness of smartphones in one study reported that it "appeared almost impossible for participants to not immediately interrupt their current activities and attend

---

Thaler, R. H. (1991). "Anomalies: The endowment effect, loss aversion, and status quo bias." *Journal of Economic Perspectives*, 5(1), 193-206.

[57]    Murnane, E. L., Abdullah, S., Matthews, M., Choudhury, T., & Gay, G. (2015). "Social (media) jet lag: How usage of social technology can modulate and reflect circadian rhythms." In *Proceedings of the 2015 ACM International Joint Conference on Pervasive and Ubiquitous Computing*, 843-854, p. 847.

[58]    Heitmayer, M., & Lahlou, S. (2021). "Why are smartphones disruptive? An empirical study of smartphone use in real-life contexts." *Computers in Human Behavior*, 116, 1-28.

[59]    HB 3, p. 4, lines 94–96.

[60]    Fitz, N., Kushlev, K., Jagannathan, R., Lewis, T., Paliwal, D., & Ariely, D. (2019). "Batching smartphone notifications can improve well-being." *Computers in Human Behavior*, 101, 84-94, p. 84.

Expert Declaration of Adam L. Alter, Ph.D.                    17

to their phones when they noticed a new notification with their senses."[61] In this study,

notifications led users to get  "caught in the loop" of unplanned smartphone use.[62]  Another study

found that its participants' typically viewed push notifications within minutes of receiving them,

regardless of whether their phones were placed in silent mode.[63]

33.     Research has shown that push notifications can disrupt performance on tasks that require

attention, even if individuals do not actually directly respond to them.[64] And the continuous

interruptions caused by push notifications can increase levels of inattention and hyperactivity,

while simultaneously lowering productivity and psychological wellbeing, mimicking symptoms

of ADHD even in individuals without clinical diagnoses.[65] These attentional challenges can

make it difficult to fully disconnect from social media, even when users try to abstain from use.

Studies have shown that when users perceive disturbances from social media notifications, they

are less able to self-regulate their social media use.[66]

34.     Push notifications also trigger the phenomenon known as Fear of Missing Out ("FOMO")

by informing users that something happening on the platform is worthy of their attention.[67]

FOMO can be an intense and distressing feeling, especially among adolescents, and has

---

[61]    Heitmayer, M., & Lahlou, S. (2021). "Why are smartphones disruptive? An empirical study of smartphone use in real-life contexts." *Computers in Human Behavior*, 116, 1-28, p. 16.

[62]    Heitmayer, M., & Lahlou, S. (2021). "Why are smartphones disruptive? An empirical study of smartphone use in real-life contexts." *Computers in Human Behavior*, 116, 1-28.

[63]    Pielot, M., Church, K., & De Oliveira, R. (2014). "An in-situ study of mobile phone notifications." *Proceedings of the 16th International Conference on Human-Computer Interaction with Mobile Devices & Services*, 233-242.

[64]    Stothart, C., Mitchum, A., & Yehnert, C. (2015). "The attentional cost of receiving a cell phone notification." *Journal of Experimental Psychology: Human Perception and Performance*, 41(4), 893-897.

[65]    Stothart, C., Mitchum, A., & Yehnert, C. (2015). "The attentional cost of receiving a cell phone notification." *Journal of Experimental Psychology: Human Perception and Performance*, 41(4), 893-897.

[66]    Du, J., Kerkhof, P. & Koningsbruggen, G. (2019). "Predictors of Social Media Self-Control Failure: Immediate Gratifications, Habitual Checking, Ubiquity, and Notifications." *Cyberpsychology, Behavior, and Social Networking*, 22, 477-485.

[67]    Brown, L., & Kuss, D. J. (2020). "Fear of missing out, mental wellbeing, and social connectedness: a seven-day social media abstinence trial." *International Journal of Environmental Research and Public Health*, 17(12), 1-18.

Expert Declaration of Adam L. Alter, Ph.D.                                    18

repeatedly been found to lower life-satisfaction and well-being, and to inspire problematic social media use, including social media addiction.[68] Push notifications play such a critical role in how people experience the world that many people, particularly social media users who rely heavily on push notifications, experience so-called "phantom vibrations," or the illusion of phone vibration signals even when those users aren't carrying their phones, or such notifications are disabled.[69] This arises in part because they are conditioned to become sensitized to vibration cues, or because they experience anxiety at the prospect of missing out on transient online activity.[70] One study examining the relationships between FOMO, well-being, and social media use found that a seven-day trial of social media abstinence led to significantly increased well-being and feelings of social connectedness, and significantly decreased FOMO.[71]

### C. Personal Interactive Metrics

35.    HB 3 defines interactive metrics as metrics that show "the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content."[72]These include Likes, reactions, shares, and comments—all powerful sources of social

---

[68]    See, e.g., Kuss, D. J., & Griffiths, M. D. (2017). "Social networking sites and addiction: Ten lessons learned." *International Journal of Environmental Research and Public Health*, 14(3), 1-17; Oberst, U., Wegmann, E., Stodt, B., Brand, M., & Chamarro, A. (2017). "Negative consequences from heavy social networking in adolescents: The mediating role of fear of missing out." *Journal of Adolescence*, 55, 51-60; Brown, L., & Kuss, D. J. (2020). "Fear of missing out, mental wellbeing, and social connectedness: a seven-day social media abstinence trial." *International Journal of Environmental Research and Public Health*, 17(12), 1-18.

[69]    See, e.g., Aleksandrowicz, A., Kowalski, J., & Gawęda, Ł. (2023). "Phantom phone signals and other hallucinatory-like experiences: Investigation of similarities and differences." *Psychiatry Research,* 319, 1-9; Deb, A. (2014). "Phantom vibration and phantom ringing among mobile phone users: A systematic review of literature." *Asia-Pacific Psychiatry,* 7, 231–239.

[70]    Aleksandrowicz, A., Kowalski, J., & Gawęda, Ł. (2023). "Phantom phone signals and other hallucinatory-like experiences: Investigation of similarities and differences." *Psychiatry Research,* 319, 1-9.

[71]    Brown, L., & Kuss, D. J. (2020). "Fear of missing out, mental wellbeing, and social connectedness: a seven-day social media abstinence trial." *International Journal of Environmental Research and Public Health*, 17(12), 1-18.

[72]    HB 3, p. 4, lines 97–100.

Expert Declaration of Adam L. Alter, Ph.D.                19

feedback that drive engagement on social media platforms.[73] In particular, research has found that adolescents show increased sensitivity to feedback provided through interactive metrics, and that their engagement in social media is driven more strongly by this feedback than is adults' engagement.[74] Interactive metrics have repeatedly been identified as a factor contributing to compulsive and addictive use of social media platforms.[75]

36.　Receiving social media feedback activates neural circuits associated with reward processing,[76] motivating behavior in a manner that mirrors the magnetic pull of non-social rewards like food and money.[77] Indeed, social media feedback in the form of interactive metrics has been described as a kind of "online social currency."[78] In one illustrative example, a consultant and entrepreneur named Rameet Chawla created an auto-Liking bot called *Lovematically,* which automatically Liked every post that appeared in his Instagram feed.[79]

---

[73]　da Silva Pinho, A., Céspedes Izquierdo, V., Lindström, B., & van den Bos, W. (2024). "Youths' sensitivity to social media feedback: A computational account." *Science Advances*, 10(43), 1-11; Rosenthal-von der Pütten, A. M., Hastall, M. R., Köcher, S., Meske, C., Heinrich, T., Labrenz, F., & Ocklenburg, S. (2019). " 'Likes' as social rewards: Their role in online social comparison and decisions to like other People's selfies." *Computers in Human Behavior*, 92, 76-86.

[74]　da Silva Pinho, A., Céspedes Izquierdo, V., Lindström, B., & van den Bos, W. (2024). "Youths' sensitivity to social media feedback: A computational account." *Science Advances*, 10(43), 1-11.

[75]　See, e.g., da Silva Pinho, A., Céspedes Izquierdo, V., Lindström, B., & van den Bos, W. (2024). "Youths' sensitivity to social media feedback: A computational account." *Science Advances*, 10(43), 1-11; Rast, R., Coleman, J. T., & Simmers, C. S. (2021). "The darkside of the like: the effects of social media addiction on digital and in-person communication." *The Journal of Social Media in Society*, 10(2), 175-201; Griffiths, M. D. (2018). "Adolescent social networking: How do social media operators facilitate habitual use?" *Education and Health*, 36(3), 66-69.

[76]　Sherman, L. E., Hernandez, L. M., Greenfield, P. M., & Dapretto, M. (2018). "What the brain 'Likes': neural correlates of providing feedback on social media." *Social Cognitive and Affective Neuroscience*, 13(7), 699–707.

[77]　Lindström, B., Bellander, M., Schultner, D. T., Chang, A., Tobler, P. N., & Amodio, D. M. (2021). "A computational reward learning account of social media engagement." *Nature Communications*, 12(1), 1-10; Rosenthal-von der Pütten, A. M., Hastall, M. R., Köcher, S., Meske, C., Heinrich, T., Labrenz, F., & Ocklenburg, S. (2019). "Likes" as social rewards: Their role in online social comparison and decisions to like other People's selfies. *Computers in Human Behavior*, 92, 76-86.

[78]　Rosenthal-von der Pütten, A. M., Hastall, M. R., Köcher, S., Meske, C., Heinrich, T., Labrenz, F., & Ocklenburg, S. (2019). "'Likes' as social rewards: Their role in online social comparison and decisions to like other People's selfies." *Computers in Human Behavior*, 92, 76-86.

[79]　See, e.g., Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, pp. 128-129.

Expert Declaration of Adam L. Alter, Ph.D.　　　　　　　20

According to Chawla, *Lovematically* devalued the currency of Likes by essentially making them free of charge. Any post, regardless of quality, was worthy of a Like, which rendered Likes valueless. Chawla allowed other users to beta-test the bot, but it was soon shut down by Instagram, which itself thrives in part because the Likes that fuel engagement with the platform are valuable to its users. Indeed, the reward provided by such metrics is so appealing to social media users that many have learned to time their posts and interactions to optimize the frequency of positive reinforcement.[80] Users also increase social media activity after uploading posts, suggesting the anticipation of reward feedback.[81]

37.     The quantifiable nature of social feedback acquired through interactive metrics increases the likelihood of social comparison and competition. Researchers have found that interactive metrics such as Likes serve as indicators of acceptance from one's peers, contributing to social comparison online.[82] Such comparisons arise because users can measure their own social standing against the status of peers and strangers who display more or fewer signals of status and engagement. The process of turning self-focused experiences—like grazing online platforms for engaging content—into a race for social status on an engagement leaderboard is known as *gamification,* and social feedback provides the "points" that fuel this leaderboard.[83] Some social media platforms also explicitly encourage such goal-setting in the form of *streaks*, combining the psychological hooks of social interaction, interactive metrics, and goals into a single, highly compelling feature. For example, Snapchat's "Snapstreak" feature tracks users' interactions

---

[80]     Lindström, B., Bellander, M., Schultner, D. T., Chang, A., Tobler, P. N., & Amodio, D. M. (2021). "A computational reward learning account of social media engagement." *Nature Communications*, 12(1), 1-10.

[81]     Lindström, B., Bellander, M., Schultner, D. T., Chang, A., Tobler, P. N., & Amodio, D. M. (2021). "A computational reward learning account of social media engagement." *Nature Communications*, 12(1), 1-10.

[82]     Rosenthal-von der Pütten, A. M., Hastall, M. R., Köcher, S., Meske, C., Heinrich, T., Labrenz, F., & Ocklenburg, S. (2019). " 'Likes' as social rewards: Their role in online social comparison and decisions to like other People's selfies." *Computers in Human Behavior*, 92, 76-86.

[83]     See, e.g., Alter, A. (2017), *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books, pp. 293-316.

across consecutive days, and two users' Snapstreak with one another is broken as soon as one day without an interaction between them occurs.[84]  Streaks compel behavior by combining a source of positive reinforcement (adding another day to the streak, for example) with the desire to avoid negative reinforcement (not wanting to break the streak). The drive to maintain a streak adds an additional layer of motivation to engage with the platform beyond the other inducements embedded in the platform's design.[85]

### D.  Autoplay

38.    HB 3 defines "auto-play video" video that "begins to play without the user first clicking on the video or on a play button for that video."[86] Autoplay contributes to the addictiveness of social media use by leveraging both the elimination of stopping cues and cliffhangers.

39.    Whereas infinite scroll completely removes stopping cues from the activity of browsing a social media feed, autoplay supplants the traditional stopping cue at the end of a video with an invitation to stay engaged without any further effort. Because of this, users can end up viewing videos for longer than anticipated or intended. For example, in a 2021 survey investigating U.S. users' response to the design of YouTube, participants ranked autoplay as one of the top three app features that undermined their sense of agency and hijacked their original intentions.[87] One particular survey respondent noted in regard to autoplay that "I often spend more time than I meant to because there is a good related video that seems worth watching so ya know, 'Just one

---

[84]    https://help.snapchat.com/hc/en-us/articles/7012394193684-How-do-Snapstreaks-work-and-when-do-they-expire.

[85]    On the effectiveness of streaks, even when users don't actively consider them before engaging with the platform, see: Weathers, D., &  Poehlman, T. A. (2023). "Defining, and understanding commitment to, activity streaks," *Journal of the Academy of Marketing Science*, 52, 531–553, p. 550.

[86]    HB 3, p. 5, lines 101–103.

[87]    Lukoff, K., Lyngs, U., Zade, H., Liao, J.V., Choi, J., Fan, K., Munson, S.A, & Hiniker, A. (2021). "How the Design of YouTube Influences User Sense of Agency." In *Proceedings of the 2021 CHI Conference of Human Factors in Computing Systems, New York, NY, USA*, 1–17.

Expert Declaration of Adam L. Alter, Ph.D.                    22

more' which becomes a couple hours."[88] Another respondent noted that "I feel like I have little control whenever YouTube takes it upon itself to just play whatever it feels like playing."[89] Further, respondents noted that the seemingly "endless" amount of content made it hard to stop watching.[90]

40.    The second psychological hook relevant to the addictiveness of autoplay is cliffhangers. As explained earlier, in ¶25, the term "cliffhanger" refers to the build-up of psychological tension and the subsequent need for a resolution.[91] Traditionally, consumers voluntarily exposed themselves to cliffhangers when they decided to watch, read, or otherwise consume longform content. They recognized or came to recognize that cliffhangers were a narrative device employed by many writers and experience designers who sought to engage consumers across discrete episodes of content. In contrast, autoplay visits one cliffhanger after another on social media users who are effectively told the beginnings of dozens of brief video narratives that need to be completed before the cliffhanger can be resolved.[92] A 2021 study of what the researchers described as the "rabbit hole of content consumption" examined participants' choices when presented with the option to watch media content from the same category as they had just

---

[88]    Lukoff, K., Lyngs, U., Zade, H., Liao, J.V., Choi, J., Fan, K., Munson, S.A, & Hiniker, A. (2021). "How the Design of YouTube Influences User Sense of Agency." In *Proceedings of the 2021 CHI Conference of Human Factors in Computing Systems, New York, NY, USA*, 1–17.

[89]    Lukoff, K., Lyngs, U., Zade, H., Liao, J.V., Choi, J., Fan, K., Munson, S.A, & Hiniker, A. (2021). "How the Design of YouTube Influences User Sense of Agency." In *Proceedings of the 2021 CHI Conference of Human Factors in Computing Systems, New York, NY, USA*, 1–17.

[90]    Lukoff, K., Lyngs, U., Zade, H., Liao, J.V., Choi, J., Fan, K., Munson, S.A, & Hiniker, A. (2021). "How the Design of YouTube Influences User Sense of Agency." In *Proceedings of the 2021 CHI Conference of Human Factors in Computing Systems, New York, NY, USA*, 1–17.

[91]    See Alter, A. (2017), "Chapter 8. Cliffhangers." *Irresistible: The Rise of Addictive Technology and the Business of Keeping us Hooked*, Penguin Books.

[92]    See, e.g., Schibler, K., Hahn, L., & Green, M. C. (2024). "Investigating responses to narrative cliffhangers using affective disposition theory." *Media Psychology, 27*, 1–25; Jimmy Donaldson, whose Mr. Beast channel has more subscribers than any other YouTube channel as of January 2025 has written a guide for new staff at his production company that emphasizes narrative structure—including curiosity loops and cliffhangers—in driving viewer retention across the course of each video; see, e.g., "How to succeed in MrBeast Production," retrieved from: https://drive.google.com/file/d/1YaG9xpu-WQKBPUi8yQ4HaDYQLUSa7Y3J/view.

Expert Declaration of Adam L. Alter, Ph.D.                    23

watched, watch media content from different category, or do a different work-related activity.[93] This study found that users frequently chose to watch media of the same kind, the researchers noting that "[watching] five [music] videos made people 10% more likely to choose to watch an additional music video than if they only watched one video."[94] Moreover, this study found that "participants whose video consumption was uninterrupted were 22% more likely to choose to watch another video than those who alternated between work tasks and videos."[95] The authors of this study attribute the significance of this effect to the "heightened accessibility" of the media, which causes people to become immersed in it, leading them to desire to maintain their connection to it and anticipate future options in the media to be more enjoyable than other options.[96]

### E. Live-streaming

41.    HB 3 defines "live-streaming" as as a function that "allows a user or advertiser to broadcast live video content in real-time."[97] In practice, live-streaming is a hybrid feature that incorporates other addictive features within it (such as interactive metrics and push notifications). The user interface of live-stream features, such as the Instagram Live interface shown below in Figure 1, commonly include a comment submission bar, a live tracker of the number of users viewing the stream, a live feed of comments, and live animations for Likes and other metrics. These aspects of the interface seamlessly integrate social interaction, feedback,

---

[93]    Woolley, K., & Sharif, M. A. (2022). "Down a Rabbit Hole: How Prior Media Consumption Shapes Subsequent Media Consumption." *Journal of Marketing Research*, 59(3), 453-471.

[94]    Woolley, K., & Sharif, M. A. (2022). "The Psychology of Your Scrolling Addiction," *Harvard Business Review*, https://hbr.org/2022/01/the-psychology-of-your-scrolling-addiction.

[95]    Woolley, K., & Sharif, M. A. (2022). "The Psychology of Your Scrolling Addiction," *Harvard Business Review*, https://hbr.org/2022/01/the-psychology-of-your-scrolling-addiction.

[96]    Woolley, K., & Sharif, M. A. (2022). "Down a Rabbit Hole: How Prior Media Consumption Shapes Subsequent Media Consumption." *Journal of Marketing Research*, 59(3), 453-471.

[97]    HB 3, p. 5, lines 104 – 105.

Expert Declaration of Adam L. Alter, Ph.D.                    24

and goal setting into the user experience, creating a visually engaging and psychologically powerful draw on attention and other cognitive resources.

**Figure 1. Instagram Live User Interface[98]**



42.    Recent research investigating the motivations of people who participate in live-streaming clearly identifies "social interaction" as a key motivator, with viewer engagement in live-streams appearing to have a "stronger social and community basis" compared to mass media.[99] In one 2017 study, social motivation was positively correlated with the number of hours people watch streams.[100] In other words, people who felt more socially connected because of the live-stream

---

[98]    https://krowcentral.com/whats-going-on/are-you-watching-instagram-live/.
[99]    Hilvert-Bruce, Z., Neill, J. T., Sjöblom, M., & Hamari, J. (2018). "Social motivations of live-streaming viewer engagement on Twitch." *Computers in Human Behavior*, 84, 58-67.
[100]    Sjöblom, M., & Hamari, J. (2017). "Why do people watch others play video games? An empirical study on the motivations of Twitch users." *Computers in Human Behavior, 75, 985–996.*

watched more. In fact, live-streams have been recognized by researchers to serve as "third places," where communities gather and socialize.[101] In these spaces, communities can emerge based on shared experiences, contents, and participants.[102]

43.    Social media platforms are aware of the unique power of the live-stream feature to increase engagement. For example, Facebook noted in 2016 that "we've seen that people comment more than 10 times more on Facebook Live videos than on regular videos,"[103] and that "[people] spend more than 3x more time watching a Facebook Live video on average compared to a video that's no longer live. This is because Facebook Live videos are more interesting in the moment than after the fact."[104]

44.    Live-streamed content is inherently fleeting, which introduces a scarcity dimension that does not apply to static videos or photos. In most cases, live-streamed content is only available live,[105] and this scarcity produces FOMO and encourages excessive use.[106]

---

[101]    Hamilton, W., Garretson, O., & Kerne, A. (2014). "Streaming on twitch: Fostering participatory communities of play within live mixed media." *Conference on Human Factors in Computing Systems - Proceedings*.

[102]    Hamilton, W., Garretson, O., & Kerne, A. (2014). "Streaming on twitch: Fostering participatory communities of play within live mixed media." *Conference on Human Factors in Computing Systems - Proceedings*.

[103]    https://web.archive.org/web/20170419203306/https://newsroom.fb.com/news/2016/04/introducing-new-ways-to-create-share-and-discover-live-video-on-facebook/.

[104]    https://web.archive.org/web/20170329185757/http://newsroom.fb.com/news/2016/03/news-feed-fyi-taking-into-account-live-video-when-ranking-feed/.

[105]    Compelling moments from popular live-streams can be "clipped" and posted as static videos on YouTube and other media platforms, which allows for further opportunities to view after the fact. However, most live streams today are broadcast by ordinary social media users to small numbers of people (see, e.g. Lottridge, D., Bentley, F., Wheeler, M., Lee, J., Cheung, J., Ong, K., & Rowley, C. (2017). "Third-wave livestreaming: teens' long form selfie." In *Proceedings of the 19th international conference on human-computer interaction with mobile devices and services*, 1-12). Such live-streamed content is far less likely to be clipped and thus far more likely to be viewable only once.

[106]    Industry publications on the topic of "FOMO marketing" recognize the clear link between scarcity and FOMO, as well as that livestreaming capitalizes on FOMO to increase consumer engagement. See, e.g., "Harnessing The Power Of Fomo (fear Of Missing Out) With Live Streaming," *Faster Capital*, available at https://fastercapital.com/topics/harnessing-the-power-of-fomo-%28fear-of-missing-out%29-with-live-streaming.html; "Future of Live Streaming: Emerging Trends in FOMO Marketing" *BSE-TEC*, available at https://www.bsetec.com/blog/future-of-live-streaming-emerging-trends-in-fomo-marketing; "The FOMO Epidemic: How Anxiety-Driven Marketing Took Over," *Marketing Scoop*, https://www.marketingscoop.com/marketing/the-fomo-epidemic-how-anxiety-driven-marketing-took-over/.

45.      Similar to infinite scrolling and autoplay features, live-streaming also relies on the elimination of stopping cues to encourage extended episodes of use. Live-stream broadcasts tend to be much longer than more traditional forms of media such as network TV shows— for example, the average live-stream length in 2024 on Twitch, one of the most popular streaming platforms, was approximately three hours.[107] With no built-in natural stopping places, users can end up viewing a live-stream for much longer than they may have intended. A 2016 survey of Twitch users found that they watched 106 minutes per day, on average, and that almost half of the surveyed population spent more than 20 hours per week on the platform.[108]

**F.  Social media poses increased risk to adolescents**

46.      While social media and its psychological hooks can pull in a person of any age, adolescents are particularly at risk, as their developing brains are more susceptible to the reward-driven mechanisms underlying these features.[109] Beginning around ages 10–12, changes in the brain amplify the impact of social rewards, heightening sensitivity to social stimuli.[110] This heightened sensitivity may increase the psychological effects of social media. In fact, a 2022 longitudinal study of 17,409 participants aged 10–21 identified specific age ranges during which adolescents are especially vulnerable to the effects of social media: 11–13 for girls and 14–15 for boys. [111] Higher social media use during these ages was associated with a decrease in life

---

[107]    https://www.statista.com/statistics/1485233/twitch-stream-length-global/#:~:text=Twitch%3A%20global%20streaming%20video%20length%202023%2D2024&text=The%20average%20Twitch%20streaming%20session,approximately%20three%20hours%20%2D%20in%202024.

[108]    Hilvert-Bruce, Z., Neill, J. T., Sjöblom, M., & Hamari, J. (2018). "Social motivations of live-streaming viewer engagement on Twitch." *Computers in Human Behavior*, *84*, 58-67, citing data from Twitch.

[109]    Abrams, Z. (2023). "Why young brains are especially vulnerable to social media" American Psychological Association News. https://www.apa.org/news/apa/2022/social-media-children-teens.

[110]    Abrams, Z. (2023). "Why young brains are especially vulnerable to social media" American Psychological Association News. https://www.apa.org/news/apa/2022/social-media-children-teens.

[111]    Orben, A., Przybylski, A. K., Blakemore, S.-J., & Kievit R. (2022). "Windows of developmental sensitivity to social media," *Nature Communications*, 13, 1-10.

Expert Declaration of Adam L. Alter, Ph.D.                                      27

satisfaction a year later, whereas lower use predicted an increase in life satisfaction.[112] Other research has documented similar patterns that indicate younger users, in particular, experience worse outcomes from using social media. For example, studies have shown that certain kinds of social media use among younger generations are associated with body image issues[113] as well as unsafe behaviors, such as substance use.[114]

47.     The increased risk of social media addiction to adolescents is further compounded by the fact that social media platforms generally combine addictive features. On its own, each individual feature has the potential to manipulate human psychology and encourage addictive behavior. However, social media platforms tend to employ multiple features at the same time, such as infinite feeds that incorporate autoplay for videos, live-streaming functions that show viewer reactions and viewer counts, push notifications delivering news of fresh likes and followers, and so on. The combined force of multiple addictive features operating at once ensures that social media platforms function to continuously siphon users' time and cognitive resources.

### VII. IN-APP CONTROL MEASURES ARE INSUFFICIENT TO PREVENT SOCIAL MEDIA ADDICTION

48.     In response to growing public awareness of the harms of social media use to young people, some social media platforms have introduced new systems or features ostensibly designed to address problematic social media consumption. However, these measures are

---

[112]     Orben, A., Przybylski, A. K., Blakemore, S.-J., & Kievit R. (2022). "Windows of developmental sensitivity to social media," *Nature Communications*, 13, 1-10.

[113]     Saiphoo, A., & Vahedi, Z. (2019). "A meta-analytic review of the relationship between social media use and body image disturbance," *Computers in Human Behavior*, 101(1), 259-279.

[114]     Nesi, J., Rothenberg, W. A., Hussong, A. M., & Jackson, K. M. (2017). "Friends' Alcohol-Related Social Networking Site Activity Predicts Escalations in Adolescent Drinking: Mediation by Peer Norms," *Journal in Adolescent Health*, 60(6), 641-647.

insufficient to prevent social media addiction, and in many cases do not actually address the features of social media platforms that drive addictive or problematic use.

## A. Instagram Teen Accounts

49.     One prominent recent example of in-app control measures is Meta's Instagram Teen Accounts, introduced on September 17, 2024.[115] According to Meta, when a teen now signs up for a new Instagram account, he or she is placed into a Teen Account, which imposes certain restrictions that can be modified only with parental approval.[116] However, many of the restrictions—such as those relating to privacy, messaging, and content settings,[117] do not address overuse. Others, such as time limit notifications,[118] can (and will) simply be ignored by users.[119] Moreover, none of the Teen Account features address the addictiveness of Instagram's infinite scroll, the autoplay of the platform's videos, the Likes and comments doled out and sought by users, or the hours spent viewing live-streams through Instagram Live. That the Teen Accounts program does not address these aspects of the Instagram experience is unsurprising, since they are constitutive features of Instagram itself, and Instagram, like all popular social media platforms, has been engineered to maximize, rather than reduce, user engagement.

## B. Similar features from YouTube and Snap

50.     Declarations in support of a Preliminary Injunction (PI) motion in this matter submitted

---

[115]    https://about.fb.com/news/2024/09/instagram-teen-accounts/.
[116]    https://about.fb.com/news/2024/09/instagram-teen-accounts/.
[117]    https://about.fb.com/news/2024/09/instagram-teen-accounts/.
[118]    Teen Accounts are sent notifications to leave the app after 60 minutes of use, per day. See https://about.fb.com/news/2024/09/instagram-teen-accounts/.
[119]    See, for example, Loid, K., Täht, K., & Rozgonjuk, D. (2020). "Do pop-up notifications regarding smartphone use decrease screen time, phone checking behavior, and self-reported problematic smartphone use? Evidence from a two-month experimental study." *Computers in Human Behavior*, 102, 22-30, which found that pop-up screentime reminders had no effect on reducing smartphone screentime or checking behavior. See also Casey, B. J., & Caudle, K. (2013). "The teenage brain: Self control." *Current Directions in Psychological Science*, 22(2), 82-87, on diminished self-control in adolescence.

Expert Declaration of Adam L. Alter, Ph.D.                                    29

by representatives of YouTube and Snap, respectively, contain descriptions of comparable in-app features that are similarly incapable of eradicating the addictive pull of those platforms. For example, YouTube offers a feature it calls "Supervised Experiences for Teens,"[120] and Snapchat provides options for parental control through its "Family Center."[121] However, similar to the features rolled out by Meta for Instagram Teens, the safety features described by the Declarants in support of the PI motion do little to address the addictiveness at the core of social media use. For example, the features described by the Declarants involve no modifications to the infinite scrolling, interactive metrics, push notifications, or live-streaming features that drive engagement with their respective platforms. As a consequence, using these platforms with these various safety features in use is likely just as addictive as using them with these features off.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: January 13, 2024

_____

Professor Adam L. Alter

---

[120]   Declaration of Alexandra Veitch, October 29, 2024, ¶14
[121]   Declaration of David Boyle, October 29, 2024, ¶7.

Expert Declaration of Adam L. Alter, Ph.D.                                    30

App. 169

**EXHIBIT A – CURRICULUM VITAE**

# Adam Alter
# Curriculum Vitae

Marketing Department, Stern School of Business, New York
University 40 West 4th Street, Room 811, New York, NY 10012

+ 1-212-998-0142; aalter@stern.nyu.edu

---

## Academic Employment

| | |
|---|---|
| 2020-present | **Professor of Marketing,** Stern School of Business, New York University<br>Robert Stansky Teaching Excellence Faculty Fellow<br>Affiliated appointment in the Psychology Department |
| 2014-2020 | **Associate Professor of Marketing,** Stern School of Business, New York University Affiliated appointment in the Psychology Department |
| 2009-2014 | **Assistant Professor of Marketing,** Stern School of Business, New York University Affiliated appointment in the Psychology Department |

## Education

| | |
|---|---|
| 2009 | **Ph.D.** in Social Psychology<br>Princeton University |
| 2006 | **M.A.** in Social Psychology<br>Princeton University |
| 2004 | **B.Sc.** in Psychology; Law minor (Honors Class I, University Medal—1st place) University of New South Wales |

## Selected Honors, Fellowships, and Awards

| | |
|---|---|
| 2021 | Elected Fellow, Association for Psychological Science |
| 2020 | NYU Stern Distinguished Teaching Award, 2019-2020 (Stern's highest teaching award voted on by a committee of senior faculty) |
| 2020 | NYU Stern Professor of the Year, 2019-2020 (voted on by all MBA students) |
| 2018 | Awarded grant to study the effects of screens on adolescents and children by Viacom and South Park Studios, $150,000 |
| 2017-present | Member, World Economic Forum Advisory Committee on AI, VR, AR, and Blockchain |
| 2017 | Designated the *Robert Stansky Teaching Excellence Faculty Fellow* at New York University's Stern School of Business |
| 2017 | *Irresistible* designated Amazon.com non-fiction title of the month for March 2017. |
| 2014 | *Drunk Tank Pink* designated a *CHOICE* Outstanding Academic Title for 2013 |
| 2010 | Runner-Up, Hillel Einhorn New Investigator Award, Society of Judgment and Decision Making |
| 2009 | Society for Personality and Social Psychology Travel Grant |
| 2008-2009 | Charlotte Elizabeth Procter Honorific Dissertation Fellowship |
| 2008 | Princeton University Dean's Fund for Scholarly Travel |
| 2007-2009 | Woodrow Wilson Scholars Society Dissertation Fellowship |
| 2004 | Young Investigator Grant, American Society of Trial Consultants |

## Publications

**Books**

**Alter, A. L.,** (May 16, 2023). *Anatomy of a Breakthrough: How to Get Unstuck When It Matters Most.* Simon and Schuster: New York.

**Alter, A. L.** (March 7, 2017). *Irresistible: The rise of addictive technology and the business of keeping us hooked.* Penguin Press: New York.
  - Judged one of the 100 best books of 2017 by Amazon.

Expert Declaration of Adam L. Alter, Ph.D.                    32

- Selected as a best book of 2017 by Inc., Forbes, Abe Books, and Library Weekly, among other outlets.
- TED talk based on *Irresistible* selected as one of the top ten most popular TED talks of 2017.

**Alter, A. L.** (March 21, 2013). *Drunk Tank Pink: And other unexpected forces that shape how we think, feel, and behave.* Penguin Press: New York.

- *New York Times* bestseller.
- Barnes and Noble book of the month and editor's choice.
- Smithsonian notable book.
- Kirkus recommended book.
- CHOICE outstanding academic title.

## Selected Journal Publications

Kappes, H., **Alter, A. L.,** Edwards, G., & Berri, D. (2022). Difficult training improves team performance: An empirical case study of US college basketball. *Behavioural Public Policy, 6*, 554-577.

Sussman, A. B., Paley, A., & **Alter, A. L.** (2021). How and why our eating decisions neglect infrequently consumed foods. *Journal of Consumer Research, 48,* 251–269,

Munz, K., Jung, M., & **Alter, A. L.** (2020). Name similarity encourages generosity: A field experiment in email personalization, *Marketing Science, 39,* 1071-1091.

Hershfield, H. E., & **Alter, A. L.** (2019). On the naturalistic relationship between mood and entertainment choice. *Journal of Experimental Psychology: Applied, 25,* 458-476.

Lick, D. J., **Alter, A. L.,** & Freeman, J. B. (2018). Superior pattern detectors efficiently learn, activate, apply, and update social stereotypes. *Journal of Experimental Psychology: General, 147,* 209- 227.

Hershfield, H. E. & **Alter, A. L.** (2017). Context matters: How macroeconomic forces may alter the reception of negative emotions in art. *Behavioral and Brain Sciences, 40,* e365.

**Alter, A. L.,** Stern. C., Granot, Y., & Balcetis, E. (2016). The "bad is black" effect: Why people believe evildoers have darker skin than do-gooders. *Personality and Social Psychology Bulletin, 42,* 1653-1665.

**Alter, A. L.,** & Hershfield, H. E. (2015). Still good evidence that people search for meaning when they approach a new decade in chronological age. *Proceedings of the National Academy of Sciences, 112,* E1171.

Sussman, A. B., Sharma, E., & **Alter, A. L.** (2015). Framing charitable donations as exceptional expenses increases giving. *Journal of Experimental Psychology: Applied, 21,* 130-139.

Shah, A. K., & **Alter, A. L.** (2014). Consuming experiential categories. *Journal of Consumer Research, 41,* 965-977.

**Alter, A. L.,** & Hershfield, H. E. (2014). People search for meaning when they approach a new decade in chronological age. *Proceedings of the National Academy of Sciences, 111,* 17066-17070.

Oppenheimer, D. M., & **Alter, A. L.** (2014). The search for moderators in disfluency research. *Applied Cognitive Psychology, 28,* 502-504.

Sharma, E., Mazar, N., **Alter, A. L.,** & Ariely, D. (2014). Financial Deprivation Selectively Shifts Moral Standards and Compromises Moral Decisions. *Organizational Behavior and Human Decision Processes, 123,* 90-100.

**Alter, A. L.** (2013).  The benefits of cognitive disfluency. *Current Directions in Psychological Science, 22,* 437-442.

**Alter, A. L.,** Oppenheimer, D. M., & Epley, N. (2013). Disfluency prompts analytic thinking--but not always greater accuracy: response to Thompson et al. (2013). *Cognition, 128,* 252-255.

Sussman, A. B., & **Alter, A. L.** (2012).  The exception is the rule: Underestimating and overspending on exceptional expenses. *Journal of Consumer Research, 39,* 800-814.

Sharma, E., & **Alter, A. L.** (2012).  Financial deprivation prompts consumers to seek scarce goods. *Journal of Consumer Research, 39,* 545-560.

Laham, S., Koval, P., & **Alter, A. L.** (2012).  The name pronunciation effect: Why people like Mr. Smith more than Mr. Colquhoun. *Journal of Experimental Social Psychology, 48,* 16-21.

**Alter, A. L.,** & Balcetis, E. (2011).  Fondness makes the distance grow shorter: Desired locations seem closer because they are more vivid. *Journal of Experimental Social Psychology, 47,* 16-21.

**Alter, A. L.,** Oppenheimer, D. M., & Zemla, J. C. (2010).  Missing the trees for the forest: A construal theory account of the Illusion of Explanatory Depth. *Journal of Personality and Social Psychology, 99,* 436-451.

- Runner-Up, 2010 Hillel Einhorn New Investigator Award, Society of Judgment and Decision Making.

**Alter, A. L.,** Aronson, J., Darley, J. M., Rodriguez, C., & Ruble, D. N. (2010). Rising to the threat: Reducing stereotype threat by reframing the threat as a challenge. *Journal of Experimental Social Psychology, 46,* 166-161.

**Alter, A. L.,** & Darley, J. M. (2009).  When the association between appearance and outcome contaminates social judgment: A bidirectional model linking group homogeneity and collective treatment. *Journal of Personality and Social Psychology, 97,* 776-795.

**Alter, A. L.,** & Oppenheimer, D. M. (2009).  Suppressing secrecy through metacognitive ease: Cognitive fluency encourages self-disclosure. *Psychological Science, 20,* 1414-1420.

**Alter, A. L.,** & Oppenheimer, D. M. (2009).  Uniting the tribes of fluency to form a metacognitive nation. *Personality and Social Psychology Review, 13,* 219-235.

Laham, S., **Alter, A. L.,** & Goodwin, G. P. (2009). Easy on the mind, easy on the wrongdoer: Unexpectedly fluent violations are deemed less morally wrong. *Cognition, 112,* 462-466.

**Alter, A. L.,** & Kwan, V. S. Y. (2009).  Cultural sharing in a global village: Extracultural cognition in European Americans. *Journal of Personality and Social Psychology, 96,* 742-760.

**Alter, A. L.,** & Oppenheimer, D. M. (2008).  Easy on the mind, easy on the wallet: Effects of fluency on valuation judgments. *Psychonomic Bulletin and Review, 15,* 985-990.

- Subject of a feature article on *Irrational Economics* in *The Economist,* April 3, 2008.

**Alter, A. L.** & Oppenheimer, D. M. (2008).  Effects of fluency on psychological distance and mental construal (or why New York is a large city, but *New York* is a civilized jungle). *Psychological Science, 19,* 161-167.

**Alter, A. L.**, Oppenheimer, D. M., Epley, N, & Eyre, R. N. (2007). Overcoming intuition: Metacognitive difficulty activates analytic reasoning. *Journal of Experimental Psychology: General, 136,* 569- 576.

**Alter, A. L.** & Forgas, J. P. (2007). On feeling happy but fearing failure: The effects of mood on self- handicapping strategies. *Journal of Experimental Social Psychology, 43,* 947-954.

**Alter, A. L.,** Kernochan, J., & Darley, J. M. (2007). Morality influences how people apply the ignorance of the law defense. *Law and Society Review, 41,* 819-864.

**Alter, A. L.**, Kernochan, J., & Darley, J. M. (2007). Transgression wrongfulness outweighs its harmfulness as a determinant of sentence severity. *Law and Human Behavior, 31,* 319-335.

**Alter, A. L.** & Oppenheimer, D. M. (2006). From a fixation on sports to an exploration of mechanism: The past, present and future of hot hand research. *Thinking and Reasoning, 12,* 431-444.

**Alter, A. L.,** & Oppenheimer, D. M. (2006). Predicting short-term stock fluctuations by using processing fluency. *Proceedings of the National Academy of Sciences, 103,* 9369-9372.

- Selected as a *PNAS: In This Week* feature article.
- Paper featured in *Nature* news, May 30th 2006.
- Interviewed on U.S. and Australian television and British radio, and research featured in international newspapers and popular journals, including *The New York Times*, *Wall Street Journal*, *Los Angeles Times*, *The Guardian* (United Kingdom).

## Book Chapters

Oppenheimer, D. M., & **Alter, A. L.** (in press) The Fluency sleeper effect: Disfluency endured today promotes fluency tomorrow. In: R. Greifeneder & C. Unkelbach, *Advances in Fluency and Metacognition.* Psychology Press.

Darley, J. M. & **Alter, A. L.** (2013). Behavioral issues of punishment and deterrence. In E. Shafir (Ed.), *Behavioral foundations of policy.* Princeton University Press: Princeton, NJ.

## Non-Academic Writing

Regular contributor to the *New Yorker* website's Currency blog:
http://www.newyorker.com/magazine/bios/adam_alter/search?contributorName=Adam+Alter

Written ad-hoc columns for, among other publications: *The Atlantic, Slate, New York Times, New Yorker, Popular Science, Huffington Post, New York Post, 99u, WIRED, Psychology Today.*

### Selected Invited Talks

MIT, Sloan School of Management;
Yale University, School of Management (twice);
Cornell University, Johnson School of Business;

University of California, San Diego, Rady School of
Management;
New York University, Stern School of Business;
Stanford University, Graduate School of Business;
Harvard University, Negotiation, Organizations and Markets
Unit;
Carnegie Mellon University, Department of Social and Decision
Sciences;
New York University, Social Psychology;
Chicago, Booth School of Business (Marketing; Behavioral Science; and Gleacher Center
Public Talk);
Stellenbosch University, Cape Town, South Africa;
University of New South Wales, Sydney,
Australia;
Erasmus University, Rotterdam, Netherlands;
Mannheim University, Mannheim, Germany;
HEC, Paris, France;
Microsoft, Seattle;
Google, NYC;
University of Houston;
University of Florida;
Cornell University;
TEDxSydney;
Princeton University, Social Psychology;
Wharton School, University of Pennsylvania, Decision Processes Colloquium;
University of Maryland;
Georgetown University;
Ohio State University;
Columbia University;
TED Mainstage, Vancouver, Canada

## Selected Service Activities

Member, Stern Faculty Council, 2018-present

NYU Stern IRB faculty representative, 2016-present Marketing Core Curriculum Committee,
2017-present

Member, World Economic Forum Committee on AI, VR, AR, and blockchain technologies,
2017- present

Technology in MBA Committee (headed by J.P. Eggers), 2018-present

Delivered invited talks at NYU to:

-    MBA 9s Orientation Event (three times)
-    NYU Senate Spouses' Event
-    NYU Stern Freshman Orientation
-    Several MBA-organized events and club meetings
-    Summer school students in the psychology department (twice)

Expert Declaration of Adam L. Alter, Ph.D.                36

Advanced assistant professor recruitment committee, 2018-present

Pro-bono work advising Google, Apple, YouTube, and various other tech companies on the ethical design of their products.

Arranged a speaker series for the MBA Core including six industry speakers from Google, Mediacom, Redscout (branding agency), Droga5 (advertising agency), and Kraft Mondelez, 2017-present.

## Selected Editorial and Reviewing Experience

**Associate Editor**
  *Journal of Consumer Psychology*
**Editorial Board**
  *Journal of Consumer Research*
  *International Journal of Research in*
  *Marketing Journal of Experimental*
  *Social Psychology Cognition*
  *Marketing Letters*

**Ad-Hoc Journal Reviewing**
  *Applied Cognitive Psychology*
  *Cognition*
  *Cognitive Psychology*
  *Cognitive Science*
  *Consciousness and Cognition*
  *Emotion*
  *European Journal of Social Psychology*
  *Group Processes and Intergroup Relations*
  *Individual Differences*
  *International Journal of Research in Marketing*
  *Journal of Applied Research in Memory and Cognition*
  *Journal of Business Ethics*
  *Journal of Experimental Psychology: General*
  *Journal of Experimental Psychology: Applied*
  *Journal of Experimental Psychology: Learning, Memory, and Cognition*
  *Journal of Experimental Social Psychology*
  *Journal of Cognitive Psychology*
  *Journal of Consumer Psychology*
  *Journal of Consumer Research*
  *Journal of Marketing Research*
  *Journal of Personality and Social Psychology*
  *Law and Human Behavior*
  *Learning and Individual Differences*
  *Management Science*
  *Marketing Letters*
  *Memory*

Expert Declaration of Adam L. Alter, Ph.D.                    37

*Memory and Cognition*
*Motivation and Emotion*
*Organizational Behavior and Human Decision Processes*
*Personality and Social Psychology Bulletin*
*Personality and Social Psychology Review*
*Perspectives in Psychological Science*
*PLoS ONE*
*Psychological Bulletin*
*Psychological Science*
*Psychology, Public Policy and the Law*
*Quarterly Journal of Experimental Psychology*
*Social Behavior and Personality*
*Social and Personality Psychology Compass*
*Social Psychology*
*Social Psychology and Personality Science*
*Social Cognition*
*Thinking and Reasoning*

**Ad-Hoc Grant Reviewing**
*Netherlands Organization for Social Research*
*Research Foundation of City University New York*
*Israeli Science Foundation*

**Memberships & Committees**
Fellow, Association for Psychological Science

Member, Association for Consumer Research

Member, Society for Consumer Psychology

Member, American Psychological Association

Member, Society of Personality and Social Psychology

Member, American Society of Trial Consultants

Member, New York Academy of Sciences

Member, Society of Judgment and Decision Making

Member, American Association for the Advancement of Science Graduate

Associate, Princeton Program in Law and Public Affairs

Graduate Fellow, Mathey College, 2006-2007.

Graduate Social Psychology Departmental Representative, Princeton Psychology Dept, 2005-2006.

Expert Declaration of Adam L. Alter, Ph.D.    38

App. 177

**EXHIBIT B – PREVIOUS EXPERT TESTIMONY**

- Red Hydrogen, LLC v. Cloudminds (Hong Kong) Ltd. JAMS REF. NO. 1220062943 (for the plaintiff; both deposition and testimony).

- In Re: Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices, and Products Liability Litigation; MDL No. 2936; Master Case No. 4:20-MD-02936-SRB United States District Court for the Western District of Missouri, Western Division (for the plaintiff; deposition).

- In Re: U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. Fox News Network, LLC. Case No. N21C-03-257 EMD. Superior Court for the State of Delaware (for the plaintiff; deposition).

- In Re: U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. Newsmax Media, Inc. Case No. N21C-08-063 EMD. Superior Court for the State of Delaware (for the plaintiff; ongoing).

- Justin O'Connor, Stanislaw, Zielinski, Daniel Fair, Bryan Smith, Jason Steen, William Fiedler, Michael Barcelona, Robert Marino, Brian Dougherty, Susan Heller, Victor M. Orndorff, and Michael McDonald on behalf of themselves and all others similarly situated v. Ford Motor Company. Case No. 1:19-cv-05045.United States District Court Northern District of Illinois (for the plaintiff; deposition).

- Kaitlyn Kuchar and Thomas Siegenthaler v. Western Reserve Academy. Case No. CVB-2021-10-3464. Court of Common Pleas, Summit County, Ohio (for the defendant; deposition)

- Daniel Michalow v. D.E. Shaw & Cc., L.P., Maximilian Dana Stone, and Edward Laurence Fishman. FINRA Case No. 23-01854, Financial Industry Regulatory Authority, (for the plaintiff; ongoing).

- In Re: US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation v. Herring Networks, Inc. d/b/a One America News Network, Charles Herring, Robert Herring, Sr., Chanel Rion, and Christina Bobb, Case No. 1:21-cv-02130. The District Court of the District of Columbia (for the plaintiff; ongoing).

# 51-3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER AND COMMUNICA-
TIONS INDUSTRY ASSOCIATION and
NETCHOICE,

*Plaintiff,*

v.

ASHLEY BROOKE MOODY, in her offi-
cial capacity as the Attorney General of
Florida,

*Defendant.*

Case No. 4:24-cv-00438

### DECLARATION OF TONY ALLEN

1. I, Tony Allen, am over the age of 18 and have personal knowledge of the facts set forth in this declaration. I have been retained by the State of Florida in *Computer and Communications Industry Association and NetChoice v. Ashley Brooke Moody*, No. 4:24-cv-00438 (N.D. Fla.), to provide testimony on the systems, processes, and procedures that may be available to social media companies to discharge their responsibilities under the Florida Statutes and Rules that were enacted pursuant to Florida House Bill 3. I have also been asked to provide definitions and context in use for some of the terminology used in the Florida Statutes and Rules.

2. I am being compensated by the Office of the Attorney General of Florida. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

3. I have reviewed the Act, Statute and Rules; CCIA's complaint, motion for preliminary injunction, memorandum in support of its motion for preliminary injunction; and four declarations in support of CCIA's Motion: one from Alexandria Veitch (dated October 24, 2024), one from Bartlett Cleland (dated October 29, 2024), one from David Boyle (dated October 24, 2024), and one from Matthew Schruers (dated October 28, 2024). In addition to these declarations, I have also had the

1

App. 180

opportunity to review the depositions provided by YouTube and Snap and their latest terms of service. I may wish to supplement my opinions or the bases for them as new evidence comes to light or new research is published.

## *Personal Background*

4. I am a Chartered Trading Standards Practitioner and Global Subject Matter Expert on Age Assurance Systems. I am the Technical Editor of ISO/IEC DIS 27566-1 – Information security, cybersecurity, and privacy protection – Age assurance systems – Part 1: Framework. I am the author of the book "Age Restricted Sales: The Law in England and Wales."

5. I am also the Founder and Executive Director of the Age Check Certification Scheme, the leading UK Accreditation Service approved auditor and technology testing service for the age-assurance industry. I am also an audit member of the Age Verification Providers Association ("AVPA")—a global trade association representing the age-assurance industry.

6. I have personal knowledge of the history, process, and logistics of online age assurance (as defined herein).

7. I have also been closely involved in the development of age-assurance legislation in the United Kingdom and elsewhere in the world, including the United States of America.

## *Summary*

8. Florida's HB3 requires social media companies to verify the age of users and, if the user is under 14, to prohibit them from creating a social media account and, if the user is aged 14 or 15, to gain parental consent for that minor to become a social media account holder. The Act requires that "a social media platform shall terminate any account held by an account holder younger than 14 years

2

of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising...". In addition, by § 501.1736 (3)(b)(1) the Act requires that a "social media platform shall terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account."

9. This Act does not specify the exact way that social media companies must perform age verification. The Act is technology agnostic and enables social media companies to choose their own approach to discharging their responsibilities to verify age and consent.

10. Based on my knowledge and experience, modern technology is capable of allowing providers of social media services to verify the ages of their consumers in a variety of ways, without jeopardizing either the providers' or consumers' interests in access or privacy. Companies operating across borders face diverse legal requirements related to age verification, shaped by local regulations, consumer protection laws, and industry-specific mandates. These obligations are often sector-specific (e.g., online services, gaming, and e-commerce) and are aimed at protecting minors from inappropriate content, services, or products.

11. As examples:

(a) In the European Union, the General Data Protection Regulation (GDPR) imposes significant obligations on businesses to verify the age of users where data processing involves minors. Specifically:

    (i)      Article 8 of GDPR mandates parental consent for processing the personal data of children under 16 (or a lower age threshold, not below 13, set by member states). To

3

App. 182

comply, companies must verify the user's age to determine whether parental consent is required.

(ii)    Many EU member states supplement GDPR with additional laws requiring age verification for access to restricted goods (e.g., alcohol, tobacco, knives) and services (e.g., gambling, adult content).

(b) In the US, age verification requirements are shaped by laws like the Children's Online Privacy Protection Act (COPPA) and other state and federal regulations:

(i)    COPPA applies to operators of websites or online services directed at children under 13 or those that knowingly collect data from children under 13. While COPPA does not explicitly require "age verification," it does require operators to:

- Obtain verifiable parental consent before collecting, using, or disclosing personal information from children under 13.

- Implement mechanisms to identify users under 13, often necessitating some form of age screening to determine whether parental consent is required.

(ii)    Several states impose age-related restrictions for purchasing specific products or accessing services

12. Further, the burden and cost of verifying age is minimal and is reduced every day as technology evolves. Social media companies already provide age-verification tools for the creation of accounts, to authorize the upload of content, or to verify the age of participants in video content. This was confirmed during the deposition on behalf of YouTube (See, e.g., Depn Veitch ¶¶ 13:14:04 relating to age estimation technologies for participants in video content uploaded)

13. Based on my knowledge and experience, device-based restrictions (See, e.g., Compl. (Doc. 1) ¶¶ 24), network-based restrictions (*ibid* ¶¶ 25), browser-level restrictions (*ibid* ¶¶ 26) and application-

4

level restrictions (*ibid* ¶¶ 27), when properly installed, provide only a partial solution to gaining assurance about the age of users. The availability of these restrictions is further enhanced where the social media company is age aware of its users, so these technology stack level filters are less effective on their own than, and not a substitute for, website-based age assurance.

14. Many of CCIA & NetChoice's members already have tools to assist parents, and already have rules (typically at age 13) that restrict children's access to their services. *See, e.g.,* Compl. (Doc. 1) ¶¶ 23- 39; Cleland Decl. (Doc. 5-2) ¶ 8-11. Often, the enforcement of these rules is retrospective—*i.e.,* access is granted and then, if information becomes available that the user is, in fact, under their self-declared age, restrictions may be applied. The Act is an improvement by requiring the age-verification process to pre-date, and not post-date, the account-creation process. *See* §501.1736 (2)(a), for minor's under 14 and §501.1736 (3)(a) for minor's aged 14 or 15. Because the Act requires pre-account-creation verification, the parental tools and controls would apply to all minors aged 14 and 15 from the start of their social media use rather than never (if the social media company never detects that the user is a minor) or some period of time after the minor has used social media unsupervised (if the social media company detects or is notified that the user is a minor). And because the Act requires parental consent for teens ages 14 and 15, parents are more likely to be involved in their child's social-media use.

### *Age Assurance Services*

15. In my experience, the Act's definitions of "social media platform", §501-1736 (1)(e), uses terms commonly used and understood by social-media companies and others in this industry. In my opinion, for example, the terms used in the statute like "upload content"; "algorithms that analyze

data and select content for users" and "push notifications about activities or events related to user's account" are regularly used in the industry to refer to common features of social-media platforms.

16. The Act requires social media companies that use addictive features to bar certain underage children from being account holders. It does not dictate processes or approaches on how to comply with that. It is expected that social media companies would turn to the existing field of 'age assurance'.

17. I am the Technical Editor of the International Standard on Age Assurance Systems, and extracts from those standards will help the Court understand what age assurance is. These global standards are also endorsed by the industry trade body the Digital Trust and Safety Partnership[1].

18. I start with some definitions from ISO/IEC DIS 27566-1 – Age assurance systems – Part 1: Framework, clause 3:

> "**Age assurance** is a set of processes and methods used to verify, estimate or infer the age or age range of an individual, enabling organizations to make age-related eligibility decisions with varying degrees of certainty."

> "An **age assurance result** is information produced by an age assurance system indicating that an individual is a certain age, over or under a certain age or within an age range."

19. Age assurance is not a new or rare technology. It is widely used by thousands of sellers and their consumers on a daily basis around the world in various contexts, such as alcohol and tobacco sales, gambling, gaming, social media, and, to a growing extent, accessing pornography.

20. Age assurance technologies have evolved significantly over the past two decades, particularly in the online environment. In the early days of online age verification, static age gates were used (c.2000s) these simple "age gates" on websites, particularly for adult content, alcohol and gaming, typically required users to self-declare their date of birth or check a box confirming they were above

---

[1] https://dtspartnership.org/wp-content/uploads/2023/09/DTSP_Age-Assurance-Best-Practices.pdf

App. 185

a specific age. They lacked sophistication and relied heavily on user honesty. There were no mechanisms, or very limited mechanisms to verify the accuracy of declared ages, making these methods easily circumvented.

21. By the early 2010s, document-based verification began to emerge as online services expanded, and some industries began requiring users to upload government-issued IDs (e.g., passports, driver's licenses) to verify age. These methods were primarily used in regulated industries like gambling and certain e-commerce platforms. These document-based methods improved accuracy but introduced friction for users and raised concerns about data privacy, as sensitive personal information was often stored insecurely.

22. By the mid-2010s the science behind biometric age estimation began to emerge with AI-powered algorithms to estimate a user's age based on physical attributes such as facial features. Early adopters included online gaming platforms and video streaming services. These methods improved user experience by providing non-intrusive and real-time verification while reducing reliance on sensitive documents. However, some privacy issues became a concern around consent, data retention and algorithmic bias.

23. In the late 2010s the development of frameworks such as the UK's PAS 1296:2018 Code of Practice for Age Check Services formalized industry practices. These frameworks established best practices for ensuring accuracy, privacy and transparency in age assurance. Now in the mid 2020s we have Real-Time, Privacy-Preserving Age Assurance leveraging deep learning models for highly accurate age estimation. These age assurance services can verify age in real-time using just a webcam or smartphone camera, without requiring the storage of sensitive personal data. Technologies now incorporate privacy-preserving methods such as edge computing and anonymized data processing. Companies are increasingly adopting standards like ISO/IEC 27566 for age assurance to align with

7

App. 186

global privacy regulations (e.g., GDPR). Age assurance has expanded into mainstream applications, including social media platforms, video games and live-streaming services, driven by societal and regulatory demands to protect minors online.

24. As a result, age assurance has evolved from rudimentary self-declaration methods to sophisticated, AI-powered systems capable of real-time, privacy-preserving verification. This technological evolution has been driven by advancements in biometrics, regulatory requirements and growing societal expectations for protecting minors in the digital environment.

25. In April 2024, a Global Age Assurance Standards Summit was held in Manchester, UK, and included representation from social media providers like Meta, Google and Microsoft; together with US agencies like NIST and ANSI. This Summit generated a full compendium of the approaches to age assurance, the state of standards development, and the latest state-of-the-art. *Compendium*, Global Age Assurance Standards Summit 2024 (Apr. 2024),(https://accscheme.com/wp-content/uploads/ACCS-GlobalSummit-Compendium-.pdf).

26. The Global Summit concluded with a consensus statement, including input from social media companies established through an open consultative process led by the British Standards Institution, that:

a.  Age assurance **can** be done.

b.  Age assurance **can** be deployed, with the right process for the right use cases, in a manner that is privacy preserving, secure, effective, and efficient.

c.  Age assurance **can** be a valuable tool among a range of measures deployed to protect children in the digital environment.

d.  Age assurance is assisted by securing International Standards, which are implemented and respected by providers of services that are required to make age-related eligibility decisions.

App. 187

e.    Laws and regulations **can** create the legal framework with robust enforcement proce-dures in place to secure the protection of children from harm.

*Communique*, Global Age Assurance Standards Summit (Apr. 12, 2024), (https://safeonline.global/wp-content/uploads/2024/05/Global-Age-Assur-ance-Standards-Summit-Communique-Final.pdf).

27. Further, third-party servicers continue to grow in number and improve the age-verification technology. The AVPA began in 2018 with just six members. It now has thirty members and there are at least forty providers competing in the global market.

28. A number of methods have been developed, initially to verify age exactly, and more recently, to estimate it with an ever-increasing degree of accuracy.

29. ISO/IEC DIS 27566-1 defines five core characteristics of age-assurance systems: functional-ity, performance, privacy, security, and acceptability. Plaintiffs' members could either develop their own age-assurance systems in accordance with the characteristics of ISO/IEC DIS 27566-1 or pro-cure from the marketplace age-assurance systems that are built to those characteristics. I produce, as Exhibit A, a copy of ISO/IEC DIS 27566-1 for the record.

30. ISO/IEC 27566-1 defines three different methods of age assurance:

9

App. 188



| Age assurance methods | | |
|---|---|---|
| **Age verification methods** | **Age estimation methods** | **Age inference methods** |
| Calculating the difference between a verified year or date of birth of an individual and a subsequent date | Analysis of biological or behavioural features of humans that vary with age | Verified information which indirectly implies that an individual is over or under a certain age or within an age range |

31. The Act does not require that social media companies to establish the date of birth of the user, merely that they determine they are not aged under 14, or are aged 14 or 15, or are aged 16 or older.

32. Age verification and age inference can be achieved by, among other methods, reference to drivers' licenses, passports, electoral rolls, credit reports, cellphone-network records, banking, and credit-card records. Users can also choose to create a digital identity and selectively release just their age attributes. This approach enables users to verify their age without disclosing other personal information, such as their name or address, enhancing privacy and control. By leveraging digital identity systems, users can securely authenticate their age for various online services while minimizing the risk of data misuse or unnecessary exposure.

33. Age estimation, on the other hand, can be achieved by analyzing facial images, voiceprints, or other personalized evidence. The most advanced of these, facial estimation, is accurate to within +/-0.8 to 1.2 years mean absolute error, according to the latest published data by a certified age-

10

assurance provider, Yoti Limited. *See Yoti Facial Age Estimation*, Yoti (Sept. 2024), https://www.yoti.com/wp-content/uploads/2024/10/Yoti-Age-Estimation-White-Paper-September-2024-PUBLIC.pdf.  My certification team has independently verified and validated the results of Yoti's testing. Yoti's White Paper also explains the performance levels at different age gateways, including 13, 14, 15, 16 and 18.

34. The value of age estimation for social media companies and consumers is that it does not require consumers to submit any personal information other than a photograph or voiceprint, which is then instantly discarded. This system is already deployed for the purpose of verifying the age of users on social media site Instagram. *Introducing New Ways to Verify Age on Instagram*, Meta (June 23, 2022), (https://about.fb.com/news/2022/06/new-ways-to-verify-age-on-instagram/).  To prevent misuse, advanced age estimation technologies often include anti-spoofing measures, such as liveness detection, which verifies that the image or voice is coming from a real, live person rather than a static photo, video, or recording. Additionally, some systems incorporate continuous authentication techniques, periodically verifying the user's identity during use to ensure the account is not being shared or accessed by someone else.

35. It is important to be clear from the outset that age-*estimation* technology is not *recognition* technology; it detects and assesses information, to give an age estimation, but it does not seek to identify who the person in the image or recording is. No image matching takes place for the purpose of estimating age.

36. A number of features and characteristics of people change with age. This allows for them to be analyzed to estimate age. An example of this is facial features. When facial age estimation is applied, users are either prompted to share a still or video image, or an existing profile picture can be used; and software then estimates their age. Systems learn how to do this by reviewing thousands of images of

11

App. 190

people with a known age to spot patterns common to those of the same age, which means the tech-

nology is becoming better by the day. A live face is detected using liveness detection and then a pixel

level review of the face is undertaken. The image generated by this method does not uniquely recog-

nize any individual.

37. Although social media companies can perform age assurance themselves, they can, and often

do, contract with third-party companies to perform the service (see p.75 *post* for some examples).

38. When using a third-party service, a social media company directs the applicant for or holder

of a user account to provide information directly to the third-party servicer who performs the age

assurance and then informs the social media company of only the check's result—"under 14"; "age

14 or 15"; "over 16" etc. It does not pass on any other information.

39. The third-party servicer does not retain a consumer's personal information other than the date

of birth, which can be used to respond to subsequent enquiries about that user's age.

40. The verification process need only be performed once per user if they return "over 16", and

the verification results for any individual user may be shared within the ecosystem of the social media

company, thereby minimizing the need for multiple age-verification checks of the same individual.

For results returning "under 16", the age verification process would need to proceed to establish if

they were under 14, or aged 14 or 15. It would be likely in a scenario returning an age 14 or 15 that a

date of birth would be retained to ensure the correct application of the appropriate requirements for

parental consent and when such requirements would expire.

41. Age assurance may be performed online from home or anywhere the user has access to the

internet and can usually be completed in less than a minute. The production of ID documents is just

one way to do age verification but it is not the most popular method and, as a result, age-assurance

systems have evolved that do not rely on this method.

12

## Cost of Age Assurance

42. The leading sector requiring robust age verification was initially online gambling. As an industry with a strong return per customer, it tolerated relatively high costs per age check, perhaps as much as a dollar each. Naturally, as the age-assurance industry grew, competition put downward pressure on pricing, and it halved relatively quickly. Age assurance is not advanced ID document verification or know-your-customer checks often used for anti-money laundering or counterterrorist financing controls. These can be much more expensive—perhaps as much as two or three dollars—but are wholly unnecessary to demonstrate compliance with laws, like the Act, that merely require verification of age. Services will do that function at a considerably lower cost.

43. Alongside competitive pressures, underlying costs have also fell. The earliest age-verification methods almost always relied on accessing third-party databases, such as credit reports, for which there was a substantial cost per check. The more successful providers secured volume discounts but were still facing a high fixed cost base. Naturally, providers looked for cheaper ways to deliver their services, so they looked beyond credit reports to banking and telecoms where good quality data was available at a much lower cost, or even at no variable cost at all.

44. As a leader of an independent conformity assessment body, I cannot speak to the specific pricing offered by individual providers. But the UK Government published an Impact Assessment in 2022 for the Online Safety Bill (as it was at the time), which estimated the cost per check to be 12 cents (converted from pence), with a caveat that this cost is expected to continue to fall through innovation, competition, and interoperability. In the UK Government's most recent update (October 2024) preparing for (what is now) the Online Safety Act 2023, they now estimate that the cost could be as low as 0.8 cents per check (converted from pence).

13

App. 192

## The Security of Data

45. Age-assurance providers that are members of the AVPA, and thus sign up to its code of conduct, do not create new databases when conducting age checks. There are, of course, sectors such as online gambling where regulators require audit trails, but the industry's general practice is *not* to retain any personal information after an age check is completed. These audited providers do not create new databases of personal data, nor track the behavior of individuals online.

46. During age-verification processes, age-verification providers apply the same degree of security you would expect in financial transactions.

47. Specifically, age verification companies adhere to a duty to protect personal data and demonstrate their adherence to this duty through various forms of global certification (*e.g.*, ISO 27001, SOC2, Cyber Essentials, BSI PAS 1296, etc.) to ensure personal data is dealt with securely, which are recognized in the US.

48. There is now a global standard in IEEE 2089.1 and an emerging global certification process under it. There is also considerable work progressing on ISO/IEC DIS 27566-1 – Age assurance systems – Part 1: Framework, which will form part of global certification of age-assurance systems.

49. Though age-verification providers share the same risk of attacks as a bank or healthcare provider, these risks are inherent to the internet, not unique to age verification. However, unlike banks and healthcare providers, age-verification providers hold considerably less valuable data, if any data at all, that would be useful to a hacker.

50. In addition to local laws, such as General Data Protection Regulations ("GDPR") in the UK and European Union, there is an industry-wide certification protocol, operated by government-approved auditors, which tests providers against international standards. This not only assesses the

14

efficacy of the age check, but also data-security and privacy measures. Social media companies governed by the Act may choose to use commercially available age-verification providers certified by these regulatory bodies, not only to consolidate their defense against potential legal claims but also to build consumer trust and confidence.

## *Ineffectiveness of Other Methods*

51. Other existing methods for protecting children on the internet, including parental controls and web-filtering technology, are not mutually exclusive with age assurance. For example, both content filtering and age verification could be deployed consecutively or concurrently. Content filtering, however, has flaws and is no substitute for age verification and parental consent.

52. A neutral analysis of content filtering can be found in a report for the European Parliament's Policy Department for Citizens' Rights and Constitutional Affairs. *The Impact of Algorithms for Online Content Filtering or Moderation*, European Parliament (Sept. 2020), bit.ly/3A6jKNK.

53. Filtering applied in the home, on the router or on laptops, tablets, and smartphones, is generally managed by parents. We know from repeated research by the UK's telecom's regulator, OFCOM, that many parents are unaware of this technology. And those aware of it often do not know how to use it, or discover their children also know how to use it and circumvent it. And those who know about it and how to use it must still choose to use it. "Just over a quarter of parents used content filters provided by their broadband supplier, where the filters apply to all devices using that service (27%). A much larger proportion (61%) said they were aware of this feature, showing that not all parents are adopting this potentially useful control." *Children and Parents: Media Use and Attitudes Report 2022*, OFCOM (Mar. 30, 2022), https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf). A survey of U.S.

15

App. 194

parents by Kapersky in 2021 found just 50% used any kind of parental controls. *See Study Finds 50% of Parents Use Parental Control Apps*, Kaspersky (Dec. 2, 2021),

(https://usa.kaspersky.com/about/press-releases/2021_study-finds-50-of-parents-use-parental-control-apps).

54. Directions on how to circumvent parental controls are easily available on the internet, and children are succeeding at getting around parental-control features. *See, e.g.*, Yoree Koh, *Tech-Savvy Kids Defeat Apple's and Others' Parental-Control Features*, Wall St. J. (Dec. 19, 2021), (https://www.foxbusiness.com/features/tech-savvy-kids-defeat-apples-and-others-parental-control-features).

55. Some parents describe supervising the children's internet usage as "a full-time job," *id.*, and that they are losing the "technological arms race over parental controls in the home," Stephen Johnson, *How Your Kids Are Outsmarting All Your Parental Controls*, Lifehacker (Dec. 21, 2021), https://lifehacker.com/how-your-kids-are-outsmarting-all-your-parental-control-1848249586.

56. One study has found that 86% of parents support laws restricting children's access to social media. Brett Cruz, *50% of American Parents Think a TikTok Ban Would Make Kids Safer Online*, Security.org (last updated June 10, 2024), https://www.security.org/digital-safety/parents-react-to-social-media-legislation/.. Another found that 81% of adults in the United States "favor parental consent for minors to use social media." Monica Anderson & Michelle Faverio, *81% of U.S. Adults – Versus 46% of Teens – Favor Parental Consent for Minors to Use Social Media*, Pew Research Ctr. (Oct. 31, 2023), (https://www.pewresearch.org/short-reads/2023/10/31/81-of-us-adults-versus-46-of-teens-favor-parental-consent-for-minors-to-use-social-media/).

57. Children today are adept at leveraging technological tools and exploiting system vulnerabilities to bypass parental controls. Here is an overview of the main strategies employed across various levels of restrictions:

16

App. 195

58. Device-level restrictions, such as parental controls or default operating system settings, aim to limit access to inappropriate content or apps. However, children often circumvent these through:

    a. Factory resetting the device to remove parental control settings. Android and Apple devices both deactivate the parental control settings if the device is reset (Apple says this can be stopped by enabling Activation Lock in the Find My feature) (https://discussions.apple.com/thread/253247939).

    b. Creating secondary or "ghost" accounts without restrictions to access unrestricted content (https://www.parentingwithfocus.org/post/the-complete-guide-to-parental-controls).

    c. Using shared payment methods or family accounts to bypass content filters or download restricted apps.

    d. Gaining administrative control to remove restrictions set by manufacturers or guardians – this is sometimes called 'Jailbreaking'.

59. Network-Based Restrictions, such as firewalls or DNS-based filtering, are implemented to block inappropriate websites across devices connected to the network. Children bypass these using:

    a. Masking their location and bypassing content filtering through encrypted connections, such as the use of virtual private networks.

    b. Accessing restricted content through publicly available proxy sites. It is not impossible to identify these services (they have been blocked for the purpose of content licensing by the likes of Netflix, news sites and subscription TV channels)

    c. Connecting to unrestricted networks, such as mobile data, public Wi-Fi, or a friend's hotspot (the phenomenon of hotspot sharing in schools for popularity, means that

17

App. 196

pupils with less attentive parents to their online browsing can offer connection for other pupils where parents have set up controls).

60. Browser-Level Restrictions such as safe search configurations, or extensions aim to restrict access to adult or harmful content. Common circumvention tactics include:

    a.   Downloading browsers that do not enforce the same restrictions or limitations (such as the Opera (https://www.opera.com/) which has built in tools to avoid restrictions.

    b.   Avoiding detection and restrictions by using modes that do not save browsing history such as Incognito Mode (https://support.google.com/chrome/answer/95464).

    c.   Manipulating URLs to access content without triggering keyword-based restrictions.

61. Applications often include built-in self-declaration tools to limit access to certain features or content. Children evade these using:

    a.   Entering incorrect birthdates to meet the minimum age requirements for apps or services - A third of children claim to be 18 or older on social media, and 22% of 8–17 year olds lie about their age on social media apps (https://www.ofcom.org.uk/online-safety/protecting-children/a-third-of-children-have-false-social-media-age-of-18/)

    b.   Using adult or older sibling accounts to access restricted content.

    c.   Downloading unauthorized versions of applications (called cracked apps) without restrictions from third-party app stores.

    d.   Using exploits, such as trial resets or in-app loopholes, to access restricted content without parental approval.

62. These attack vectors can be applicable to age assurance systems too, however, where the age assurance process is conducted by specialist third party age verification providers, their systems are developed and designed to recognize these attack vectors and mitigate them. Children's ability to

18

circumvent restrictions underscores the need for a multi-layered approach that combines technical solutions with active parental involvement and education. Solutions that evolve with technological advancements and incorporate behavioral insights can better address these challenges. As age assurance has technologically evolved over the last few years, its role in the holistic protection of children from online harm has become more paramount.

63. Research for the Federal Trade Commission (https://www.ftc.gov/system/files/documents/public_events/1582978/betrayed_by_the_guardian_-_security_and_privacy_risk_of_parental_control_solutions.pdf) examines the Security and Privacy Risks of Parental Control Solutions. The report concludes that:

> "Our cross-platform comprehensive analysis of popular solutions shows systematic problems in the design and deployment of all the analyzed solutions (with some exceptions) from a security and privacy point of view. Indeed several of these solutions can undermine children's online and real-world safety. As these solutions are viewed as an essential instrument to provide children a safer online experience by many parents, these solutions should be subjected to more rigorous and systematic evaluation, and more stringent regulations."

64. Filtering software is also an imperfect solution. Many filtering tools collect data on browsing habits. This information can be mishandled or accessed by unauthorized parties. The privacy-infringement concerns raised about age verification also apply to content filtering. Research on Internet Filtering and Adolescent Exposure to Online Sexual Material concluded that caregiver's use of internet filtering had inconsistent and practically insignificant links with young people's reports of encountering sexual material online. Przybylski & Nash, Cyberpsychol Behav Soc Netw. 2018 Jul 1;21(7):405-10,(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6101267/)

65. Filtering software can reflect the biases of its developers, resulting in the blocking of content based on cultural or ideological standards that may not align with the values of all users.

66. The dynamic nature of the internet requires constant updates to filtering algorithms to keep up with new websites and changing content. This maintenance is resource-intensive and often lags behind the creation of new harmful content.

67. High-quality filtering software can be expensive, typically in the range of $4-5 per month per license.

68. Relying solely on content-filtering software can lead to complacency among parents and guardians, who mistakenly believe that the software provides complete protection. This can result in a lack of active engagement and communication with children about safe online behaviors.

69. Content filtering is not a replacement for what the Act requires of social media companies: age verification and parental consent. In short, content filtering is a less effective approach than the one the Act adopts.

## *Parental Consent*

70. Parental consent is generally done separately from age assurance or verification. This process generally occurs after an age-assurance process determines that a user is a minor.

71. There are numerous commercial providers of parental-consent services in the United States through the Children's Online Privacy Protection Act (COPPA) Safe Harbor Program. *See COPPA Safe Harbor Program*, Federal Trade Comm'n (last accessed Oct. 30, 2024), https://www.ftc.gov/enforcement/coppa-safe-harbor-program.

72. In implementing COPPA, the Federal Trade Commission set up a process that enables industry groups to seek safe harbor for how they gain parental consent. The list of currently approved Safe Harbor organizations is:

- Children's Advertising Review Unit (CARU)

20

App. 199

- Entertainment Software Rating Board (ESRB)

- iKeepSafe

- kidSAFE

- Privacy Vaults Online, Inc. (d/b/a PRIVO)

- TRUSTe

73. There are many methods of verifying parental consent, including:

a. Email Verification: This is one of the simplest methods, where a parent receives an email requesting consent and must respond or click a link to confirm.

b. Knowledge-Based Authentication: Here, the parent answers questions only they are likely to know, such as financial or historical details, which are verified against public records.

c. Credit Card or Payment Verification: Many systems verify parental consent by requiring a small charge (often refundable) on a parent's credit card. This method leverages the fact that payment cards are usually only available to adults.

d. Government ID Verification: This method asks parents to upload a scanned ID (such as a driver's license) for identity verification.

e. Video Verification: In this approach, parents participate in a live video verification or upload a short video of themselves providing consent. This method can be reliable, especially if paired with AI for identity matching.

f. Third-Party Verification Services: Some companies use third-party age-assurance providers specializing in parental-consent verification. These services manage verification across various methods (such as ID verification, payment, or biometric checks), and ensure compliance with data protection and privacy laws like GDPR and COPPA.

## *What We've Learned*

74. Age-assurance methods do not necessarily add a new step to a user's visit to a new website or app because, through re-usability and interoperability, one age check can be used across multiple sites seamlessly.

21

75. Some social media companies are already using age-assurance technology in some contexts.

For example:

   a.   Meta has deployed age-assurance measures on Instagram, using Yoti as a provider. *See Introducing New Ways to Verify Age on Instagram*, Meta (June 23, 2022), https://about.fb.com/news/2022/06/new-ways-to-verify-age-on-instagram/. This is also being applied to Instagram Teen accounts.

   b.   TikTok scans public videos of users to help determine account holders' ages. *See* Sarah Perez, *TikTok CEO Says Company Scans Public Videos to Determine Users' Ages*, TechCrunch (Mar. 23, 2023), https://techcrunch.com/2023/03/23/tiktok-ceo-says-company-scans-public-videos-to-determine-users-ages/.

   c.   Google's YouTube Official Blog states, "If our systems are unable to establish that a viewer is above the age of 18, we will request that they provide a valid ID or credit card to verify their age. We've built our age-verification process in keeping with Google's Privacy and Security Principles." *Using Technology to More Consistently Apply Age Restrictions*, YouTube Official Blog (Sept. 22, 2020), https://blog.youtube/news-and-events/using-technology-more-consistently-apply-age-restrictions/.

   d.   If a user tries to change their self-reported age or has been identified as being underage, platforms, including Pinterest, Discord, TikTok, and Google, require users to verify their age with a government-issued ID, credit card, or a live photo.

   e.   PlayStation has deployed age-assurance measures with Yoti. *Age Verification Frequently Asked Questions*, PlayStation (last accessed Oct. 29, 2024), https://www.playstation.com/en-gb/support/account/age-verification-faq/#:~:text=Age%20verification%20allows%20us%20to,by%20our%20service%20provider%2C%20Yoti.

   f.   Age assurance is also now available on social media websites through services like VerifyMy. *VerifyMyAge*, VerifyMy (last accessed Oct. 29, 2024), https://verifymy.io/.

76. Over the past 25 years, the age-verification industry has developed a wider range of ways to verify age that offer users choice, including alternatives to document-based approaches. Users can choose, for example, age-estimation techniques, which do not require ownership or use of a document and where the image is instantly deleted. Many hundreds of millions of age-assurance checks are now undertaken globally each year. The cost has dropped dramatically, with reusability likely to lead to that

22

App. 201

trend continuing so there are no undue burdens on social media companies due to the high costs of implementing full ID-document and know-your-customer level verification technologies. Nor would there necessarily be any significant loss of traffic resulting from the use of these technologies, except, of course, from minors who do not have parental consent.

77. The UK Government estimate in the Impact Assessment for the Online Safety Act 2023 puts the cost per check at 12 cents and possibly as low as 0.8 cents for high volume platforms, but notes that the cost may reduce further through interoperability and growing competition. Those 12 cents also may be defrayed across 100 websites before the check needs to be repeated to maintain the on-going integrity of the age-verification ecosystem, and that is only if businesses determine that periodic re-validation is prudent.

78. Concerns about anonymity have also been addressed. The age-verification sector was created specifically to enable users to access the sites they wished to access through the data-minimized sharing of age. By selecting a trusted third party, even when selective disclosure from full identity documents or a digital-identity wallet is used to prove age, the provider then only confirms "yes" or "no" when a website enquires "is this user an adult?" In Europe, users are given further reassurance by the enforcement of the General Data Protection Regulations; but in the United States, contractual commitments to maintain secrecy and the threat of civil damages claims if that is not applied offer similar protection.

79. Whether or not privacy laws apply, globally AVPA members must adhere to a Code of Conduct that requires privacy and data security. *See Code of Conduct*, Age Verification Provider's Ass'n (last accessed Oct. 29, 2024), https://avpassociation.com/membership/avpa-code-of-conduct/.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based on my personal knowledge.

23

App. 202

App. 203

Executed    Jan 09, 2025


*Tony Allen*
Tony Allen (Jan 9, 2025 21:29 GMT)

Tony Allen

24

**51-9**

# Social Media and Youth Mental Health



The U.S. Surgeon General's Advisory

# Contents

**About the Advisory**                                                                 **3**

**Social Media and Youth Mental Health**                                               **4**

**Social Media Has Both Positive and Negative Impacts on Children and Adolescents**    **5**

The Potential Benefits of Social Media Use Among Children and Adolescents              6

The Potential Harms of Social Media Use Among Children and Adolescents                 6

**What Drives Mental Health and Well-Being Concerns: A Snapshot of the Scientific Evidence**    **8**

Potential Risk of Harm from Content Exposure                                           8

Potential Risk of Harm from Excessive and Problematic Use                              9

**Critical Questions Remain Unanswered**                                               **11**

Known Evidence Gaps                                                                     11

**We Must Take Action: A Way Forward**                                                 **13**

What Policymakers Can Do                                                               15

What Technology Companies Can Do                                                       16

What Parents and Caregivers Can Do                                                     17

What Children and Adolescents Can Do                                                   18

What Researchers Can Do                                                                19

**Acknowledgments**                                                                    **20**

**Endnotes**                                                                           **21**

App. 206

# About the Advisory

A Surgeon General's Advisory is a public statement that calls the American people's attention to an urgent public health issue and provides recommendations for how it should be addressed. Advisories are reserved for significant public health challenges that require the nation's immediate awareness and action.

This Advisory calls attention to the growing concerns about the effects of social media on youth mental health. It explores and describes the current evidence on the positive and negative impacts of social media on children and adolescents, some of the primary areas for mental health and well-being concerns, and opportunities for additional research to help understand the full scope and scale of social media's impact. This document is not an exhaustive review of the literature. Rather, it was developed through a substantial review of the available evidence, primarily found via electronic searches of research articles published in English and resources suggested by a wide range of subject matter experts, with priority given to, but not limited to, meta-analyses and systematic literature reviews. It also offers actionable recommendations for the institutions that can shape online environments — policymakers and technology companies — as well as for what parents and caregivers, young people, and researchers can do.

For additional background and to read other Surgeon General's Advisories, visit **SurgeonGeneral.gov**

App. 207



# Social Media and Youth Mental Health

Social media[1] use by youth is nearly universal. Up to 95% of youth ages 13–17 report using a social media platform, with more than a third saying they use social media "almost constantly."[2] Although age 13 is commonly the required minimum age used by social media platforms in the U.S.,[3] nearly 40% of children ages 8–12 use social media.[4] Despite this widespread use among children and adolescents, robust independent safety analyses on the impact of social media on youth have not yet been conducted. There are increasing concerns among researchers, parents and caregivers, young people, healthcare experts, and others about the impact of social media on youth mental health.[5, 6]

More research is needed to fully understand the impact of social media; however, the current body of evidence indicates that while social media may have benefits for some children and adolescents, there are ample indicators that social media can also have a profound risk of harm to the mental health and well-being of children and adolescents. At this time, we do not yet have enough evidence to determine if social media is sufficiently safe for children and adolescents. We must acknowledge the growing body of research about potential harms, increase our collective understanding of the risks associated with social media use, and urgently take action to create safe and healthy digital environments that minimize harm and safeguard children's and adolescents' mental health and well-being during critical stages of development.

> **Up to 95% of youth ages 13–17 report using a social media platform, with more than a third saying they use social media "almost constantly."**

App. 208

# Social Media Has Both Positive and Negative Impacts on Children and Adolescents

The influence of social media on youth mental health is shaped by many complex factors, including, but not limited to, the amount of time children and adolescents spend on platforms, the type of content they consume or are otherwise exposed to, the activities and interactions social media affords, and the degree to which it disrupts activities that are essential for health like sleep and physical activity.[6] Importantly, different children and adolescents are affected by social media in different ways, based on their individual strengths and vulnerabilities, and based on cultural, historical, and socio-economic factors.[7, 8] There is broad agreement among the scientific community that social media has the potential to both benefit and harm children and adolescents.[6, 9]

Brain development is a critical factor to consider when assessing the risk for harm. Adolescents, ages 10 to 19, are undergoing a highly sensitive period of brain development.[10, 11] This is a period when risk-taking behaviors reach their peak, when well-being experiences the greatest fluctuations, and when mental health challenges such as depression typically emerge.[12, 13, 14] Furthermore, in early adolescence, when identities and sense of self-worth are forming, brain development is especially susceptible to social pressures, peer opinions, and peer comparison.[11, 13] Frequent social media use may be associated with distinct changes in the developing brain in the amygdala (important for emotional learning and behavior) and the prefrontal cortex (important for impulse control, emotional regulation, and moderating social behavior), and could increase sensitivity to social rewards and punishments.[15, 16] As such, adolescents may experience heightened emotional sensitivity to the communicative and interactive nature of social media.[16] Adolescent social media use is predictive of a subsequent decrease in life satisfaction for certain developmental stages including for girls 11–13 years old and boys 14–15 years old.[17] Because adolescence is a vulnerable period of brain development, social media exposure during this period warrants additional scrutiny.

App. 209

Case 4:24-cv-00438-MW-MAF    Document 51-9    Filed 01/13/25    Page 6 of 25
USCA11 Case: 25-11881    Document: 24-1    Date Filed: 08/13/2025    Page: 210 of 229
Social Media Has Both Positive and Negative Impacts on Children and Adolescents



## The Potential Benefits of Social Media Use Among Children and Adolescents

Social media can provide benefits for some youth by providing positive community and connection with others who share identities, abilities, and interests. It can provide access to important information and create a space for self-expression.[9] The ability to form and maintain friendships online and develop social connections are among the positive effects of social media use for youth.[18, 19] These relationships can afford opportunities to have positive interactions with more diverse peer groups than are available to them offline and can provide important social support to youth.[18] The buffering effects against stress that online social support from peers may provide can be especially important for youth who are often marginalized, including racial, ethnic, and sexual and gender minorities.[20, 21, 22] For example, studies have shown that social media may support the mental health and well-being of lesbian, gay, bisexual, asexual, transgender, queer, intersex and other youths by enabling peer connection, identity development and management, and social support.[23] Seven out of ten adolescent girls of color report encountering positive or identity-affirming content related to race across social media platforms.[24] A majority of adolescents report that social media helps them feel more accepted (58%), like they have people who can support them through tough times (67%), like they have a place to show their creative side (71%), and more connected to what's going on in their friends' lives (80%).[25] In addition, research suggests that social media-based and other digitally-based mental health interventions may also be helpful for some children and adolescents by promoting help-seeking behaviors and serving as a gateway to initiating mental health care.[8, 26, 27, 28, 29]

## The Potential Harms of Social Media Use Among Children and Adolescents

Over the last decade, evidence has emerged identifying reasons for concern about the potential negative impact of social media on children and adolescents.

A longitudinal cohort study of U.S. adolescents aged 12–15 (n=6,595) that adjusted for baseline mental health status found that adolescents who spent more than 3 hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety.[30]

App. 210

**Social Media Has Both Positive and Negative Impacts on Children and Adolescents**

As of 2021, 8th and 10th graders now spend an average of 3.5 hours per day on social media.[31] In a unique natural experiment that leveraged the staggered introduction of a social media platform across U.S. colleges, the roll-out of the platform was associated with an increase in depression (9% over baseline) and anxiety (12% over baseline) among college-aged youth (n = 359,827 observations).[32] The study's co-author also noted that when applied across the entirety of the U.S. college population, the introduction of the social media platform may have contributed to more than 300,000 new cases of depression.[32, 33] If such sizable effects occurred in college-aged youth, these findings raise serious concerns about the risk of harm from social media exposure for children and adolescents who are at a more vulnerable stage of brain development.

Limits on the use of social media have resulted in mental health benefits for young adults and adults. A small, randomized controlled trial in college-aged youth found that limiting social media use to 30 minutes daily over three weeks led to significant improvements in depression severity.[34] This effect was particularly large for those with high baseline levels of depression who saw an improvement in depression scores by more than 35%.[35] Another randomized controlled trial among young adults and adults found that deactivation of a social media platform for four weeks improved subjective well-being (i.e., self-reported happiness, life satisfaction, depression, and anxiety) by about 25–40% of the effect of psychological interventions like self-help therapy, group training, and individual therapy.[36]

In addition to these recent studies, correlational research on associations between social media use and mental health has indicated reason for concern and further investigation. These studies point to a higher relative concern of harm in adolescent girls and those already experiencing poor mental health, [37, 38, 39] as well as for particular health outcomes like cyberbullying-related depression,[40] body image and disordered eating behaviors,[41] and poor sleep quality linked to social media use.[42] For example, a study conducted among 14-year-olds (n = 10,904) found that greater social media use predicted poor sleep, online harassment, poor body image, low self-esteem, and higher depressive symptom scores with a larger association for girls than boys.[43] A majority of parents of adolescents say they are somewhat, very, or extremely worried that their child's use of social media could lead to problems with anxiety or depression (53%), lower self-esteem (54%), being harassed or bullied by others (54%), feeling pressured to act a certain way (59%), and exposure to explicit content (71%).[44]

App. 211

# What Drives Mental Health and Well-Being Concerns: A Snapshot of the Scientific Evidence

Scientific evidence suggests that harmful content exposure as well as excessive and problematic social media use are primary areas for concern.

## Potential Risk of Harm from Content Exposure

Extreme, inappropriate, and harmful content continues to be easily and widely accessible by children and adolescents. This can be spread through direct pushes, unwanted content exchanges, and algorithmic designs. In certain tragic cases, childhood deaths have been linked to suicide- and self-harm-related content and risk-taking challenges on social media platforms.[45, 46] This content may be especially risky for children and adolescents who are already experiencing mental health difficulties.[47] Despite social media providing a sense of community for some, a systematic review of more than two dozen studies found that some social media platforms show live depictions of self-harm acts like partial asphyxiation, leading to seizures, and cutting, leading to significant bleeding.[48] Further, these studies found that discussing or showing this content can normalize such behaviors, including through the formation of suicide pacts and posting of self-harm models for others to follow.

Social media may also perpetuate body dissatisfaction, disordered eating behaviors, social comparison, and low self-esteem, especially among adolescent girls.[49, 50, 51, 52] A synthesis of 20 studies demonstrated a significant relationship between social media use and body image concerns and eating disorders, with social comparison as a potential contributing factor.[41] Social comparison driven by social media is associated with body dissatisfaction, disordered eating, and depressive symptoms.[53, 54, 55, 56] When asked about the impact of social media on their body image, nearly half (46%) of adolescents aged 13–17 said social media makes them feel worse, 40% said it makes them feel neither better nor worse, and only 14% said it makes them feel better.[57]

Additionally, roughly two-thirds (64%) of adolescents are "often" or "sometimes" exposed to hate-based content.[58] Among adolescent girls of color, one-third or more report exposure to racist content or language on social media platforms

at least monthly.[24] In a review of 36 studies, a consistent relationship was found between cyberbullying via social media and depression among children and adolescents,[40] with adolescent females and sexual minority youth more likely to report experiencing incidents of cyberbullying.[59, 60] Nearly 75% of adolescents say social media sites are only doing a fair to poor job of addressing online harassment and cyberbullying.[61]

In addition, social media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents (e.g., adults seeking to sexually exploit children, to financially extort them through the threat or actual distribution of intimate images, or to sell illicitly manufactured fentanyl).[62, 63, 64] Adolescent girls and transgender youth are disproportionately impacted by online harassment and abuse, which is associated with negative emotional impacts (e.g., feeling sad, anxious or worried).[65, 66] Nearly 6-in-10 adolescent girls say they've been contacted by a stranger on certain social media platforms in ways that make them feel uncomfortable.[24]

## Potential Risk of Harm from Excessive and Problematic Use

Excessive and problematic use of social media can harm children and adolescents by disrupting important healthy behaviors. Social media platforms are often designed to maximize user engagement, which has the potential to encourage excessive use and behavioral dysregulation.[67, 68, 69, 70] Push notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations are some examples of these features that maximize engagement. According to one recent model, nearly a third (31%) of social media use may be attributable to self-control challenges magnified by habit formation.[71] Further, some researchers believe that social media exposure can overstimulate the reward center in the brain and, when the stimulation becomes excessive, can trigger pathways comparable to addiction.[68, 72] Small studies have shown that people with frequent and problematic social media use can experience changes in brain structure similar to changes seen in individuals with substance use or gambling addictions.[73, 74] In a nationally representative survey of girls aged 11–15, one-third or more say they feel "addicted" to a social media platform.[24] Over half of teenagers report that it would be hard to give

App. 213

**What Drives Mental Health and Well-Being Concerns: A Snapshot of the Scientific Evidence**

up social media.[2] Nearly 3-in-4 teenagers believe that technology companies manipulate users to spend more time on their devices.[68] In addition, according to a survey of 8th and 10th graders, the average time spent on social media is 3.5 hours per day, 1-in-4 spend 5+ hours per day and 1-in-7 spend 7+ hours per day on social media.[31]

Excessive and problematic social media use, such as compulsive or uncontrollable use, has been linked to sleep problems, attention problems, and feelings of exclusion among adolescents.[43, 75, 76, 77] Sleep is essential for the healthy development of adolescents. A systematic review of 42 studies on the effects of excessive social media use found a consistent relationship between social media use and poor sleep quality, reduced sleep duration, sleep difficulties, and depression among youth.[42] Poor sleep has been linked to altered neurological development in adolescent brains, depressive symptoms, and suicidal thoughts and behaviors.[78, 79, 80] On a typical weekday, nearly 1-in-3 adolescents report using screen media until midnight or later.[58] While screen media use encompasses various digital activities, social media applications are the most commonly used applications by adolescents.[58]

In a recent narrative review of multiple studies, problematic social media use has also been linked to both self-reported and diagnosed attention-deficit/hyperactivity disorder (ADHD) in adolescents, although more research is necessary to understand whether one causes the other.[81] A longitudinal prospective study of adolescents without ADHD symptoms at the beginning of the study found that, over a 2-year follow-up, high-frequency use of digital media, with social media as one of the most common activities, was associated with a modest yet statistically significant increased odds of developing ADHD symptoms (OR 1.10; 95% CI, 1.05-1.15).[82] Additionally, social media-induced fear of missing out, or "the pervasive apprehension that others might be having rewarding experiences from which one is absent,"[83] has been associated with depression, anxiety, and neuroticism.[84]

App. 214

# Critical Questions Remain Unanswered

Nearly every teenager in America uses social media, and yet we do not have enough evidence to conclude that it is sufficiently safe for them. Our children have become unknowing participants in a decades-long experiment. It is critical that independent researchers and technology companies work together to rapidly advance our understanding of the impact of social media on children and adolescents. This section describes the known gaps and proposes additional areas for research that warrant urgent consideration.

## Known Evidence Gaps

The relationship between social media and youth mental health is complex and potentially bidirectional.[19] There is broad concern among the scientific community that a lack of access to data and lack of transparency from technology companies have been barriers to understanding the full scope and scale of the impact of social media on mental health and well-being. Most prior research to date has been correlational, focused on young adults or adults, and generated a range of results.[85] Critical areas of research have been proposed to fill knowledge gaps and create evidence-based interventions, resources, and tools to support youth mental health.[86] Thus, there is an urgent need for additional research including on, but not limited to, the following questions:

- How do in-person vs. digital social interactions differ in terms of the impact on health, and what are the unique contributions of social media behavior to social connectedness, social isolation, and mental health symptoms?

- What are the potential pathways through which social media may cause harm to children's and adolescents' mental health and well-being? For example:
  » How does social comparison affect one's sense of life satisfaction and in-person relationships?
  » How does the use of social media, including specific designs and features, relate to dopamine pathways involved in motivation, reward, and addiction?

- What type of content, and at what frequency and intensity, generates the most harm? Through which modes of social media access (e.g., smartphone, computer) and design features? For which users and why?

---

App. 215

**Critical Questions Remain Unanswered**

Known Evidence Gaps

- What are the beneficial effects of social media? For whom are the benefits greatest? In what ways, and under what circumstances?

- What individual-, community-, and societal-level factors may protect youth from the negative effects of social media?

- What types of strategies and approaches are effective in protecting the mental health and well-being of children and adolescents on social media (e.g., programs, policies, design features, interventions, norms)?

- How does social media use interact with a person's developmental stage for measuring risk of mental health impact?

> It is critical that independent researchers and technology companies work together to rapidly advance our understanding of the impact of social media on children and adolescents.

App. 216

# We Must Take Action: A Way Forward

Our children and adolescents don't have the luxury of waiting years until we know the full extent of social media's impact. Their childhoods and development are happening now. While social media use can have positive impacts for some children, the evidence noted throughout this Surgeon General's Advisory necessitates significant concern with the way it is currently designed, deployed, and utilized. Child and adolescent use of platforms designed for adults places them at high risk of "unsupervised, developmentally inappropriate, and potentially harmful" use according to the National Scientific Council on Adolescence.[87] At a moment when we are experiencing a national youth mental health crisis, now is the time to act swiftly and decisively to protect children and adolescents from risk of harm.

To date, the burden of protecting youth has fallen predominantly on children, adolescents, and their families. Parents face significant challenges in managing children and adolescents' use of social media applications, and youth are using social media at increasingly earlier ages.[4, 88] Nearly 70% of parents say parenting is now more difficult than it was 20 years ago, with technology and social media as the top two cited reasons.[89] While nearly all parents believe they have a responsibility to protect their children from inappropriate content online,[89] the entire burden of mitigating the risk of harm of social media cannot be placed on the shoulders of children and parents. Nearly 80% of parents believe technology companies have a responsibility to protect children from inappropriate content as well.[89]

We must provide children and their families with the information and tools to navigate the changing digital environment, but this burden to support our children must be further shared. There are actions technology companies can take to make their platforms safer for children and adolescents. There are actions researchers can take to develop the necessary research base to support further safeguards. And there is a role for local, state, and federal policy to implement protections for our children and adolescents.

The U.S. has a strong history of taking action in such circumstances. In the case of toys, transportation, and medications — among other sectors that have

App. 217

widespread adoption and impact on children — the U.S. has often adopted a safety-first approach to mitigate the risk of harm to consumers. According to this principle, a basic threshold for safety must be met, and until safety is demonstrated with rigorous evidence and independent evaluation, protections are put in place to minimize the risk of harm from products, services, or goods. For example, the Consumer Product Safety Commission requires toy manufacturers to undergo third-party testing and be certified through a Children's Product Certificate as compliant with the federal toy safety standard for toys intended for use by children.[90] To reduce the risk of injury from motor vehicle accidents, the National Highway Traffic Safety Administration requires manufacturers to fit new motor vehicles with standard airbags and seat belts, among other safety features, and conduct crash tests to be compliant with the Federal Motor Vehicle Safety Standards.[91] Medications must demonstrate safety to the Food and Drug Administration before being made available and marketed for use.[92] Given the mounting evidence for the risk of harm to some children and adolescents from social media use, a safety-first approach should be applied in the context of social media products.

To better safeguard the mental health and well-being of children and adolescents, policymakers, technology companies, researchers, families, and young people must all engage in a proactive and multifaceted approach. Through the recommendations below, we can provide more resources and tools to children and families, we can gain a better understanding of the full impact of social media, and we can maximize the benefits and minimize the harms of social media platforms to create safer, healthier online environments for children.

> **We can maximize the benefits and minimize the harms of social media platforms to create safer, healthier online environments for children.**

App. 218

# What Policymakers Can Do

Policymakers play an important role in addressing the complex and multifaceted issues related to social media use and in protecting youth from harm.

- **Strengthen protections to ensure greater safety for children interacting with all social media platforms,** in collaboration with governments, academic organizations, public health experts, and technology companies.

  » **Develop age-appropriate health and safety standards** for technology platforms. Such standards may include designing technology that is appropriate and safe for a child's developmental stage; protecting children and adolescents from accessing harmful content (e.g., content that encourages eating disorders, violence, substance abuse, sexual exploitation, and suicide or discusses suicide means); limiting the use of features that attempt to maximize time, attention, and engagement; developing tools that protect activities that are essential for healthy development like sleep; and regularly assessing and mitigating risks to children and adolescents.

  » **Require a higher standard of data privacy for children** to protect them from potential harms like exploitation and abuse. Six-in-ten adolescents say they think they have little or no control over the personal information that social media companies collect about them.[32]

  » **Pursue policies that further limit access — in ways that minimize the risk of harm — to social media for all children,** including strengthening and enforcing age minimums.

- **Ensure technology companies share data relevant to the health impact of their platforms** with independent researchers and the public in a manner that is timely, sufficiently detailed, and protects privacy.

- **Support the development, implementation, and evaluation of digital and media literacy curricula in schools and within academic standards.** Digital and media literacy provides children and educators with digital skills to strengthen digital resilience, or the ability to recognize, manage, and recover from online risks (e.g., cyberbullying and other forms of online harassment and abuse, as well as excessive social media use).

- **Support increased funding for future research** on both the benefits and harms of social media use and other technology and digital media use for children, adolescents, and families.

- **Engage with international partners** working to protect children and adolescents against online harm to their health and safety.

# What Technology Companies Can Do

Technology companies play a central role and have a fundamental responsibility in designing safe online environments and in preventing, minimizing, and addressing the risks associated with social media.

- **Conduct and facilitate transparent and independent assessments of the impact of social media products and services on children and adolescents.** Assume responsibility for the impact of products on different subgroups and ages of children and adolescents, regardless of the intent behind them.

  » **Be transparent and share assessment findings and underlying data** with independent researchers and the public in a privacy protecting manner.

  » **Assess the potential risks of online interactions and take active steps to prevent potential misuse**, reducing exposure to harms. When proactive responses fail, take immediate action to mitigate unintended negative effects.

  » **Establish scientific advisory committees to inform approaches and policies** aimed at creating safe online environments for children. Scientific advisory committees should be comprised of independent experts and members of user subgroups, including youth.

- **Prioritize user health and safety in the design and development of social media products and services.**[93, 94, 95, 96] Prioritize and leverage expertise in developmental psychology and user mental health and well-being in product teams to minimize risks of harm to children and adolescents.

  » **Ensure default settings for children are set to highest safety and privacy standards**. Provide easy-to-read and highly visible information about policies regarding use by children.

  » **Adhere to and enforce age minimums** in ways that respect the privacy of youth users.

- **Design, develop, and evaluate platforms, products, and tools that foster safe and healthy online environments for youth,** keeping in mind the needs of girls, racial, ethnic, and sexual and gender minorities. The platform design and algorithms should prioritize health and safety as the first principle, seek to maximize the potential benefits, and avoid design features that attempt to maximize time, attention, and engagement.

- **Share data relevant to the health impact of platforms and strategies employed to ensure safety and well-being** with independent researchers and the public in a manner that is timely and protects privacy.

- **Create effective and timely systems and processes to adjudicate requests and complaints from young people, families, educators, and others** to address online abuse, harmful content and interactions, and other threats to children's health and safety. Social media platforms should take these complaints seriously, thoroughly investigate and consider them, and respond in a timely and transparent manner.

# What Parents and Caregivers Can Do

The onus of mitigating the potential harms of social media should not be placed solely on the shoulders of parents and caregivers, but there are steps they can take to help protect and support children and adolescents against the risk of harm.

- **Create a family media plan.**[97] Agreed-upon expectations can help establish healthy technology boundaries at home – including social media use. A family media plan can promote open family discussion and rules about media use and include topics such as balancing screen/online time, content boundaries, and not disclosing personal information. For information on creating a family media plan, visit www.healthychildren. org/MediaUsePlan.

- **Create tech-free zones and encourage children to foster in-person friendships.**[98] Since electronics can be a potential distraction after bedtime and can interfere with sleep, consider restricting the use of phones, tablets, and computers for at least 1 hour before bedtime and through the night. Consider keeping family mealtimes and in-person gatherings device-free to build social bonds and engage in a two-way conversation. Help your child develop social skills and nurture his or her in-person relationships by encouraging unstructured and offline connections with others and making unplugged interactions a daily priority. See the American Academy of Pediatrics (AAP) guidelines for media use.

- **Model responsible social media behavior.** As children often learn behaviors and habits from what they see around them, try to model the behavior you want to see.[97, 99] Parents can set a good example of what responsible and healthy social media use looks like by limiting their own use, being mindful of social media habits (including when and how parents share information or content about their child), and modeling positive behavior on your social media accounts.

- **Teach kids about technology and empower them to be responsible online participants at the appropriate age.**[100] Discuss with children the benefits and risks of social media as well as the importance of respecting privacy and protecting personal information in age-appropriate ways. Have conversations with children about who they are connecting with, their privacy settings, their online experiences, and how they are spending their time online. Empower and encourage them to seek help should they need it. Learn more about the benefits and risks of social media use and get guidance from experts at AAP's Center of Excellence on Social Media and Youth Mental Health and from the American Psychological Association's Health Advisory on Social Media Use in Adolescence.

- **Report cyberbullying and online abuse and exploitation.** Talk to your child about their reporting options, and provide support, without judgment, if he or she tells or shows you that they (a) are being harassed through email, text message, online games, or social media or (b) have been contacted by an adult seeking private images or asking them to perform intimate or sexual acts. You or your child can report cyberbullying to the school and/or the online platform, or your local law enforcement.[101] Visit CyberTipline, Take it Down, or contact your local law enforcement to report any instances of online exploitation.

- **Work with other parents to help establish shared norms and practices and to support programs and policies around healthy social media use.** Such norms and practices among parents facilitate collective action and can make it easier to set and implement boundaries on social media use for children.

App. 221

# What Children and Adolescents Can Do

The burden of mitigating the potential harms of social media does not rest solely on the shoulders of children and adolescents, but there are measures they can take to navigate social media in a safe and healthy way.

- **Reach out for help.** If you or someone you know is being negatively affected by social media, reach out to a trusted friend or adult for help. For information from experts, visit AAP's Center of Excellence on Social Media and Youth Mental Health. If you or someone you know is experiencing a mental health crisis, contact the 988 Suicide and Crisis Lifeline by calling or texting 988 for immediate help.

- **Create boundaries to help balance online and offline activities.** Limit the use of phones, tablets, and computers for at least 1 hour before bedtime and through the night to enable sufficient and quality sleep. Keep mealtimes and in-person gatherings device-free to help build social bonds and engage in two-way conversations with others. Nurture your in-person relationships by connecting with others and making unplugged interactions a daily priority.

- **Develop protective strategies and healthy practices** such as tracking the amount of time you spend online, blocking unwanted contacts and content, learning about and using available privacy and safety settings, learning and utilizing digital media literacy skills to help tell the difference between fact and opinion, and ensuring you are connecting with peers in-person. See this Tip Sheet on Social Media Use and Mental Health for healthy social media use created for and by young people.

- **Be cautious about what you share.** Personal information about you has value. Be selective with what you post and share online and with whom, as it is often public and can be stored permanently. If you aren't sure if you should post something, it's usually best if you don't. Talk to a family member or trusted adult to see if you should.

- **Protect yourself and others.** Harassment that happens in email, text messaging, direct messaging, online games, or on social media is harmful and can be cyberbullying. It might involve trolling, rumors, or photos passed around for others to see – and it can leave people feeling angry, sad, ashamed, or hurt. If you or someone you know is the victim of cyberbullying or other forms of online harassment and abuse:

  » **Don't keep online harassment or abuse a secret.** Reach out to at least one person you trust, such as a close friend, family member, counselor, or teacher, who can give you the help and support you deserve. Visit stopbullying.gov for helpful tips on how to report cyberbullying. If you have experienced online harassment and abuse by a dating partner, contact an expert at Love is Respect for support or if your private images have been taken and shared online without your permission, visit Take it Down to help get them removed.

  » **Don't take part in online harassment or abuse.** Avoid forwarding or sharing messages or images and tell others to stop. Another way is to report offensive content to the site or network where you saw it.

App. 222

# What Researchers Can Do

Researchers play a critical role in helping to gain a better understanding of the full impact of social media on mental health and well-being and informing policy, best practices, and effective interventions.

- **Establish the impact of social media on youth mental health as a research priority and develop a shared research agenda.**[102] Research should include but not be limited to:

  - » **Rigorous evaluation of social media's impact** on youth mental health and well-being, including longitudinal and experimental studies. This could also include research on specific outcomes and clinical diagnoses (e.g., sleep duration and quality, attention, depression, anxiety, and body image), among specific populations (e.g., racial, ethnic, and sexual and gender minorities), and based on specific aspects of social media (e.g., designs, features, and algorithms).

  - » **Role of age, developmental stage, cohort processes, and the in-person environment** in influencing the onset and progression of poor mental health outcomes among social media users.

  - » **Benefits and risks associated** with specific social media designs, features, and content.

  - » **Long-term effects on adults** of social media use during childhood and adolescence.

- **Develop and establish standardized definitions and measures** for social media and mental health outcomes that are regularly evaluated and can be applied across basic research, population surveillance, intervention evaluation, and other contexts.

- **Evaluate best practices for healthy social media use** in collaboration with experts including healthcare providers, parents, and youth.[94, 103, 104]

- **Enhance research coordination and collaboration.** Example opportunities include developing an accessible evidence database and forming a consortium of researchers focused on examining the positive and negative effects of social media on mental health and well-being. Researchers should work with community partners to make research findings publicly accessible and digestible.

---

App. 223

# Acknowledgments

We are grateful to all of the experts, academic researchers, associations, and community-based organizations across the country who shared their insights.

The U.S. Surgeon General's Advisory on Social Media and Youth Mental Health was prepared by the Office of the Surgeon General with valuable contributions from partners across the U.S. Government, including but not limited to:

**Office of the Assistant Secretary for Health (OASH)**

**Office of the General Counsel (OGC)**

**Office of the Assistant Secretary for Planning and Evaluation (ASPE)**

**Centers for Disease Control and Prevention (CDC)**
  Office of the Director

  National Center for Injury Prevention and Control (NCIPC)

  National Center for HIV, Viral Hepatitis, STD, and TB Prevention, Division of Adolescent and School Health (DASH)

**Health Resources and Services Administration (HRSA)**

**National Institutes of Health (NIH)**

***Eunice Kennedy Shriver* National Institute of Child Health and Human Development (NICHD)**

**National Institute of Mental Health (NIMH)**

**Substance Abuse and Mental Health Services Administration (SAMHSA)**

App. 224

# Endnotes

**1.** The definition of social media has been highly debated over the past few decades. As a result, there isn't a single, widely-accepted scholarly definition of social media. (Aichner et al., 2021) The definition may vary from the cited research in this document based on the methods used in each study. In making conclusions and recommendations, this document regards social media as "internet-based channels that allow users to opportunistically interact and selectively self-present, either in real-time or asynchronously, with both broad and narrow audiences who derive value from user-generated content and the perception of interaction with others." (Carr & Hayes, 2015) For the purposes of this product, we did not include studies specific to online gaming or e-sports. **Source:** Aichner, T., Grünfelder, M., Maurer, O., & Jegeni, D. (2021). Twenty-Five Years of Social Media: A Review of Social Media Applications and Definitions from 1994 to 2019. *Cyberpsychology, Behavior And Social Networking*, 24(4), 215–222. https://doi.org/10.1089/cyber.2020.0134 **Source:** Carr, C. T.,  & Hayes, R. A. (2015). Social Media: Defining, Developing, and Divining. *Atlantic Journal of Communication*, 23:1, 46-65. https://doi.org/10.1080/15456870.2015.972282

**2.** Vogels, E., Gelles-Watnick, R. & Massarat, N. (2022). Teens, Social Media and Technology 2022. Pew Research Center: Internet, Science & Tech. United States of America. Retrieved from https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/

**3.** The minimum required age set by social media platforms is informed by the Children's Online Privacy Protection Act that requires social media platforms to collect verifiable parental consent before collecting, storing, and sharing data from children under age 13. **Source:** Federal Trade Commission. (n.d.). Children's Online Privacy Protection Act ("COPPA"). Federal Trade Commission. Retrieved from https://www.ftc.gov/legal-library/browse/statutes/childrens-online-privacy-protection-act

**4.** Rideout, V., Peebles, A., Mann, S., & Robb, M. B. (2022). Common Sense Census: Media use by tweens and teens, 2021. San Francisco, CA: Common Sense. Retrieved from https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf

**5.** It is important to note that many factors can shape mental health, and a comprehensive approach, including prevention strategies, will be needed to support and protect the mental health of children and adolescents. **Source:** Office of the Surgeon General (OSG). (2021). Protecting Youth Mental Health: The U.S. Surgeon General's Advisory. US Department of Health and Human Services. Retrieved from https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf

**6.** American Psychological Association. (2023). Health Advisory on Social Media Use in Adolescence. American Psychological Association. Retrieved from https://www.apa.org/topics/social-media-internet/health-advisory-adolescent-social-media-use.pdf

**7.** Beyens, I., Pouwels, J. L., van Driel, I. I., Keijsers, L., & Valkenburg, P. M. (2020). The effect of social media on well-being differs from adolescent to adolescent. *Scientific reports*, 10(1), 10763. https://doi.org/10.1038/s41598-020-67727-7

**8.**  Hollis, C., Livingstone, S., & Sonuga-Barke, E. (2020). Editorial: The role of digital technology in children and young people's mental health - a triple-edged sword?. *Journal of child psychology and psychiatry, and allied disciplines*, 61(8), 837–841. https://doi.org/10.1111/jcpp.13302

**9.** Uhls, Y. T., Ellison, N. B., & Subrahmanyam, K. (2017). Benefits and Costs of Social Media in Adolescence. *Pediatrics*, 140(Suppl 2), S67–S70. https://doi.org/10.1542/peds.2016-1758E

**10.** Fuhrmann, D., Knoll, L. J., & Blakemore, S. J. (2015). Adolescence as a Sensitive Period of Brain Development. *Trends in cognitive sciences*, 19(10), 558–566. https://doi.org/10.1016/j.tics.2015.07.008

**11.** Blakemore, S. J., & Mills, K. L. (2014). Is adolescence a sensitive period for sociocultural processing?. *Annual review of psychology*, 65, 187–207. https://doi.org/10.1146/annurev-psych-010213-115202

**12.** Romer D. (2010). Adolescent risk taking, impulsivity, and brain development: implications for prevention. *Developmental psychobiology*, 52(3), 263–276. https://doi.org/10.1002/dev.20442

**13.** National Academies of Sciences, Engineering, and Medicine (NASEM). (2019). The Promise of Adolescence: Realizing Opportunity for All Youth. Washington, DC: The National Academies Press. https://doi.org/10.17226/25388

**14.** Kessler, R. C., Amminger, G. P., Aguilar-Gaxiola, S., Alonso, J., Lee, S., & Üstün, T. B. (2007). Age of onset of mental disorders: a review of recent literature. *Current opinion in psychiatry*, 20(4), 359–364. https://doi.org/10.1097/YCO.0b013e32816ebc8c

**15.** Maza, M. T., Fox, K. A., Kwon, S. J., Flannery, J. E., Lindquist, K. A., Prinstein, M. J., & Telzer, E. H. (2023). Association of Habitual Checking Behaviors on Social Media With Longitudinal Functional Brain Development. *JAMA pediatrics*, 177(2), 160–167. https://doi.org/10.1001/jamapediatrics.2022.4924

**16.** Crone, E. A., & Konijn, E. A. (2018). Media use and brain development during adolescence. *Nature communications*, 9(1), 588. https://doi.org/10.1038/s41467-018-03126-x

App. 225

17. Orben, A., Przybylski, A. K., Blakemore, S. J., & Kievit, R. A. (2022). Windows of developmental sensitivity to social media. *Nature communications*, 13(1), 1649. https://doi.org/10.1038/s41467-022-29296-3

18. Anderson, M. & Jiang, J. (2018). Teens' Social Media Habits and Experiences. Pew Research Center: Internet, Science & Tech. United States of America. Retrieved from https://www.pewresearch.org/internet/2018/11/28/teens-social-media-habits-and-experiences/

19. Seabrook, E. M., Kern, M. L., & Rickard, N. S. (2016). Social Networking Sites, Depression, and Anxiety: A Systematic Review. *JMIR mental health*, 3(4), e50. https://doi.org/10.2196/mental.5842

20. According to the National Institutes of Health, sexual and gender minority (SGM) populations include, but are not limited to, individuals who identify as lesbian, gay, bisexual, asexual, transgender, Two-Spirit, queer, and/or intersex. Individuals with same-sex or -gender attractions or behaviors and those with a difference in sex development are also included. These populations also encompass those who do not self-identify with one of these terms but whose sexual orientation, gender identity or expression, or reproductive development is characterized by non-binary constructs of sexual orientation, gender, and/or sex. **Source:** U.S. Department of Health and Human Services. National Institutes of Health. (2022, December 8). Sex, gender, and Sexuality. National Institutes of Health. https://www.nih.gov/nih-style-guide/sex-gender-sexuality

21. Charmaraman, L., Hernandez, J., & Hodes, R. (2022). Marginalized and Understudied Populations Using Digital Media. In J. Nesi, E. Telzer, & M. Prinstein (Eds.), Handbook of Adolescent Digital Media Use and Mental Health (pp. 188-214). Cambridge: Cambridge University Press. https://doi.org/10.1017/9781108976237.011

22. Ybarra, M. L., Mitchell, K. J., Palmer, N. A., & Reisner, S. L. (2015). Online social support as a buffer against online and offline peer and sexual victimization among U.S. LGBT and non-LGBT youth. *Child abuse & neglect*, 39, 123–136. https://doi.org/10.1016/j.chiabu.2014.08.006

23. Berger, M. N., Taba, M., Marino, J. L., Lim, M. S. C., & Skinner, S. R. (2022). Social Media Use and Health and Well-being of Lesbian, Gay, Bisexual, Transgender, and Queer Youth: Systematic Review. *Journal of medical Internet research*, 24(9), e38449. https://doi.org/10.2196/38449

24. Nesi, J., Mann, S. and Robb, M. B. (2023). Teens and mental health: How girls really feel about social media. San Francisco, CA: Common Sense. Retrieved from https://www.commonsensemedia.org/sites/default/files/research/report/how-girls-really-feel-about-social-media-researchreport_final_1.pdf

25. Vogels, E., & Gelles-Watnick, R. (2023). Teens and social media: Key findings from Pew Research Center surveys. Pew Research Center: Internet, Science & Tech. United States of America. Retrieved from https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys/

26. Kauer, S. D., Mangan, C., & Sanci, L. (2014). Do online mental health services improve help-seeking for young people? A systematic review. *Journal of medical Internet research*, 16(3), e66. https://doi.org/10.2196/jmir.3103

27. Rice, S. M., Goodall, J., Hetrick, S. E., Parker, A. G., Gilbertson, T., Amminger, G. P., Davey, C. G., McGorry, P. D., Gleeson, J., & Alvarez-Jimenez, M. (2014). Online and social networking interventions for the treatment of depression in young people: a systematic review. *Journal of medical Internet research*, 16(9), e206. https://doi.org/10.2196/jmir.3304

28. Ridout, B., & Campbell, A. (2018). The Use of Social Networking Sites in Mental Health Interventions for Young People: Systematic Review. *Journal of medical Internet research*, 20(12), e12244. https://doi.org/10.2196/12244

29. Kruzan, K. P., Williams, K. D. A., Meyerhoff, J., Yoo, D. W., O'Dwyer, L. C., De Choudhury, M., & Mohr, D. C. (2022). Social media-based interventions for adolescent and young adult mental health: A scoping review. *Internet interventions*, 30, 100578. https://doi.org/10.1016/j.invent.2022.100578

30. Riehm, K. E., Feder, K. A., Tormohlen, K. N., Crum, R. M., Young, A. S., Green, K. M., Pacek, L. R., La Flair, L. N., & Mojtabai, R. (2019). Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth. *JAMA psychiatry*, 76(12), 1266–1273. https://doi.org/10.1001/jamapsychiatry.2019.2325

31. Miech, R. A., Johnston, L. D., Bachman, J. G., O'Malley, P. M., Schulenberg, J. E., and Patrick, M. E. (2022). Monitoring the Future: A Continuing Study of American Youth (8th- and 10th-Grade Surveys), 2021. Inter-university Consortium for Political and Social Research [distributor]. https://doi.org/10.3886/ICPSR38502.v1

32. Braghieri, L., Levy, R., & Makarin, A. (2022). Social Media and Mental Health. *American Economic Review*, 112(11), 3660-3693. https://pubs.aeaweb.org/doi/abs/10.1257/aer.20211218

33. Doucleff, M. (2023, April 25). The Truth About Teens, Social Media and the Mental Health Crisis. NPR. Retrieved May 2, 2023, from https://www.npr.org/sections/health-shots/2023/04/25/1171773181/social-media-teens-mental-health

34. Hunt, M. G., Marx, R., Lipson, C., & Young, J. (2018). No more FOMO: Limiting social media decreases loneliness and depression. *Journal of Social and Clinical Psychology, 37*(10), 751–768. https://doi.org/10.1521/jscp.2018.37.10.751

35. From a mean Beck Depression Inventory (BDI) of 23 at baseline to a mean BDI of 14.5 at Week 4.

36. Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The Welfare Effects of Social Media. *American Economic Review*, 110(3), 629-76. DOI: 10.1257/aer.20190658

37. Abi-Jaoude, E., Naylor, K. T., & Pignatiello, A. (2020). Smartphones, social media use and youth mental health. *Canadian Medical Association journal*, 192(6), E136–E141. https://doi.org/10.1503/cmaj.190434

**38.** Orben, A., & Przybylski, A. K. (2020). Reply to: Underestimating digital media harm. *Nature human behaviour*, 4(4), 349–351. https://doi.org/10.1038/s41562-020-0840-y

**39.** Twenge, J. M., Haidt, J., Lozano, J., & Cummins, K. M. (2022). Specification curve analysis shows that social media use is linked to poor mental health, especially among girls. *Acta psychologica*, 224, 103512. https://doi.org/10.1016/j.actpsy.2022.103512

**40.** Hamm, M. P., Newton, A. S., Chisholm, A., Shulhan, J., Milne, A., Sundar, P., Ennis, H., Scott, S. D., & Hartling, L. (2015). Prevalence and Effect of Cyberbullying on Children and Young People: A Scoping Review of Social Media Studies. *JAMA pediatrics*, 169(8), 770–777. https://doi.org/10.1001/jamapediatrics.2015.0944

**41.** Holland, G., & Tiggemann, M. (2016). A systematic review of the impact of the use of social networking sites on body image and disordered eating outcomes. *Body image*, 17, 100–110. https://doi.org/10.1016/j.bodyim.2016.02.008

**42.** Alonzo, R., Hussain, J., Stranges, S., & Anderson, K. K. (2021). Interplay between social media use, sleep quality, and mental health in youth: A systematic review. *Sleep medicine reviews*, 56, 101414. https://doi.org/10.1016/j.smrv.2020.101414

**43.** Kelly, Y., Zilanawala, A., Booker, C., & Sacker, A. (2019). Social Media Use and Adolescent Mental Health: Findings From the UK Millennium Cohort Study. *EClinicalMedicine*, 6, 59–68. https://doi.org/10.1016/j.eclinm.2018.12.005

**44.** Gelles-Watnick, R. (2022). Explicit Content, Time-wasting Are Key Social Media Worries For Parents Of U.S. Teens. Pew Research Center. United States of America. Retrieved from https://www.pewresearch.org/fact-tank/2022/12/15/explicit-content-time-wasting-are-key-social-media-worries-for-parents-of-u-s-teens/

**45.** Dyer C. (2022). Social media content contributed to teenager's death "in more than a minimal way," says coroner. *BMJ* (Clinical research ed.), 379, o2374. https://doi.org/10.1136/bmj.o2374

**46.** Carville, O. (2022, November 30). TikTok's Viral Challenges Keep Luring Young Kids to Their Deaths. Bloomberg. Retrieved from https://www.bloomberg.com/news/features/2022-11-30/is-tiktok-responsible-if-kids-die-doing-dangerous-viral-challenges

**47.** Sumner, S. A., Ferguson, B., Bason, B., Dink, J., Yard, E., Hertz, M., Hilkert, B., Holland, K., Mercado-Crespo, M., Tang, S., & Jones, C. M. (2021). Association of Online Risk Factors With Subsequent Youth Suicide-Related Behaviors in the US. *JAMA network open*, 4(9), e2125860. https://doi.org/10.1001/jamanetworkopen.2021.25860

**48.** Dyson, M. P., Hartling, L., Shulhan, J., Chisholm, A., Milne, A., Sundar, P., Scott, S. D., & Newton, A. S. (2016). A Systematic Review of Social Media Use to Discuss and View Deliberate Self-Harm Acts. *PloS one*, 11(5), e0155813. https://doi.org/10.1371/journal.pone.0155813

**49.** Lonergan, A. R., Bussey, K., Fardouly, J., Griffiths, S., Murray, S. B., Hay, P., Mond, J., Trompeter, N., & Mitchison, D. (2020). Protect me from my selfie: Examining the association between photo-based social media behaviors and self-reported eating disorders in adolescence. *The International journal of eating disorders*, 53(5), 485–496. https://doi.org/10.1002/eat.23256

**50.** Meier, E. P., & Gray, J. (2014). Facebook photo activity associated with body image disturbance in adolescent girls. *Cyberpsychology, behavior and social networking*, 17(4), 199–206. https://doi.org/10.1089/cyber.2013.0305

**51.** Thai, H., Davis, C. G., Mahboob, W., Perry, S., Adams, A., & Goldfield, G. S. (2023). Reducing Social Media Use Improves Appearance and Weight Esteem in Youth With Emotional Distress. *Psychology of Popular Media*. 10.1037/ppm0000460.

**52.** Vogel, E. A., Rose, J. P., Roberts, L. R., & Eckles, K. (2014). Social comparison, social media, and self-esteem. *Psychology of Popular Media Culture*, 3(4), 206–222. https://doi.org/10.1037/ppm0000047

**53.** Nesi, J., & Prinstein, M. J. (2015). Using Social Media for Social Comparison and Feedback-Seeking: Gender and Popularity Moderate Associations with Depressive Symptoms. *Journal of abnormal child psychology*, 43(8), 1427–1438. https://doi.org/10.1007/s10802-015-0020-0

**54.** Appel, H., Gerlach, A. L., & Crusius, J. (2016). The Interplay Between Facebook Use, Social Comparison, Envy, And Depression. *Current Opinion in Psychology*, 9, 44–49. https://doi.org/10.1016/j.copsyc.2015.10.006

**55.** Kleemans, M., Daalmans, S., Carbaat, I., & Anschütz, D. (2018). Picture Perfect: The Direct Effect Of Manipulated Instagram Photos On Body Image In Adolescent Girls. *Media Psychology*, 21(1), 93–110. https://doi.org/10.1080/15213269.2016.1257392

**56.** Mabe, A. G., Forney, K. J., & Keel, P. K. (2014). Do You "Like" My Photo? Facebook Use Maintains Eating Disorder Risk. *The International journal of eating disorders*, 47(5), 516–523. https://doi.org/10.1002/eat.22254

**57.** Bickham, D.S., Hunt, E., Bediou, B., & Rich, M. (2022). Adolescent Media Use: Attitudes, Effects, and Online Experiences. Boston, MA: Boston Children's Hospital Digital Wellness Lab. Retrieved from https://digitalwellnesslab.org/wp-content/uploads/Pulse-Survey_Adolescent-Attitudes-Effects-and-Experiences.pdf

**58.** Rideout, V., & Robb, M. B. (2018). Social media, social life: Teens reveal their experiences. San Francisco, CA: Common Sense Media. Retrieved from https://www.commonsensemedia.org/sites/default/files/research/report/2018-social-media-social-life-executive-summary-web.pdf

**59.** Alhajji, M., Bass, S., & Dai, T. (2019). Cyberbullying, Mental Health, and Violence in Adolescents and Associations With Sex and Race: Data From the 2015 Youth Risk Behavior Survey. *Global pediatric health*, 6, 2333794X19868887. https://doi.org/10.1177/2333794X19868887

App. 227

60. Rice, E., Petering, R., Rhoades, H., Winetrobe, H., Goldbach, J., Plant, A., Montoya, J., & Kordic, T. (2015). Cyberbullying perpetration and victimization among middle-school students. *American journal of public health*, 105(3), e66–e72. https://doi.org/10.2105/AJPH.2014.302393

61. Vogels, E. (2022). Teens and Cyberbullying 2022. Pew Research Center: Internet, Science & Tech. United States of America. Retrieved from https://www.pewresearch.org/internet/2022/12/15/teens-and-cyberbullying-2022/

62. Wolak, J., Finkelhor, D., Walsh, W., & Treitman, L. (2018). Sextortion of Minors: Characteristics and Dynamics. *The Journal of adolescent health,* 62(1), 72–79. https://doi.org/10.1016/j.jadohealth.2017.08.014

63. Federal Bureau of Investigations. (2022, December 19). FBI and Partners Issue National Public Safety Alert on Financial Sextortion Schemes. FBI. Retrieved from https://www.fbi.gov/news/press-releases/fbi-and-partners-issue-national-public-safety-alert-on-financial-sextortion-schemes

64. U.S. Drug Enforcement Administration. (2021, July 23). DEA Washington warns of deadly counterfeit drugs on social media. DEA. Retrieved from https://www.dea.gov/stories/2021/2021-07/2021-07-23/counterfeit-drugs-social-media

65. Finkelhor, D., Turner, H.A., & Colburn, D. (2023). Which dynamics make online child sexual abuse and cyberstalking more emotionally impactful: Perpetrator identity and images? *Child Abuse & Neglect*, 137, 106020. https://doi.org/10.1016/j.chiabu.2023.106020

66. Finkelhor, D., Turner, H., & Colburn, D. (2022). Prevalence of Online Sexual Offenses Against Children in the US. *JAMA network open*, 5(10), e2234471. https://doi.org/10.1001/jamanetworkopen.2022.34471

67. 5Rights Foundation. (2021). Pathways: How Digital Design Puts Children At Risk. Retrieved from https://5rightsfoundation.com/uploads/Pathways-how-digital-design-puts-children-at-risk.pdf

68. Kuss, D. J., & Griffiths, M. D. (2011). Online social networking and addiction--a review of the psychological literature. *International journal of environmental research and public health*, 8(9), 3528–3552. https://doi.org/10.3390/ijerph8093528

69. Griffiths, M.D. (2018). Adolescent social networking: How do social media operators facilitate habitual use? *Education and Health*, 36(3), 66-69. Retrieved from https://sheu.org.uk/sheux/EH/eh363mdg.pdf

70. Marino, C., Gini, G., Vieno, A., & Spada, M. M. (2018). The associations between problematic Facebook use, psychological distress and well-being among adolescents and young adults: A systematic review and meta-analysis. *Journal of affective disorders*, 226, 274–281. https://doi.org/10.1016/j.ypmed.2020.106270

71. Allcott, H., Gentzkow, M., & Song, L. (2022). Digital Addiction. *American Economic Review*, 112 (7): 2424-63. https://doi.org/10.1257/aer.20210867

72. Andreassen, C. S. (2015). Online Social Network Site Addiction: A Comprehensive Review. *Current Addiction Reports*, 2, 175–184. https://doi.org/10.1007/s40429-015-0056-9

73. He, Q., Turel, O., & Bechara, A. (2017). Brain anatomy alterations associated with Social Networking Site (SNS) addiction. *Scientific reports*, 7, 45064. https://doi.org/10.1038/srep45064

74. Montag, C., Markowetz, A., Blaszkiewicz, K., Andone, I., Lachmann, B., Sariyska, R., Trendafilov, B., Eibes, M., Kolb, J., Reuter, M., Weber, B., & Markett, S. (2017). Facebook Usage On Smartphones And Gray Matter Volume Of The Nucleus Accumbens. *Behavioural Brain Research*, 329, 221–228. https://doi.org/10.1016/j.bbr.2017.04.035

75. Shannon, H., Bush, K., Villeneuve, P. J., Hellemans, K. G., & Guimond, S. (2022). Problematic Social Media Use in Adolescents and Young Adults: Systematic Review and Meta-analysis. *JMIR mental health*, 9(4), e33450. https://doi.org/10.2196/33450

76. Boer, M., Stevens, G., Finkenauer, C., & van den Eijnden, R. (2020). Attention deficit hyperactivity disorder-symptoms, social media use intensity, and social media use problems in adolescents: Investigating directionality. *Child Development*, 91(4), e853-e865. https://doi.org/10.1111/cdev.13334

77. Franchina, V., Vanden Abeele, M., van Rooij, A. J., Lo Coco, G., & De Marez, L. (2018). Fear of Missing Out as a Predictor of Problematic Social Media Use and Phubbing Behavior among Flemish Adolescents. *International Journal Of Environmental Research And Public Health*, 15(10), 2319. https://doi.org/10.3390/ijerph15102319

78. Telzer, E. H., Goldenberg, D., Fuligni, A. J., Lieberman, M. D., & Gálvan, A. (2015). Sleep variability in adolescence is associated with altered brain development. *Developmental cognitive neuroscience*, 14, 16–22. https://doi.org/10.1016/j.dcn.2015.05.007

79. Liu, R. T., Steele, S. J., Hamilton, J. L., Do, Q. B. P., Furbish, K., Burke, T. A., Martinez, A. P., & Gerlus, N. (2020). Sleep and suicide: A systematic review and meta-analysis of longitudinal studies. *Clinical psychology review*, 81, 101895. https://doi.org/10.1016/j.cpr.2020.101895

80. Shochat, T., Cohen-Zion, M., & Tzischinsky, O. (2014). Functional consequences of inadequate sleep in adolescents: a systematic review. *Sleep medicine reviews*, 18(1), 75–87. https://doi.org/10.1016/j.smrv.2013.03.005

81. Dekkers, T. J., & van Hoorn, J. (2022). Understanding Problematic Social Media Use in Adolescents with Attention-Deficit/Hyperactivity Disorder (ADHD): A Narrative Review and Clinical Recommendations. *Brain Sciences*, 12(12), 1625. https://doi.org/10.3390/brainsci12121625

82. Ra, C. K., Cho, J., Stone, M. D., De La Cerda, J., Goldenson, N. I., Moroney, E., Tung, I., Lee, S. S., & Leventhal, A. M. (2018). Association of Digital Media Use With Subsequent Symptoms of Attention-Deficit/Hyperactivity Disorder Among Adolescents. *JAMA*, 320(3), 255–263. https://doi.org/10.1001/jama.2018.8931

83. Przybylski A. K., Murayama K., DeHaan C.R., & Gladwell V. (2013). Motivational, emotional, and behavioral correlates of fear of missing out. *Computers in Human Behavior*; 29:1841–1848.

84. Fioravanti, G., Casale, S., Benucci, S.B., Prostamo, A., Falone, A., Ricca, V., & Rotella, F. (2021). Fear of missing out and social networking sites use and abuse: A meta-analysis. *Computers in Human Behavior*, 122, 106839. https://doi.org/10.1016/j.chb.2021.106839

85. Odgers, C. L., & Jensen, M. R. (2020). Annual Research Review: Adolescent mental health in the digital age: facts, fears, and future directions. *Journal of Child Psychology and Psychiatry*, and Allied Disciplines, 61(3), 336–348. https://doi.org/10.1111/jcpp.13190

86. Office of the Surgeon General (OSG). (2021). Protecting Youth Mental Health: The U.S. Surgeon General's Advisory. U.S. Department of Health and Human Services. Retrieved from https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf

87. Odgers, C.L., Allen, N.B., Pfeifer, J.H., Dahl, R.E., Nesi, J., Schueller, S.M., Williams, J. L., & the National Scientific Council on Adolescence (2022). Engaging, safe, and evidence-based: What science tells us about how to promote positive development and decrease risk in online spaces, Council Report No 2. doi: 10.31234/osf.io/rvn8q

88. Clark, S. J., Schultz, S. L., Gebremariam, A., Singer, D. C., & Freed, G. L. (2021). Sharing too soon? Children and social media apps. C.S. Mott Children's Hospital National Poll on Children's Health, University of Michigan, 39(4). Retrieved from https://mottpoll.org/sites/default/files/documents/101821_SocialMedia.pdf

89. Auxier, B., Anderson, M., Perrin, A., & Turner, E. (2020). Parenting Children in the Age of Screens. Pew Research Center: Internet, Science & Tech. Retrieved from https://www.pewresearch.org/internet/2020/07/28/parenting-children-in-the-age-of-screens/

90. U.S. Consumer Product Safety Commission. (n.d.). Toy Safety Business Guidance & Small Entity Compliance Guide. U.S. Consumer Product Safety Commission. Retrieved from https://www.cpsc.gov/Business--Manufacturing/Business-Education/Toy-Safety-Business-Guidance-and-Small-Entity-Compliance-Guide

91. Unites States Department of Transportation. (n.d.). National Highway Traffic Safety Administration. Retrieved from https://www.nhtsa.gov/

92. U.S. Food and Drug Administration. (n.d.). Center for Drug Evaluation and Research. U.S. Food and Drug Administration. Retrieved from https://www.fda.gov/drugs

93. Australian Government, eSafety Commissioner. (nd). Safety by Design. Retrieved from https://www.esafety.gov.au/industry/safety-by-design

94. Information Commissioner's Office. (nd). Introduction To The Age Appropriate Design Code. Retrieved from https://ico.org.uk/for-organisations/childrens-code-hub/

95. Perrino, J. (2022, July 27). Using "Safety By Design" To Address Online Harms. Brookings Institute. https://www.brookings.edu/techstream/using-safety-by-design-to-address-online-harms/

96. Lenhart, A., & Owens, K. (2021). The Unseen Teen: The Challenges of Building Healthy Tech for Young People. Data & Society. Retrieved from https://datasociety.net/library/the-unseen-teen/

97. American Academy of Pediatrics (AAP). (2018, October 8). Kids & Tech: Tips for parents in the Digital age. HealthyChildren.org. Retrieved from https://www.healthychildren.org/English/family-life/Media/Pages/Tips-for-Parents-Digital-Age.aspx

98. Morgan Stanley Alliance For Children's Mental Health & Child Mind Institute. (2022, May). How to set limits on screen time and internet use. Retrieved from https://www.morganstanley.com/assets/pdfs/setting-limits-on-screen-time-tip-sheet.pdf

99. Ehmke, R. (2023, March 13). How using social media affects teenagers. Child Mind Institute. Retrieved from https://childmind.org/article/how-using-social-media-affects-teenagers/

100. American Psychological Association. (2019, December 12). Digital Guidelines: Promoting healthy technology use for children. American Psychological Association. Retrieved from https://www.apa.org/topics/social-media-internet/technology-use-children

101. US Department of Health and Human Services, Assistant Secretary for Public Affairs (ASPA). (2021, November 10). Prevent cyberbullying. StopBullying.gov. Retrieved from https://www.stopbullying.gov/cyberbullying/prevention https://www.stopbullying.gov/cyberbullying/how-to-report

102. National Academies of Sciences, Engineering, and Medicine (NASEM). (n.d.). Assessment of the Impact of Social Media on the Health and Wellbeing of Adolescents and Children. Retrieved from https://www.nationalacademies.org/our-work/assessment-of-the-impact-of-social-media-on-the-health-and-wellbeing-of-adolescents-and-children

103. American Academy of Pediatrics. (2023, February 7). Center of Excellence on Social Media and Youth Mental Health. Retrieved from https://www.aap.org/en/patient-care/media-and-children/center-of-excellence-on-social-media-and-youth-mental-health/#:~:text=What%20We%20Do,protect%20youth%20mental%20health%20online

104. American Academy of Pediatrics. (2017). *Bright Futures Guidelines for Health Supervision of Infants, Children, and Adolescents* (4th ed., pp. 229-234). American Academy of Pediatrics. https://downloads.aap.org/AAP/PDF/Bright%20Futures/BF4_HealthySocialMedia.pdf