No. 25-11881

# In the United States Court of Appeals for the Eleventh Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ET AL.,
*Plaintiffs-Appellees*,

V.

JAMES UTHMEIER, IN HIS OFFICIAL CAPACITY AS FLORIDA ATTORNEY GENERAL,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

## APPENDIX VOLUME 2

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

August 13, 2025

*Counsel for Appellant*

App. 230

# Index

Docket/Tab#

**Volume 1**

District Court Docket Sheet ...........................................................................................A

Complaint ......................................................................................................................1

Declaration of Jean Twenge, Ph.D. ........................................................................51-1

Declaration of Adam Alter, Ph.D. ..........................................................................51-2

Declaration of Tony Allen.........................................................................................51-3

U.S. Surgeon General's Advisory on Social Media and Youth Mental Health......51-9

**Volume 2**

Preliminary Injunction Hearing Transcript...............................................................71

Order Denying Motion for Preliminary Injunction ..................................................72

Order Granting Motion to Dismiss ...........................................................................73

Amended Complaint....................................................................................................74

**Volume 3**

Order Granting Renewed Motion for Preliminary Injunction ..............................94

Attorney General's Notice of Appeal .......................................................................95

71

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS      )
INDUSTRY ASSOCIATION, et al.,  )
                               )
            Plaintiffs,        ) Case No: 4:24cv438
                               )
       v.                      ) Tallahassee, Florida
                               ) February 28, 2025
JAMES UTHMEIER, in his official)
capacity as Attorney General   )
of the State of Florida,       )
                               )
                               ) 9:00 AM
            Defendant.         )
_____)

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 137)**

Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                           111 North Adams Street
                           Tallahassee, Florida 32301
                           megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:


For the Plaintiffs:        Clement & Murphy PLLC
                           By:  ERIN E. MURPHY
                                JAMES XI
                                KEVIN JOSEPH WYNOSKY
                                MITCHELL KESHAVA PALLAKI
                                Attorneys at Law
                                erin.murphy@clementmurphy.com
                                james.xi@clementmurphy.com
                                kevin.wynosky@clementmurphy.com
                                mitchell.pallaki@clementmurphy.com
                           706 Duke Street
                           Alexandria, Virginia 22314


                           Stearns Weaver Miller
                           By:  DOUGLAS L. KILBY
                                Attorney at Law
                                dkilby@stearnsweaver.com
                           106 East College Avenue
                           Suite 700
                           Tallahassee, Florida 32301


For the Defendant:         Office of the Attorney General
                           By:  KEVIN A GOLEMBIEWSKI
                                DAVID M. COSTELLO
                                Attorneys at Law
                           kevin.golembiewski@myfloridalegal.com
                           david.costello@myfloridalegal.com
                           3507 East Frontage Road
                           Suite 200
                           Tampa, Florida 33607


                           Florida Attorney General's Office
                           By:  JOHN M. GUARD
                                DARRICK WILLIAM MONSON
                                ANITA J. PATEL
                                Attorneys at Law
                                john.guard@myfloridalegal.com
                                darrick.monson@myfloridalegal.com
                                anita.patel@myfloridalegal.com
                           PL-01 The Capitol
                           Tallahassee, Florida 32399

App. 234

APPEARANCES (Cont'd.):

For the Defendant:          Florida Attorney General's Office
                            By:  DAVID M. COSTELLO
                                 Attorney at Law
                            david.costello@myfloridalegal.com
                            3501 East Frontage Road
                            Suite 200
                            Tampa, Florida 33606Firm}

**P R O C E E D I N G S**

(Call to Order of the Court at 9:00 AM on Friday, February 28, 2025.)

THE COURT:  Please take your seats.

All right.  We are here for a hearing on a preliminary injunction, Case No. 4:24cv438.  I issued an order on the hearing procedures on February 25th.

The matter has been well-briefed by the parties.  The last word, in terms of filings, was from the plaintiffs in terms of the reply as it relates to the preliminary injunction, that is, as distinguished from the motion to dismiss.  So I indicated we'll start with counsel for the defense.

Counsel, you may proceed.

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

I was going to set up a PowerPoint if that's okay.

THE COURT:  That's fine.

(Pause in proceedings.)

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

Kevin Golembiewski for the Attorney General of Florida.

There's broad bipartisan agreement, Your Honor, that social media platforms are addicting kids to their products. There's also broad agreement about the features that are fostering that addiction.  Those features, according to the U.S. Surgeon General for the Biden Administration, include

App. 236

infinite scroll, auto play, displaying personalized metrics, and other commercial practices that manipulate kids into spending more and more time scrolling and on the platform. They do that by short-circuiting kids' self-control mechanisms and overstimulating the reward systems in their brains. Children have less cognitive defenses against those types of practices. And, as a result, they are more likely to be hooked.

As a result of platforms' decision to use these practices to maximize bottom lines, kids across this country have experienced behavioral addiction to platforms, and we've seen a mental health crisis in this country that has harmed a generation of children.

In March 2024, the Florida legislation passed HB 3 in an effort to make a dent in this public health crisis. Plaintiffs are trade associations that challenge HB 3 on First Amendment grounds, and they seek a preliminary injunction enjoining multiple provisions of a statutory scheme, but they have not established clear entitlement to that extraordinary relief for multiple reasons, including they haven't established standing, and the claims fail on the merits.

Before jumping into the merits and standing, Your Honor, I just want to do some table-setting about the law and about the scope of plaintiffs' claims. So the aim of the law is to address compulsive use; it is not focused on content or kids engaging with material they find interesting. And

that's confirmed by the fact that if a platform simply chooses not to use these addictive features, these harmful practices, kids can contract with the platform to create an account and they can spend as much time as they want. The law is not concerned with time spent on platforms.

This makes HB 3 materially different than the social media laws in other states that plaintiffs have repeatedly referenced in their filings. They reference and rely on: *Griffin*, *Yost, Reyes*, *Paxton*, and other cases, but the laws in each of those cases did not target addiction. Florida's law is first of its kind in that respect.

Some of the laws excluded from coverage platforms that have news, sports, or education on them. Some of the laws targeted content. Ohio's law, for example, only applies to platforms that target kids.

And one of the criteria for that is, quote, "whether the subject matter targets kids," but HB 3 is not concerned with subject-matter content. If an educational app uses all these features, gamifies the experience, and causes kids to compulsively use it, it could be liable under this law as well, just like a social networking platform, a streaming service, or a gaming service. The focus is functionality.

And so just to set the table with plaintiffs' claims, plaintiffs assert claims on behalf of users and adults. They have not pleaded any claims on behalf of the member platforms,

and we raise this early for two reasons.  First, just to lay out the scope of what's before the Court in this hearing, and, second, because it's relevant to our shotgun pleading argument.

In the complaint plaintiffs include one sentence and one paragraph, paragraph 63, mentioning members' rights.  They say that HB 3 interferes with the First Amendment right of platforms to disseminate speech.  There is no factual development of that point.  There's no facts explaining what expression, what platforms are engaged in that's being interfered with, and that's a particularly glaring deficiency given *Moody* explains that not all news feeds, not all platforms are engaged in expression.  There need to be facts there.  And under *Iqbal* and *Twombly*, that's insufficient for them to state a claim.

We also took them not to be asserting members' rights because there's good strategic reasons for that.  First, plaintiffs have resisted discovery of platforms in this proceeding, and if they are asserting members' rights that would open the door to more discovery of platforms.

Second, if plaintiffs asserted members' rights, their associational standing argument would be even more difficult.  Because if members' rights are being asserted, stands to reason member participation is even more necessary.  And further confirming to us that only members -- only users' rights were asserted in the 26(f) report where plaintiffs represented in

asking this Court to limit discovery that *Moody* and the editorial right discussed in that case are irrelevant.

But then in the PI reply, plaintiffs came back and said, Well, the law interferes with editorial rights and cited *Moody*. And so that kind of shifting claims is exactly what the Eleventh Circuit's rigid shotgun pleadings rules are designed to protect against and is another reason why the complaint is a shotgun pleading that must be dismissed and the PI denied as moot on that basis alone.

Now, moving to standing -- moving to the merits of the case in standing, there's three main issues that I'd like to discuss today: Lack of standing, lack of a cause of action, and that plaintiffs are unlikely to succeed on the merits.

For standing plaintiffs rely on associational standing, but for three independent reasons, they haven't met their burden to establish that: They can't use associational standing to assert the rights of nonmembers; they haven't proven that any member platform would have standing -- that means the member platform would have both an injury in fact and prudential standing to assert the rights of users; and they haven't proven that member participation is unnecessary.

So, first, and just briefly, organizations cannot use associational standing to assert nonmember rights. All the exceptions to the bar on third-party claims are premised on a close relationship. Next friend standing involves a close,

App. 240

often familial, relationship.  Associational standing involves the association-member relationship.  Third-party standing involves a close-aligned relationship.

And so our point is that plaintiffs can't end-run that common requirement that goes through the jurisprudence on third-party claims and use associational standing to assert the rights of third-party users that they admittedly have no relationship with.  But if the Court disagreed and thought members could press associational standing on behalf of users, the PI must be denied for two reasons at the member-standing prong of associational standing.

First, they fail to plead that any members regulated by HB 3 and has prudential standing.  Nowhere in their complaint do they identify that a member engages in conduct that could subject it to regulation under subsection (1)(e) of the law, and they also fail to offer any evidence at the preliminary injunction stage establishing injury in fact or member standing. And, in fact, in plaintiffs' PI reply, they didn't engage with any of the evidence that that we laid out in our PI response. They simply referred back to their MTD response which, of course, only addressed the pleadings and not the PI evidence.

And so for injury in fact, the standard, as this Court knows, is there at least needs to be an allegation that a plaintiff will engage in conduct that arguably triggers enforcement.  For HB 3 that means there need to be some

allegations identifying a member that arguably engages in all the conduct in (1)(e), including that it has 10 percent or more of its users who are under age 16 using the platform for two-plus hours per day. Plaintiffs have not done that.

Instead their theory seems to be, Our members are social media platforms, some of the major ones. This law is focused on social media, so somebody has got to be covered. But cases like *Summers* and *Georgia Republican Party* reject that type of probabilistic analysis and say, You've got to come forth with specific facts identifying a member who satisfies the criteria and faces a credible threat of enforcement. And so plaintiffs have not come close to getting there at the PI stage.

They've offered declarations from four individuals, each of which has only vague, equivocal legal conclusions about this issue. So the four quotes from the declarations are on the screen, and they include statements like: *I understand that YouTube may be subject to the Act, as one or more of its services may meet the definition of social media.*

That's not enough to meet the heightened burden at the PI stage to establish that YouTube, indeed, engages in the conduct that would trigger HB 3. There needed to be some factual allegations about the user base, about the algorithms, et cetera.

And the depositions didn't help the plaintiffs. If anything, it undercut the declarations. Most notably,

Mr. Cleland, who had put in his deposition -- or in his declaration that Facebook and YouTube were likely covered by the law, admitted upon questioning that he does not know which members are covered.

Mr. Schruers admitted that NetChoice and CCIA have access to very little nonpublic information, like the demographic or user data.

Ms. Veitch said she's not a data scientist.  She doesn't know about the user rates.

And Mr. Boyle was silent -- the Snap representative was silent on this issue.

So all that together, all we have is a couple conclusory legal statements that these platforms may be covered under the law, which is not enough.  They had to come forward with some conduct that could arguably be proscribed by the law under subsection (1)(e) or, in other words, identify some conduct that at least lines up with those four requirements in (1)(e).

THE COURT:  Counsel, can I ask a question?

MR. GOLEMBIEWSKI:  Yes, sir.  Yes, Your Honor.

THE COURT:  And I'll phrase it that way because in light of DOJ's position, I want to make sure this is a safe place for you.  I don't want to ask any questions -- and the same goes for plaintiffs' counsel.  I realize the new trend is to file ethics complaints if a judge asks questions.  It hurts

the feelings of lawyers.

So I think you answered my question which is you don't have to, for purposes of standing, with certainty, prove it would apply.  It's that you'd have to have some granular facts in which you could both -- you could argue that it arguably would apply to it.  In other words, you don't have to go through and expend all the funds that have been described as compliance cost to establish, in fact, this is the percentage and these are the users.  But you would at least have to have some granular facts from which this Court can conclude it would arguably apply to at least one of the members; correct?

MR. GOLEMBIEWSKI:  Yes, Your Honor.  So for --

THE COURT:  And as I understood your argument, Judge, it's defective in two ways:  First, Judge -- and we've cited authority that says this -- for the complaint to stand, which the PI is tied to, you've got to have at least some allegations.  And then we cited, Judge, your *Pernell* case -- and you could have cited any number of cases -- noting that for a preliminary injunction, you can't just allege stuff.  You've got to have some facts, which is why, Judge, I just went through the declarations and the depositions.

So it's defective, and we have a problem for two reasons.  You don't have any facts in front of you which would suggest it would arguably apply to any particular member.  While you may intuitively, Judge, think -- and we all may intuitively

App. 244

think that these features, for example, exist in YouTube and you can, for example, in YouTube know that they have an entire -- I don't know what to call it -- a sub -- kid service so you can say, Okay, well, they've obviously got kids in front of them.

The problem is, Judge, there's gaps when you are trying to decide whether the law could apply to them because you've got to have at least one addictive feature and meet the other three qualifications.  And here there is no one member that there is any granular facts from which you could find all four of those things arguably apply, and there's not even any allegation.

So it both fails as a complaint and would fail -- even if they alleged it in the complaint, you don't have any granular facts in the depositions or declarations that would establish as to any one member those four criteria arguably would apply.

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

THE COURT:  All right.

MR. GOLEMBIEWSKI:  That's correct.  And just to -- one example.

So, for example, on this arguably point, if they would have said, Here's a platform.  It has -- it appears to have 15 percent of its under-16 users using the platform for 2.1 hours a day over the past several years.  You know, that doesn't exactly line up with the 10-percent threshold, but from there you could infer that it's arguably covered by the law.  There

App. 245

needed to be something, some kind of factual basis like that for one particular member.

And they could have used pseudonyms -- we know that from Eleventh Circuit precedent -- to identify that platform, but they had to have some kind of factual basis there otherwise --

THE COURT:  And let me ask you this because interestingly arguments end up being brought back up in other subsequent cases.  I'm not suggesting you'd have to run actual numbers.  You suggested -- gave the example, I think it may be slightly less exacting than that what they'd have to produce.

But I thought your point was, Judge, even if you didn't have to have any one member say, For this time frame we specifically met the 10-percent rule and the two-hour usage, there'd at least have to be some facts that would suggest that they had a belief -- and this Court would have a belief -- that's so.  And whether or not -- we can leave it for another day, whether or not you have to have that sort of specific conclusion and study or data to suggest that it in fact would apply, Judge, we don't even have any underlying facts from which you could infer that it would meet that threshold; right?

MR. GOLEMBIEWSKI:  That's correct.

THE COURT:  Okay.

MR. GOLEMBIEWSKI:  That's correct, Your Honor.  Yeah, exactly, not in the complaint and certainly not in the PI

discovery even though there was ample opportunity for them to come forward with those type of bare-bones facts.

THE COURT:  And aside from any deficiency in the complaint, even if they had such an allegation in the complaint, Judge, that wouldn't be enough for PI because you've got to have facts that would support the allegation.

MR. GOLEMBIEWSKI:  Correct, Your Honor.

THE COURT:  I understand your argument.

MR. GOLEMBIEWSKI:  And just to close on this injury-in-fact section, because plaintiffs have failed to establish that any one member has injury in fact, even if they are asserting members' rights, they lack standing because no member -- you need to have that injury in fact to assert whoever's rights through associational standing.  So that would dispose of all claims that they intend to bring.

On top of that, they haven't established that any member has prudential standing.  And so for the claims asserting the users' rights, they would have to show that a member could come into court with an injury in fact and get by the bar on third-party claims.  And there's two ways they could really show that:  Overbreadth and third-party standing.

Overbreadth doesn't apply under the Eleventh Circuit's decision in *Mata Chorwadi* because our law does not penalize or regulate users.  So, therefore, the law cannot be applied to them, to the users, and you can't use overbreadth to assert

their rights.

Plaintiffs don't mention *Mata Chorwadi* in their responsive filing. They rely heavily on *American Booksellers*. But the plaintiffs in *Mata Chorwadi* briefed *American Booksellers*, cited it, and the Eleventh Circuit rejected that and said in this context you can't use overbreadth, period.

That leaves third-party standing. Plaintiffs' main contention on this point is they are directly -- the member platforms are a directly regulated business. And so under *Craig v. Boren*, they can assert the rights of their user/customers, but they don't even argue that the users face a hindrance. Instead they say, We don't have to show hindrance because of *Craig v. Boren*. But *Kowalski* explained -- summarizing all the third-party standing jurisprudence and even cited *Craig*, cited cases like *Powers*, and said, Running through these cases are two requirements, hindrance and close relationship.

And the Eleventh Circuit of *Young Apartments* said, Yeah, you've got to show hindrance and close relationship even if you are a directly regulated business. Here there is no argument, much less a showing, that users face a barrier to enforcing their First Amendment rights.

And, in fact, the plaintiffs have cited *SEAT* from the Western District of Texas and *Reyes*, two other challenges to social media laws. In both those cases, there were users who challenged the law, and in *SEAT* there were minor users. And so

there is no argument here that users can't enforce their own First Amendment rights and the hindrance fails, and this is an independent basis, then, for saying that they haven't established member standing.

That leaves member participation, the third prong of associational standing.  Plaintiffs haven't shown that member participation was unnecessary.  The PI litigation has shown that members are going to have to participate in this case.

The NetChoice and CCIA representatives can't even identify which platforms are covered, much less litigate a case asserting the rights of those platforms' users.  They recognize they don't have access to nonpublic information.  And this is particularly jarring because plaintiffs seek -- bring as-applied claims on behalf of covered members when they can't identify those members, and they seek an injunction only to covered members.  So we'd have to identify them even to provide that injunctive relief.

Moving beyond standing to cause of action, plaintiffs chose to plead the First Amendment claim only under Section 1983.  This is similar to the *UPSIDE* case before Your Honor recently where the plaintiffs pleaded only a Section 1983 cause of action and not an equitable cause of action, and that's a problem because you cannot use Section 1983 to assert the rights of third parties.  The statute allows the person who has been deprived of rights to bring a lawsuit and hold the defendant

liable.

In this case if the Attorney General was held liable, it would be to the plaintiffs. If the plaintiffs sought attorneys' fees under '83 and '88, the Attorney General would be liable to the plaintiff trade associations, not to the individual rights holder.

And this is something that the old Fifth -- albeit in dicta in a Judge Wisdom opinion -- recognized is the case in the State of 1983. This is the law in the Second Circuit Court of Appeals, and Judge Posner has recognized that you can't use '83 to assert third-party claims.

So this is another independent basis why they have not proven a likelihood of success on the merits.

THE COURT: The Fifth has actually spoken on this more recently; right?

MR. GOLEMBIEWSKI: Yes, Your Honor. They are split -- they are a split panel --

THE COURT: Was it a split panel? Or was it a preliminary -- was it a court on -- a panel that decided a preliminary injunction, and ultimately the final panel said they got it wrong before?

MR. GOLEMBIEWSKI: That's exactly right, yeah.

THE COURT: Hasn't the Eleventh Circuit said -- I believe in one of my cases -- We don't care what the preliminary injunction panel says. It doesn't matter and it's not good law.

App. 250

I mean, maybe that only applies to Judge Walker favorable preliminary injunction rulings.  That may be the special rule that it's enforceable and binding any other time, but not when Judge Walker is affirmed, but I thought that's what the Eleventh Circuit said.

MR. GOLEMBIEWSKI:  In *Jacobson* they might.  The Eleventh Circuit might have said that, but the Fifth Circuit might have different rules.  And our point in citing those case --

THE COURT:  Well, I'm not bound by the Fifth; right?

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

THE COURT:  So for my purposes in the Eleventh Circuit law, the Eleventh Circuit would say, I go with what the final panel said, not the preliminary injunction panel.  Isn't that what -- I'm pretty sure that's what Chief Judge Pryor said to me.

I mean, Counsel, I only have to get a spanking once to learn the lesson.

MR. GOLEMBIEWSKI:  Well, you are not bound by the Fifth at all, so you don't have to listen to either of those opinions, Your Honor.

THE COURT:  Well, I know, but you bring up the Fifth --

MR. GOLEMBIEWSKI:  Yes, Your Honor.

THE COURT:  -- is my point.  You are touting the Fifth

App. 251

as, Judge, look at this dicta by Wisdom as something you ought to follow when the Fifth Circuit, albeit in not the most detailed way -- I would use that rather than what I was going to say -- and I would ask plaintiffs' counsel -- I don't think any of the Courts that have explained why you can do this under 1983 -- other than saying, Well, that's what happens and what we do, I don't believe anybody has really ever explained and directly engaged with the language of 1983 and explained why that's so, including the Fifth's most recent statement.

I think they just say, This happens all the time, so it must be so. Maybe not the most fair way to characterize it, but I think it's generally fair; no?

MR. GOLEMBIEWSKI: That's right. That's right. They've said that's how we have always done it. Whereas the stay panel -- I know the stay panel -- I know it might be entitled to less weight, but they did do some textual analysis. And Judge Winsor recently passed on this argument. He didn't decide it, but he just said that the textual analysis was persuasive.

So our point is that there is a body of jurists who have analyzed the text -- and it ain't binding; we agree -- but there is a body of jurists who have analyzed the texts and indicated that you can't use 1983 in the way plaintiffs are trying to.

THE COURT: And let me footnote something that I was

going to ask as a question now that plaintiffs will need to answer, which I raised -- as you pointed out -- in one of my prior cases; namely, if you don't plead a claim in equity, how does that save your claim if you don't have a 1983 claim?

That's not for you. That's for them. I'm saying I just need to bookmark that because you raise the issue, and I don't want to forget. If I don't ask them, I want them to address: If I find that 1983 isn't the appropriate vehicle, what do I do with the fact they did not plead in the alternative?

MR. GOLEMBIEWSKI: I can give you an answer.

THE COURT: Well, you said they'd lose.

MR. GOLEMBIEWSKI: That's indeed what I would say, but the PI would be denied.

And they could amend and bring an equitable cause of action, but the PI would be denied. And that's not just a technicality. This matters because 1983 comes with fee awards that can be hefty when these cases go up and down the courts.

THE COURT: I'm not saying I agree with you on the merits as it relates to 1983, but I just want to make sure that they respond with respect to whether or not they did, in fact, plead in the alternative that it was a claim in equity.

But, go ahead.

MR. GOLEMBIEWSKI: Okay. I'll move on to the merits.

THE COURT: By the way, do you disagree that there is

such a claim, because that jurisprudence is rather odd as well? They kind of cite to *Ex Parte Young*. And based on my read, the case law just says, Well, we've allowed it. It happens. It exists. I'm not -- what's the case that would say you could bring such a claim in equity?

MR. GOLEMBIEWSKI: I can't speak on that.

THE COURT: Okay. Go ahead.

Merits.

MR. GOLEMBIEWSKI: Yes, sir.

So there's three different reasons why the Attorney General is likely to prevail on the merits of the First Amendment claim. The plaintiffs have not shown that the First Amendment rights of children and adults are implicated. Even if they are implicated, this law is at most a content neutral --

THE COURT: Does it matter if the members' First Amendment rights are implicated?

MR. GOLEMBIEWSKI: We don't believe the members' rights are implicated either, if Your Honor construes the complaint as bringing members' rights.

THE COURT: Help me to understand that.

MR. GOLEMBIEWSKI: So the only argument that plaintiffs make as to members' rights is in the reply brief, the PI reply. And they say -- they cite *Moody*. It's just one paragraph, and they say, The members' right -- has a right to use these addictive features as part of the presentation of

speech. But *Moody* did not say that.

*Moody* focused on the editorial judgment in developing and selecting the content for a newsfeed, and the use of that editorial discretion decides what goes in the newsfeed, and how it's ordered can be expressive. But the Court did not go as far as to say any kind of functionality you pair with that newsfeed is also protected expression.

This is like *Arcara* in a sense where the Supreme Court said, You can't put together books and sex and say it's all expression. You can't put together newsfeeds and any kind of functionality, including just commercial practices, that manipulate the user, and say it's all expression. And *Moody* doesn't provide them support for that extension.

In fact, there was a series of states, New York and other states, that have filed an amicus brief that cautioned the Court not to write a decision that would say such a thing in that case, and the Supreme Court didn't. And Justice Kagan in the majority opinion even mentioned that social media sites present new dangers such as harms to children's mental health that make them different than prior types of media, like newspapers.

And so we read *Moody* as carefully cabining its opinion to that newsfeed function.

THE COURT: Well, as it relates to children and adults, children under 13 can't use them at all; right?

So riddle me this:  How does that not implicate the First Amendment if they don't have access at all?

I mean, isn't that the ultimate First Amendment bar?

MR. GOLEMBIEWSKI:  Well, they do not -- they are not denied access, Your Honor.  So if any platform -- and this gets into kind of the merits of this two-step test that the Courts discuss in *TikTok*.

So, first, the law does not directly regulate speech because it regulates only contracting to enter accounts with platforms that use addictive features.  Now, we are not saying that anytime --

THE COURT:  What's your best case on that, Counsel?

I mean, so you are telling me, Judge, no Republican can get library cards, and check out books.  Judge, we are just talking about library cards so First Amendment -- not a First Amendment case.

MR. GOLEMBIEWSKI:  Well, we are not taking that kind of maximalist position, Your Honor.  We do think that if you are regulating commercial activity and on the face of the law it's evident you are targeting expression, like in that situation, the First Amendment would be implicated.  And --

THE COURT:  Isn't that a content-based question?

It seems to me you are conflating what -- and you may win on that, but it seems to me those are two different questions:  One, is the First Amendment implicated?  Two, is it

content based?

It sounds a lot like what you were just saying to me is really the question I've got to answer about whether it's content based. But help me to understand why I've got that wrong.

MR. GOLEMBIEWSKI: It is a similar inquiry, Your Honor, and I think *TikTok* is the most -- provides the most guidance on this.

So what you are looking at in this disproportionate burden test that the Court discussed in *TikTok* is is the focus or aim of the law expression. For content based you are looking at is the purposes or aim of the law content. It's a similar analysis. But what the Court indicated in *TikTok* was, Well, the focus of the law there was corporate control, not the speech of TikTok. There were causal steps between the law which regulated divestiture and corporate control and any alleged burden on speech, and that was another indicator --

THE COURT: Counsel, I'm completely confused. And this is why I asked and tried to separate it out. Again, it doesn't mean you lose, but I thought *TikTok* starts with the assumption the First Amendment is implicated. And what you are talking about is exactly what I ask, which is whether or not -- isn't that an explanation for why it's not content based.

Do I have that wrong? Did *TikTok* -- that decision didn't assume the First Amendment was implicated?

App. 257

MR. GOLEMBIEWSKI:  Well, it did assume that, but you are wrong where this analysis came in the opinion.  So in the first section --

THE COURT:  So they assumed it, but they talked about it anyway?

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

THE COURT:  Okay.  All right.

MR. GOLEMBIEWSKI:  So they start out -- so the DC Circuit -- just to step back, the DC Circuit said that the First Amendment applied.  The Supreme Court walked that back and said, We are not so sure the First Amendment applies.  Because there is these causal steps between the regulation and alleged burden on speech, because the focus is corporate control, it appears that this law is only aimed at commercial activity, not any speech.

And so they are hesitant to say -- to hold that the law implicated speech, but they did say --

THE COURT:  Since this targets user content, isn't that what makes this different?

MR. GOLEMBIEWSKI:  This law does not target any kind of content.  The law says that if a platform uses addictive features, it can't enter contracts with kids.  The law is totally agnostic to kids going on social media platforms, speaking, listening --

THE COURT:  But one of the four criteria about whether

the law applies to you and that you can either have a private

action against you or the government can come after you is if

you're -- right -- if it's tied to user content?  Isn't that one

of the four prongs?

Am I missing something?

MR. GOLEMBIEWSKI:  The first prong you might be

referring to is it applies to platforms that allow users to post

content or see other users' activity.  That's not concerned with

speech.  That is identifying platforms that engage in

interaction and allow for --

THE COURT:  Isn't that exactly what the *Reyes* case in

Utah dealt with?  That if you've got categories of speech -- and

this is switching to the content-based question.  Because I've

got to tell you, you've got a hard road to hoe to convince me

that this isn't -- it doesn't mean you lose, but it's not -- it

doesn't implicate speech.

But with content based, let's start with this:  Can't

we agree, even though it has nothing to do with message, you

couldn't say that you can't have any type of political

discussion of any kind, not related to any particular message,

but just categorically eliminate any kind of political

discussion?

That would be content based; correct?

MR. GOLEMBIEWSKI:  Correct.

THE COURT:  And so setting aside whether or not you've

App. 259

got a speaker as a proxy for a message or you are limiting particular messages and so forth, the law is pretty clear that if you knock out a category of speech, that's content based; right?

MR. GOLEMBIEWSKI:  If the law on its face is discriminating against a category of speech.

THE COURT:  Why is this case not the same as *Reyes*, because you functionally have stopped social interactive speech, which is what the Court in Utah said was the problem with the category.

MR. GOLEMBIEWSKI:  Well --

THE COURT:  It may be twofold:  One, Judge, we think this is distinguishable why.  And, number two, we think the Court in Utah just flat out got it wrong.  I realize it's not binding.

So I realize there are multiple aspects to that question and you can answer none or all of them --

MR. GOLEMBIEWSKI:  Well, that's --

THE COURT:  -- because, again, I don't want to upset you.

MR. GOLEMBIEWSKI:  That's correct, Your Honor.

So our law is different than Utah.  So what the *Reyes* court focused on was the law specifically singled out social content.  But our law in saying --

THE COURT:  What if our law is the functional

equivalent of that?

MR. GOLEMBIEWSKI:  I disagree, Your Honor, because our law says if you can see other users' activities or users can upload content and the site has the addictive features, then the law applies.  If Disney+, for instance, which is plainly an entertainment-based service, allowed 7- and 8-year-olds to see what other 7- and 8-year-olds were watching, what they are binging, and gamified streaming experience in that way, the law would apply there too.  So it's not concerned with social speech.

The law in *Reyes* specifically said "social speech." But we also disagree with *Reyes* that the mere category of social speech could be considered a content-based distinction because *City of Austin* explains that subject matter, message, viewpoint, those are the things that content-based discrimination is concerned with.  And "social speech," I don't even know what that means.  Every kind of speech that's social or communicative.

I think what plaintiffs are getting at is -- and the *Reyes* court might be getting at is -- if you are posting personal updates or talking about your life, that's social.  But if a platform -- if today Facebook was covered and it allowed those personal update posts, et cetera, and then tomorrow it only allowed posts about movies and music and sports, it would still be covered under the law.  Because the content of the post

App. 261

doesn't matter at all, whether it's social, antisocial, whatever. And so *Reyes* is wrong on that point, and our law is also distinguishable because it doesn't even single out social content.

THE COURT: I went to India last summer and went to all the stepwells. Isn't what this is trying to block no different?

In that context it's women in India, for hundreds of years, that's where they met and interacted was in the stepwells. Isn't this the digital equivalent of that?

And isn't that why the *Reyes* court said this was a problem and why it's content based?

MR. GOLEMBIEWSKI: So two responses. So, first, the *Reyes* court said on its face there was a content based distinction. Plaintiffs haven't even argued that here. They assumed the law is content neutral on its face, and they argue purpose or discrimination.

And that seems to be what Your Honor is getting at, that this is a stealth content regulation really trying to get kids off popular social media sites. But the law doesn't function like that in operation because it can apply to any kind of site.

THE COURT: But you'd agree that if it functioned that way, Houston, we may have a problem?

MR. GOLEMBIEWSKI: If the law -- I don't agree. I

don't agree, Your Honor.

Because if the law only applied to Facebook and Instagram, the platforms tout that those sites have all the diverse thought, human thought, and perspectives on there, period.  So we are not singling out any kind of content if we apply it to only to those cites.

And, in fact, the Eleventh Circuit in *NetChoice v. Moody* kind of rejected that kind of speaker-based analysis where the platforms were saying the law in *NetChoice I* singled out platforms that have over one hundred million users, and so that shows they are coming after the particular content on the sites, and the Eleventh Circuit said that's not the case.

Justice Kagan also recognized that at the *NetChoice* oral argument where she said there's no specific discrimination when it comes to big platforms, bigness has no protection.  And so for singling them out, it could be for innumerable reasons.

THE COURT:  I thought there was all kinds of case law that says if you functionally -- based on who you target, you're functionally addressing particular exchanges, that does matter?

You really would read *Moody* as so sweeping as knocking out all those prior cases?  That if the subset -- sort of, I guess, the example would be if you are going to knock out all local newspapers that have a different voice than national news conglomerates that you are targeting -- you can infer from going after local newspapers -- which, of course, this doesn't apply

anymore because they have all been eaten up, and the same handful of people are delivering all the messages -- but in our history there was a distinction that mattered.  And I thought there was all kinds of cases, and that's just one example, where it is fair based on targeting a group.

And I guess it would depend on how the sweep -- isn't there a difference between targeting one platform versus targeting a group of platforms where you've functionally taken out almost an entire type of speech?  Let me give you an example.

There are small commercial planes in this -- I just flew recently with my bride to Fort Jefferson on a float plane.  Arguably, that was a commercial flight.  I paid to fly with six people.

But if you have a law that covers -- and I know this isn't speech, but follow my analogy, however poor.  If you have a law that covers every major airline, even down to Spirit, Frontier, et cetera, doesn't that tell you something about the reach even though there are technically other commercial flights out there?

So if there's a billion flights and 999 million of them are covered because you've targeted this collective group of platforms, so it's 99 percent -- and I'm not suggesting there is a record here that would support that, that would have been a question I have for the plaintiffs.  Isn't there something we

can infer from that?

If there's four major social platforms, which that would be where children would socially interact, and it's like 99 percent of, you know, that type of social interaction, wouldn't that tell us something? Or no?

MR. GOLEMBIEWSKI: It could. And this is the *Minneapolis Star* line of cases. If there is that kind of singling out -- speaker-based singling out, it could tell us something. But in *TikTok* the Court underscored that it needs to be a speaker-based distinction that shows there's really some kind of content-based discrimination going on in that the platforms aren't being regulated based on a special characteristic.

And so maybe all these platforms make up the bulk of the social media universe, but if they are also engaging in practices that are manipulative and getting kids to compulsively use them, that's a special characteristic that we can use to regulate them. If newspapers were -- big newspaper companies were lacing their newspaper -- this is -- this is, you know, fantastical, but if they are lacing their newspapers with LSD and selling them, we could regulate that even if it's targeting the biggest --

THE COURT: Arguably they are laced with something worse than LSD, but go ahead.

MR. GOLEMBIEWSKI: If they are doing that, we can

regulate them because they are choosing this business practice. And this is a situation where the law is content neutral on its face. It doesn't apply to any of those platforms if they chose not to use the addictive features. So that shows the law is not concerned with what content they have.

If they just chose to take on a business practice that doesn't manipulate kids, it might hurt their bottom lines and advertisement revenue a little bit. They can -- kids can continue contracting with them. So they've chosen to make that special characteristic part of their business models, and the State can regulate that and address the problem in front of it.

Cases like *McCullen* from the Supreme Court and, again, in *TikTok*, the Court says the State can address the problem in front of it. It doesn't have to say, All right, we are going to regulate all platforms on the Internet to address these addictive features just to avoid getting hit with the ruling that the law is content based. You can zero in on the platforms using these features and that gamify their sites through this interaction are the ones that have proven to be the most addictive.

And Your Honor also mentioned the point about the record evidence. There is no evidence that the law is, indeed, only applying to the biggest social media sites like TikTok, et cetera. Plaintiffs, if they want to come forward and say that this is a stealth content-based regulation, they need to offer

App. 266

some evidence.  In *Minneapolis Star* there was evidence that the law had the effect of only applying to the two or three largest newspapers in that state.

And so where we are at in the analysis here, Your Honor, is the law is content neutral on its face.  The government hasn't offered any kind of content-based justification, and so plaintiffs are having to hang on this claim that it's a speaker-based law, and, therefore, it discriminates on content even though there is an elephant in the room that this industry is addicting kids.  And that's what the Florida Legislature is addressing here, not any kind of content. They can put whatever content on their sites they want and not be covered by the law if they don't use addictive features or if kids aren't compulsively using it two-plus hours.

THE COURT:  Of course that all assumes the addictive features aren't themselves expressive; right?

MR. GOLEMBIEWSKI:  Even if the addictive features were expressive, the law wouldn't be content based.

The First Amendment might be implicated if Your Honor assumes, Okay, these -- this law is regulating these addictive features and they are expressive, so the First Amendment applies.  You can send a push notification with any content in the world.  It could say:  Check out the site, this is just what happened in the news; Kobe Bryant passed away; Steph Curry dropped 50 points in a game.  It wouldn't matter because it's a

App. 267

content-neutral regulation of push notifications.

Same with autoplay/infinite scroll. Those don't deliver only a particular type of content. Apps from Duolingo to Facebook use these types of features. And so it doesn't matter what kind of content is being delivered.

THE COURT: I'm feeling a little bit better about myself as a luddite. Does Facebook even exist, sir?

MR. GOLEMBIEWSKI: It definitely exists.

THE COURT: I thought it was called -- isn't it called something else now?

MR. GOLEMBIEWSKI: MySpace still exists.

THE COURT: Okay.

MR. GOLEMBIEWSKI: I can tell you that.

THE COURT: I don't think I said "MySpace." I think I said "Facebook," but, go ahead.

MR. GOLEMBIEWSKI: Yeah, I think it exists.

But, yeah, so just to wrap up the content neutral, they had to show that the speaker-based regulation is just a content-based regulation. And they haven't even showed it's, indeed, a speaker-based regulation because the law could apply to any type of platform that is interactive and has the features, whether it's Disney+, Duolingo, et cetera.

And I want to take one more try explaining the *TikTok* test.

THE COURT: By the way, I understand the actual

App. 268

program is called Facebook.  It's --

(Indiscernible crosstalk.)

THE COURT:  -- called Meta.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  I was trying to be funny, but apparently that was lost on everyone.  But, go ahead.

MR. GOLEMBIEWSKI:  I just want to --

THE COURT:  And I'm not offended.  My wife doesn't think I'm funny either.

MR. GOLEMBIEWSKI:  Just on the threshold issue where the First Amendment is implicated, *TikTok* admitted, Your Honor -- and this is where confusion might come in -- that it has not clearly articulated the framework for disproportionate burden cases.  And so it is still unclear what exactly you are looking at when you are examining whether a regulation of commercial activity like contracting is, in fact, aimed at speech rather than merely incidentally burdening it.

But our law has many similar features to the law in *TikTok* that gave the Court pause in finding that this First Amendment was implicated.  Our law is not like a law banning library cards.  Because on the face of that law, there is no interest unrelated to expression that's apparent.  Here there's an apparent interest of protecting kids from addiction.  That's apparent from the face of the law.

And even if the Court disagreed with *TikTok* and

App. 269

thought that that's still too of an unclear area of law, *Indigo Room* and *Gary* from the Eleventh Circuit are on point.  The plaintiffs try to distinguish those cases, the alcohol ordinance cases, in two ways.

They say, Well, those involved nonspeech products.  But the cases did not care what the actual business was doing.  The focus was:  Was it selling alcohol?  What is the law focused on?  That harmful practice.

Our law is focused on a harmful practice of addictive features.  It doesn't care if kids speak and listen on social media.  They can't be penalized for that just like the kids in *Indigo Room* and *Gary* couldn't be penalized for expressive dancing or going to political rallies.  The law was silent as to that.

Second, the plaintiffs say, Well, on social media you go on there, and the primary function is to socialize.  Well, the primary function of bars and clubs is to socialize too.  And since Your Honor has injected humor, the whole show *Cheers* with Woody Harrelson was all about going to a bar and socializing.

And so there is going to be some effects -- obviously, if you are stopping kids from going into bars -- on them socializing, but the Eleventh Circuit didn't care.  They said the First Amendment wasn't implicated in either case.  So that's also an easy way just to resolve this without getting into the thicket of the disproportional burden test.

And that gets us to tailoring.  So if the law -- if tailoring applies and scrutiny applies, the law is at most a content-neutral manner restriction.  And the plaintiffs haven't even argued that it's not a manner restriction, meaning they don't argue that the law prohibits speech.  All it does is restrict the manner of engaging with social media platforms, and it's content neutral on its face.  And so then the law just needs to be narrowly tailored to serve a significant governmental interest, which it is, child well-being, and it leaves open ample alternative channels.

And just before applying that law, *TikTok* underscored that when the Legislature is implementing a content-neutral interest, it has latitude.  It can make deductions and inferences and rely on predictive judgments about how regulation will advance its interest of reducing whatever harm is at stake.

Our law does that.  There is no question it will reduce kids' exposure to addictive features by regulating contracts that expose kids to those harmful practices, and it does not burden a substantial amount of speech unrelated to the interest.

Children can use any platform without addictive features.  They can use their parents' accounts.  They can use platforms that allow them to go on the platform without an account, as YouTube allows people to watch videos without an account.  And adults are not burdened in any meaningful way.

The age verification technology that exists, according to our expert, Mr. Allen, is far different than the technology that existed 25 years ago in *Reno* and *ACLU*.

Some platforms like Instagram, according to Mr. Allen, are already doing facial image analysis to identify, from looking at photos or pictures, the age of the user.  And HB 3 on its face does not require any particular method of age verification.  It gives discretion to the platforms to use commercially reasonable methods.

And Mr. Allen testified that those include a whole swath of methods that don't require adults to give over sensitive personal information.  And recently in the *Free Speech Coalition v. Paxton* case, the Supreme Court also expressed scepticism at the idea that age verification is still a burden to adults.  And so for those reasons, the law would satisfy tailoring.

But even if the Court disagrees on standing, disagrees on cause of action, and disagrees on the merits, there's still several other bases for denying the PI.  First, Section 501.1736(2), which prohibits contracting with kids 13 and under to have accounts, does not -- is not facially invalid because it applies to kids of tender years -- and that's language from the Supreme Court's decision in *Prince* -- who don't have an interest in entering a contract with lengthy terms of services with social media sites.  And so if Facebook decides to contract with

kids who are 6- and 7-years-old to give them accounts, the law could be validly enforced against them, and that would be a clean, plainly legitimate sweep.

Next, the record is underdeveloped particularly as to members' rights. So if plaintiffs now are changing positions and saying that they want to assert a claim based on members' rights, there is no evidence in the record about what expression the members are engaged in or how that expression is stifled.

The complaint is also a shotgun pleading, and plaintiffs had a seven-month delay in challenging the law, which kind of forced us to agree to voluntarily not enforce so that we could have an orderly PI schedule and actually get discovery, which has proven very helpful on standing and understanding the trade associations' actual knowledge of the platforms, which is very limited.

And so for those reasons, the complaint should be dismissed and the PI denied as moot. But at a minimum, the PI should be denied.

Thank you, Your Honor.

THE COURT: Thank you. That was about 50 minutes. I did ask you some questions. I said I was going to give you 30 minutes uninterrupted.

You got ample time; is that correct?

MR. GOLEMBIEWSKI: Yes, Your Honor.

THE COURT: And just to amplify something you said

earlier so I don't hear something different later on argued somewhere else, you were afforded the opportunity by this Court, over the plaintiffs' objection, for discovery; is that correct?

MR. GOLEMBIEWSKI: Yes, Your Honor.

THE COURT: All right. Thank you.

Why don't we do this: For the benefit of my court reporter, it's -- unlike testimony, this is a little bit harder, this type of exchange, and Counsel and the Court, as well, were speaking at a rather fast pace. So we are going to go ahead and take a ten-minute break.

And when we come back, Counsel, I'll hear from plaintiffs' counsel.

Thank you.

(Recess taken at 9:54 AM.)

(Resumed at 10:08 AM.)

THE COURT: Counsel, before we begin, just a couple of editorial notes, I guess.

I didn't ask a lot of questions I could have asked because I wanted counsel to be able to make his presentation on behalf of the defense. So I want to make plain -- and I think I said this at least once -- my silence doesn't necessarily mean I agree with every point. So you certainly should push back. I more was asking some questions because I want to make sure that I flagged it because there were some questions I wanted to make sure that I had answered by the plaintiffs.

The second thing that would be helpful to me -- and this is not meant to be in the pejorative as it relates to counsel's argument.  I didn't understand all of your claims to be as cast by the defense.  So as we're going through, it would be helpful to the Court for you to say, Well, Judge, actually, this is our claim, and this is -- you know, we refer to this in our complaint or our PI.

Because as I was following through -- and, again, I didn't interrupt when we did -- there's -- my sort of outline of how I construed your arguments in a number of instances varies from counsel's characterizations of your arguments.

And so I would ask that you do that as you go throughout and identify those points and explain why you disagree that that's not the fair characterization of your claims or the structures of your claims; okay?

And so you may proceed.

And I will note that my law clerks all lost the bet at how long it took me to interrupt counsel.  And they didn't tell me the time, and I didn't have any money down.

But I'll try to extend to you the same courtesy.

MS. MURPHY:  Not at all.  Is it okay if I am here since I'm using a binder?

THE COURT:  Certainly.  Keep your voice up, and if the court reporter can't hear you, she'll let you know.  She doesn't have to ask me.  I just tell her to tell lawyers and witnesses

directly.

MS. MURPHY:  Very good.  I would just like to say I welcome questions.  So if there are particular points where there is something you want to be sure that -- you know, about a disagreement, by all means feel free to stop and ask me.  So that is not a concern on my part at all.

So Florida House Bill 3 is the latest in a series of recent efforts by states to restrict access to websites based on concerns about their potential effects on minors, many of which -- actually, almost all of which have been enjoined by courts throughout the country.  These kinds of laws are nothing new historically.  Efforts to restrict access to speech have cropped up anytime a medium or forum for speech has captured the attention of minors, whether it be, you know, back in the day with laws about movies, television, comic books, video games, et cetera.

And while Florida's law may differ in a few of its particulars from some of the other laws that have been enjoined throughout the country, none of those distinctions changes the bottom line here.  Just as with those other laws, HB 3 burdens far too much speech while advancing the State's professed interest little, if at all.

I think I'm at least clear now at this point about what the State's interest is, but that itself has been a bit of a moving target throughout the briefing in this case.  Sometimes

App. 276

they are talking about predators; sometimes they are talking about content; sometimes they are talking about how much time is on service; sometimes they are talking about addiction. Ultimately, it really doesn't matter because, principally, you have a problem here with tailoring. This just isn't a law that is narrowly tailored to try to avoid abridging speech to the greatest degree possible, which is the requirement in the context of the First Amendment.

So I know that -- you know, obviously, I'd like to be talking about the merits since -- but the State has raised standing issues here, and since they are jurisdictional, I will start there.

To be clear, we absolutely are asserting associational standing on behalf of our members, but we are not purporting to bring this lawsuit only on behalf of the interests of users. We've said -- from day one and in every brief we've filed on our preliminary injunction, in the motion to dismiss, in response to every argument the State has made, we have said our members are the basis for associational standing here and our members independently have Article III standing.

They have Article III standing because of the compliance costs they would face. They have Article III standing because of their -- the restrictions on their ability to disseminate third-party speech, which *Moody* said is itself a First Amendment right. And they have Article III standing

because restrictions on the ability to disseminate what I think even the State would agree is their own speech -- you know, there is speech generated on these services that is speech that originates with the service itself that isn't third-party speech, and I don't see how the State could have any argument that that's not our speech -- and this restricts the ability to disseminate that speech as well.  So those are all interests of our members.

And I don't take the State to dispute that if we have a covered member, there would be compliance costs; there would be at least the restriction as to disseminating our own speech; and certainly, as to services here that are the exact services the Supreme Court was talking about in *Moody,* there would be the exact First Amendment interest that the Supreme Court recognized in *Moody.*

They instead -- they seem to be making a kind of either -- technical argument that they don't think we've given enough information to conclude that we have any members who are covered by this law.

THE COURT:  Well, let's circle back for one minute.  Let's -- and I'm not -- this is not a finding of the Court.  I'm not concluding this at this juncture.  But let's circle back to the complaint itself.

If the complaint itself doesn't state a claim, can that be fixed by the arguments raised in the preliminary

injunction and subsequent papers?

MS. MURPHY:  I think it could.  I mean, I do think you have to be clear -- in the complaint, all we need to do is adequately allege standing, and we allege -- we have -- you know, we are trade services.  We have trade organizations that have members that are covered.  We said that, and you really don't have to say --

(Phone interruption.)

MS. MURPHY:  You really don't have -- is it good?  Yes?  Okay -- to say more than that in the complaint.  Now, they can push back and say, We have some reason we don't trust the allegations in the complaint.  And at that point, you know, we can provide more information.

THE COURT:  Setting aside standing, I believe counsel said that what was troubling was that you didn't allege that the -- the members weren't alleging a First Amendment complaint. They were simply alleging the deprivation of users' rights and that was a defect.  And maybe I'm mischaracterizing his argument, but --

MS. MURPHY:  No, I under --

THE COURT:   -- that there was another defect.

MS. MURPHY:  I understood him to say that, but then he promptly said, Well, they only alleged it in paragraph -- I think it's 66.  I mean -- because we did allege it.  We clearly allege this implicates our members and our users.  We allege

both of those things.  And when they said, We are unclear whether you're alleging both of those things, we confirmed in our briefing, No, no, we're alleging both of those things.

So I think at this point -- you know, I mean --

THE COURT:  And is the theory that the -- Judge, the reason why the -- not just the members but the users matter is that, unlike the case cited by counsel, here, Judge, there is a -- is a bridge and a nexus between our members and the users, not It's completely dissimilar from the hotel and the hotel patrons?  That Court recognized that there was a complete break and a disconnect between the hotel and the patrons based on the rights that were being discussed.  Whereas here, Judge, there's a seamless connection between our members and users for purposes of the -- this complaint and our claims.

MS. MURPHY:  That's right.  So in the hotel case, you know, the theory was:  By virtue of regulating us in certain ways, you're -- the signs you're making us put up might chill our patrons from calling 9-1-1.  That was the argument there.

Here, this is a law that directly inscripts our members into the service of the State for the purpose of restricting the access of our users to our services.  They are inextricably intertwined.  The reason we are being regulated is to restrict the access of people who want to be using our services.  You cannot kind of think about those two things distinctly and say, You're only regulating us, not them; or only

our interests matter or only theirs do.  They are inextricably intertwined.  They're saying, We want to restrict your ability to provide access to places where your users would like to engage in First Amendment activity.

That is the classic -- you know, I mean, even outside the First Amendment context, that's *Craig v. Boren*.  But that's *Brown versus Entertainment Merchants Association.*  I mean, that was a case brought by a trade association alone.  There was -- the only plaintiffs there were trade associations who were asserting that they had members who would like to sell video games to the minors who had the parental control restriction, and the Court raised no standing concerns, no third-party standing concerns, no concerns about any of this.  It resolved the whole case by focusing on the First Amendment rights of minors, because if you say you can't give certain forms of speech or allow people to access certain forms of speech or engage in it, of course that has an effect on the people -- the users who want to engage in the speech.

And to me -- the way I think about this is it's almost less even a question of standing.  I'm not even sure how a court would engage in the substantive First Amendment analysis of whether a law is narrowly tailored to avoid abridgment of speech without asking, Whose speech does it abridge?  Whose First Amendment rights does this impact?  And often -- in most cases, if not -- you know, certainly many cases, it's not just the

plaintiff.  It's going to be plaintiff and users and others out there.

So we think we fall just squarely into the long line of cases where it's been commonplace for vendors or trade associations representing vendors to be able to assert the interests of the people who would like to use their services and engage in the First Amendment activities that they provide.

THE COURT:  Let's -- and I distracted you, so let's go back to the question of what's before this Court that would -- for purposes of standing, to show that a member -- this law would apply to the member.

MS. MURPHY:  Sure.

THE COURT:  And you've heard me say to counsel for the defense, I'm not suggesting that you have to expend huge sums of money and prove with certainty -- mathematical certainty that this would apply to us.

But it does seem to me that at least one member -- there have to be -- especially for preliminary injunction purposes, there has to be at least one member through declarations, depos, or something before this Court which would suggest they arguably fall within the statute such that their fear is reasonable, such that it's reasonable for them to engage in compliance costs, which is the injury, I believe, you allege; correct?

MS. MURPHY:  Correct.

App. 282

THE COURT:  So with respect to -- pick me one member -- I don't need to go through it because it only takes one member.  What's the one member, and what declaration, depo, or other record evidence are you relying on to support the fact that, in fact, there's an algorithm being used; that one of the addictive functions applies; that they're uploading or viewing content -- uploading and viewing content, and then it's arguable that there's the percentage of the users and the time?

MS. MURPHY:  Sure.  So, if I may, I'll tell you two just because we did two.

So we have two members who submitted declarations and were deposed.  That's Snap and YouTube.  They submitted declarations where both of them said, We believe we may be covered by this law.  And they then talked about things --

THE COURT:  Well, let -- can we agree that if I got a declaration that just said "I believe we may be covered by this law," that would not be the quantum of evidence that would be accepted at the Eleventh Circuit if you just had the conclusory statement?

MS. MURPHY:  I mean -- I guess I have a little trouble agreeing with that when you're talking about a law that was enacted with a press conference that said, We're passing this to regulate you, you know -- which we didn't explain, but, like, they've literally said (indiscernible crosstalk).

THE COURT:  Well, Counsel, let me give you a good

App. 283

example.  And I'm not saying I agree with it and it abandoned 50 years of jurisprudence, but in *Jacobson*, the Eleventh Circuit said, We don't care that there was a witness on the stand.  We don't care that Judge Walker weighed the credibility of witnesses because we can judge on a cold record the credibility of folks better than he can.  We don't care that the witness under oath, subject to the Court's observations -- the fact finder concluded that they were being honest when they said that they were going to spend money on -- money they would have spent on outreach and other programs are now being spent on education.  So they gave specific examples.

They didn't bring in a ledger; they didn't bring in an accountant for the entity, but a person under oath that had the personal knowledge testified to that.  I found they were credible, and I said that that was enough.  And they said, No.  No, it's not.

And I understand diversion of resources is different than compliance costs here.

MS. MURPHY:  Yep.

THE COURT:  But it just seems to me that if that's not enough for purposes of standing, how would somebody's conclusory statement believe "I work for this company, I've read the law, and I think that it would apply to us"?

MS. MURPHY:  I think it is different because that's in the context of saying we're going to divert resources.  That

does make a difference.  That is not the same thing as saying, We believe we're a regulated entity, and we believe that to the degree that we are going to take down these --

THE COURT:  But that --

MS. MURPHY:  -- complaints --

(Indiscernible crosstalk.)

THE COURT:  -- belief has to be reasonable.

MS. MURPHY:  It does have to be --

THE COURT:  So how do I -- as the fact finder, which I am for the purpose of this hearing, a preliminary injunction, how do I conclude that YouTube or Snapchat -- that person -- just based on their belief because they've read the law and their position, that, de facto, makes it -- I mean, that makes it reasonable by virtue of the fact that they --

MS. MURPHY:  (Indiscernible crosstalk.)

So if it helps you, I didn't get through everything that I have before you because it's not just the declarations.

THE COURT:  Sure.

MS. MURPHY:  Your Honor allowed depositions here, and they deposed these witnesses from these companies, and there is a record that was created where they go through that they have the particular features; that they have minors who use the services.  I mean, the Snap rep, you know, talked about having about 15 to 20 percent of people on its services that are -- that would fall within the age restrictions the State is

imposing here; that they cover all the features.

The only thing that the State can say is, Wow, people couldn't make explicit representations about whether they meet the two-hour threshold. Our members don't necessarily keep those kinds of metrics, and we're not even sure exactly how the State expects -- is doing those metrics. So I think if all you're saying is, you know, You didn't provide this -- and what you don't hear from the State --

THE COURT: How about this: Is -- by any metrics, our users -- generally a chunk of them spend extended periods of time, and our user data suggests that minors use the services much the way adults do, and from that we fairly extrapolate that we meet the 10 percent, two-hour usage?

MS. MURPHY: I mean, if you wanted us to provide some additional information that way, we can try and pull that together.

THE COURT: I'm not saying --

MS. MURPHY: What I would say is --

THE COURT: I'm just saying is -- do you think that's required? If not, why not?

MS. MURPHY: I don't think that's required. I think it's enough. Once we say we reasonably believe we are covered, I think it's incumbent on the State to say why our belief is not reasonable in their view, and they have not said that. They have never said that they actually don't think any of our

members are covered.

THE COURT:  Isn't the burden on the plaintiff to establish the belief is reasonable for purpose of a preliminary injunction?

MS. MURPHY:  There is no -- we have by saying we reasonably believe it.  I don't see any basis in this record or in the State's arguments to doubt that that is a reasonable belief.  They have not said that they have any reason to think that this law actually covers nobody.

THE COURT:  Let me give you an example.  And I'm not suggesting you have to use magic words, although certainly it would make my life as a judge a lot easier.  So I've had all kinds of cases where I've had to read the declarations, try to figure out what can be reasonably inferred from the facts, and basically create a diagram of the declaration to see if I can figure out a way that it can be reasonably inferred from the declaration that the person said X so there's standing.

MS. MURPHY:  Sure.

THE COURT:  And I've actually got a law clerk that now works in Orlando that I think bears some scars as I was hurling declarations across a conference room table a couple of years ago, because for the life of me I don't understand why that's not the way declarations are drafted.

So I'm not saying that this is -- there's not underlying facts from which I can infer, but let's take the

App. 287

YouTube -- the declaration from YouTube.  I'm not saying you have to use the magic word "algorithm," but these declarations are not written where it says, for example, "YouTube uses algorithms, and here's an example of the type of algorithm we use."  I'm not sure that I can't fairly infer from the balance of the declaration that they're using algorithms, but -- that's my concern.

And you don't have to do this, but if you want to take the time to do this, it would be helpful for me for you to say, In the YouTube declaration and as confirmed through the deposition -- I'm sorry.  Yeah, the YouTube declaration -- this is why it's -- we've got an algorithm.  This is why they clearly said you upload and/or -- and view -- can view content.  This is the addictive feature that's listed in the statute that -- one or more that's used by ours and -- you don't have to do that, but I can tell you that for me to find there's standing, that's the exercise I've got to go through.

MS. MURPHY:  Well, let me step back a moment and tell you why I actually am not really sure that is the exercise you have to go through, because the ultimate question here --

THE COURT:  I hope Chief Judge Pryor is not on my panel if I don't engage in that exercise.  But, go ahead.

MS. MURPHY:  I will happily make this argument to Chief Judge Pryor too.

The ultimate question here is whether we have a

credible fear that the law will be enforced against us.

THE COURT:  And for there to be a credible fear of enforcement, there has to be a credible fear that the statute applies to you; right?

MS. MURPHY:  There can be a credible fear based on the fact that the State has publicly singled out our members as parties that it believes are covered by this law.  That itself is evidence that --

THE COURT:  If that's what you are hanging your hat on, where's that in the record?

MS. MURPHY:  We pointed out in our briefing that they're -- in the press release -- the press coverage -- in the official signing press conference about this law, they singled out members of ours; and in their own briefing, they talk about our members as the reason this law was passed.

So when you have a government entity that passes a law and says, We're passing it to regulate you, and then we say, We're worried that they are going to regulate us, and we think we are going to have to come into compliance because they've said they plan to regulate us; and then they come in and they don't say, No, no, we don't plan to regulate you.  What -- you know, You're wrong.  You misunderstood.  They just say, Well, you haven't laid out for us all the facts we would need to help us establish our case when we come regulate you.

That is not our burden on standing.  Our burden is to

App. 289

show a credible threat of enforcement.

THE COURT:  Counsel, I agree with you that could be a -- one way of showing a credible threat.  But let me -- when we start talking about traceability and redressability, though, I think it depends on who says it.

So, for example, in the case where some folks in the state of Florida decided if you had any connection to a Palestinian, not that you are Palestinian, not that your mama was Palestinian, if you thought about dating a Palestinian or any connection at all, you're suddenly going to be -- we don't want you on campus.  That's a slight exaggeration.  But the statements were made by the chancellor that had -- was a figurehead and had no authority to enforce anything.  So for there -- it seems to me -- and that's an example in terms of credible threat.

Here doesn't it matter who makes the statement?  So if somebody disconnected from enforcement or -- in terms of traceability or redressability here, makes a statement, they're just interested in it, does that somehow make the threat of enforcement a credible threat that would give you what you need for purposes of standing?

MS. MURPHY:  If we were just pointing to, like, a news article where somebody in the Florida government said something about us, okay.  But we're talking about the record at which the Attorney General was part of the official press signing -- State

App. 290

press statement for the signing of this law.  You know, this is -- wasn't just some -- just the people who passed it.  It also included people who are going to enforce it who were all there saying, We're bringing this to come at you.  They singled out NetChoice and said, like, NetChoice and its members are going to sue us because they think this law is unconstitutionally regulating them, and they'll lose on the merits.

THE COURT:  So, Judge, regardless of what sort of facts we present to support those underlying facts, we've got the AG tacitly -- I believe it would have been her at the time, now him -- shaking her head "yes" as a spokesman said, We're going after NetChoice; and based on those statements -- and we've got somebody connected to the enforcement side, which is setting aside private enforcement.  But the public enforcer, that's what gives us the credible --

MS. MURPHY:  So I'm not -- I'm certainly not asking you to say, like, one thing alone is it.  We've got multiple things here.  We have declarations where we said -- our members went on record and said under oath, We believe we may be covered by this, and we're not in compliance, and we're going to have to expend a bunch of money to do it.  They sat for depositions where they answered all the State's questions, said, Yes, we have this feature.  We have this feature.  Yes, we use algorithms.  Yes, we have minors.

THE COURT:  So that gives us algorithms; that gives us --

MS. MURPHY:  They went through the addictive features.

THE COURT:  -- addictive features, and I assume they talked about uploading or viewing content.

MS. MURPHY:  The content was discussed.

THE COURT:  So then the question becomes -- as it relates to my concern about at least one member would meet -- or could meet that full criteria such that there's a credible threat and it's reasonable -- the fear that gave rise to somebody saying, I think I'm covered, so I'm going to have to engage in these compliance costs, it comes down to what do we need as it relates to the percentage and the time; right?

MS. MURPHY:  And I just don't think that we can't get in the standing door without providing the State all the details it wants about whatever data we can compile to tell it exactly who is covered, and I would note --

THE COURT:  Which are the -- which y'all were suggesting were, in fact, the compliance costs?

MS. MURPHY:  Sure, that --

THE COURT:  So the argument is we don't have to sustain the injury that would give us standing, which is the compliant costs, in order to get in the courthouse doors.

And I, with all due respect to the defense, would agree with that proposition at the 30,000-foot-up view.

Case 4:24-cv-00438-MW-MAF   Document 71   Filed 03/11/25   Page 61 of 137
USCA11 Case: 25-11881   Document: 24-2   Date Filed: 08/13/2025   Page: 64 of 227

61

But don't you still have to have something -- some fact that would support that it's a reasonable for them to believe that the 10 percent user and the time requirements would apply?  You've always said, Judge, we said we have a lot of young people using and/or -- I guess it's YouTube that has the child or -- feature or --

MS. MURPHY:  Right, YouTube Kids --

THE COURT:  YouTube Kids.

MS. MURPHY:  -- that's designed for younger kids.

THE COURT:  And what is there on this record that I would look at that would suggest it was a reasonable apprehension that it applies such that my fear is justified and, therefore, I would -- it's reasonable for me to engage in, compliance costs that there are people spending lots of time on it?

MS. MURPHY:  I mean, if you're looking for something that we put forward that specifically categorize --

THE COURT:  I'm not saying two hours.  I'm not saying --

(Indiscernible crosstalk.)

MS. MURPHY:  I think it's a reasonable inference -- first, I think the right question is whether it's a reasonable view of ours that the State thinks that we satisfy the criteria, because we have to comply with the law or risk an enforcement action as long as the State thinks we're covered.

THE COURT:  NetChoice has, though, a program or feature?

MS. MURPHY:  I'm sorry?

THE COURT:  NetChoice has a social media platform?

MS. MURPHY:  NetChoice itself -- I'm talking about the members.

THE COURT:  No, I know.

So when you said, though, earlier, because facts matter, that the AG specifically was part --

MS. MURPHY:  Oh, they were talking about both NetChoice and its members.  They called out members by name.

THE COURT:  Well, that's what I was asking --

MS. MURPHY:  Yes.

THE COURT:  -- because --

MS. MURPHY:  They called out members by name and then said, NetChoice will sue us.

THE COURT:  -- this couldn't possibly apply to NetChoice; right?

MS. MURPHY:  They understood that the universe of entities they were regulating are NetChoice members.  That's why they talked about the members and NetChoice.  I don't think they --

(Indiscernible crosstalk.)

THE COURT:  Did they call out Snapchat or YouTube? Who did they call out?

MS. MURPHY:  I believe it was -- they definitely called out Snap, which is also one of our declarants here.

So, you know, at that point I think it's -- it's -- you know, when you put all that together, what the State really seems to be asking for here is something -- I mean, first off, they are the only state in the country in any of these lawsuits that's challenged standing, and I think there's a reason for that.

I mean, if this -- if they really are not convinced this law covers our members -- any of our members -- I don't understand what this law is.  The whole point of this law is to cover certain of our members, and they are not here telling Your Honor that they don't think it covers our members.  They are not here saying, We don't plan to enforce against you.  And in many courts, that's enough.

You know, the very fact that I've come forward as a plaintiff and said, I believe you're going to enforce the law against me -- if the State defendant won't say, No, no, you're wrong.  I won't enforce against you --

THE COURT:  In fairness, they may be reading Eleventh Circuit daily published opinions, which is why they start with standing since you're not a religious organization or a church.  So -- I mean, there are reasons why that might be so.

I want you to say whatever else you want on standing, but I want you to move -- be able to move to the other points.

App. 295

MS. MURPHY:  Sure.  I think the only other things, you know, that I would say on standing is, I mean, we obviously think we have user standing -- member standing.

But the *Virginia v. American Booksellers* case is a case where the Court said that the American -- the association could go forward -- even if the booksellers and association didn't have standing in their own right that they could go forward purely on the standing of their users.  The Court has a footnote in that case that explicitly reserves judgment on whether the plaintiffs had standing in their own right, and the whole holding of the case is in the First Amendment context; you can go forward on your users alone.

Now, we don't think we need to do that because we believe our members have standing in their own right, but, ultimately, that is the square holding of that case in the First Amendment context; that if you -- that you can assert the First Amendment rights of users even if, unlike here, you as a plaintiff wouldn't have standing.

So any way -- any which way you look at it, we think you come to the conclusion that there is Article III standing here, which, of course, goes also to why we think, of course, we can raise the interests of our users either way.

THE COURT:  Do you wish to add anything -- I know you have addressed it in your papers -- anything to prudential standing as distinguished from Article III standing?

And let me pause here and say I -- you haven't said that, but I'm also -- I can't apologize for everybody talking about standing because jurisdiction does matter.

MS. MURPHY:  Sure.

THE COURT:  I mean, we can't reach anything.  It's a given.  And I've got to -- an obligation, even if it wasn't raised by the government, to address and consider jurisdiction.

But do you wish to address it?  And I'm not saying you have to, and I promise I'm going to give you as much time as you need.  Do you wish to address prudential standing, or do you want to move on to the next point?

MS. MURPHY:  The only thing I would say that I think they are putting in the prudential standing bucket is this idea of excessive member participation, which I just don't think -- you know, the Eleventh Circuit has indicated that's not really something you should be focusing on the front end; let plaintiffs try to prove their case.

And here they've already -- what's happened to date has shown just because members aren't plaintiffs doesn't mean you can't get information from them if you need to.  There are third-party discovery tools.  They've already been able to depose members and ask whatever questions they wanted.  You know, obviously, there's limitations on that, but that's the kind of thing that should be assessed as the case goes forward, not some basis to say, Oh, you might need to know something from

the members, so we're going to dismiss.

You always need some information about members in associational standing cases that are based on members. That's why the Eleventh Circuit has said, No, the test is excessive member participation, and has specifically said that that's really almost never going to be a concern in a case like this where you're only seeking injunctive relief that would apply to every --

(Indiscernible crosstalk.)

THE COURT: It would similarly come up in cases where you're -- for example, damages.

MS. MURPHY: Exactly, where you're seeking different relief for different members, which we're not.

THE COURT: I do want you to address -- and it's okay if you want to leave it at what's in the brief, but two things: One, directly engage with the question about whether the members, as opposed to -- I'm sorry -- the association, rather, as opposed to the members, can bring a 1983 claim; and, two, what do I do with the fact and the alternative argument about equity if it wasn't pled, and do you believe it was pled?

MS. MURPHY: Sure.

So, you know, first, we absolutely think there is an equitable cause of action wholly apart from 1983. Do our -- does our complaint in each count say "and *Ex Parte Young*"? No. So, you know, I suppose if you wanted us to amend to add those

words to each count we could, but there's really no need to do so. It's commonplace to understand that as long as a complaint seeks equitable relief, it has invoked the equitable *Ex Parte Young* cause of action.

That's exactly how *Brown* itself was set up, as a case where they pled only 1983 claims, but they also were seeking equitable relief.

So I don't think there's really, you know, any requirement or anything to be gained from just having us amend to add those words. So we do think that's an independent basis to have a cause of action here.

I also don't think their 1983 argument is right because it is premised on the notion that we don't have standing. They're assuming that we're only asserting third-party rights, and we're not, for all the reasons we have already discussed.

But even if there were, ultimately, kind of third-party rights at issue here -- and the law talks about -- 1983 has been invoked in many contexts where you're focusing on the users, not just on the members. And I think if you go back to the text of 1983, I mean, it doesn't say that you have to be the party whose constitutional rights were violated to invoke 1983. You can get a remedy for an injury that's caused by the violation of constitutional rights.

So even if you thought -- and if our interest was

compliance costs, the users' interests were First Amendment, it doesn't matter as long as we have an injury and it's being caused by a violation of the Constitution. We have a cause of action.

And so I think their 1983 argument really becomes entirely derivative of their argument that we don't have standing, and we obviously think we do have standing. So we feel confident that we have a cause of action.

The last thing I'd say before turning to the merits is, you know, for all the reasons we've discussed, I don't think there is any deficiency in what we've provided. But given that we have a case that's been fully briefed on a PI motion and all of that, if there was some reason Your Honor felt you needed more information, I think it would make more sense to give us a little time to see if we can provide information rather than kind of start this whole thing over again from scratch by virtue of a technicality where I -- especially when I don't think they really don't think our members are covered by this law.

So if I can turn to the merits. So the -- obviously, the threshold question here is whether this law implicates the First Amendment at all, and on that question, we do think the answer is quite easy.

This is a law that is not about singling out some activity that's wholly unrelated to expressive activity. They are imposing a restriction on the ability to access expressive

activity, to access services where you look at other people's speech, you engage in your own speech, you share your views with people. It is all about the exchange and the engaging in First Amendment activity, and the whole point of this law is to restrict who can get access to these sites to engage in that activity. They are not regulating the act of creating an account for the sake of regulating the act of creating an account. They are regulating it as the gateway to getting in the door to engage in First Amendment protected activity.

And I do think it's important to recognize at the outset that this case, like other cases that, you know, have been enjoined across the country -- this is not a case like the one at the Supreme Court where the argument is that you're dealing with speech that's not protected vis-a-vis minors. The speech here is unquestionably in -- in the main, constitutionally protected as to minors. They've made no argument that this law is about trying to keep minors from accessing speech --

THE COURT: This would be different, for example, if it was asserting the right for minors to see pornography because they have no such right.

MS. MURPHY: Exactly.

Section 2 of this law is focused on content that is harmful to minors. We didn't challenge Section 2. That's not at issue here. So it would be different if you were targeting

App. 301

specific speech and saying, The reason we can do so is because we think it's not constitutionally protected as to minors. That's not their argument.  I take them to take as a given that this is -- you know, these are services where minors engage in speech that is constitutionally protected vis-a-vis minors, not just adults.  And so when you are passing a law that says -- you know, it really is no different from the law that says you can't go to the bookstore; you can't get the library card.  You're regulating and restricting the means of accessing and engaging in First Amendment activity.  That plainly implicates the First Amendment.

And it's quite different from *TikTok,* which, as Your Honor noted, the Court did proceed on the assumption that the law at issue in *TikTok* implicated the First Amendment anyway, but the law at issue in *TikTok* regulated foreign ownership of a company.  Now, it had a significant impact because if the law went into effect, all of TikTok's users wouldn't be able to access content anymore.  And the Court said, That alone is reason enough that we're going to assume that it does implicate the First Amendment.

But you don't even need to get into that kind of question here because the restriction on access -- you know, in the *TikTok* context, it was incidental.  They weren't passing the law to prevent people from accessing TikTok.  They said, If you get rid of the foreign ownership, it's fine.  Here it's all

about access.  This isn't an incidental effect of them restricting an account.  They're restricting an account because they don't want minors using these services, or they only want --

THE COURT:  Well, they say using these services with those addictive qualities.  What says you to that?

MS. MURPHY:  I'd say using these services.  They're just talking about features of these services and labeling them addictive.  These are -- and there is deposition testimony explaining that these are features.

They are -- I mean, first off, they're expressive features.  One of the features they're singling out is you have the ability to see if they liked other people's content or yours.  That's, obviously, expressive activity saying "I liked your content," "I didn't like it," "I found it funny," "I found it boring."  You know, that's expressive activity.  Those are metrics of expressive activity.

The decision to allow people to continue accessing content -- I mean, you know, what they're arguing is akin to saying they can decide whether you can break your book out into chapters or a series.  Those are decisions about how you're presenting your content, and they are important to the way our services function.

I mean, the Snap declarant explained in their deposition that the idea of getting rid of push notifications,

the things that tell you that one of your friends has sent a Snap, the service would kind of cease to do what it's designed to do, which is facilitate daily spontaneous interaction where you communicate with each other instantaneously.  If you had to go and say, I'm going to have to wait and look at the end of the day and see if, perhaps, anybody sent me a Snap, it's degrading what the services are all about.  So they may want to call them addictive features, but they are inherently part of it.

         And their argument -- when they say, Oh, just drop them -- I mean, to be clear, that would be -- they'd be saying, you know, We can make you drop them as to, like, everybody, because these are not just services that are being used by minors.  They are services that are used mostly in the main by adults.

         And the logic of their argument is that they can restrict the ability of services to give adults push notifications, or whatever it may be, because those are somehow something that can be divorced from the content and have nothing to do with expression.  I think that's a pretty radical conception that really would get at a lot of decisions that are made about how all sorts of content are presented.  Of course you have to make decisions.  How long is this going to be?  Am I going to break my movie into three parts versus one four-hour movie people sit through?  You make those decisions as part of how you deliver content and how you want users to engage with

it.

So I don't think you can divorce those and say, you know, Oh, just get rid of the features we don't like and offer a different service, and then suddenly the law won't apply to you.

THE COURT:  What's your best argument this is content based?

MS. MURPHY:  Sure.

So I'd focus on the first and second prongs of the definition of the services that are covered here.  So they want to focus on the features, but it's not enough to have the features.  It only -- you know, there's all sorts of services that have those features that they are not regulating.  They only want to regulate the ones that, first off, have -- they put it as where you upload bad content or can view content that's uploaded by others.  In other words, services that -- that facilitate user interaction, that kind of give a platform for the everyday person to communicate with other everyday people, instead of being a service where the provider themself selects all of the content.

THE COURT:  Same question I asked counsel on the other side:  Are you suggesting that this is the functional equivalent of what the Court was addressing in Utah in the *Reyes* case?

MS. MURPHY:  Absolutely.  Absolutely.  I think it's the same thing.

THE COURT:  So, Judge, it's content based because it's

addressing a category of speech, and functionally, it's regulating the category of speech of social interaction.

MS. MURPHY:  Absolutely.  That is -- you know, if you want to articulate the difference between a Disney+ streaming service and what this is going after, they are -- they seem to have particular concern when average citizens are talking to each other and there is not somebody selling the service who maybe has a broader kind of customer base who may push back a little bit on what content is there.

They seem to have a little bit of distrust once you're letting just -- you know, empowering everyday people to communicate with each other, or empowering everyday people to see the things, as often happens on many of these sites, to follow their elected officials, to learn more about the schools they want go to, their sports teams, all sorts of things.

THE COURT:  Is that the beginning and end of the inquiry; that it's a category of speech, so, therefore, it's not content neutral?  Or does it -- is there a further step to that, it has to be a category, and from that we imply something else?

MS. MURPHY:  I think that it's the fact that you're singling out specific -- you know, like, it's -- one way of thinking about it is we clearly have a law that's singling out certain speakers because it doesn't apply to everybody who has the features.  So then you ask what's the basis for singling out the certain speakers, and that basis sure strikes me as content

based, especially when you then have all of the evidence they themselves are putting forward is talking about, you know, we're worried about the things that we see here.

THE COURT:  So you attack a category of speech -- when you attack a category, it suggests you're going after speech, and that's the mischief associated with allowing you to go after a category?

MS. MURPHY:  Yeah, I think that's right.

I would also say I think the second prong of the definition is content based.  It's just basically the flip side of what Ohio tried to do in the *Yost* case by saying, We're going to focus on places where minors spend at least two hours a day. That's just saying, We're going to use a metric to figure out if you have speech that's especially attractive to minors, or even a little attractive to minors, since two hours a day is hardly, in my mind -- you know, I can't think of all the things I did for two hours a day that were speech-related as a child that I didn't think I (indiscernible) --

(Reporter requested clarification.)

MS. MURPHY:  I was not addicted to all of them, but I don't think that -- once you're saying we're going to single out services on the basis of whether their content seems to be attractive to minors, that is itself a content-based distinction.

So both of these prongs that single out -- that say,

We're not worried about everyone who has these features -- you know, if some news site has them and, like, 10 percent --

THE COURT:  Well, Counsel says, Look to *City of Austin* because, Judge, it follows up -- was it *Reed* that it followed up?  *Reed* --

MS. MURPHY:  *City of Austin* is first.

THE COURT:  It was after *Reed*.  *Reed* first and then *City of Austin*; right?

Yeah.  So -- he says, But wait.  *City of Austin* clarified this whole category issue.  What -- and says it's more complicated than that -- what says you to that? -- and that *Reed* -- I'm sorry.  *City of Austin* would suggest that's not -- this doesn't -- isn't content based for the same reasons *City of Austin* said.

MS. MURPHY:  I mean, I think what the Court was getting at in the later case was, look, if there's no way to -- like, if the law doesn't work in the -- I mean, you know, it was dealing -- there they had to be able to say, Are you addressing a service that's on the property?  And there's no way to know if a law is talking about a service that's on the property without looking at the content.

And it was almost -- as I take what the Court was saying, they were saying, Look, in that particular context, the examination of content was incidental to an interest.  It was actually property based, not content based.  And in that kind of

rare context where there's no way to understand it by -- other than looking a little bit at content, maybe that doesn't qualify as content based here.  But here it's --

THE COURT:  Or, broadly construed, it says that just because you break things down in category doesn't really suggest anything about whether you're going after a message or not, and, therefore, 30,000-foot-up view of that holding is that it's a lot more complicated, and the prior case was easy because it was just distinguishing between political speech as a category and other speech.  Isn't that another way of looking at sort of the *Austin* gloss on *Reed*?

MS. MURPHY:  I think that would be an awfully broad way to read *Reed.*  To me*, Reed* was more recognizing there are certain narrow contexts in which you may be able to peek at content without being content based.  I don't think *Reed* meant to be throwing out --

THE COURT:  *City of Austin* was the one that said that, though; right?

MS. MURPHY:  I mean, I'm mixing them up now.  Which one --

THE COURT:  Maybe I've got them written in reverse.

MS. MURPHY:  Whichever one came second.

THE COURT:  *City of Austin* came second.

MS. MURPHY:  The second one I think was referring to, look, there's going to -- you know, it is content --

THE COURT:  There's an aberration where you are going to have to look at content, but it doesn't make it content based is your point.

MS. MURPHY:  Right, right.

THE COURT:  I understand you.

MS. MURPHY:  But in the vast majority of cases, if the thing that -- the reason you are covered or not is because you provide a certain type of content, that's going to be enough to be content based.  And here you have a definition that's asking: Do you focus on social interaction, and do you have content that is attractive to minors?  Those aren't incidental to the definition here.  That's what they're trying to get at because they want to regulate services that they think minors may be using -- may enjoy using more than they think is appropriate.

So I do think that the law here is content based.  Of course, even if it's not content based, it's subject to heightened scrutiny either way because it implicates the First Amendment.  So content based only goes to the question of whether it's strict scrutiny versus intermediate scrutiny, and we do not think this law could satisfy either --

THE COURT:  And we'll talk about that in a minute. Before I get there, I think, arguably, I could have articulated that better, talking about the gloss that *Austin* put on *Reed*.

But *Austin* could also be construed as suggesting that just because you have to look to content doesn't mean that

you're going after the subject of speech would be a -- may be the better way of looking at that.  I don't want to spend too much time.  You've answered that question and that dichotomy.

Why don't you now talk about, Judge, strict scrutiny, this is how it would apply, why it fails.  And then, Judge, we disagree, but if you apply intermediate scrutiny, this is how it would apply and why we win.

And then I need you to talk, before you sit down, about *Moody* and what *Moody* tells us and -- or doesn't tell us that would apply in this case and our -- and my consideration of the issues before me.

MS. MURPHY:  Sure.  So I'm going to say one last note on *Austin* and *Reed* which is to Your Honor's point.  The Court explicitly said that just because a law is content neutral on its face doesn't mean it's not content based.  You do have to look behind it and see what the distinctions are.  So even when they were stepping away a little bit, they still said of course it's not -- it goes both ways.

And I'm actually -- I think it might be helpful to talk a little about *Moody* up front just to kind of --

THE COURT:  Sure.

MS. MURPHY:  -- set the table for why we don't think it's particularly relevant here.

That's not because our rights aren't at stake.  It's because the law is different in its nature.  So the law at issue

in the *Moody* case -- the two laws that were at issue there, the way they regulate it is by restricting the editorial discretion of the services.  They said, you know, you can't not put certain content on, or you can't deliver content in a certain way.  So they didn't -- they were not access restrictions in the sense of saying you can't let certain people use your services.  They were regulating the ability of the service provider to how they could disseminate third-party speech and, in some respects, how they could disseminate, you know, the speech that they themselves generate.

THE COURT:  And because of that, you don't believe you have to address a concern addressed by Barrett in her concurrence about how much information you have to put on about the industry and the burden?

MS. MURPHY:  Exactly.  Because the reason that mattered in that case is because when you have a law that's targeting the exercise of editorial discretion by regulated entities, that -- you know, the natural question is, one, is every regulation engaged in this kind of activity; and, two, if they are, are they exercising First Amendment rights?

And what the Court said in *Moody* was, We think most of them are, but we are just not totally clear if this law might reach some other entities that might not be engaged in First Amendment activity, and so that's what our concern is.

That -- none of that really comes into play here at

all because this is an access restriction.  It's not a law that's saying we're going to restrict -- you know, kind of like you have to supply certain types of content; you have to present it in certain ways.  It's saying people under a certain age can't have accounts on your site, and people in another age group can't have them unless their parents say yes.  And even adults, you know, have to verify their age before they get there.

So there's -- the First Amendment interest there exists wholly apart from whether you think third-party feeds are third-party speech, our speech, some combination of the two. The users have a right to see that third-party speech under the First Amendment no matter whose speech it is.

And so -- and we also, conversely -- you know, even if you set aside the question that we think we already won in *Moody* that, of course, we are engaged in First Amendment activity when we disseminate third-party speech, this law prevents us even from disseminating our own speech.

So it just is a law that doesn't implicate what the Court was worried about there when it was saying, We're not really sure if this might reach, like, Uber and email.  I mean, this law carves out email and direct messaging.  So the concerns the Court was talking about there of we're not sure who this covers and we need to know that so that we can ask whether they are all engaged in First Amendment activity is just really not

particularly front and center in this case at all since here we have an access restriction, not a restriction that's principally on the manner in which -- you know, what kind of content we can disseminate and how.

THE COURT:  So I want to make sure I understand your facial constitutional challenge, and I know a lot of ink has been spilled on this by various judges and panels.  But are you saying the universe, for purposes of analyzing this -- the universe I'm looking at, is covered websites, and because it can't constitutionally be applied to any of -- the website that it covers, that's why it's facially unconstitutional?

MS. MURPHY:  Yes.

THE COURT:  And so the fact the other websites that it doesn't cover is irrelevant for purposes of the facial constitutional challenge here?

MS. MURPHY:  Absolutely.  It's irrelevant in the sense of -- if we prevail and you issue a preliminary injunction, it's irrelevant as to entities that aren't covered by the law.  We're not seeking relief as to entities that are not covered by the law; we are seeking relief as to entities that are.

And so, you know, that's why a lot of what they're saying about "We need more information about exactly who of your members is covered" I don't -- that's not relevant to the merits here, because unlike in *Moody* -- you know, to be clear, we think the law in *Moody* is facially unconstitutional.  We are

App. 314

litigating those issues in *Moody*.  But the Court's concern was this law may apply to some other entities that may not be exercising First Amendment rights.

And in this context, this law is only going to apply, by its terms, to entities that are facilitating the ability of the users to engage in First Amendment activity.  That's the first definitional prong of who's covered by this law.  So you're never going to have an entity that's covered by this law that isn't allowing users to come engage in First Amendment activity on their service, and that alone is the basis for -- our First Amendment arguments stem from the restrictions that are being imposed on access to the content that's covered by virtue of prong one of the definition.

So turning to the application of strict and intermediate scrutiny, certainly the first question is whether there is a compelling government interest.  I think as I'm hearing the State today, they're not articulating a parental control interest or an interest in harm from predators.

THE COURT:  Well, it's the opposite of parental control because you're going to argue parental control is why it's not the least restrictive means; right?

MS. MURPHY:  Yes.  And they can't really argue parental control as to minors under 14 since as to them they say, We don't care what the parents think.  We are not going to let you have an account anyway.

So as I understand, their articulated interest is this --

THE COURT:  The addictive nature of --

MS. MURPHY:  It's the addictive nature.

THE COURT:  -- platforms with these features.

MS. MURPHY:  It's the addictive nature.

Now, the first problem they have with that is the problem the Supreme Court pointed out in *Brown*, which was their evidence of so-called behavioral addiction here is really correlation evidence.  They haven't met the high burden of demonstrating causation and really tethering this to, you know, these are the cause of --

THE COURT:  That analysis would be much different, though, if I subject it to an intermediate-level scrutiny; correct?

MS. MURPHY:  It's still their burden.  It is still their burden, and I think it takes something more than correlation to get there.  You know, it is a lesser burden, but we still don't think the evidence that they have submitted is sufficient.

But, ultimately, even if you accepted that there is an interest, I think kind of the biggest problem with this law is, first, it's not even clear how it advances those interests in any meaningful way.  But to the extent it does -- so it's certainly not the less -- least restrictive, even a less --

there were many less restrictive means available that would not burden nearly as much speech.

THE COURT:  I understand the least restrictive argument, but help me to understand -- if you are concerned about minors being addicted and spending too much time on these platforms, telling anybody 13 or under they can't be on them, that may not be, in terms of tailoring or least restrictive -- but help me to understand -- you just, I thought, said that it is completely disconnected from their concern.  How would that be --

MS. MURPHY:  I said it doesn't advance it in a particularly --

THE COURT:  How would it not --

MS. MURPHY:  -- meaningful way, and I think here are some of the problems.  I do think the analysis is a little bit different for 14 and 15 --

THE COURT:  If I say you can't play with rattlesnakes because I don't want you to get bit by a rattlesnake -- so you can't ever be near a rattlesnake.  That would keep you from getting bit by the rattlesnake; right?

MS. MURPHY:  Sir, one of the things that's a little bit unusual about their argument is they are saying, As long as you don't create an account, we're okay with you, you know, seeing and engaging with the same content.  They even say in their briefs "We don't care if you have the ability to upload

App. 317

content in some means where you don't have an account." And so it just seems pretty odd to me to be saying, like, We really don't care if you do all of these things so long as you just don't do them under the guise of an account. At that point all you seem to be doing is hamstringing the ability of our members to say, We're going to take into account how old you are so we can tailor this service more appropriately to your age.

THE COURT: If you don't use the account, then you'd have to use your -- somebody else's if you want to get on these services such that you'd be monitored, presumably, by somebody else; right?

MS. MURPHY: Not necessarily. I mean, for one, they talk about using it in a way where you are not using an account at all, which is possible on some services, but also -- I mean, there's certainly nothing that says that just because you go to a service through your parents' account your parents are going to sit there and watch what you do the whole time you are on the service. That is not a requirement. There is nothing in this law, other than for the 14- and 15-year-olds, at the -- you know, a gate-checking, "Yes, you can have an account." There is nothing in this law that does anything to facilitate (indiscernible crosstalk).

THE COURT: For purposes of there being a nexus between what you are doing and trying to fix the problem, does it have to be a perfect fit, or does it just have to advance

that interest substantially?

MS. MURPHY:  It has to be narrowly tailored to avoid unnecessary abridgment of speech.  That --

THE COURT:  I understand.

MS. MURPHY:  That is the standard even under intermediate scrutiny.  The Supreme Court said that in *McCutcheon,* in *McCullen,* and *Packingham,* all intermediate scrutiny cases.  And the *Americans for Prosperity* case discusses at length how narrow tailoring is the standard even in the intermediate scrutiny case.

THE COURT:  And I understand that.  I was asking a slightly different question.  When you were saying you start off with the proposition is it advancing an interest and is it even connected to the interest, I understand that then bleeds over into is it narrowly tailored and so forth.

I was taking umbrage with the notion there was a complete disconnect between -- as -- but I understand for your purposes it certainly is relevant for purposes of analyzing whether it's tailored or not.

MS. MURPHY:  And I would say I do think there's a pretty significant disconnect when it comes to 14- and 15-year-olds.  I would -- it was just something that was pointed out in the *Reyes* case, in the *Griffin* case, in *Arkansas* that there is something pretty odd about saying, We're terribly concerned that you might be addicted if you use these services,

App. 319

but as long as your parents say it's okay, we've lost all interest in whether and how much you use them.  As *Brown* says, that's really -- you know, if your concern is really -- if you -- that's *Brown*'s words.  It's not how you address a serious societal concern.

THE COURT:  What about the idea, though, that what we've done is if you get older but you are still not old enough, we at least want to create the filter of the parent who knows whether you're a mature 15-year-old and acts responsibly versus one that isn't?  And we understand that nobody is going to know the kid better than a parent, and so we tried to create sort of this hybrid for 14- and 15-year-olds recognizing there's a great difference between maturity levels and such.  And who knows them better than their parents?  So we are going to use their parents as a filter to make that kid-specific judgment.  I'm not saying that means they win, but isn't that a fair way to look at it too?

MS. MURPHY:  I think it's just not a remotely narrowly tailored way to advance their interest, because if what you really want to ensure is -- you know, if you really came at it as, look, we are not trying to prevent complete access to these services but, rather, want to deal with specific concerns we have about some minors who may be focused on, you know, particular content that we are troubled with or minors who may be using these services for more time than we think they could,

it's much more sensible to focus on how do we give parents effective tools to help them, if they want to, to monitor their children.

THE COURT:  Would it be okay if the law said because we are concerned about these very things, you've got to allow parents to sign off, and you've got to -- sign out, rather, and -- sign their kids out, and you've got to honor that if they did?

MS. MURPHY:  We are not challenging the parts of the law that say, for instance, that if a parent asks us to terminate a minor's account, we have to do so.  We are not challenging that.  That -- you know, if the parent themself is exercising authority to say, I don't want my minor to use this service, we are not here trying to override that.

The problem is this law starts from a default of you don't get to use it unless your parent comes in and says yes, and then it kind of counterintuitively says, As long as they say yes once, we've lost all interest in what you do afterwards.

And the reason that matters is because, as *Brown* and other cases say, it -- just that complete kind of lack of connecting the way you're regulating to what you say is the reason you're regulating calls into question whether this is really about distrusting and disliking certain speech or certain speakers or certain services, which is the whole reason we have heightened scrutiny in the First Amendment, because we want the

State to assure us that that's not what's going on.  And when you have that kind of disconnect, they haven't assured us that that's not what's going on.

And I think here, you know, is the existence of parental control tools that are much more tailored to what they are talking about.  There are tools where you could tell parents, Look, if you are worried about how much time your minor is spending on a service, here's -- here's application-level tools, here's device-level tools.  You can turn off the Internet in your house for hours a day like Florida requires its schools to do because that's how it effectuates keeping kids off --

THE COURT:  Your point is those are both less restrictive means, but they're also showing ways in which it could be narrowly tailored, but it's not.

MS. MURPHY:  And they are more tailored.  It's not just that they're narrowly -- they actually do more to advance the interest the State is talking about here, because instead of saying, Look, there's some number of minors who might be using these services in a way that's harmful.  We are going to keep all minors off them or at least keep, you know, 14- and 15-year-olds off, unless their parents say they can be on them, it says, We recognize that there's a massive amount of protected First Amendment activity going on here, and before shutting it all down, we are going to instead start with how can we look at the particular aspects that may give us pause and say, What can

we do to address them and to determine that, you know, hey, maybe we want to ensure that parents understand that there are tools out here; that they know how to use them; that they are available to them.

The reality may be there's some parents who don't share Florida's view that it is really problematic for their child to watch, you know, three hours of political coverage on YouTube for a day.  There is built into this the notion that the State knows better than the parents do what children want.  And I think a law that focused on empowering parents instead of the State coming in and saying, We are going to kind of make the decisions for all children across the board rather than letting you determine what is safe and effective and valuable and educational and useful and socially productive for your minors -- you know, that's the kind of thing that generally is subject to significant First Amendment suspicion if we -- it's a law that ends up operating pretty much the same way the law that was held unconstitutional in *Brown* operates.

And I don't think that kind of the State singling out these features and saying "Oh, we're focused on these particular features" really works because the features they are talking about are features that exist on all types of services.  They exist on streaming services.  They exist on other services online.  They are not regulating the features -- QUA features.  They are interested in these features only when these features

App. 323

are used in connection with particular services when minors engage in particular forms of protected First Amendment activity, and that right there is a reason to be suspicious of what the State is doing and hold them to a very high burden. And when you come at this from the level of "We are just going to restrict access across the board," that just doesn't cut it.

Is there something else you asked me to cover before I sit down? I'm trying to recall.

THE COURT: You are going to have another chance to talk again.

We are going to take a break. You can confer with your colleagues.

Counsel for the government can communicate with his colleagues.

And when we come back -- let me find out -- assuming that I don't interrupt you, Counsel, how long -- I had said 10 minutes, but how long do you need for your sort of rebuttal?

MR. GOLEMBIEWSKI: To be safe, maybe 15 minutes.

THE COURT: Sure. I'll give both sides 15 minutes.

So y'all can go over your notes.

And, Ms. Murphy, if after he does his 15 minutes if you'd like a break to look at your notes so you can make best use of your 15 minutes, we can take another break; okay?

MS. MURPHY: Sounds good.

THE COURT: We'll take a 10-minute break and come

back, and I'll hear the rebuttal from counsel.

And then if you don't need a break, we'll hear from you.

And we'll wrap it up.

Thank you.

(Recess taken at 11:13 AM.)

(Resumed at 11:29 AM.)

THE COURT:  Counsel, you may proceed.

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

So I'd like to start with standing.

Standing is not a technicality, and it can't be granted based on speculation.  You asked plaintiffs for any record evidence establishing that a platform engages in the conduct contemplated by subsection (1)(e), including that 10 percent, two-hour threshold, and they were not able to identify anywhere in the record where that's the case.

The plaintiffs seem to be saying the members they are identifying at this point are YouTube and Snap.  On page 20 through 22 of the YouTube declarant's deposition, Ms. Veitch, she recognized that she doesn't know what the demographic or user rates are of YouTube.  And she said she's not a data scientist, so she doesn't have that information.  And she didn't offer anything that could substantiate, even at a basic level, that YouTube meets that 10 percent, two-hour threshold.

Counsel has suggested that this is some kind of burden

App. 325

on platforms to come forward with this proof even though it's their burden in a preenforcement challenge, but the Snap representative, Mr. Boyle, on page 119 through 120 of his transcript said: *We do track the amount of time spent in the application.  We have the capability to aggregate that data to break it down by different demographics.*  But he never said that a lot of kids are on the platform more than two hours per day or offered anything, and that's important.

So plaintiffs have pivoted to credible threat, but the *Driehaus* standard has multiple prongs.  The first is they need to allege, a plaintiff, that they are engaged in conduct that is arguably proscribed, and then they have to establish credible threat.  Here plaintiffs haven't even established that any member engages in conduct that can be arguably proscribed.  Instead they've jumped that, pivoted to credible threat, and are relying on speculation and things not in the record.

The complaint does not allege that the Attorney General has it out for any particular NetChoice members or that the Attorney General singled out any members at that press conference.  The plaintiffs have only cited 23 seconds of that press conference in their filings, and they are -- they are the 23 seconds of Former House Speaker Renner's speech where he talked about the functionality of the law when that is read in context.

Sure, legislators at times might talk about platforms,

App. 326

but what matters is the text of the law for standing.

Legislatures say a lot of things a lot times, and that's why the

Eleventh Circuit has said in cases like *Hubbard* you can't go

mining the legislative record for legislative intent or

motivation.  At standing you have to come forward with some

credible threat of enforcement from the entity that you are

suing, and there are is nothing like that in this record about

the Attorney General and there is nothing even establishing that

first step of arguably proscribed conduct under *Driehaus*.

THE COURT:  Counsel, I've just got to ask -- and I

think the answer would be, Judge, that's not this case.  But

certainly if there was no issue at all, you passed a law -- I

understand why you couldn't, but you passed a law that says this

law is directed to YouTube and YouTube then sues, so there is

not going to be an issue of application.  I mean, there's case

law that says you can assume the Attorney General is going to

enforce the law of the state.  So if there wasn't an application

issue, you don't have to have anything else to suggest that it

would be reasonable to take actions because you are going to

assume the Attorney General is going to enforce the law of the

state if it clearly applies to you; right?

MR. GOLEMBIEWSKI:  You are saying if they've

established our belief proscribed -- and then the -- individuals

engaged in arguably proscribed conduct, they sue.  On credible

threat, if the Attorney General is defending the law, are we --

you are saying we would assume that --

THE COURT:  No.  I'm saying you're suggesting that you would have to have a -- I don't think it necessarily matters is my point.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  Are you suggesting there has to be a statement from the Attorney General to show there is a credible threat of enforcement?

I think the law is pretty clear that if it applies to somebody, I can be in reasonable apprehension that the Attorney General is going to do her -- his job now and follow the law; right?

MR. GOLEMBIEWSKI:  Yeah, I'm not touching on that question at all.

What I'm saying is they're jumping over arguably proscribed and saying, Well, they have standing because the Attorney General suggested something at the press conference when she didn't even do that.

THE COURT:  The question was the unremarkable proposition that it works the other way as well.

MR. GOLEMBIEWSKI:  Yeah.

THE COURT:  That if it clearly applies to you, then this idea that you've got to have some statement that somebody is going to enforce wouldn't be necessary.

MR. GOLEMBIEWSKI:  Yeah.  There's --

App. 328

THE COURT:  I was just saying the reflexive is true.

MR. GOLEMBIEWSKI:  I see.  Yes, Your Honor.

There's Eleventh Circuit precedent that supports that proposition --

THE COURT:  Okay.

MR. GOLEMBIEWSKI:  -- you know, if there is traceability and redressability, et cetera.

And what this redounds to, because they can't identify any record (indiscernible), is again a probabilistic argument. They are asking the Court to make the leap to say, Well, we represent a lot of social media platforms, so one must be covered, even though the Legislature crafted a law with very specific criteria and didn't just advance some kind of broad law addressing all quote/unquote "social media."

And plaintiffs, they have offered no evidence to suggest that the law in effect is only going to target their members.  Their members don't even include the full universe of social media platforms as commonly understood.  TikTok is not a member, and TikTok has 170 million people.  So even if the law --

THE COURT:  Do I know that from this record?

MR. GOLEMBIEWSKI:  That TikTok is not a member?

THE COURT:  Yeah.

MR. GOLEMBIEWSKI:  Yes, Your Honor.

THE COURT:  I guess my --

App. 329

MR. GOLEMBIEWSKI:  They've disclaimed that.

THE COURT:  I know that.  And so what other information is actually in the record?  The record is really thin on terms of the universe that's in and out, right, other than --

MR. GOLEMBIEWSKI:  Yeah, that's right.

I mean, yeah, so the plaintiffs say, Well, they know -- the State knows this law applies.  I don't know who this law applies to, Your Honor.  It's very specific in its criteria, and there's been no evidence put forward about any platforms that meet the criteria.

THE COURT:  I understand.

MR. GOLEMBIEWSKI:  My point is a practical point. Even though --

THE COURT:  The practical point is you pass laws that shut down protests, passed on all manner of laws that stop all kinds of speech and say, We don't have an enforcement mechanism; we are having it privately enforced; or we don't know who it applies to.  So even if it chills vast amounts of speech in violation of the First Amendment, so sad too bad.

I understand that theory generally, but that's not the problem in this case.

You can continue.

MR. GOLEMBIEWSKI:  Yeah, that's right.

And there's been no argument, for example, that the

10 percent, two-hour threshold is vague, to your point.

I mean, the folks that testified know they have this data on users, but they weren't able to offer any testimony to substantiate that conduct.

So the next point, Your Honor, that I just wanted to briefly mention is the cause-of-action issue. So I think plaintiffs suggested that the cause-of-action problem in 1983 is derivative of a standing problem, but that's not the case. Section 1983 allows the person who has been deprived of rights to bring an action and hold the State actor liable.

An association cannot assert the rights of its members because that is a third-party claim, and the members are the rights holders under 1983. Associational standing and the cause of action are two distinct issues. An association might be able to bring an equitable cause of action on behalf of members, but 1983 does not allow the association to assert the rights of any third-party rights holders, members, or users. And --

THE COURT: Since they pled and ask for equitable relief, what else would they have to put in their complaint to seek equitable relief under *Ex Parte Young* and that line of cases that recognizes the claim in equity?

MR. GOLEMBIEWSKI: Well, they need to at least cite *Ex Parte Young* and say somewhere they are bringing a cause of action under equity.

THE COURT: What if they don't cite anything?

App. 331

What if 1983 wasn't there, they don't use the magic words "claim in equity," but they say the First Amendment is violated and they just ask for equitable relief?

Why would that not fall squarely within the case law that recognizes such a claim?

MR. GOLEMBIEWSKI:  That's -- well, if they just have a request for relief, that's different than the cause of action. They need to plead a cause of action and identify one in their complaint.  You can't just seek equitable relief for damages and say, Well, we have --

THE COURT:  *Ex Parte Young* really isn't a cause of action, is it?

MR. GOLEMBIEWSKI:  No, you are right, Your Honor. It's not really a cause of action, but it's indicative of at least providing some kind of guidance to the defendant and the Court of putting on notice what's the vehicle -- the procedural vehicle through which this action is being pursued.  If you just request an injunction in the relief, that doesn't signal to the defense or the Court what's the cause of action or vehicle being used to get this teed up on the merits.

THE COURT:  Except that if everybody on the planet recognizes you can bring a claim for equity based on a constitutional right under *Ex Parte Young*, it tells the government that's what you are doing.  So I don't know why that wouldn't put somebody on notice.

App. 332

But that -- we don't have to resolve that right now.

MR. GOLEMBIEWSKI:  Okay.  Yes, Your Honor.

And so then I'd like to turn to the merits.  So, first, just as a threshold matter, plaintiffs say that the State and the defendants have just labeled these features addictive. That is not the case.

The U.S. Surgeon General recognized them as addictive. Experts recognize them as addictive.  The legislative staff analysis in this case was pretty thorough and cited a lot of --

THE COURT:  The Surgeon General also said COVID was dangerous, but I get it.  It doesn't necessarily say -- the U.S. Surgeon General, just because he says something doesn't make it so.

But, go ahead.

MR. GOLEMBIEWSKI:  Well, Your Honor, it is well known in this country that kids are addicted to these platforms.  This is a mental health --

THE COURT:  It was well known when I was growing up that I was going to become a Satanist because I played Dungeons & Dragons.  Is that -- I don't know what really that means.  You can say that there's studies, Judge, and you can't ignore expert reports that say X.

But invoking the "it's commonly known" -- I mean, it was commonly known that masks would prevent, potentially, the spread of COVID, but apparently that was fake news.  So, I mean,

App. 333

I don't understand how the "commonly known" helps you.

MR. GOLEMBIEWSKI:  Even if you put aside the "commonly known," Your Honor, our point is that plaintiff suggests that this is some -- what -- the point they are making --

THE COURT:  And by the way, "commonly known" certainly wouldn't -- if you are subject to strict scrutiny, that certainly wouldn't be enough; right?

MR. GOLEMBIEWSKI:  Agreed.

THE COURT:  And you would even agree the sort of loosey-goosey causal effect under existing case law wouldn't be enough for strict scrutiny; right?

MR. GOLEMBIEWSKI:  A direct causal link is required under *Brown* for strict scrutiny.  Is it not required for intermediate --

THE COURT:  Right.  I think I said --

(Indiscernible crosstalk.)

MR. GOLEMBIEWSKI:  No, that's right.  But the plaintiff suggested otherwise, so I wanted to --

THE COURT:  All right.

(Indiscernible crosstalk.)

MR. GOLEMBIEWSKI:  -- since we are talking -- since we are talking.

But the point that the plaintiffs seem to be making about this, saying we are slapping a label on addictive features, is that it's arbitrary and that we really have a

stealth point here, a purpose, to chill expression.  But our point is that nothing about these -- us singling out these features is arbitrary.  No one can contest that there's data out there.  Whether you disagree with the U.S. Surgeon General or not, they are saying that, experts are saying that.  And there's also evidence that kids are compulsively using this product at rates we have never seen.

Kids weren't reading comics -- millions and millions of kids weren't reading comics eight hours a day.  Millions and millions of kids weren't listening to rap music eight hours a day.  There's something different going on here, and there's a consensus --

THE COURT:  The problem, Counsel, that's a really bad example, the comics, because there is an entire exhibit in Glasgow where they barred comics in the entire country because somebody decided that comics were turning their youth against their parents and were causing them to engage and worship the supernatural and stuff.

So, I mean, I guess that was the point the plaintiffs were making is from the beginning of time, we've targeted things under some belief that it's harming our youth, but doesn't necessarily make it so.

But, go ahead.

MR. GOLEMBIEWSKI:  But -- but I think that helps -- that cuts in our favor, Your Honor, because the point about the

App. 335

ban in Glasgow was that it believed kids were being turned against their parents.  There was concern about exposure to content.

This law applies to these addictive features that -- push notifications, infinite scroll doesn't expose you to any particular content.  It's a psychological hook that keeps you scrolling because you don't have to press "load" more.  So it's qualitatively different than in those types of example.

THE COURT:  And that's -- the nub of the case is whether it is regulating speech or it's not.  I get that part.

MR. GOLEMBIEWSKI:  Gotcha.

THE COURT:  That's one of the primary issues you and plaintiffs' counsel disagree about.

MR. GOLEMBIEWSKI:  And I'll get into that, then, on the content-neutral piece.

So *City of Austin* is important*.  City of Austin* followed *Reed*, Your Honor, and it emphasized that what matters for the content-based analysis is whether the law discriminates based on communicative content.  Because as the Supreme Court has previously recognized in *R.A.V.*, the focus for the content-based analysis is, is the law going to drive viewpoints, ideas, and, in particular, messages from the marketplace.

*Reed* held that -- and this is how the Fifth Circuit had interpreted *Reed* and this is what led to *Austin* -- that if you have to read something, it's necessarily content based.  But

App. 336

even under that maximalist view of *Reed*, which *City of Austin* receded from, our law is not content based.  You don't have to look at any of the posts uploaded, any of the user activity to know whether our law applies.  Its subject matter doesn't matter.

If the site has those functions, the law applies.  And so *Austin* -- *Austin* stated:  *The City's provisions at issue here do not single out any topic or subject matter for differential treatment.  A sign's substantive message itself is irrelevant to the application of the provisions.*

THE COURT:  It doesn't single out any subject matter.  And their whole issue here is it singles out a subject matter; namely, social communication, i.e., *Reyes*.

MR. GOLEMBIEWSKI:  Well, the next section -- the sentence expounds on that:  *A sign's substantive message itself is irrelevant to the application of provisions.*  That's what matters, the communicative content or the substantive message.  When you are singling that out, that is a content-based discrimination.  But this broad category of social speech doesn't turn on any kind of substantive message.

Anything a child says on the platform --

THE COURT:  Fair enough.  And that's what I think I said to you earlier, Counsel, it's not that you lose.  I said there were two aspects.

One, is there such a thing -- separate and apart from,

for example, speaker by proxy, is there another category which is -- you can tell because it takes out a subject. I used political speech as an example. It's not a particular message; it's just a general category of speech. And I said, But, secondarily, the issue becomes is that sort of social speech -- and I'm not bound by *Reyes*, and this case is, again, by functionality not as direct as *Reyes* -- there's a separate issue about whether or not *Reyes* is correct or the distinction here doesn't matter.

So I do want you to explain that to me, and I think you were doing that but sort of indirectly.

Do you think, for example -- let's start with *Reyes*. That's the easiest thing.

MR. GOLEMBIEWSKI: Yeah.

THE COURT: And assume there was no distinction between this law and *Reyes*, which there is, do you think that Utah court got it wrong by saying because it's targeting that subject, namely, the social interaction, that that's the type of subject that would be content based and fall within the ambit of the case law, i.e. *Reed* and *Austin*?

MR. GOLEMBIEWSKI: Yes, I do think it got it wrong.

THE COURT: Okay.

MR. GOLEMBIEWSKI: I think social speech is too general of a category. It doesn't -- if you are regulating quote/unquote "social speech," you are not regulating any

App. 338

particular communicative content because all speech is social.

I guess I struggle with this even because I don't know what the definition even is of "social speech."  If social speech is any communication between peers and a law regulates that, that is not singling out any communicative content.  It's regulating out -- it's regulating an exchange, but it's not threatening or singling out viewpoints, ideas, or messages.

And so --

THE COURT:  Does it matter at all that it's singling out and blocking that communication in that sphere and that type of communication?

So, in other words, would it matter, for example, if you said, You can have conversations anywhere except in a tent. You just -- you don't want Boy Scouts talking anymore.  I guess there is no such thing as Boy Scouts anymore.  Whatever it's called now, but -- Scouts of the World or something; whatever it's called now -- does that matter or no?

MR. GOLEMBIEWSKI:  No.  That just sounds like a manner restriction to me.  If you say, you know, you can't -- you can't socialize outside of a jail, that doesn't seem to me to single out any kind of content at all.

If you recognize -- all you're doing is regulating some kind of interaction or communication, but there's no specific substance or message to that.

In *Austin* the plaintiffs -- the plaintiffs made a

App. 339

similar move where they said, Well, regulate --

THE COURT: So you are saying with, like, for example, the political -- because I want to flesh this out -- like, with a category of political speech, Judge, we agree it doesn't have to say no conservative or no liberal speech.

MR. GOLEMBIEWSKI: Yeah.

THE COURT: But by saying "political speech," it's targeting a subject matter, namely, you can't communicate about anything political one way or the other at all, and it's taking out a specific subset of speech. Whereas the social speech, whatever it means, Judge -- I don't even know how you are going to define it or how they mean it -- it's so broad and so vast. It encompasses so much speech. It's completely disconnected from the sort of categories of speech that may not have a specific message or viewpoint, but it is a category. And, for example, political speech is a subject sufficiently narrow that that's why it was problematic.

MR. GOLEMBIEWSKI: That's right. That's right.

And so that's actually -- I mean, the next sentence in *City of Austin* is: *There are no content-discriminatory classifications for political messages, ideological messages, or directional messages concerning specific events.* And so the Court conceptualized the issue the same as that level of generality.

It has to be more specific because if you are singling

out political speech, you threaten to drive from the marketplace of ideas that type of speech.  You are disfavoring it.  If you are regulating interaction, you are not disfavoring any ideas. You can -- you're disfavoring -- you could be disfavoring all ideas altogether, but you are not singling anything out.

And so, I mean, it's just hard -- like, if this is the case, then, when you send a kid to detention, everybody has to be quiet in study hall, that's a First Amendment problem because they are not able to communicate.  I mean, that's a content-based regulation.

I mean, the whole point of *City of Austin* was to figure out the right level of generality of thinking about this content-based distinction.  And the Court narrowed it down to the subject matters, political speech.  Social speech would engulf all those, right, because if a restriction on social speech was a content-based discrimination, that means you are restricting all kinds of speech, and somehow it's still singling out speech.  But that's not how the test works.

THE COURT:  I understand your argument.  Thank you.

MR. GOLEMBIEWSKI:  Thank you, Your Honor.

Okay.  And just to address tailoring.  So -- because the law is content neutral, intermediate scrutiny applies or time, place, manner restriction, which we know in our brief is a little bit more forgiving under cases like *Club Madonna* and *Lady J.*  And plaintiffs didn't dispute that.  We think that

that's the analysis that applies, but the law satisfies either form of tailoring.

Plaintiffs' principle argument on tailoring is that there's parental controls. And in their PI reply, they said that the less restrictive alternative is promoting parental controls. I mean, I don't know exactly what that means.

If they are saying -- requiring platforms to have parental controls or requiring parents to turn off the Internet at night, that would seem to me pretty restrictive. If they are talking about just --

THE COURT: Well, we've empowered parents to control what books our kids read in school. Why is it far-fetched to empower parents and think they know best for their individual children about who they are engaging with socially on social media platforms?

MR. GOLEMBIEWSKI: Well, parents certainly have a role, but the key is these controls. And the controls have proven ineffective. So these platforms --

THE COURT: You are taking the control away. Because if I've got a 13-year-old child and I want him to -- does my kid get to sign up if I want him to be able to sign up and have an account in a social media platform on Facebook?

MR. GOLEMBIEWSKI: You can register for an account and a kid can use your account, and you can monitor them.

THE COURT: I don't want to monitor them. Just like I

want them to read the book about the two penguins raising an egg together. The two male penguins raising an egg together. I don't want to sign up on my account. I want to have my own Facebook account. I want my kid -- you've taken that choice away from me; right?

MR. GOLEMBIEWSKI: I just think it's an irrelevant issue because their -- I mean, the degree of control that parents have is irrelevant. What's --

THE COURT: The point, Counsel -- and I don't think it's particularly far-fetched -- is the State of Florida picks and chooses when they want the parents to be making the decision. And when it suits their purposes, they do; and when it doesn't, they don't.

But I've got it. Fair enough.

MR. GOLEMBIEWSKI: So our point is mainly about these parental controls are ineffective. So -- and we have evidence to that effect. The plaintiffs, they don't have evidence really on anything at this point.

So the Snap declarant testified that the number of parents that actually use their parental controls is in the single digits even though these platforms have touted these controls for years. We cited articles from leaked TikTok documents where TikTok said they only had parental controls for PR purposes. The parental controls are also ineffective according to our doctor, Dr. Alter. And this is something that

in the *Free Speech Coalition v. Paxton* case Justice Barrett remarked on; that it's hard to manage all these parental controls, and the past ten years have shown they are not a less-restrictive alternative.

But even if they were, even if promoting -- I mean, this is like -- it's, like, a stunning argument to me. Because the argument seems to be: We should have done a PSA promoting parental controls and just kept trusting platforms to implement them with fidelity despite the *FTC* finding they don't implement them with fidelity, despite kids being on these platforms so extensively, despite parents not being able to navigate these controls. The less-restrictive alternative was to just trust them? That's similar arguments like tobacco companies made 25 years ago. So just setting that aside, even if this were one less-restrictive alternative, that is not enough to defeat a law under intermediate scrutiny.

The Supreme Court in *TikTok v. Garland* said, Okay, the plaintiffs here paraded all these alternatives that might be less restrictive. But in intermediate scrutiny, when the State is impleting a content-neutral interest, that's not going to defeat the law if -- as long as the law is not substantially unrelated, the burden it imposes, to its aim as long as it's tailored.

And this law is tailored to that aim. Kids are going to be -- reduce their exposure to addictive features through

App. 344

accounts.  The account restriction or contracting for accounts is rational, because how "accounts" is defined in the statute is things -- profiles, et cetera, that platforms use to track users' activity.  And so with an account, you can track users' activity, target them with push notifications, target them with personalized display metrics, and it can effectuate these addictive features.  And so there's a nexus there.

So this law, we think, easily clears intermediate scrutiny, particularly that we have a compelling government interest of protecting child well-being.  And this law does not substantially burden any speech unnecessarily.

And the last point, Your Honor, is just on the members' rights issue.  So I understand, based on plaintiffs' presentation, their argument to be they're bringing claims on behalf of the members, and through that claim they are also asserting the rights of kids and adults.  But that's -- but the Courts don't allow some kind of omnibus claim.

What was happening in *Brown* was the sellers of video games were seeking to enforce their own rights, and California justified the ban on violent video games by saying kids don't have a First Amendment right to receive that kind of speech.  So you, video game companies, don't have a right to distribute it.  And so kids' rights were relevant only to understanding the scope of the speakers' rights.

The video game companies did not bring an independent

App. 345

claim on behalf of kids.  And so I'm a little -- I'm more confused at this point about are they asserting claims on behalf of children and adults, as well as members, or is it just members and they are using alleged burdens on kids and adults to make their case?

And I would just underscore that this is another reason why the complaint is a shotgun pleading because it jams together so many different contentions in one count, and it incorporates all allegations by reference.

That's all I have unless Your Honor has any other questions.

THE COURT:  No additional questions.

Thank you.

MR. GOLEMBIEWSKI:  Thanks.

MS. MURPHY:  So, actually, we'll start with standing.

And, you know, we think we have met our burden on standing here.  As the State acknowledges, the question is simply whether we have adequately alleged and demonstrated for PI purposes that we have conduct that's arguably proscribed by the statute.

You can look at the deposition of the Snap deponent here, pages 117 through 23.  The State went through each of the aspects of this law and asked:  Does Snap have this feature?  Does Snap do this?  Does Snap do this?  And the answer was yes as to all of them.

App. 346

And the only thing -- that's why they are harping on it -- the only thing they don't have is precise information about the number of hours that minors use the services. But I think it's certainly reasonable for a member to say, Look, we have all the features. We -- as our deponent said, 15 to 20 percent of our users are minors. And, oh, by the way, you've specifically identified us as a service that you believe -- you, the State, who is going to enforce this, believe is covered by it. So we think there's a pretty good chance we are covered by this law and that you're going to come after us. And I can point you to one of the cases that we --

THE COURT: Let me ask you this first: When you are talking about the 15 percent, 20 percent of our users are minors and so forth, is that part of the explanation of the Snapchat representative of why they think the provision applies to them?

MS. MURPHY: It was questions that were being asked by the State in its effort to illicit whether the law covers -- is likely to cover Snap. And they asked them about, you know, what percentage of your users are minors? Do you have users in Florida? Do you have minor users in Florida? They asked all these questions and Snap answered them, and they are not pointing to anything Snap said that gave them reason to think Snap is not, in their mind, covered by the law. They are just pointing to one piece in all of this.

THE COURT: So there certainly is evidence before this

App. 347

Court based on that -- and I'll certainly go back based on your representation as an officer of the Court -- that they have a -- it's not an insubstantial number of minors using at least Snapchat.

So is there any discussion in that depo, not necessarily about minors but about average uses or typical uses, et cetera, in terms of times people stay on the service?

MS. MURPHY:  I think the particular deponent -- you know, these were not 30(b)(6) depositions, didn't have that kind of level of detailed information.  So to the extent the Court thinks --

THE COURT:  Is there any mention or reference anywhere at all about timing even in the most general way?  Yes, our services are generally used by folks, and they just -- and it's not uncommon for people to use it for hours at a time.

MS. MURPHY:  I don't recall if there's specific discussion in that respect in the deposition.  I will note that the State's evidence here is all evidence they are putting on. I mean, the State just stood up and told Your Honor people are using -- these minors are using these services for eight hours a day.

They have put on their own evidence where they have people talking about the use of minors of the particular services that they are saying are covered.  So they seem to have their own evidence they are suggesting shows that the amount of

App. 348

time is significant, which again goes to -- I mean, this is not -- this is not, Hey, we have to come in and confess and demonstrate and prove that every single aspect of the law is covered.  We have to show that we are arguably proscribed.

THE COURT:  You are saying, Judge, we also can rely, like any fact finder, it doesn't mean who produces it or who files the depo or the affidavit.  You can rely on any information in the record at this stage to determine whether the plaintiff met its burden.  And, Judge, there is nothing that keeps us from relying on the depos they took and the information they submitted.

And if you look at all that information together, to answer your question, yes, Judge, there is information from which you could fairly extrapolate there are -- for at least one of our members, there's a large number of children users and fairly extrapolate that they're staying on -- that users that use these types of services, based on the addictive qualities, use them for the amount of times that would fall squarely within the ambit of this provision.

MS. MURPHY:  And I think --

THE COURT:  Is that -- am I following you?

MS. MURPHY:  Yes.  And I would just put that all in the specific context of the legal inquiry here that is arguably proscribed.

And, certainly, if you look at all the information

that's available here from us, from them, from the depositions, everything we have at this point, I think it's really hard to say that there's not even an arguable basis for our members, who have submitted declarations where they said, We believe we are covered, who took the time to bring this lawsuit because we believe we are likely going to face enforcement actions from the State if we don't take action.

All of that is done because we do in good faith believe that members here could be covered by this statute and that the State would enforce it against them.

THE COURT:  Well, let me -- and it is important, so let me ask you the question this way because I also don't want to distort what the burden is.

The burden for preliminary injunction is roughly akin to summary judgment.  You've got to come forward with evidence -- and it doesn't matter who files it, but you've got to come forward with evidence from which I find, as a fact finder, that it is not speculative or just a possibility, but, rather, that it's reasonable to believe that these -- this provision would apply to this particular member such that their fear that they are going to have to, for pre-enforcement purposes, expend a lot of money on compliance costs is reasonable such -- their fear that they are going to have to do that, expend it, is reasonable; correct?

MS. MURPHY:  I think that's fair.  I mean, I do want

App. 350

to be clear --

THE COURT:  Fair, or that's what's required?

MS. MURPHY:  I think that's required.

I just want to be clear about what -- you know, as I understand the legal test as the State said, there's arguably proscribed and then a credible threat of enforcement.  And, you know, the credible threat part is a little bit more focused on if I'm covered, are you likely to kind of enforce against me?  The arguably proscribed part is it's arguably.

So, yes, at summary judgment -- I'm sorry -- yes, at a preliminary injunction, it's a higher standard than just the pleadings standard, but the standard is still arguably proscribed.  We don't, because we are at a PI, have to prove we are --

THE COURT:  Well --

(Indiscernible crosstalk.)

THE COURT:  Let me give you an example because I want to make sure if there is anything else you want to say, you can say it.  For example, I did this with teachers where they submitted affidavits that were many, many, pages long talking about how they felt about the law, and then they came to other hearings and testified about how it made them feel.  And I kept wondering why do I care?  But what they were thin on in the affidavits and thin on at their depositions or thin on their testimony in court was these are the eight topics I can't talk

about.

And so there had to be some evidence that suggested that they either were, in fact, going to continue to talk about those topics that their speech arguably may have been proscribed or fall within those topics, and they are going to continue the speech such that they ran the risk of being -- losing their jobs, or whatever penalties they were going to impose.  Or they stopped talking because there was evidence that would suggest they arguably -- their -- whatever topics they were covering fell within those topics such that they were either speaking at risk or stopped speaking.

MS. MURPHY:  Right.

THE COURT:  It seems to me the same thing is here. There has to be evidence that would suggest that -- and I know that's a chill case, and it's not directly to this case.  But here the idea is that you don't have to prove beyond a reasonable doubt it's going to apply.  But what you do have to do is have some evidence such that it's not just speculative or a possibility, but there's a reasonable belief you are covered by the statute such that you are going to expend money, ergo be injured by compliance costs in this pre-enforcement context.

Do I have that wrong?

MS. MURPHY:  No, I think that's right.

I think this is even easier because it's not a context where you are saying, you know, I might just refrain from -- you

know, we haven't not been clear about what it is we think we have to do if we are covered.  Our declarations cover that extensively in terms of, Here's how we are not, you know, presently doing what the State would require, and it would cost us time and money to do it.

So I think we've been very clear here on the direct connection between our fear of enforcement --

THE COURT:  And, Judge --

(Indiscernible crosstalk.)

THE COURT:  -- we've got people that show we are using uploading.  We've got algorithms.

MS. MURPHY:  Yes.

THE COURT:  We have, clearly, one or more of these addictive features.  We've got a bunch of kids who are users, a high percentage.

And so whether or not 10 percent of them do or do not stay on a significant length of time, that's really what we are talking about, Judge, whether a percentage of the kids that we have -- which we've clearly established we have a fear because we have a large number of minors using our services, and that the law doesn't require us to go through the exercise to establish that with any precision.

And there certainly is evidence before you, not the least of which is the government's own evidence, that if you've got a bunch of kids on your social platform, they are going to

App. 353

be spending extensive periods of time on it.  Otherwise, it would be completely inconsistent with what they found in their entire rationale for the law to begin with.  And that's not something they have just alleged in their papers, it's what they filed.

And so, Judge, if you want to argue the record doesn't support a particular finding or something reasonable -- so, for example, if you are opposing -- if you are filing a motion for summary judgment and you don't think the other side is going to respond, don't file the entire deposition of the plaintiff because the judge may deny summary judgment because you provided the judge with the information that would suggest there are disputed issues of fact.

Here, Judge, you can look to their affidavits, and that's our source to fill the one gap they've identified.

MS. MURPHY:  Yes.

THE COURT:  Is that it in a nutshell?

MS. MURPHY:  Yes.

THE COURT:  It's not a finding.  I just wanted to make sure I understood.

MS. MURPHY:  That's it in a nutshell.  And a way I might put it just even a little more simplistically is I don't think you have to ignore the context of the law, the nature of the law, and their justifications for the law in answering the questions of is it -- you know, do we have an arguable basis to

App. 354

believe that a law that they say they passed to come after us is actually coming after us?  I think that you don't have to kind of dispense the common sense just because we are talking about standing.

So we do think there is an evidentiary basis in the record to address the standard, which is simply the arguably proscribed question, and we think we do have standing here on behalf of our members.  And, of course, as we discussed earlier, we can assert the rights of our users as well.

Turning to the merits, just, you know, a few points on all of this.  I mean, for one, to the extent what the State is trying to say is that it can isolate these particular features that they call addictive features because they are not in and of themselves covered by the First Amendment -- I do think it's worth noting, and they are not denying -- that would mean that they can restrict or ban them even as to adults, and it wouldn't implicate the First Amendment; that they could say, Services can no longer offer the option of, you know, allowing users to see if other people liked their content.  And they'd say, That doesn't implicate the First Amendment because we are regulating some sort of conduct of offering certain features rather than speech.  I think that's a pretty extraordinary proposition that really just can't be right.

It's -- if you take that logic and apply it outside the context of anything other than these services -- I mean,

App. 355

their own experts analogize these features to kind of a digital version of a to-be-continued at the end of a book.  The notion that the State could single that out and say, You know, no more to-be-continueds because a lot of times kids want to read the next book if it says "to-be-continued."  I get it that they have a reason they are saying they are worried about these features, but the notion that you can divorce these features from the content and say they have nothing to do with the First Amendment is just flat wrong, and I don't think there is any authority out there to support it.

I also think they have a real problem when they say that this law is really about these features.  It's not.  If this were just about features, we'd have one prong of the definition.  It would be the features.  This is about the use of the features on particular services and particular -- in conjunction with particular types of content and social interaction, and that's not an accident.

Again, they have experts here who have talked about -- they are not just concerned in the abstract.  You don't see their experts saying, you know, I'm really worried that there's too many kids who are going on and watching political rallies or, you know, interacting with their church on Facebook or something like that.  They are talking about content.  They are worried that they might interact with particular content that could give rise to self-harm or self-image concerns.

They are worried that allowing -- facilitating the back and forth of kind of playground interaction in a social setting on the --

THE COURT:  Counsel --

(Indiscernible crosstalk.)

THE COURT:  -- my concern with this line, how do I know -- that's a good argument if I said, Tell me what you think is being done and why you think this is the mischief they're -- how do I get --

MS. MURPHY:  Sure.

THE COURT:  And I don't want to spend too much time on this.  But how do I get to where you are at --

MS. MURPHY:  Sure.

THE COURT:  -- that that's the -- that's what they are doing?

Because it doesn't say that in the statute; right?

MS. MURPHY:  Well, so -- so I would say three things. First, I think two prongs of the statute do tell you this is content based, the first and the second one.  Because the first one does single out these -- you know, where you are uploading and looking at the content of other users and all of that kind of interaction.

Now, they would say, you know, we think that's content neutral.  I don't think it is, but --

THE COURT:  And I do want you to focus on that.  I'm

sorry to interrupt you, but I do want to give you a chance.

Because one thing that -- I'm not suggesting it's the only thing counsel said, but one thing that counsel has said that sticks with me is -- and that's why I asked him, Do you -- not that there's sort of this category of speech and what can you get out of it, but do you disagree with the *Reyes* court. And he said yes. And, of course, I'm not bound by that. I'm just using that as a shorthand so y'all can discuss the topic.

And he says, Well, Judge, assuming -- even though it's distinguishable on its face because here it's functionality, there it was a specific provision that said we are targeting this type of exchange. His argument was, Judge, that exchange can literally include any interaction between two people talking about anything, and that's why that's not the sort of category that if you prohibit it, it's content based.

I definitely want you to respond to that.

MS. MURPHY: Sure. So I do think you can view that as content based. And I guess another way to kind of come at it is -- one thing that is clear from the first prong of the definition is it is carving out certain speakers. I think -- I mean, we'd kind of have to -- the State would have to agree it operates to say certain types of services are covered and certain types are not.

And then you ask what is the basis for the distinction that they are drawing to say streaming services are on one

App. 358

side -- you know, Disney+ is over here, but, you know, Snap is over here?  What is their basis for thinking those things are different?

And the basis that the statute itself identifies is that they seem to have some particular concern when you just have users who are the speakers speaking to each other providing content and interacting with each other.  Whereas there's somehow -- for some reason less concern if you are getting kind of all your cartoons selected by Disney+ instead of some of them coming from users on YouTube Kids.

And at that point, that strikes me as, as the Supreme Court has said, not all speaker-based distinctions are necessarily content based, but they raise the concern that they might be.  And here I don't see how you don't end up finding that the distinction seems to be based on, you know, we are just worried that we don't know as much about what content you are going to get once you are empowering everybody to speak to each other as opposed to having kind of one speaker control it.

That's the distinction they are drawing, and that strikes me as a content-based distinction, especially when you put it in the context of their own evidence and experts and things that they are citing where they say, Yeah, our worry is -- you know, we are less worried if someone sits and watches TV for several hours.  We are more worried if they are there engaging in kind of peer-to-peer social interaction with other

people their age where they comment on each other's -- what other people are doing, have likes and dislikes, or we are worried that you might see particular forms of content on these services because they are a (indiscernible).

(Reporter requested clarification.)

MS. MURPHY:  A little less regulated.

And then if I can just -- one more content-based thing is I didn't hear them say any response to our argument that the second prong of the definition, by singling out services that minors find more attractive, is in and of itself just a proxy for the content-based distinction of speech that minors -- that is more attractive to minors, which is the same distinction that the *Yost* Court found sufficient to find the law content based in Ohio.  It just comes at it from a different -- a different lens.

THE COURT:  Give me one second.

(Pause in proceedings.)

THE COURT:  I want you to assume -- and I'm not ruling, but I want you to assume I find your argument about content based unpersuasive.  I don't want you to sit down or leave or end until you explain to me or I give a chance to respond to counsel for the government's suggestion about why under intermediate scrutiny you would lose.

MS. MURPHY:  Sure, sure.

So I will turn straight to that.  And I'd point you in particular on that to the Arkansas *Griffin* case which was

App. 360

resolved under intermediate scrutiny, not strict scrutiny.  And I'd also note *Packingham* was a case that's resolved under intermediate scrutiny, not strict scrutiny.

So certainly in this context, we have Courts that have said, Look, when you come at Internet restrictions and say you can't access the services at all by virtue of concerns -- I mean, in *Packingham*, the concern -- nobody --

THE COURT:  The sex offender case.

MS. MURPHY:  Nobody denied that there was absolutely a compelling interest in protecting people and particularly minors.  But the Court said restricting the access of sex offenders themselves, convicted sex offenders, is not sufficiently tailored under intermediate scrutiny.  It seems to me a fortiori saying, Oh, we'll come at it from the side of taking, you know, the innocent users who just want to engage in First Amendment activity and say all of you can't get on there. It has got to be not narrowly tailored.

I think, you know, the State said that causation is only required in the strict scrutiny context.  I don't know what authority they have for that.  Certainly *Brown* was a strict-scrutiny context case, but it did not say causation only matters in the strict scrutiny context.  It's just that there's a little bit lesser burden to demonstrate causation in the intermediate scrutiny context, and we don't think they have done that.

And, indeed, you know, the fact that they kind of just want to say, Well, everyone knows this is true.  I mean, that's -- that's not evidence.  That's the State's argument, and it is certainly not some widely accepted proposition that the types of features they are singling out caused so-called behavioral addiction.

But even if you assume that, I still think the real problem here is the narrow tailoring problem, because the idea of just stopping all the access at the front end is inherently not narrowly tailored when you are talking about a universe of speech so broad as what is on these types of services.  And while you don't have to have the least restrictive means in the intermediate scrutiny context, you do have to be narrowly tailored to avoid unnecessary abridgment of First Amendment rights.

That's what the *Americans for Prosperity* case made very clear.  To the extent Courts didn't think you needed narrow tailoring in the intermediate scrutiny context, that was a mistake.  You do.  And here we have plenty of other alternatives that not only are less restrictive but are actually much more tailored to addressing concerns that -- while there are lots of beneficial ways that minors can use these services, there may be instances where concerns arise.  And --

THE COURT:  What says you to Counsel's comment that, Judge, the record before you suggests that parental controls,

and what you suggest are all these alternatives, are absolutely not effective and that narrowly tailored doesn't require you to rely on and use, and it doesn't become narrowly tailored because they are ineffective alternatives?

MS. MURPHY:  Sure.

I do not think they've come close to meeting their burden of proving that these are ineffective, and even here, standing at the podium, what I heard the State say is they are ineffective because not a lot of parents use them.  They pointed to evidence that not a lot of parents use them.  That is not evidence that they are ineffective.

It could be -- and this is precisely what the Supreme Court said in *Brown* and in several cases before it when it talked about the burden that you need to show that they actually are ineffective.  It may be that they are not used because they don't know enough about them or how to use them.  It may be that parents aren't using them because some parents don't share the State's concerns.

THE COURT:  Well, let me ask you this way, Counsel: We've got kids that are graduating that can't read and write at grade level, and there can be a variety of reasons why that's so.  We've got increased rates of -- related to social isolation and so forth or suicide.  We've got all manner of problems -- and I'm not saying -- I'm not just bringing stuff in from outside the record.  There's been articulated by the State the

host of problems that's trying to be addressed.

And parents aren't addressing it, and so that's not fixing the problems.  Having parental controls is not fixing the problem.  The State just has to surrender and say, Let's just have a generation of imbeciles, and it becomes this steamroll effect where they are less educated, more detached, more suicidal, less productive?

I mean, it seems to me whatever I'm doing as a judge, there's got to be a commonsense gloss to it, even when I'm applying standards articulated by the Supreme Court or the Eleventh Circuit.  So when we start talking about whether something is narrowly tailored or not, I'm supposed to set aside common sense, and it's supposed to be divorced from reality in terms of whether or not -- I guess, does it matter if it's just hypothetical ways that you could draw a more narrow statute that may or may not be and likely are ineffective?

I mean, I'm just -- it's the reverse of what I said.  Although I saw some heads shaking and I didn't say anything -- I never shook my head "no" when a judge said anything in a court, but I'll -- it is what it is.  We have a new level of professionalism in courts.

But, you know, I'll ask you sort of the reverse question I asked them about their -- the State's focus on parents when they want to.  The same is true here.  Are the State's hands really tied if we are faced with some sort of

App. 364

public pandemic -- and mental health is a -- can be a pandemic -- and parents aren't engaged?  The State is really -- and that would be the alternative to relying on the parents. Their hands are really tied because it's not narrowly tailored because they should have relied on parents which weren't policing their children to begin with?

MS. MURPHY:  So the point is not that the State's hands are not completely tied.  It's that if the State wants to go to the extreme measure of shutting off massive amounts of First Amendment protected activity, the burden is on the State to demonstrate, not just hypothesize, that alternatives that would not restrict nearly as much First Amendment activity actually are ineffective.

And their own expert, Dr. Allen, when he testified about this, said -- 210 to 218 in his deposition, said that he was just speculating about whether they actually are ineffective, as opposed to whether parents might be choosing not to use them or just kind of don't know how to use them.  That's their burden.  That's what it means to be heightened scrutiny.

And even in intermediate scrutiny, it is the State's burden.  So they can't just come in and say, Look, you told us there's alternatives, but, like, we don't think they are effective because not enough parents, in our view, are using them.  So we are going to go straight to the absolute most draconian approach, which is say under 14, no access; and 14 to

15, you know, we're creating a default, the kind of default that *Brown* said it's not even clear is permissible on the part of the government, that we are going to assume that minors can't have access to speech unless and until their parents say okay.

We are going to go straight to those absolute kind of most draconian measures without first even examining whether, Hey, maybe if we worked, kind of, in partnership to ensure parents know all about these tools, maybe there's some ways the State could work together kind of to figure out if there are some aspects of them that need to be fine-tuned, if we need to educate parents about, Here's ways to ensure your minors don't circumvent them.

That's what *Brown* and a long line of cases before it say are the measures that a State is supposed to try first rather than start all the way at the other end of the spectrum of saying, We'll just shut down the access to speech entirely. And most of those cases, by the way, were saying that even in context where we are talking about stuff that is, you know, not so obviously constitutionally protected as to minors.

So in this context, you know, I think *Brown* really is the most on-point case where we have the State shutting that down. The State just has to do a lot more work before it can go to the type of means it has selected here.

THE COURT:  Anything additional?

MS. MURPHY:  I think that's it for me unless you have

any other questions.

THE COURT: I don't have any other questions.

I do want to say to counsel for the government who is lead counsel, You were not shaking your head. That was not directed to you, and you've been nothing but a model of professionalism in your presentation today.

Anything additional from the government?

MR. GOLEMBIEWSKI: No, Your Honor.

THE COURT: All right. Court is in recess -- before I go there, let me say this:

Y'all took months, months to brief everything in this case. I'm pretty sure -- and I think the record will make this clear -- I offered up a hearing in December. So I'm not suggesting I'm going to spend months and months and months writing an order, but I do want to make clear I get some time as well.

And if counsel gets months to brief it, then I get some time to write an order. And so if I had set it in December and we had not had any discovery and y'all hadn't had extended time for briefs, it's not unusual for me to stop everything I'm doing and continue cases or get coverage from other judges and get an order out in, you know, 72 hours. I'm not going to do that.

So I'm not suggesting I'm going to sit on this. I'm not suggesting it's going to take me months and months, but I am

App. 367

going to take time to write an order.  Because I know that's one of the issues that comes up, when are we going to hear from you?  I'm not suggesting these lawyers would.  I'm shocked at the number of times I get a call -- not me, but my chambers -- saying, When is Judge Walker going to issue an order within 24 hours of thousands of pages being submitted to me on some topic?  So I'm going to -- it's going to take me a little time to write an order.

I'll do my best.  I understand the importance of it.  And I understand that I need to move forward both quickly and thoughtfully in getting an order out, and I'll do my best.

I'm not going to give you a date by which I'll do it, but I'll try to do it sooner rather than later.  I do have a trial every week for the next three weeks.  That doesn't mean I'm not working on this, but I have a trial for, again, every week for the next three weeks.

So I'll do my best, again, to get to it as quickly as I can; all right?

Thank you.

Court is in recess.

(Proceedings concluded at 12:26 PM on Friday, February 28, 2025.)

* * * * * * * *

        I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy is noted within the transcript.


/s/ Megan A. Hague                          3/11/2025

Megan A. Hague, RPR, FCRR, CSR          Date
Official U.S. Court Reporter


                        **I N D E X**


OTHER RECORD MADE                               PAGE

Argument by Mr. Golembiewski                      4
Argument by Ms. Murphy                           43
Rebuttal Argument by Mr. Golembiewski            93
Rebuttal Argument by Ms. Murphy                 114

72

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,**

      *Plaintiffs,*

**v.**                                    **Case No.:  4:24cv438-MW/MAF**

**JAMES UTHMEIER,**

      *Defendant.*

_____/

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs bring a First Amendment challenge to provisions of a Florida law that prohibit some social media platforms from allowing youth in the state who are under the age of 14 to create or hold an account on their platforms, and similarly prohibit allowing youth who are 14 or 15 to create or hold an account unless a parent or guardian provides affirmative consent for them to do so. Before this Court is Plaintiffs' motion for a preliminary injunction. ECF No. 4. This Court has considered all the briefing and evidence submitted by the parties and held a hearing on the motion on February 28, 2025. For the reasons stated below, Plaintiffs' motion is **DENIED** for failure to show a substantial likelihood of demonstrating standing.

Standing is not a technicality, but a constitutional requirement that must be satisfied for any federal court to exercise jurisdiction over an action. The source of

App. 371

this requirement is Article III, Section 2 of the Constitution, which grants federal courts power only over "cases" and "controversies." This Court recognizes that, to a lay observer, it may seem counterintuitive or even absurd to conclude that there is no case or controversy between the Plaintiffs here—two trade associations representing, among others, several major social media companies—and the Attorney General of Florida, who is charged with enforcing a law that regulates some social media companies. But the Supreme Court and the Eleventh Circuit have developed a rigorous, fact-intensive test for standing that this Court must faithfully apply.[1] And it should come as no surprise to the parties that this Court does so in this case, as this Court has applied that now familiar test in every case before it and has been required to dismiss no small number of cases for lack of standing. Plaintiffs bear the burden to establish standing, and at the preliminary-injunction stage, they must do so by coming forward with evidence demonstrating a substantial likelihood of establishing standing. Here, Plaintiffs have failed to carry that burden. Because Plaintiffs have not demonstrated a substantial likelihood of establishing standing, this Court does not reach the merits of the question in this case; namely, whether the challenged law abridges the First Amendment.

---

[1] *See, e.g.*, *NFC Freedom, Inc. v. Diaz*, 700 F. Supp. 3d 1057, 1074 (N.D. Fla. 2023) (explaining how the Eleventh Circuit's application of the Supreme Court's three-part test for Article III standing has evolved in recent years).

2

App. 372

I

A district court may grant a preliminary injunction only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). A preliminary injunction is an "extraordinary and drastic remedy" that may only be granted if "the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal quotation marks omitted). This Court begins its analysis here with the first prong because typically, if a plaintiff cannot establish a substantial likelihood of success on the merits, this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). The "affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that a plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting) (internal alterations omitted). In other

3

App. 373

words, if Plaintiffs fail to carry their burden on standing, this Court cannot issue a preliminary injunction.

Over time, the Supreme Court has developed a three-part test for determining whether a party has standing. Under that test, a plaintiff must show (1) that they have suffered an injury in fact that is (2) fairly traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The first prong, an injury in fact, requires that the plaintiff face an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560. This is the "irreducible constitutional minimum" required for standing under Article III of the Constitution. *Id.* And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, a plaintiff cannot "rest on such mere allegations as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Cacchillo*, 638 F.3d at 404 (quoting *Lujan*, 504 U.S. at 561) (internal

4

alterations omitted); *see also Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 608 (11th Cir. 1985).

## II

Plaintiffs are "Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat." ECF No. 1 at ¶ 15. Plaintiffs assert associational standing, which allows a membership organization to bring claims on behalf of its members so long as (1) at least one of its members would have standing to sue in its own right, (2) the interests the suit seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). To satisfy the first requirement, Plaintiffs must provide evidence that at least one of their members can satisfy the traditional three-part test for Article III standing. Here, Plaintiffs have not provided evidence showing that at least one of their members meets the injury-in-fact requirement of Article III standing.

Plaintiffs assert two theories of an injury in fact to at least one of their members. First, Plaintiffs argue that at least one of their members has an injury in fact because it operates a platform that is likely to be covered by Florida's law, and the member company will have to expend money and resources to come into compliance with the law. ECF No. 62 at 14. Second, Plaintiffs argue that the law

5

injures the First Amendment rights of at least one of its members because it restricts the member's ability to disseminate both their own and third-party speech to their users. *Id.* Either type of injury would satisfy the injury-in-fact requirement of the standing test. But Plaintiffs have failed to produce the evidence needed to show that either of these purported injuries is "actual or imminent, not conjectural or hypothetical" and "fairly traceable" to the Attorney General. *Lujan*, 504 U.S. at 560. That is because, for either injury to be "actual or imminent" and "fairly traceable" to the Attorney General, Plaintiffs must show that at least one specific member of theirs is likely regulated by the law. They have not done so.

Florida's law does not regulate all social media platforms. Instead, it regulates only those platforms that meet each of four specific criteria under the challenged statute. The first criterion is that the platform "[a]llows users to upload content or view the content or activity of other users." § 501.1736(1)(e)(1), Fla. Stat. The second criterion is that ten percent or more of the platform's users who are under 16 spend, on average, two hours or more on the platform on the days when using it. § 501.1736(1)(e)(2), Fla. Stat.[2] The third criterion is that the platform employs "algorithms that analyze user data or information on users to select content for users." § 501.1736(1)(e)(3), Fla. Stat. The last criterion is that the platform has at

---

[2] For simplicity, this Court will hereinafter refer to this requirement as the "time requirement."

least one "addictive feature."[3] § 501.1736(1)(e)(4), Fla. Stat. But Plaintiffs have not provided evidence showing that any one specific member operates a platform that is likely covered by the law.[4] The only pieces of evidence that Plaintiffs have produced on this point are vague, conclusory assertions in each of the four declarations attached to their motion for a preliminary injunction that the declarant "understand[s]" or "believes" that one of their members "may be" or "appears to be" covered by the law. *See* ECF No. 5-1 at ¶ 5 (declaration of Alexandra Veitch) ("I understand that YouTube may be subject to the Act, as one or more of its services may meet the definition of 'social media platform.'"); ECF No. 5-2 at ¶ 20 (declaration of Bartlett Cleland) ("Although aspects of the Act's definition are vague and do not make clear the full extent of the entities governed by its provisions, I understand that some NetChoice members appear to be regulated by the Act. These include, at least the following members: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram."); ECF No. 5-3 at ¶ 9 (declaration of Bartlett Cleland) ("I am familiar with Florida's HB3

---

[3] The "addictive features" covered by the law are infinite scrolling, push notifications, the display of "personal interactive metrics" (such as the number of "likes" on a post), auto-play video, and live-streaming functionality.

[4] Plaintiffs chose not to provide this evidence even after Defendant raised this issue in both the motion to dismiss, ECF No. 50 at 14–15, and the opposition to the motion for a preliminary injunction, ECF No. 51 at 12–14. Moreover, this Court expressly provided Plaintiffs with the opportunity to file supplemental declarations in support of their reply brief and did not prohibit the parties from presenting live testimony at the hearing. *See* ECF No. 35.

App. 377

(the 'Act') and believe that Snap may be covered by the scope of the law."); ECF No. 5-4 at ¶ 4 (declaration of Matthew Schruers) ("I understand that a number of CCIA's members would be considered 'social media platforms under Florida House Bill 3 (HB3) including, at a minimum: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram."). The declarants do not offer any explanation for these assertions. What's more, Plaintiffs objected to interrogatories from Defendant about their reasons for believing that some of their members would be covered by the law. *See* ECF No. 51-8 at 3 ("CCIA further objects to this interrogatory . . . including that portion of the request calling for CCIA to explain how it determined that one or more members falls within the definition set out in the statute."); *id.* at 24 (same objection with respect to NetChoice).

When questioned at the hearing about the factual basis for their assertion that at least one of their members is likely covered by the law, Plaintiffs made essentially two arguments. First, Plaintiffs argued that evidence introduced by Defendant shows that at least one of Plaintiffs' members is likely covered by the law. Plaintiffs pointed to the depositions of their declarants,[5] in which employees of YouTube and Snap confirmed that their respective companies' platforms met three of the law's four

---

[5] Depositions which this Court allowed Defendant to conduct over Plaintiffs' objection that no discovery should be permitted at this stage in the case.

coverage criteria: the ability of users to upload content, the use of algorithms to select content for users, and the use of one or more "addictive features" as identified by the law. ECF No. 71 at 59:17–60:6. But nowhere in these depositions—or in any of the evidence submitted by either party—is there a single fact tending to show that any one specific member likely meets the time requirement for coverage under the law.[6]

Plaintiffs do not claim that this information is unavailable to their members or that it would be burdensome for their members to provide it.[7] Nor do they argue that the time requirement is so vague that their members can only guess at whether it applies to them. They argue only that standing does not require them to provide the Attorney General with precisely the information he would need to successfully

---

[6] Plaintiffs at the hearing also gestured at factual assertions in Defendant's briefing and evidence from Defendant's expert declarations. But although one of Defendant's expert declarations cites statistics about how much time youth spend using "social media" generally, neither that declaration nor any of Defendant's evidence includes facts about how much time youth spend using any particular platform. *See, e.g.*, ECF No. 51-1 at ¶¶ 10–11, 13 (declaration of Jean Twenge); *see also* ECF No. 51-9 at 7, 9 (Surgeon General's Advisory). Generalized statistics about "social media" do not give this Court enough information to determine whether it is likely that any particular platform—such as Facebook, Instagram, YouTube, or Snapchat—meets the time requirement to fall within the statute's reach. These generalized statistics could mean either that many youth spend more than two hours on, say, Facebook, or it could equally mean that youth spend an hour or so on each of many different social media platforms each day. The evidence before this Court does not allow it to assess which of these explanations is more likely, let alone identify which of Plaintiffs' members' platforms likely meet the time requirement in addition to the law's other three criteria. It should be no surprise to Plaintiffs that facts matter here, and this Court cannot simply ignore this gap in the record that Plaintiffs failed to fill.

[7] Nor could they reasonably do so, as at least one of Plaintiffs' declarants noted in his deposition that Snapchat already tracks the total amount of time users spend in the app and has the capability of breaking that data down by age. ECF No. 52-2 at 119:14–120:13 (transcript of Boyle deposition).

enforce the law against one of their members. *See* ECF No. 71 at 117:1–4. But that argument relies on a misunderstanding of the level of specificity the standing inquiry requires. This Court has never suggested that Plaintiffs must hand over data showing with certainty that one of their members meets the time requirement. What is required is for Plaintiffs to adduce some evidence from which this Court could reasonably conclude that it is likely that at least one specific member meets this requirement. For example, if Plaintiffs provided evidence that their member "Z" operates a platform on which more than ten percent of *all* users average two hours of daily use, that this platform allows youth under 16 to use its platform, and that its user data does not give any indication that users under 16 use the platform less per day than adult users, this would likely be sufficient at this stage to demonstrate that member "Z" arguably falls under coverage of the challenged statute.[8] But here, Plaintiffs failed to provide any evidence that permits a reasonable inference that any of their members are covered by the challenged statute.[9]

---

[8] Some may read this example and find it frustrating that this Court reaches the conclusion it does on standing, because it seems that this evidentiary deficiency could be easily fixed. It likely could have been, and Plaintiffs were afforded ample opportunity to do so before the hearing. Nevertheless, it was not fixed, and "close enough" is not good enough for standing.

[9] At the hearing, in response to this Court's questioning, Plaintiffs requested that this Court give them "a little time to see if we can provide information" to correct the evidentiary deficiencies. ECF No. 71 at 68:9–18. But by then, that ship had sailed. As this Court noted above, Plaintiffs had multiple opportunities to provide supplemental evidence in response to Defendant's standing arguments. They declined to avail themselves of those opportunities. Only when pressed by this Court at the hearing did Plaintiffs decide to seek a mulligan. For the purposes of this motion, that was too late.

Second and primarily, Plaintiffs argued that it is not their burden to provide evidence that one of their members in fact meets all four of the coverage criteria, so long as "it's a reasonable view of ours that the State thinks that we satisfy the criteria."[10] ECF No. 71 at 56:8–58:1, 61:1–25. For this argument, Plaintiffs lean heavily on the standard for establishing a First Amendment "chill" injury—namely, an intention to engage in a course of conduct that is arguably affected with a constitutional interest and proscribed by statute under which they face a credible threat of enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). But whenever a plaintiff invokes federal jurisdiction, that plaintiff bears the burden of establishing standing. *Lujan*, 504 U.S. at 561. And Plaintiffs cannot show that their members' intended conduct is "arguably proscribed" by statute absent facts showing that they likely meet the statute's coverage criteria.[11] *See CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006). The evidence Plaintiffs cited in their briefing and at the hearing—mentions of some of Plaintiffs' members in the Attorney General's briefing in this case and in the press

---

[10] This was the only argument Plaintiffs made on this point in their briefing, *see* ECF No. 62 at 15, ECF No. 63 at 8 n. 1, and their primary argument at the hearing.

[11] *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988), does not help Plaintiffs on this point. *American Booksellers* reached its conclusion that plaintiff booksellers had standing to challenge a ban on display of books "harmful to juveniles" after a consolidated preliminary injunction hearing and trial on the merits in which plaintiffs introduced 16 books that they believed were examples of books that would subject them to the statute. *Id.* at 390–91. In other words, the American Booksellers Association introduced actual evidence to support their claim that the challenged statute applied to them.

conference following the Governor's signing of HB 3—does not compensate for this omission. Even assuming, for the sake of argument, that the Florida Legislature designed the law with some of Plaintiffs' members in mind and that the Attorney General believes some of Plaintiffs' members are likely covered by it, the law can only be enforced against one of Plaintiffs' members if its platform meets each of the four specific coverage criteria. Plaintiffs have failed to demonstrate that any of its members meet these coverage requirements, and there is no reason to believe that the Legislature or the Attorney General has any more information about whether or which of Plaintiffs' members meet those coverage criteria than Plaintiffs or their members do. Moreover, Plaintiffs have pointed to no evidence suggesting the Attorney General plans to act in bad faith and enforce the statute against members whose platforms *do not* meet the statutory coverage requirements. So this Court cannot conclude that any potential compliance costs or chilled speech is fairly traceable to Defendant in the absence of evidence that the member so harmed operates a platform that likely meets the law's coverage criteria. *C.f. Clapper v. Amnesty Int'l*, 568 U.S. 398, 415 (2013) ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.").

A final note: at times, Plaintiffs' arguments seem to suggest that this Court should simply conclude that Plaintiffs have standing because it is likely, given that

their members include most of the major social media companies, that the law will apply to at least one of those members. But this sort of probabilistic analysis has been squarely rejected by the Supreme Court. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009). Accordingly, this Court can only find standing if there are sufficient facts to show that at least one *specific* member is likely covered by the law. The record does not provide sufficient facts to make that finding here.

III

Because Plaintiffs have not met their burden to show that at least one of their members has an injury in fact sufficient to confer Article III standing, they have not demonstrated a substantial likelihood of establishing standing for purposes of their preliminary injunction motion. Accordingly, Plaintiffs' motion, ECF No. 4, is **DENIED**.

**SO ORDERED on March 13, 2025.**

**s/Mark E. Walker**
**Chief United States District Judge**

13

# 73

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

     *Plaintiffs,*

v.                         **Case No.:  4:24cv438-MW/MAF**

JAMES UTHMEIER,

     *Defendant.*

_____/

## ORDER GRANTING MOTION TO DISMISS

Plaintiffs, internet trade associations with members including Google, Meta, and Snap, Inc., brought this action challenging provisions of a new Florida law that place age and parental consent limits on holding an account on some social media platforms. This Court has considered, without hearing, Defendant's motion to dismiss. ECF No. 50. The motion is fully briefed. *See* ECF No. 62; ECF No. 66. For the reasons stated below, Defendant's motion is **GRANTED**, and Plaintiffs' complaint is **DISMISSED without prejudice** for lack of standing.

I

Plaintiffs are the Computer & Communications Industry Association (CCIA) and NetChoice, both internet trade associations whose members include companies that operate major social media platforms like Facebook, Instagram, YouTube, and

App. 385

Snapchat. ECF No. 1 ¶¶ 7–8. They challenge Section 1 of Florida House Bill 3, now codified at § 501.1736, Fla. Stat., which restricts some social media platforms from allowing Florida youth under 14 to create or hold an account on their platforms and from allowing youth aged 14 and 15 to create or hold an account without affirmative parental consent. § 501.1736(2)–(3), Fla. Stat. The law defines a "social media platform" as an "online forum, website, or application" that satisfies four criteria: (1) allows users to upload content or view the content or activity of other users, (2) has ten percent or more of the daily active users under 16 spend on average two hours per day or longer on the platform on the days when using it,[1] (3) employs algorithms that analyze user data or information on users to select content for users, and (4) has any one of five listed "addictive features." § 501.1736(1)(e), Fla. Stat.

Plaintiffs seek declaratory and injunctive relief against the Attorney General of Florida, who is given power to enforce the law. § 501.1736(5), Fla. Stat. Plaintiffs bring three claims, alleging that the law violates the First Amendment, that the law's coverage definition is unconstitutionally vague, and that the law is preempted by the federal Children's Online Privacy Protection Act, 15 U.S.C. § 6501 *et seq*.

## II

Defendant moves to dismiss Plaintiffs' complaint for lack of standing under Fed. R. Civ. P. 12(b)(1), among other reasons. Standing is a constitutional

---

[1] For simplicity, this Court will refer to this requirement as the "time requirement."

prerequisite to a federal court exercising subject matter jurisdiction over an action. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs.*, 572 F.3d 1271, 1279 (11th Cir. 2009). A facial challenge occurs when, as here, a defendant bases their challenge to subject matter jurisdiction solely on the allegations in the complaint. *Id.* In considering the Defendant's facial challenge, this Court must take Plaintiffs' allegations as true and draw reasonable inferences from the facts alleged. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the motion-to-dismiss stage, standing is evaluated by determining whether the complaint clearly alleges facts demonstrating each element of Article III standing. *Glynn Env't Coal. v. Sea Island Acquisition*, 26 F.4th 1235, 1240 (11th Cir. 2022). Only factual allegations, and not legal conclusions, are relevant to this inquiry, and "mere conclusory statements . . . do not suffice." *Id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 678).

Article III standing requires a plaintiff to have (1) suffered an injury in fact that is (2) fairly traceable to the challenged conduct of the defendant, and (3) is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact must be "concrete, particularized, and actual or imminent." *Muransky v. Godiva Chocolatier*, 979 F.3d 917, 925 (11th Cir. 2020). An injury that is "conjectural or hypothetical" is constitutionally insufficient. *Id.*

3

Plaintiffs here seek to establish associational standing, which requires, *inter alia*, factual allegations from which this Court can reasonably infer that at least one of their members has Article III standing to sue in their own right.[2] *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977). Plaintiffs have failed to meet this burden.

### III

Plaintiffs do not allege sufficient facts to allow this Court to draw a reasonable inference that at least one of their members faces an injury in fact from the challenged law. For one of Plaintiffs' members to face an injury in fact that is "actual or imminent," not "conjectural or hypothetical," and that is "fairly traceable" to Defendant, Plaintiffs must allege facts from which this Court can reasonably infer that at least one of their members is covered by the law.[3] *Lujan*, 504 U.S. at 560. If

---

[2] In their complaint, Plaintiffs also allege that they "have standing to assert both their own First Amendment rights and the First Amendment rights of their members' current and prospective users." ECF No. 1 ¶ 11. It is not clear on what basis they claim that their own First Amendment rights are infringed by the law, as the complaint makes no factual allegations that their own speech is restricted by the law. In other places, Plaintiffs allege that the First Amendment rights of their members are infringed by the law, and perhaps that is what was intended here. *See, e.g.*, *id.* ¶ 63. But even for this latter argument, the factual allegations underlying this claim are thin. And any First Amendment injury to a member's users is only traceable to the Attorney General if the member is likely covered by the law.

[3] It is not sufficient for Plaintiffs to allege that, because their members include many of the major social media companies, one is likely to meet the law's coverage requirements. The Supreme Court has squarely rejected this sort of probabilistic analysis. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497–99 (2009). Instead, Plaintiffs must plead sufficient facts for this Court to reasonably infer that at least one identifiable member of theirs likely meets the four coverage criteria. Nor is it sufficient for Plaintiffs to plead facts suggesting that some Florida leaders intended for the law to cover some of Plaintiffs' members, because this law can only be enforced

4

none of their members are likely to covered by the law, then any compliance costs or chilled speech incurred by those members are not sufficient to confer standing. *C.f. Clapper v. Amnesty Int'l*, 568 U.S. 398, 415 (2013) ("[Plaintiffs] cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."). Because this law does not regulate "social media" platforms generally, but instead limits its coverage to those platforms that meet each of four specific criteria, this Court cannot reasonably infer that any particular platform is likely covered by the law without some factual allegations regarding each of those criteria.[4] Plaintiffs plead none. At best, this Court could reasonably infer that that Facebook, YouTube, and Snapchat satisfy the user-content criterion, that YouTube satisfies the algorithm, auto-play, and livestream criteria, and that Facebook satisfies the livestream criterion. *See* ECF No. 1 ¶¶ 15–16, 35, 66. But Plaintiffs' complaint includes no factual allegations from which this

---

against those members if they meet the four coverage criteria, and Florida leaders are in no better position to know whether Plaintiffs' members meet those criteria than Plaintiffs or their members themselves are. *See* ECF No. 72 at 11–12.

[4] One of Plaintiffs' claims for relief is a vagueness challenge to the law's coverage criteria. But Plaintiffs must still allege some facts from which this Court could reasonably infer that one of Plaintiffs' members could satisfy these criteria under at least some possible interpretation.

5

Court could reasonably infer that at least one of these platforms likely meets the law's time requirement.[5]

Even if this Court takes into account all of the evidence presented in this matter relating to the Plaintiffs' motion for a preliminary injunction, *see Fla. Fam. Pol'y Council v. Freeman*, 561 F.3d 1246, 1253 (11th Cir. 2009), it still does not suffice. *See* ECF No. 72 (order denying Plaintiffs' motion for a preliminary injunction).

Because this Court finds that Plaintiffs have not plausibly alleged standing, it need not consider Defendant's other arguments for dismissing the complaint.[6]

Accordingly, Defendant's motion to dismiss, ECF No. 50, is **GRANTED**. Plaintiffs' complaint is **DISMISSED without prejudice** for lack of standing. If Plaintiffs intend to file an amended complaint, they shall do so **on or before Monday, March 31, 2025**.

**SO ORDERED on March 17, 2025.**

> **s/Mark E. Walker**
> **Chief United States District Judge**

---

[5] This Court reiterates that it is not holding Plaintiffs to an impossible standard. *See* ECF No. 72 at 10 (discussing the minimal facts that would need to be shown—or here, alleged—to meet this standard).

[6] However, if Plaintiffs intend to re-plead their claims, they would do well to make explicit what they claimed was implicit in their initial complaint, such as an equitable cause of action brought in the alternative for their constitutional claims.

App. 390

74

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, <br><br> *Plaintiffs*, <br><br> v. <br><br> JAMES UTHMEIER, in his official capacity as Attorney General of the State of Florida, <br><br> *Defendant*. | Case No. 4:24-cv-00438-MW-MAF |

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

## INTRODUCTION

1.      Florida House Bill 3 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors.  Books, movies, television, rock music, video games, and the Internet have all been accused in the past of posing risks to minors.  Today, similar debates rage about "social media" websites.  These debates are important, and the government may certainly take part in them.  But the First Amendment does not take kindly to government efforts to resolve them.  The Constitution instead leaves the power to decide what speech is appropriate for minors where it belongs:  with their parents.

2.      Nevertheless, some states have recently taken it upon themselves to try to restrict minors' access to constitutionally protected speech on some of the most popular online services.  Courts across the country have unanimously rejected those efforts as inconsistent with the First Amendment.  And rightly so.  While states certainly have a legitimate interest in protecting minors who use such services, restricting the ability of minors (and adults) to access them altogether is not a narrowly tailored means of advancing any such interest.  In a Nation that values the First Amendment, the preferred response is to let parents decide what speech and mediums their minor children may access—including by utilizing the many available tools to monitor their activities on the Internet.

1

3.      Like the laws that have preceded it, HB3 violates the First Amendment. The Act bans anyone under 14 from creating or holding an account on certain "social media platforms" altogether, and it requires 14- and 15-year-olds to obtain a parent's consent before doing so.  By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Florida has "with one broad stroke" restricted—and, for those under 14, prohibited—access to valuable sources for speaking and listening, learning about current events, "and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

4.      Again, while Florida certainly has a legitimate interest in protecting minors, it is not obvious what HB3 is designed to "protect" minors from.  The law does not focus on any particular content that may pose special risk to minors.  Nor does it focus on identifying specific means of or forums for communication that those seeking to take advantage of minors have proven more likely to use.  HB3's definition of "social media platform" instead appears designed to restrict access to websites that minors especially enjoy using—specifically, websites that facilitate significant amounts of First Amendment activity.  Indeed, whether a service is covered turns in part on how long minors spend on it and whether it employs tools designed to bring to their attention content they might like.  But by that metric, the state could restrict access to the most popular segments of nearly any medium for

2

constitutionally protected speech, be it enticing video games, page-turning novels, or binge-worthy TV shows. Burdening protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

5.    In all events, the state cannot begin to show that its draconian access restrictions are necessary to advance any legitimate interest it may assert. Parents already have a wealth of tools at their disposal to limit what online services their minor children use, what they can do on those services, and how often they can use them. Florida may wish that more Floridians shared its own views about whether minors should use "social media platforms." But while the state may take many steps to protect minors from harm, including by persuading parents to take advantage of tools to limit their minor children's access to "social media platforms," it may not take matters into its own hands and restrict access itself. After all, "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech" is not "a proper governmental means of aiding parental authority." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

6.    For these reasons and others, the Court should declare Section 1 of HB3 unconstitutional and enjoin the Attorney General of Florida from enforcing it.

## THE PARTIES

7.    Plaintiff Computer & Communications Industry Association (CCIA) is a nonprofit membership association that represents a broad cross-section of

3

companies in the computer, Internet, information technology, and telecommunications industries. CCIA's members include (among others) Google, LLC, and Meta Platforms, Inc. A full list of CCIA's members is located here: https://tinyurl.com/mvh4tv2n. For more than 50 years, CCIA has promoted open markets, open systems, and open networks. CCIA serves the interests of its members, which share a commitment to the vital First Amendment protections that HB3 undermines. CCIA brings this action on its members' behalf to vindicate its members' First Amendment rights and the First Amendment rights of their users and to prevent the economic and other injuries that HB3 will cause them absent judicial relief.

8.      Plaintiff NetChoice is a nonprofit trade association for Internet companies. NetChoice's members include (among others) Google, LLC, Meta Platforms, Inc., and Snap Inc. A full list of NetChoice's members is located here: https://tinyurl.com/3vdmvstv. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that make the Internet more accessible and useful. NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that HB3 undermines. NetChoice brings this action on its members' behalf to vindicate its members' First Amendment rights and the First Amendment rights of their members' users and to prevent the economic and

other injuries that HB3 will cause members absent judicial relief.

9.    CCIA and NetChoice have standing to bring their challenges.

10.    CCIA and NetChoice have associational standing to challenge the Act because: (1) some of their members have standing to sue in their own right; (2) challenging the Act is germane to CCIA's and NetChoice's associational purposes; and (3) their members' individual participation is unnecessary in this challenge. *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *7 (D. Utah Sept. 10, 2024); *Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *7-9 (W.D. Tex. Aug. 30, 2024); *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at *5-6 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 716 F.Supp.3d 539, 548-50 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9 (W.D. Ark. Aug. 31, 2023).

11.    At least one of CCIA's and NetChoice's members has standing to sue in its own right. "Nothing in [the Supreme] Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate the law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). A plaintiff need allege only facts sufficient to establish that his conduct is "arguably proscribed by the statute they wish to challenge." *Id.* (alterations and quotation marks omitted); *see also id.* at 158 (explaining that "we do not require a plaintiff to

5

expose himself to liability before bringing suit" (citation omitted)); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (finding that plaintiffs had standing to bring a pre-enforcement challenge because they "alleged an actual and well-founded fear that the law will be enforced against them"); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119-20 (11th Cir. 2022) (explaining that plaintiff need only allege that its conduct is "arguably proscribed" by the law and that the plaintiff is subject to "a credible threat of enforcement"). Both CCIA and NetChoice have members who satisfy that standard, as each has members who operate services that are at a minimum "likely covered by the law." Dkt. 73 at 5.

12. Snap Inc., which is a member of NetChoice, operates Snapchat, which appears to satisfy each of the criteria set forth in HB3's definition of "social media platform."

13. Snapchat "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as it allows users to create, upload, and share pictures and videos with other users. *See* Snapchat Support, How to Use Snapchat (last visited Mar. 28, 2025), https://tinyurl.com/3n4eh9vm.

14. During the past 12 months, 10% or more of the daily active users on Snapchat who used Snapchat at least 80 percent of the days during the previous 12 months and who are younger than 16 years of age spent on average 2 hours per day or longer on Snapchat on the days when using Snapchat.

6

15. Snapchat "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), as it uses algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past. *See* Snapchat Support, Personalization on Snapchat (last visited Mar. 28, 2025), https://tinyurl.com/ytavfaum.

16. Snapchat includes at least one feature listed under Section 501.1736(1)(e)(4). Snapchat users may enable notifications to alert them of Snaps or messages from other users. §501.1736(1)(e)(4)(b) ("Push notifications"); *see* Snapchat Support, Notifications (last visited Mar. 28, 2025), https://tinyurl.com/4hs56nsm.

17. While direct messaging is one of Snapchat's primary uses, "e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not Snapchat's "exclusive function." §501.1736(1)(e).

18. Snapchat's users include "resident[s]" in Florida (as HB3 defines that term) who are between 13 and 16 years old. §501.1736(1)(a), (d)

19. Snapchat does not currently prohibit minors under 14 from creating accounts when Snapchat knows or has reason to believe that the minor is located in Florida. §501.1736(2). Snapchat does not currently prohibit 14- and 15-year-olds

7

from creating accounts when Snapchat knows or has reason to believe that the minor is located in Florida. §501.1736(4). And Snapchat does not currently require 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when Snapchat knows or has reason to believe that the minor is located in Florida. §501.1736(3).

20.    There is an "actual and well-founded fear that the law will be enforced against" Snap. *Am. Booksellers*, 484 U.S. at 393. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.* To the contrary, statements made by officials at HB3's signing ceremony expressly identified Snapchat as one of Florida's intended targets. Press Conference at 22:24-23:03, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. And while Florida has had ample opportunity throughout this litigation to provide assurances that Snap is not covered if that is its view, the state has conspicuously declined to do so. To the contrary, Florida has repeatedly explained in its briefs that it enacted HB3 in response to alleged concerns about various features on websites such as "Snapchat." Dkt. 51 at 2.

21.    Because Snapchat is "likely covered by" HB3, Dkt. 73 at 5, Snap will be forced "to take significant and costly compliance measures or risk" potential enforcement against it, if HB3 is not enjoined. *Am. Booksellers*, 484 U.S. at 392. To avoid the substantial risk of an enforcement action, Snap will need to implement

systems to conduct age verification. It will also need to implement systems to conduct parental verification. Making such changes to Snapchat will be costly and will require a significant amount of budget, resources, and staff investment over many months and possibly longer. A "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

22. Because Snapchat is "likely covered by" HB3, Dkt. 73 at 5, HB3 will also hinder Snap's ability to communicate with its users, burdening Snap's own exercise of First Amendment rights. Snapchat curates and disseminates content to users that Snapchat thinks will be particularly relevant to them. Snapchat selects the content it disseminates to a particular user based in part on the content that the user has interacted with in the past (via the user's account) and Snapchat's own rules about what content is appropriate. By restricting users from creating accounts on Snapchat, HB3 burdens Snap's exercise of First Amendment rights. *Moody v. NetChoice, LLC*, 603 U.S. 707, 727-40 (2024). "[A] deprivation of the[] First Amendment right to free speech" is a quintessential injury in fact. *Speech First*, 32 F.4th at 1119.

23. Likewise, HB3's regulation of so-called "addictive features" burdens Snap's exercise of First Amendment rights. Snapchat engages in First Amendment activity when it communicates with its users via, e.g., "[p]ush notifications." By imposing burdens on Snap for engaging in that First Amendment activity, HB3

App. 401

interferes with Snap's First Amendment rights. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

24. Google, LLC, which is a member of both CCIA and NetChoice, operates YouTube. YouTube "is likely covered" by HB3, as it appears to satisfy each of the criteria set forth in HB3's definition of "social media platform."

25. YouTube "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as it allows users to create, upload, and share videos with others around the world. *See* YouTube Help, Upload YouTube Videos (last visited Mar. 28, 2025), https://tinyurl.com/2fety3cv. YouTube Kids likewise allows users to view content created by other users. *See* YouTube Help, YouTube Kids (last visited Mar. 28, 2025), https://tinyurl.com/yhn4aycy.

26. YouTube "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), as it relies on automated efforts to suggest videos to users based on, among other things, content the user has interacted with in the past. *See* YouTube Help, Manage Your Recommendations & Search Results (last visited Mar. 28, 2025), https://tinyurl.com/536r2wwu; *see also* YouTube For Families Help, Recommended Videos on YouTube Kids (last visited Mar. 28, 2025), https://tinyurl.com/mryarz36.

27. YouTube utilizes at least one of the features listed in Section

10

501.1736(1)(e)(4).  YouTube users may enable "[p]ush notifications" to alert them of user activity on the videos they upload.  §501.1736(1)(e)(4)(b); *see* YouTube Help, Manage YouTube Notifications (last visited Mar. 28, 2025), https://tinyurl.com/3zsdfjwr.  And YouTube displays "personal interactive metrics" to show users how many times other users have "liked" their videos. §501.1736(1)(e)(4)(c); *see* YouTube Help, Like or Dislike a Video (last visited Mar. 28, 2025), https://tinyurl.com/wrvf33vr.

28.    Because YouTube's usage patterns and demographics change frequently, it is difficult for YouTube to conclusively determine whether "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" YouTube "on the days when using" YouTube "during the previous 12 months."  §501.1736(1)(e)(2).  One significant ambiguity of HB3 is that it is unclear whether a company is covered if it meets the 10% metric over certain periods but not others, which is entirely possible given that YouTube does not have control over which users spend how much time using YouTube in a given time.  The problem is compounded by the fact that HB3 defines "daily active users" in a way that is different from how YouTube defines and measures that term.[1]  Nevertheless, even though YouTube does not in the ordinary

---

[1] HB3 defines "[d]aily active users" to mean "the number of unique users in the United States who used the online forum, website, or application at least 80 percent

course of its business attempt to measure the specific metric made relevant by HB3 (the percentage of "daily active users" who are under 16 who spend on average 2 or more hours per day using the service), there is reason to believe that, based on historical data about usage, YouTube may be covered by the Act.  At a minimum, YouTube would face a serious risk of an enforcement action by Florida if it did not comply.  That is partly because there are multiple ways of calculating the threshold, and it is unclear which method Florida would use. Because there is a potential way to calculate the threshold that might result in a percentage above 10%, the costs, risks, and reputational harms associated with an enforcement action (including potentially broad investigatory demands) are sufficiently substantial that, absent an express assurance by the state that YouTube is not covered, YouTube will face substantial and costly compliance measures.

29.    In addition, Florida's own expert cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)," Dkt. 51-1 at ¶13, which includes survey results regarding teenagers' self-reported time using YouTube.  *See* J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c.  Given

---

of the days during the previous 12 months," regardless of whether users have an account or access the service using their own account.

Florida's expert's reliance on that survey, YouTube has an "actual and well-founded fear" that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" YouTube "on the days when using" YouTube "during the previous 12 months," §501.1736(1)(e)(2). *Am. Booksellers*, 484 U.S. at 393.

30.    "[E]-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not the "exclusive function" of YouTube or YouTube Kids.  §501.1736(1)(e).

31.    YouTube's users include "resident[s]" in Florida (as HB3 defines that term) who are under 14, as well as "resident[s]" in Florida who are 14 and 15 years old.  §501.1736(1)(a), (d).

32.    YouTube does not currently prohibit minors under 14 from creating accounts when YouTube knows or has reason to believe that the minor is located in Florida.  §501.1736(2).  YouTube does not currently prohibit 14- and 15-year-olds from creating accounts when YouTube knows or has reason to believe that the minor is located in Florida.  §501.1736(4).  And YouTube does not currently require 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when YouTube knows or has reason to believe that the minor is located in Florida.

13

§501.1736(3).

33.     There is an "actual and well-founded fear that the law will be enforced against" YouTube. *Am. Booksellers*, 484 U.S. at 393. "The State has not suggested that the newly enacted law will not be enforced," and there is "no reason to assume otherwise." *Id.* And while Florida has had ample opportunity throughout this litigation to provide assurances that YouTube is not covered if that is its view, the state has conspicuously declined to do so.

34.     Because there is an "actual and well-founded fear that the law will be enforced against" YouTube, YouTube will be forced "to take significant and costly compliance measures or risk" potential enforcement against it should the law take effect. *Am. Booksellers*, 484 U.S. at 392-93. To avoid the risk of an enforcement action, YouTube will need to implement systems to conduct age verification. It will also need to implement systems to conduct parental verification. Making such changes to YouTube will be costly.

35.     Because there is an "actual and well-founded fear that the law will be enforced against" YouTube, *Am. Booksellers*, 484 U.S. at 393, HB3 will also hinder YouTube's ability to communicate with its users, burdening YouTube's exercise of First Amendment rights. YouTube curates and disseminates content to users that YouTube thinks will be particularly relevant to them. YouTube selects the content it disseminates to a particular user based in part on the content that the user has

14

interacted with in the past (via the user's account) and YouTube's own rules about what content is appropriate. By restricting users from creating accounts on YouTube, HB3 burdens that exercise of First Amendment rights. *Moody*, 603 U.S. at 727-40.

36.    Likewise, HB3's regulation of so-called "addictive features" burdens YouTube's exercise of First Amendment rights. YouTube engages in First Amendment activity when it communicates with its users via, e.g., "[p]ush notifications," and "personal interactive metrics." By imposing special burdens on YouTube for engaging in that First Amendment activity, HB3 burdens YouTube's First Amendment rights.

37.    Meta Platforms, Inc., which is a member of CCIA and NetChoice, operates Facebook and Instagram, which appear to satisfy each of the criteria set forth in HB3's definition of "social media platform."

38.    On information and belief, both Facebook and Instagram "[a]llow[] users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as they allow users to create, upload, and share pictures and videos with other users. *See* Facebook Help Center, Share Photos on Facebook (last visited Mar. 28, 2025), https://tinyurl.com/5jxy2hcb; Instagram Help Center, Share a Post (last visited Mar. 28, 2025), https://tinyurl.com/eaz6nwub.

39.    On information and belief, both Facebook and Instagram "[e]mploy[] algorithms that analyze user data or information on users to select content for users,"

§501.1736(1)(e)(3), as they use algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past. *See* Facebook Help Center, Learn About and Manage Suggested Content in Your Facebook Feed (last visited Mar. 28, 2025), https://tinyurl.com/yumkra7m; Instagram Help Center, How Instagram Determines Which Posts Appear As Suggested Posts (last visited Mar. 28, 2025), https://tinyurl.com/2w97sbcn.

40.    On information and belief, both Facebook and Instagram include at least one feature listed under Section 501.1736(1)(e)(4).  Both Facebook and Instagram users may enable notifications to alert them of activity related to their accounts.  §501.1736(1)(e)(4)(b) ("Push notifications"); *see* Facebook Help Center, Push, Email and Text Notifications (last visited Mar. 28, 2025), https://tinyurl.com/4965bkx8; Instagram Help Center, Notification Settings (last visited Mar. 28, 2025), https://tinyurl.com/47k8p3ce.  And both Facebook and Instagram display "personal interactive metrics" to show users how many times other users have "liked" their content.  §501.1736(1)(e)(4)(c); *see* Facebook Help Center, Like and React to Reels and Videos on Facebook (last visited Mar. 28, 2025), https://tinyurl.com/438vek43; Instagram Help Center, Like or Unlike a Post on Instagram (last visited Mar. 28, 2025), https://tinyurl.com/mrx4w563.

41.    There is an "actual and well-founded fear" that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend

16

on average 2 hours per day or longer on" Meta's online service, Facebook, "on the days when using" Facebook "during the previous 12 months," §501.1736(1)(e)(2). *Am. Booksellers*, 484 U.S. at 393. There is likewise an "actual and well-founded fear" that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" Instagram, another Meta-operated service, "on the days when using" Instagram "during the previous 12 months," §501.1736(1)(e)(2). *Am. Booksellers*, 484 U.S. at 393.

42.    Statements made by officials at HB3's signing ceremony expressly identified Instagram as one of Florida's intended online services to regulate. Press Conference at 12:30-13:00, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. Florida has repeatedly explained in its briefs that it enacted HB3 in response to alleged concerns about various features on websites such as "Facebook and Instagram." Dkt. 51 at 6. And the legislative history of HB3 is replete with references to both Facebook and Instagram. *See* Florida House of Representatives Staff Final Bill Analysis HB3 at 5, 7, 11 (Mar. 28, 2024); Florida Senate Bill Analysis and Fiscal Impact Statement HB3 at 6 (Feb. 13, 2024); Florida House of Representatives Staff Analysis at 5 (Jan. 17, 2024).

43.    Florida's own expert, moreover, cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time

spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)." Dkt. 51-1 at ¶13. While Florida's expert did not include specific information "about how much time youth spend using any particular platform" in her report, Dkt. 72 at 9 n.6, the study that she cites identifies Instagram and Facebook as two of the four most popular "social media platforms" among teenagers. *See* J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c. It also includes survey results regarding teenagers' self-reported time using Facebook and Instagram. *Id.* Given Florida's expert's reliance on that survey, there is an actual and well-founded fear that Florida thinks that 10% or more of daily active users on Facebook and Instagram who are younger than 16 spend on average 2 hours per day or longer on Facebook and Instagram.

44.   On information and belief, "e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not the "exclusive function" of either Facebook or Instagram. §501.1736(1)(e).

45.   On information and belief, both Facebook and Instagram users include "resident[s]" in Florida (as HB3 defines that term) who are between 13 and 16 years old. §501.1736(1)(a), (d).

46.     On information and belief, neither Facebook nor Instagram currently prohibits minors under 14 from creating accounts when they know or have reason to believe that the minor is located in Florida, §501.1736(2), neither Facebook nor Instagram currently prohibits 14- and 15-year-olds from creating accounts when they know or have reason to believe that the minor is located in Florida, §501.1736(4), and neither Facebook nor Instagram currently requires 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when they know or have reason to believe that the minor is located in Florida. §501.1736(3).

47.     Because there is an "actual and well-founded fear that the law will be enforced against" Meta, Plaintiffs expect that Meta will be forced "to take significant and costly compliance measures or risk" potential enforcement against it should HB3 take effect. *Am. Booksellers*, 484 U.S. at 392-93.  To avoid the substantial risk of an enforcement action, Plaintiffs expect that Meta will need to implement both age verification and parental verification systems.  Making such changes to Facebook and Instagram will be costly and will require a significant amount of budget, resources, and staff investment.

48.     Because there is an "actual and well-founded fear that the law will be enforced against" Meta, *Am. Booksellers*, 484 U.S. at 393, Plaintiffs expect that HB3 will also hinder Meta's ability to communicate with its users, burdening Meta's own exercise of First Amendment rights.  Both Facebook and Instagram curate and

disseminate content to users that they think will be particularly relevant to them. Facebook and Instagram select the content they disseminate to a particular user based in part on the content that the user has interacted with in the past (via the user's account) and Facebook's and Instagram's own rules about what content is appropriate. By restricting users from creating accounts on Facebook and Instagram, HB3 burdens their exercise of First Amendment rights. *Moody*, 603 U.S. at 727-40.

49.    Likewise, HB3's regulation of so-called "addictive features" burdens Facebook's and Instagram's exercise of First Amendment rights. Facebook and Instagram engage in First Amendment activity when they communicate with their users via, e.g., "[p]ush notifications." By imposing burdens on Facebook and Instagram for engaging in that First Amendment activity, HB3 interferes with their First Amendment rights.

50.    CCIA and NetChoice have standing to assert both their members' First Amendment rights and the First Amendment rights of their members' current and prospective users. *See Am.* Booksellers, 484 U.S. at 393; *Paxton*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 716 F.Supp.3d at 550-51; *Griffin*, 2023 WL 5660155, at *11-12.

51.    Defendant James Uthmeier is the Attorney General of Florida. HB3 charges the Florida Department of Legal Affairs—of which the Attorney General is the head—with its enforcement. *See* HB3, §1(5) (codified at Fla. Stat.

§501.1736(5)).[2]  Attorney General Uthmeier is a resident of Florida.  CCIA and NetChoice sue Attorney General Uthmeier for declaratory and injunctive relief in his official capacity as the Attorney General of Florida.

## JURISDICTION AND VENUE

52.    CCIA's and NetChoice's causes of action arise under 42 U.S.C. §1983 and the United States Constitution.  The Court therefore has subject matter jurisdiction under 28 U.S.C. §1331.  This Court has authority to grant legal and equitable relief under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908), injunctive relief under 28 U.S.C. §1651, and declaratory relief under 28 U.S.C. §§2201(a) and 2202.

53.    Venue is proper in this district under 28 U.S.C. §1391 because the defendant performs his official duties in the Northern District of Florida and is therefore considered to reside in this district as a matter of law.

## BACKGROUND

54.    CCIA and NetChoice are Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat.  These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind."

---

[2] For ease of reference, this complaint cites provisions of HB3 §1 based on the locations in Title XXXIII, Chapter 501 of Fla. Stat. at which they are codified.

21

*Packingham*, 582 U.S. at 107. "On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos." *Id.* at 104. YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. And on Snapchat, users can deepen connections with friends and family by communicating with each other in fun and casual ways.

55.     Like adults, minors use these websites to engage in an array of First Amendment activity on a wide range of topics. Minors use online services to read the news, connect with friends, explore new interests, follow their favorite sports teams, and research their dream colleges. Some use online services to hone a new skill or showcase their creative talents, including photography, writing, or other forms of expression. Others use them to raise awareness about social causes and to participate in public discussions on salient topics of the day. Still others use them to build communities and connect with others who share similar interests or experiences, which is particularly helpful for minors who feel isolated or marginalized at home, or are seeking support from others who understand their experiences. *See* Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), https://tinyurl.com/t2rejxyx.

56.     These websites also engage in their own First Amendment activity when they curate and disseminate third-party speech to their users. Both Facebook and Instagram curate and disseminate third-party content to their users based on their

22

App. 414

judgment about what is appropriate for users to see, taking into consideration information about each user through the user's account. YouTube likewise curates and disseminates videos to users based on YouTube's judgment about what the user may find especially interesting, which is informed in part by the activity associated with the user's account. Snapchat also curates and disseminates content to users based on what Snapchat thinks is relevant to the user, which is also based in part on activity associated with the user's account.

57.    Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree online services like Facebook, YouTube, and Snapchat are appropriate for minors. Concerns that new means of communication may be harmful to minors, however, are hardly new. The same basic concerns animating discussion about minors' access to the Internet have been raised repeatedly in the past about other types of speech and other mediums of expression.

58.    In the 1800s, for example, "penny dreadful" publications were condemned for glorifying criminals and were blamed for youthful delinquency by the media and parents alike. *See* James B. Twitchell, *Preposterous Violence: Fables of Aggression in Modern Culture* 169 (1989). Decades later, comic books were derided as "particularly injurious to the ethical development of children." *Juvenile*

*Delinquency (Comic Books), Hearings Before the Subcommittee to Investigate Juvenile Delinquency*, 83rd Cong., 2d Sess. 86 (1954) (testimony of Dr. Frederic Wertham). Movies were accused of "possess[ing] a great[] capacity for evil, particularly among the youth of a community." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). Television too. *See, e.g.*, Surgeon General's Scientific Advisory Committee on Television and Social Behavior, *Television and Growing Up: The Impact of Televised Violence, Report to the Surgeon General*, U.S. Pub. Health Serv. (1971), https://tinyurl.com/39xcysnk; *Juvenile Delinquency (Television Programs): Hearings Before the Subcommittee to Investigate Juvenile Delinquency of the Senate Committee on the Judiciary*, 83d Cong., 2d Sess. (1954). In the 1980s, "partly clad, long-haired rockers who sing about sex, sado-masochism, suicide, murder and other things" were the problem. *See* I. Molotsky, *Hearing on Rock Lyrics*, N.Y. Times (Sept. 10, 1985), https://tinyurl.com/yrknwwf8. A decade later, families and lawmakers alike raised concerns about the harmful effects of the Internet. *See* H.R. Rep. No. 105-775, p.7 (1998). Concerns about violent video games followed soon after. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789-90 (2011).

59.     As these historical examples reflect, people inevitably have different opinions about what content and mediums are appropriate for minors. Some believe that Mark Twain's *Adventures of Huckleberry Finn* is inappropriate because it

24

App. 416

contains racial epithets; others think it is a uniquely valuable piece of literature. *See* Alvin Powell, *Fight Over Huck Finn Continues: Ed School Professor Wages Battle for Twain Classic*, Harvard Gazette (Sept. 28, 2000), https://tinyurl.com/ye2xwphb. Some think *Saving Private Ryan* is too violent for minors; others think it imparts valuable lessons. *See Graphic 'Private Ryan' Not For Kids*, Chicago Tribune (Aug. 6, 1998), https://tinyurl.com/44tf6jfr. Some think that video games are unduly violent. *See* William Siu, *I Make Video Games. I Won't Let My Daughters Play Them*, N.Y. Times (Oct. 2, 2022), https://tinyurl.com/muakc2hh. Others say that smartphones are too addictive. *See* Tayana Panova & Xavier Carbonell, *Is Smartphone Addiction Really an Addiction*, 7 J. Behav. Addictions 252 (2018), https://tinyurl.com/9rfsbbum. Opinions likewise differ greatly when it comes to whether and to what extent it is appropriate for minors to use online services like Facebook, YouTube, and Snapchat.

60. There are certainly legitimate concerns underlying both sides of these debates, and the government may have a role in empowering parents with tools and information to make their own judgments about what speech is appropriate for their own minor children. But when the government has crossed the line into deciding for itself which constitutionally protected speech minors may access, courts have invalidated such efforts as inconsistent with the First Amendment. *See, e.g., Brown*, 564 U.S. at 794-95 (invalidating law prohibiting distribution of violent video games

25

App. 417

to minors without parental consent); *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-14 (1975) (invalidating law prohibiting display of movies containing nudity at drive-in theaters). After all, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may the government bar public dissemination of protected materials to them." 422 U.S. at 212-13 (citation omitted).

61. Indeed, even restrictions on access to speech that is *not* constitutionally protected as to some or all minors have rarely survived scrutiny, as they often impede the First Amendment rights of adults. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004) (enjoining law restricting access to sexually explicit materials on the Internet); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programing on television); *Reno v. ACLU*, 521 U.S. 844 (1997) (invalidating law enacted to protect minors from "indecent" and "patently offensive" communications on the Internet). As courts have explained in striking down such laws, tools that enable parents to decide for themselves what speech their minor children may access are virtually always "less restrictive" than imposing "universal restrictions at the source." *Ashcroft*, 542 U.S. at 667.

62. In short, in a Nation that values the First Amendment, the preferred response from the government is to let parents decide what speech is appropriate for their minor children, including by using tools that make it easier for them to restrict

26

access should they choose to do so. And while the government may have some role to play in facilitating access to such tools, it has rarely needed to do so since market forces typically drive industries to be responsive to parents' concerns. The movie, music, and video game industries, for example, have all developed sophisticated ratings systems to assist parents.

63. The same is true of the Internet. Plaintiffs' members and others have developed sophisticated tools and technologies that allow parents to supervise and restrict what their minor children see and how they see it. Parents who wish to limit minors' access to online services like Instagram and YouTube, or to filter or monitor the content to which they are exposed, have many options at their disposal.

64. ***Device-level restrictions.*** Parents can decide whether and when to let their minor children use computers, tablets, and smartphones in the first place. And those who choose to let them use such devices have many ways to control what they see and do. Apple, for example, provides parents with tools to limit how long minors can spend on their iPhones, iPads, and MacBooks. *See, e.g.*, Apple, *Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch*, https://tinyurl.com/uxfnna4y (last visited Mar. 26, 2025). It also provides them with tools to control what applications (*e.g.*, Facebook, YouTube, and Snapchat) minors can use, set age-related restrictions for those applications, filter online content in Safari and on other applications, and control privacy settings. *Id.* Google,

Microsoft, and Samsung similarly offer parental controls for their devices. *See* Google, Family Link, *Help Keep Your Family Safer Online*, https://tinyurl.com/mr4bnwpy (last visited Mar. 26, 2025); Microsoft, *Getting Started with Microsoft Family Safety*, https://tinyurl.com/yc6kyruh (last visited Mar. 26, 2025); Samsung, *Manage Family Groups and Parental Controls with Your Samsung Account*, https://rb.gy/u4y1sz (last visited Mar. 28, 2025). And many third-party applications allow parents to control and monitor minors' use of Internet-connected devices and online services. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://tinyurl.com/s6bje2jd.

65. ***Network-level restrictions***. Cell carriers and broadband providers also provide parents with tools to block apps and websites from their minors' devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. *See, e.g.*, Verizon, *Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family*, https://tinyurl.com/ycyxy6x6 (last visited Mar. 26, 2025); AT&T, *AT&T Secure Family App*, https://tinyurl.com/d995ya2u (last visited Mar. 26, 2025); T-Mobile, *Family Controls and Privacy*, https://tinyurl.com/57run7ac (last visited Mar. 26, 2025); Comcast Xfinity, *Parental Controls for Xfinity Internet and TV*, https://tinyurl.com/2rwyt7mv (last visited Mar. 26, 2025). Most wireless routers (the

28

devices that provide wireless Internet throughout a home) contain parental control settings as well.  *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 28, 2025), https://tinyurl.com/mtvdwypu.  Parents can use those settings to block specific websites and applications (Facebook, YouTube, etc.) if they do not want their minor children to access them.  *See, e.g.*, Netgear, *NETGEAR Smart Parental Controls*, https://tinyurl.com/me3ksfvu (last visited Mar. 26, 2025).  They can limit the time spent on the Internet by turning off their home Internet at specific times during the day, pausing Internet access for a particular device or user, or limiting how long their minor children can spend on a particular website or service.  *Id.*  And they can set individualized content filters for their minor children and monitor the websites they visit and services they use.  *Id*.

66.   ***Browser-level restrictions.***  Parental controls on Internet browsers offer another layer of protection.  Google Chrome, Microsoft Edge, and Mozilla Firefox all offer parents tools to control which websites minors can access.  *See, e.g.*, Mozilla, *Block and Unblock Websites with Parental Controls on Firefox*, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022).  Microsoft offers "Kids Mode," which allows access to only a pre-approved list of websites.  *See* Microsoft, *Learn More About Kids Mode in Microsoft Edge*, https://tinyurl.com/59wsev2k (last visited Mar. 26, 2025).  Google has a similar feature.  It also provides parents with "activity reports," allowing them to see what apps and websites their minor children

29

App. 421

are accessing the most.  Google, *Google's Parental Controls – Google Safety Center*, https://tinyurl.com/kwkeej9z (last visited Mar. 26, 2025).

67.    ***Application-level restrictions.***  On top of all that, CCIA and NetChoice members provide parents with many tools to decide what their minor children can see and do on their services.  And they have devoted extensive resources to developing policies and practices to protect minors who use them.

68.    For starters, services operated by CCIA and NetChoice members, including Facebook, Instagram, and Snapchat, prohibit minors under 13 from accessing their main services.  Some members offer separate experiences for users under 13 geared for that age group.  For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Mar. 26, 2025); YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Mar. 26, 2025).  These services allow parents to select content settings, set screen-time limits, and otherwise oversee minors' use of the services.

69.    CCIA and NetChoice members also expend significant resources curating the content users post on their services to ensure that it is appropriate for adults and teens alike.  Members restrict the publication of (among other things) violent and sexual content, bullying, and harassment.  Some prohibit content that

App. 422

encourages body shaming and promote content that encourages a positive self-image. Several use "age gating" to keep minors from seeing certain content visible to adults, or younger teens from seeing content visible to older teens. CCIA and NetChoice members implement their policies through algorithms, automated editing tools, and human review. If a member determines that a piece of content violates its policies, it can remove the content, restrict it, or add a warning label or a disclaimer to accompany it. And members can (and do) suspend or ban accounts that violate their policies.

70.     CCIA and NetChoice members also provide users with tools to curate the content they wish to see. Users can generally choose whom to follow. Users can generally block or mute other users and control who may see and interact with their own content. Some members provide users with tools to exclude specific categories of content they wish to avoid. Facebook users, for example, can alter the content Facebook displays by hiding certain types of content or opting to see fewer posts from a specific user or group (or blocking them altogether). Instagram users can select a "not interested" button to filter out content they do not wish to see. They can also use keyword filters (for example, "fitness" or "recipes" or "fashion") to do the same.

71.     CCIA and NetChoice members empower parents to monitor teens' online activities on their services.

72.     Snapchat's "family center" allows parents to see their teen's friends list and who they have been messaging, review their privacy settings, and manage parental controls.

73.     Facebook offers supervision tools that parents and guardians can use. Parents can see how much time their teens have spent on the Facebook app.  They can set scheduled breaks for them and see their Facebook friends.  Parents can also review some of their teens' privacy settings and content preferences and see the people and pages they have blocked.  *See, e.g.*, Meta, *Supervision on Facebook*, https://tinyurl.com/595h985k (last visited Mar. 28, 2025).

74.     Instagram enables parents and guardians to set time limits for their teens, set reminders to close the app, monitor the time spent on Instagram, and monitor accounts followed by their teens and the accounts that follow them.  Parents can also review the accounts blocked by their teens, as well as their teens' privacy, messaging, and sensitive content settings.  *See, e.g.*, Instagram, Help Center, *About Supervision on Instagram*, https://tinyurl.com/zxxmmbhb (last visited Mar. 26, 2025).  Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts," which default to the strictest privacy settings and have limitations on who can contact teens, which content they can see, and what time of day they receive notifications.  Minors under 16 will need a parent's permission to relax any of these Instagram Teen Account settings.  Instagram will

also provide additional supervision features, including features that allow parents to monitor with whom their teens are chatting and what they are seeing. *See, e.g.*, Instagram, *Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents* (Sept. 17, 2024), https://tinyurl.com/22fwuzz9.

75.    YouTube offers a "supervised experience" for teens (separate from the supervised experience for minors younger than 13), allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teens' channel activity (such as uploads, comments, and subscriptions); and (3) to choose whether to link accounts between a parent and teen. YouTube, *More Choices for Kids, Tweens, and Teens from YouTube*, https://tinyurl.com/2dpetf76 (last visited Mar. 28, 2025).    YouTube has also developed features and policies directed at promoting digital wellbeing among teens and children, such as turning auto-play off by default, refining its recommendation systems so teens are not repeatedly exposed to potentially harmful content, and reminding teens to take a break or go to bed. *Id.*

76.    CCIA and NetChoice members also restrict communications between adults and teens on their services, if they allow such communications at all.

77.    Facebook, Instagram, and Snapchat, for example, all take steps to limit adults from messaging teens to whom they are not connected. *See, e.g.*, Meta, *Introducing Stricter Message Settings for Teens on Instagram and Facebook* (Jan.

25, 2024), https://tinyurl.com/2ucma8sv; Snap Inc., *Snapchat Safeguards for Teens*, https://tinyurl.com/mvas8784 (last visited Mar. 26, 2025). Snapchat's default settings permit direct messages only between people who are already friends on the platform or established contacts in both users' phones, and Snapchat does not recommend minors as friend connections unless one has the other as an existing phone contact or they share mutual friends.

78.   Instagram encourages teens via prompts and safety notices to be cautious in conversations with adults, even those to whom they are connected. And Instagram Teen Accounts take this a step further by restricting direct messaging from people teens do not follow or are not connected to, regardless of the user's age.

79.   Some CCIA and NetChoice members also inform users when an adult who has been exhibiting potentially suspicious behavior attempts to interact with them. If, for example, an adult is sending a large amount of friend or message requests to people under age 18, or has recently been blocked by people under age 18, Instagram alerts the recipients and gives them the option to end the conversation and block, report, or restrict the adult.

80.   YouTube and other members do not offer private messaging between users at all.

## FLORIDA HOUSE BILL 3

81.   Notwithstanding the long line of cases striking down government

34

efforts to decree what constitutionally protected speech minors may access, and the wealth of tools available to help parents tailor and restrict their minor children's Internet access should they choose to do so, Florida has taken it upon itself to decide what is appropriate for minors on the Internet.  Last year, Florida enacted HB3, which dramatically restricts minors' access to "social media platforms," significantly curtailing (and in some cases, eliminating) their ability to engage in core First Amendment activities on many of the most popular online services.

82.    HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activit[ies] of other users."  Fla. Stat. §501.1736(1)(e).  But instead of regulating all online services that allow users to share and view content, the Act limits the definition to the online services that minors enjoy using the most—i.e., the services that facilitate the most First Amendment activity.  An online service qualifies as a "social media platform" only if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the service "on the days when using" the service, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has "one or more addictive features." *Id.* HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play functions," and "[l]ive-streaming functions." *Id*. The Act excludes any service on

35

which "the exclusive function is e-mail or direct messaging." *Id.*

83.    Section 1 of HB3 imposes several restrictions on access to "social media platforms" that are relevant here[3]:

84.    ***Restrictions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platforms" altogether.  *Id.* §501.1736(2)(a).  It also requires "social media platforms" to terminate any existing accounts held by minors under age 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising."  *Id.* §501.1736(2)(b).  Account holders have 90 days to dispute the termination.  *Id.*

85.    An "account holder" is "a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state."  *Id.* §501.1736(1)(a).  "If a social media platform allows an account holder to use the social media platform, the parties have entered into a contract."  *Id.* §501.1736(8).

86.    ***Restrictions on 14- and 15-year-olds.*** HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's

---

[3] CCIA and NetChoice challenge only Section 1 of HB3.  For ease of reference, future references to "HB3" or "the Act" refer only to Section 1 unless otherwise stated.

parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). It also requires "social media platforms" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." *Id.* §501.1736(3)(b). The account holder has 90 days to dispute the termination. *Id.* HB3 specifies that if its parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §501.1736(4).

87. HB3 does not explain how a "social media platform" is supposed to identify who is a "parent or guardian." But the regulations enacted by the Florida Attorney General require "social media platform[s]" to "conduct reasonable parental verification" in "determining whether someone is a parent." Fla. Admin. Code §2-43.002(2). "Reasonable parental verification" means "any method that is reasonably calculated at determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means," which "may include" "requesting from a child the child's parent's name, address, phone number, and e-mail address," "contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship," and "utilizing any commercially reasonable method

regularly used by the government or business to verify that parent's identity and age." *Id.* §2-43.001(12).

88.    HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or reckless[ly]" violate its provisions.  Fla. Stat. §501.1736(5).  HB3 authorizes the Florida Attorney General to enforce the law, and it imposes a civil penalty of up to $50,000 per violation.  Fla. Stat. §501.1736(5).  The regulations implementing HB3 specify that a "social media platform" commits a "knowing or reckless violation" if "it, based on the facts or circumstances readily available to" it, "should reasonably have been aroused to question whether the person was a child and thereafter failed to perform reasonable age verification."  Fla. Admin. Code §2-43.002(3)(a).

89.    And the implementing regulations all but mandate that a "social media platform" implement whatever the state deems to be "reasonable age verification" for all users, as the regulations state that the Attorney General "will not find [a knowing or reckless violation] … has occurred if a social media platform establishes it has utilized a reasonable age verification method with respect to all who access the social media platform."  *Id.* §2-43.002(3)(b).  "Age verification" methods that satisfy this standard are "any commercially reasonable method of age verification approved by the commercial entity," Fla. Stat. §501.1737(1)(i); "commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party"

38

organized, owned, and operated in the United States, *id.* §501.1738(1); or "method of verifying age that is regularly used by the government or businesses for the purpose of age and identity verification." Fla. Admin. Code §2-43.002(1).

90.    HB3 also includes a private right of action authorizing minors (or their representatives) to sue a "social media platform" for letting them create an account. Fla. Stat. §501.1736(6)(a). A minor account holder may recover up to $10,000 in damages for each violation of the Act. *Id.*

91.    HB3 took effect on January 1, 2025. HB3 §5.

## CLAIMS FOR RELIEF

### COUNT ONE
### First Amendment
### (42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)

92.    CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

93.    "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet." *Id.* The Supreme Court has therefore held that the First Amendment limits the government's ability to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors.

39

94.    In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment.  The state tried to justify the law on the ground that it served its interest in keeping convicted sex offenders away from minors.  *See id.* at 106. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment even assuming intermediate scrutiny applied.  *Id.* at 107-08.  By barring sex offenders from accessing "social networking" websites altogether, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens."  *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge."  *Id.* at 107.  For the government to "foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."  *Id.* at 108.

95.    That rule applies with full force to efforts to restrict minors' access to such services.  The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).  Courts have therefore routinely invalidated government efforts to

protect minors from the purportedly harmful effects of new forms of media by restricting their access to constitutionally protected speech.

96.    In *Brown*, for example, the Supreme Court held that a California law that prohibited the sale of violent video games to minors without parental consent violated the First Amendment.  564 U.S. at 804-05.  And in *Erznoznik*, the Court held the First Amendment prohibited a City of Jacksonville ordinance barring the display of movies containing nudity at drive-in theaters.  422 U.S. at 217-18; *accord Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 689-91 (1968) (invalidating ordinance restricting dissemination of films deemed "not suitable for young persons"); *Joseph Burstyn*, 343 U.S. at 501-02 (invalidating law authorizing denial of license to show films deemed "sacrilegious").

97.    Unsurprisingly given that body of precedent, courts around the country have universally enjoined state efforts to restrict minors' access to "social media platforms," including laws that require teens to obtain parental consent to access them.  *See, e.g.*, *Reyes*, 2024 WL 4135626; *Paxton*, 2024 WL 4051786; *NetChoice, LLC v. Bonta*, 2024 WL 3838423 (9th Cir. Aug. 16, 2024); *Fitch*, 2024 WL 3276409; *Yost*, 716 F.Supp.3d 539; *Griffin*, 2023 WL 5660155; *NetChoice v. Bonta*, 2025 WL 807961 at *21-22 (N.D. Cal. Mar. 13, 2025).

98.    HB3 should be enjoined for the same reasons.  The provisions prohibiting some minors from creating accounts on "social media platforms"

41

App. 433

altogether, *see* Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (4)(a), (4)(b)(1), and the provisions requiring other minors to obtain parental consent to create accounts on "social media platforms," *id.* §§501.1736(3)(a), (3)(b)(1), are unconstitutional, as they violate the First Amendment both on their face and as applied to CCIA and NetChoice members who operate "social media platform[s]" as defined by the Act.[4]

99.    Those provisions plainly restrict core First Amendment activity. They completely prohibit minors under age 14 from creating accounts on the websites it covers. Fla. Stat. §§501.1736(2)(a), (2)(b)(1). That makes HB3 even more restrictive than the laws enjoined in *Paxton*, *Fitch*, *Yost*, *Griffin*, and *Bonta*—none of which completely *bans* access to covered services. By prohibiting minors under age 14 from creating accounts at all, Florida has "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Packingham*, 582 U.S. at 107.

100.    Requiring 14- and 15-year-olds to obtain parental consent before creating accounts likewise restricts core First Amendment activity. Fla. Stat.

---

[4] While all of Section 1 is unconstitutional because HB3's definition of "social media platform" is unconstitutionally vague, *see* Count II *infra*, Plaintiffs' First Amendment challenge is only to the provisions prohibiting minors under 14 from creating accounts on "social media platforms," the provisions requiring 14- and 15-year-olds to obtain parental consent before doing so, and the backup provisions prohibiting 14- and 15-year-olds from creating accounts (which kick in only if the parental-consent provisions are enjoined). *See* Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), (4)(b)(1).

§§501.1736(3)(a), (3)(b)(1).  As numerous courts have concluded, requiring minors to obtain parental consent before accessing "social media" abridges First Amendment rights.  *See, e.g.*, *Reyes*, 2024 WL 4135626 at \*20; *Fitch*, 2024 WL 3276409 at \*14; *Yost*, 716 F.Supp.3d at 551; *Griffin*, 2023 WL 5660155 at \*17.  And the Supreme Court has already held that the government lacks "the power to prevent children from hearing or saying anything *without their parents' prior consent.*"  *Brown*, 564 U.S. at 795 n.3.  Otherwise, then "it could be made criminal to admit persons under 18 to a political rally without their parents' prior written consent— even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors."  *Id.*  It could even "be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent."  *Id.*  The state plainly has no such authority: demanding parental consent requires parents to intervene to undo the state's exercise of governmental authority to restrict speech.  *Id.*; *Yost*, 716 F.Supp.3d at 558.

101.   Potentially anticipating these challenges, HB3 specifies that if the court enjoins the parental consent requirement, then it shall be severed and replaced with a provision banning access by 14- and 15-year-olds.  Fla. Stat. §501.1736(4)(a), (4)(b)(1).  That would make the First Amendment problem even more glaring, as that would just prevent even more minors "from engaging in the legitimate exercise of First Amendment rights."  *Packingham*, 582 U.S. at 108.  And it confirms that the

43

state's real goal is not to aid parental authority, but to override it.

102. HB3 also burdens the First Amendment rights of *adults* to access covered services, as it effectively requires adults to prove their age to do so. HB3's implementing regulations specify that it is a "knowing or reckless" violation of the law for a "social media platform" not to conduct a "reasonable age verification" when it suspects (or reasonably should suspect) that the account holder is "a child." Fla. Admin. Code §2-43.002(3). And the implementing regulations effectively compel covered services to implement whatever the state deems to be "reasonable age verification procedures" for all users, as doing so operates as an affirmative defense. *Id.* §2-43.002(3)(b). As courts have repeatedly reaffirmed, requiring adults to verify their age before accessing speech significantly burdens First Amendment rights. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 849; *Griffin*, 2023 WL 5660155 at *17; *Yost*, 716 F.Supp.3d at 552; *Fitch*, 2024 WL 3276409, at *12. By forcing adults to either surrender sensitive personal information to access protected speech or forgo that First Amendment activity entirely, such requirements "discourage users from accessing" online services and "completely bar" some adults from doing so. *Reno*, 521 U.S. at 856.

103. The unique aspects of online services like Facebook and YouTube only heighten the First Amendment values at stake. While government restrictions on books, magazines, movies, and video games prohibit people from *receiving* speech,

HB3 also restricts users' ability to engage in their own speech and associate with like-minded individuals. *See Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982).

104. On top of that, HB3's access restrictions interfere with the First Amendment rights of CCIA and NetChoice members to disseminate both their own and third-party speech to their users—restricting their own First Amendment rights as well. *See Moody*, 144 S.Ct. 2383; *Reyes*, 2024 WL 4135626, at \*8; *Yost*, 716 F.Supp.3d at 551-52. For example, the Act restricts covered websites from curating and disseminating content to their users, who are willing listeners. It also imposes compliance obligations on covered websites for communicating with their users via "[p]ush notifications," "[a]uto-play," "[i]nfinite scrolling," and "personal interactive metrics."

105. In fact, HB3 is even more problematic than the laws invalidated in *Brown*, *Erznoznik*, *Ashcroft*, and *Playboy*. Some of those laws at least involved an attempt (albeit an unsuccessful one) to "adjust the boundaries of an existing category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. But Section 1 of HB3 does not endeavor to confine its restrictions to anything that even arguably approaches unprotected speech. It instead restricts—and sometimes even prohibits—access to "social media platforms" even if all a teenager wants to do is to attend church services on Facebook or view educational materials on YouTube.

App. 437

106. Because HB3 restricts access to large swaths of constitutionally protected speech, it is subject to heightened scrutiny. *See Packingham*, 582 U.S. at 103. Indeed, the sweeping nature of its restrictions demands strict scrutiny. If California had restricted access to *all* video games out of concern that video games might be addictive, that would have made the First Amendment violation even more glaring. *See Brown*, 564 U.S. at 794. So too if Jacksonville had prohibited the public display of all movies based on a concern "that motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression," *Joseph Burstyn*, 343 U.S. at 502; *see Erznoznik*, 422 U.S. at 217-18.

107. Florida's decision to restrict minors' access to a particular medium of protected expression, based on features that are not meaningfully different from features found on all manner of mediums for speech, reinforces the need for strict scrutiny, as it renders HB3 content based. The law singles out certain "social media platforms" because the state is concerned about the *content* minors may encounter on those services. As the House Speaker explained at the bill's signing ceremony (which the Governor livestreamed on Facebook), HB3 seeks to address services that are "curating *content* for your children which is encouraging them to stay on just a few more hours longer every day *and is leading them and nudging them in a particular direction*." Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024),

46

https://tinyurl.com/5fhv2e2t (emphases added).

108.    HB3's speaker distinctions reinforce that conclusion.  Courts are deeply skeptical of laws that "distinguish[] among different speakers," as a speaker and her speech are so often "interrelated" that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  That principle has particular force when a law singles out for disfavored treatment some but not all in the business of disseminating speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983).

109.    HB3 facially "distinguish[es] among different speakers." *Citizens United*, 558 U.S. at 340.  The definition of "social media platform" singles out a subset of online services for disfavored treatment, while exempting others.  And those speaker distinctions are an obvious proxy for content discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).  While the law purports to address "addictive features," it does not restrict access to all mediums that employ similar features to engage their audience.  The law leaves services like Disney+, Hulu, and Roblox uncovered, even though many minors spend hours on those services each day, and even though they employ the same so-called "addictive features," like personalized algorithms, push notifications, and autoplay. *See Reyes*, 2024 WL 4135626 at *15 & n.157.  The state's only evident justification for restricting access

47

App. 439

to Facebook, Instagram, YouTube, and Snapchat while leaving many other mediums for speech untouched is the state's apparent belief that the covered websites deliver *content* the state thinks is particularly harmful. *See* Press Conference at 6:00-6:23, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.

110. Regulation based on these so-called "addictive features"—i.e., how long users remain engaged—is particularly suspect, as the judgment that minors are spending too much time on certain media, whether it be comic books, video games, television, or websites, is inherently content based. And singling out forms of speech that have proven particularly popular imposes a particularly significant First Amendment burden, as it distinctly burdens the content that people find most valuable. Letting the government make such decisions would be devastating to First Amendment values—which is precisely why whether and what limits to put on screen time or video games or the like is a matter that has traditionally been reserved to parents, not to the government, "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

111. But whether strict or intermediate scrutiny applies, Florida at the very least must demonstrate that HB3 is "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 103. Florida cannot do so.

112. To the extent Florida seeks to justify HB3's restrictions on the theory

that they "give[] parents a greater ability to protect their children," Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a, that argument fails at least twice over. For one thing, the law is radically over-restrictive judged by that interest, as it prohibits some minors from creating accounts on "social media platform[s]" *even if their parents approve*. Fla. Stat. §§501.1736(2)(a)-(b), 501.1736(4). That Florida has taken that extreme step raises a serious concern that its true goal is to impose "what the State thinks parents *ought* to want," which is not a permissible ground for government interference with First Amendment rights. *Brown*, 564 U.S. at 804.

113. But that aside, Florida's conception of how it may help parents "protect their children" reflects a fundamental misunderstanding of the proper role of government in family decision-making. The Supreme Court has consistently held that parents—not the state—have the primary right and responsibility to guide their minor children's upbringing. And the Supreme Court has expressed serious "doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802.

114. To the extent Florida seeks to justify HB3 on the ground that it helps protect minors from "predators," Press Release, *Governor DeSantis Signs*

*Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024),
https://tinyurl.com/28mtyp3a, that does not work either, as the law is radically over-restrictive judged by that interest. *See Fitch*, 2024 WL 3276409, at *14. In *Packingham*, North Carolina argued that barring convicted sex offenders from accessing "social media" was necessary to protect minors from predators. 582 U.S. at 106. The Court acknowledged the importance of that interest, but it nevertheless concluded that the law could not withstand intermediate scrutiny because the state had a narrower way to achieve its goals: It could "prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." *Id.* at 107. If the First Amendment prohibits barring convicted sex offenders from using websites, laws restricting or even prohibiting innocent users' access to those same websites cannot possibly be narrowly tailored.

115. Nor can Florida justify HB3 on the theory that it has an important interest in protecting minors from alleged "dangers" of "social media," such as "addiction," "higher rates of depression" and "self-harm." Press Conference at 6:54-6:58, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t; Press Release, *Governor DeSantis Signs Legislation to Protect Children and Uphold Parental Rights* (Mar. 25, 2024), https://tinyurl.com/28mtyp3a. Even assuming the state

50

App. 442

could produce evidence that its concerns are real rather than conjectural, HB3 is both wildly overinclusive and underinclusive judged by that interest. The law does not single out any particular speech (let alone any *unprotected* speech) that might pose special risks to minors. It instead restricts (and sometimes forecloses) minors' ability to access any speech on these services at all, regardless of whether the content has *any* capacity to lead to "depression" or "self-harm."

116. HB3 thus hinders access not just to potentially harmful content, but to services that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Indeed, it would even preclude minors from accessing content and resources on these services that could help them cope with mental health struggles. On top of that, the Act has the practical effect of hindering adults from accessing the same online services, even though the state has no legitimate reason to do so. *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57. That is breathtakingly overbroad measured against *any* interest the state could assert. *See Fitch*, 2024 WL 3276409, at *12.

117. Conversely, HB3 is "wildly underinclusive when judged against" any of the justifications the state has proffered. *Brown*, 564 U.S. at 802. The Act leaves many online services with materially indistinguishable—indeed, sometimes literally identical—content and functionality uncovered just because they are preferred by a

smaller percentage of minors and/or typically used for fewer hours a day. The law exempts services like Disney+, Hulu, and Roblox, even though they employ many of the same features HB3 denigrates as "addictive." The legislative record contains no evidence that "requiring social media companies to compel minors to push 'play,' hit 'next,' and log in for updates will meaningfully reduce the amount of time they spend on social media platforms." *Reyes*, 2024 WL 4135626, at \*15. And Florida is "perfectly willing" to let minors access supposedly harmful services to their hearts' content "so long as one parent … says it's OK." *Brown*, 564 U.S. at 802.

118. At bottom, the law really seems to be animated by Florida's concern that minors are spending what the state views as "too much" time on "social media platforms." In a word, HB3 is an internet-rationing statute that restricts minors in Florida from accessing speech that their peers elsewhere may access. It is highly doubtful that the state has a legitimate interest in restricting minors' ability to access and interact with mediums for protected speech just because it thinks they are spending too much time doing so. Some minors undoubtedly spend two hours a day reading graphic novels, playing video games, listening to podcasts or music, watching movies, or binging television series. That hardly empowers Florida to insert itself into homes throughout the state and second-guess the parenting choices of its residents about what content and in what quantity is appropriate for their minor children.

52

App. 444

119.   But even assuming that is an important state interest, Florida cannot begin to demonstrate that it lacks less restrictive alternatives than restricting minors' (and adults') access to "social media platforms."  When it comes to concerns about the Internet, the Supreme Court has repeatedly emphasized that enabling people to voluntarily restrict content at the *receiving* end is less restrictive than restricting access at the source.  *See, e.g.*, *Ashcroft*, 542 U.S. at 666-67; *Playboy*, 529 U.S. at 815.  After all, "targeted blocking enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners."  529 U.S. at 815.

120.   Here, too, parents already have ample tools at their disposal to restrict minors' access to "social media platforms"—which unlike the services in those cases, involve speech that is constitutionally *protected* as to minors—should they want to do so.  *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 2024 WL 4135626, at *13; *Fitch*, 2024 WL 3276409, at *11; *Yost*, 716 F.Supp.3d at 560.  To be sure, parents may not always choose to utilize those tools in the ways Florida wishes they would. But to the extent Florida is concerned that parents do not understand how to utilize them, it "cannot show that the Act's restrictions meet a substantial need of parents who wish to restrict their children's access … but cannot do so."  *Brown*, 564 U.S. at 803.  After all, it is manifestly less restrictive to educate parents about what tools are available and how to use them, and "a court should not presume parents, given

53

full information, will fail to act." *Playboy*, 529 U.S. at 824.

121. The state also has plenty of other far less restrictive alternatives to address any concerns it may have about specific content, like expanding its recently enacted digital literacy curriculum for public-school students or developing an easily accessible curriculum for parents. *See* Fla. Stat. §1003.42(2)(*o*)(5) (as added by Fla. H.B. 379 (2023)). Instead, Florida chose the bluntest possible instrument: a near-total ban on access for teens and onerous restrictions for adults. That is the antithesis of narrow tailoring.

122. Indeed, HB3 is so poorly tailored when judged against any *legitimate* interest the state may have that it seems Florida's real concern is that not all parents share its views about the propriety of "social media platforms" for minors. But to the extent that is the concern that HB3 is designed to address, the law's "effect is only in support of what the State thinks parents *ought* to want," which, again, is not a permissible ground for government interference with First Amendment rights. *Brown*, 564 U.S. at 804.

123. Unless declared invalid and enjoined, the Act's access ban and parental consent requirements will unlawfully deprive Plaintiffs' members and their users of their fundamental First Amendment rights and will irreparably harm Plaintiffs, their members, and their members' users.

**COUNT TWO**
**Unconstitutional Vagueness**
**(42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)**

124. CCIA and NetChoice re-allege and incorporate by reference the allegations in paragraphs 1-91 as though fully set out herein.

125. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54. After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). So when a law "reaches a substantial amount of constitutionally protected conduct," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982), it must speak "only with narrow specificity," *NAACP v. Button*, 371 U.S. 415, 433 (1963).

126. HB3 fails to speak with the requisite specificity. The Act's primary provision governing the scope of its coverage defines "[s]ocial media platform" as

55

"an online forum, website, or application" (1) that allows users to "upload content" or view content from other users; (2) where ten percent or more of the daily active users who are younger than 16 years of age spend on average two hours per day or longer "on the online forum, website, or application"; (3) that "[e]mploys algorithms" that analyze user data or information on users to select content for users; and (4) that has one or more "addictive features," including "push notifications" to "inform a user about specific activities or events related to the user's account." Fla. Stat. §501.1736(1)(e). These criteria are riddled with ambiguities, rendering both the definition and the operative provisions that employ it unconstitutionally vague.

127. For one thing, what does it mean to "upload content"—a term left undefined? *Id.* §501.1736(1)(e)(1). Any online service that requires a user to create an account will require a user to upload at least *some* information as a part of the account registration process (i.e., a username and password). Does filling in such information, or providing one's name, cellphone number, and/or email or mailing address, qualify as "uploading content"? What about a site with a search bar that allows users to type in a query and then responds with results that match that search? Has the user, by typing in a search bar, "uploaded content"? Sites and applications that facilitate purchases require a user to provide payment information. Is that "uploading content" within the meaning of HB3? If so, there are countless sites—ranging from Spotify to C-SPAN—that could satisfy this criterion. And what if a

56

site allows a user to upload content in one area—for example, a comments section on an article, or a chatbox for technical support—but nowhere else? HB3 does not answer any of these questions.

128. The requirement that a website "[e]mploys algorithms" analyzing user data is equally vague. *Id.* §501.1736(1)(e)(3). An algorithm is "a step-by-step procedure for solving a problem or accomplishing some end." *Algorithm*, Merriam-Webster.com, https://tinyurl.com/ywn4f6x4 (last visited Mar. 28, 2025). Computer code gives a computer step-by-step instructions for how to perform and complete a given task. Thus, *all* computer code can be considered an algorithm at some level. For example, many sites require a user to log in to see certain content. Such sites require code that contains an algorithmic "if, then" instruction: If the user is logged in, then display the content; if not, then do not display the content. Would such a site "employ algorithms" in such a way that fulfills HB3's criterion? Again, HB3 does not say.

129. Finally, the provision addressing "push notification[s]" is indecipherable. HB3 states that a push notification qualifies as an "addictive feature" if it "inform[s] a user about specific activities or events related to the user's account." Fla. Stat. §501.1736(1)(e)(4)(b). That could mean that push notifications qualify as "addictive features" only if they provide an update about "specific activities or events" that relate to a user's account. Or it could reach updates about

57

"events related to a user's account," rendering the statute far more expansive. For example, any push notification about a breaking news event would fall within this broader reading, because breaking news always involves some kind of "specific activity."

130. Even the narrower potential reading of the definition of an "addictive" push notification remains impermissibly vague. What does it mean for a notification to be "related to a user's account"? If, for example, a user expresses a preference for a given sports team as a part of the user's account or profile, does notifying the user of breaking news about that team "relate to" that user's account? Or must the notification relate to an *online* event or activity, such as a liked photo or a new follower, that relates to the user's account? What if the notification has to do with the account, but has nothing to do with content the website disseminates—say, a notification stating that there was a suspicious login attempt on the account? Again, HB3 answers none of these questions.

131. Given these difficulties with determining who is covered by the Act, it is bound to chill even more speech, as some websites will inevitably change the way they disseminate content to try to avoid having to comply with the law.

132. Because the vagueness problems in the law's definition of "social media platform" infect all of Section 1, all of Section 1 is unconstitutional.

133. Unless declared invalid and enjoined, the Act will unlawfully deprive

Plaintiffs' members and Internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiffs, their members, and their members' users.

**COUNT THREE**
**Preemption**
**(42 U.S.C. §1983; *Ex parte Young*; 28 U.S.C. §§2201(a) and 2202)**

134. CCIA and NetChoice re-allege and incorporate by reference the allegations in paragraphs 1-91 as though fully set out herein.

135. The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. §6501 *et seq.*, regulates online services' collection and use of personal information from minor children. COPPA defines a "child" as an "individual under the age of 13." 15 U.S.C. §6501(1). The Federal Trade Commission ("FTC") has authority to enforce COPPA and has promulgated regulations implementing it. *See* 16 C.F.R. §312.1 *et seq.*

136. COPPA makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed" by the FTC. 15 U.S.C. §6502(a)(1). These regulations generally require a website operator "to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children." 16 C.F.R. §312.5(a). But the regulations also

enumerate several circumstances in which a child's or parent's personal information may be collected and used without parental consent. *See id.* §312.5(c).

137.    COPPA expressly precludes any state from "impos[ing] any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in [COPPA] that is inconsistent with the treatment of those activities or actions under" §6502 and the FTC regulations promulgated under it.  15 U.S.C. §6502(d).

138.    HB3's imposition of liability for retaining "personal information held by the social media platform relating to the terminated account," Fla. Stat. §501.1736(2)(b)(4), (3)(b)(4), (4)(b)(4), squarely conflicts with COPPA's statutory and regulatory "treatment of those [same] activities," 15 U.S.C. §6502(d).  COPPA expressly *permits* website operators to retain "personal information from children" if they first "obtain verifiable parental consent," 16 C.F.R. §312.5(a), but HB3 imposes liability for retaining such information even if there is parental consent.

139.    COPPA also permits website operators to retain minor children's personal information for certain enumerated purposes *without* parental consent. *See* 16 C.F.R. §312.5(c)(1)-(8).  For example, parental consent is not required if an online service collects certain information from minor children to "[p]rotect the security or integrity of its Web site or online service," "[t]ake precautions against liability," "[r]espond to judicial process," or, under certain circumstances, "provide

60

information to law enforcement agencies." *Id.* §312.5(c)(6).  In addition, an online service may collect a form of "individually identifiable information" known as a "persistent identifier"—e.g., "a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier," any of which "can be used to recognize a user over time and across different Web sites or online services"—without parental consent, so long as the information "is used for the sole purpose of providing support for the [online service's] internal operations." *Id.* §§312.2, 312.5(c)(7).

140.   Because HB3's prohibition on retaining "personal information held by the social media platform relating to the terminated account," Fla. Stat. §501.1736(2)(b)(4), (3)(b)(4), (4)(b)(4), squarely conflicts with COPPA's statutory and regulatory scheme, it is expressly preempted under §6502(d).

## COUNT FOUR
## EQUITABLE RELIEF

141.   CCIA and NetChoice re-allege and incorporate by reference the preceding allegations as though fully set out herein.

142.   Section 1 of the Act violates federal law and deprives Plaintiffs' members and their users of enforceable federal rights.  Federal courts have the power to enjoin unlawful actions by state officials.  *See Ex parte Young*, 209 U.S. 123 (1908); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

143.   This Court can and should exercise its equitable power to enter a

App. 453

preliminary injunction enjoining Attorney General Uthmeier, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1) against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

144.    This Court can and should exercise its equitable power to enter a permanent injunction enjoining Attorney General Uthmeier, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Section 1 of HB3 against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

**COUNT FIVE**
**DECLARATORY RELIEF**

145.    CCIA and NetChoice re-allege and incorporate by reference the allegations in paragraphs 1-140 as though fully set out herein.

146.    Section 1 of the Act violates federal law and deprives Plaintiffs' members and their users of enforceable federal rights.

147.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. §2201(a).  And they have the power to grant "[f]urther and necessary or proper relief based on a declaratory judgment or decree … after reasonable notice and hearing,

62

App. 454

against any adverse party whose rights have been determined by such judgment."

*Id.* §2202.

148.    This Court can and should exercise its power under §§2201(a) and 2202 to enter a declaration that that Section 1 of HB3 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

## PRAYER FOR RELIEF

CCIA and NetChoice pray for the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C. §§2201(a) and 2202, that Section 1 of HB3 on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that it is unconstitutional as applied to CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

2.    A preliminary injunction enjoining Attorney General Uthmeier, as well as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing the provisions of HB3 that will be codified at Fla. Stat. §§501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1) against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

3.    A permanent injunction enjoining Attorney General Uthmeier, as well

63

as all officers, agents, and employees subject to his supervision, direction, or control, from enforcing Section 1 of HB3 against CCIA and NetChoice members who operate "social media platforms" as defined by the Act.

4.   Such costs and reasonable attorneys' fees to which CCIA and NetChoice may be entitled by law, including under 42 U.S.C. §1988.

5.   Any further relief that the Court deems just and proper.

Respectfully submitted,

/s/ *Douglas L. Kilby*

| | |
|---|---|
| Paul D. Clement | Douglas L. Kilby |
| Erin E. Murphy | Florida Bar No. 73407 |
| James Y. Xi (*pro hac vice*) | Hannah E. Murphy |
| Joseph J. DeMott (*pro hac vice*) | Florida Bar No. 1032759 |
| Kevin Wynosky (*pro hac vice*) | Abby Corbett |
| Mitchell K. Pallaki (*pro hac vice*) | Florida Bar No. 31332 |
| CLEMENT & MURPHY, PLLC | Grace Mead |
| 706 Duke Street | Florida Bar No. 49896 |
| Alexandria, VA 22314 | STEARNS WEAVER MILLER |
| (202) 742-8900 | WEISSLER ALHADEFF & |
| paul.clement@clementmurphy.com | SITTERSON, P.A. |
| erin.murphy@clementmurphy.com | Highpoint Center |
| james.xi@clementmurphy.com | 106 East College Avenue, Suite 700 |
| joseph.demott@clementmurphy.com | Tallahassee, FL 32301 |
| kevin.wynosky@clementmurphy.com | (850) 580-7200 |
| mitchell.pallaki@clementmurphy.com | dkilby@stearnsweaver.com |

*Counsel for Plaintiffs CCIA and NetChoice*

March 28, 2025

64

App. 456