No. 25-11881

# In the United States Court of Appeals for the Eleventh Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ET AL.,
*Plaintiffs-Appellees*,

V.

JAMES UTHMEIER, IN HIS OFFICIAL CAPACITY AS FLORIDA ATTORNEY GENERAL,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

## APPENDIX VOLUME 3

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

August 13, 2025

*Counsel for Appellant*

App. 457

## Index

Docket/Tab#

**Volume 1**

District Court Docket Sheet ................................................................................A

Complaint .......................................................................................................... 1

Declaration of Jean Twenge, Ph.D. ............................................................... 51-1

Declaration of Adam Alter, Ph.D. ................................................................. 51-2

Declaration of Tony Allen ............................................................................... 51-3

U.S. Surgeon General's Advisory on Social Media and Youth Mental Health ...... 51-9

**Volume 2**

Preliminary Injunction Hearing Transcript ..................................................... 71

Order Denying Motion for Preliminary Injunction ....................................... 72

Order Granting Motion to Dismiss ................................................................. 73

Amended Complaint ......................................................................................... 74

**Volume 3**

Order Granting Renewed Motion for Preliminary Injunction ....................... 94

Attorney General's Notice of Appeal .............................................................. 95

**94**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**COMPUTER & COMMUNICATIONS**
**INDUSTRY ASSOCIATION and**
**NETCHOICE,**

      *Plaintiffs,*

**v.**                              **Case No.:  4:24cv438-MW/MAF**

**JAMES UTHMEIER,**

      *Defendant.*

_____/

## ORDER GRANTING RENEWED MOTION FOR
## PRELIMINARY INJUNCTION

Pending before this Court is Plaintiffs' renewed motion for a preliminary injunction, ECF No. 75. This Court has considered, without hearing,[1] the motion, Plaintiffs' memorandum of law in support, ECF No. 76, Defendant's opposition, ECF No. 86, and Plaintiffs' reply, ECF No. 88. Plaintiffs seek to preliminarily enjoin the enforcement of a Florida law that prohibits some social media platforms from allowing youth in the state who are under the age of 14 to create or hold an account on their platforms, and similarly prohibits allowing youth who are 14 or 15 to create

---

[1] This Court previously held a hearing on Plaintiffs' first motion for preliminary injunction. *See* ECF No. 71. Because these issues were already extensively briefed and argued before that hearing, the parties requested a hearing on the renewed motion only if this Court deemed it necessary. *See* ECF No. 79 at 2, 9. After reviewing the briefing on the renewed motion, this Court determined that an additional hearing was not necessary to decide the motion.

or hold an account unless a parent or guardian provides affirmative consent for them to do so. For the reasons explained below, the motion is **GRANTED**.

Although this Court today finds that Florida's challenged law is likely unconstitutional, it does not doubt that parents and legislators in the state have sincere concerns about the effects that social media use may have on youth, nor does it render parents or the State powerless to address those concerns. For example, this Order leaves in place new provisions of Florida law that require covered social media platforms to terminate any account held by a youth under 16 in the state upon the request of a parent or guardian. Instead, like other district courts around the country, this Court simply recognizes that the First Amendment places stringent requirements on the State to avoid substantially burdening speech unless the State can show that doing so is necessary to achieve its significant interests.

This Order proceeds as follows. First, this Court briefly describes the challenged law and the background of this case. Next, this Court considers two preliminary issues: whether this Court is barred from proceeding by the doctrine of *Younger* abstention, and whether this Court should treat Plaintiffs' renewed motion for preliminary injunction as a motion for reconsideration. Third, this Court explains the four prerequisites to injunctive relief and analyzes each. Fourth, this Court addresses the questions of bond and a stay pending appeal. Finally, this Court determines the appropriate relief.

App. 461

I

On March 25, 2024, the state of Florida enacted H.B. 3, now codified at § 501.1736, Fla Stat. 2024 Fla. Sess. Law Serv. Ch. 2024-42 (H.B. 3). The law imposes requirements on "social media platform[s]," which it defines as "an online forum, website, or application" that satisfies each of four specific criteria. § 501.1736(1)(e), Fla Stat. The first criterion is that the platform "[a]llows users to upload content or view the content or activity of other users." *Id.* The second is that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the online forum, website, or application during the previous 12 months or, if the online forum, website, or application did not exist during the previous 12 months, during the previous month."[2] *Id.* The third is that the platform "[e]mploys algorithms that analyze user data or information on users to select content for users." *Id.* The last is that the website has any one of five "addictive features": infinite scrolling, push notifications, auto-play video, live-streaming, or display of "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content." *Id.* The definition excludes platforms "where the exclusive function is email or direct messaging . . . shared only between the sender and the recipients, without displaying or posting

---

[2] For simplicity, this Court will refer to this as the "time requirement."

3

publicly or to other users not specifically identified as the recipients by the sender."
*Id.*

The law prohibits any covered social media platform from allowing youth in Florida under age 14 to become an account holder and from allowing any youth in Florida aged 14 or 15 to become an account holder absent affirmative consent from a parent or guardian. §§ 501.1736(2)(a), (3)(a), Fla. Stat. It further requires that covered social media platforms terminate any accounts held by youth under 14 in Florida, including accounts that the platform "treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising," and to similarly terminate accounts for 14- and 15-year-olds in Florida "if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account." §§ 501.1736(2)(b)(1), (3)(b)(1), Fla. Stat. The law also requires that covered social media platforms allow account holders who are 15 or younger to request to terminate their accounts and for the platform to honor such requests within 5 business days. §§ 501.1736(2)(b)(2), (3)(b)(2), Fla. Stat. It similarly requires that social media platforms allow the parent or guardian of youth aged 15 or younger to make such requests and requires the platform to effectuate the termination within 10 business days.[3]

---

[3] For simplicity, this Court will refer to this as the "parental veto" provision. Plaintiffs do not challenge the provisions regarding termination requests by youth or their parents; they only

§§ 501.1736(2)(b)(3), (3)(b)(3), Fla. Stat. Finally, the law provides that, should a court enjoin the subsection regarding 14- and 15-year-olds, that subsection "shall be severed" and replaced by a provision applying the same rules to 14- and 15-year-olds that the law applies to youth under 14. § 501.1736(4), Fla. Stat.

Plaintiffs initiated this challenge in October 2024 and promptly filed a motion for preliminary injunction. ECF Nos. 1, 4. The law had an effective date of January 1, 2025, but Defendant agreed to stay enforcement of the law until the preliminary injunction motion was resolved in exchange for Plaintiffs agreeing to make their declarants available for depositions. *See* ECF No. 25 at 2–5.

The parties briefed Plaintiffs' motion for preliminary injunction and a motion to dismiss by Defendant, and this Court held a hearing on February 28, 2025. ECF No. 71. After the hearing, this Court denied the motion for preliminary injunction because Plaintiffs had failed to adduce facts sufficient to show that they were likely to have Article III standing. ECF No. 72. This Court also granted Defendant's motion to dismiss because Plaintiffs' complaint failed to allege facts sufficient to show Article III standing. ECF No. 73. This Court allowed Plaintiffs to amend their complaint, and they did so on March 28, 2025. ECF No. 74. Plaintiffs then filed the present renewed motion for preliminary injunction. ECF No. 75.

---

challenge the provisions requiring blanket termination of existing accounts and prohibitions on the creation of new accounts. ECF No. 74 at 43 n.4.

5

App. 464

Plaintiffs Computer & Communications Industry Association ("CCIA") and NetChoice are "Internet trade associations whose members operate many online services, including Facebook, Instagram, YouTube, and Snapchat." ECF No. 76 at 10. CCIA's members include Google, LLC, which operates YouTube, and Meta Platforms, Inc., which operates Facebook and Instagram. ECF No. 74 ¶¶ 24, 37. NetChoice's members include Snap Inc. ("Snap"), which operates Snapchat, as well as Google and Meta. *Id.* ¶¶ 7–8, 12, 24, 37. Defendant is the Attorney General of Florida, charged with enforcing the challenged statute. § 501.1736(5), Fla. Stat.

While briefing on the present motion was underway, Defendant filed an enforcement action under the challenged law against Snap in Florida state court. *See Att'y Gen. of Fla. v. Snap Inc.*, Case No. 3:25-cv-676 (N.D. Fla.), ECF No. 1-1. That case was then removed to federal court and is now pending before this Court. *Snap*, Case No. 3:25-cv-676 (N.D. Fla.), ECF Nos. 1, 7.

## II

Defendant raises two important threshold issues: whether this Court should abstain from proceeding under *Younger* and whether Plaintiffs' renewed motion should be treated as a motion for reconsideration. This Court considers each in turn.

## A

First, Defendant argues that this Court is required to abstain from exercising its jurisdiction over this case under the doctrine of *Younger v. Harris*, 401 U.S. 37,

6

91 (1971). That doctrine requires federal courts to abstain from exercising jurisdiction over cases when the "requested relief would interfere" with certain proceedings in state court. *31 Foster Child. v. Bush*, 329 F.3d 1255, 1276–77 (11th Cir. 2003). *Younger* abstention is a "limited exception to the usual rule" that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237, 1241 (11th Cir. 2024) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Because "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule," only "the clearest of justifications merits abstention." *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1266–67 (11th Cir. 2019) (quoting *Colo. River Water*, 424 U.S. at 813; *Jackson-Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1140 (11th Cir. 2013)).

*Younger* abstention is required when (1) there is an "ongoing" state court proceeding[4] at the time of the federal action, (2) the state proceeding implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of their federal constitutional claims. *Tokyo Gwinnett*, 940 F.3d at 1268 (citing *Middlesex Cnty. Ethics Comm. v. Garden State*

---

[4] *Younger* itself concerned only a state criminal prosecution, but the Supreme Court has since expanded the doctrine to apply to all state-filed civil enforcement proceedings "brought to vindicate important state policies." *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977). No party argues that the state case against Snap falls outside this category.

*Bar Ass'n*, 457 U.S. 423, 432 (1982)).

As discussed previously, Defendant initiated an enforcement action against Snap, a member company of Plaintiff NetChoice, in state court on April 21, 2025, after Plaintiffs in this case filed their amended complaint and renewed motion for preliminary injunction and the same day that Defendant filed his response in opposition to the present motion. In the time since Defendant filed his brief in opposition to the motion for preliminary injunction, the state court case at issue was removed to federal court. *Snap*, Case No. 3:25-cv-676 (N.D. Fla.), ECF No. 1. The Attorney General has filed a motion to remand that case to state court. *Snap*, Case No. 3:25-cv-676 (N.D. Fla.), ECF No. 14. This Court will not prejudge the issue of whether the case should be remanded. If it is properly in federal court, then there is no basis for *Younger* abstention in this case. But this Court also determines that *Younger* abstention would not be appropriate in this case even if the enforcement action against Snap is not properly in federal court and thus should be considered a state proceeding.

The parties seem to agree, rightly, that the proceeding against Snap implicates an important state interest and affords the federal Plaintiffs an adequate opportunity for judicial review of their constitutional claims, so the question for this court is whether that proceeding was "ongoing . . . at the time of" this federal action. *Tokyo Gwinnett*, 940 F.3d at 1268. The Supreme Court has made clear that a state

8

proceeding may be "ongoing" for the purpose of this rule even if it was filed after the commencement of the federal action, as was the case here. *See Hicks v. Miranda*, 422 U.S. 332, 349 (1975). The determinative question is whether the state proceedings began "before any proceedings of substance on the merits have taken place in federal court." *Id.*

This question is not resolved by looking to the "raw time that a federal case has spent on a district court's docket"—here, nearly six months—but rather "whether the court has meaningfully engaged the merits of the claims before it." *New Ga. Project*, 106 F.4th at 1244. Nor is the question resolved merely by looking to whether the court has issued a ruling on the merits or granted a preliminary injunction. *See, e.g.*, *For Your Eyes Alone, Inc., v. City of Columbus*, 281 F.3d 1209, 1218–19 (11th Cir. 2002) (holding that it was an abuse of discretion for the district court to abstain under *Younger* even though the only ruling that had been made by the court at the time the state proceeding commenced was oral denial of a TRO). Courts in this circuit are directed to look to "the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences or hearings held, and any change in the parties' position as a result of the federal litigation." *New Ga. Project*, 106 F.4th at 1243 (quoting *Tokyo Gwinnett*, 940 F.3d at 1272) (brackets omitted).

9

No Eleventh Circuit or Supreme Court case presents the same set of relevant facts as this one. But a comparison of this case's facts to those presented in the Eleventh Circuit and Supreme Court cases that have addressed this issue reveals that abstention would not be appropriate here.

At the time the state proceeding was filed, this case had been pending in federal court for nearly six months. In that time, the parties fully briefed, and this Court ruled on, a motion for preliminary injunction and a motion to dismiss. *See* ECF Nos. 4, 5, 51, 50, 56, 62, 63, 66, 72, 73. The briefing involved substantial discussion of the merits of Plaintiffs' First Amendment claims, and this Court devoted no small portion of its three-hour hearing on the first preliminary injunction motion to probing the merits. *See* ECF No. 71. Prior to the hearing, this Court also permitted the parties—at Defendant's insistence—to engage in preliminary discovery. *See* ECF Nos. 25, 34, 35. The parties conducted seven depositions and exchanged interrogatories, requests for production, requests for admission, and responses to each, as well as initial disclosures. ECF No. 61. Both this discovery and the declarations and exhibits submitted by the parties in their first round of preliminary injunction briefing adduced facts relevant to the merits of Plaintiffs' claims, such as the evidence of a compelling interest in the challenged law and tailoring. *See* ECF Nos. 51-1, 51-2, 51-3, 51-4, 51-5, 51-6, 51-7, 51-9, 51-11, 63-1, 63-2, 63-3. Accordingly, although this Court ultimately did not address the Plaintiffs'

10

likelihood of success on the merits in its rulings, it was prepared to do so. Also prior to the initiation of the state proceeding, Plaintiffs filed an amended complaint and a renewed motion for preliminary injunction, and this Court allowed Defendant to conduct a second round of four depositions. ECF Nos. 74, 75, 76, 86. Finally, in addition to a thorough hearing on the preliminary injunction motion, this Court has held three conferences to resolve the parties' differences on the scope of permissible preliminary discovery. *See* ECF Nos. 30, 36, 81.

The history of this case is far closer to *Tokyo Gwinnett* and *For Your Eyes Alone*—cases in which it was an abuse of discretion for the district court to abstain under *Younger*—than to *Hicks* or *New Georgia Project*. In *Hicks*, the Supreme Court found that no "proceedings of substance on the merits" had taken place in federal court because the only actions that had been taken before the federal plaintiffs were charged in state court were the denial of a TRO without hearing and the convening of a three-judge court. 422 U.S. at 338, 349–50. And in *New Georgia Project*, the only action the district court had taken at the time state proceedings began was to admit the plaintiffs' attorneys *pro hac vice* and issue a "routine standing order," and the parties had filed only a complaint, *pro hac vice* motions and notices of appearance, a motion for preliminary relief, and service waivers. 106 F.4th at 1244. By contrast, in *For Your Eyes Alone*, the court similarly denied a TRO, but did so after a thorough hearing, and the defendant had also filed motions to dismiss and for

11

summary judgment and its answer. 281 F.3d at 1218–19. Finally, in *Tokyo Gwinnett*, the parties had agreed to and the district court had entered a consent TRO, both parties filed their initial disclosures, the defendant answered the complaint and filed a motion to dismiss, the district court granted the motion to dismiss on ripeness grounds, and the plaintiff filed a notice of appeal and an opening brief. 940 F.3d at 1272.

Defendant here emphasizes that this case is still at the pleading stage because he has not yet filed an answer, unlike in *For Your Eyes Alone* and *Tokyo Gwinnett*. But neither opinion emphasized the filing of the answer as a crucial step, nor did *New Georgia Project* in characterizing those opinions. *For Your Eyes Alone* instead emphasized the holding of a hearing before the denial of the TRO as central to its conclusion. *See* 281 F.3d at 1218–19. This Court therefore concludes that substantial proceedings on the merits had occurred in this case before the state-court proceedings began.[5] Accordingly, *Younger* abstention is not appropriate in this case whether or not the enforcement action against Snap is properly in federal court.

---

[5] This Court pauses to note that its decision on *Younger* abstention is not based on a finding of bad faith on behalf of the State, which can provide an exception to the doctrine where it applies. This Court does not find that Defendant has acted in bad faith, despite Plaintiffs' arguments to the contrary. This Court's decision is based only on the conclusion that *Younger* abstention is not applicable here because substantial proceedings on the merits had occurred in this case before the state proceeding commenced.

B

Second, Defendant argues that this Court should treat Plaintiffs' renewed motion for preliminary injunction as a motion for reconsideration. This Court raised this question in a previous case but did not decide it. *See Alachua Cnty. Educ. Ass'n v. Rubottom*, 2023 WL 7132968, at *1 n.2 (N.D. Fla. Sept. 22, 2023). Now with the benefit of briefing, this Court concludes that Plaintiffs' renewed motion should not be treated as a motion for reconsideration and should be analyzed under the traditional test for preliminary relief.

In a previous case in which this Court considered a renewed motion for injunctive relief, this Court noted a Middle District of Florida case in which the court determined that a renewed motion for preliminary injunction should be treated as a motion for reconsideration. *Alachua Cnty. Educ. Ass'n*, 2023 WL 7132968, at *1 n.2 (citing *Oviedo Med. Ctr. v. Adventis Health Sys.*, 2020 WL 4218276, at *1 n.2 (M.D. Fla. Apr. 28, 2020). Because the parties had neither raised nor briefed the question, this Court proceeded without deciding whether the motion should be treated as a motion for reconsideration. *Id.* In *Oviedo*, unlike in this case, the court denied the plaintiff's first preliminary injunction motion for failure to show irreparable harm. 2020 WL 4218276, at *2. Thus the renewed motion essentially asked the court to reconsider its finding on one of the four prerequisites to injunctive relief. *Id.* Here, by contrast, this Court denied preliminary injunctive relief on the basis of standing

13

and permitted the Plaintiffs to amend their complaint. The Plaintiffs' renewed motion therefore does not ask this Court to reconsider its ruling on any of the prerequisites for injunctive relief. Because this context differs significantly than from that presented in *Oviedo* and because neither this Court nor the parties have identified any other cases in which a renewed motion for preliminary injunction was treated as a motion for reconsideration, this Court will not evaluate the present motion under the more stringent standard for a motion for reconsideration and will instead apply only the traditional four-part test for preliminary relief.

Next, this Court applies that four-part test.

### III

A district court may grant a preliminary injunction only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party (or, in other words, the "balance of the equities" weighs in favor of relief); and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). A preliminary injunction is an "extraordinary and drastic remedy" that may only be granted if "the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir.

14

App. 473

1983) (internal quotation marks omitted). This Court begins its analysis with the first prong because typically, if a plaintiff cannot establish a substantial likelihood of success on the merits, this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care v. 1-800 Contacts,* 299 F.3d 1242, 1247 (11th Cir. 2002).

And the "affirmative burden of showing a likelihood of success on the merits necessarily includes a likelihood of the court's reaching the merits, which in turn depends on a likelihood that a plaintiff has standing." *Nat'l Wildlife Fed'n v. Burford,* 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting) (internal alterations omitted). In other words, if Plaintiffs fail to carry their burden on standing, this Court cannot issue a preliminary injunction. Accordingly, this Court begins its consideration of the four prerequisites by assessing whether Plaintiffs have met their burden on standing.

A

Over time, the Supreme Court has developed a three-part test for determining whether a party has standing. Under that test, a plaintiff must show (1) that they have suffered an injury in fact that is (2) fairly traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992). The first prong, an injury in fact, requires that the plaintiff face an injury that is "concrete and particularized" and "actual or imminent, not conjectural

15

or hypothetical." *Id.* at 560. This is the "irreducible constitutional minimum" required for standing under Article III of the Constitution. *Id.* And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'" *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, a plaintiff cannot "rest on such mere allegations as would be appropriate at the pleading stage, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Cacchillo*, 638 F.3d at 404 (quoting *Lujan*, 504 U.S. at 561) (internal alterations omitted); *see also Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 608 (11th Cir. 1985).

Plaintiffs here assert associational standing, which allows a membership organization to bring claims on behalf of its members so long as (1) at least one of its members would have standing to sue in its own right, (2) the interests the suit seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). To satisfy the first requirement, Plaintiffs must provide evidence that at least one of their

16

members can satisfy the traditional three-part test for Article III standing.[6]

First, Plaintiffs must show that at least one of their members faces an injury in fact that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Plaintiffs allege that their members face an economic injury because they are regulated by the law and must take costly steps to comply with its requirements. For their members' compliance costs to constitute an injury in fact, it must be based on an "actual and well-founded fear that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). In this case, because the law contains specific coverage requirements, Plaintiffs' members have an "actual and well-founded fear" of enforcement if there is a factual basis for their belief that they meet the law's coverage requirements.

Plaintiffs provide evidence that at least two of their members are likely covered by the law.[7] First, Plaintiffs allege that Snap, which is a member of

---

[6] This Court's standing analysis does not discuss or depend on the State's new enforcement action against Snap under the challenged law because it was filed after the amended complaint in this case, and the standing inquiry looks to the time the complaint was filed. *Cook v. Bennett*, 792 F.3d 1294, 1298 (11th Cir. 2015).

[7] In employing the phrase "likely covered" here and in its prior order, this Court has not raised the bar for establishing standing from showing conduct is "arguably" proscribed to showing it is "likely" proscribed. This Court's previous decision was based solely on the fact that Plaintiffs had not adduced the basic facts necessary to establish whether any one of their members even could be covered by the law. Accordingly, the Eleventh Circuit's recent decision in *HM Florida-ORL, LLC v. Governor of Fla.*, ___ F.4th ___, 2025 WL 1375363 (11th Cir. 2025), does not alter this Court's prior analysis. There, like in many other cases before it, the Eleventh Circuit considered what a plaintiff must show to establish that their intended course of conduct is "arguably" proscribed when the plaintiff and the state disagree about what a law's terms mean. The plaintiff in *HM Florida*, unlike the Plaintiffs here in their prior motion, adduced specific facts

17

NetChoice, operates the platform Snapchat that is likely covered by the law. ECF No. 74 ¶¶ 12–22. In support of their allegations, Plaintiffs submit the declaration of David Boyle, Senior Director of Product at Snap. ECF No. 76-1 ¶ 2. Boyle declared that Snapchat meets each of the law's four coverage requirements; namely, that it "allows users to upload content or view the content or activity of other users" by allowing users to "create, upload, and share pictures and videos with other users," it "uses algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past," it includes at least one of the features that the law considers "addictive" because it allows users to receive notifications to alert them of messages from other users, and it satisfies the time requirement because "[d]uring the past 12 months, 10% or more of the daily active users on Snapchat who used Snapchat at least 80 percent of the days during the previous 12 months and who are younger than 16 years of age spent on average 2 hours or longer" on the platform on the days when using it. *Id.* ¶¶ 10–13. He also declared that "Snapchat's users include minors in Florida who are 13-16 years old." *Id.* ¶ 15. And importantly, the direct messaging exclusion in the law does not apply

---

about the performances it planned to host, which allowed the Eleventh Circuit to determine that the performances could subject it to enforcement action. *Id.* at *4–8. And unlike in this case, the challenged law there defined its proscribed conduct in vague terms like "lewd conduct." *Id.* at *24. Thus, a more appropriate analogy to Plaintiffs' evidence from its prior motion would be if the restaurant operator in *HM Florida* had refused to even say whether it ever allow or intend to allow minors to attend their performances. In short, the standard is still and has always been that plaintiffs need only show that their conduct is "arguably proscribed" by the challenged law, but they must still adduce facts on which the argument can be made.

18

to the platform because although "direct messaging is one of Snapchat's primary use cases," it is not the Snapchat's exclusive function. *Id.* ¶ 14.

Because Snapchat is likely covered by the law, Snap must take costly steps to come into compliance with it. These steps include "implementing an age verification process for adults and minors alike, implementing parental identification and verifiable parental consent processes on an application or feature-by-feature basis, disabling and/or removing various features of the app for certain minor users" and potentially more. *Id.* ¶ 16. These changes "will require a significant amount of budget, resources, and staff investment over many months and possibly longer." *Id.* ¶ 16. These costs are sufficient to constitute an injury in fact to Snap.

Additionally, Plaintiffs allege that Google, which operates YouTube and is a member of both NetChoice and CCIA, is similarly covered by the law and also faces injury in the form of compliance costs. ECF No. 74 ¶¶ 24–28, 30–34. In support, Plaintiffs submit the declaration of Alexandra Veitch, Director of Public Policy for the Americas at YouTube. ECF No. 76-4 ¶ 1. Veitch declared that YouTube likely meets the requirements for coverage under the law because it "allows users to create, upload, and share videos with others around the world," it employs algorithms in the form of "automated efforts to suggest videos to users based on, among other things, content the user has interacted with in the past," it includes at least one of the "addictive" features identified by the law—display of personal interactive metrics

19

and the ability to enable push notifications to be alerted of user activity on videos the user has uploaded, and it does not "exclusive[ly] function" as an email or direct messaging service. *Id.* ¶ 7–9. YouTube has users in Florida, including users who are under 14 and users who are 14 and 15 years old. *Id.* ¶¶ 4, 48. But because "YouTube's usage patterns and demographics change frequently, it is difficult" to "conclusively determine" whether it meets the time requirement, and YouTube does not measure the specific metric employed by the statute. *Id.* ¶ 9. However, Veitch declares that "based on historical data about usage," YouTube "may be covered by the Act," particularly because "there are multiple ways of calculating the threshold, and it is unclear which method Florida would use" and there is a "potential way to calculate the threshold that might result in a percentage above 10%." *Id.* ¶ 10. Although still somewhat vague, these facts are sufficient to show that YouTube and its parent company, Google, have an actual and well-founded fear that the law will be enforced against them. As this Court explained in its prior orders, this standard does not require Plaintiffs to hand over data showing with certainty that a member meets the time requirement, merely to adduce evidence showing that the member's belief that the law applies to them is objectively reasonable.

Because it has an objectively reasonable basis to believe that it is covered by the law, YouTube will have to dedicate "a large upfront investment of resources" in order to develop the age and parental verification and consent processes needed to

20

come into compliance. *Id.* ¶¶ 47–48. And maintaining those systems "will require substantial resources, including a large ongoing investment in the human resources necessary to evaluate the identities and familial relationships" of users. *Id.* YouTube will also need to close existing profiles and accounts for certain users under 16. *Id.* ¶ 48. These costs are sufficient to show an injury in fact.[8]

Defendant does not contest that the elements of traceability and redressability are met, and this Court finds that they are. Defendant is the Attorney General of Florida, who, as head of the Florida Department of Legal Affairs, is charged with enforcing the statute. *See* § 501.1736(5), Fla. Stat. Because Plaintiffs' members' injuries stem, at least in significant part, from the threat of an enforcement action by Defendant, they are traceable to Defendant and to that extent would be redressed by an injunction prohibiting Defendant from enforcing the law against them.[9]

---

[8] In addition to the economic cost, these compliance measures impose a First Amendment cost on YouTube by "hinder[ing] YouTube's ability to communicate with its users." *Id.* ¶ 49. That is because YouTube "disseminates content to users that YouTube thinks will be particularly relevant to them" through its video recommendations, which will be more difficult if users are restricted from creating accounts. *Id.* YouTube also "communicates with its users via notifications" and the display of personal interactive metrics, and by "imposing compliance obligations on YouTube for engaging in such communications," the statute "forces YouTube to choose between restricting access to its services or ceasing such communications altogether." This is the classic "First Amendment chill" injury recognized in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) and its progeny. Because Plaintiffs have shown that YouTube has an objectively reasonable basis to conclude that they are covered by the law, this First Amendment cost is an independent injury sufficient to confer standing.

[9] Although addressed in neither side's briefing, this Court pauses to note that the challenged law contains a private right of action in addition to its public enforcement provision. *See* § 501.1736(6), Fla. Stat. Nevertheless, this Court finds that the elements of traceability and redressability are met with respect to Defendant because an injunction would "give Plaintiffs['s

21

Accordingly, this Court finds that both Snap and Google would have standing to sue in their own right, and thus the first prong of the associational standing test is satisfied for both Plaintiffs.

This Court also finds that the second and third prongs of the associational standing test are satisfied for both Plaintiffs. Regarding the second prong, Defendant does not contest that the action is germane to the organizations' purposes, and this Court finds it is. CCIA promotes "open markets, open systems, and open networks" and seeks to serve the interests of its members, including their First Amendment interests. ECF No. 74 ¶ 7. And NetChoice's mission is to "promote online commerce and speech and to increase consumer access and options through the internet, while minimizing burdens on businesses that make the Internet more accessible and useful." *Id.* ¶ 8.

Defendant vigorously disputes that the third prong is satisfied, relying heavily on the Supreme Court's recent decision in another Florida social media case to argue that this case requires the participation of individual members because deciding the merits will require a fact-intensive inquiry. *See* ECF No. 86 at 30–36 (citing *Moody*

---

members] the freedom" to continue allowing youth to hold accounts "without fear of government enforcement," and thus would provide at least partial redress. *Honeyfund.com v. DeSantis*, 622 F. Supp. 3d 1159, 1172 (N.D. Fla. 2022). This is sufficient to satisfy both elements because "the ability to effectuate a partial remedy satisfies the redressability requirement," *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021), and in this context, as is often the case, traceability and redressability "travel together." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

*v. NetChoice*, 603 U.S. 707 (2024)). But Defendant's reliance on *Moody* is misplaced. *Moody* simply clarified that applying the standard for a facial challenge will be fact-intensive in some circumstances; none of the opinions in the case even mentioned associational standing or the participation of individual members, even though the consolidated cases at issue were brought by two trade associations (the same two associations that are Plaintiffs here).

As an initial matter, Defendant's argument ignores that, as Judge Hinkle recently explained, the Supreme Court itself has recognized that associations are often better positioned to answer the kind of industry-wide factual questions that were implicated in *Moody* and could be implicated here. *See NetChoice v. Uthmeier*, Case No. 4:21-cv-220 (N.D. Fla.), ECF No. 209 at 13–16 (Hinkle, J.) (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986)). And the participation of individual members is not necessary to answer the legal questions raised by either Plaintiffs' facial or as applied challenges here. The third prong of the associational standing test is satisfied "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to the proper resolution of the case." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The questions this Court must answer— whether the challenged law implicates the First Amendment, whether it is content based or content neutral, and whether it is narrowly tailored to further a significant

23

government interest—can all be answered without reference to the intricacies of each individual platform's operation, as this Court's subsequent analysis shows. Accordingly, the participation of individual members is not required, and the third and final prong of the associational standing test is satisfied.

Finally, Defendant argues that even if Plaintiffs have standing to assert the First Amendment rights of their members, they do not have standing to assert the rights of their members' users. This is incorrect. When a plaintiff has standing and a cause of action to assert its own First Amendment rights, it can also raise the rights of third parties to support its merits arguments. *See Warth*, 422 U.S. at 501. Here, Plaintiffs have asserted the rights of their members as well as their members' users. *See* ECF No. 74 ¶ 104. Defendant's reliance on *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023), is misplaced. In *Mata Chorwadi*, the Eleventh Circuit did not allow a hotel to assert the First Amendment rights of its guests to challenge a municipal nuisance law because there was no causal connection between the enforcement of the law against the hotel and any violation of the guests' rights—guests were not likely to be deterred from calling 911 by seeing a sign announcing that the hotel had been designated a chronic nuisance property. But here, by contrast, the enforcement of Florida's law prohibiting certain

24

social media platforms from allowing a subset of youth to create accounts directly burdens those youths' rights to engage in and access speech.[10]

Having assured itself that Plaintiffs have standing, this Court proceeds to evaluate their likelihood of success on their First Amendment claim.

B

In assessing Plaintiffs' likelihood of success on their First Amendment claim, this Court's analysis proceeds as follows. This Court begins by noting that Plaintiffs bring both facial and as-applied challenges to Florida's law and discusses the standards for each. Next, this Court assesses whether Florida's law implicates the First Amendment and thus triggers heightened scrutiny. Third, this Court evaluates whether strict or intermediate scrutiny applies. Concluding that intermediate scrutiny is the appropriate test, this Court then applies it.

1

Plaintiffs bring both facial and as-applied challenges to Florida's social media law. *See* ECF No. 74 at 43. In the First Amendment context, a facial challenge to a law succeeds only when "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

---

[10] Defendant's reliance on *Kowalksi v. Tesmer*, 543 U.S. 125 (2004) and *Young Apartments v. Town of Jupiter*, 529 F.3d 1027, 1041–42 (11th Cir. 2008) is also misplaced. Neither *Kowalksi* nor *Young Apartments* was a First Amendment case, and the Supreme Court has repeatedly said that the rules on third-party standing are relaxed in the First Amendment context. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (quoting *Sec'y of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 956–57 (1984)).

*Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)) (brackets omitted). An as-applied challenge, by contrast, requires showing only that the law is unconstitutional as applied to the plaintiffs before the Court—here, the member companies of Plaintiffs' associations. In a recent case, the Supreme Court clarified that the burden of succeeding on a facial challenge—even in the First Amendment context, in which the standard is less demanding in order to "provide[ ] breathing room" for free expression—is highly fact intensive. *Id.* To evaluate Plaintiffs' facial challenge, this Court must "assess the law['s] scope" and consider [w]hat activities, by what actors" the law "prohibit[s] or otherwise regulate[s]." *Id.* Only then can the court "decide which of the law['s] applications violate the First Amendment" and "measure them against the rest." *Id.* at 725. The Supreme Court offered this directive in a case concerning two laws that were directed at social media but were worded broadly enough to potentially sweep in other platforms like Etsy, Uber, and Venmo. *Id.* The lower courts and the parties in briefing before them had focused narrowly on whether the laws were constitutional as applied to services like Facebook's News Feed and YouTube's homepage, and thus had not measured those applications of the laws against applications to other kinds of sites and functionalities. *Id.* at 724–25.

Applying the lesson of *Moody* to the case before this Court, then, requires an assessment of the scope of the present law's coverage. Plaintiffs' position is that "all

aspects of [HB3], in every application to a covered social media company, raise the same First Amendment issues." ECF No. 88 at 52 (alteration in original). And they correctly note that "Florida identifies no covered service . . . on which protected speech does not proliferate." *Id.* This is because, Plaintiffs argue, the law limits its coverage to websites that allow users to "upload content or view the content or activity of other users," and thus any covered website will be one on which users engage in speech.[11] *Id.* at 52–53. Defendant does not even hypothesize that there might be covered websites on which the "content" is all or mostly unprotected

---

[11] Although not raised in their preliminary injunction motion, Plaintiffs' amended complaint does bring a vagueness challenge in which Plaintiffs argue that, because the challenged law does not define "upload content," it could be interpreted to include things like uploading payment information, typing information into a website's search bar, or sending a help message to a chatbot. ECF No. 74 ¶ 127. If one of these activities were all it took for a website to meet the "upload content" requirement, then it would not be as clear that any covered website will necessarily be a forum for protected speech. But this Court does not agree that the law sweeps so broadly.

"To determine [statutory text's] best reading, we exhaust all the textual and structural clues that inform its meaning." *DeSantis v. Dream Defenders*, 389 So. 3d 413, 418–19 (Fla. 2024). One such clue is that "a definition usually should be construed consistently with the ordinary meaning of the defined term." *NetChoice v. Uthmeier*, Case No. 4:21-cv-220 (N.D. Fla.), ECF No. 209 at 7 (Hinkle, J.) (citing A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 228 (2012) and *Bond v. United States*, 572 U.S. 844, 861–62 (2014)). Merriam-Webster defines "social media" as "forms of electronic communication (such as websites for social networking and microblogging) through which users create online communities to share information, ideas, personal messages, and other content (such as videos)." *Social media*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/social%20media (last visited May 30, 2025). Reading the "upload content" requirement in the context that it is defining "social media platform" clarifies that it does not extend the law's coverage to merely searching a term or uploading payment information. Defendant seems to agree, arguing in his motion to dismiss Plaintiffs' first complaint that these hypotheticals "ignore the statutory context, attempting to manufacture vagueness by reading the phrases in a vacuum." ECF No. 50 at 35. Accordingly, this Court concludes that the law by its terms applies to websites that provide forums for speech.

speech. Defendant's only argument that the law may be constitutional as applied to some covered websites but not others is that, if the law is subject to First Amendment scrutiny, it may be sufficiently tailored to some platforms but not others based on differences in the parental controls available on each platform and the age distribution of the platforms' users.[12] *See* ECF No. 86 at 33–34. Because Defendant only argues that the question of constitutionality might differ at the tailoring step, this Court's analysis regarding whether the First Amendment is implicated, what level of scrutiny should be applied, and whether the law furthers a significant state interest is the same for both the facial and as-applied challenges. This Court then separately considers whether Plaintiffs have carried their burden to sustain a facial challenge at the tailoring stage.

2

Defendant begins by arguing that the challenged law does not warrant First Amendment scrutiny at all and should therefore be evaluated under only rational basis review. A law may trigger First Amendment scrutiny by directly regulating speech, by regulating "conduct that has an expressive element," or by imposing a "disproportionate burden upon those engaged in protected First Amendment

---

[12] Defendant also argues that the platforms likely differ in specifics that weigh on the question of whether the platforms engage in protected expression when they curate content to disseminate to their users. *See* ECF No. 86 at 32–33. But because this Court's conclusion on the challenged law's constitutionality does not depend on the answer to that question, these potential differences are not relevant to determining whether Plaintiffs are likely to succeed on their facial challenge.

28

App. 487

activities." *TikTok, Inc. v. Garland*, 145 S.Ct. 57, 65 (2025). Defendant argues that the law here merely regulates "commercial activity with children, not speech" because it only limits the act of account creation on regulated platforms. ECF No. 86 at 41–42. Defendant does not cite any case in which the regulation of a contract made for the purpose of accessing speech was found to lie outside the ambit of the First Amendment. Instead, Defendant relies on the Supreme Court's recent decision in *TikTok* and on two Eleventh Circuit cases concerning age restrictions on entering bars.[13] But these cases are inapposite.

*TikTok* was an unusual case and is thus worth discussing here in some detail. In it, the Court assumed without deciding that a law effectively banning[14] the social media platform TikTok implicated the First Amendment. 145 S.Ct. at 66. But before so assuming, the Court suggested in dicta that it might not.[15] *Id.* The Court identified three ways in which a law can implicate the First Amendment: it can "directly

---

[13] Namely, *Indigo Room v. City of Fort Myers*, 710 F.3d 1294 (11th Cir. 2013) and *Gary v. City of Warner Robins*, 311 F.3d 1334 (11th Cir. 2002).

[14] The law did not directly ban TikTok. Instead, it prohibited any entity in the United States from providing certain services to "distribute, maintain, or update" the platform unless TikTok divested from foreign control within 270 days of the law's enactment. 145 S.Ct. at 64. But petitioners argued, and the government did not contest, that it was "commercially infeasible" for divestment to occur within the timeline, and thus the law "effectively ban[ned]" TikTok in the United States. *Id.* at 66.

[15] Notably, the Court also cautioned that, given the "expedited time" in which it was required to consider the case and the "challenging new context" of considering "new technologies with transformative capabilities," its "analysis must be understood to be narrowly focused." *Id.* at 62–63.

regulate expressive conduct," it can regulate "conduct that has an expressive element," or it can "impose a disproportionate burden upon those engaged in protected First Amendment activity." *Id.* at 65. The Court considered only the first and third categories in its discussion. First, the Court opined that "[i]t is not clear that the Act itself directly regulates protected expressive activity" because it was directed only at the foreign ownership of the companies that operate the social media platform, and petitioners had not identified any case in which the Court had "treated a regulation of corporate control as a direct regulation of expressive activity or semi-expressive conduct." *Id.* at 65–66. The Court then determined that the First Amendment claim before it "more closely approximate[d] a claim that" the law "impose[d] a disproportionate burden upon" speech. *Id.* at 66. But the Court noted that "a law targeting a foreign adversary's control over a communications platform is in many ways different in kind from the regulations of non-expressive activity that we have subjected to First Amendment scrutiny."[16] Specifically, the law's "focus on

---

[16] Defendant seizes on this line to argue that the challenged law is similarly "different in kind" from regulations historically subject to First Amendment scrutiny because there is a "historical tradition" of regulating "contract[s] with children." ECF No. 86 at 47–49. This argument is without merit. Defendant analogizes to the Eleventh Circuit's recent case upholding restrictions on the purchase of guns by those under the age of 21, *NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. Mar. 14, 2025) (en banc). But beyond determining whether a content-based category of speech falls outside the First Amendment's protection, neither the Supreme Court nor the Eleventh Circuit have made a "historical tradition" of regulation the test for First Amendment free speech claims, as they have with claims for gun rights and Establishment Clause claims. *Compare Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011) (determining that violent speech does not fall outside the First Amendment's protections and thus a ban on the sale or rental of violent video games to minors is subject to strict scrutiny) *with New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (holding that "historical tradition" is the sole test for Second Amendment

30

a foreign government, the congressionally determined adversary relationship between that foreign government and the United States, and the causal steps between the regulations and the alleged burden on protected speech . . . may impact whether First Amendment scrutiny applies." *Id.*

Defendant urges that Plaintiffs' challenge must be categorized as a claim that the Florida law imposes a disproportionate burden upon speech, and that the Court's dicta in *TikTok* indicates that no disproportionate burden is created by Florida's law. But this argument fails in two ways. First, none of the factors that gave the Court pause in *TikTok* are present in Florida's law. Florida's law does not regulate corporate control, but the creation of accounts used to access speech. Florida's law does not concern foreign governments or foreign adversaries. And there is not a causal distance between the law and the asserted burden on speech—Florida's law directly prohibits certain minors from holding accounts on websites where they can access speech.[17] Second, Florida's law also falls under the second category of regulations

---

claims) *and Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) (directing that the Establishment Clause be interpreted by reference to "historical practices and understandings"). Instead, the Supreme Court has struck down regulations of "contracts with children" when they have unduly burdened speech. *See Brown*, 564 U.S. at 805. Thus it can hardly be said that the challenged law is "different in kind" from those the Court has subjected to First Amendment scrutiny. And even if it were, that is not the test this Court is bound to apply.

[17] Defendant argues that there are "causal steps" between Florida's law and a burden on speech because the burden only arises "if a platform chooses to use addictive features and require users to become account holders." ECF No. 86 at 47. But that is not analogous to the causal distance the Court referred to in *TikTok*, where the burden of a ban only arose because it was "commercially infeasible" that divestment could occur within the allowed timeframe. 145 S.Ct. at 66.

that the Court did not consider in *TikTok*: regulations of conduct that has an expressive element. The Supreme Court addressed this category of regulations in *United States v. O'Brien*, 391 U.S. 367 (1968). There, the Court articulated the First Amendment test to be applied when "speech" and "nonspeech" elements are "combined in the same course of conduct," and the government seeks to regulate the "nonspeech" element. *Id.* at 376. Even if it is assumed that the creation of a social media account alone is "nonspeech" conduct,[18] it is inextricable from the speech element combined in the same course of conduct—namely, accessing a forum for speech. Accordingly, the dicta in *TikTok* does not indicate that the law before this Court escapes First Amendment scrutiny.

The Eleventh Circuit's bar cases are also inapposite. The laws in those cases prohibited persons under 21 from entering or remaining in certain "alcoholic beverage establishments" while alcohol was being served or sold to the public. *Indigo Room*, 710 F.3d at 1297–98, 1300. They were challenged by underage plaintiffs who wished to enter those establishments to engage in expressive activity.

---

And Defendant's related argument that it is not the law's restriction on account holding that burdens speech but instead the platforms' decisions to require accounts to use some or all of their features would, if accepted, eviscerate established First Amendment precedent. Under it, the law struck down in *Brown v. Entertainment Merchants Association*, for example, which banned the sale or rental of violent video games to minors, would have been immune to First Amendment scrutiny because the makers and distributers of the games could simply have given them away for free. 564 U.S. 786 (2011).

[18] But a compelling argument can be made that the creation of a social media account is itself expressive association.

*Id.* In both cases, the court found that the laws did not implicate the First Amendment with minimal reasoning. But as the court noted in *Indigo Room*, the "text of the Ordinance [did] not regulate speech." *Id.* at 1300. By contrast, the text of the law before this Court does directly regulate speech. Its application hinges on, among other things, whether a platform "[a]llows users to upload content or view the content or activity of other users." § 501.1736(1)(e), Fla. Stat. Thus a more apt analogy to the law at issue here would be one that prohibited youth from entering an alcoholic beverage establishment only if that establishment also hosted open-mic nights. That would clearly implicate the First Amendment, as does the law before this Court.[19] In short, no matter how Florida's law is analyzed, it implicates the First Amendment.

---

[19] Defendant also points to *Arcara v. Cloud Books*, 478 U.S. 697 (1986), in which the Supreme Court found that the closure of a bookstore under a statute authorizing the closure of a premises used for prostitution did not warrant First Amendment scrutiny, to argue that the use of "addictive features" by social media platforms is akin to the allowance of prostitution on its premises by Cloud Books. But the Court's reasoning in *Arcara* relied on two factors not present here. First, there the law did not "inevitably single out bookstores or others engaged in First Amendment protected activities for the imposition of its burden." *Id.* at 705. As just explained, Florida's law does just that by limiting its coverage to platforms that allow "users to upload content or view the content or activity of other users." § 501.1736(1)(e), Fla. Stat. And second, the "sexual activity carried on" in *Arcara* "manifest[ed] absolutely no element of protected expression." 478 U.S. at 705. By contrast, at least some of the "addictive features" targeted by Florida's law are inextricable from speech. The decision by platforms to communicate with their users via push notifications, to display the number of times a post has been "liked" by others, or to allow users to live-stream video to their audience all involve or facilitate expression. Like the draft card burning in *O'Brien*, they may not be pure speech, but they are a far cry from the prostitution at issue in *Arcara*.

App. 492

3

Because the challenged law implicates the First Amendment, this Court must next determine whether strict or intermediate scrutiny applies. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994) ("*Turner I*"). Accordingly, to guard against the risk that "the Government may effectively drive certain ideas or viewpoints from the marketplace," a law triggers the most exacting level of review— strict scrutiny—when it targets speech because of its content. *Id.* Such content-based laws are presumptively unconstitutional and may survive only if the government proves that they are "narrowly tailored to serve a compelling state interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But if a law is "unrelated to the content of speech," it triggers only intermediate scrutiny. *Turner I*, 512 U.S. at 642. Surviving intermediate scrutiny is somewhat easier for the government. The law need not be as precisely tailored as it would need to be under strict scrutiny, and the government can use it to further a wider range of interests. Plaintiffs urge that Florida's law is content based and subject to strict scrutiny, while Defendant argues that it is content neutral and subject to, at most, intermediate scrutiny. Ultimately, this Court finds it is a close call, but the law is most likely subject to only intermediate scrutiny.

34

A law may be content based in essentially one of two ways. First, a law is facially content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 596 U.S. at 163. The facial distinction may be "obvious" and define regulated speech "by particular subject matter," or it may be more subtle and instead define regulated speech by its "function or purpose." *Id.* But regardless, its core characteristic is that it draws distinctions "based on the message a speaker conveys." *Id.* at 164. Second, a law that is facially content neutral but which "cannot be justified without reference to the content of the regulated speech" or that was adopted by the government "because of disagreement with the message [the speech] conveys" will be treated as content based. *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)) (alteration in original).

Plaintiffs make two arguments that Florida's law falls into the first category and an additional argument that it falls into the second. First, Plaintiffs argue that the law singles out speakers for disfavored treatment as a proxy for content. Plaintiffs note that, because the law only covers social media platforms that allow users to upload content or view the content or activity of other users and excludes email and direct messaging services, it leaves uncovered some websites that employ the purportedly "addictive features" that so concern the State of Florida. Plaintiffs argue that the State's "only evident justification" for this speaker distinction is its belief that the covered websites deliver content the State believes to be particularly

35

harmful. ECF No. 76 at 31. This Court is not convinced. *Turner I* provided the most detailed guidance on when a speaker distinction gives rise to strict scrutiny. 512 U.S. 622. There, Congress enacted "must-carry" rules that required cable systems to carry local broadcast television stations. *Id.* at 626, 630–32. The law thus singled out cable systems for regulation. But the Supreme Court concluded that a special characteristic of cable—namely, the "bottleneck monopoly power" it holds to block out broadcast signals—justified the differential treatment, and thus strict scrutiny was not warranted. *Id.* at 660–61. The Court reached this conclusion even though, as Justice O'Connor noted in a separate opinion, the statutory findings enacted as part of the law favorably discussed the content of broadcast television. *Id.* at 676–78 (O'Connor, J. concurring in part and dissenting in part).

Here, the State suggests that viewing the content or activity of peers is more addictive than merely viewing content created by, for example, a streaming service, and that special characteristic warrants special treatment by the law. *See* ECF No. 71 at 29:5–9. That is true, the State posits, regardless of the message or subject matter being shared, simply because youth are particularly interested in what their peers are doing and saying. Although this "special characteristic" is not as clear-cut as the monopoly power arising from the technological features of cable, this Court finds that it is likely sufficient to render the law content neutral. Reinforcing this conclusion is the fact that the social media platforms covered by Florida's law

36

"cannot avoid or mitigate" the effects of the law by "altering" the content of the speech on their platforms—for instance, by changing their content moderation policies to include more or less of a certain subject matter or viewpoint. *C.f. TikTok*, 145 S.Ct. at 67.

Plaintiffs' second argument that the law should be subject to strict scrutiny is that, by limiting its coverage to platforms where users are allowed to share content or view the content of other users, the law singles out "social" speech. Plaintiffs point to *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1121–23 (D. Utah 2024), in which a sister district court found that a similar social media law was content based because its coverage definition drew "distinctions between websites that allow users to interact socially and websites that serve another function or purpose."[20] *Id.* at 1121. That court considered this to be a facial distinction analogous to that struck down by the Supreme Court in *Reed*, where a municipal sign ordinance applied different restrictions to signs based on whether they were "political signs" designed to influence the outcome of an election, "ideological signs" otherwise communicating a message or ideas, or "temporary directional signs" directing the public to an event. *Id.* at 1122 (citing *Reed*, 576 U.S. at 164). Although it is a difficult question, this

---

[20] Notably, the Utah law included as one of its coverage requirements that the website or app "allow users to interact socially with each other." *Id.* at 1121 (quoting Utah Code §§ 13-71-101(14)). Florida's law does not include this language, but Plaintiffs argue that the "upload content" requirement functions the same way. *See* ECF No. 88 at 44.

Court is hesitant to reach the same conclusion. The Supreme Court subsequently narrowed *Reed* in *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61 (2022). There, the Court found that distinguishing between signs advertising businesses on the same premises as the sign and signs advertising off-premises businesses was not content based, even though the distinction required reading the sign to determine which set of rules applied. *Id.* at 69. This was so, importantly, because the rules did not "single out any topic or subject matter for differential treatment." *Id.* at 71. In reviewing its precedents, too, the *Austin* Court found the key question to be whether a regulation "discriminate[s] based on topic, subject matter, or viewpoint" or, in an alternate formulation reiterated from *Reed*, based on "the topic discussed or the idea or message expressed." *Id.* at 72, 74. Reconciling *Austin* with *Reed* thus requires parsing what counts as a "topic" or "subject matter." In the context of this case, it requires determining whether "social" speech, or peer-to-peer speech, is a topic or subject in the relevant sense. This Court tentatively concludes that it is not. Social speech, or speech generated by users on social media platforms, can touch on any conceivable topic, message, or idea, and accordingly does not seem akin to the kind of category that the Supreme Court discussed in *City of Austin*.

Finally, Plaintiffs argue that Florida's law is subject to strict scrutiny because it cannot be justified without reference to the content of the regulated speech. This Court disagrees. This category is narrowly drawn, and the Supreme Court has found

38

it inapplicable even in cases, like this one, where the legislative history of the law included comments by lawmakers referencing the content of speech to be regulated when explaining their reasons for supporting the law. In *O'Brien*, for example, the Supreme Court rejected the argument that a law banning the burning of draft cards was motivated by a purpose to suppress antiwar protests, despite the statements of supportive legislators during floor debate on the bill. 391 U.S. at 385–86. Similarly, in *Turner I*, the Court found must-carry rules to be content neutral despite statutory findings noting the positive contributions of local broadcast programming. 512 U.S. at 676–78 (O'Connor, J. concurring in part and dissenting in part). These cases illustrate that the test is not whether the law *has ever been* justified with reference to the content of regulated speech, it is whether the law *cannot be justified without* reference to content. Here, the legislative history and Defendant's briefs include content-neutral justifications: that the use of push notifications, infinite scroll, auto-play video, live-streaming, and displays of personal interactive metrics is addictive to children and causes them to spend more time on the platforms than is healthy.

In short, the challenged law is likely subject to only intermediate scrutiny.[21]

---

[21] Because this Court finds that Florida's law is not sufficiently tailored even under intermediate scrutiny, it would also necessarily fail if the appropriate standard were strict scrutiny.

4

Having concluded that Florida's law is likely subject to intermediate scrutiny, this Court now applies that test. A law subject to intermediate scrutiny will survive only if it is "narrowly tailored to serve a significant governmental interest" and it "leave[s] open ample alternative channels for communication." *Ward*, 491 U.S. at 791. Despite the near-identical verbiage, intermediate scrutiny is not strict scrutiny. Under intermediate scrutiny, the government has leeway to pursue a wider range of interests. And "narrow tailoring" under intermediate scrutiny, unlike under strict scrutiny, does not limit the government to only the "least restrictive means" of furthering its significant interest. *Id.* at 798. Instead, narrow tailoring under intermediate scrutiny means only that the law does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017) (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).

The first step under intermediate scrutiny is to determine whether the law furthers a "significant" government interest. *Ward*, 491 U.S. at 791. Defendant argues that the challenged law furthers the State's significant interest in protecting children from "compulsive use" of social media, pointing to an expert declaration and a report by the U.S. Surgeon General indicating that increased time spent on social media is associated with worsened mental health in youth. ECF No. 86 at 55.

40

Plaintiffs correctly note that the Supreme Court in *Brown* required causal, not merely correlational, evidence to establish a compelling interest under strict scrutiny, but the Court there noted that it allows Congress to make "predictive judgments" about expected harm under intermediate scrutiny. 564 U.S. at 799. Plaintiffs also argue that the State's purported interest in reducing compulsive use of social media is not legitimate because it is not "unrelated to the suppression of free expression," as *O'Brien* requires. ECF No. 88 at 48–49 (quoting *O'Brien*, 391 U.S. at 377). As Plaintiffs put it, Florida's law "seeks to protect minors from alleged 'addiction' to websites where they engage in and interact with *speech*." *Id.* (emphasis in original). But this Court disagrees that a state has no legitimate interest in limiting compulsive use if the compulsive use is of a speech product. While a state of course has no legitimate interest in limiting the amount of time any person spends engaging with speech, it may have a legitimate interest in regulating the use of features that are designed and operate to undermine a person's ability to exercise their will in determining the amount of time that they choose to spend engaging with an activity, whether that activity involves speech or not—particularly when that person is a minor with heightened susceptibility to such features.[22] Regardless, because this Court finds that the law is not sufficiently tailored to the State's asserted interest, it

---

[22] For a thoughtful argument that states have a legitimate interest in regulation that supports "freedom from addiction," see Matthew B. Lawrence, *Addiction and Liberty*, 108 CORNELL L. REV. 259 (2023).

can assume without deciding that this is a significant government interest sufficient to satisfy intermediate scrutiny.

The second and final step under intermediate scrutiny is to determine whether the law is narrowly tailored.[23] To be narrowly tailored, the law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham*, 582 U.S. at 106.

Florida's law cannot meet this standard, either facially or as applied. Even assuming the significance of the State's interest in limiting the exposure of youth to websites with "addictive features," the law's restrictions are an extraordinarily blunt instrument for furthering it. As applied to Plaintiffs' members alone, the law likely bans all youth under 14 from holding accounts on, at a minimum, four websites that provide forums for all manner of protected speech: Facebook, Instagram, YouTube, and Snapchat. It also bans 14- and 15-year-olds from holding accounts on those four websites absent a parent's affirmative consent,[24] a requirement that the Supreme Court has clearly explained the First Amendment does not countenance. *See Brown*, 542 U.S. at 796 n.3 (explaining that while the state may have the power to "*enforce* parental prohibitions," it does not have the power "to prevent children from hearing

---

[23] If the law is not narrowly tailored, this Court "need not consider" whether it leaves open ample alternative channels of communication. *McCullen*, 573 U.S. at 496 n.9.

[24] The law's provision that applies an across-the-board ban on 14- and 15-year-olds holding accounts if the parental consent requirement is enjoined only increases the burden, and thus fares no better. *See* § 501.1736(4), Fla. Stat.

42

App. 501

or saying anything *without their parents' prior consent*" (emphasis in original)).

These four platforms alone "enable billions of users around the world" to exchange speech by viewing or reading the speech of others and by sharing their own. ECF No. 76-2 ¶ 7 (Declaration of Matthew Schruers). They can be used to "maintain connections with friends and family and create new connections," express oneself artistically and creatively, stay informed about current events and engage in speech on important political and social issues, and learn from others. *Id.* ¶ 10. YouTube alone has "billions of monthly logged-in users" and "over 500 hours of content are uploaded every minute" by people spanning "more than 100 countries" and who speak more than 80 languages. ECF No. 76-4 ¶ 29 (Declaration of Alexandra Veitch).

Facially, the law fares no better. The law by definition applies to websites that serve as forums for First Amendment speech, *see supra* n.11, and imposes the same onerous restriction with respect to each. Unlike the law at issue in *Moody*, this law is not so broad that it could cover such "variegated and complex" platforms that it could constitutionally be applied to some but not others.[25] 603 U.S. at 725. As the

---

[25] The law at issue in *Moody* applied to "any information service, Internet search engine, or access software provider that . . . provides or enables computer access by multiple users to a computer server" that met certain revenue or size thresholds. § 501.2041(1)(g). In contrast, here, the law applies only to social media platforms that allow users to "upload content or view the content or activity of other users"—in other words, engage in speech. § 501.1736(1)(e)(1). And the constitutionality of the law in *Moody* was a more fact-dependent legal question than the one presented by the law here because it was alleged to infringe only on the speech rights of platforms, which could be the case only if the platform were engaged in expressive activity in the United States when it made decisions about the content displayed to users. *See id.* at 724–26; *see also id.* at 745–47 (Barrett, J., concurring).

Eleventh Circuit recently put it, "*Moody* warns against considering only apples when reviewing a law that regulates oranges and pears, too, but the Act regulates only apples." *HM Florida-ORL*, 2025 WL 1375363, at *31 n.17.

*Packingham* provides the closest analogy. In it, North Carolina made it a felony for a registered sex offender to "access" a social media site. 582 U.S. at 101. The Supreme Court assumed that intermediate scrutiny applied but nevertheless found that the provision could not stand because the prohibition it enacted was "unprecedented in the scope of First Amendment speech it burden[ed]." *Id.* at 105–07. As the Court explained, the law "in one broad stroke bar[red] access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. Social media websites, according to the Court, "provide the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* This is perhaps especially true for youth, for whom the available forums for speech are generally more limited than for adults, who tend to have freer rein to decide for themselves where to go and how to spend their time.

44

And youth have First Amendment rights.[26] While neither the Supreme Court nor the Eleventh Circuit have ever precisely defined the limits of those rights,[27] it has made clear that "minors are entitled to a significant measure of First Amendment protection." *Brown*, 564 U.S. at 794 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–213 (1975)). And it is worth pausing for a moment to note why it is that the Constitution protects those rights. Youth are people, not mere people-in-waiting or extensions of their parents. They have their own interests, ideas, and minds. Not only that, but they are citizens in training. The responsibilities and privileges of citizenship are significant, and our constitutional system is better served when its citizens build those muscles over time, beginning when they are young, rather than all at once the day they come of age. As the Supreme Court put it more than 80 years

---

[26] By the same token, others have a First Amendment right to speak to and associate with youth. *See, e.g.*, *HM Florida-ORL*, 2025 WL 1375363, at *25–30.

[27] For example, the Supreme Court has never determined whether there is a lower age limit beyond which children do not enjoy First Amendment protections. Defendant argues that, at a minimum, the law's provisions prohibiting youth under 14 from holding accounts on covered social media platforms cannot be unconstitutional because "[s]ix-year-olds have no First Amendment interest in internet accounts" and therefore the law has a "broad sweep of valid applications" to platforms that provide accounts to children of "tender years." ECF No. 86 at 60–61. Perhaps six-year-olds do not have such a First Amendment interest, but this Court need not decide that question because this law does not prohibit children aged 6 and under from holding social media accounts, it prohibits youth under 14 from holding such accounts. And the Supreme Court has itself recognized the First Amendment rights of youth as young as 13. Mary Beth Tinker was a mere 13 years old when she asserted her right to protest the Vietnam War by wearing a black armband to school, and the Court agreed that her right to do so was protected by the First Amendment. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969). Thus, by categorically barring all 13-year-olds in Florida from engaging with the vast universe of speech available on covered social media platforms, the law has already burdened substantially more speech than necessary even if some younger children may not have the same First Amendment interests.

45

ago, "That [we] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Accordingly, the First Amendment recognizes the rights of youth to learn, to refuse to salute the flag, to protest war, to view films, to play video games, to attend political rallies or religious services even without the authorization of their parents, and more. *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Barnette*, 319 U.S. 624; *Tinker*, 393 U.S. 503; *Erznoznik*, 422 U.S. 205; *Brown*, 564 U.S. at 795 n.1.

Defendant attempts to distinguish *Packingham* by arguing that Florida's law does not prohibit "access" to social media altogether, it merely prohibits youth from holding accounts on the platforms. This distinction does not make a difference in this case. While it is true that at least one of these platforms, YouTube, does not require users to be account holders to passively view some content, all require users to hold accounts in order to share one's own content—in other words, to speak.[28]

---

[28] Defendant also argues that the limitation to account holding renders the law narrowly tailored because it means that "any platform that children access regularly will either not use addictive features or will not allow children to become 'account holders,' making it more difficult for platforms to target them with the features." ECF No. 86 at 56. But Defendant provides no reason to believe that becoming an account holder makes it any easier for a platform to "target" a youth with "addictive features" other than push notifications, and in fact the opposite seems likely the case for the remaining features. How would being an account holder, rather than an anonymous user, make it any easier for a platform to "target" a youth with infinite scrolling, auto-play video,

And as discussed above, accepting the argument that restricting a commercial transaction to access speech does not burden speech because the speech could be given away for free would eviscerate First Amendment precedent. *See supra* n.17.

Defendant points to two other features of the law to argue that it is narrowly tailored. First, Defendant argues that the law is tailored to preventing harm to youth because it only targets social media sites that use "specific features found by the Legislature (and the U.S. Surgeon General) to be addictive." But the law applies to any social media site that employs any one of the five addictive features under any circumstances, even if, for example, the site only sends push notifications if users opt in to receiving them, or the site does not auto-play video for account holders who are known to be youth. Accordingly, even if a social media platform created youth accounts for which none of the purportedly "addictive" features are available, it would still be barred from allowing youth to hold those accounts if the features were available to adult account holders. Second, Defendant argues that the statute is narrowly targeted only to "platforms that have proven effective at using [the statute's purportedly 'addictive'] features to addict children." ECF No. 86 at 56–57. But it does not. It sweeps in platforms on which ten percent or more of the "daily active

---

live-streamed content, or the display of personal interactive metrics? These are generally functionalities built into the platform as a whole. And on at least some platforms, it is the creation of an account that allows a user to turn them off. *See, e.g.*, ECF No. 76-4 ¶ 23 (Declaration of Alexandra Veitch, explaining that auto-play is turned off by default for users known to be under 18).

users" under 16 have spent an average of two or more hours per day during the previous 12 months. § 501.1736(1)(e), Fla. Stat. That simply means that the ability of youth under 16 to access a given social media platform will turn on how long other youth have used the platform in the last year, whether they have used it for that long because they are "addicted" or because they simply wished to engage with speech for more than two hours per day. And because the requirement is a moving target, a youth may be permitted to create an account one day only to have the account suddenly purged another day because the 12-month average use of ten percent of their peers has changed.[29] Notably, for all his arguments that these coverage requirements render the law narrowly targeted to only social media platforms that "addict children" with "addictive features," Defendant does not point to any social media platform, as that term is commonly understood, that the law might leave untouched. ECF No. 86 at 56. The law's coverage requirements, in short, do not render it sufficiently tailored under *Packingham*.

Nor can *Packingham* be distinguished on the basis that the scope of speech restricted by Florida's law is necessary to further the state's interest in shielding children from addiction. An established principle in the First Amendment context is that enabling individuals to voluntarily restrict problematic content at the receiving

---

[29] Or, in practice, the fact that the requirement is a moving target may mean that many social media websites apply the law's restrictions on account holding regardless of whether they meet the time requirement.

48

end is preferred over restricting speech at the source. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 666–67 (2004). In this context, that means that parents are best positioned to make the appropriately individualized determinations about whether or when their children should use social media platforms, and if so, which platforms and under what conditions. And there are numerous tools available for parents who wish to do so. Even setting aside the parental control and supervision tools offered by the websites themselves, parents can determine whether and when to let their children use internet-connected devices, they can utilize device-level settings to limit how long their children use them, or they can block specific websites from their children's devices at the network level through their internet router. *See* ECF No. 76-2 ¶¶ 12–14. Perhaps most importantly, should they discover that their child has an account on a social media platform that the parent wishes to restrict, they can simply make a request to the platform that the account be terminated. Under provisions of Florida law that Plaintiffs do not challenge, the platform would then be required to terminate the account within 10 business days. §§ 501.1736(2)(b)(3), 501.1736(3)(b)(3), Fla. Stat.; *see* ECF No. 74 at 43 n.4.

Defendant argues that the parental supervision and control tools that are available at the device, network, and platform level are not sufficient because they

are "difficult for parents to use and manage," few parents use them,[30] they do not "address the features that make platforms addictive," and their use in some cases may be "counterproductive." ECF No. 86 at 58. But "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. Defendant has not done so here.

As an initial matter, neither the legislature in enacting the law nor the Attorney General in defending it here has ever explained why the law's parental veto provision, which Plaintiffs do not challenge, is insufficient to achieve the state's interest. That alone is a significant indicium that the law is not narrowly tailored. And Defendant's argument that the parental controls available do not "address the features that make platforms addictive" is perplexing; if the harm to youth is, as Defendant asserts, that youth are compelled to spend too much time on these platforms to the detriment of their health, then any device- or network-level tool that allows parents to limit the total time their children spend on such platforms seems directly responsive to the concern. As for the argument that parents find the tools available difficult to use or manage, the evidence cited by Defendant on this point is

---

[30] Although redacted in its public filing, Defendant made this argument under seal in briefing.

extremely limited, pointing only to means some youth could employ to circumvent certain parental controls,[31] a quote from an individual parent in an article on Lifehacker.com, research on the U.K., and opinion polling on whether youth should be restricted from accessing social media. ECF No. 51-3 ¶¶ 51–61. And if parents do find the available tools confusing or difficult to use, the appropriate role for the state is to provide educational tools and resources for parents to learn how to do so. The only evidence that the use of parental controls may be "counterproductive" is a pair of studies in which the researcher concluded that "parental involvement and direct supervision were both associated with fewer peer problems and less online victimization for teens, but neither of these factors correlated with the use of parental control apps." ECF No. 51-11 at 6–7. That does not support Defendant's contention that parental supervision and control tools are insufficient to address the harms the State identifies. Lastly, the fact that few parents choose to use parental controls does not help the State. This fact could simply suggest that few parents know the tools are available or know how to use them, or that parents do not share the state's concerns about social media. In either circumstance, the appropriate response from the State is a public education campaign, either to inform parents about the risks of social

---

[31] As the Supreme Court explained in *Brown*, "some gap in compliance is unavoidable," and the history-spanning problem of youth scheming to evade the restrictions placed on them does not mean that the available tools are so ineffective that a draconian restriction on speech is warranted. 564 U.S. at 803 n.9.

media or to equip them with the knowledge they need to employ the tools they have available—including the State's new option of requesting that a social media platform terminate their children's accounts. It is not to prophylactically bar all youth under 14—plus all youth aged 14 and 15 who are unable to get their parents to take the affirmative step of assenting to the creation of each of their social media account—from engaging in speech on social media platforms altogether.[32]

And because these substantially less burdensome alternatives are available with respect to any covered platform, regardless of their specific features, this Court concludes that Plaintiffs are substantially likely to succeed not just in their as-applied

---

[32] Nor does the Supreme Court's decision in *TikTok* help Defendant. *TikTok* did discuss the "latitude" afforded to the government "to design regulatory solutions to address content-neutral interests." 145 S.Ct. at 71. But as *TikTok* explained, that "latitude" applies only "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* (quoting *Ward*, 491 U.S. at 800). For the reasons just explained, the means chosen by Florida here are substantially broader than necessary and thus the State's "latitude" does not extend far enough to permit the challenged law. The law at issue in *TikTok*, by contrast, was not substantially broader than necessary because, so long as the platform was controlled by a foreign adversary, its "very operation in the United States implicate[d] the Government's" national security concerns. *Id.* And the courts give particularly heightened deference to cases involving the federal government's "sensitive and weighty interests of national security and foreign affairs," which are not implicated in the present case. *Holder v. Humanitarian Law Project,* 561 U.S. 1, 33–34 (2010).

*Turner II* also does not suggest that the challenged law can survive intermediate scrutiny. *See Turner Broad. Sys. v. FCC*, 520 U.S. 180 (1997). There the Supreme Court upheld federal must-carry rules under intermediate scrutiny, but only after weighing the "tens of thousands of pages" of evidence concerning the need for the rules, including records from three years of preenactment hearings in Congress and extensive factual findings enacted into the law, and determining that the burden they imposed "approximate[d] the benefits" as well. *Id.* at 187, 191, 215. By contrast, the legislative record supporting Florida's challenged law is relatively weak—Defendant identifies only a 25-page advisory from the U.S. Surgeon General and a 24-page bill analysis from the Florida House staff, ECF Nos. 51-9, 51-11—and its burden reaches substantially more speech than necessary to further the State's interest.

challenge but in their facial challenge as well. This Court has "address[ed] the full range" of platforms the law could cover and determined it is likely limited to platforms that provide a forum for First Amendment activity. *Moody*, 603 U.S. at 724. Each application of the law burdens substantially more protected speech than necessary because it imposes the same sweeping burden on the rights of youth under 16 despite the availability, in each case, of substantially less burdensome alternatives. Accordingly, the law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* at 744.

C

Plaintiffs have also satisfied the remaining requirements for preliminary relief. Plaintiffs' members face irreparable injury because the law forces them to choose between either incurring unrecoverable compliance costs and curtailing their First Amendment rights to disseminate speech to willing listeners, *see Moody*, 603 U.S. at 731–32, or risking an enforcement action that could result in penalties of up to $50,000 per violation and attorney fees and costs. § 501.1736(5), Fla. Stat. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *accord Honeyfund.com v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024). And the compliance costs platforms would incur to comply with the law

53

would not be recoverable because the State is protected against damages claims by sovereign immunity. Plaintiffs therefore face irreparable injury twice over.

Defendant's argument that Plaintiffs have shown a lack of reasonable diligence and are thus not entitled to preliminary relief is unavailing. Plaintiffs initiated the present challenge mere days after Florida enacted the regulations implementing H.B. 3 and two months before the law took effect. As this Court has previously explained, plaintiffs are allowed some time to consider their options and prepare their lawsuit and motion. *See Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255, 1286 (N.D. Fla. 2024). And had Plaintiffs filed suit before the law's implementing regulations were enacted, they would almost certainly have faced an argument from the State that their challenge was not ripe. Furthermore, this Court does not find that Plaintiffs' failure to produce sufficient evidence of standing in support of their initial motion constituted a lack of diligence. Plaintiffs were operating under a good-faith belief that the law of standing did not require additional evidence, and this Court will not penalize them simply because it disagreed.

The balance of the equities and the public interest also favor preliminary relief. The irreparable injury faced by Plaintiffs is "not outweighed by any threatened harm to Florida because the government has no legitimate interest in enforcing an unconstitutional law," and "an injunction is not contrary to the public interest because it is in the public interest to protect First Amendment rights."

54

App. 513

*Honeyfund.com*, 94 F.4th at 1283 (internal quotation marks omitted). Defendant's argument that preliminary relief would be counter to the public interest because the "legal environment for claims like Plaintiffs'" is in flux is also unavailing. ECF No. 86 at 25. Defendant points to the Supreme Court's pending decision in *Free Speech Coalition v. Paxton*, No. 23-1122, in which it will determine the appropriate standard for assessing a law that burdens adults' access to protected speech. But there is no reason to withhold relief in this case until the Supreme Court issues its decision in *Free Speech Coalition* because this Court's determination of the Plaintiffs' likelihood of success on the merits does not turn on any argument regarding the law's impact on adult users' speech. Accordingly, Plaintiffs have carried their burden on all four prerequisites to preliminary relief.

IV

This Court next considers whether Plaintiffs must secure a bond in furtherance of the preliminary injunction. Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.'" *BellSouth Telecomms. v. MCImetro Access Transmission Servs.*, 425 F.3d 964,

55

App. 514

971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009). Here, considering that the challenged law's unlawful impact on Plaintiffs' and youth's First Amendment rights weighs against requiring a bond, this Court waives the bond requirement.

V

Finally, having determined a preliminary injunction is warranted, this Court addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Because this test is so similar to the four-part test for establishing entitlement to preliminary injunctive relief, courts rarely stay a preliminary injunction pending appeal. So too here. Because no exceptional

56

circumstances justify staying this Order pending appeal, this Court shall not do so. *Contrast with Brenner v. Scott*, 999 F. Supp. 2d 1278, 1292 (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country). Defendant has every right to appeal, and this Court sees no reason to delay Defendant in seeking an appeal by requiring him to move to stay under Rule 62.

VI

Finally, because the challenged law is likely facially unconstitutional and Plaintiffs have carried their burden on the remaining requirements for preliminary relief, statewide relief is appropriate.[33] *See HM Florida-ORL*, 2025 WL 1375363, at *33. However, given the pending motion to remand the state enforcement action against Snap, this Court will reserve judgment on whether that action should be stayed until it rules on remand. Accordingly,

---

[33]And although Plaintiffs' amended complaint and motion for preliminary injunction do not expressly state that they are raising a facial challenge, their briefing indicates that they are, *see, e.g.*, ECF No. 88 at 52–53 ("Plaintiffs have done just that, [showed that the law prohibits a substantial amount of protected speech relative to its plainly legitimate sweep,] as 'all aspects of HB3, in every application to a covered social media company, raise the same First Amendment issues.'"), and Defendant's briefing indicates that he understood and argued it as such. *See* ECF No. 86 at 60 ("Plaintiffs press no as-applied challenges in their renewed motion—they instead broadly attack HB3 as unconstitutional on its face."). Regardless, even if Plaintiffs had not brought a facial challenge, this Court would be permitted to evaluate the law's constitutionality on its face. *See HM Florida-ORL*, 2025 WL 1375363, at *32 (citing *Ams. for Prosperity Found.*, 594 U.S. at 611).

57

**IT IS ORDERED**:

1. Plaintiffs' renewed motion for a preliminary injunction, ECF No. 75, is **GRANTED**.

2. Defendant Uthmeier must take no steps to enforce §§ 501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1), (4)(a), and (4)(b)(1), Fla. Stat. until otherwise ordered.[34] This Order binds Defendant and his officers, agents, servants, employees, attorneys, and successors in and office—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

**SO ORDERED on June 3, 2025.**

s/Mark E. Walker
**Chief United States District Judge**

---

[34] This Order does not prohibit or limit Defendant from briefing the pending motions in its case against Snap before this Court, Case No. 3:25-cv-676 (N.D. Fla.).

**95**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION, et al.,

      Plaintiffs,

v.                                                    Case No. 4:24-cv-00438-MW-MAF

JAMES UTHMEIER, in his official
capacity as Attorney General of the
State of Florida,

      Defendant.

_____/

## NOTICE OF APPEAL

Notice is hereby given that Defendant James Uthmeier, in his official capacity as Attorney General of the State of Florida, appeals to the United States Court of Appeals for the Eleventh Circuit the preliminary injunction dated June 3, 2025, ECF No. 94.

App. 519

Dated: June 3, 2025                    Respectfully submitted,

                                       JAMES UTHMEIER
                                         *Attorney General of Florida*

                                       */s/ Darrick W. Monson*
                                       JEFFREY PAUL DESOUSA (FBN 110951)
                                         *Acting Solicitor General*
                                       KEVIN A. GOLEMBIEWSKI (FBN 1002339)
                                         *Senior Deputy Solicitor General*
                                       DARRICK W. MONSON (FBN 1041273)
                                         *Deputy Solicitor General*
                                       ANITA J. PATEL (FBN 0070214)
                                       JAMES WACZEWSKI (FBN 0154989)
                                         *Special Counsels*
                                       SARA E. SPEARS (FBN 1054270)
                                         *Assistant Attorney General*

                                       Office of the Attorney General
                                       PL-01, The Capitol
                                       Tallahassee, Florida 32399
                                       (850) 414-3300
                                       darrick.monson@myfloridalegal.com

                                       *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of June, 2025, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Darrick W. Monson*
Deputy Solicitor General

Dated: August 13, 2025

Respectfully submitted,

JAMES UTHMEIER
Attorney General

/s/ Kevin A. Golembiewski
JEFFREY DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3681
*kevin.golembiewski@myfloridalegal.com*

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that on August 13, 2025, I electronically filed this Appendix with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General