**No. 25-11881**

_____

# United States Court of Appeals for the Eleventh Circuit

_____

Computer & Communications Industry Association, et al.,
*Plaintiffs-Appellees,*

v.

James Uthmeier, in his official capacity as Florida Attorney General,
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

_____

**Brief for Amici Curiae State of Utah, 26 Other States, and the District of Columbia in Support of Appellant and Reversal**

_____

Stanford E. Purser
Utah Solicitor General
Utah Attorney General's Office
160 E. 300 S., 5th Floor
P.O. Box 140858
Salt Lake City, UT 84114-0858
(801) 366-0533

*Counsel for Amicus Curiae*
*State of Utah*

Additional Amici Curiae and Counsel Listed After Signature Block

## Certificate of Interested Persons
## and Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1, the undersigned counsel certifies that in addition to the persons identified in the Certificate of Interested Persons and Corporate Disclosure Statement that Defendant-Appellant filed with the Court in their Initial Brief, the persons listed below are known to have an interest in the outcome of this case:

1. Bailey, Andrew

2. Bird, Brenna

3. Brown, Anthony G.

4. Carr, Christopher M.

5. Clark, Charity R.

6. District of Columbia

7. Drummond, Gentner

8. Griffin, Tim

9. Hilgers, Michael T.

10. Jackley, Marty J.

11. Jennings, Kathleen

12. Kautz, Keith G.

i

13. Knudsen, Austin

14. Labrador, Raúl

15. Marshall, Steve

16. McCuskey, John B.

17. Miyares, Jason S.

18. Murrill, Liz

19. Nessel, Dana

20. Paxton, Ken

21. Purser, Stanford

22. Rayfield, Dan

23. Rokita, Theodore E.

24. Schwalb, Brian L.

25. State of Alabama

26. State of Alaska

27. State of Arkansas

28. State of Delaware

29. State of Georgia

30. State of Idaho

31. State of Indiana

32. State of Iowa

33. State of Louisiana

34. State of Maryland

35. State of Michigan

36. State of Missouri

37. State of Montana

38. State of Nebraska

39. State of New Mexico

40. State of North Dakota

41. State of Ohio

42. State of Oklahoma

43. State of Oregon

44. State of South Carolina

45. State of South Dakota

46. State of Texas

47. State of Utah

48. State of Vermont

49. State of Virginia

50. State of West Virginia

iii

51. State of Wyoming

52. Taylor, Treg R.

53. Torrez, Raúl

54. Wilson, Alan

55. Wrigley, Drew

56. Yost, Dave

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement .................................................................................... i

Table of Authorities .......................................................... vi

Introduction and Interest of Amici Curiae ............................... 1

Statement of the Issues .................................................... 4

Summary of Argument ........................................................ 4

Argument ................................................................... 7

    I.  HB3 is a content-neutral law subject at most to intermediate scrutiny. ............................................................. 8

        A.  The Act's regulation of sites that allow users to upload and view user posts is content neutral. ................................... 9

        B.  HB3 does not make an inappropriate speaker-based distinction. ......................................................... 13

    II.  HB3 readily passes intermediate scrutiny. ................... 15

        A.  States have an important interest in protecting youth from social media's harms. ..................................... 16

        B.  HB3 is appropriately tailored. ............................... 22

Conclusion ................................................................ 25

Additional Amici Curiae .................................................... 26

Certificate of Compliance ................................................... 28

Certificate of Service ...................................................... 28

v

## Table of Authorities

**Federal Cases**

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC,*
 596 U.S. 61 (2022) ............................................................. 8, 11, 12, 14

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
 No. 4:24-cv-438-MW/MAF, 2025 WL 1570007
 (N.D. Fla. June 3, 2025) ....................................................................... 9

*Free Speech Coalition, Inc. v. Paxton,*
 145 S. Ct. 2291 (2025) ............................................................. 15, 22, 23

*NetChoice v. Reyes,*
 748 F. Supp. 3d 1105 (D. Utah 2024) ................................................ 10

*Packingham v. North Carolina,*
 582 U.S. 98 (2017) .............................................................................. 22

*Reed v. Town of Gilbert,*
 576 U.S. 155 (2015) ............................................................. 8, 10, 11, 12

*TikTok Inc. v. Garland,*
 145 S. Ct. 57 (2025) .............................................................................. 8

*Turner Broad. Sys., Inc. v. FCC,*
 512 U.S. 622 (1994) ...................................................................... 14, 15

**State Statutes**

Fla. Stat. § 501.1736 .............................................................................. 2

Fla. Stat. § 501.1736(1)(e) ......................................................... 9, 22, 23

**Other Authorities**

5Rights Foundation, *Pathways: How Digital Design Puts Children
 at Risk* (July 2021) ............................................................................ 18

C.S. Mott Children's Hospital, University of Michigan Health,
 *Mott Poll Report: Sharing Too Soon? Children and Social Media
 Apps* (Oct. 2021) ................................................................................ 24

Emily A. Vogels, Risa Gelles-Watnick, and Navid Massarat, *Teens,
 Social Media and Technology* 2022, Pew Research Center
 (Aug. 10, 2022) ................................................................................... 16

Greg Lukianoff and Jonathan Haidt, *The Coddling of the American Mind: How Good Intentions and Bad Ideas Are Setting Up a Generation for Failure* (2018)......................................................1

Helen Thai, et al., *Reducing Social Media Use Improves Appearance and Weight Esteem in Youth with Emotional Distress*, 13 Psychology of Popular Media 162 (2024) .........................20

Hunt Allcott, et al., *The Welfare Effects of Social Media*, 110 Am. Econ. Rev. 638 (2020) ...........................................................20

Jonathan Rothwell, *Teens Spend Average of 4.8 Hours on Social Media Per Day,* Gallup (October 13, 2023) ..........................................16

Letter from State Attorneys General to Matthew Penarczyk and Michael O'Sullivan (March 28, 2022) ...................................................20

Letter from State Attorneys General to United States Senate Committee on Commerce, Science, and Transportation (Oct. 4, 2021) .......................................................................................21

Melissa G. Hunt, et al.*, Follow Friends One Hour a Day: Limiting Time on Social Media and Muting Strangers Improves Well-Being*, 44 J. Soc. & Clinical Psych. 187 (2023) ....................................19

Melissa G. Hunt, et al., *No More FOMO: Limiting Social Media Decreases Loneliness and Depression*, 37 J. Soc. & Clinical Psych. 751 (2018)...............................................19

Roberto Mosquera, et al., The Economic Effects of Facebook (Feb. 2019) ...............................................................................................19

U.S. Surgeon Gen., Advisory, Social Media and Youth Mental Health (2023)............................................................................... passim

Victoria Rideout, et al., *Common Sense Census: Media Use by Tweens and Teens, 2021*......................................................................17

## Introduction and Interest of Amici Curiae

The first president of Facebook once described the thought process behind building social media sites:

> [It] was all about: How do we consume as much of your time and conscious attention as possible? . . . [W]e need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post . . . . And that's going to get you to contribute more content . . . . It's a social-validation feedback loop . . . exploiting a vulnerability in human psychology.

He concluded: "God only knows what it's doing to our children's brains." Greg Lukianoff and Jonathan Haidt, *The Coddling of the American Mind: How Good Intentions and Bad Ideas Are Setting Up a Generation for Failure* 147 (2018).

Now we know. Excessive social media use has led to an alarming spike in adverse mental health outcomes among teenagers. And it increases youth susceptibility to depression, anxiety, self-harm, and suicide.

Social media companies know all this too. Yet they laced their products with highly addictive features like push notifications, autoplay, and infinite scroll that act like nicotine in tobacco or the design features of casinos, meant to keep gamblers at the slots and

tables as long as possible. Those addictive elements have nothing to do with the underlying content and everything to do with luring and trapping youth in an endless loop, where their eyeballs are constantly drawn to social media, so the social media companies can profit from the data.

Those addictive elements work. The average teenager spends nearly five hours per day on social media. Nearly a third of 13- to 18-year-olds say they are on social media constantly. Even the most conscientious parents are losing the battle to maintain effective parental controls. For all these reasons, the former U.S. Surgeon General warned, "We must . . . urgently take action" to protect children from those harms.

Florida, like many other states, heeded this warning. It enacted H.B.3, now codified as Florida Statute § 501.1736 (HB3 or Act), to limit the ability of certain platforms who use those addictive features to contract with children who are 15 years old or younger. The problem is the district court enjoined the Act's enforcement. The court held HB3 is content neutral but failed intermediate scrutiny because it is not appropriately tailored.

2

Amici Curiae are the States of Utah, Alabama, Alaska, Arkansas, Delaware, Georgia, Idaho, Indiana, Iowa, Louisiana, Maryland, Michigan, Missouri, Montana, Nebraska, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Texas, Vermont, Virginia, West Virginia, Wyoming, and the District of Columbia (Amici States). Amici States have a strong interest in Florida's appeal seeking the reversal of the district court's holding that HB3 failed intermediate scrutiny and the resulting injunction. Like Florida, the Amici States have compelling interests in protecting children and youth from the harmful effects of excessive social media use. Amici States thus have an especially strong interest in supporting Florida's position and explaining why HB3 satisfies First Amendment scrutiny. HB3 is a content-neutral regulation that furthers Florida's (and all States') important interest in protecting the mental health of its children.

## Statement of the Issues

Amici States address the following issues:

1.      The district court correctly held that HB3 is content neutral because it does not single out speech based on any topic, idea, or message.

2.      The district court erred when it held that HB3 fails intermediate scrutiny because it is not narrowly tailored.

## Summary of Argument

I.      The district court correctly held that HB3 is content neutral and subject at most to intermediate scrutiny. The Act applies to platforms that allow users to upload content or view other users' content. This is quintessentially content agnostic. Nothing here triggers content-based strict scrutiny: HB3 doesn't target speech based on the topics discussed or ideas or messages conveyed; it can be applied without refencing any speech's content, and there's no argument or factual grounds suggesting Florida adopted the law because of disagreement with any message conveyed.

The fact that Appellees (collectively CCIA) characterize HB3 as regulating "social speech" doesn't change the analysis. CCIA can call it

whatever it wants; the Act's plain text and its application still have nothing to do with any specific topics or points of view. Indeed, so-called "social speech" can be about anything. CCIA's complaints about speaker-based discrimination are similarly flawed. Speaker-based regulations warrant strict scrutiny only if they are content based. HB3 is not. While the Act exempts platforms that provide only email or direct messaging, the exceptions are function based, not content based. And given the harms that social media companies' functions—push notifications, infinite scroll, and autoplay—create, the companies have more than enough "special characteristics" to justify regulation.

II.    The district court erred in concluding that HB3 fails intermediate scrutiny.  A law satisfies intermediate scrutiny if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests. HB3 readily passes that test.

First, there can be no real dispute that Florida, and all States, have significant and important interests in protecting their youth and children from the harms resulting from excessive social media use. And

far too many of our youth and children use social media far too much. The social media companies have intentionally designed their products to addict kids into overuse, exploiting their vulnerabilities and human physiology. The results have been devastating. Hours of social media use each day doubles the risk of bad mental health outcomes, including anxiety and depression. Overuse has also been linked with feelings of exclusion, attention problems, and sleep problems, which in turn can create a host of other serious mental health issues, including depression, altered neurological development, and suicidal thoughts. States not only have an important interest, but also a moral duty, to try to protect their youth and children by curbing those harms.

Second, while presuming Florida's important interest, the district court wrongly concluded that HB3 was not sufficiently tailored to address the problem. The court said HB3 burdens too much speech. But the Act applies to only companies with a minimum number of users younger than 16 and that use algorithms and addictive features designed to increase use. This approach leaves any adult speech alone. Plus, HB3 excludes non-addictive services like email and direct messaging and allows affected companies to avoid regulation by

6

eliminating their addictive features or reducing minor engagement. And ample alternatives remain. Adults are unaffected, 14- and 15-year-olds can use the platforms with parental consent, and minors can use non-covered services or platforms without accounts.

The district court also erred in surmising that parental controls and public education options made HB3 unnecessary. But that argument does not survive the Supreme Court's recent *Free Speech Coalition* decision. The question under intermediate scrutiny is not whether some other approach may be superior, but whether the State's interest in protecting children would be achieved "less effectively" without the law. That's indisputably the case here. Parental controls have already proven insufficient to stem the tide of harm kids are suffering. And, besides, kids inevitably find workarounds. The U.S. Surgeon General's advisory confirms that children and parents cannot bear the entire burden of mitigating social media's harms.

## Argument

HB3 satisfies intermediate scrutiny under the First Amendment. The district court correctly held that HB3 is a content neutral law subject at most to intermediate scrutiny. The court also rightly assumed

7

that HB3 furthers Florida's important governmental interests in protecting its children from social media's harms. But the court erred when it held HB3 failed intermediate scrutiny because it was not narrowly tailored and enjoined the law. This Court should affirm the district court's content-neutrality decision, reverse its decision that HB3 is not appropriately tailored, and vacate the resulting preliminary injunction.

## I.    HB3 is a content-neutral law subject at most to intermediate scrutiny.

The district court correctly held that HB3 is content neutral. A law may be content based in two ways. First, a regulation is facially content based when it targets speech based on the "topic discussed or idea or message expressed." *TikTok Inc. v. Garland,* 145 S. Ct. 57, 67 (2025) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Second, a law may be content based if it cannot be justified without reference to the regulated speech's content or if it was adopted by the government because of disagreement with the message conveyed by the speech. *TikTok Inc.,* 145 S. Ct. at 67. Content neutral laws, on the other hand, are "agnostic as to content." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022).

HB3 is agnostic as to content. Its application to platforms that allow users to upload content or view other users' content—what CCIA calls "social speech"—does not single out websites because of the topic discussed or idea or message expressed. The definition's exclusion of certain services, such as email and direct messaging services, is not content- or speaker-based either.

## A.    The Act's regulation of sites that allow users to upload and view user posts is content neutral.

HB3 defines a regulated social media platform as an "online forum, website, or application" that meets several criteria, including "[a]llow[ing] users to upload content or view the content or activity of other users." Fla. Stat. § 501.1736(1)(e). This requirement is content-neutral on its face. It regulates platforms based on whether they have the functional capabilities that enable users to upload and view user-created content. And it applies equally to any content uploaded or viewed by a social media user regardless of what it says. *Id.*

Even so, CCIA still attempted to shoehorn the criterion into a content-based regulation below by arguing it regulates "social" speech because it applies only to sites that permit peer-to-peer interaction among users. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24-

9

cv-438-MW/MAF, 2025 WL 1570007, at \*14 (N.D. Fla. June 3, 2025) ("PI Order"). But HB3 makes no such distinction between "social" speech and speech for any other purpose. And even if HB3's user-generated content criteria could somehow be described as regulating "social speech," the Act would still be content neutral. "Social speech" could be about anything. The Act's criteria still would not distinguish between speech based on the topic discussed or idea or message expressed.

This analysis tracks *Reagan's* clarification of *Reed.* And it shows precisely why the district court below properly rejected CCIA's argument and the flawed content-based analysis in *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1121-23 (D. Utah 2024).

*Reed* declared unconstitutional a law that prohibited the display of outdoor signs without a permit, but exempted ideological signs, political signs, and temporary directional signs (as well as twenty other categories), which were each subject to different rules. 576 U.S. at 159. While the law did not discriminate among viewpoints within those topical categories, the Court still held the restrictions "single[d] out specific subject matter[s]" for different treatment. *Id.* at 164, 169. And

10

determining which subject-matter restriction applied depended entirely on reviewing the communicative content of the sign. *Id.* at 164.

Courts applying *Reed* mistakenly interpreted this holding to mean that a law was content based if it required any content review to determine whether a law applied. *Reagan*, 596 U.S. at 68. *Reagan* rejected that interpretation. The case involved a regulation that distinguished between on and off premises signs. *Id.* at 71. Although determining whether a sign was on or off premises required reviewing the sign's content, this review did not make the regulation content based. *Id.* Unlike *Reed*, the Supreme Court explained, the regulation did "not single out any topic or subject matter for differential treatment." *Reagan*, 596 U.S. at 71, 73-74. The sign's "substantive message" was irrelevant to the regulation's application; the content mattered "only to the extent it inform[ed] the sign's relative location." *Id.*

The *Reagan* Court also narrowed *Reed's* suggestion that a law is necessarily content based if it regulates speech based on its function or purpose. *Reagan*, 596 U.S. at 74. To be sure, *Reagan* confirmed that laws cannot "swap[] an obvious subject-matter distinction for a 'function

11

or purpose proxy' that achieves the same result." *Id.* But it disagreed that classifications considering function or purpose are "*always* content based." *Id.* Only those function or purpose classifications that discriminate based on "the topic discussed or the idea or message expressed" trigger strict scrutiny. *Id.* at 73-74 (quoting *Reed*, 576 U.S. at 171).

HB3's regulation of websites that allow users to upload their own and view other users' content is like the content-neutral regulation in *Reagan* rather than the content-based law in *Reed*. HB3 does not contain any express subject matter distinctions like the 23 different topical category exemptions in *Reed*. The Act instead applies uniformly to all user uploaded or viewed content—regardless of the topic discussed or idea or message expressed. To the extent review of a platform's content is necessary, it is only to discern whether the website has that function at all. The substance of the uploaded or viewed content is irrelevant. *Reagan*, 596 U.S. at 714.

For these reasons, HB3's regulation of websites that enable user generated content is not a proxy for subject discrimination. It does not target speech for a social—as opposed to some other—purpose. Speech

uploaded or viewed might be for any purpose, whether it is looking for a job, buying or selling a bike, asking for help playing a video game, or merely interacting with friends. As the district court correctly noted, "social speech, or speech generated by users on social media platforms, can touch on any conceivable topic, message, or idea." PI Order at *14. That criteria is thus content neutral.

### B.    HB3 does not make an inappropriate speaker-based distinction.

The district court also correctly rejected CCIA's argument that HB3 uses a speaker-based distinction as a proxy for content because its definition of social media excludes sites and services where the exclusive function is email or direct messaging. PI Order at 13.

HB3's exclusion of sites that provide only email or direct messaging is not a content-based distinction. Like the Act's provision regulating sites that allow users to upload content, the exclusions look only at the content-neutral structural characteristics of a site. Whether the law applies has nothing to do with the subject or message of any user-generated content or any email or direct message. Likewise, even if the Act leaves sites like streaming services unregulated, that is also not content based. Any differing regulation of streaming services and a

13

social media site has nothing to do with the subjects, messages, or ideas on those sites. The critical difference is their structure.

These structural criteria are like the content-neutral standards in *Turner I*, where the challenged law applied based on the number of channels and how they were transmitted, not on the programming's "content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 644-45 (1994) (*Turner I*). Likewise, HB3 regulates structure; the content matters only to reveal that structure. *Reagan*, 596 U.S. at 71.

HB3 also does not create an inappropriate speaker-based distinction. Speaker-based distinctions don't automatically trigger strict scrutiny. *Turner I*, 512 U.S. at 657-58. They demand strict scrutiny only when the "speaker preference reflects a content preference." *Id.* at 658. Likewise, strict scrutiny does not automatically apply to regulations that focus on "one medium (or a subset thereof) but not others." *Id.* at 660. Intermediate scrutiny applies when "the differential treatment is 'justified by some special characteristic of' the particular" medium. *Id.* at 660-61 (internal quotation marks omitted).

The district court correctly recognized that such special characteristics exist here. HB3 does not distinguish between social

media platforms and other services based on their subject or message. It does so because social media platforms are unique. Their structure supplies users with an endless feed of peer interactive content that is linked to excessive use, poor mental health, and anxiety caused by fear of missing out. *See infra* section II.A. These "special characteristics" may be different than the monopolistic nature of cable cited in *Turner I*, but the legal result is the same: strict scrutiny does not apply, particularly where the Act does not regulate what those social media services say. 512 U.S. at 659-60.

## II.    HB3 readily passes intermediate scrutiny.

Content-neutral laws are subject at most to intermediate scrutiny because they "pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025) (quoting *Turner I*, 512 U.S. at 642). A law survives intermediate scrutiny "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id.* The district court erred when it held HB3 did not satisfy that test.

15

### A.   States have an important interest in protecting youth from social media's harms.

Florida, like Amici States, has a significant interest in protecting children and youth from social media's harms. Minors spend considerable time on social media, with their use being described as "nearly universal." U.S. Surgeon Gen., Advisory, Social Media and Youth Mental Health at 4 (2023) (Surgeon Gen. Advisory).[1] Up to 95% of 13- to 17-year-olds report using social media platforms, with more than a third of them reporting "almost constant" social media use. *Id.* More than half of them say it would be "hard to give [social media] up." Emily A. Vogels, Risa Gelles-Watnick, and Navid Massarat, *Teens, Social Media and Technology* 2022, Pew Research Center (Aug. 10, 2022)[2]; Surgeon Gen. Advisory, at 9-10. As of 2023, the average teenager spent nearly five hours a day on social media. Jonathan

---

[1]https://www.ncbi.nlm.nih.gov/books/NBK594761/pdf/Bookshelf_NBK594761.pdf.

[2]https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.

16

Rothwell, *Teens Spend Average of 4.8 Hours on Social Media Per Day,* Gallup (October 13, 2023).[3]

Social media use among children is also prevalent. Nearly 40% of eight- to twelve-year olds use social media, Surgeon Gen. Advisory at 4, and nearly 20% percent of them report using it every day. Victoria Rideout, et al., *Common Sense Census: Media Use by Tweens and Teens, 2021* at 5.[4] Those numbers may be lower than for adolescents, but they are still substantial considering that age thirteen is the generally required minimum age to use social media platforms. *Id.*

More troubling still, social media platforms are knowingly designed to maximize user engagement. *Id.* at 9. Features like "push notifications, autoplay, and infinite scroll" and the quantification and display of popularity (such as "likes") are examples of features designed to maximize engagement. *Id.* Social media sites increasingly use "algorithms that leverage user data to serve content recommendations."

---

[3] https://news.gallup.com/poll/512576/teens-spend-average-hours-social-media-per-day.aspx.

[4] https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

*Id.* These features are designed to stimulate the brain's reward center and reduce friction in use, making it easier to keep using and harder to stop, thus inducing users to stay on the platform as long as possible. *Id.* at 9-10; 5Rights Foundation, *Pathways: How Digital Design Puts Children at Risk*, at 7, 21-47 (July 2021).[5] Minors are particularly susceptible because they have less impulse control and are more sensitive to peer rewards. Surgeon Gen. Advisory at 5.

All this social media engagement harms mental health. Adolescents who spend more than three hours each day on social media "face[] double the risk of experiencing poor mental health outcomes including symptoms of anxiety and depression." *Id.* at 6. Excessive social media use has been "linked to sleep problems, attention problems, and feelings of exclusion among adolescents." *Id.* at 10. Poor sleep, in turn, is tied to a host of other problems, including altered neurological development, depressive symptoms, and suicidal thoughts. *Id.* Problematic social media use has also been linked to ADHD symptoms. And the "social-media induced fear of missing out, or 'the pervasive

---

[5] https://5rightsfoundation.com/wp-content/uploads/2021/09/Pathways-how-digital-design-puts-children-at-risk.pdf.

apprehension that others might be having rewarding experiences from which one is absent, has been associated with depression, anxiety, and neuroticism." *Id.*

On the other hand, studies show limiting social media use improves mental health. Melissa G. Hunt, et al., *No More FOMO: Limiting Social Media Decreases Loneliness and Depression*, 37 J. Soc. & Clinical Psych. 751, 751-58, 766-68 (2018).[6] A randomized controlled trial in college-aged youth found limiting social media use to thirty minutes daily over three weeks led to significant improvements in loneliness and depression. *Id.*; *see also* Melissa G. Hunt, et al.*, Follow Friends One Hour a Day: Limiting Time on Social Media and Muting Strangers Improves Well-Being*, 44 J. Soc. & Clinical Psych. 187 (2023).[7] Other studies also show improvement in mental health outcomes when social media use is restricted. Roberto Mosquera, et al., The Economic

---

[6]https://www.researchgate.net/publication/328838624_No_More_FOMO _Limiting_Social_Media_Decreases_Loneliness_and_DepressionPDF) No More FOMO: Limiting Social Media Decreases Loneliness and Depression.

[7]https://www.researchgate.net/publication/371242707_Follow_Friends_ One_Hour_a_Day_Limiting_Time_on_Social_Media_and_Muting_Stran gers_Improves_Well-Being.

Effects of Facebook (Feb. 2019).[8] For example, a study that paid people to deactivate social media reported that reduced social media use increased general happiness. Hunt Allcott, et al., *The Welfare Effects of Social Media*, 110 Am. Econ. Rev. 638, 653-56, 672 (2020).[9] And an experiment found reducing social media use to one hour a day improved youths' confidence in their appearance. Helen Thai, et al., *Reducing Social Media Use Improves Appearance and Weight Esteem in Youth with Emotional Distress*, 13 Psychology of Popular Media 162 (2024).[10]

For these reasons, many states, like Florida, have passed their own laws designed to protect children from social media's harms. States have also pursued advocacy and enforcement actions to protect minors from harms caused by social media. For example, forty-three states, including Florida, sent a letter to TikTok and Snapchat urging them to implement stronger parental controls on their platforms. Letter from State Attorneys General to Matthew Penarczyk and Michael O'Sullivan

---

[8] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3312462.

[9] https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20190658.

[10] https://www.apa.org/pubs/journals/releases/ppm-ppm0000460.pdf.

(March 28, 2022).[11] And forty-eight states, including Florida, expressed support for the U.S. Senate's 2021 investigation into the impact Facebook and Instagram's algorithms have on minors' mental health. Letter from State Attorneys General to United States Senate Committee on Commerce, Science, and Transportation (Oct. 4, 2021).[12]

As in those cases, Florida has an important interest in its children's mental health and well-being. That interest extends to protecting those children under the age of 16 from compulsive social media use by regulating the platforms minors use that are designed to maximize user engagement. The district court's ruling that Florida cannot enforce its law to protect those interests—if affirmed—will chill the efforts of Florida and other States to address the harms social media is causing children.

---

[11] https://www.naag.org/wp-content/uploads/2022/03/NAAG-Final-Letter-Parental-Control-App.pdf.

[12] https://www.naag.org/wp-content/uploads/2021/10/Final-NAAG-Letter-to-Senate-Subcommittee-on-Consumer-Protection-Product-Safety-and-Data-Security.pdf.

21

### B.    HB3 is appropriately tailored.

The district court erred when it found HB3 is insufficiently tailored under intermediate scrutiny. First, the court wrongly concluded that HB3 burdens too much speech. PI Order at \*15. HB3 does not target all online speech. It is instead limited to platforms that cross a certain threshold of users who are younger than 16 and that uses algorithms and addictive features designed to maximize user engagement. Fla. Stat. § 501.1736(1)(e). It is thus not like the law in *Packingham*, which imposed a broad ban on adult social media access for sex offenders. *Packingham v. North Carolina*, 582 U.S. 98, 107-08 (2017).

HB3's age-specific and feature-based approach also preserves adult speech by limiting its restrictions to minors on high-risk platforms. While those sites may not be the only potentially dangerous or addictive sites, Florida need not craft a law to solve all the internet's perils "in one fell swoop." *Free Speech Coalition*, 145 S. Ct. at 2318 (internal quotation marks omitted).

HB3's narrow tailoring is further evidenced by its exemptions and compliance options. It excludes non-addictive services (e.g., email, direct

22

messaging) and allows platforms to avoid regulation by eliminating addictive features or reducing minor engagement, minimizing speech burdens. Fla. Stat. § 501.1736(1)(e). Ample alternative channels also remain. Adults face no restrictions, 14- to 15-year-olds can access platforms with parental consent, and minors can use non-covered services or access platforms without accounts where those services permit it.

Second, the district court erred in suggesting that voluntary alternatives, such as parental controls and public-education campaigns, render HB3's requirements unnecessary. PI Order at *18. *FSC* rejected similar arguments that a law imposing age assurance requirements on certain obscene websites was unconstitutional because the state could have promoted parental tools instead. *Free Speech Coalition*, 145 S. Ct. at 2318. The Supreme Court upheld the law, noting the government's interest in protecting children from obscenity would be "achieved less effectively" without it. *Id.* That was enough, regardless of whether the court thought "some other approach might be superior." *Id.*

So too here. Florida's interest in protecting its children from the harms of compulsive social media use would be achieved less effectively

23

without HB3. Parental controls have proven less effective. Parents do not know how to use them and find them difficult to manage. Surgeon Gen. Advisory at 13. And even for parents who do use those controls, their children know how to bypass them. C.S. Mott Children's Hospital, University of Michigan Health, *Mott Poll Report: Sharing Too Soon? Children and Social Media Apps* (Oct. 2021).[13]

The Surgeon General's call for mandatory standards underscores this inadequacy. Surgeon Gen. Advisory at 15. Public-education campaigns, while valuable, cannot counteract social media platforms' psychological hooks designed to maximize user engagement. As the Surgeon General found, the "entire burden of mitigating the risk of harm of social media cannot be placed on the shoulders of children and parents." *Id.* at 13.

HB3 is narrowly tailored to Florida's significant interest in protecting minors from the harms of compulsive social media use. The district court's injunction undermines Florida's authority to protect minors from social media's harms. The Court should reverse it.

---

[13]https://mottpoll.org/sites/default/files/documents/101821_SocialMedia.pdf.

## Conclusion

For the reasons above, this Court should affirm the district court's content-neutrality holding but reverse the district court's preliminary injunction and its order that the Act does not survive intermediate scrutiny.

Respectfully submitted,

*/s/ Stanford E. Purser*
Stanford E. Purser
*Utah Solicitor General*

*Counsel for Amicus Curiae*
*State of Utah*

25

**Additional Amici Curiae**

STEVE MARSHALL
Attorney General
State of Alabama

TREG R. TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

KATHLEEN JENNINGS
Attorney General
State of Delaware

BRIAN L. SCHWALB
Attorney General
District of Columbia

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

LIZ MURRILL
Attorney General
State of Louisiana

ANTHONY G. BROWN
Attorney General
State of Maryland

DANA NESSEL
Attorney General
State of Michigan

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

RAÚL TORREZ
Attorney General
State of New Mexico

26

DREW WRIGLEY
Attorney General
State of North Dakota

GENTNER F. DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

KEN PAXTON
Attorney General
State of Texas

JASON S. MIYARES
Attorney General
State of Virginia

KEITH G. KAUTZ
Attorney General
State of Wyoming

DAVE YOST
Attorney General
State of Ohio

DAN RAYFIELD
Attorney General
State of Oregon

MARTY J. JACKLEY
Attorney General
State of South Dakota

CHARITY R. CLARK
Attorney General
State of Vermont

JOHN B. MCCUSKEY
Attorney General
State of West Virginia

27

## Certificate of Compliance

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 5,576 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Stanford E. Purser*
Utah Solicitor General

## Certificate of Service

I certify that on August 20, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Stanford E. Purser*
Utah Solicitor General

28