# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

―――――――――

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant.*

―――――――――

On Appeal from the United States District Court
for the Northern District of Florida,
No. 4:23-cv-00438

―――――――――

## BRIEF FOR PLAINTIFFS-APPELLEES

―――――――――

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

September 12, 2025

No. 25-11881, *Computer & Communications Industry Association, et al. v. Attorney General, State of Florida*

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1, Plaintiffs-Appellees hereby certify that there are no additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal that were omitted from the Appellant's certificate or the certificate supplied by amici curiae. *See* CA11.Dkt.6; CA11.Dkt.23 at C.1-3; CA11.Dkt.26 at i-iv.

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, Plaintiffs-Appellees respectfully submit this Corporate Disclosure Statement and state as follows:

1. Computer & Communications Industry Association (CCIA) has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

2. NetChoice has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

September 12, 2025

s/Erin E. Murphy
Erin E. Murphy

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees agree that oral argument would assist the Court in deciding the novel and important issues presented by this appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.................................................CIP-1

STATEMENT REGARDING ORAL ARGUMENT................................................. i

TABLE OF AUTHORITIES................................................................ iv

INTRODUCTION ......................................................................... 1

STATEMENT OF THE CASE............................................................. 5

    A.    Legal and Factual Background............................................. 5

    B.    Procedural Background .................................................... 12

SUMMARY OF ARGUMENT....................................................... 15

STANDARD OF REVIEW ............................................................ 18

ARGUMENT .......................................................................... 18

I.    Plaintiffs Are Likely To Succeed On Their First Amendment Claim .......... 18

    A.    HB3 Triggers First Amendment Scrutiny .......................... 18

    B.    HB3 Triggers Strict Scrutiny............................................ 24

    C.    HB3 Cannot Survive Any Level of Heightened Scrutiny.................. 28

    D.    Florida's Contrary Arguments Lack Merit.......................... 33

II.    Florida's Threshold Arguments Lack Merit ................................. 43

    A.    Plaintiffs May Assert the First Amendment Rights of Their Members' Users................................................... 43

    B.    The District Court Did Not Abuse Its Discretion by Declining to Abstain................................................ 48

III.    Florida's Scope Of Relief Argument Lacks Merit........................ 53

CONCLUSION ...................................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES[*]

**Cases**

*31 Foster Children v. Bush*,
  329 F.3d 1255 (11th Cir. 2003) ........................................................52

*Am. All. for Equal Rts. v. Fearless Fund Mgmt.*,
  103 F.4th 765 (11th Cir. 2024) ........................................................54

*Angelilli v. Activision Blizzard*,
  2025 WL 1184247 (N.D. Ill. Apr. 23, 2025) ....................................26

*Arcara v. Cloud Books*,
  478 U.S. 697 (1986) ........................................................................38

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) .......................................................... 22, 25, 31

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ........................................................................44

*Brown v. Ent. Merchs. Ass'n,
  564 U.S. 786 (2011) ...................... 7, 17, 20-21, 23, 25, 29, 31, 33-35, 42-43, 48

*Buehrle v. Key West*,
  813 F.3d 973 (11th Cir. 2015) ........................................................34

*CAMP Legal Def. Fund v. Atlanta*,
  451 F.3d 1257 (11th Cir. 2006) ......................................................47

*Carafano v. Metrosplash.com*,
  339 F.3d 1119 (9th Cir. 2003) ........................................................33

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977) .................................................................. 45-46

*CCIA v. Paxton*,
  747 F.Supp.3d 1011 (W.D. Tex. 2024) ................................. 1, 43, 48

---

[*] Citations upon which Plaintiffs-Appellees primarily rely are marked with asterisks.

*Cincinnati v. Discovery Network,*
507 U.S. 410 (1993)........................................................26

*Citizens United v. FEC,*
558 U.S. 310 (2010)........................................................27

*City of Austin v. Reagan Nat'l Advert. of Austin,*
596 U.S. 61 (2022)..........................................................26

*Craig v. Boren,*
429 U.S. 190 (1976).................................................... 45-46

*\*Erznoznik v. Jacksonville,*
422 U.S. 205 (1975)...............................................15-16, 19-22

*FEC v. Cruz,*
596 U.S. 289 (2022)........................................................33

*For Your Eyes Alone v. Columbus,*
281 F.3d 1209 (11th Cir. 2002)..............................................51

*Fraternal Ord. of Police v. United States,*
152 F.3d 998 (D.C. Cir. 1998) .............................................48

*\*Free Speech Coal. v. Paxton,*
145 S.Ct. 2291 (2025)...................... 21-23, 25, 28, 30, 32, 35-37, 40-41

*Harris v. Evans,*
20 F.3d 1118 (11th Cir. 1994) .............................................47

*Hicks v. Miranda,*
422 U.S. 332 (1975).......................................................52

*HM Fla.-ORL v. Governor,*
137 F.4th 1207 (11th Cir. 2025) ....................................... 22, 33

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977).......................................................47

*Indigo Room v. Fort Myers,*
710 F.3d 1294 (11th Cir. 2013) ...........................................36

*IndyMac Venture v. Silver Creek Crossing*,
  2009 WL 3698513 (W.D. Wash. Nov. 3, 2009) .................................................49

*JMM v. District of Columbia*,
  378 F.3d 1117 (D.C. Cir. 2004) ..........................................................................52

*Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs.*,
  77 F.3d 1063 (8th Cir. 1996) ..............................................................................49

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ...................................................................................... 45-47

*Mata Chorwadi v. Boynton Beach*,
  66 F.4th 1259 (11th Cir. 2023) ..................................................................... 45-47

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ..................................................................... 28, 32-33, 41

*Moody v. NetChoice*,
  603 U.S. 707 (2024) ................................................................................ 18, 24, 38

*NetChoice v. Bonta*,
  2025 WL 2600007 (9th Cir. Sept. 9, 2025) ......................................................26

*NetChoice v. Carr*,
  2025 WL 1768621 (N.D. Ga. June 26, 2025) ........................................ 1, 22, 28

*NetChoice v. Fitch*,
  134 F.4th 799 (5th Cir. 2025) ...........................................................42-43, 47-48

*NetChoice v. Fitch*,
  2025 WL 2350189 (U.S. Aug. 14, 2025) ............................................................2

*NetChoice v. Griffin*,
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025) .................... 1, 6, 22, 43, 48, 50, 54

*NetChoice v. Reyes*,
  748 F.Supp.3d 1105 (D. Utah 2024) ....................................................... 1, 22, 26

*NetChoice v. Yost*,
  778 F.Supp.3d 923 (S.D. Ohio 2025) ................... 1, 22, 26, 29, 34-35, 43, 48, 54

*New Ga. Project v. Att'y Gen.*,
106 F.4th 1237 (11th Cir. 2024) .................................................. 52-53

*NIFLA v. Becerra*,
585 U.S. 755 (2018) ........................................................................28

*Ohio Ass'n of Indep. Schs. v. Goff*,
92 F.3d 419 (6th Cir. 1996) ...........................................................48

*Otto v. Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ........................................................33

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002) ...........................................................48

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .............................. 2-3, 5, 16, 18-19, 22-23, 28, 31-32, 34-35

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........................................................................25

*Reno v. ACLU*,
521 U.S. 844 (1977) .................................................. 22, 24-25, 31

*SEAT v. Paxton*,
765 F.Supp.3d 575 (W.D. Tex. 2025) ...........................................26

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) .....................................................18

*Sorrell v. IMS Health*,
564 U.S. 552 (2011) .......................................................... 29, 34-35

*State v. Packingham*,
368 N.C. 380 (2015) .......................................................................35

*Steffel v. Thompson*,
415 U.S. 452 (1974) ........................................................................53

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................................................54

*TikTok v. Garland*,
604 U.S. 56 (2025) ..................................................................... 37, 40-41

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) ...............................................................................19

*\*Tokyo Gwinnett v. Gwinnett Cnty.*,
940 F.3d 1254 (11th Cir. 2019) ............................................... 49-52

*Trump v. CASA*,
145 S.Ct. 2540 (2025) .............................................................................55

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) ..................................................................... 22, 25, 44

*Vill. of DePue v. Exxon Mobil Corp.*,
537 F.3d 775 (7th Cir. 2008) ..............................................................49

*\*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ........................................................... 43-44, 46, 48

*Young Apartments v. Jupiter*,
529 F.3d 1027 (11th Cir. 2008) ..........................................................47

*Younger v. Harris*,
401 U.S. 37 (1971) ...................................................................... 14, 49

**Statutes**

Fla. Admin. Code r.2-43.001(12) ........................................................11

Fla. Admin. Code r.2-43.002(2) ...........................................................11

Fla. Admin. Code r.2-43.002(3) ...........................................................23

Fla. Admin. Code r.2-43.002(3)(a) .......................................................12

Fla. Stat. §1003.02(1)(g) ........................................................................32

Fla. Stat. §1006.07(2)(f) .........................................................................32

Fla. Stat. §501.1736(1)(e) ................................................... 9-10, 26-27, 36

Fla. Stat. §501.1736(2)(a) .......................................................................10

Fla. Stat. §501.1736(2)(b) .................................................... 10, 15, 32

Fla. Stat. §501.1736(3)(a) ....................................................11

Fla. Stat. §501.1736(3)(b) ....................................................11, 15, 32

Fla. Stat. §501.1736(4)(a) ....................................................11

Fla. Stat. §501.1736(4)(b) ....................................................11, 32

Fla. Stat. §501.1736(5) ........................................................ 11-12

Fla. Stat. §501.1736(6)(a) ....................................................12

## Other Authorities

C. Pearson, *She Started the Debate About Kids and Phones.*
*Now She Wants to End It.*, N.Y. Times (Sept. 6, 2025),
https://perma.cc/A5GD-CJMT ...........................................41

Order, *OAG v. Snap Inc.*,
No. 3:25-cv-676 (N.D. Fla. Aug. 13, 2025)......................................14

**INTRODUCTION**

Florida House Bill 3 is the latest attempt in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors. Books, comics, movies, rock music, and video games have all been accused of endangering minors in the past. Today, similar debates rage about "social media." Those debates are important, and the government may certainly participate in them. But the First Amendment does not take kindly to government efforts to resolve them. The Constitution instead leaves the power to decide what speech minors may access where it belongs: with their parents.

Nevertheless, several states have recently taken it upon themselves to try to restrict minors' access to some of the most popular "social media" services. Courts across the country have rejected those efforts as inconsistent with the First Amendment. *E.g.*, *CCIA v. Paxton*, 747 F.Supp.3d 1011 (W.D. Tex. 2024), *appeal filed*, No. 24-50721 (5th Cir.); *NetChoice v. Yost*, 778 F.Supp.3d 923 (S.D. Ohio 2025), *appeal filed*, No. 25-3371 (6th Cir.); *NetChoice v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025), *appeal filed*, No. 25-1889 (8th Cir.); *NetChoice v. Reyes*, 748 F.Supp.3d 1105 (D. Utah 2024), *appeal filed*, No. 24-4100 (10th Cir.); *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025), *appeal filed*, No. 25-12436 (11th Cir.). And rightly so. While states may certainly take steps to protect minors who use such services, restricting the ability of minors (and adults) to access

them is not a narrowly tailored means of advancing a legitimate governmental interest. Just as the government may not restrict minors' access to libraries, movies, or video games, the government may not restrict their access to websites that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham v. N.C.*, 582 U.S. 98, 107 (2017).

Given the numerous Supreme Court precedents prohibiting states from decreeing what constitutionally protected speech minors may access, "it is no surprise that the District Court in this case enjoined" Florida from enforcing HB3. *NetChoice v. Fitch*, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J., concurring in the denial of the application to vacate stay). The Act bans minors under 14 from creating or holding accounts on certain "social media platforms" and requires 14- and 15-year-olds to obtain a parent's consent before doing so. By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Florida has "with one broad stroke" prevented millions of Floridians "from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 107-08.

Indeed, HB3 is even more obviously unconstitutional than laws that have preceded it. Rather than restricting access to all "social media" websites, HB3 singles out websites that minors enjoy most. Whether a website is covered turns in

part on how long minors spend on it and whether it employs tools purportedly designed to bring to their attention content they might like. But the Supreme Court has repeatedly explained that the government may not restrict speech just because it is popular. Otherwise, the government could restrict access to the most popular segments of nearly any medium for constitutionally protected speech. By Florida's logic, it could restrict access to enticing video games, engaging novels, or binge-worthy TV shows. Burdening protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

Florida's contrary arguments lack merit. Its principal argument is that HB3 regulates the conduct of "account creation" rather than speech. Courts have repeatedly rejected that argument, for good reason. Just as with library cards, newspaper subscriptions, or any other "conduct" necessary to access speech, people create accounts on "social media" websites to gain access to places "where they can speak and listen." *Id.* at 104. And Florida does not dispute that prohibiting minors from creating accounts on "social media" websites makes it impossible for them to engage in the full range of social and interactive First Amendment activity that users enjoy on those websites—be it posting short videos for their Instagram followers, sharing pictures with friends on Snapchat, participating in online church services on YouTube, or petitioning elected officials on Facebook.

Florida's efforts to satisfy heightened scrutiny likewise fall short. It insists that HB3 protects children from "addiction." But HB3 does not seek to protect minors from "addiction" to non-speech products like drugs and gambling; it seeks to protect minors from purported "addiction" to popular websites for *speech*. Burdening protected speech that citizens find especially compelling is a First Amendment vice, not a virtue.

In all events, Florida cannot begin to show that its draconian restrictions are necessary to advance any legitimate interest it may assert. HB3 prohibits *all* minors under 14 from creating accounts on the websites it covers (and requires all 14- and 15-year-olds to obtain parental consent to do so) so long as *some* minors spend (in Florida's view) too much time on them. That is akin to restricting *all* minors from obtaining library cards just because some spend too much time reading books, or restricting all minors from accessing Disney+ because some spend too much time watching cartoons. Such draconian restrictions are especially unwarranted given that parents already have a wealth of tools at their disposal to protect their children on the Internet—tools that Florida itself employs when it wishes to restrict minors' access to "social media" in schools. And to the extent parents do not share Florida's views about whether or how much their minor children should use "social media platforms," Florida has no business overriding core parenting decisions. In short,

while the state may take many steps to protect minors from harm, it may not take matters into its own hands and restrict access itself.

Given the obvious ways in which HB3 violates the First Amendment, it is no surprise that Florida tries to avoid the question altogether by pressing several meritless threshold objections. Binding Supreme Court precedent forecloses its argument that Plaintiffs cannot assert the First Amendment rights of their members' users. And the district court did not abuse its discretion by declining to abstain from resolving this first-in-time-filed lawsuit based on Florida's late-breaking and suspiciously-timed enforcement action against Snap (which will remain in federal court for the foreseeable future anyway).

This Court should affirm.

## STATEMENT OF THE CASE

### A.    Legal and Factual Background

1. Plaintiffs are trade associations whose members operate many online services, including Facebook, Instagram, Snapchat, and YouTube. Those services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107; D.Ct.Dkt.76-2.¶7 ("Schruers.Decl."). "On Facebook, for example, users can debate religion and politics with their friends and neighbors." *Packingham*, 582 U.S. at 104. Instagram allows users to share vacation pictures and informative videos with

others.  D.Ct.Dkt.76-3.¶6 ("Cleland.Decl.").  YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.  D.Ct.Dkt.76-4.¶¶3, 12-15 ("Veitch.Decl.").  And on Snapchat, users can deepen connections with friends and family by communicating with each other in fun and casual ways.  D.Ct.Dkt.76-1.¶¶3-4 ("Boyle.Decl.").  On each service, users can create accounts to share their own speech with others.  D.Ct.Dkt.94 at 31-32 & n.18, 46 ("PI.Op.").  These accounts likewise allow covered services to communicate with their users about content they think users will find engaging.  PI.Op.33.n.19, 53; Schruers.Decl.¶25; Cleland.Decl.¶31.

Like adults, minors use those websites to engage in an array of First Amendment activity.  Some use them to read the news, connect with friends, explore new interests, and showcase their creative talents.  Others use them to participate in public discussions on salient topics of the day.  *See* PI.Op.46.  "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them."  *Griffin*, 2025 WL 978607, at *13.  Still others use them to connect with those who share similar interests or experiences.  Schruers.Decl.¶¶9-10; Cleland.Decl.¶27a.

Just as people inevitably have different opinions about what books, television shows, and video games are appropriate for minors, people inevitably have different views about whether and to what degree "social media" websites are appropriate for

minors. Concerns that new means of communication may be harmful to minors, however, are hardly new. The same basic concerns have been raised repeatedly in the past about other types of speech and mediums of expression, from "penny dreadfuls" to "motion pictures," "[r]adio dramas," "comic books," and more. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011).

While the government can certainly participate in those debates, the Supreme Court has repeatedly rejected government efforts to try to resolve them by decreeing what speech minors may access. After all, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 794-95. And while states have an interest in protecting minors from harm, that interest "does not include a free-floating power to restrict the ideas to which [they] may be exposed." *Id.* In a Nation that values the First Amendment, the preferred response is to let parents decide what constitutionally protected speech their children may access.

Parents have many tools at their disposal to control their children's access to the Internet should they choose to do so. Parents can decide whether and when to let them use computers, tablets, and smartphones in the first place. And those who choose to let them use those devices have many ways to control what they see and do. Device manufacturers (e.g., Apple, Google) offer settings that parents may use

to limit the time minors spend on certain applications and websites. Schruers.Decl.¶12; Cleland.Decl.¶8. Cell carriers and broadband providers (e.g., Verizon, AT&T, Comcast Xfinity) provide parents with tools to block apps and websites from their children's devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. Schruers.Decl.¶13; Cleland.Decl.¶9. Most wireless routers (e.g., NetGear, TP-Link) have similar tools, as do Internet browsers (e.g., Google Chrome, Mozilla Firefox). Schruers.Decl.¶14; Cleland.Decl.¶10.

On top of all that, Plaintiffs' members have devoted extensive resources to developing policies and practices to protect minors who use their services. For starters, some prohibit minors under 13 from accessing their services, Boyle.Decl.¶5; Schruers.Decl.¶15a; Cleland.Decl.¶12, while others offer separate experiences geared specifically toward minors, Veitch.Decl.¶¶22a, 24 (YouTube Kids is a "family-friendly place for kids to explore their imagination and curiosity"). When Plaintiffs' members permit minors to access their services, they provide numerous ways for parents to oversee their children's activity. On Snapchat, for example, parents can control privacy settings and observe with whom their child is messaging through "Family Center." Boyle.Decl.¶¶6-8. On Instagram, parents can review their teens' activity and limit their ability to send direct messages.

Schruers.Decl.¶15d; Cleland.Decl.¶11b.  And on YouTube, parents can link their own accounts with their teens' and monitor their activity.  Veitch.Decl.¶¶20-21, 23.

Plaintiffs' members have also invested significant time and resources into curating the content that minors and adults see on their services.  Schruers.Decl.¶¶7, 15-17; Cleland.Decl.¶¶11-17.  For instance, many members restrict and remove content that they consider objectionable (e.g., violent and sexual content), promote content that they consider valuable, attach warning labels or disclaimers to content that violates their policies, and remove accounts that disseminate such content.  Schruers.Decl.¶¶15b-16; Cleland.Decl.¶16.

2. Notwithstanding the many cases striking down government efforts to decree what constitutionally protected speech minors may access and the wealth of tools available to help parents tailor and restrict Internet access, Florida has taken it upon itself to decide what is appropriate for minors on the Internet.  It enacted HB3, which dramatically restricts minors' access to certain "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on some of the most popular online services.

HB3 defines "social media platform" as "an online forum, website, or application" that "[a]llows users to upload content or view the content or activit[ies] of other users."  Fla. Stat. §501.1736(1)(e).  But HB3 does not regulate all online services that allow users to share and view content.  Its definition of "social media

9

platform" is instead limited to online services that minors enjoy using the most—i.e., that facilitate the most First Amendment activity. An online service qualifies as a "social media platform" only if "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on it "on the days when using" the service, and only if it "[e]mploys algorithms that analyze user data or information on users to select content for users" and has one or more "addictive features." *Id.* HB3's list of so-called "addictive features" covers "[i]nfinite scrolling," "[p]ush notifications," "personal interactive metrics," "[a]uto-play" functions, and "[l]ive-streaming" functions. *Id.* The Act excludes any service on which "the exclusive function is e-mail or direct messaging." *Id.*

HB3 imposes several restrictions on access to "social media platforms" that are relevant here:

***Prohibitions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platforms" altogether. §501.1736(2)(a). It also requires "social media platforms" to terminate existing accounts held by minors under age 14 and those "categorize[d] as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." §501.1736(2)(b)(1).

***Restrictions on 14- and 15-year-olds.*** HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or

10

guardian provides consent for the minor to become an account holder."
§501.1736(3)(a). It also requires "social media platforms" to terminate existing
accounts held by 14- and 15-year-olds and those "categorize[d] as belonging to an
account holder who is likely 14 or 15 years of age for purposes of targeting content
or advertising." §501.1736(3)(b)(1). HB3 specifies that if its parental-consent
requirements are enjoined, then they "shall be severed" and replaced with a
provision banning 14- and 15-year-olds from creating accounts altogether.
§501.1736(4)(a), (4)(b)(1).

HB3 does not explain how a "social media platform" is supposed to identify
who is a "parent or guardian." But regulations enacted by the Florida Attorney
General require "social media platform[s]" to "conduct reasonable parental
verification." Fla. Admin. Code r.2-43.002(2). "Reasonable parental verification"
means "any method that is reasonably calculated at determining that a person is a
parent of a child that also verifies the age and identity of that parent by commercially
reasonable means," including requesting the parent's contact information,
confirming the parental relationship "by obtaining documents or information
sufficient to evidence that relationship," and "utilizing any commercially reasonable
method … to verify that parent's identity and age." *Id.* r.2-43.001(12).

HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or
reckless[ly]" violate its provisions. Fla. Stat. §501.1736(5). HB3 authorizes the

Florida Attorney General to enforce the law and seek civil penalties of up to $50,000 per violation. *Id.* HB3's implementing regulations specify that a covered service commits a "knowing or reckless violation" if, "based on the facts or circumstances readily available," it "should reasonably have been aroused to question whether the person was a child and thereafter failed to perform reasonable age verification." Fla. Admin. Code r.2-43.002(3)(a). HB3 also includes a private right of action authorizing minors (or their representatives) to sue a "social media platform" for letting them create an account. Fla. Stat. §501.1736(6)(a). Minor account holders may recover up to $10,000 in damages for each violation. *Id.*

### B. Procedural Background

In October 2024, Plaintiffs brought this challenge to HB3. They asked the district court to preliminarily enjoin Florida from enforcing HB3's account-creation ban and parental-consent requirement before they took effect in January 2025. Although courts across the country have enjoined similar laws without any discovery, Florida insisted that it required sweeping discovery just to respond to Plaintiffs' motion. D.Ct.Dkt.34 at 2-3. The district court acquiesced, giving Florida "great latitude" to inquire into a list of 110 topics. D.Ct.Dkt.35 at 3; D.Ct.Dkt.51-10 at 20. The parties then engaged in several months of discovery in preparation for the preliminary-injunction briefing and hearing, including written discovery and

hours-long depositions conducted by both sides. D.Ct.Dkts.51-4 to -7; D.Ct.Dkts.63-1 to -3; D.Ct.Dkts.47, 61 at 1-3.

Florida challenged Plaintiffs' Article III standing, arguing that they had not demonstrated that any member was likely covered by HB3—even though Florida officials had singled out some by name when enacting HB3. Though Florida never actually argued that Plaintiffs' members are *not* covered by HB3, the court nevertheless accepted its standing argument, faulting Plaintiffs for not affirmatively establishing that at least one of their members met every component of HB3's coverage criteria—albeit while acknowledging that the result "may seem counterintuitive or even absurd." D.Ct.Dkt.72 at 2.

Plaintiffs promptly filed an amended complaint and renewed preliminary-injunction motion curing the purported deficiency with revised declarations confirming that Snapchat, YouTube, Facebook, and Instagram likely satisfy each criterion. D.Ct.Dkts.74-76. Although Florida insisted that it needed yet another round of discovery, it refused to extend the stay of enforcement. Rather, after convincing the district court that Plaintiffs must supply proof that their members were violating HB3 in order to bring a pre-enforcement action, Florida promptly used that same proof to sue Snap in state court—mere hours before responding to

the renewed preliminary-injunction motion. D.Ct.Dkt.86-1.[1] It then insisted that this late-breaking action against one member required the district court to abstain from resolving this months-old lawsuit under *Younger v. Harris*, 401 U.S. 37 (1971).[2]

The court rejected that position and granted Plaintiffs' motion to enjoin Florida from enforcing HB3. The court declined to abstain given the "substantial proceedings on the merits" that had occurred "before the state-court proceedings began." PI.Op.10-12. It concluded that Plaintiffs have standing to assert the First Amendment rights of their members' users. PI.Op.23-25. And it held that HB3's account-creation ban and parental-consent requirement likely violate the First Amendment.

As the court explained, HB3 "clearly implicate[s] the First Amendment" because it regulates "the creation of accounts used to access speech." PI.Op.28-33. And while the Court tentatively concluded that intermediate scrutiny applies, it held that the law flunks even intermediate scrutiny. Even assuming that Florida has a significant interest in protecting minors from "compulsive use" of social media, the

---

[1] Florida also told the district court that it was contemplating an enforcement action against Meta. D.Ct.Dkt.82 at 9-13.

[2] Snap removed that case to federal court, which denied Florida's motion to remand. *See* Order, *OAG v. Snap Inc.*, No. 3:25-cv-676 (N.D. Fla. Aug. 13, 2025), ECF No.36.

court concluded that HB3 burdens substantially more speech than is necessary to address the state's concern. PI.Op.40-41. HB3 restricts access to websites where minors engage in wide swaths of First Amendment activity, even if those websites pose no risk of harm or addiction to minors. PI.Op.42-43, 47. And Florida had less restrictive means of addressing its "addiction" concerns. The court emphasized, for example, that HB3 also requires "social media platforms" to terminate minors' accounts at their parents' behest, a provision of HB3 that Plaintiffs have not challenged under the First Amendment. PI.Op.49 (citing Fla. Stat. §501.1736(2)(b)(3), (3)(b)(3)). After finding that the equities tip decisively in Plaintiffs' favor, the Court preliminarily enjoined the state from enforcing HB3's account-creation ban and parental-consent requirement against Plaintiffs' members.

## SUMMARY OF ARGUMENT

The district court correctly held that HB3 violates the First Amendment. The Supreme Court has repeatedly held that "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975). Just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech that is constitutionally protected as to minors "to protect the young from ideas or images that a legislative body thinks

unsuitable for them." *Id.* at 209, 213-14. And just as the government may not ban minors' access to libraries, movies, or video games, it may not restrict their access to websites that for many are valuable sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Simply put, it is not for the government to decide what constitutionally protected speech is appropriate for minors or how much time they may spend engaging in it.

HB3 does just that. By prohibiting minors under 14 from creating accounts on the most popular "social media" websites and requiring 14- and 15-year-olds to obtain parental consent before doing so, Florida has with "one broad stroke" prevented millions of minors "from engaging in the legitimate exercise of First Amendment rights." *Id.* at 107-08. Florida claims that it may do so in service of preventing "addiction" to those websites. Fla.Br.35-36. But its "addiction" concerns are plainly focused on particular content. After all, Florida does not restrict minors' access to *all* services that employ tools like "infinite scroll" and "push notifications." HB3 leaves minors free to watch Disney+ or Hulu to their hearts' content, which plenty of minors do. Florida takes issue with those features only when they are connected to services that feature content it apparently does not trust—i.e., content generated by everyday people, rather than selected by a third-party provider.

There is thus no way to understand HB3 as anything other than an effort "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795. And the state simply does not have a valid interest in "protecting" minors from spending "too much" time engaging with speech—let alone with particular speech that it distrusts. If it were otherwise, then the state could restrict all minors from accessing libraries just because some spend (in the state's view) too much time reading page-turning novels, or from using streaming services because some spend too much time watching engaging cartoons. It could also restrict the use of cliffhangers, shorter chapters, serialization, or any of the many other expressive devices developed over millennia that could be said to "undermine a person's ability to exercise their will in determining the amount of time that they choose to spend engaging with" books, radio programs, movies, television, and so on. Fla.Br.16.

Given the grave First Amendment problems with HB3, it is unsurprising that Florida fixates on threshold arguments, insisting that Plaintiffs lack "prudential standing" to assert the First Amendment rights of its members' users and that the district court should have abstained from resolving this first-in-time suit because of a late-breaking enforcement action that Florida strategically filed in state court six months into this litigation. Those arguments are meritless. As courts across the country have recognized, decades of precedent forecloses Florida's "prudential

standing" argument. And the district court acted within its broad discretion in declining to abstain because of the state's enforcement action against Snap, which smacks of gamesmanship and will remain in federal court for the foreseeable future anyway.

This Court should affirm.

## STANDARD OF REVIEW

This Court reviews a decision to grant a preliminary injunction under the "highly deferential" abuse-of-discretion standard. *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (en banc).

## ARGUMENT

**I.     Plaintiffs Are Likely To Succeed On Their First Amendment Claim.**

**A.     HB3 Triggers First Amendment Scrutiny.**

1. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody v. NetChoice*, 603 U.S. 707, 733 (2024). And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen." *Packingham*, 582 U.S. at 104. Today, those places encompass the "vast democratic forums of the Internet," including "social media" websites. *Id.* The Supreme Court has therefore held that the First Amendment limits the government's power to restrict access to "social media" websites like Facebook and YouTube, even when its ostensible aim is to protect minors. *Id.* at 106-08.

In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it furthered its interest in keeping convicted sex offenders away from minors. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment. *Id.* at 107-08. By barring sex offenders from accessing "social networking" websites, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. For the government to "foreclose access to social media" is "to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

For all the same reasons, the First Amendment constrains the government's authority to restrict minors' access to those websites too. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Just as "the First Amendment strictly limits [the government's] power" when it "undertakes

selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable to them." *Erznoznik*, 422 U.S. at 209, 213-14. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.

Consistent with those principles, the Supreme Court has held that "persons under 18 have [a] constitutional right to speak or be spoken to without their parents' consent." *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, the state could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors"—or "to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents' prior consent." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young

people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

To be sure, the Supreme Court has recognized some exceptions to those principles. But it has emphasized that exceptions are rare, and that "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Erznoznik*, 422 U.S. at 212-13. The government may, for example, "adjust the boundaries of an existing category of unprotected speech" like obscenity "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. After all, something that is not obscene for adults may still be obscene for children. *See, e.g.*, *Free Speech Coal. v. Paxton* (*FSC*), 145 S.Ct. 2291, 2306 (2025). But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 2310, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

Outside of those "relatively narrow and well-defined circumstances," *id.*, courts have routinely struck down government efforts to protect children from the purportedly harmful effects of new forms of media. In *Brown*, for example, the Supreme Court held that a California law prohibiting the sale of violent video games to minors without parental consent violated the First Amendment. *Id.* at 804-05.

21

And in *Erznoznik*, it held that a local ordinance barring the display of movies containing nudity at drive-in theaters violated the First Amendment. 422 U.S. at 217-18. Even when the government restricts access to speech that is *not* protected as to minors, courts have struck down laws that impermissibly interfere with the speech of adults. *See Ashcroft v. ACLU*, 542 U.S. 656, 673 (2004); *Reno v. ACLU*, 521 U.S. 844, 873 (1977); *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 807 (2000); *HM Fla.-ORL v. Governor*, 137 F.4th 1207, 1239 (11th Cir. 2025).

2. Given that long line of precedent, it is unsurprising that courts across the country have concluded that state attempts to restrict minors' access to "fully protected speech," *FSC*, 145 S.Ct. at 2310, on "social media platforms"—including parental-consent requirements materially identical to those in HB3—violate the First Amendment. *E.g.*, *Carr*, 2025 WL 1768621; *Yost*, 778 F.Supp.3d 923; *Griffin*, 2025 WL 978607; *Reyes*, 748 F.Supp.3d 1105. And just like the laws struck down in those cases, HB3 plainly restricts core, fully protected First Amendment activity. By restricting access to websites like Instagram, Snapchat, and YouTube, Florida has "prevent[ed] … user[s] from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108.

In fact, HB3 even more obviously implicates the First Amendment than the laws invalidated in *Brown*, *Reno*, *Ashcroft*, *Playboy*, *Erznoznik*, and *HM*. Some of those cases at least involved an attempt to "adjust the boundaries of an existing

category of unprotected speech" (like obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794; *see also FSC*, 145 S.Ct. at 2310. HB3 does not even endeavor to confine its restrictions to speech that could arguably be said to approach a constitutional line. It instead restricts minors' ability to create accounts and access and engage in speech on websites like Snapchat and YouTube writ large, even if all they want to do is to attend church services, participate in the launch of a presidential campaign, or communicate with friends or family. Florida has thus restricted wide swaths of protected First Amendment activity based on a concern that *some* uses of those services *sometimes* harm *some* minors. If California had restricted access to *all* video games based on a concern that some video games may be harmful to some minors, that would have made the burden on First Amendment rights even more glaring. *See Brown*, 564 U.S. at 793-98; *Packingham*, 582 U.S. at 108-09.

On top of that, by effectively requiring all users to verify their age before accessing covered websites, HB3 burdens the right of *adults* to access those websites too. *See* Fla. Admin. Code r.2-43.002(3). As the Supreme Court recently reaffirmed, requiring adults to submit "proof of age" before accessing speech (even speech that is unprotected as to minors) "is a burden on the exercise of" their First Amendment rights. *FSC*, 145 S.Ct. at 2309. By forcing adults to surrender sensitive personal information to access protected speech, such requirements "discourage users from

accessing" speech on the Internet and "completely bar" some adults from doing so. *Reno*, 521 U.S. at 856.

The unique aspects of websites like Instagram, YouTube, and Snapchat heighten the First Amendment values at stake. While restrictions on books, movies, and video games prohibit people from *receiving* speech, HB3 also restricts users from engaging in their own speech and participating in the exchange of ideas. And HB3's access restrictions interfere with the rights of Plaintiffs' members, who "have a First Amendment right to speak to and associate with youth." PI.Op.45.n.26. Websites like Instagram, YouTube, and Snapchat curate and disseminate speech to their users based on editorial decisions—decisions informed by their choices about what content is appropriate for and likely to be of value or interest to users. Boyle.Decl.¶12; Schruers.Decl.¶¶5b, 6b, 7, 25; Cleland.Decl.¶¶21b, 22b, 23b, 31; Veitch.Decl.¶49. By restricting minors' access to Plaintiffs' members' services, HB3 interferes with their First Amendment rights as well. *See Moody*, 603 U.S. at 735-38.

### B. HB3 Triggers Strict Scrutiny.

While HB3, at a minimum, must survive intermediate scrutiny, its sweeping restrictions demand strict scrutiny twice over. As the Supreme Court recently explained, laws that "suppress[] a large amount of speech" that citizens "'have a constitutional right to receive' and to share" trigger "strict scrutiny." *FSC*, 145 S.Ct.

24

at 2312. The law in *Playboy*, for example, "triggered strict scrutiny because it banned '30 to 50% of all adult programming.'" *Id.* at 2311 n.9 (citing *Playboy*, 529 U.S. at 812). "To prohibit *this much* speech" "is a significant restriction" warranting "strict scrutiny." *Id.* The law in *Reno* likewise "triggered—and failed—strict scrutiny because it 'effectively *suppresse[d]* a large amount of speech that adults have a constitutional right to receive' and to share." *Id.* at 2312 (citing *Reno*, 521 U.S. at 874). So too in *Ashcroft*. *Id.* (citing *Ashcroft*, 542 U.S. at 661-62). That makes sense. Again, had California restricted access to *all* video games in *Brown*, 564 U.S. at 794, or had Jacksonville prohibited the public display of *all* movies in *Erznoznik*, 422 U.S. at 217-18, the First Amendment burdens would have been even more severe. HB3 thus triggers strict scrutiny given the sheer amount of fully protected First Amendment activity that it restricts.

HB3 also discriminates based on content and speaker, triggering strict scrutiny twice over. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Facially content-neutral laws will nevertheless "be considered content-based" if they "cannot be justified without reference to the content of the regulated speech." *Id.* at 164. And if "there is evidence that an impermissible purpose or justification underpins a

facially content-neutral restriction … that restriction may be content based." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 76 (2022).

HB3 is content based on its face because it defines "social media platforms" based on whether they permit users to "upload content or view the content or activity of other users." §501.1736(1)(e)(1). In other words, HB3 targets websites "based on the 'social' subject matter 'of the material [they] disseminate[].'" *Reyes*, 748 F.Supp.3d at 1122-23. As many courts have held, "[t]he elevation of … provider-generated content over user-generated content is a content-based regulation." *SEAT v. Paxton*, 765 F.Supp.3d 575, 592 (W.D. Tex. 2025); *Reyes*, 748 F.Supp.3d at 1122-23; *Yost*, 778 F.Supp.3d at 953; *cf. Angelilli v. Activision Blizzard*, 2025 WL 1184247, at *5 (N.D. Ill. Apr. 23, 2025); *contra NetChoice v. Bonta*, 2025 WL 2600007, *9 (9th Cir. Sept. 9, 2025) (finding a California law not content based because it "applies to websites whether they facilitate social interaction or other forms of content"). The "very basis for the regulation is the difference in content": Websites that have made the editorial choice to facilitate speech and interaction between users are covered, while websites that have made the editorial choice to focus on other speech and speakers are not. *Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993).

HB3's speaker distinctions reinforce the conclusion that it is content based. Courts are deeply skeptical of laws that "distinguish[] among different speakers," as

"[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). HB3's definition of "social media platform" singles out a subset of online services for disfavored treatment. Services like Disney+ and Hulu employ many of the so-called "addictive features" that HB3 targets, and they are plenty popular (indeed, perhaps even more so) with minors, too. For example, both Hulu and Disney+ autoplay the next episode in a television series. And many popular email and messaging services utilize push notifications to alert users of new messages. Yet HB3 exempts them from coverage, no matter how much time minors spend on those services. §501.1736(1)(e).

Those speaker distinctions are a proxy for content discrimination. The difference between services that are covered and services that are not is that the latter do not permit users to publicly "upload content or view the content or activity *of other users*"—*viz.*, they lack the type of social, interactive content by everyday people that Florida apparently distrusts. §501.1736(1)(e)(1) (emphasis added). While Florida insists (and the district court tentatively agreed) that its interest in preventing websites from using "addictive features" is a "content-neutral" justification, HB3 leaves unregulated a whole slew of online services that use those same features. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes," rather than disfavoring

content.  *NIFLA v. Becerra*, 585 U.S. 755, 773-74 (2018).  In point of fact, Florida admits that it restricted access to Instagram, Snapchat, and YouTube while leaving other mediums for speech untouched because it considers "social media" "more addictive" since minors "are particularly interested in what their peers are doing and saying"—i.e., in the *content* on those services.  PI.Op.36.  While that may be "a different flavor of content-based regulation," *Carr*, 2025 WL 1768621, at *12, it is a content-based regulation nonetheless.

### C.    HB3 Cannot Survive Any Level of Heightened Scrutiny.

HB3 cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Florida to demonstrate that HB3 is "the least restrictive means of achieving a compelling state interest."  *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  Intermediate scrutiny requires it to show that HB3 is "narrowly tailored to serve a significant governmental interest."  *Packingham*, 582 U.S. at 105-06.  The state's interest must be "unrelated to the suppression of free speech."  *FSC*, 145 S.Ct. at 2302.  And its chosen solution may not "burden substantially more speech than necessary to further those interests."  *Id.*  HB3 flunks both levels of scrutiny.

Start with Florida's professed interest in protecting minors from alleged "addiction" to "social media."  While protecting minors is certainly a laudable goal, here that interest is plainly related to the suppression of expression.  After all, HB3 does not regulate "addiction" to *nonspeech* products like drugs or gambling.  It seeks

to protect minors from alleged "addiction" to websites where they access, engage in, and interact with *speech*. Making matters worse, Florida restricts access to only *some* services that disseminate speech—those that minors find particularly engaging. But Florida has no legitimate interest in restricting access to speech just because minors find it especially appealing. It could not validly restrict access to Disney+ because it offers too many shows that "contain ... catchy jingles," *Sorrell v. IMS Health*, 564 U.S. 552, 578 (2011), any more than it could restrict access to books that end in cliffhangers. In *Brown*, California did not even try to justify its law on the theory that it had an interest in preventing minors from addiction to video games. 564 U.S. at 799-804. For good reason. As the Supreme Court has repeatedly made clear, "the fear that speech might persuade provides no lawful basis for quieting it." *Sorrell*, 564 U.S. at 576. Burdening access to protected speech citizens find especially interesting is especially inconsistent with the First Amendment.

While the district court concluded that Florida has a legitimate interest in regulating "features" that may lead individuals to spend more time engaging in speech, PI.Op.41, that cannot be squared with the court's acknowledgment that the "features" targeted by HB3 are "inextricable from speech" covered services disseminate, PI.Op.33.n.19; *see also Yost*, 778 F.Supp.3d at 953—or with the manner in which Florida has regulated. Again, Florida restricts services with features like infinite scroll, push notifications, autoplay, etc., only when they are tethered to

certain speech.  *See supra* pp.26-28.  Florida is not concerned with "infinite scroll" when it is attached only to provider-generated news or sports content, or with autoplay when used on popular streaming services.  Nor is Florida concerned with cliffhangers, serialization, or any of the many other features that could be said "to undermine a person's ability to exercise their will in determining the amount of time that they choose to spend engaging with" books, radio programs, movies, television, and so on.  Fla.Br.16.  Florida's concern is thus not even with "addiction" to speech writ large; it is with "addiction" to content that the state apparently distrusts.  The features HB3 restricts are just a means to the impermissible end of restricting access to that speech.[3]

In all events, HB3 is not a narrowly tailored means of addressing the state's professed interest.  Even under intermediate scrutiny, HB3 must not "burden substantially more speech than necessary to further [its] interests."  *FSC*, 145 S.Ct. at 2302.  Unlike laws that restrict access to websites that contain content that is *unprotected* as to minors, *see id.* at 2300, HB3 restricts "with one broad stroke" access to services that for many are valuable sources for knowing current events,

---

[3] Contrary to Florida's suggestion (at 12-13), Plaintiffs argued below that "the state has no legitimate interest in restricting minors' ability to access and interact with mediums for protected speech just because it thinks they are spending too much time engaged in quintessential First Amendment activity," while *also* arguing that HB3 is insufficiently tailored even assuming Florida's professed interest is legitimate.  *See* D.Ct.Dkt.76 at 36.

speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. And it has the practical effect of hindering adults' access to those services, even though Florida has no legitimate reason to do so. *See Ashcroft*, 542 U.S. at 663; *Reno*, 521 U.S. at 856-57. Florida could not restrict all minors under 16 from obtaining library cards just because some might come across *Fifty Shades of Grey*, or because others might spend two or more hours a day reading *The Hunger Games*. Nor could it prevent them from entering the arcade just because some may want to play *Grand Theft Auto* or others spend two or more hours playing *Dance Dance Revolution*. *See Brown*, 564 U.S. at 794-95, 798-99. For the same reasons, Florida may not restrict minors from creating accounts on "social media" websites just because some may spend more time on them than Florida thinks they should.

HB3 flunks narrow tailoring in other ways as well. For example, it "applies to any social media site" with the so-called "addictive features under any circumstances, even if … the site only sends push notifications if users opt in … or the site does not auto-play video for account holders who are known to be youth." PI.Op.47. And it sweeps in websites regardless of whether minors "are 'addicted' or because they simply wish[] to engage with speech for more than two hours per day." PI.Op.48. That underscores why HB3 is nothing like the law addressed in *FSC*. There, Texas sought to protect minors from content that is *obscene* to them, and it

31

chose a legislative solution that targeted only websites with a substantial amount of obscene content. 145 S.Ct. at 2318. HB3, by contrast, burdens minors' access to the most popular "social media" websites regardless of whether the website harms them.

On top of that, Florida has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 491; *see Packingham*, 582 U.S. at 107. To survive intermediate scrutiny, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests." *McCullen*, 573 U.S. at 495. Parents already have many tools to protect their minors on the Internet, including refusing to give them Internet-connected devices at all. *See supra* pp.7-9. In fact, Florida uses such tools itself when it comes to limiting minors' access to "social media" in schools. Florida restricts the use of cell phones during instruction time. *See* §1006.07(2)(f). And it requires school officials to block "social media" websites on school devices. §1003.02(1)(g)(4). Florida has never tried to explain why parents cannot adopt a similar approach for limiting minors' access outside of school.

Nor has Florida explained why HB3's separate requirement that services terminate minors' accounts at their parents' behest is insufficient to achieve its goals. *See* §501.1736(2)(b)(3), (3)(b)(3), (4)(b)(3). Even under intermediate scrutiny, "a

prophylaxis-upon-prophylaxis approach" is "a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *FEC v. Cruz*, 596 U.S. 289, 306 (2022); *see McCullen*, 573 U.S. at 490-91. That Florida insists on layering additional restrictions on top of those existing ones underscores that its real concern is that some parents choose not to prevent their minor children from creating accounts on "social media" websites. But the First Amendment does not tolerate speech restrictions "in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804; *see HM*, 137 F.4th at 1245.

### D.  Florida's Contrary Arguments Lack Merit.

1. Florida does not dispute that adults and minors alike use websites like Instagram, YouTube, and Snapchat to engage in protected First Amendment activity. Nor does it dispute that HB3 restricts certain users from doing so. It nevertheless tries to evade First Amendment scrutiny by insisting that HB3 regulates the "commercial transaction" of "entering into a contract" to create an account. Fla.Br.28-29. Florida ignores that creating an account (a personalized profile containing information the user chooses to present) is itself speech. *See Carafano v. Metrosplash.com*, 339 F.3d 1119, 1124 (9th Cir. 2003). But that aside, this Court has repeatedly held that the First Amendment may not be evaded by isolating some purportedly "non-speech" component of protected activity. *Otto v. Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020). The state may not "ban a protected activity" by

"procee[ding] upstream" to "dam the source." *Buehrle v. Key West*, 813 F.3d 973, 977 (11th Cir. 2015).

A law that prohibits publishing books, for example, does not become more tolerable if it accomplishes that end by banning entering a contract to "purchas[e] or us[e] ink." *Sorrell*, 564 U.S. at 571. So too with a law that precludes people from reading the Miami Herald by banning users from creating accounts on miamiherald.com. Just as with library cards, newspaper subscriptions, or any other so-called "conduct" necessary to access speech, people create the accounts HB3 targets to access websites "where they can speak and listen." *Packingham*, 582 U.S. at 104. Divorcing the act of creating an account from the intended objective of using the service is akin to trying to distinguish the act of purchasing a book from the intended objective of reading it. *See Brown*, 564 U.S. at 792 n.1; *Yost*, 778 F.Supp.3d at 948.

By Florida's logic, California could have evaded First Amendment scrutiny in *Brown* by insisting that the law restricted only the "commercial activity" of "entering into a contract" for the sale or rental of video games. Fla.Br.28, 33. But the Supreme Court squarely rejected the "distinction" between "the sale or rental" of video games and "the creation or possession" of them, since that "would make permissible the prohibition of printing or selling books—though not the writing of them." *Brown*, 564 U.S. at 792 n.1. When it comes to the First Amendment, "[w]hether government

regulation applies to creating, distributing, or consuming speech makes no difference." *Id.*[4] By the same token, it makes no difference whether the state restricts engaging in speech or accomplishes the same end by restricting access to mediums for speech. The First Amendment applies just the same.

That is precisely why the Supreme Court held that when the government restricts access to "social media," it "prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham*, 582 U.S. at 108. It did so, moreover, while reversing a decision holding that a statute prohibiting sex offenders from "access[ing] certain carefully-defined Web sites" was "a regulation of conduct," not speech. *State v. Packingham*, 368 N.C. 380, 386 (2015). Florida tries to distinguish *Packingham* on the ground that HB3 restricts only *creating accounts* on "social media," not "accessing" services altogether. Fla.Br.30. But it is blackletter law that "burden[s]" on protected speech trigger First Amendment scrutiny just as much as "bans." *Sorrell*, 564 U.S. at 565-66; *see also FSC*, 145 S.Ct. at 2309. And while Florida notes that users can still engage in *some* activity on *some*

---

[4] Florida's suggestion that the First Amendment is inapplicable because it is purportedly not "necessary" for covered services to "require contracts" for accounts, Fla.Br.30.n.20, "would, if accepted, eviscerate established First Amendment precedent," PI.Op.32.n.17. It was not "necessary" for the video game creators in *Brown* to profit from their games. But choosing to sell their games for profit (rather than giving them away for free) "does not vitiate … First Amendment rights." *Yost*, 778 F.Supp.3d at 949.

websites without an account, it does not dispute that many forms of interaction on "social media" can happen *only* with an account. After all, people do not just use "social media" to browse content anonymously. They use it to engage in *social* interaction possible only with an account—e.g., commenting on a friend's Instagram post or sending videos to classmates on Snapchat.

Florida invokes laws that prohibit minors from entering establishments that serve alcohol. Fla.Br.32. But there is an obvious difference between laws that restrict access to bars and casinos and laws that restrict access to websites that "[a]llow[] users to upload content or view the content or activity of other users," §501.1736(1)(e)—i.e., websites dedicated to *speech.* The government has reasons "unrelated to the suppression of free speech" to limit access to alcohol establishments. *FSC*, 145 S.Ct. at 2317. Such laws principally regulate the non-speech activity of drinking alcohol; any impact on speech inside those premises is merely "incidental." *See Indigo Room v. Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013). Here, by contrast, HB3 directly regulates the means by which users access and engage in protected expression. The burdens on speech are anything but incidental. As the district court put it, "a more apt analogy to the law at issue here would be one that prohibited youth from entering an alcoholic beverage establishment only if that establishment also hosted open-mic nights. That would clearly implicate the First Amendment." PI.Op.33.

The Supreme Court's recent decision in *FSC* confirms that HB3 triggers heightened scrutiny. The Texas law at issue there required "proof of age to access content that is obscene to minors." 145 S.Ct. at 2309. Because the statute "[o]n its face … regulate[d] only speech that is obscene to minors," the burden on the constitutional rights of adults to access that speech was "only incidental to the statute's regulation of activity that is not protected by the First Amendment." *Id.* Even so, the Court held that the law triggered heightened scrutiny because of "the incidental burden that age verification necessarily has on an adult's First Amendment right to access [that] speech," squarely rejecting Texas' argument that "only rational-basis review applies." *Id.* at 2316. If the age-verification requirement in *FSC* (which "only incidental[ly]" burdened First Amendment activity that was protected only as to adults) triggers heightened scrutiny, then HB3's account-creation ban and parental consent requirement (which directly restricts access to First Amendment activity that is protected for adults and minors alike) triggers heightened scrutiny *a fortiori*.

*TikTok v. Garland*, 604 U.S. 56 (2025), does not suggest otherwise. The Court did not hold that the First Amendment did not apply there—it assumed that it did. *Id.* at 68-69. And the "unique" law at issue there is nothing like HB3. *Id.* It did not prohibit users from accessing or creating accounts on TikTok. It prohibited the distribution of a "foreign adversary controlled application." *Id.* at 65-66. In other words, the law principally regulated TikTok's "corporate control." *Id.* at 68. True,

37

the law may ultimately cause TikTok to shutter if it cannot find a buyer. But that is an incidental effect of the prohibition on foreign-adversary ownership, not a direct regulation of speech. Florida's reliance on *Arcara v. Cloud Books*, 478 U.S. 697 (1986), fails for similar reasons. There, New York applied a generally applicable law banning prostitution to shut down an adult bookstore where prostitution was commonplace. Doing so did not violate the First Amendment because the law regulated non-expressive conduct (prostitution) and impacted speech (by forcing the bookstore to close) only incidentally. *Id.* at 707.

Nor can Florida evade First Amendment scrutiny by insisting that HB3's restrictions apply only when a website chooses "to use the [targeted] features." Fla.Br.31, 38-39. Restricting access to speech forums that use certain features to disseminate speech is still a restriction on speech. Indeed, it is a restriction on speech twice over since a website's choices about how to "organiz[e] and present[]" collections of "third-party speech" are just as much protected "expressive activity," as decisions to separate a long story into chapter books or to end episodes with cliffhangers. *Moody*, 603 U.S. at 731-32. By Florida's logic, states could restrict access to MiamiHerald.com because it utilizes so-called "addictive features" like seamless pagination, push notifications, and autoplay without even triggering First Amendment scrutiny.

Florida does not grapple with the implications of its position. It instead proffers an absurd consequences argument of its own, insisting that HB3 is "no different" from a law "prohibiting children from subscribing to newspapers that use an ink known to cause cancer." Fla.Br.34. According to the state, such a law "would not trigger First Amendment scrutiny because its focus is toxic ink, not expression." *Id.* But the more apt analogy to HB3 would be a law that banned minors alone from subscribing to publications only if they *both* use toxic ink *and* are especially popular with minors, while leaving minors who preferred other publications (not to mention adults) wholly unprotected from toxic exposure. Florida, of course, would never do that—because rational governments address harmful substances by banning the substance, not by restricting access to only a subset of speech services that use it. Florida's hypothetical of "a newspaper lac[ing] its pages with LSD to hook children," CA11.Dkt.15 at 7, suffers from the same problem: While a ban on lacing *any* products with LSD undoubtedly would survive any constitutional scrutiny it may trigger, it is hard to see how a rational government would address concerns with LSD-lacing by banning that non-speech conduct only as to especially popular children's books. The state's hypothetical thus succeeds only in underscoring yet again why the so-called "'addictive features' targeted by Florida's law are inextricable from speech." PI.Op.33.n.19.

2. Florida's efforts to survive intermediate scrutiny fare no better. It argues that the district court misapplied intermediate scrutiny under *TikTok* and *FSC*, but the laws in those cases were far more tailored than HB3. In *TikTok*, the government sought to "prevent[] a foreign adversary from collecting vast swaths of sensitive data" about U.S. users. 604 U.S. at 76. Its chosen means were not "substantially broader than necessary to achieve" that "national security objective," since the "prohibitions prevent China from gathering data from U.S. TikTok users unless and until a qualified divestiture severs China's control." *Id.* at 77. In *FSC*, Texas sought to protect minors from "content that is *obscene* to [them]," and it chose a legislative solution (requiring "proof of age to access content that is obscene to minors") that targeted only websites with a substantial amount of that unprotected content. 145 S.Ct. at 2309, 2318.

HB3, by contrast, restricts minors from creating accounts on "social media" websites that are chock full of constitutionally protected content regardless of whether minors "are 'addicted' or because they simply wish[] to engage with speech for more than two hours per day." PI.Op.48. HB3, for instance, would completely bar a 13-year-old from creating an account on YouTube to participate in online church services, even if she barely uses YouTube otherwise. And it would require a 14-year-old to obtain parental consent before sharing videos of his school project on Snapchat, regardless of whether he is "addicted" to that service. Florida never

bothers to explain how restricting access in those circumstances is necessary to prevent "addiction." HB3 thus burdens "substantially more speech than necessary to further" Florida's interests. *FSC*, 145 S.Ct. at 2302.

Florida criticizes the district court for "parad[ing] a series of alternatives" and "displac[ing] the [Legislature's] judgment" for its own. Fla.Br.39 (citing *TikTok*, 604 U.S. at 78). But under intermediate scrutiny, the state bears the burden of showing that its chosen means are "not substantially broader than necessary to achieve the government's interest," *TikTok*, 604 U.S. at 77, and that "alternative measures that burden substantially less speech would fail," *McCullen*, 573 U.S. at 495. Florida barely tried to make that showing below. For good reason. HB3 contains no factual findings suggesting that "alternative measures … would fail." *Id.*; *see also TikTok*, 604 U.S. at 78 (noting that the government's chosen means should be "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination"). Florida's own expert admitted that he had no data to support that proposition and was instead just speculating about how often (if at all) minors circumvent parental controls. D.Ct.Dkt.63-2 at 211:1-219:10.[5] Florida, moreover, requires its own schools to use those same tools to restrict access to "social media"

---

[5] Florida's other expert apparently uses those same tools when it comes to protecting her own children from the allegedly harmful effects of social media. *See* C. Pearson, *She Started the Debate About Kids and Phones. Now She Wants to End It.*, N.Y. Times (Sept. 6, 2025), https://perma.cc/A5GD-CJMT.

while minors are at school, which it presumably would not do if it truly considered them ineffective.  *See supra* p.32.  And the state has no answer to the reality that HB3 adopts exactly the sort of "prophylaxis-upon-prophylaxis approach" that flunks intermediate scrutiny.  *See supra* pp.32-33.

3. Finally, Florida argues that even if it is facially unconstitutional to require 14- and 15-year-olds to obtain parental consent before creating accounts on "social media" websites, Plaintiffs failed to demonstrate that it is facially unconstitutional to ban minors under 14 from doing so.  Fla.Br.41-45.  According to Florida, the account-creation ban can constitutionally apply to children of "tender years" even if it may be unconstitutional as to 13-year-olds.  Fla.Br.41-42.  Florida never explains what it means by "tender years."  Fla.Br.44.  Nor does it suggest that some substantial number of five-year-olds are creating accounts on "social media" services.[6]  If that were truly Florida's concern, then it should have tailored its law accordingly.  That HB3 treats thirteen-year-olds the same as five-year-olds just underscores that it is not remotely tailored to achieve the state's interests.  And far from saving a speech

---

[6] Even assuming they were, Florida does not explain why five-year-olds have less of a First Amendment interest in viewing content on YouTube Kids than teens have in sharing photographs on Snapchat.  It instead argues only that "history and tradition" support its position because *all* children lacked legal rights "[a]t the Founding."  Fla.Br.43 (citing *Brown*, 564 U.S. at 826 (Thomas, J., dissenting)).  While that was certainly "Justice Thomas's view in *Brown*," that is "not" the "law of the land."  *NetChoice v. Fitch*, 134 F.4th 799, 810 (5th Cir. 2025) (Ho, J., concurring in judgment).

restriction from facial invalidation, insufficient tailoring necessitates it. *See Brown*, 564 U.S. at 804-05.[7]

## II. Florida's Threshold Arguments Lack Merit.

### A. Plaintiffs May Assert the First Amendment Rights of Their Members' Users.

1. Florida insists that, though Plaintiffs have Article III standing to bring this lawsuit, they lack "prudential standing" to assert the First Amendment rights of their members' users. Fla.Br.18-23. Every court that has considered that argument has rejected it. *E.g., Fitch*, 134 F.4th at 805-07; *Paxton*, 747 F.Supp.3d at 1031; *Yost*, 778 F.Supp.3d at 942-43; *NetChoice v. Griffin*, 2023 WL 5660155, at *10 (W.D. Ark. Aug. 31, 2023). Rightly so. Decades of precedent forecloses it.

Start with *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988). There, several organizations of booksellers and two bookstores brought a pre-enforcement First Amendment challenge to a Virginia statute that made it unlawful for booksellers to knowingly display explicit material to minors. *Id.* at 387-88 & n.3. Virginia argued that the plaintiffs lacked standing to bring their First Amendment challenge because they asserted only the "rights of bookbuyers." *Id.* at 392-93. The Supreme Court disagreed. While "the usual rule is that a party may

---

[7] Florida's argument that Plaintiffs "did 'not even attempt'" to show that HB3 is facially unconstitutional is puzzling, as it acknowledges in the very next sentence that Plaintiffs argued below (as they continue to do now) that HB3 is unconstitutional in all its applications. Fla.Br.45.

assert only a violation of its own rights," in "the First Amendment context '[l]itigants … are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Id.* The Court therefore had no problem with the booksellers' associations or bookstores "alleg[ing] an infringement of the First Amendment rights of bookbuyers." *Id.* at 388 n.3, 393 & n.6.

*American Booksellers* hardly stands alone. The plaintiffs in *Brown* were organizations that represented the video game and software industries, not minors asserting a First Amendment right to purchase video games without their parents' consent. 564 U.S. at 789-90. Although the Court did not specifically address standing, it allowed the association plaintiffs to assert the First Amendment rights of minors and repeatedly emphasized their rights in striking down California's law. *Id.* at 795 n.3, 805; *see, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 252-53 (2002) (emphasizing "the rights of adults" to receive speech even though plaintiffs were publishers, not consumers, of adult-oriented materials); *Playboy*, 529 U.S. at 811 (2000) (similar).

Even outside the First Amendment context, the Court has repeatedly held that plaintiffs have "standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation

of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); *see Craig v. Boren*, 429 U.S. 190, 195 (1976); *Mata Chorwadi v. Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023). In *Craig*, for example, the Court held that a beer vendor had standing to assert the equal-protection rights of her underage male customers in a challenge to the constitutionality of an Oklahoma statute that prohibited the sale of 3.2% beer to men under 21 and women under 18. The Court explained that the vendor was "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force." *Id.* at 195; *see also, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977). The same reasoning applies here. HB3 directly regulates Plaintiffs' members, so their own standing is indisputable. And the "threatened imposition of governmental sanctions" will require them to restrict prospective users from accessing their services, thereby "result[ing] indirectly in the violation of third parties' rights." *Craig*, 429 U.S. at 195. Plaintiffs' members may therefore "act[] as advocates of the rights of third parties who seek access to their market or function." *Id.*

Florida never addresses *Craig* or the many other decisions holding that those who provide services may assert the rights of those who use them. It instead insists that Plaintiffs' members lack a sufficiently "close relationship" with their users and that there is no "'hindrance' to children 'protect[ing] [their] own' First Amendment

'interests.'" Fla.Br.19-20 (quoting *Kowalski*, 543 U.S. at 130). That is impossible to square with *Craig* and *Carey*. Florida suggests that some minors may "like" HB3 since "many children report feeling 'manipulated' and 'addicted' by the features" it targets. Fla.Br.20. But the same could be said whenever a vendor invokes its customer's rights; some customers in *Craig* may well have approved of Oklahoma's differing age restrictions on the sale of alcohol, but that did not prevent the vendor from asserting the interests of customers who wanted to purchase beer but could not. And while Florida blithely insists that teenagers could challenge HB3 if they wanted to do so, Fla.Br.19, the same was true in *Craig*, yet the Court nevertheless held that the vendor could assert her customers' rights, 429 U.S. at 192-93.

Florida's efforts to distinguish *American Booksellers* are even less persuasive. It describes *American Booksellers* as an "overbreadth standing" case and insists that Plaintiffs cannot rely on "overbreadth standing" because HB3 "does not regulate children." Fla.Br.19, 22. But whatever Florida may mean by "overbreadth standing," Virginia's law did not regulate bookbuyers; it imposed obligations on *booksellers*. Yet the Court held that the bookseller associations could assert the rights of bookbuyers.

Florida's cases are inapposite. *Mata Chorwadi* held that a hotel lacked standing to assert its guests' First Amendment rights because enforcement of the statute against the hotel was unlikely to implicate those rights. 66 F.4th at 1265.

46

Here, by contrast, enforcement of HB3 against Plaintiffs' members will unquestionably restrict the First Amendment rights of their users; indeed, that is the whole point. *Kowalski* involved an attempt to assert the equal protection and due process rights of third parties to challenge a statute that directly regulated those third parties, not the plaintiff. 543 U.S. at 127-28; *see also CAMP Legal Def. Fund v. Atlanta*, 451 F.3d 1257, 1263 (11th Cir. 2006) (similar); *Harris v. Evans*, 20 F.3d 1118, 1120-21 (11th Cir. 1994) (en banc) (similar). In that context, it makes sense to ask whether anything hindered the third parties from asserting their own rights; after all, they are the ones directly regulated. But as *Kowalski* itself recognized, requiring third parties to sue makes much less sense when "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." 543 U.S. at 130; *accord Mata Chorwadi*, 66 F.4th at 1265. As for *Young Apartments v. Jupiter*, that case reversed a decision finding that landlords lacked standing to assert the equal protection rights of their tenants. 529 F.3d 1027, 1043 (11th Cir. 2008). How that decision helps the state, it does not explain.

Florida argues that even if Plaintiffs' *members* may assert their users' First Amendment rights, Plaintiffs may not. Wrong again. *See Fitch*, 134 F.4th at 805-06. An organization with associational standing "assert[s] the claims of its members" and stands in their stead. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). To the extent the organization's members may assert their

users' rights, the organization may too. In *American Booksellers*, for example, the Supreme Court held that the bookseller associations could "allege[] an infringement of the First Amendment rights of bookbuyers." 484 U.S. at 388 n.3, 393 & n.6. Likewise, in *Brown*, the Court did not dispute that organizations that represented the video game and software industries could assert the First Amendment rights of minors to purchase violent video games without their parents' consent. 564 U.S. at 789; *see also Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 292 (3d Cir. 2002); *Ohio Ass'n of Indep. Schs. v. Goff*, 92 F.3d 419, 421-22 (6th Cir. 1996); *Fraternal Ord. of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998), *on reh'g*, 173 F.3d 898, 903 (D.C. Cir. 1999) (standing analysis "unchanged from our prior opinion"). It is thus unsurprising that courts have repeatedly and resoundingly rejected the notion that Plaintiffs cannot assert the First Amendment rights of their members' users. *See Fitch*, 134 F.4th at 805-06; *Griffin*, 2023 WL 5660155, at *12; *Yost*, 778 F.Supp.3d at 946; *Paxton*, 747 F.Supp.3d at 1030-31. Florida offers no good reason to depart from that consensus.

## B. The District Court Did Not Abuse Its Discretion by Declining to Abstain.

Florida's abstention argument is meritless. For starters, there is no longer any state judicial proceeding to which the district court could defer. While Florida initially filed its enforcement action against Snap in state court (months after Plaintiffs filed this lawsuit), Snap promptly removed the case to federal court. And

although Florida moved to remand the case to state court, the district court denied its motion, *see supra* n.2, so the state's enforcement action against Snap will remain in federal court for the foreseeable future. Because no ongoing state judicial proceeding exists, there is no basis to abstain from resolving this lawsuit. The "comity" and "federalism" concerns that undergird *Younger* do not require federal courts to abstain in favor of another proceeding in *federal* court, 401 U.S. at 44-45, which is why courts across the country have declined to abstain in similar situations. *See, e.g.*, *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs.*, 77 F.3d 1063, 1071 (8th Cir. 1996); *IndyMac Venture v. Silver Creek Crossing*, 2009 WL 3698513, at *2 (W.D. Wash. Nov. 3, 2009); *cf. Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 783 (7th Cir. 2008).

But even setting that aside, *Younger* abstention is generally appropriate only when the state-court lawsuit is filed first, *Tokyo Gwinnett v. Gwinnett Cnty.*, 940 F.3d 1254, 1266-67 (11th Cir. 2019), which is not the case here. The narrow exception Florida invokes is limited to instances when the first-in-time federal action has not "moved beyond the 'embryonic stage.'" *Id.* at 1271. To assess whether a first-in-time federal action is in its "embryonic stage," "courts look to 'the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences [or hearings] held, and any change in the parties' position as a result of the federal litigation,'" as well as "the filing of motions, even if the

district court did not rule on the motions." *Id.* at 1267, 1272. A district court's assessment of whether those factors warrant abstention is left to its sound discretion. *Id.* at 1266.

The district court acted well within that discretion in declining to abstain here. Plaintiffs filed this lawsuit in October 2024. The parties briefed, and the court resolved, two motions, both involving significant discussion of Plaintiffs' claims. D.Ct.Dkts.4-5, 51, 63; D.Ct.Dkts.50, 62, 66. Plaintiffs then filed an amended complaint, D.Ct.Dkt.74, and the parties completed briefing on a third motion, which again involved substantial argument on the merits of Plaintiffs' First Amendment claim. D.Ct.Dkts.75-76, 87. And that is to say nothing of the substantial discovery on the merits of Plaintiffs' First Amendment claim in which the parties have engaged—all at the *state's* insistence, no less.[8] The court imposed no limits on the list of topics Florida could explore, D.Ct.Dkt.35 at 3, and Florida took full advantage in deposing each of Plaintiffs' declarants (twice), D.Ct.Dkts.51-4 to -7. Florida produced three experts, which Plaintiffs likewise deposed. D.Ct.Dkts.63-1 to -3.

---

[8] Florida does not meaningfully dispute that much of that discovery involved the merits. *See* D.Ct.Dkt.115 at 8. It nevertheless suggests that none of it is relevant to the abstention analysis because it was conducted at the preliminary-injunction stage. Fla.Br.25. But Florida never explains why that matters, particularly when (as here) that discovery far exceeded the merits-stage discovery that other courts needed to *permanently* enjoin similar laws. *See NetChoice v. Griffin*, 2024 WL 1262476, at *4 (W.D. Ark. 2024) (ordering "minimal discovery" into just eight topics); *Yost*, 778 F.Supp.3d at 935, 959 (permanently enjoining Ohio law after no discovery).

And the parties exchanged initial disclosures, a first round of interrogatories, requests for admission, and requests for production and responses to the same. D.Ct.Dkts.47, 61 at 1-2. On top of all that, the court held multiple conferences and a lengthy hearing on Plaintiffs' claims, which included consideration of both the law and the evidence. D.Ct.Dkt.70.

To put it mildly, both parties have done far more than just "beg[i]n actively litigating [their] position[s] in federal court." *For Your Eyes Alone v. Columbus*, 281 F.3d 1209, 1218 (11th Cir. 2002). This action thus fits comfortably within the long line of cases that have rejected requests to abstain from resolving a first-in-time federal suit. *See Tokyo*, 940 F.3d at 1272 (no abstention when plaintiff had filed a complaint and an amended complaint, and parties had briefed a motion to dismiss and filed initial disclosures); *For Your Eyes*, 281 F.3d at 1213-14, 1220 (no abstention when parties were in the midst of briefing two motions on the merits and court had resolved a motion for a temporary restraining order after an evidentiary hearing).

Florida insists that no "proceedings of substance on the merits" had occurred before the second preliminary-injunction motion because this Court resolved the parties' first two motions on standing grounds. Fla.Br.24. But that was also the case in *Tokyo*. The district court twice granted motions to dismiss on jurisdictional grounds, first finding the matter moot, and then finding that the plaintiff lacked

standing to assert certain claims. Yet this Court held that the district court abused its discretion by abstaining. 940 F.3d at 1259-61, 1272. As the Court explained, the evidence the parties presented in connection with a request for a temporary restraining order, the briefing on a motion to dismiss, and the filing of initial disclosures all demonstrated that the first-in-time federal action had proceeded far beyond the nascent stage that might justify deferring to a second-in-time state action. *Id.* at 1272. This case follows *a fortiori*.

Florida's cases do not aid its cause. Some do not involve a first-in-time federal suit. *See 31 Foster Children v. Bush*, 329 F.3d 1255, 1275 (11th Cir. 2003); *JMM v. D.C.*, 378 F.3d 1117, 1126 (D.C. Cir. 2004). And the rest involve federal suits that had barely progressed beyond their filing. *See Hicks v. Miranda*, 422 U.S. 332, 348-49 (1975) (finding abstention warranted when state action was filed one day after federal complaint was served); *New Ga. Project v. Att'y Gen.*, 106 F.4th 1237, 1240, 1244 (11th Cir. 2024) (finding abstention proper where state campaign finance commission had recommended the attorney general initiate a prosecution four weeks before the federal lawsuit was filed, and no briefing had been completed on any motion in federal court). Here, by contrast, the only thing nascent is the state's late-breaking enforcement action. Put simply, there is no reason to abandon the federal courts' "virtually unflagging obligation to exercise … jurisdiction." *Tokyo*, 940 F.3d at 1266-67.

That is all the more true because the state-court proceeding appears to have been initiated in an attempt to "strategically seek[] to evade federal-court jurisdiction." *New Ga.*, 106 F.4th at 1245-46. After persuading the court to deny Plaintiffs' initial preliminary-injunction motion on the theory that it was unclear whether HB3 covered any of Plaintiffs' members, Florida turned around and used the more detailed declaration it forced Plaintiffs to file as evidence in a state-court enforcement action against Snap under HB3. D.Ct.Dkt.86-1.¶¶47, 139-41. And Florida filed that action mere hours before responding to Plaintiffs' renewed motion, for the evident purpose of enabling it to make a late-breaking abstention request. While the district court declined to find that Florida acted in "bad faith," *see* PI.Op.12.n.5, Florida's actions appear to be (at a minimum) a "strategic[] [attempt] to evade federal-court jurisdiction," *New Ga.*, 106 F.4th at 1246. To reward its tactics with abstention would "turn federalism on its head," *Steffel v. Thompson*, 415 U.S. 452, 472 (1974).

## III. Florida's Scope Of Relief Argument Lacks Merit.

Finally, Florida argues that the Court should limit injunctive relief to Snap because "Snap is the only member for whom [Plaintiffs] established a justiciable injury." Fla.Br.46. That is wrong on both the facts and law. On the facts, Plaintiffs have shown an injury-in-fact as to YouTube and Meta too. YouTube's declarant explains why YouTube likely meets the law's thresholds. Veitch.Decl.¶10. Both

CCIA's and NetChoice's declarants likewise explain why Facebook and Instagram likely meet that threshold. Schruers.Decl.¶6; Cleland.Decl.¶23. Florida, moreover, would not be urging this Court to let it enforce HB3 against other members if it did not think any other members were covered. In fact, it takes remarkable chutzpah for Florida to continue to insist that Plaintiffs have not shown that Meta faces a "credible threat of enforcement" under HB3 when it informed the district court that it is considering bringing an imminent enforcement action against Meta under HB3. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014); D.Ct.Dkt.82 at 9-13.

Florida's argument is also wrong on the law. If this Court agrees that HB3 likely violates the First Amendment, then HB3 cannot constitutionally be enforced against *any* of Plaintiffs' members' services, be it YouTube, Instagram, or Snapchat. Florida's contrary argument runs headlong into precedent. In *Speech First v. Cartwright*, for example, this Court reversed the denial of a preliminary injunction and ordered that the entire policy be enjoined to the benefit of *all* the association's members, even though only three submitted declarations in the district court demonstrating injury. 32 F.4th 1110, 1129 (11th Cir. 2022); *see Am. All. for Equal Rts. v. Fearless Fund Mgmt.*, 103 F.4th 765, 780 (11th Cir. 2024) (similar). And courts across the country have enjoined laws like HB3 without limiting relief to those members that submitted declarations. *E.g.*, *Griffin*, 2025 WL 978607, at *17; *Yost*, 778 F.Supp.3d at 959. Florida's invitation to depart from that consensus is a

not-so-thinly-veiled attack on long-settled associational standing principles that the Supreme Court has not seen fit to revisit. *See Trump v. CASA*, 145 S.Ct. 2540, 2549 n.2 (2025). There is simply no basis for allowing Florida to continue to enforce its unconstitutional law against *any* of Plaintiffs' members.[9]

## CONCLUSION

The Court should affirm.

Respectfully submitted,

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

September 12, 2025

---

[9] Plaintiffs do not object if this Court wishes to clarify that the preliminary injunction applies only to Plaintiffs' members.

**CERTIFICATE OF COMPLIANCE**

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.


September 12, 2025

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy

# ADDENDUM

# TABLE OF CONTENTS

Fla. Stat. §501.1736 ................................................................1a

# Fla. Stat. §501.1736. Social media use for minors

(1) As used in this section, the term:

(a) "Account holder" means a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state.

(b) "Daily active users" means the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous 12 months, or, if the online forum, website, or application did not exist during the previous 12 months, the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous month.

(c) "Department" means the Department of Legal Affairs.

(d) "Resident" means a person who lives in this state for more than 6 months of the year.

(e) "Social media platform" means an online forum, website, or application that satisfies each of the following criteria:

1. Allows users to upload content or view the content or activity of other users;

2. Ten percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the online forum, website, or application on the days when using the online forum, website, or application during the previous 12 months or, if the online forum, website, or application did not exist during the previous 12 months, during the previous month;

3. Employs algorithms that analyze user data or information on users to select content for users; and

4. Has any of the following addictive features:

a. Infinite scrolling, which means either:

(I) Continuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page; or

(II) Seamless content, or the use of pages with no visible or apparent end or page breaks.

b. Push notifications or alerts sent by the online forum, website, or application to inform a user about specific activities or events related to the user's account.

c. Displays personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content.

d. Auto-play video or video that begins to play without the user first clicking on the video or on a play button for that video.

e. Live-streaming or a function that allows a user or advertiser to broadcast live video content in real-time.

The term does not include an online service, website, or application where the exclusive function is e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender.

(2)(a) A social media platform shall prohibit a minor who is younger than 14 years of age from entering into a contract with a social media platform to become an account holder.

(b) A social media platform shall:

1. Terminate any account held by an account holder younger than 14 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.

2. Allow an account holder younger than 14 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3.  Allow the confirmed parent or guardian of an account holder younger than 14 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

4.  Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

(3)(a) A social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent for the minor to become an account holder.

(b)  A social media platform shall:

1.  Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account. The social media platform shall provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.

2.  Allow an account holder who is 14 or 15 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3.  Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

4.  Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

(4) If a court enjoins the enforcement of subsection (3) or would otherwise enjoin enforcement of any other provision of this section due to subsection (3), then subsection (3) shall be severed, and the following shall come into effect:

(a) A social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder.

(b) A social media platform shall:

1. Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of 90 days if the account holder fails to effectively dispute the termination.

2. Allow an account holder who is 14 or 15 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3. Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

4. Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

(5) Any knowing or reckless violation of subsection (2), subsection (3), or, if in effect, subsection (4) is deemed an unfair and deceptive trade practice actionable under part II of this chapter solely by the department against a social media platform. If the department has reason to believe that a social media platform is in violation of subsection (2), subsection (3), or, if in effect, subsection (4), the department, as the enforcing authority, may bring an action against such platform for an unfair or deceptive act or practice. For the purpose of bringing an action pursuant to this section, ss. 501.211 and 501.212 do not apply. In addition to other remedies under part II of this chapter, the department may collect a civil penalty of up to $50,000 per violation and reasonable attorney fees and court costs. When the social media platform's failure to comply with subsection (2), subsection (3), or, if in effect, subsection (4) is a consistent pattern of knowing or reckless conduct, punitive damages may be assessed against the social media platform.

(6)(a) A social media platform that knowingly or recklessly violates subsection (2), subsection (3), or, if in effect, subsection (4) is liable to the minor account holder,

including court costs and reasonable attorney fees as ordered by the court. Claimants may be awarded up to $10,000 in damages.

(b) A civil action for a claim under this subsection must be brought within 1 year from the date the complainant knew, or reasonably should have known, of the alleged violation.

(c) Any action brought under this subsection may only be brought on behalf of a minor account holder.

(7) For purposes of bringing an action under this section, a social media platform that allows a minor account holder younger than 14 years of age or a minor account holder who is 14 or 15 years of age to create an account on such platform is considered to be both engaged in substantial and not isolated activities within this state and operating, conducting, engaging in, or carrying on a business and doing business in this state, and is therefore subject to the jurisdiction of the courts of this state.

(8) If a social media platform allows an account holder to use the social media platform, the parties have entered into a contract.

(9) This section does not preclude any other available remedy at law or equity.

(10)(a) If, by its own inquiry or as a result of complaints, the department has reason to believe that an entity or person has engaged in, or is engaging in, an act or practice that violates this section, the department may administer oaths and affirmations, subpoena witnesses or matter, and collect evidence. Within 5 days, excluding weekends and legal holidays, after the service of a subpoena or at any time before the return date specified therein, whichever is longer, the party served may file in the circuit court in the county in which it resides or in which it transacts business and serve upon the enforcing authority a petition for an order modifying or setting aside the subpoena. The petitioner may raise any objection or privilege which would be available upon service of such subpoena in a civil action. The subpoena shall inform the party served of its rights under this subsection.

(b) If the matter that the department seeks to obtain by subpoena is located outside the state, the entity or person subpoenaed may make it available to the department or its representative to examine the matter at the place where it is located. The department may designate representatives, including officials of the state in which the matter is located, to inspect the matter on its behalf and may respond to similar requests from officials of other states.

(c)  Upon failure of an entity or person without lawful excuse to obey a subpoena and upon reasonable notice to all persons affected, the department may apply to the circuit court for an order compelling compliance.

(d)  The department may request that an entity or person that refuses to comply with a subpoena on the ground that testimony or matter may incriminate the entity or person be ordered by the court to provide the testimony or matter. Except in a prosecution for perjury, an entity or individual that complies with a court order to provide testimony or matter after asserting a valid privilege against self-incrimination shall not have the testimony or matter so provided, or evidence derived therefrom, received against the entity or person in any criminal investigation or proceeding.

(e)  Any entity or person upon whom a subpoena is served pursuant to this section shall comply with the terms thereof unless otherwise provided by order of the court. Any entity or person that fails to appear with the intent to avoid, evade, or prevent compliance in whole or in part with any investigation under this part or who removes from any place, conceals, withholds, mutilates, alters, or destroys, or by any other means falsifies any documentary material in the possession, custody, or control of any entity or person subject to any such subpoena, or knowingly conceals any relevant information with the intent to avoid, evade, or prevent compliance shall be liable for a civil penalty of not more than $5,000 per week in violation, reasonable attorney fees, and costs.

<Subsec. (11) expires by its own terms on Oct. 2, 2029.>

(11)(a) All information held by the department pursuant to a notification of a violation of this section or an investigation of a violation of this section is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution, until such time as the investigation is completed or ceases to be active. This exemption shall be construed in conformity with s. 119.071(2)(c).

(b)  During an active investigation, information made confidential and exempt pursuant to paragraph (a) may be disclosed by the department:

1.  In the furtherance of its official duties and responsibilities;

2.  For print, publication, or broadcast if the department determines that such release would assist in notifying the public or locating or identifying a person that the department believes to be a victim of an improper use or disposal of customer records, except that information made confidential and exempt by paragraph (c) may not be released pursuant to this subparagraph; or

3. To another governmental entity in the furtherance of its official duties and responsibilities.

(c) Upon completion of an investigation or once an investigation ceases to be active, the following information held by the department shall remain confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution:

1. Information that is otherwise confidential or exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution.

2. Personal identifying information.

3. A computer forensic report.

4. Information that would otherwise reveal weaknesses in the data security of a social media platform.

5. Information that would disclose the proprietary information of a social media platform.

(d) For purposes of this section, the term "proprietary information" means information that:

1. Is owned or controlled by the social media platform.

2. Is intended to be private and is treated by the social media platform as private because disclosure would harm the social media platform or its business operations.

3. Has not been disclosed except as required by law or a private agreement that provides that the information will not be released to the public.

4. Is not publicly available or otherwise readily ascertainable through proper means from another source in the same configuration as received by the department.

5. Reveals competitive interests, the disclosure of which would impair the competitive advantage of the social media platform that is the subject of the information.

(e)  This subsection is subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2029, unless reviewed and saved from repeal through reenactment by the Legislature.

(12) The department may adopt rules to implement this section.