**No. 25-11881**

**UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

————————————

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION; NETCHOICE,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant*.

————————————

On Appeal from the United States District
Court for the Northern District of Florida,
4:24-cv-00438

————————————

**SUPPLEMENTAL APPENDIX**

————————————

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
JAMES Y. XI
MITCHELL K. PALLAKI
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiffs-Appellees*

September 12, 2025

# INDEX TO EXCERPTS OF RECORD

Docket/Tab #

Declaration of David Boyle in Support of Plaintiffs' Renewed
Motion for Preliminary Injunction............................................................    76-1

Declaration of Matthew Schruers in Support of Plaintiffs'
Renewed Motion for Preliminary Injunction.............................................    76-2

Declaration of Bartlett Cleland in Support of Plaintiffs'
Renewed Motion for Preliminary Injunction.............................................    76-3

Declaration of Alexandra N. Veitch in Support of Plaintiffs'
Renewed Motion for Preliminary Injunction.............................................    76-4

Excerpts from the Transcript of the Deposition of Tony Allen..................    63-2

**TAB 76-1**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

<table>
<tr>
<td>
COMPUTER & COMMUNICATIONS<br>
INDUSTRY ASSOCIATION and<br>
NETCHOICE,<br>
<br>
      *Plaintiffs*,<br>
<br>
      v.<br>
<br>
JAMES UTHMEIER, in his official<br>
capacity as Attorney General of the<br>
State of Florida,<br>
<br>
      *Defendant*.
</td>
<td>
Case No. 4:24-cv-00438-MW-MAF
</td>
</tr>
</table>

## DECLARATION OF DAVID BOYLE IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

SA2

I, David Boyle, declare as follows

1.    I am over 18 years of age and am competent in all respects to make this Declaration.

2.    I am currently employed as Senior Director, Product at Snap Inc. ("Snap"). I have held this role since 2018. I make this declaration based on personal knowledge including information and belief obtained from performing my job duties in the ordinary course of business.

3.    Snap's flagship application is Snapchat, a camera and communications service that allows users to communicate with friends and family using text, audio and video calls, photos, and short videos. Snapchat is typically used for direct, private communications between small groups of people who already know each other in real life. By default, friendship and the ability to communicate on Snapchat must be "bidirectional," meaning that two users cannot communicate with one another unless both parties have requested and/or agreed to accept the other as a friend or both users have each other in their contact books.

4.    Snapchat opens to the user's camera and allows the user to send texts (called "chats") and images (called "Snaps") that delete by default after being opened. This default ephemerality feature is designed to mirror real-life interactions. It affords users a digital way to show a more authentic, unpolished, and spontaneous side of themselves. Snapchat also offers users a variety of tools

1

SA3

to add effects to their photos, such as adding puppy dog ears to a face or augmented reality effects on a landmark (like rainbows coming out of the Eiffel tower). Since October 2013, users have been able to compile photos and videos into "Stories" generally available for 24-hours which, by default, are viewable only by a user's friends. Through Snapchat's "Discover" feature, users also have access to vetted content from trusted partners (e.g., NBC News). In November 2020, Snap introduced "Spotlight," a feature that allows users to make videos that anyone can view. Over 430 million people globally use Snapchat every day to communicate with friends and stay in touch.

5.    When creating an account on Snapchat, users are required to provide their date of birth, as well as to provide either an email address or phone number. Individuals under age 13 are not allowed to create an account. If Snap learns that a registered user is under 13, it takes action to terminate the account.

6.    Snap takes numerous precautions to protect minors (age 13-17) who use the service. For example, minors can only view direct messages from users with whom they are already friends on the platform or already have in their phone's contacts. Even so, whenever a teen is embarking on a 1:1 chat conversation with a friend with whom they do not share multiple mutual friends, the teen will receive an in-app warning that this person is outside the teen's network and to remind the teen to only chat with people they know and trust and

2

**SA4**

giving them the option to block the user before chatting. Snap also empowers users to report harmful images or videos, and it employs technology to identify known illegal images and videos of child sexual abuse materials, which it then reports to the relevant authority. Snap also takes steps to safeguard the mental health of its users. For instance, in 2020, Snap launched Here For You which surfaces resources from expert organizations to Snapchat users when they search for a range of mental-health related topics.

7.    In addition, Snap launched Family Center to empower parents with tools and resources to make what they believe are the right choices for their teen – based on their teen's age, maturity level, and their family values. Through Snapchat's Family Center, a parent or guardian can link their Snapchat account to their teen's account to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report suspicious accounts. Family Center is designed to mirror the oversight that parents have over their teens' actions in real life. For instance, parents typically know who their teen spends time with in-person, but they generally do not hear all the in-person conversations that their teens have with their friends.

8.    Parents and legal guardians of Snapchatters under 18 may submit privacy requests on their teen's behalf. These requests may include options to

access, download, and delete their teen's information, including the deletion of their teen's Snapchat account. The easiest way for a parent to access their teen's data would be through the Download My Data tool or, if they would like to delete their teen's account, the account deletion process. Snap's Privacy FAQ provides more information about the tools available to the Snapchat community. Snap continuously reviews its policies and procedures to ensure our community is able to submit and fulfill privacy requests.

9.      I am familiar with Florida's HB3 (the "Act") and believe that Snap is likely covered by the law.

10.      Snapchat allows users to upload content or view the content or activity of other users, as it allows users to create, upload, and share pictures and videos with other users. *See* How to Use Snapchat, https://help.snapchat.com/hc/en-us/articles/7012332815508-How-to-Use-Snapchat?

11.      During the past 12 months, 10% or more of the daily active users on Snapchat who used Snapchat at least 80 percent of the days during the previous 12 months and who are younger than 16 years of age spent on average 2 hours per day or longer on Snapchat on the days when using Snapchat.

12.      Snapchat uses algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past. *See* Snapchat Support, Personalization on Snapchat (last visited Mar. 14, 2025),

https://help.snapchat.com/hc/en-us/sections/18011205511700-Personalization-on-Snapchat.

13.     Snapchat includes at least one feature that meets the requirements of Section 501.1736(e)(4). For example, Snapchat users may enable notifications to alert them of Snaps or messages from other users. *See* Snapchat Support, Notifications (last visited Mar. 14, 2025), https://tinyurl.com/4hs56nsm.

14.     While direct messaging is one of Snapchat's primary use cases, direct messaging shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender, is not Snapchat's exclusive function.

15.     Snapchat's users include minors in Florida who are 13-16 years old.

16.     Because Snapchat may be covered by the law, Snapchat has an actual and well-founded fear that HB3 may be enforced against it. Snap will need to take numerous steps to comply with the law if the Attorney General is not enjoined from enforcing it. HB3 implicates fundamental aspects of Snap's services and requires extensive modifications to Snapchat's code that would fundamentally alter the nature of those services. This includes implementing an age verification process for adults and minors alike, implementing parental identification and verifiable parental consent processes on an application or feature-by-feature basis, disabling and/or removing various features of the app

for certain minor users, and potentially requiring other changes depending on how the law is interpreted and enforced. For example, Snapchat communicates with its users via what HB3 labels "[p]ush notifications." If HB3 takes effect, Snap will be forced to choose between restricting access to its services or jettisoning those communications altogether. These changes will impede users' – minors and adults alike – access to Snap's services and their enjoyment of the ability to communicate with friends and family, and make those services less helpful to users. These changes are also costly from a monetary and privacy perspective and will require a significant amount of budget, resources, and staff investment over many months and possibly longer.

17. Conducting parental verification poses two unique challenges. First, Snap has to confirm that the person claiming to be the parent is who they claim to be. This may require collecting government-issued or other forms of identification that contain personal information. Snap typically does not collect, let alone store, more personal information about its users than necessary and does not collect government-issued or other forms of identification. Snap does not currently have a process in place to collect and verify identity through forms of government-issued identification, or otherwise verify a person's identity. Second, even if Snap could verify a person's identity, there are separate challenges with establishing whether that person is a parent or legal guardian of the minor user

6

and maintaining that information. These challenges include establishing a parent or legal guardian for minor users whose parents are not their biological parents, minor users whose parents are not their legal guardians, minor users who have different last names than their parents, or those whose parents share joint custody. Although Snap has a multi-step process set up in Family Center to establish a parent/teen association between accounts, Snap does not have a system in place to verify the familial relationship between two individuals to the specifications described in the law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 24th day of March, 2025, in Santa Monica, California.

David Boyle

———————————————

David Boyle

**TAB 76-2**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION and
NETCHOICE,

     *Plaintiffs*,

     v.

JAMES UTHMEIER, in his official
capacity as Attorney General of the State
of Florida,

     *Defendant*.

Case No. 4:24-cv-00438-MW-MAF

**DECLARATION OF MATTHEW SCHRUERS
IN SUPPORT OF PLAINTIFFS' RENEWED
MOTION FOR PRELIMINARY INJUNCTION**

1
**SA11**

I, Matthew Schruers, declare as follows:

1.     I am the President & CEO of the Computer & Communications Industry Association (CCIA).  I have worked at the organization for nearly twenty years.  Upon joining the Association, I focused on legal, legislative, and policy matters, later taking on the roles of Chief Operating Officer and President and CEO.  In each of these capacities, I have worked closely and communicated often with CCIA members regarding how public policy proposals affect their businesses, operations, and relationships with their users.  Through my experience, I have also gained familiarity with how such proposals affect all manner of websites, applications, and other digital services.[1]

2.     I previously submitted a declaration, dated October 28, 2024, in this case. I submit this declaration in support of Plaintiffs' Renewed Motion for Preliminary Injunction.  I am over the age of 18 and am competent to make the statements herein.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.   About CCIA and CCIA's Affected Members.

3.     CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet,

---

[1] This Declaration will refer to all digital services—including social media websites and applications—as "websites" unless necessary to distinguish among different kinds of digital services.

information technology, and telecommunications industries.  For more than fifty years, CCIA has promoted open markets, open systems, and open networks, and has advocated for the interests of the world's leading providers of technology products and services before governments and the courts.[2]

4.    CCIA's membership includes computer and communications companies, equipment manufacturers, software developers, service providers, and integrators, among others.[3]  I understand that a number of CCIA's members would be considered "social media platforms" under Florida House Bill 3 (HB3) including, at a minimum: (1) Google, which owns and operates YouTube; and (2) Meta, which owns and operates Facebook and Instagram.

5.    More specifically, based on my experience in the industry, my review of the declaration submitted by Alexandra Veitch on behalf of YouTube, and based on information publicly available about how YouTube's services operate, it is my understanding that one or more of YouTube's services likely meet each of the criteria to constitute a "social media platform" under HB3.    Fla. Stat. §501.1736(1)(e).

    a.    It is my understanding that because YouTube allows users to create, upload, and share videos with others, *see* YouTube Help, Upload

---

[2] CCIA, Home, https://tinyurl.com/4vd6akap (last visited Mar. 27, 2025).

[3] Currently, CCIA's members include: Amazon, Apple, Cloudflare, Coupang, Deliveroo, eBay, EchoStar, Google, Intel, Intuit, Meta, Nord Security, Opera, Pinterest, Rakuten, Shopify, Texas.net, Uber, Viagogo, Waymo, X, and Zebra.    *See* CCIA, Members, https://tinyurl.com/mvh4tv2n (last visited Mar. 27, 2025).

YouTube Videos (last visited Mar. 27, 2025), https://tinyurl.com/2fety3cv, and because YouTube Kids allows users to view content created by other users, *see* YouTube Help, YouTube Kids (last visited Mar. 27, 2025), https://tinyurl.com/yhn4aycy, YouTube constitutes a service that "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1).

b.    It is my understanding that YouTube also "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), because YouTube and YouTube Kids provide users with recommendations of videos to view that are informed by users' past interaction with content on those services.  *See* YouTube Help, Manage Your Recommendations & Search Results (last visited Mar 27, 2025), https://tinyurl.com/536r2wwu; *see also* YouTube For Families Help, Recommended Videos on YouTube Kids (last visited Mar. 27, 2025), https://tinyurl.com/mryarz36.

c.    I further understand that YouTube has what the state refers to as "addictive" features, as YouTube gives users the option to receive "[p]ush notifications," §501.1736(1)(e)(4)(b); *see* YouTube Help, Manage YouTube Notifications (last visited Mar. 27, 2025), https://tinyurl.com/3zsdfjwr, and because YouTube also displays "likes," which HB3 characterizes as

"personal interactive metrics," §501.1736(1)(e)(4)(c); *see* YouTube Help, Like or Dislike a Video (last visited Mar. 27, 2025), https://tinyurl.com/wrvf33vr.

d. I also understand that YouTube and YouTube Kids are services, whose "exclusive function" is neither "email [n]or direct messaging." §501.1736(1)(e).

e. And it is my understanding from my review of Ms. Veitch's declaration that while YouTube does not track data in the exact manner necessary to state precisely whether its services meet the hourly threshold that HB3 sets (i.e., whether 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on its services on the days when using those services, §501.1736(1)(e)(2)), there is reason to believe that, based on historical data about usage, YouTube may be covered by the Act. At the very least, there is reason to believe that Florida thinks YouTube meets HB3's hourly threshold. After all, Florida's own expert cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)," Dkt. 51-1 at ¶13, which includes survey results regarding teenagers' self-reported time using YouTube. *See* J. Rothwell, Teens Spend Average of 4.8 Hours on

Social Media Per Day (Oct. 13, 2023) (last visited Mar. 27, 2025), https://tinyurl.com/2j55rs7c. Given Florida's expert's reliance on that survey, there is reason to believe that Florida thinks YouTube meets the 10 percent threshold.

f. I further understand that YouTube has users under the age of 16 who are located in Florida. I also understand that YouTube does not prevent minors under 14 (including those who have access to YouTube's age-appropriate experiences via YouTube Kids or Supervised Experience) from accessing its services through parent-supervised accounts when YouTube has reason to believe those users are located in Florida and that YouTube does not prohibit 14- or 15-year-olds who do not have consent from a parent or guardian from creating accounts when it has reason to believe those users are located in Florida.

6. In addition, based on my experience in the industry and my review of publicly available information, I believe that Meta-owned and -operated services, Facebook and Instagram, likely satisfy each of the component parts of the definition of "social media platform." Fla. Stat. §501.1736(1)(e).

a. It is my understanding that both Facebook and Instagram "[a]llow[] users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), as both services allow users to create,

6
**SA16**

upload, and share pictures and videos with other users. *See* Facebook Help Center, Share Photos on Facebook (last visited Mar. 27, 2025), https://tinyurl.com/5jxy2hcb; Instagram Help Center, Share a Post (last visited Mar. 27, 2025), https://tinyurl.com/eaz6nwub.

b.    It is my understanding that Facebook and Instagram also both "[e]mploy[] algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), because both services use algorithms to show users content that may be particularly relevant to them based in part on their past interaction with content on the services. *See* Facebook Help Center, Learn About and Manage Suggested Content In Your Facebook Feed (last visited Mar. 27, 2025), https://tinyurl.com/yumkra7m; Instagram Help Center, How Instagram Determines Which Posts Appear As Suggested Posts (last visited Mar. 27, 2025), https://tinyurl.com/2w97sbcn.

c.    I further understand that Facebook and Instagram both have features that the state refers to as "addictive." When using these services, users can enable "[p]ush notifications," §501.1736(1)(e)(4)(b). *See* Facebook Help Center, Push, Email and Text Notifications (last visited Mar. 27, 2025), https://tinyurl.com/4965bkx8; Instagram Help Center, Notification Settings (last visited Mar. 27, 2025), https://tinyurl.com/47k8p3ce. In addition, both Facebook and Instagram

display how many other users have "liked" a given post, which meets HB3's definition of "personal interactive metrics," §501.1736(1)(e)(4)(c). *See* Facebook Help Center, Like and React to Reels and Videos on Facebook (last visited Mar. 27, 2025), https://tinyurl.com/438vek43; Instagram Help Center, Like or Unlike a Post on Instagram (last visited Mar. 27, 2025), https://tinyurl.com/mrx4w563.

d.    It is my understanding that "email [and] direct messaging" are not the "exclusive function[s]" of either Facebook or Instagram. §501.1736(1)(e).

e.    Florida's own statements regarding HB3 and its reliance on a publicly available survey data about minors' reported use of CCIA members' services leads me to conclude that there is an "actual and well-founded" basis for believing that Florida thinks that both Meta-operated services, Facebook and Instagram, meet HB3's requirement that 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on the services on the days when using those services, §501.1736(1)(e)(2), and that Florida will accordingly enforce HB3 against Meta.

f.    Indeed, officials at HB3's signing ceremony expressly identified Instagram as one of Florida's intended online services to regulate.

8
**SA18**

Press Conference at 12:30-13:00, *Governor Ron DeSantis Signs H.B.3* (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.  And that Florida believes Meta's services are covered by HB3 is further substantiated by its assertions in its briefing in this case that it has concerns about the features available on websites, such as "Facebook and Instagram."  Dkt. 51 at 6.  In addition, Florida's own expert in this case relied on a study claiming that minors in the United States spend "an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)."  Dkt. 51-1 at ¶13.  That study identifies Instagram and Facebook as two of the four most popular "social media platforms" among teenagers.  *See* J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c.  And it includes survey results in which teenagers self-reported spending an average of 0.9 hours per day on Instagram and 0.3 hours per day on Facebook.  Given that those self-reported numbers are for the average teenage user, it is likely that at least 10% or more of Facebook's daily active users under the age of 16 spend 2 hours or more per day on that service and that at least 10% or more of Instagram's daily active users under the age of 16 spend 2 hours or more per day on Instagram.

9

**SA19**

g.      At the very least, it is likely that Florida thinks both Facebook and Instagram satisfy HB3's coverage requirements, especially considering the legislative history of HB3 is replete with references to both Facebook and Instagram.  *See* Florida House of Representatives Staff Final Bill Analysis HB3 at 5, 7, 11 (Mar. 28, 2024); Florida Senate Bill Analysis and Fiscal Impact Statement HB3 at 6 (Feb. 13, 2024); Florida House of Representatives Staff Analysis at 5 (Jan. 17, 2024).  Because Florida likely thinks Facebook and Instagram are covered, Meta will likely have to take costly steps to comply with the law.

h.      Finally, it is my understanding that Facebook and Instagram both have users under 16 who are "residents" of Florida (as HB3 defines that term).  It is my understanding that neither service prohibits minors under 14 that they have reason to believe are located in Florida from creating or holding accounts and that neither service requires 14- and 15-year-olds that the services have reason to believe are located in Florida to obtain consent from a parent or guardian before creating an account.

7.      These HB3-covered members enable billions of users around the world to create and share content using their services, whether to facilitate work, study, prayer, socialization, commerce, or communications.  These companies also moderate and curate what is displayed on their services as a vital part of their

operations.    They disseminate a massive and constantly expanding amount of content in order to provide valuable products and tools for their users.

8.    Because content moderation is central to the operations of these CCIA members, issues surrounding trust and safety constitute a significant part of CCIA's policy and advocacy work.  To that end—among our other endeavors and projects in this area—CCIA is incubating a non-profit organization called the Digital Trust & Safety Partnership (DTSP).  DTSP partners include CCIA members and other businesses dedicated to improving practices and procedures for identifying and preventing the dissemination of objectionable and harmful content online.  DTSP aims to develop and iterate upon industry best practices for, among other things, the moderation of third-party content and behavior, with the goal of ensuring a safer and more trustworthy Internet.  DTSP's objectives include the facilitation of internal assessments—and, subsequently, independent third-party assessments—of participants' implementation of identified best practices for promoting the safety of their users and the online communities that they maintain.  DTSP balances these collective goals with the recognition that each participating company has its own values, service aims, digital tools, and human-led processes for moderating the extremely broad range of human expression they facilitate.

## II. Valuable and Protected Speech on CCIA Members' Websites.

9.      The content on CCIA members' websites comes from all over the world and is incredibly diverse.  The services enable and provide a forum for the height of human thought and creativity: material that runs the gamut from being culturally significant, informative, educational, or politically engaging to funny and entertaining.  These services offer central avenues for protected speech and expression, and millions of individuals use these services daily to engage in speech.

10.      CCIA members' websites offer access to a wide array of highly valuable speech and viewpoints, and adults and minors alike benefit from access to these websites.  Many Americans use at least one of CCIA members' websites.  Accordingly, CCIA's members offer their users the opportunity to (1) maintain connections with friends and family and create new connections, (2) express themselves and their creative works, (3) stay informed about current events and engage in their own political and social speech on the day's issues, (4) learn from others, whether through expressly educational content or through the ability for cross-cultural exchange, and (5) find high-quality and engaging expression.

**SA22**

**III. Parents Already Have Many Ways to Monitor Their Teens' Internet Use.**

11.  CCIA holds a firm conviction that children are entitled to a higher level of security and privacy in their online experiences.  But not only do parents already have widely available tools to monitor and control their children's online behavior, CCIA's members are already actively engaged in various initiatives to integrate new, robust protective design features into their websites and services.

12.  **Device-level restrictions.**  Parents can decide whether and when to let their children use computers, tablets, and smartphones.  And those who choose to let their children use such devices have many ways to control what their children see and do.  Device manufacturers, such as Apple, Google, Microsoft, and Samsung, provide parents with tools to limit how long their children can spend on their devices.  *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://tinyurl.com/uxfnna4y (last visited Mar. 27, 2025); Google, Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited Mar. 27, 2025); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited Mar. 27, 2025); Samsung, Manage Family Groups and Parental Controls with Your Samsung Account, https://rb.gy/u4y1sz (last visited Mar. 27, 2025).  And many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services.  *See, e.g.*, Alyson Behr, *The Best*

*Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://tinyurl.com/s6bje2jd (last visited Mar. 27, 2025).

13.   **Network-level restrictions.**   Cell carriers and broadband providers similarly give parents tools to block apps and sites from children's devices, ensure that they are texting and chatting with trusted contacts, and restrict screen time during certain hours of the day. *See, e.g.*, Verizon, Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family, https://tinyurl.com/ycyxy6x6 (last visited Mar. 27, 2025); AT&T, AT&T Secure Family App, https://tinyurl.com/d995ya2u (last visited Mar. 27, 2025); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac (last visited Mar. 27, 2025); Comcast Xfinity, Parental Controls for Xfinity Internet and TV, https://tinyurl.com/2rwyt7mv (last visited Mar. 27, 2025). Many wireless routers (devices that provide wireless Internet throughout a home) offer parental control settings as well, which allow parents to block specific websites or applications, monitor what services their children visit and for how long they visit them, and limit hours that children can use the internet. *See, e.g.*, Molly Price & Ry Crist, How to Set Up and Use Your Wi-Fi Router's Parental Controls, CNET (Feb. 28, 2025), https://tinyurl.com/mtvdwypu; Netgear, NETGEAR Smart Parental Controls, https://tinyurl.com/me3ksfvu (last visited Mar. 27, 2025).

14.    **Browser-level restrictions.**   Internet browsers give parents another layer of protection by offering parents tools to control which websites their children can access.   *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022) (last visited Mar. 27, 2025).   Others also permit parents to set up a "Kids Mode," which allows children to access only a pre-approved list of websites.   *See* Microsoft,    Learn    More    About    Kids    Mode    in    Microsoft    Edge, https://tinyurl.com/59wsev2k (last visited Mar. 27, 2025); Google, Google's Parental Controls–Google Safety Center, https://tinyurl.com/kwkeej9z (last visited Mar. 27, 2025).

15.    **Application-level restrictions.**   On top of all the measures discussed above, CCIA's members have been leading the effort to implement settings and parental tools to individually tailor younger users' online use to the content and services that are suited to their unique lived experience and developmental needs. Jordan Rodell, *Why Implementing Education is a Logical Starting Point for Children's Safety Online*, Disruptive Competition Project (Feb. 7, 2023), https://tinyurl.com/bdct9res.

a.    Several CCIA members prohibit minors younger than 13 from accessing their main services.  Other members offer separate experiences for users under 13 geared for that specific age group.  *See* YouTube for Families

Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Mar. 27, 2025); YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Mar. 27, 2025).

b.   Several use "age gating" to help ensure that users view only age-appropriate content. *See* Instagram, Updates to the Sensitive Content Control (June 6, 2022), https://tinyurl.com/y8y8ds7p; YouTube Help, Age-Restricted Content, https://tinyurl.com/52hmx4ze (last visited Mar. 27, 2025).

c.   Others automatically impose default privacy settings for minors' accounts. *See* Pinterest, Resources for Parents and Caregivers of Teens, https://tinyurl.com/yvzsd82p (last visited Mar. 27, 2025); Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, https://tinyurl.com/22fwuzz9 (last visited Mar. 27, 2025).

d.   Several CCIA member products permit a self-identified parent to supervise teens' online activities on their services, once confirmed by both users. *See, e.g.*, Meta, Supervision on Facebook, https://tinyurl.com/595h985k (last visited Mar. 27, 2025); Instagram, Help

Center, About Supervision on Instagram, https://tinyurl.com/zxxmmbhb (last visited Mar. 27, 2025).

16.    As an added layer of protection beyond these controls that limit minors' access to objectionable content on the Internet, many CCIA members moderate content.  Content moderation, which includes the practices and systems used by digital services to manage and mitigate content- and behavior-related risks to users and others, serves a vital function in allowing websites to express themselves and effectuates a website's community standards, thereby delivering on commitments that they have made to their communities.  It enables CCIA's members to remove patently illegal content like child sexual abuse material (CSAM) as defined under U.S. federal law—which members remove and report to the National Center for Missing and Exploited Children (NCMEC)—and graphic violence and material from dangerous organizations.  In Q4 of 2024 alone, Meta "actioned" tens of millions of pieces of content classified as adult nudity and sexual activity, bullying and harassment, child endangerment, dangerous organizations and individuals, hate speech, or suicide and self-injury across Facebook and Instagram.  Meta, Community Standards Enforcement Report: Q4 2024 Report, https://tinyurl.com/kewzmkbs (last visited Mar. 27, 2025).  By removing such content and, in some cases, implementing age-gate features that prevent minors' access to certain swaths of material, CCIA's members have also

17

**SA27**

curated the material on their websites to ensure that minors are protected from objectionable content.

17.     These various services thus enable parents to set time limits, provide enhanced privacy protections as a default for their minor children, as well as offer other tools to allow parents to block particularly objectionable sites entirely. Competitive Enterprise Institute, *Children Online Safety Tools*, https://tinyurl.com/2f36fe7x (last visited Mar. 27, 2025).   CCIA supports supplementing this array of tools with the implementation of digital citizenship curricula in educational environments.  *See* Rodell, *supra*.  Such curricula will not only educate children on proper social media use but also help inform parents on what mechanisms presently exist that can be used to protect their children as they see fit, based on their family's experiences.  *Id.*  These tools therefore empower parents and guardians to oversee and control their minor children's use of the Internet.

## IV.  Relevant Provisions of Florida House Bill 3.

18.     I understand that HB3 prohibits minors under the age of 14 from creating accounts on "social media platform[s]" altogether.   Fla. Stat. §501.1736(2)(a).  I understand that HB3 also requires "social media platform[s]" to terminate any existing accounts held by minors under the age of 14, "including accounts that the social media platform treats or categorizes as belonging to an

account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b). I understand that account holders have 90 days to dispute the termination. *Id.*

19. I understand that HB3 prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a). I understand that HB3 also requires "social media platform[s]" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising." *Id.* §501.1736(3)(b). I understand that the account holder has 90 days to dispute the termination. *Id.* I also understand that HB3 specifies that if the parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether. *Id.* §501.1736(4).

20. I understand that the regulations enacted by the Florida Attorney General to implement HB3 say that, in "determining whether someone is a parent … for a known child, a social media platform shall conduct reasonable parental verification." Fla. Admin. Code §2-43.002(2). I understand that "[r]easonable parental verification" means "any method that is reasonably calculated at

determining that a person is a parent of a child that also verifies the age and identity of that parent by commercially reasonable means," which "may include, but is not limited to" "requesting from a child the child's parent's name, address, phone number, and e-mail address," "contacting the name provided by the child and confirming that the parent is the child's parent by obtaining documents or information sufficient to evidence that relationship," and "utilizing any commercially reasonable method regularly used by the government or business to verify that parent's identity and age." *Id.* §2-43.001(12).

21.   I understand that HB3 makes it an "unfair and deceptive trade practice" to "knowing[ly] or reckless[ly]" violate its provisions.   Fla. Stat. §501.1736(5).  I understand that HB3 authorizes the Florida Attorney General to enforce the law and that it imposes a civil penalty of up to $50,000 per violation. *Id.*

## V.   The Impact of House Bill 3 on CCIA Members.

22.   CCIA's members provide vibrant communities for users to engage in vitally important forms of free expression, and the Act will burden or eliminate their ability to engage in these various types of speech.

23.   By prohibiting minors under 14 from accessing "social media platform[s]" at all, and by blocking 14- and 15-year-olds from accessing "social media platform[s]" unless they obtain the consent of a parent or guardian, HB3

restricts them from accessing websites where they can engage in First Amendment activity.

24. In addition to restricting the speech of minors, the Act would also burden the speech of adults. The practical effect of the law is to require covered members to verify the age of users before deciding whether to let them create an account. Indeed, the regulations implementing HB3 require CCIA's covered members to conduct "reasonable age verification" if the "facts or circumstance readily available to" them "should reasonably have [] aroused [a] question whether the person was a child." Fla. Admin. Code §2-43.002(3)(a). Covered members will have no choice but to endeavor to verify users' age, including by requiring both adults and minors to provide documentation proving their age. That would significantly burden adults' access to constitutionally protected speech. Identification requirements discourage users from accessing websites operated by covered members, and they completely bar adults who do not possess documentation from accessing such services.

25. HB3 also burdens the First Amendment rights of CCIA members who wish to communicate with users. As detailed above, CCIA members curate and disseminate content to their users that they think will be particularly relevant to them. These members decide what content to share with users based on the content that users have previously interacted with as well as the members' rules

about what content is appropriate for their services.  As the Supreme Court has explained, "the creation and dissemination of information are speech within the meaning of the First Amendment."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 730-32 (2024).  But by imposing restrictions on who may access covered members' services, including by restricting who may create accounts, HB3 directly abridges members' ability to disseminate information to their users in violation of their speech rights.  *Moody*, 603 U.S. at 727-40.  Furthermore, HB3 further burdens CCIA's covered members' First Amendment rights by regulating so-called "addictive features."  Such features, like "[p]ush notifications," enable CCIA members to speak directly to users, which means that HB3's restrictions on the use of those features directly interferes with members' ability to communicate with their users.  As a result, HB3 denies covered members the right to disseminate their speech and the speech of others to the audience that wishes to interact with their services.

26.    The burden on speech imposed by HB3 is particularly notable because it singles out websites that (according to the state) are "addictive."  As I understand it, whether a service is covered turns in part on how long minors spend on the service and whether the service employs tools designed to bring to their attention content they might like.  *See* Fla. Stat. §501.1736(1)(e); Press Conference, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social*

*Media*, 6:00-6:23 (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.  In other words, the law burdens speech that users find especially interesting, rationing the Internet and doling it out only in those contexts that the state believes are appropriate for its citizenry.

## VI. Complying with HB3 Would Be Extremely Burdensome.

27.    Compliance with HB3 will be unduly burdensome and extremely costly for CCIA's covered members, which will cause them and their users irreparable harm.  Based on my experiences working with CCIA's members, I believe that HB3's restrictions will require websites, in practice, to implement complex age verification, parental consent, and parental verification procedures.  And I can attest that the processes of confirming the age and identity of users, confirming the age and identity of parents, and confirming the relationship between the user and the parent are inherently difficult and require capabilities that many websites lack.

28.    To comply with HB3's ban on minors under 14 from creating accounts and accessing their websites altogether, CCIA's covered members will need to assess the age of existing account holders and implement procedures to determine the age of future account holders before they access their services.  Fla. Stat. §501.1736(2)(a).  But the statute also requires websites to investigate and to terminate "an account holder who is likely younger than 14 years of age."  *Id.*

§501.1736(2)(b).  And HB3's implementing regulations impose liability on websites that "fail[] to perform reasonable age verification" after learning that an account holder may in fact be a minor.  Fla. Admin. Code §2-43.002(3)(a).  The combination of these requirements means that in practice CCIA's covered members will be forced to implement age-verification procedures to avoid potential liability for failing to properly investigate whether an account needs to be terminated under HB3's ban related to minors under 14.  To do so, members will spend large, unrecoverable sums up front to develop the proper capabilities.  And to ensure the process continues to work effectively, members will need to engage in additional ongoing expenditures that maintain those capabilities.  These costs cannot be recouped and are extremely burdensome on members.

29.  Complying with HB3's parental consent requirement for 14- and 15-year-olds will also be extremely difficult and costly.  Fla. Stat. §501.1736(3)(a).

a.  Because the parental consent provision covers both account holders who actually are 14- or 15-year-olds and those who are "likely" that age, *id.* §§501.1736(3)(a), (b), and because the implementing regulations similarly require age verifications for such account holders as well, Fla. Admin. Code §2-43.002(3)(a), CCIA's members will need to institute procedures that enable them to assess the age of account holders (both current and prospective) to correctly determine whether they are in fact

minors. As was the case with HB3's provision banning 14-year-olds, the parental consent provision will require, in practice, that CCIA's members implement age verification procedures, which will be extremely difficult and costly.

b. In addition, HB3's parental consent requirement and the implementing regulations will also compel CCIA's members to implement parental-verification procedures. Fla. Admin. Code §2-43.002(2). Remotely verifying the existence of a relationship between two accounts as Florida requires is exceptionally difficult to implement. This is particularly so in instances where parents or legal guardians do not have the same last name as the children in question, where a child is in foster care, or where a parent is not located in Florida. As a result, these requirements demand additional, significant upfront and ongoing investments to implement. And these costs compound the irreparable burden HB3 will place on CCIA's members, just for the members to attempt to comply with its restrictions.

30. In short, if HB3 is not enjoined and is enforced against CCIA's members, as Florida is likely to do, CCIA's mission to promote open markets, open systems, and open networks would be directly, substantially, and irreparably harmed. Likewise, CCIA's covered members, as well as their users (both minor and adult account holders alike), will suffer irreparable harm.

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of March, 2025, in Washington, DC.

Matthew Schruers

**TAB 76-3**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, <br><br> *Plaintiffs*, <br><br> v. <br><br> JAMES UTHMEIER, in his official capacity as Attorney General of the State of Florida, <br><br> *Defendant*. | Case No.: 4:24-cv-00438-MW-MAF |

## DECLARATION OF BARTLETT CLELAND IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

**SA38**

I, Bartlett Cleland, declare as follows:

1.    I am the General Counsel and Director of Strategy Initiatives of Plaintiff NetChoice.  As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of the association's objectives, as well as represent the association in public forums, at industry events, and in meetings with government officials and agencies.  I work with team members to execute the association's lobbying efforts at federal and state levels, educating lawmakers and regulators on tech issues, in service of the organization's mission.  I also assist in developing the association's policy agenda, working closely with the CEO, Board of Directors, and members to identify legislative and regulatory priorities.  My role at NetChoice and my previous experience—which includes being a known thought leader, writer and speaker on all issues of innovation, communications and technology, having spent twenty six years in the technology and innovation public policy space—has also made me familiar with other websites, applications, and digital services more broadly.[1]

2.    I submit this declaration in support of Plaintiffs' Renewed Motion for Preliminary Injunction.  I am over the age of 18 and am competent to make the

---

[1] This Declaration will refer to all digital services covered by the Act as "covered websites," unless necessary to distinguish among different kinds of digital services.  Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

statements herein.  I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.    About NetChoice.

3.    NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet.  NetChoice is a 501(c)(6) nonprofit organization.  As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2]  In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.  NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet.

4.    For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers.  Our members include a broad array of popular online services: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, Prizepicks,

---

[2] NetChoice, Home, https://tinyurl.com/bdne27n.

Snap Inc., StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!.[3]  Many of these members operate websites that are among the Internet's most popular destinations, disseminating billions of user-generated posts.  Other members' websites serve comparatively smaller communities.

## II. NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.

5.      NetChoice members' websites are full of a wide range of valuable expression and provide access to various communities.  Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech. They do so in a wide variety of ways—socially (to connect with friends from school and church, form groups, or find communities of those with likeminded interests), demonstratively (to showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or current events), politically (to participate in public discussion or raise awareness about social causes), educationally (to get help with math problems, learn about financial literacy, or listen to college course lectures), as well as a myriad of other ways.

---

[3] NetChoice, About Us, https://tinyurl.com/3vdmvstv.

6.     The specific communities that NetChoice members offer and foster each differ, thereby providing users with different benefits.  On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services.  On Instagram, users can share vacation pictures and short informative videos.  On Snapchat, users can share moments with friends and family.  And on YouTube, users can watch documentaries.

## III.    Parents have many tools to supervise their minor children online, and NetChoice members go to great lengths to protect minors.

7.     With existing and widely available tools, parents and guardians have many choices to monitor and supervise their minor children's use of the Internet.  These tools both overlap and complement each other.  Of course, parents can also control whether their minor children have access to Internet-connected devices in the first place.

8.     **Device-level restrictions.**  When parents give their minor children access to Internet-connected devices, they can take advantage of the built-in tools in the device to restrict their children's use.  Specifically, many of the manufacturers of the most widely used mobile phones and tablets publicize the ways parents can limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings.  *See* Apple, Use Parental Controls on Your Child's iPhone, iPad, and iPod Touch, https://tinyurl.com/uxfnna4y (last

visited Mar. 26, 2025); Google, Family Link, Help Keep Your Family Safer Online, https://tinyurl.com/mr4bnwpy (last visited Mar. 26, 2025); Microsoft, Getting Started with Microsoft Family Safety, https://tinyurl.com/yc6kyruh (last visited Mar. 26, 2025); Samsung, Manage Family Groups and Parental Controls with Your Samsung Account, https://rb.gy/u4y1sz (last visited Mar. 26, 2025); *see also* Apple, *Helping Protect Kids Online* (Feb. 2025), https://tinyurl.com/427n5vmj.  Likewise, third-party applications allow parents to monitor their minor children's activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://tinyurl.com/s6bje2jd.

9.    **Network-level restrictions.**  Many cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access; to block certain apps, sites, and contacts from their children's phones; and to restrict screen time on devices.  *See, e.g.*, Verizon, Parental Control & Monitoring App: Kids Phone Tracking, Verizon Family, https://tinyurl.com/ycyxy6x6 (last visited Mar. 26, 2025); AT&T, AT&T Secure Family App, https://tinyurl.com/d995ya2u (last visited Mar. 26, 2025); T-Mobile, Family Controls and Privacy, https://tinyurl.com/57run7ac (last visited Mar. 26, 2025); Comcast Xfinity, Parental Controls for Xfinity Internet and TV, https://tinyurl.com/2rwyt7mv (last visited Mar. 26, 2025).  Similarly, many wireless routers (the devices that provide wireless

Internet in homes) publicize their parental control settings that parents can use to block specific online services; allow only those online services that a parent specifies; limit the time that their children spend on the Internet by turning off the home Internet at specified hours, by pausing Internet access for specific devices or users, or by limiting the amount of time a particular website or service may be accessed; set individualized content filters; and monitor the online services that their children visit. *See* Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 28, 2025), https://tinyurl.com/mtvdwypu; Netgear, NETGEAR Smart Parental Controls, https://tinyurl.com/me3ksfvu (last visited Mar. 26, 2025).

10.    **Browser-level restrictions.**  Internet browsers also allow parents to control what online services their minor children may access.  *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://tinyurl.com/6u6trm5y (last updated Aug. 11, 2022).  Some of these browsers permit parents to set up a "Kids Mode," which allows children to access only a pre-approved list of websites.  *See* Microsoft, Learn More About Kids Mode in Microsoft Edge, https://tinyurl.com/59wsev2k (last visited Mar. 26, 2025); Google, Google's Parental Controls – Google Safety Center, https://tinyurl.com/kwkeej9z (last visited Mar. 26, 2025).  Some even provide "activity reports" to notify parents which applications and websites a child accesses most often.  *Id.*  Similarly, third-party

software and browser extensions are also widely available to reinforce these tools on browsers. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://tinyurl.com/mwz58dcr.

11.    **Application-level restrictions.**  On top of all that, NetChoice members provide parents with many tools to decide what their children can see and do on their services, as their declarations explain.  They have devoted extensive resources to developing policies and practices to protect minors who use them.  These tools serve as the tangible examples of NetChoice's position—that the best solution to protect children online is a private solution—at work.  NetChoice members give parents, as the proper decisionmakers, an array of tools to guide and oversee their children's online access without barring children from accessing important educational and creative resources.  And because parents are in the driver's seat, parents can make independent decisions about their children based on their family's unique needs in the privacy of their own homes—they can choose how and when to access the protected speech environments NetChoice members have created without divulging sensitive or private information.

a.    For example, Meta has supervision tools that parents and guardians can use to help support their teens.  When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week, and their average daily time spent

for the week; set scheduled breaks for their teen; see their teen's Facebook friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://tinyurl.com/mvm234vn (last visited Mar. 26, 2025).

  b. Instagram currently offers Supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time their teen has spent on Instagram; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://tinyurl.com/zxxmmbhb (last visited Mar. 26, 2025). Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://tinyurl.com/22fwuzz9. Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less-strict settings. *Id.* Via Teen Accounts, parents will have added supervision

features, including ways to get insights into whom their minors are chatting with and whom they have blocked, as well as seeing topics their minors are looking at. *Id.*

c. And for teenage users, Snapchat provides parents and guardians the "Family Center," where parents and guardian can see with whom their teens have communicated in the last seven days; review their teens' existing friends and any they have recently added; limit their teens' ability to view certain content from public sources; review their teens' safety and privacy setting; and report any accounts that might be of concern to parents. *See* Snap Inc., Snapchat Support, What is Family Center?, https://tinyurl.com/yck6j6sz (last visited Mar. 26, 2025); Snap Inc., Snapchat Safeguards for Teens, https://tinyurl.com/mvas8784 (last visited Mar. 26, 2025).

12. All NetChoice members prohibit minors younger than 13 from accessing their main services. However, some members, like YouTube via YouTube Kids and its "Supervised Experience" on YouTube, offer separate experiences for users under 13 geared for that specific age group. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://tinyurl.com/2z6cw92p (last visited Mar. 26, 2025); YouTube Help, What Is a Pre-Teen Supervised Experience on YouTube, https://tinyurl.com/2uat3j5r (last visited Mar. 26, 2025). These youth-

specific services also allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

13.   NetChoice members also implement other measures that further promote minors' safety while accessing these services.

a.   For example, Instagram and YouTube have implemented "age gating" features to ensure that users are able to view only age-appropriate content. *See* Instagram, Updates to the Sensitive Content Control (June 6, 2022), https://tinyurl.com/y8y8ds7p; YouTube Help, Age-Restricted Content, https://tinyurl.com/52hmx4ze (last visited Mar. 26, 2025).

b.   Others, like Snapchat and Instagram, automatically impose default privacy settings for minors' accounts. *See* Snap Inc., Snapchat Safeguards for Teens, https://tinyurl.com/mvas8784 (last visited Mar. 26, 2025); Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://tinyurl.com/22fwuzz9.

c.   Instagram further protects minors through safety notices that encourage them to be cautious when interacting with other users and that notify them if another user has exhibited suspicious behavior, such as sending a large number of messages or friend requests to users under 18. Instagram, Continuing to Make Instagram Safe for the Youngest Members of Our

Community (Mar. 17, 2021), https://tinyurl.com/3mzwpj4s.  Instagram also gives minors the option to end their interaction with the flagged user or to block them.  *Id.*

14.    And any minor-specific policies and parental tools exist alongside the websites' overall features and generally applicable "content-moderation" policies that help foster the communities and unique user experiences these services offer.

15.    NetChoice members provide users with the option and the tools to control the content they see and the users they interact with.  This generally comes in the form of tools that allow users to decide whom to follow, whether to block or mute users they wish to restrict their interactions with, and to search or hide content based on their personal preferences.  For example, Facebook permits users to customize the content they see by hiding posts or content from specific users and groups.  Facebook, Help Center: Control What You See in Feed on Facebook, https://tinyurl.com/y6x9sd8b (last visited Mar. 26, 2025).  Similarly, Instagram gives them options to filter the content they see by using keyword filters or using the "not interested" button.  Instagram, How to See More of What You Want on Instagram (Aug. 30, 2022), https://tinyurl.com/4ax2849b.  These tools promote opportunities for users to better engage with NetChoice members' services and the unique communities they offer.

**SA49**

16.    And NetChoice members limit publication of speech that they consider harmful, objectionable, or simply not conducive to their communities. Consequently, NetChoice members publish and enforce bespoke content-moderation policies that address the publication of such prohibited content. Through these policies, members remove, restrict, or add warning labels to content deemed to violate the policies as well as suspend or ban accounts that post such content. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://tinyurl.com/yc7mm3hm ("By the Numbers"). By removing such content, NetChoice members have also curated the material on their websites to further ensure that minors are protected from objectionable content. By way of example, YouTube has implemented policies and procedures to protect minors from content promoting eating disorders and to limit their access to content likely to cause teens to have a negative self-image regarding their body types. YouTube, Building Content Recommendations to Meet the Unique Needs of Teens and Tweens, https://tinyurl.com/dcyz9uv3 (last visited Mar. 26, 2025).

17.    Broadly, NetChoice members have pursued measures to help promote minors' safety on their services and to promote parents' ability to control and monitor

the activities of their children.  This empowers families to make decisions that fit

their particular needs and experiences about how their children should interact with

and access members' services.  This reflects NetChoice's commitment to protecting

and respecting families' private choices about how to use online services, knowing

that they are best situated to make the appropriate decisions for themselves.

## IV.    The Act's effect on NetChoice members and the Internet.

18.    I understand that Florida House Bill 3 ("the Act") was signed into law

on March 25, 2024, and that it took effect January 1, 2025.

19.    I understand that the Act regulates "social media platform[s]." Fla. Stat.

§501.1736(1)(e).  I understand that the Act defines "social media platform" as "an

online forum, website, or application" that "[a]llows users to upload content or view

the content or activities of other users." *Id.*   But it does not sweep in all potential

services that enable users to share and view content.  Rather, the Act limits its

coverage to online services that facilitate the most First Amendment protected

activity.  An online service qualifies as a "social media platform" only if (1) "[t]en

percent or more of the daily active users who are younger than 16 years of age spend

on average 2 hours per day or longer" on the service "on the days when using" the

service; (2) it "[e]mploys algorithms that analyze user data or information on users

to select content for users"; and (3) has one or more "addictive features." *Id.*  HB3's

list  of  so-called  "addictive  features"  covers  "[i]nfinite  scrolling,"  "[p]ush

notifications," "personal interactive metrics," "[a]uto-play" functions, and "[l]ive-streaming … functions." *Id.* The Act excludes any service on which "the exclusive function is e-mail or direct messaging." *Id.*

20.    Aspects of the Act's definition are vague and do not make clear the full extent of the entities governed by its provisions. That said, based on my review of the declarations submitted on behalf of Google and Snap Inc. and based on publicly available information related to those members, I understand that some NetChoice members operate services that are at a minimum "likely covered by the law," Dkt. 73 at 5, as those services appear to be "social media platforms" as defined by the Act. Members that are "likely covered" by HB3 include, at least the following: (1) Google, which owns and operates YouTube; (2) Snap Inc., which owns and operates Snapchat; and (3) Meta, which owns and operates Facebook and Instagram.

21.    Based on my experience in the industry, my review of the declaration submitted by Alexandra Veitch on behalf of Google, and based on information publicly available about how YouTube operates, it is my understanding that one or more of YouTube's services likely meet each of the component parts of the definition of "social media platform." Fla. Stat. §501.1736(1)(e).

     a.    It is my understanding that YouTube constitutes a service that "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), because it allows users to create, upload,

14
**SA52**

and share videos with others, *see* YouTube Help, Upload YouTube Videos (last visited Mar. 26, 2025), https://tinyurl.com/2fety3cv, and because YouTube Kids allows users to view content created by other users, *see* YouTube Help, YouTube Kids (last visited Mar. 26, 2025), https://tinyurl.com/yhn4aycy.

b. It is also my understanding that because YouTube and YouTube Kids provide recommendations of content for users to view based on content they have previously interacted with through their accounts, *see* YouTube Help, Manage Your Recommendations & Search Results (last visited Mar. 26, 2025), https://tinyurl.com/536r2wwu; *see also* YouTube For Families Help, Recommended Videos on YouTube Kids (last visited Mar. 26, 2025), https://tinyurl.com/mryarz36, YouTube also constitutes a service that "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3).

c. I further understand that YouTube has at least some of the features listed in Section 501.1736(1)(e). It is my understanding that YouTube allows users to enable "[p]ush notifications," §501.1736(1)(e)(4)(b); *see* YouTube Help, Manage YouTube Notifications (last visited Mar. 26, 2025), https://tinyurl.com/3zsdfjwr, and that YouTube displays "personal interactive metrics," §501.1736(1)(e)(4)(c), by reporting the number of users that "like"

a video, *see* YouTube Help, Like or Dislike a Video (last visited Mar. 26, 2025), https://tinyurl.com/wrvf33vr.

d.    I also understand that YouTube and YouTube Kids are not services in which the "exclusive function" is either "email or direct messaging."  §501.1736(1)(e).

e.    Based on my review of Ms. Veitch's declaration, I understand that YouTube does not track usage data in the same way that HB3 contemplates, such that it is difficult for YouTube to state definitively whether 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on its services on the days when using those services.  §501.1736(1)(e)(2).  But it is my understanding that based on YouTube's historical data about usage patterns, as explained in Ms. Veitch's declaration, YouTube has an actual and well-founded fear that YouTube meets HB3's hourly threshold.  At the very least, YouTube has an actual and well-founded fear that Florida thinks that it is covered.  In fact, Florida's own expert cited a study claiming that "U.S. teens spent an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)," which includes survey results regarding teenagers' self-reported time using YouTube.  J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct.

13, 2023), https://tinyurl.com/2j55rs7c.  Given Florida's expert's reliance on that survey, there is a significant chance that Florida thinks that "[t]en percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on" YouTube "on the days when using" YouTube "during the previous 12 months," §501.1736(1)(e)(2).

f.     I further understand that YouTube has users under 16 who are residents in Florida (as HB3 defines that term).  It is my understanding that YouTube does not currently preclude minors under 14 from accessing YouTube Kids or its Supervised Experience through parent-supervised accounts when YouTube has reason to believe the user is located in Florida. And I understand that YouTube does not currently prohibit 14- or 15-year-olds from creating accounts when it has reason to believe the user is located in Florida.

22.    In addition, based on my experience in the industry, my review of the declaration submitted by David Boyle on behalf of Snap Inc., and based on information publicly available about how Snapchat operates, it is my understanding that Snapchat is also likely covered by the Act, as it appears that Snapchat meets each of the component parts of the Act's definition of "social media platform."  Fla. Stat. §501.1736(1)(e).

a.    It is my understanding that Snapchat "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1), by allowing users to create, upload, and share pictures and videos with others who use the service.  *See* How to Use Snapchat (last visited Mar. 26, 2025), https://tinyurl.com/yzmyjwr3.

b.    It is my understanding that Snapchat also "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(1)(e)(3), because it disseminates content to users based on how they have interacted with content in the past through their accounts.  *See* Snapchat Support, Personalization on Snapchat (last visited Mar. 26, 2025), https://tinyurl.com/y8ncmvba.

c.    I further understand that Snapchat includes at least at least some of the features listed in Section 501.1736(1)(e).  Snapchat allows users to receive "[p]ush notifications," §501.1736(1)(e)(4)(b), as users can enable alerts that allow them to be notified when other users send Snaps or messages. *See* Snapchat Support, Notifications (last visited Mar. 26, 2025), https://tinyurl.com/4hs56nsm.

d.    I also understand that while Snapchat is primarily used for direct messaging, Snapchat nonetheless is not a service where "email or direct messaging" is its "exclusive function."  §501.1736(1)(e).

18
**SA56**

e. It is my understanding from my review of Mr. Boyle's declaration that during the past 12 months, 10% or more of the daily active users on Snapchat who used Snapchat at least 80 percent of the days during the prior 12 months and who are younger than 16 years of age spent an average of 2 hours per day or longer on Snapchat on the days when using Snapchat.

f. I further understand that Snapchat has users under the age of 16 who are located in Florida. It is my understanding based on Mr. Boyle's declaration and publicly available information about how Snapchat operates that Snap does not currently prevent minors under 14 (but who represent that they are over 13) from creating accounts to access Snapchat, nor does it prohibit 14- or 15-year-olds from creating accounts without the consent of a parent or guardian, when Snapchat has reason to believe such users are located in Florida.

23. In addition, it is my understanding based on the combination of my experience in the industry and my review of publicly reported information that Meta's services, Facebook and Instagram, also likely constitute "social media platforms" as defined by HB3. Fla. Stat. §501.1736(1)(e).

a. It is my understanding that both Facebook and Instagram allow users to create, upload, and share pictures and videos with other users. *See* Facebook Help Center, Share Photos on Facebook (last visited Mar. 26, 2025),

https://tinyurl.com/5jxy2hcb; Instagram Help Center, Share a Post (last visited Mar. 26, 2025), https://tinyurl.com/eaz6nwub.  For this reason, both services appear to satisfy the first criterion to meet the definition of "social media platform" under HB3: that they "[a]llow[] users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(1)(e)(1).

b.    It is my understanding that Facebook and Instagram also both "[e]mploy[] algorithms that analyze user data or information on users to select content for users."  §501.1736(1)(e)(3).  Facebook and Instagram both report that they use algorithms to determine the relevant content to disseminate to users, which recommendations are based in part on users' past usage of those services.  *See* Facebook Help Center, Learn About and Manage Suggested Content In Your Facebook Feed (last visited Mar. 26, 2025), https://tinyurl.com/yumkra7m; Instagram Help Center, How Instagram Determines Which Posts Appear As Suggested Posts (last visited Mar. 26, 2025), https://tinyurl.com/2w97sbcn.

c.    I further understand that Facebook and Instagram both have at least some of the features listed in Section 501.1736(1)(e).  It is my understanding that Facebook and Instagram allow users to enable "[p]ush notifications," §501.1736(1)(e)(4)(b), to alert them of activity related to their accounts. *See* Facebook Help Center, Push, Email and Text Notifications (last

20
**SA58**

visited Mar. 26, 2025), https://tinyurl.com/4965bkx8; Instagram Help Center, Notification Settings (last visited Mar. 26, 2025), https://tinyurl.com/47k8p3ce. And it is my understanding that both Facebook and Instagram display "personal interactive metrics," §501.1736(1)(e)(4)(c), because they report the number of time users have "liked" a post. *See* Facebook Help Center, Like and React to Reels and Videos on Facebook (last visited Mar. 26, 2025), https://tinyurl.com/438vek43; Instagram Help Center, Like or Unlike a Post on Instagram (last visited Mar. 26, 2025), https://tinyurl.com/mrx4w563.

d.    It is my understanding that "email [and] direct messaging" are not the "exclusive function[s]" of either Facebook or Instagram. §501.1736(1)(e).

e.    Based on my review of public information and information from Florida provided in connection with this litigation, it is my understanding that Facebook and Instagram likely satisfy HB3's coverage criterion that 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on its services on the days when using those services. §501.1736(1)(e)(2).

f.    For example, Instagram was identified by name at HB3's signing ceremony as one of Florida's intended online services to regulate. Press

21
**SA59**

Conference at 12:30-13:00, Governor Ron DeSantis Signs H.B.3 (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t.   In addition, Florida has submitted briefing in this case that identifies allegedly problematic features on "Facebook and Instagram" that Florida contends HB3 is purportedly supposed to address.  Dkt. 51 at 6.  And Florida offered up an expert who cited to a study claiming that minors in the United States reported that they spent "an average of 4.8 hours a day using social media sites (defined as total time spent on Instagram, Facebook, Twitter/X, YouTube, TikTok, WhatsApp, and WeChat)."  Dkt. 51-1 at ¶13.  That study identifies Instagram and Facebook as two of the four most popular "social media platforms" among teenagers.  See J. Rothwell, Teens Spend Average of 4.8 Hours on Social Media Per Day (Oct. 13, 2023), https://tinyurl.com/2j55rs7c.  And it includes survey results in which teenagers self-reported spending an average of 0.9 hours per day on Instagram and 0.3 hours per day on Facebook.  Given that those self-reported numbers are for the average teenage user, it is likely that at least 10% or more of daily active users under the age of 16 spend 2 hours or more per day on those services.

g.     At the very least, it is likely that Florida thinks both Facebook and Instagram satisfy HB3's coverage requirements, especially considering the legislative history of HB3 is replete with references to both Facebook and

22
**SA60**

Instagram. *See* Florida House of Representatives Staff Final Bill Analysis HB3 at 5, 7, 11 (Mar. 28, 2024); Florida Senate Bill Analysis and Fiscal Impact Statement HB3 at 6 (Feb. 13, 2024); Florida House of Representatives Staff Analysis at 5 (Jan. 17, 2024). Because Florida likely thinks Facebook and Instagram are covered, Meta will likely have to take costly steps to comply with the law.

h.     Based on my experience in the industry, I further understand that Facebook and Instagram do not currently prohibit minors under 14 from creating accounts when they have reason to believe that such minors are located in Florida and that neither currently requires 14- and 15-year-olds to obtain the consent of a parent or guardian to create an account when they have reason to believe such minors are located in Florida.

24.     In short, my experience, the declarations submitted by NetChoice members, the public information about NetChoice members, and Florida's statements in connection with this lawsuit, lead me to believe that there is an actual and well-founded fear that Florida will enforce HB3 against NetChoice members, including but not limited to Google, Snap Inc., and Meta.

25.     NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to

23

**SA61**

provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads NetChoice to conclude that the Act, if not enjoined, would irreparably harm our members and their business models by repelling both adult and non-adult users. This could lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.

26.    Additionally, as explained below, many of NetChoice members will face significant difficulty in implementing the Act's provisions, thereby hindering their business interests. These burdens on speech and business of NetChoice members are imposed even though, as this Declaration details, NetChoice members already have detailed policies and features in place allowing parents to monitor their children's online activities, to limit what they may access or whom they may contact, and to stop their children from spending too much time on these covered websites (however their parents see fit). Put differently, HB3's blunt denial of access to minors displaces the more nuanced tools NetChoice members already have in place that empower parents and give them greater control over their children's online usage.

27.    ***Restrictions on minors under 14.*** HB3 prohibits minors under the age of 14 from creating accounts on "social media platform[s]" altogether. Fla. Stat. §501.1736(2)(a). It also requires "social media platform[s]" to terminate any

existing accounts held by minors under the age of 14, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising." *Id.* §501.1736(2)(b).

a.    The ban on minors under 14 significantly burdens their First Amendment rights by denying them all access to the myriads of resources available on NetChoice members' social media sites. They will no longer be able to use these sites for art, education, gaming, general interest, information gathering, professional activities, research, political engagement, and participation in religious services and communities. And it will deny certain minors the benefits that social media provides by giving them a community to explore their personal interests and identity. Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 6 (2023), available at https://tinyurl.com/t2rejxyx.

b.    Not only will these rules impede access to protected speech, but compliance with the ban will also be burdensome on NetChoice members. Given covered members will need to assess the age of existing account holders before they access the covered websites to ensure no minor under 14 creates an account, Fla. Stat. §501.1736(2)(a), they will need to implement procedures that accurately determine the age of future account holders.

Accuracy is particularly important as HB3's implementing regulations impose liability a covered website's "fail[ure] to perform reasonable age verification" after learning that an accountholder may in fact be a minor. Fla. Admin. Code §2-43.002(3)(a).

c.  Given these regulations deem "reasonable age verification" procedures as state-approved methods for complying with HB3, NetChoice members will be compelled to implement such age verification processes if the law takes effect. Designing and maintaining comprehensive systems to comply with the regulations implementing the Act will be extremely costly, time-consuming, and resource intensive. The burdens increase with the level of certainty with which companies must verify ages. These costs will hamper both NetChoice members by requiring that they expend significant resources that cannot be recouped. And adding additional processes at sign up inevitably affect account-holder growth, as cumbersome registration processes can dissuade people from signing up. Any decline in account-holder signups or current accounts will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality. And of course, decline in usage means fewer people avail themselves of the valuable speech available on the websites.

28.    ***Restrictions on 14- and 15-year-olds.***  HB3 also prohibits 14- and 15-year-olds from creating an account on a "social media platform" "unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a).  It also requires "social media platform[s]" to terminate existing accounts held by 14- and 15-year-olds, "including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising."  HB3 specifies that if the parental consent requirements are enjoined, then they "shall be severed" and replaced with a provision banning 14- and 15-year-olds from creating an account on a "social media platform" altogether.  *Id.* §501.1736(4).

    a.    As was the case with the restrictions on minors under 14, these provisions burden the speech rights of 14- and 15-year-olds.  By requiring prior parental approval before these minors may access any of covered members' services, HB3 directly denies them their First Amendment right to connect with communities holding shared interests, express themselves, and find educational or valuable content, even if their parents do not oppose or would like them to be able to access such information.

    b.    The parental consent restriction would also impose significant costs on NetChoice members who seek to comply with its provisions.  Because the parental consent provision covers both accountholders who

27

**SA65**

actually are 14- or 15-year-olds and those who are "likely" that age, Fla. Stat. §501.1736(3)(a), (b), and because the implementing regulations similarly require age verifications for such accountholders as well, Fla. Admin. Code §2-43.002(3)(a), members will again be forced in practice to verify each accountholder's age. That imposes the costs noted above applicable to the restrictions for minors under 14.

c.     The parental consent component adds another layer of costs and burdens. Under the Act's implementing regulations, covered websites must "conduct reasonable parental verification before allowing [the parent to] exercise … any right [under HB3]." *Id.* §2-43.002(2). Developing and deploying such procedures is also costly, time consuming, and resource intensive. And verifying a genuine parent-child relationship to ensure that the parent may properly provide consent for the child will require covered websites to identify both the minor and the parent (or guardian), which intrudes on both of their privacy rights. It will create friction impeding users' willingness and ability to use the services.

d.     Covered websites also face many difficulties in securing parental consent. For example, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed, families are nontraditional (like foster families), families have different surnames or

addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

29.  Furthermore, HB3 further chills online First Amendment protected speech when it imposes significant costs on online services that currently serve minors (i.e., by requiring covered services to implement cost-prohibitive procedures to comply and by threatening significant penalties, up to $50,000, for each violation, Fla. Stat. §501.1736(5)).  There is a serious risk that NetChoice members, when confronted with these costs, will be discouraged from providing child-appropriate online services or disseminating content geared to such minors.  And there is an equally serious risk that they might also institute higher age barriers than required for all users, even though doing so would prevent their services from reaching all who would benefit from their communities and content.  These ancillary costs to speech as a result of HB3 hamper members' ability to disseminate the valuable expression found on their websites and conflict with NetChoice's mission to promote free expression on the Internet.

30.  In addition to restricting the speech of minors, the restrictions on minors under 14 and those imposed on minors who are 14 and 15 years old would also burden the speech of adults.  The Act requires covered members to terminate the accounts of those who are "treat[ed] or categorize[d] as belonging to an account holder who is likely younger than 14 years of age" or "is likely 14 or 15 years of

29
**SA67**

age." Fla. Stat. §501.1736(2)(b), (3)(b). In both instances, the Act puts the onus on the account holder to contest the termination. *Id.* Further, regulations implementing HB3 require covered members to conduct "reasonable age verification" if the "facts or circumstance readily available to" them "should reasonably have [] aroused [a] question whether the person was a child." Fla. Admin. Code §2-43.002(3)(a). Such restrictions imperil the speech rights of adults, who could be forced to provide documentation to ensure they can maintain access to NetChoice members' services. These and the costs attendant to implementing procedures that will be needed to comply with these provisions are likely to dissuade many adults from using the website, which further undermines the ability for those interested to access the valuable expressive content available on these covered websites.

31. In addition to the burdens applicable to each provision, HB3's strictures across the board implicate the First Amendment rights held by NetChoice members. By restricting who may access covered members' services, HB3 directly abridges members' ability to disseminate information. "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2401-02 (2024). And yet, HB3 prohibits NetChoice members from exercising their rights to disseminate their speech and the speech of others to the audience that wishes to interact with their services. Indeed, as detailed above, NetChoice members

engage in First Amendment protected activity by curating and disseminating content that they deem to be most valuable to users and that complies with their rules about the content allowed on their services. By restricting (and in some cases prohibiting) account creation, HB3 directly interferes with NetChoice members' First Amendment rights. *Moody*, 603 U.S. at 727-40.

32.    And these irreparable harms and burdens on free speech caused by HB3 are particularly notable given it regulates only the most (so-called) "addictive" websites—a euphemism for the most popular social media services. *See* Fla. Stat. §501.1736(1)(e); Press Conference, *Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media*, 6:00-6:23 (Mar. 25, 2024), https://tinyurl.com/5fhv2e2t. By denying minors and adults access to these popular websites and the expressive content they carry, HB3 ultimately burdens substantial amounts of protected speech where that speech is most abundant. Such a result flies in the face of the First Amendment, which protects against the government's "tilt[ing] public debate" in its favored direction by selectively regulating only "those actors [who] possess [the most] enviable vehicle[s] for expression." *Moody*, 603 U.S. at 741 (quotation marks omitted). And this is compounded by the fact that when HB3 regulates the so-called "addictive features," it also directly interferes with NetChoice members' ability to communicate directly with their users about content users are likely to find most valuable. Indeed, features, like "[p]ush notifications,"

serve as the means by which NetChoice members notify and alert members to content associated with their accounts. HB3 therefore does further harm by impinging on the valuable speech rights of both covered websites and their users.

*    *    *

33.    In short, NetChoice members would incur substantial, unrecoverable costs in complying with HB3's burdensome requirements. These costs could not be recouped even if NetChoice's challenge to the law were ultimately successful on the merits. And if the Act is not enjoined, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially impaired—as would its affected members' minor and adult account holders and users (both current and prospective).

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

Executed on this 28th day of March, 2025, in Washington, DC.

Bartlett Cleland

32

**TAB 76-4**

Docusign Envelope ID: A850F669-5EFE-420F-AE7E-B0D6ADAB23E8    Case 4:24-cv-00438-MW-MAF    Document 76-4    Filed 03/28/25    Page 1 of 24

USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 74 of 121

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and NETCHOICE, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 4:24-cv-00438-MW-MAF |
| JAMES UTHMEIER, in his official capacity as Attorney General of the State of Florida, | ) ) ) ) ) | |
| *Defendant.* | ) | |

**DECLARATION OF ALEXANDRA N. VEITCH IN SUPPORT OF PLAINTIFFS'
RENEWED MOTION FOR PRELIMINARY INJUNCTION**

I, Alexandra N. Veitch, declare as follows:

1.      I am the Director of Public Policy for the Americas at YouTube. As part of my role, I lead a team that monitors and assesses the U.S. legislative and regulatory landscape, including policy proposals and legislation, such as Florida House Bill 3 ("HB3" or "Act") that would affect YouTube's ability to provide services and content to users in Florida—and perhaps worldwide.[1] My team also leads external advocacy for YouTube's policies and practices with government leaders and policy stakeholders, advises the company on public policy issues as it relates to online, user-generated content, and represents the company in public-policy forums, across a broad region.

2.      I submit this declaration in support of Plaintiffs' Renewed Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have

---

[1] I understand that the Act may distinguish between "user[s]" and "account holder[s]." *See, e.g.*, Fla. Stat. §501.1736(1)(a) (defining account holder), (1)(e) (defining Act's coverage in terms of "users"). Unless necessary to distinguish between the two for potential compliance purposes, this declaration will use the term "user" to encompass both statutory terms.

**SA72**

Docusign Envelope ID: A8505669-5EFE-420F-AE7F-B0D6ADAB23E8

Case 4:24-cv-00438-MW-MAF    Document 76-4    Filed 03/28/25    Page 2 of 24
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 75 of 121

personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

3.  YouTube is an online service that allows users to create, upload, and share videos with others around the world. YouTube strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem. As a result, YouTube has a wealth of highly valuable and enriching user-generated content, providing users with a wide array of news, educational content, and entertainment.

4.  People in Florida use YouTube's services.

5.  Both YouTube and its parent company Google are members of both the Computer & Communications Industry Association and NetChoice.

6.  I understand that YouTube is likely subject to the Act, as one or more of its services may meet the definition of "social media platform." Fla. Stat. §501.1736(1)(e).

7.  YouTube "[a]llows users to upload content or view the content or activity of other users," Fla. Stat. §501.1736(e)(1), as it allows users to create, upload, and share videos with others around the world.  *See* YouTube Help, Upload YouTube Videos (last visited Mar. 21, 2025), https://tinyurl.com/2fety3cv.  YouTube Kids likewise allows users to view content created by other users.  *See* YouTube Help, YouTube Kids (last visited Mar. 21, 2025), https://tinyurl.com/yhn4aycy.

8.  YouTube "[e]mploys algorithms that analyze user data or information on users to select content for users," §501.1736(e)(3), as both YouTube and YouTube Kids use automated efforts to suggest videos to users based on, among other things, content the user has interacted with in the past.  *See* YouTube Help, Manage Your Recommendations & Search Results (last visited Mar. 21, 2025), https://tinyurl.com/536r2wwu; *see also* YouTube For Families Help, Recommended  Videos  on  YouTube  Kids  (last  visited  Mar.  21,  2025),

**SA73**

https://tinyurl.com/mryarz36. These recommendations also help enforce YouTube's Community Guidelines, explained below.

9.    YouTube includes at least one feature that HB3 labels as "addictive"—though of course YouTube does not agree with that pejorative characterization of its features. §501.1736(e)(4).  For instance, YouTube users may enable "[p]ush notifications" to alert them of user activity on the videos they upload.  §501.1736(e)(4)(b); *see* YouTube Help, Manage YouTube Notifications (last visited Mar. 21, 2025), https://tinyurl.com/3zsdfjwr.  YouTube also displays "personal interactive metrics" to show users how many times other users have "liked" their videos. §501.1736(e)(4)(c); *see* YouTube Help, Like or Dislike a Video (last visited Mar. 21, 2025), https://tinyurl.com/wrvf33vr.

10.    Because YouTube's usage patterns and demographics change frequently, it is difficult for YouTube to conclusively determine whether 10% or more of "the daily active users who are younger than 16" spend on average 2 hours per day or longer on its services on the days when using those services.  One significant ambiguity of HB3, in fact, is that it is unclear whether a company is covered if it meets the 10% metric over certain periods but not others, which is entirely possible given that YouTube does not have control over which users spend how much time using YouTube in a given time.  This problem is compounded by the fact that HB3 defines "daily active users" differently from how YouTube defines and measures that term.[2]  Nevertheless, even though YouTube does not in the ordinary course of its business attempt to measure the specific metric made relevant by HB3 (the percentage of "daily active users" who are under 16 who spend on average 2 or more hours per day using the service), there is reason to believe that

---

[2] HB3 defines "[d]aily active users" to mean "the number of unique users in the United States who used the online forum, website, or application at least 80 percent of the days during the previous 12 months," §501.1736(1)(b) regardless of whether users have an account or access the service using their own account.

3

**SA74**

based on historical data about usage, YouTube may be covered by the Act or—at a minimum—that YouTube would face a serious risk of an enforcement action by Florida if it did not comply. This is partly because there are multiple ways of calculating the threshold, and it is unclear which method Florida would use. Because there is a potential way to calculate the threshold that might result in a percentage above 10%, the costs, risks, and reputational harms associated with an enforcement action (including potentially broad investigatory demands) are sufficiently substantial that, absent an express assurance by the State that YouTube is not covered, YouTube will face substantial and costly compliance measures.

11. Finally, "e-mail or direct messaging consisting of text, photographs, pictures, images, or videos shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients by the sender" is not the "exclusive function" of YouTube or YouTube Kids. §501.1736(e).

## I. YouTube's Principled Approach to Minors and Responsibility

12. On YouTube, "[c]hildren and teenagers today can access a world of possibilities": "Whether it's exploring important topics around the world or looking up a video to help with algebra homework, they've never known a reality without this world at their fingertips." Neal Mohan, *YouTube's Principled Approach for Children and Teenagers*, YouTube Official Blog (Oct. 16, 2023), https://perma.cc/FD9S-HGTA. We believe that "[f]amilies everywhere deserve the same safe, high-quality experience online, no matter where they live. And all children and teenagers ought to have the same access to the opportunities the internet provides." *Id.*

13. YouTube has invested, and continues to invest, immense resources in developing and fostering age-appropriate services, features, and policies, making age-appropriate user-generated content accessible for its users. Five principles guide YouTube's approach to minors:

- "The privacy, physical safety, mental health, and wellbeing of children and teenagers

4

**SA75**

Docusign Envelope ID: A850566 9-5EFE-420F-AE7F-B0D6ADAB23E8 Case 4:24-cv-00438-MW-MAF Document 76-4 Filed 03/28/25 Page 5 of 24

USCA11 Case: 25-11881 Document: 28 Date Filed: 09/12/2025 Page: 78 of 121

require special protections online";

- "Parents and caregivers play an important role in setting the rules for their family's online experiences, particularly for the youngest children";
- "All children and teenagers deserve free access to high-quality and age appropriate content that meets their individual interests and needs";
- "The developmental needs of children differ greatly from those of teenagers and should be reflected in their online experiences"; and
- "With appropriate safeguards, innovative technologies can benefit children and teenagers."

*Id.*

14.     These Youth Principles are just one part of the work we do to foster a vibrant, safer, and open community for users. To successfully support this community, YouTube must constantly balance disseminating a wide range of user-generated content against addressing objectionable and harmful speech. On one hand, the Internet is a force for creativity, learning, and access to information. The world is a better place when we listen, share, and build community through our stories. We strive to empower users to access, create, and share information. We believe that a free flow of ideas fosters opportunity, community, and learning, and enables diverse and authentic voices to break through.

15.     As a result, YouTube is full of valuable and enriching content for minors. They can encounter educational content, spanning lectures on history from leading universities across the world to step-by-step instructions on how to solve calculus problems. They can watch performances of centuries' old musical compositions and clips of the latest Broadway plays. Indeed, YouTube's open approach ensures that people across the world can interact across language, geography, and culture—breaking down the barriers to information.

16.     But on the other hand, an open Internet poses challenges. Bad actors exploit the Internet, including YouTube, for their own personal gain or for purposes of causing harm, even as we invest in the policies and systems to stop and deter them. Objectionable and harmful content on our website also makes YouTube less open, not more, by creating a space where creators and

5

**SA76**

Docusign Envelope ID: A850E669-5EFE-420F-AE7F-B0D6ADAB23E8 Case 4:24-cv-00438-MW-MAF Document 76-4 Filed 03/28/25 Page 6 of 24

USCA11 Case: 25-11881 Document: 28 Date Filed: 09/12/2025 Page: 79 of 121

users may not feel safe to share, learn, and experience. We believe that, in order to have and protect openness, a service should attempt to strike the right balance between fostering freedom of expression and decreasing the likelihood that users will encounter harmful user-generated content on our service.

17.     Consequently, working to keep harmful and illegal content off our services is core to the work of many different teams across Google and YouTube. When it comes to the information and user-generated content on our services, we discharge that responsibility based on clear, transparent policies and processes.

### A. YouTube's Age-Appropriate Experiences and Policies for Minors

18.     YouTube has long invested in research, policies, and practices to offer age-appropriate ways for minors to explore, learn, and participate in the online world. Such efforts are designed with consideration of our youngest users' wellbeing. We also provide tools and guidance that offer families flexibility to choose the right experience for them, enabling them to create healthy and positive digital habits at home and in school. We believe that appropriate safeguards can empower young people and help them learn, grow, and prepare for the future. Accordingly, we (1) invest in age-appropriate services and features that align with children's and teens' developmental stages and needs; (2) offer tools that give families flexibility to manage their relationships with technology; (3) implement policies, protections, and programs that aim to increase online safety for children and teens; and (4) provide resources that teach the fundamentals of digital citizenship and media literacy to allow for confident, safer online exploration.

19.     We also prioritize making robust resources and guides available for children, teens, and their parents so they can better understand YouTube's services. *E.g.*, YouTube Help, Understand Your Choices as a Family, https://perma.cc/BK42-3TUR; YouTube Help, What is a Supervised Experience on YouTube?, https://perma.cc/CP6V-ZMEW ("YouTube Help, What is a

6

**SA77**

Supervised Experience").

20.    YouTube offers "Supervised Experiences for Teens." With this experience:

[P]arents and teens will be able to link their YouTube accounts in our new Family Center hub. In Family Center, parents can see shared insights into their teens' channel activity on YouTube including the number of uploads, subscriptions and comments. Parents (and teens) will also receive proactive email notifications at key events, like when teens upload a video or start a livestream, providing an opportunity to offer advice on responsible creation supported by resources created with Common Sense Networks, an affiliate of Common Sense Media.

James Beser, *A Collaborative Approach to Teen Supervision on YouTube*, YouTube Official Blog (Sept. 4, 2024), https://perma.cc/S73H-R3QL.

21.    Using these features, parents can (1) receive email notifications when a teen uploads a video or starts a livestream, which "provid[es] an opportunity to offer advice on responsible creation supported by resources created with Common Sense Networks, an affiliate of Common Sense Media," *id.*; (2) gain insights into their teen's channel activity (such as "the number of uploads, subscriptions[,] and comments"), *id.*; and (3) link accounts between a parent and teen, YouTube, My Family, https://tinyurl.com/msddw866.

22.    In addition, users known to be under the age of 13 are required to have their parent's consent to their having an account. Further, the parent's account remains linked to their child's account so that they can help manage their child's YouTube experience. When a parent sets up a child's Google Account, the parent is given the option to either allow the child to access only YouTube Kids (a standalone service described in detail below) or set up a "Supervised Experience" on YouTube. YouTube offers varying content levels and features that are meant to align with kids' developmental stages and give families tools to supervise children's use of the website. Developed in partnership with child-development experts, these services and experiences reach more than 100 million active viewers worldwide every month:

**SA78**

a.   **YouTube Kids:**   YouTube's standalone service "YouTube Kids" is a filtered version of YouTube built specifically to let children under the age of 13 explore age-appropriate content, with additional tools for parents and caregivers to moderate the content children see.  YouTube Kids, A Safer Online Experience for Kids, https://perma.cc/8FZJ-9UBE.   YouTube Kids features a carefully curated selection of "content that is age-appropriate, adheres to our quality principles, and is diverse enough to meet the varied interests of kids globally."  *Id.*  YouTube works "with a variety of external specialists in child development, children's media, and digital learning and citizenship" to determine what content should be available on YouTube Kids.  *Id.*  As a result, kids have access to a broad range of high-quality content.  *See* James Beser, *Enabling a High Quality Kids Experience & Helping Kids Creators Thrive on YouTube*, YouTube Official Blog (Dec. 16, 2022), https://perma.cc/2G7Y-9JQB ("Beser, *Enabling a High Quality Kids Experience & Helping Kids Creators Thrive on YouTube*").  The content on YouTube Kids has been approved by YouTube in collaboration with its partners and is sorted into age-appropriate collections that parents can further curate.  YouTube Kids, Tips and Tools for Your Family, https://tinyurl.com/yc272vsw.  Videos on YouTube Kids include popular children's videos, educational content, and content from trusted partners.  We have invested heavily over the years to make YouTube Kids a safer, family-friendly place for kids to explore their imagination and curiosity.  In addition to other tools discussed below, our built-in timer in YouTube Kids lets parents or caregivers, at their discretion, "limit screen time by telling kids when it's time to stop watching."  *See* YouTube for Families Help, Limit Screen Time on YouTube Kids, https://perma.cc/9T3X-J5M5.  "The timer will display a friendly alert and stop the app when the session is over" so that parents or caregivers do not have to.  *Id.*  Similarly, parents can control their minor children's privacy

8

**SA79**

settings. YouTube for Families Help, Manage YouTube Kids Profile Settings, https://tinyurl.com/mr2esjwk. In short, YouTube Kids provides a simplified version of the service that is attuned to the needs of younger users, providing primarily a service for viewing age-appropriate content, while removing many features that may be less useful for these age groups, such as content uploads and commenting.

b.  **Supervised Accounts:**  YouTube also provides "supervised accounts" that are linked to parents' accounts for children (up to the relevant age of consent) whose parents decide their children are ready to explore some of YouTube's vast universe of user-generated content. In these parent-managed accounts, and at the parent or caregiver's discretion, "parents [can] select a content setting that limits the videos and music [their] children under 13 can find and play." YouTube Help, What is a Supervised Experience. For example, parents can, among other things, (1) "block specific channels"; (2) change their minor child's permissible "content level settings," including "Explore" (generally for viewers 9+), "Explore More" (generally for viewers 13+), and "Most of YouTube" (almost all videos on YouTube except for videos marked only for adults or otherwise not appropriate); and (3) review their child's watch history from their device as well as pause and clear their child's search and watch history in parent tools. YouTube Help, Parental Controls & Settings for Supervised Experiences on YouTube, https://perma.cc/XJ2P-AXF9 ("YouTube Help, Parental Controls & Settings for Supervised Experiences on YouTube"); *see also* YouTube Help, Choose Content Settings for Pre-teen Supervised Experiences, https://perma.cc/X67E-5PTE. "Supervised accounts also change the features they can use, the default account settings, and the ads they see." YouTube Help, What is a Supervised Experience. For instance, functionalities like creating content and posting content are disabled on the Supervised Experience. *Id.* Further, when parents create a

9

**SA80**

Docusign Envelope ID: A850F6C9-5EFE-420F-AE7F-B0D6ADAB23E8

Case 4:24-cv-00438-MW-MAF   Document 76-4   Filed 03/28/25   Page 10 of 24
USCA11 Case: 25-11881   Document: 28   Date Filed: 09/12/2025   Page: 83 of 121

Google Account for their child with Family Link and use YouTube's Supervised Experience, parents and caregivers can set screen time limits on their Android device or Chromebook.  Google Family Link, FAQ, https://perma.cc/V62E-GDFW.  Parents and caregivers can set their child's Android device or Chromebook to lock after the child has used it for a certain amount of time or when the parents or caregivers think their child needs downtime.   Google  for  Families  Help,  Manage  Your  Child's  Screen  Time, https://perma.cc/K74X-QL3M.  Parents set up their own accounts to serve as managing accounts.   YouTube  for  Families  Help,  Get  Started  with  Supervised  Accounts, https://perma.cc/LAL7-YHQN.

23.     YouTube also offers a suite of digital wellbeing tools that encourage children and teens to be mindful of their screen time. These include:

a.     **Autoplay:** YouTube's autoplay feature is turned off by default for all users we know to be under 18 across all of YouTube's services.  YouTube Help, Autoplay Videos, https://perma.cc/UK5U-MXCM.  Parents or caregivers can choose to disable autoplay on YouTube Kids and YouTube's Supervised Experiences.  *See* YouTube Help, Parental Controls & Settings for Supervised Experiences on YouTube.

b.     **Recommendations on YouTube for Teens:**  We have worked to refine our recommendation systems so that teens on YouTube are not overly exposed to user-generated content that, while perhaps acceptable as a single video, could be considered differently if viewed in high quantities.  Through consultation with our Youth & Families Advisory Committee and with input from academic research, we "define[d] categories of videos that are innocuous in a single view, but that could be problematic if viewed in repetition for some young viewers" which "include content that": (1) "Compares physical features and idealizes some types over others"; (2) "Idealizes specific fitness levels or body

10

**SA81**

weights"; and (3) "Features social aggression (non-contact fights and intimidation)." YouTube, Building Content Recommendations to Meet the Unique Needs of Teens and Tweens at 3, https://perma.cc/75ZA-V8CH.  We have implemented guardrails for teens to limit repeated recommendations of videos related to these topics.

c. **"Take a Break" Reminders:**  These reminders pause a video until a user dismisses or resumes playing the video.  This feature is turned on by default for all users we know to be under 18 across all of YouTube's services, including on Supervised Experiences. YouTube Help, Take a Break Reminder, https://perma.cc/EK8A-DBFM.

d. **Bedtime Reminders:**  Users can set a specific time to receive a reminder to stop watching YouTube and go to bed.  This reminder is turned on by default for all users we know to be under 18 across all of YouTube's services, including on Supervised Experiences. YouTube Help, Set a Bedtime Reminder, https://perma.cc/ES3D-WYY7.

## B. Partnerships With Experts

24. YouTube has ongoing partnerships with independent experts in fields such as child development, emerging media, and digital wellbeing.  For example, we have created a set of best practices for kids and family content.  *See, e.g.*, YouTube Help, Best Practices for Kids & Family Content, https://perma.cc/M9JA-6K9Z.  These best practices help guide creators to create quality content that "support[s] child development and wellbeing by promoting things like . . . respect[,] healthy habits, learning and curiosity, [and] play and imagination."  Beser, *Enabling a High Quality Kids Experience & Helping Kids Creators Thrive on YouTube*.  They also help determine which content is recommended in the main YouTube experience and is included in YouTube Kids. "Since we have begun to incorporate our quality principles into YouTube Kids recommendations, viewership of content that reflects our high quality principles has increased by over 45% in the app." *Id.*  In 2023, YouTube updated our Community Guidelines to update our approach to eating

11

**SA82**

disorder-related content, including by limiting the visibility of certain content to adults. Dr. Garth Graham, *An Updated Approach to Eating Disorder-Related Content*, YouTube Official Blog (Apr. 18, 2023), https://perma.cc/D4HT-VPCD. This change was informed by independent experts such as the National Eating Disorder Association. *Id.* YouTube's Youth and Family Advisory Committee also advises YouTube on the developmental stages of teens and how content consumed online can affect their wellbeing. James Beser, *Continued Support for Teen Wellbeing and Mental Health on YouTube*, YouTube Official Blog (Nov. 2, 2023), https://perma.cc/JTC6-QKVH.

### C. YouTube's Minor-Specific Content and Safety Policies

25.    YouTube strives to provide positive online experiences for our users, and that is especially true for children and teens. Over the years, we have developed a robust set of policies and enforcement mechanisms to ensure that YouTube remains a welcoming community for our users. For minors specifically, that might require limiting their access to certain user-generated content—in addition to developing different services that better strive to reflect minors' needs.

26.    YouTube has always maintained a set of Community Guidelines that outline categories of content that are prohibited on YouTube. These Guidelines apply to all types of content on our services, including videos, comments, links, thumbnails, video descriptions, stories, posts, live streams, playlists, external links contained in uploaded content (including clickable URLs or verbal directions to users to visit other sites), and any other user-generated content. Our Community Guidelines are a key part of our broader suite of policies, and we regularly update them to keep pace with emerging challenges. *See* YouTube, Community Guidelines, https://perma.cc/PD8B-K2EB ("YouTube, Community Guidelines"). Our policies for prohibited or restricted content address a variety of issues, including:

a.    **Age-Restricted Content:** We age-restrict user-generated content that might not violate our Community Guidelines but that may be inappropriate for minors. These include

**SA83**

Docusign Envelope ID: A850F6C9-5EFE-420F-AE7F-B0D6ADAB23E8

Case 4.24-cv-00438-MW-MAF    Document 76-4    Filed 03/28/25    Page 13 of 24
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 86 of 121

categories of content such as (1) "nudity and sexually suggestive content"; (2) content that depicts "adults participating in dangerous activities that minors could easily imitate"; (3) "violent or graphic content"; and (4) "vulgar language." YouTube Help, Age-Restricted Content, https://perma.cc/9YD5-3KU5. Age-restricted videos are not viewable to users who are known to be under 18 or any signed-out user. *Id.*

b.    **Child Safety:**    YouTube has a standalone "Child Safety Policy" that prohibits "[s]exually explicit content featuring minors and content that sexually exploits minors." YouTube Help, Child Safety Policy, https://perma.cc/KVQ3-Q69Z ("YouTube's Child Safety Policy"). We report content on YouTube that contains child sexual abuse material ("CSAM") to the National Center for Missing and Exploited Children ("NCMEC"). *Id.* This policy also prohibits content: (1) showing a minor participating in "harmful or dangerous acts"; (2) that could encourage minors to participate in dangerous activities; (3) showing any infliction of physical, emotional, or sexual abuse on a child; or (4) concerning "[c]yberbullying and harassment involving minors." *Id.* The Child Safety Policy also prohibits content that targets minors and families, but contains problematic content including, but not limited to, "sexual themes, violence, [and] other [inappropriate] themes" intended to shock young audiences. *Id.* In addition, "content that doesn't violate our policies but features children may have some features disabled at both the channel and content level. These features may include":

- Comments;
- Live chat;
- Live streaming;
- Video recommendations (how and when the video is recommended);
- Community posts; and
- Shorts Video remixing.

*Id.*

13

**SA84**

**D. YouTube's General Content Moderation Policies**

27.     YouTube has robust and extensive content moderation policies and enforcement. *See* YouTube, Community Guidelines.

28.     YouTube has also developed policies around "educational, documentary, scientific, and artistic content" (EDSA), dealing with topics that might otherwise violate our Community Guidelines.  Michael Grosack, *A Look at How We Treat Educational, Documentary, Scientific, and Artistic Content on YouTube*, YouTube Official Blog (Sept. 17, 2020), https://perma.cc/6DK2-P3GF.  Decisions about whether a piece of content qualifies for an EDSA exception "are nuanced and context is important." *Id.*  As an example, YouTube "do[es] not allow content targeting minors with insults or bullying, but [YouTube] may allow content that shows this as part of an **educational** anti-bullying campaign provided the minors are actors or their identity [is] hidden." *Id.*  "EDSA exceptions are a critical way we make sure that important speech stays on YouTube, while protecting the wider YouTube ecosystem from harmful content." *Id.*; *see* YouTube Help, How YouTube Evaluates Educational, Documentary, Scientific and Artistic (EDSA) Content, https://perma.cc/L6QN-RJW8.

29.     YouTube has billions of monthly logged-in users, and over 500 hours of content are uploaded every minute by an extraordinarily diverse community of creators, who span more than 100 countries and 80 languages. On a daily basis, users watch more than a billion hours of video on YouTube and generate billions of views. *See* YouTube for Press, YouTube Official Blog, https://perma.cc/BT46-ZRY7.

30.      YouTube has developed robust means of addressing user-generated content that violates our policies.  YouTube relies on a mix of human and automated efforts to detect violative content and remove it.  YouTube's first line of defense is automated systems that are trained with machine learning and/or incorporate hash-matching technology to quickly identify and take action

14

**SA85**

against violative content. YouTube also relies on global teams to review flagged content and remove it, restrict who can view it, or leave the content on the site if it does not violate any policies. YouTube employs expert teams around the world to investigate sophisticated bad actors who are adept at circumventing automated defenses. YouTube, Information Quality & Content Moderation at 12, https://perma.cc/NG6U-WJ3R. Content moderation can be human-resource intensive, even for CSAM and known violative content. YouTube verifies with human review all CSAM hashes to confirm that they are CSAM before they are reported to NCMEC. And human review becomes even more time-intensive and important for other illegal conduct like "grooming," trafficking, or harassment that requires more context to understand if illegal activity is taking place.

31.     While no system of reviewing such a high volume of content is foolproof, YouTube expends great effort and resources in removing objectionable and harmful user-generated content before most users see it. In fact, the vast majority of violative videos are seen by fewer than 10 people before they are removed. In the second quarter of 2024, approximately 59.91% of removed videos had no views before they were removed, and approximately 24.34% had between 1-10 views. *See* Google, YouTube Community Guidelines Enforcement Report - Removals, https://perma.cc/62W6-AQ45 ("Google, Community Guidelines Enforcement Report - Removals"). Over that same period, YouTube removed 8,497,876 videos. *Id.* YouTube has also created a metric for determining what percentage of views on YouTube comes from content that violates our policies. This metric, known as the Violative View Rate (VVR), helps us measure our responsibility work. *See* Google, YouTube Community Guidelines Enforcement Report - Views, https://perma.cc/5MGX-PYPP. YouTube's VVR is calculated by taking a sample of viewed videos to a team for review. The team then determines which videos in the sample violate our policies, and YouTube uses these decisions to estimate a VVR. *Id.* In the second quarter of 2024, YouTube estimated a 0.09-0.11% VVR. *Id.* This means that out of every 10,000 views on

15

**SA86**

YouTube, 9-11 come from violative content. This is down by more than 85% when compared to the final quarter of 2017 (when our teams started tracking this metric), in large part thanks to our investments in robust content moderation, including automated technologies and human review.

32.    Our practices also involve taking action against users and channels that continue to upload violative content. A YouTube channel is terminated if it accrues three Community Guidelines strikes in 90 days, has a single case of severe abuse (such as predatory behavior), or is determined to be wholly dedicated to violating our guidelines (as is often the case with spam accounts). When a channel is terminated, all of its videos are removed. In the second quarter of 2024, YouTube terminated 3,260,974 total channels. *See* Google, Community Guidelines Enforcement Report - Removals. The majority of channel terminations are a result of accounts being dedicated to spam (80.4%) or adult sexual content (4.8%) in violation of our guidelines. *Id.*

33.    Our efforts are not limited to removing objectionable and harmful user-generated content in the videos uploaded on our site. They also extend to user-generated comments. In the second quarter of 2024, YouTube removed approximately 1,372,493,981 comments. *Id.* Approximately 99.6% percent of comments removed are first detected by YouTube's automatic flagging system, and the majority of actions taken against comments (80.8%) are for spam. *Id.*

34.    Enforcing our policies takes a tremendous amount of effort. YouTube's global teams work continually to remove user-generated content from YouTube that violates our policies. We endeavor to give our teams visibility into emerging issues before they reach, or become widespread on, our website. That valuable visibility is driven by our Intelligence Desk, a team within YouTube's Trust & Safety organization. These specialized analysts identify trends and the risks they pose. They also regularly monitor ongoing threats, both tracking their prevalence across media and evaluating how they morph over time. Our teams also work to provide appropriate age restrictions and other appropriate warnings on content.

16

**SA87**

35.    Given the open nature and scale of YouTube and because bad actors are constantly refining how they attempt to evade detection, detecting violative user-generated content cannot be done with perfect accuracy nor upon the moment of upload.  YouTube, Information Quality & Content Moderation at 12.  Nevertheless, YouTube continuously works to combat new challenges and bad actors through a multi-faceted and nuanced approach to exercising its discretion in setting its content moderation policies, working to distinguish among content that is truly objectionable or harmful, borderline content (which is content that comes close to violating, but does not quite violate our Community Guidelines), and content that contributes positively to the YouTube community.  To that end, we have a diverse set of means to help us keep our community safe, including:  (1) appending warning interstitials for sensitive content; (2) surfacing helpful resources for crisis management; and (3) suspending and/or terminating channels or accounts.  YouTube also encourages creators to age-restrict content when appropriate.  The YouTube Team, *Using Technology to More Consistently Apply Age Restrictions*, YouTube Official Blog (Sept. 22, 2020), https://perma.cc/G5Z4-UFXC.  We apply age restrictions on content ourselves, when needed.  We have other tools to help us provide authoritative information on our service-such as the use of information panels to show basic background information, sourced from independent, third-party partners, that give more context on a topic.  For example, in partnership with third-party expert organizations and global experts in the space, we expanded our crisis resource panels to introduce a "pause" page for queries related to suicide, self-harm, and eating-disorder topics that provides users with options with how to proceed before they are able to see search results related to these topics.  These include selecting to contact third-party crisis-resource-hotline partners for support or searching for various self-help tools.  We further prioritize the recommendations of authoritative content and limit the spread of borderline content to users through recommendations.  Because removing content is only one way of managing content, YouTube has developed and invested in

17

**SA88**

this diverse set of tools that are essential in balancing free expression and responsibility on our website. Simply put, these tools provide additional information and options compared to simply removing (or not removing) user-generated content from our website.

## II.    YouTube's Compliance Obligations Under the Act

36.    Google and YouTube support regulations designed to protect the wellbeing of minors online while ensuring that users' rights to access speech are not impeded. *See generally* Google, Legislative Framework to Protect Children and Teens Online, https://perma.cc/6SVS-M823 ("Google, Legislative Framework"). But the Act here is not well-suited to protect minors. It fails to take into account differences among online services, fails to take into account the differences among minors at different developmental levels, and ultimately will only impede minors' access to valuable information and speech online. Furthermore, it will discourage and stymie innovation that makes YouTube's services better for all.

### A. Prohibition on minors younger than 14, and potential prohibition on minors younger than 16 (Fla. Stat. §501.1736(2), (4))

37.    I understand the Act provides that a "social media platform shall prohibit a minor who is younger than 14 years of age from entering into a 'contract' [as defined by the Act] with a social media platform to become an account holder." *Id.* §501.1736(2)(a) (internal quotation marks added). I understand the Act further provides that a "social media platform shall":

1. Terminate any account held by an account holder younger than 14 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely younger than 14 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.

2. Allow an account holder younger than 14 years of age to request to terminate the account. Termination must be effective within 5 business days after such request.

3. Allow the confirmed parent or guardian of an account holder younger than 14 years of age to request that the minor's account be terminated. Termination must

18

**SA89**

be effective within 10 business days after such request.

4. Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

*Id.* §501.1736(2)(b).  An "account holder" is "a resident who opens an account or creates a profile or is identified by the social media platform by a unique identifier while using or accessing a social media platform when the social media platform knows or has reason to believe the resident is located in this state."  *Id.* §501.1736(1)(a).  And the law provides that "[i]f a social media platform allows an account holder to use the social media platform, the parties have entered into a contract."  *Id.* §501.1736(8).

38.    In addition, I understand that if the Act's parental-consent requirement (addressed below) is enjoined, then the Act's prohibition on creating accounts would extend to 14- and 15-year-olds too:

If a court enjoins the enforcement of subsection (3) or would otherwise enjoin enforcement of any other provision of this section due to subsection (3), then subsection (3) shall be severed, and the following shall come into effect:

(a) A social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder.

(b) A social media platform shall:

1. Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, and provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of 90 days if the account holder fails to effectively dispute the termination.

2. Allow an account holder who is 14 or 15 years of age to request to terminate the account.  Termination must be effective within 5 business days after such request.

3. Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated. Termination must be effective within 10 business days after such request.

**SA90**

4. Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

*Id.* §501.1736(4).

39. As I understand Section 501.1736(2), it prohibits all minors younger than 14 from being an "account holder" (as defined by the Act) on any YouTube service qualifying as a "social media platform" under the Act if that use qualifies them as an "account holder."

40. Specifically, Section 501.1736(2) could require YouTube to stop allowing minors younger than 13 from being "account holders" on YouTube Kids and the Supervised Experience—which could prohibit YouTube from offering those services to minors younger than 13 altogether. If so, parents would lose the option to provide their minor children with the family-friendly content available on those services. "Different families have different preferences so YouTube Kids has videos from science experiments, to nursery rhymes, to hula-hooping pigs, and everything in between." YouTube Kids, All Kinds of Videos for All Kinds of Kids, https://tinyurl.com/mwskdk56. For instance, YouTube Kids has partnerships with Sesame Street and Ms. Rachel—who each provide age-appropriate and enriching content for children. Thus, the Act will impede both affected minors and their parents' access to useful services.

41. Moreover, as I understand Section 501.1736(2), it would prohibit 13-year-olds from "hold[ing]" "accounts" on YouTube's main service—and perhaps even accessing the service altogether. Although minors younger than 13 may still view content on YouTube without accounts, their parents can only supervise their minor children using the tools explained above if their minor children have accounts. In addition, 13-year-olds would not be able to access all of the speech-facilitating abilities that YouTube provides.

42. If the Act's prohibition on account creation and access is extended to 14- and 15-year-olds under Section 501.1736(4), then the harms explained above would be exacerbated.

20

**SA91**

**B. Parental consent for 14- and 15-year-olds (Fla. Stat. §501.1736(3))**

43.    I understand that the Act provides a "social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent for the minor to become an account holder." *Id.* §501.1736(3)(a).  I understand the Act further provides that a "social media platform shall":

> 1. Terminate any account held by an account holder who is 14 or 15 years of age, including accounts that the social media platform treats or categorizes as belonging to an account holder who is likely 14 or 15 years of age for purposes of targeting content or advertising, if the account holder's parent or guardian has not provided consent for the minor to create or maintain the account.  The social media platform shall provide 90 days for an account holder to dispute such termination. Termination must be effective upon the expiration of the 90 days if the account holder fails to effectively dispute the termination.

> 2. Allow an account holder who is 14 or 15 years of age to request to terminate the account.  Termination must be effective within 5 business days after such request.

> 3. Allow the confirmed parent or guardian of an account holder who is 14 or 15 years of age to request that the minor's account be terminated.  Termination must be effective within 10 business days after such request.

> 4. Permanently delete all personal information held by the social media platform relating to the terminated account, unless there are legal requirements to maintain such information.

*Id.* §501.1736(3)(b).

44.    As I understand this provision, it will require us to secure parental consent before allowing 14- and 15-year-olds from being "account holder[s]" on YouTube's main service.

45.    Compliance with this provision will negatively affect users' experiences. Implementing such systems would significantly restrict, if not block entirely, access to information and services online.  As we have said, legislatively mandating parental consent "could unnecessarily preclude some teens from accessing the basic benefits of the online world and have unintended effects on vulnerable youth."  Google, Legislative Framework at 2.  Among other

21

**SA92**

Docusign Envelope ID: A850F6C9-5EFE-420F-AE7F-B0D6ADAB23E8

Case 4:24-cv-00438-MW-MAF    Document 76-4    Filed 03/28/25    Page 22 of 24
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 95 of 121

reasons, this is because some teens may have parents who are incapacitated, abusive, not proficient in English, not technologically savvy, or otherwise not available.

### C. Parental-verification requirement (Fla. Admin. Code §2-43.002(2))

46.    I understand that regulations under the Act provide that "a social media platform shall conduct reasonable parental verification" in "determining whether someone is a parent . . . for a known child." Fla. Admin. Code §2-43.002(2).

47.    It is difficult to verify the custodial arrangements of teenage users. Developing foolproof systems would require a large upfront investment of resources and would overly restrict the ability of teenagers to participate in online speech. Furthermore, operating and maintaining those systems will require substantial resources, including a large ongoing investment in the human resources necessary to evaluate the identities and familial relationships of our users. That can be complicated for many reasons, including when parents disagree with one another about providing consent.

48.    Given that, according to YouTube's best, good-faith attempt to construe the Act's coverage requirements, YouTube appears to be subject to the Act, YouTube will be required to take significant and costly compliance measures or face significant risk of enforcement by the Attorney General—including potentially broad investigatory demands—if the Attorney General is not enjoined from enforcing it. YouTube's users include minors in Florida who are under 14 (including those who have access via YouTube Kids or Supervised Experience), as well as minors in Florida who are 14 or 15 years old. YouTube does not currently prohibit minors under 13 from creating parent-supervised accounts when YouTube knows or has reason to believe that the minor is located in Florida; parents may elect to provide children access to YouTube or YouTube Kids via a Supervised Experience or a profile on the YouTube Kids app, and these supervised accounts and YouTube Kids profiles appear to qualify as "accounts" under HB3. YouTube does not

22

**SA93**

Docusign Envelope ID: A850F6C9-5EFE-420F-AE7F-B0D6ADAB23E8

Case 4:24-cv-00438-MW-MAF   Document 76-4   Filed 03/28/25   Page 23 of 24
USCA11 Case: 25-11881   Document: 28   Date Filed: 09/12/2025   Page: 96 of 121

currently prohibit minors over 13 from creating accounts when YouTube knows or has reason to believe that the minor is located in Florida.  YouTube does not currently prohibit 14 and 15 year olds from creating accounts when YouTube knows or has reason to believe that the minor is located in Florida.  And YouTube does not currently require 14 and 15-year-olds to obtain the consent of a parent or guardian to create an account when YouTube knows or has reason to believe that the minor is located in Florida.  Unless HB3's enforcement is enjoined, YouTube will need to implement systems to conduct age verification and parental verification, and to close existing profiles and accounts for certain users.  Making such changes to YouTube will be costly.

49.    HB3 will also hinder YouTube's ability to communicate with its users.  YouTube disseminates content to users that YouTube thinks will be particularly relevant to them.  In assembling users' feeds, YouTube may suggest third-party videos to a particular user based in part on the videos the user has interacted with in the past (via the user's account), as well as information about the videos themselves and YouTube's own content-moderation policies.  By restricting users from creating accounts on YouTube, HB3 makes it more difficult for YouTube to engage in such communications.

50.    YouTube also communicates with its users via notifications  and when it informs users of the number of people that have viewed or liked their videos or comments.  By imposing compliance obligations on YouTube for engaging in such communications, HB3 forces YouTube to choose between restricting access to its services or ceasing such communications altogether.

51.    In sum, if Defendant is allowed to enforce the Act, Google and YouTube will suffer irreparable harm in the form of unrecoverable compliance costs, diminished ability to provide valuable user-generated content, and ongoing regulatory uncertainty about whether its services comply with the Act's broad prohibitions. Moreover, YouTube's users may experience a degraded service that frustrates their ability to engage with the wealth of speech available on YouTube.

**SA94**

\*      \*      \*

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct to the best of my knowledge.

Executed on March 21, 2025, in WASHINGTON, D.C.

Signed by:

*Alexandra N. Veitch*

346A76BAA93C431...

ALEXANDRA N. VEITCH

**SA95**

**TAB 63-2**

# In the Matter Of:

## COMPUTER vs MOODY

4:24-CV-438-MW-MAF

# TONY ALLEN

*January 27, 2025*



Case 4:24-cv-00438-MW-MAF    Document 63-2    Filed 02/14/25    Page 2 of 307
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 100 of 121

TONY ALLEN                                          January 27, 2025
COMPUTER vs MOODY                                                  1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO.:   4:24-CV-438-MW-MAF


COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION and
NETCHOICE,

          Plaintiffs,

vs.

ASHLEY BROOKE MOODY, in her official capacity as
Attorney General of the State of Florida,

          Defendant.
_____/

VIDEOTAPED DEPOSITION

OF

TONY ALLEN


DATE TAKEN:  Monday, January 27, 2025

TIME:        Commenced at 9:11 a.m.
             Concluded at 3:16 p.m.

PLACE:       107 Collins Building
             Tallahassee, Florida

REPORTED BY:    Kairisa J. Magee
                NCRA Registered Court Reporter
                Florida FPR-C
                Realtime Provider
                Florida Notary Public



APPEARANCES:


On behalf of Plaintiffs:

     CLEMENT & MURPHY, PLLC
     706 Duke Street
     Alexandria, VA 22314
     202.742.8900
     BY:  KEVIN WYNOSKY, ESQ.
     kevin.wynosky@clementmurphy.com
     BY:  MITCHELL K. PALLAKI, ESQ.
     mitchell.pallaki@clementmurphy.com
     AND

     STEARNS WEAVER MILLER
     106 E College Ave
     Suite 700
     Tallahassee, FL 32301-7721
     (850) 329-4846
     BY:  DOUGLAS L. KILBY, ESQ.   (REMOTELY)
     dkilby@stearnsweanever.com
     BY:  HANNAH E. MURPHY, ESQ.   (REMOTELY)
     hmurphy@stearnsweaver.com
     BY:  GRACE L. MEAD, ESQ.  (REMOTELY)
     gmead@stearnsweaver.com


On behalf of Defendant:

     OFFICE OF THE ATTORNEY GENERAL
     The Capitol PL-01
     Tallahassee, FL 32399-1050
     (850) 414-3300
     BY:  JAMES WACZEWSKI, ESQ.
     james@waczewskilaw.com
      BY:  ANITA PATEL, ESQ.
     anita.patel@myfloridalegal.com
     BY:  SARA E. SPEARS, ESQ.
     sara.spears@myfloridalegal.com


ALSO PRESENT:  R.L. MINNICH, VIDEOGRAPHER; PAUL
TASKE (REMOTELY); and STEPHANIE JOYCE  (REMOTELY)



TONY ALLEN
COMPUTER vs MOODY

January 27, 2025
74

So that word "harder" is a bit difficult because it depends on what you're doing and how you're doing it.  It can be very, very easy to do or with a tap of a phone or with a -- looking at a camera.  It can be harder if you have to go, you know, go and find a passport and upload an image via passport.  Very much depends on the deployment and how it is activated by the social media platform.

Q.   Thinking about the method of age estimation where a user looks into a webcam and I think you said waves their hand or takes a picture of themself; right?

A.   Yeah.

Q.   Are there any privacy concerns associated with that method of age estimation?

A.   Privacy concerns with all the methods because they all -- to one extent or another, they all require you to share information about yourself.

The way that the international standard is structured is to make sure that those privacy concerns are addressed so that they are data-minimized, that materials are not kept.

With age estimation, the way that works, technically, is it's not trying to identify the person.  It's not looking at and doesn't always



require a face.  It can be voice.  It can be hand movements, depending on the technology that's deployed.  But it's not taking enough data to be able to identify an individual person.  It's not the same process as biometric comparison where you're taking an image of someone to try to compare it with an image that appears on a driver's license, for instance.  That's much more relevant to age verification.

But there are privacy issues around all types of age verification, parental consent, parental control.  They all, whatever they are, require you to share information about yourself with -- with providers.

Q.   So I'll represent to you certainly that my everyday life, I've come across requirements along the lines of what you've just described.  I've had to take a picture of myself to sign up for something or to order something.  And, honestly, every time I am required to do that, it makes me feel a little uncomfortable just taking my picture and having it go on to the ether.

Is that a common reaction, in your experience?

A.   Yes, I think it probably is.  We all are



ESQUIRE
DEPOSITION SOLUTIONS

Case 4:24-cv-00438-MW-MAF     Document 63-2     Filed 02/14/25     Page 77 of 307
USCA11 Case: 25-11881     Document: 28     Date Filed: 09/12/2025     Page: 104 of 121

TONY ALLEN                                                January 27, 2025
COMPUTER vs MOODY                                                      76

doing a lot more biometrics.  I will -- I will tell you when I -- when I came through the airport in Atlanta and I felt as though, as a visitor to this country, I just had my photograph taken and my fingerprints taken and my reason for coming and including producing an email from the attorney general's office to give justification.  It is, I think, an increasing part of daily life that we have these needs to provide this digital information.

Q.   And would you agree to me -- excuse me.  Strike that.  New line.

Would you agree with me that people of all ages might be uncomfortable sharing a picture of themself even if they don't know how it's being used?

MR. WACZEWSKI:  Objection to form.

A.   I mean, I -- as an expert, I can say that I'm aware that people are uncomfortable with sharing information, biometric information or personal information.  I think the way that the international standard is structured is to address that concern and to make sure that the providers of services in this space are structured in the same way -- in the right way.  Sorry.

What I would say also is that there is a



benefit of disassociating the process of age assurance or parental consent or control from the provider and the service. So having a third party involved in that process enables you to draw a very clear fence around what that data is doing and where it is being used.

But, yeah, I do accept that. I think I would also -- I have heard this question a lot where people say that they are concerned about sharing their image or their photo when it comes to formal processes of identification. But then I also am well aware, from my own personal experience, that people will readily share videos of themselves on TikTok or photos of themselves in a local restaurant or whatever, on social media, quote openly and quite freely. So there's a bit of a -- a balance there.

BY MR. WYNOSKY:

Q. Do you think there are people that, upon realizing they have to provide a picture of themself to sign up for a service or order something, they might just decide to abandon pursuing that service or that particular item because they don't want to share a photo of themself?

MR. WACZEWSKI: Objection to form.

A. I think it's important that people



TONY ALLEN                                          January 27, 2025
COMPUTER vs MOODY                                              78

providing those services provide alterative means by which you can achieve the same objective. Certainly, as I was talking about coming through the border, there was a sign up to say, If you object to this, then ask one of the CVP, I think it is, agents and they will provide an alterative method by which you can do that.

But, yeah, it's possible that people will decide that they don't want to use the service on the basis of having to go through some sort of process to access that service. I think that's the same with any service, with any -- yeah, the bank account, buying any goods, whatever it is, you know, creating an Amazon account or whatever it might be.

BY MR. WYNOSKY:

Q.   And would you -- if we move on from taking a picture at a webcam and we think about other forms of age assurance that you mentioned, so providing a copy of an official document, would you agree that there are people who, upon being asked to provide a copy of an official document, might feel sufficiently uncomfortable that they abandon pursuing whatever service or good that was requiring them to provide a copy of an official document?

A.   Yeah, I think the same answer applies to



Case 4:24-cv-00438-MW-MAF    Document 63-2    Filed 02/14/25    Page 80 of 307
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 107 of 121

TONY ALLEN                                                    January 27, 2025
COMPUTER vs MOODY                                                          79

that as it does to providing any other personal information about yourself.

Q.   And that same answer, just to make sure the transcript is clear, is "yes"?

A.   Yes.

Q.   Generally speaking, is age verification more expensive for websites to implement effectively relative to age estimation or age inference?

A.   Depends on the way they go about doing the age verification.  So if it is a -- a document scan and an extraction of documents, information from documents, that does tend to be slightly more expensive than if it's a record check, so if it's an electronic link to a record.

The reason for that is because you might have to do what's called liveness detection and a biometric binding with a age verification process. So just to explain what that is, if someone produces driving license and shows it to a camera on the computer, you've got to biometrically bind that to the person that's on the driving license to make sure it's my driving license.

And you go -- and you've also got to make sure that it is a human being that is doing the presentation and not a deepfake attack.  So there is



TONY ALLEN                                              January 27, 2025
COMPUTER vs MOODY                                                     94

records, the same process is that the user or the individual has to be able to have the right to access those records and the right to share them.

I would personally say it's probably more burdensome to go and dig out your passport from wherever it is because that requires you to go away from your device or your -- your computer and go and find something, which, you know -- and I travel a lot, so I keep my passport with me.

But for children, I'm guessing someone will have to go and find it.  But, I mean ... a lot of children also carry ID for different reasons.  But it's -- I wouldn't say one is more burdensome than the other.

BY MR. WYNOSKY:

Q.    If we think about an age-verification process that relies on driver's licenses, passports, bank records, things like that, are there any equity concerns with relying on those forms of documents to conduct age verification?

MR. WACZEWSKI:  Objection to form.

A.    I don't quite understand what you mean by "equity concerns," if you want to expand on that.

BY MR. WYNOSKY:

Q.    Is it fair to say that access to a



Case 4:24-cv-00438-MW-MAF    Document 63-2    Filed 02/14/25    Page 96 of 307
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 109 of 121

TONY ALLEN                                    January 27, 2025
COMPUTER vs MOODY                                           95

driver's license or a passport or a banking record might differ across different socioeconomic groups?

A.    Yes.

Q.    So to sort of spin this out a little bit more, minority groups, lower income groups, they may not have as ready access to a driver's license or bank records or a passport as people in higher income brackets, for instance?

A.    Yeah.  I think there's available evidence to support that.

Q.    And does that present a problem in terms of age verification schemes that rely on documents like driver's licenses, passports, and bank records?

A.    Yes.

Q.    Can you explain to me what those problems are?

A.    If you don't have access to the data or the information or the -- how to access their records, then that's not a process that they would be able to follow.  It is -- as I mentioned earlier, it's certainly more challenging to do age verification and date of birth finding with -- the younger the people are because they haven't built up that, what we call digital footprint.  They haven't built up that footprint of information.



Case 4:24-cv-00438-MW-MAF    Document 63-2    Filed 02/14/25    Page 97 of 307
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 110 of 121

TONY ALLEN                                                    January 27, 2025
COMPUTER vs MOODY                                                          96

Q.   And so it sounds like it's more difficult, not just with the younger the people are, but also, for lack of a better word, the poorer they are or the socioeconomic status they have; correct?

A.   I think, yes.  There's definitely -- you know, I won't necessarily say poorer.  So -- but we would say -- okay.  We use the term "identity challenged" in the sector, which is people who, for whatever reason, haven't built up the identity portfolio of things that they can rely on when they're doing identity checking.

Q.   Do social media companies like Meta or X or Instagram currently use any age-assurance methods?

A.   Yes.

Q.   And which age-assurance methods do they use?

A.   I think they use a broad selection of them, both inference, estimation, and age verification.  And they also deploy their own in-house algorithmic programming for age assurance as well.

Q.   How do you know that?

A.   I've met with them, discussed it with them.  I've seen the systems.  I've seen what they

TONY ALLEN                                                    January 27, 2025
COMPUTER vs MOODY                                                         209

technological controls, because I think you're

looking at two different things.

Q.    Well, I'm looking at what you wrote in

paragraph 53 of your declaration, which says,

"A survey of U.S. parents by Kaspersky in 2021 found

just 50 percent used any kind of parental controls."

And maybe what you just said is 50 percent

use parental control apps.

A.    Yeah.

Q.    But it's not accurate to say that

50 percent use any kind of parental controls.  That

number is much higher, isn't it?

MR. WACZEWSKI:  Objection to form.

A.    I -- I'm referring to the study or study

says that 50 percent of parents use parental control

apps.

BY MR. WYNOSKY:

Q.    And the same study also says that

96 percent of parents set limits on their child's

digital habits; correct?

A.    Yes.

Q.    Let's go to paragraph 58 of your

declaration, please.

A.    58?

Yeah.

Q.    So you say, "Children often circumvent device-level restrictions through various methods."

Do you see that?

A.    Yes.

Q.    And when you say "often," do you have any data on exactly how frequently children employ these various techniques you describe in the paragraph to circumvent device-level restrictions?

A.    No -- no specific data, no.

Q.    Is it your position that device-level restrictions are, inevitably, ineffectual?

A.    Not inevitably.  I think that all of these -- as I said earlier, on all of these restrictions and all of these activities have a role to play in the overall picture of things.  But I think that I'm pointing out here that, you know, there are -- you know, there are challenges with this -- with particularly these are the ways that children get around these particular restrictions that are there.

I know that they're inevitable.  But my view is that you're looking for a -- a multi-layered approach to the protection of children online.

Q.    Let's go to paragraph 59.

A.    Yeah.



TONY ALLEN                                          January 27, 2025
COMPUTER vs MOODY                                              211

Q.   So just one sort of global question.  I don't see any sources for citations in paragraph 59. Do you?

A.   No.  I think these are just general -- these are from my general knowledge of how these different restrictions operate.

Q.   So when you say children bypass these network-based restrictions using the various tools you described in subparagraphs A through C, what is your basis for saying that children actually use these methods to evade network-based restrictions?

A.   Knowledge, experience, and understanding of how these systems work.

Q.   And in paragraph 58, you said, "Children often circumvent device-level restrictions."

Here you just say, "Children bypass."

Does that mean that it's harder to bypass network-based restrictions than it is to bypass device-level restrictions?

A.   That's possibly slightly over-interpretation of a missing word there.  But I think in answer to your question, I think it is probably easier to get around device-level than it is around network-level ones only because you probably need a bit more knowledge to get around



800.211.DEPO (3376)
EsquireSolutions.com

**SA111**

TONY ALLEN                                                   January 27, 2025
COMPUTER vs MOODY                                                        212

network ones than device-based ones.

Q.    You're not the first person to accuse a
lawyer of over-interpreting omission of a particular
word.

I want to spend a little bit of time
talking about subparagraphs (a) through (c).

A.    You mean 59?

Q.    In paragraph 59, yes.

A.    Yeah.

Q.    Do you have any data on exactly how many
children are using -- we'll start with (a), "masking
their location and bypassing content filtering
through encrypted connections, such as the use of
virtual private networks"?

MR. WACZEWSKI:  Objection to form.

A.    No.

BY MR. WYNOSKY:

Q.    Do you think that there are,
realistically, a lot of children out there doing
this?

A.    I think what I would describe it as --
as -- virtual private networks are kind of what you
describe as the talk of the playground at the
moment.

And so there's a -- there's a bit of a --



I will -- it will just get around this by using a VPN.

No, I'm not entirely convinced.  Here in the U.S., we had a -- a case going on in relation to the banning of TikTok.  And I think it was taken down for about 48 hours or so, whatever that was.  But everyone thought they would just get around it by using a VPN.  I would say it didn't work, and they weren't able to bypass that restriction using a VPN.

So I -- I suspect that the use of VPNs is possibly -- as I said, it's the talk of the playground, but it's possibly overhyped as an actual way around potentially these restrictions and being able to sort of geographically or virtually relocate yourself.

Q.    The playground has certainly changed since my days.

A.    Yes, me too.

Q.    How about subparagraph (b)?  "Accessing restricted content through publicly available proxy sites."

I'm not even sure I know what that means.  Can you explain what that means?

A.    So this is probably more relevant to



pornography than it is to social media.  Because social media is a -- an ecosystem in its own right.  But what -- what sometimes happens in the area of pornography is that, although the site will appear and it will appear in a content-filtered and restricted way -- it's got the "restricted to adults" filter tag on it -- there are other sites that will effectively reproduce that and create a proxy path without those filters on.

If you know where to find them and you know where to look -- and they are out there.  That's -- to be fair, that's probably less relevant to social media because, ultimately, if someone tried to copy Facebook, they'd face some real challenges making it work.

Q.   So for purposes of understanding your declaration in this case, subparagraph (b) in 59 is mostly background.  It's not --

A.   Yes.

Q.   -- directly relevant to your opinions in this case?

A.   I think these sections are all mostly background.  I was asked to give an opinion on the -- on these particular types of restriction, mainly because I think they were raised in the --


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

TONY ALLEN                                    January 27, 2025
COMPUTER vs MOODY                                          215

either in the complaint or in one of the declarations that came in previously.

Q.   And if we keep going to paragraph 60 of your declaration.  That's Exhibit 5.

A.   Yeah.

Q.   Here you say common -- strike that.  New line.

This paragraph discusses browser-level restrictions; is that right?

A.   Yes, that's correct.

Q.   And you say, "Common circumvention tactics include," and you go on to list three common circumvention tactics; is that right?

A.   Yes.

Q.   Now, you don't say in paragraph 60 that children are actually using these common circumvention tactics, do you?

A.   That is correct.

Q.   Do you have any data to suggest whether children are actually using these common circumvention tactics?

A.   No.

Q.   So without data, is it speculation as to whether children are using these browser-level restrictions, circumvention tactics?

Case 4:24-cv-00438-MW-MAF   Document 63-2   Filed 02/14/25   Page 217 of 307
USCA11 Case: 25-11881   Document: 28   Date Filed: 09/12/2025   Page: 118 of 121

TONY ALLEN                                              January 27, 2025
COMPUTER vs MOODY                                                    216

A.   Yes.

Q.   If we can go to paragraph 61.

A.   Yep.

Q.   This paragraph discusses built-in self-declaration tools; is that right?

A.   Yes, that's correct.

Q.   And than you say, "Children evade these using," and you list four different, I guess, potential evasion techniques; is that right?

A.   Yes.

Q.   Do you have my data on how often children are using these self-declaration evasion techniques?

A.   So there's a -- a link to a report there which covers one of those.  I think the other thing that I would say in that is that the social media companies themselves publish that data.  So in their transparency reports, they publish the number of accounts that they discover, I think, in a year, whatever the temporal period is that they describe, where they discover the age that's been self-declared is not the age that they discover the user to be.  And they then -- they then publish about how much action they take to address that.

Q.   So there is a source for subsection (a).

A.   Yes.



TONY ALLEN                                            January 27, 2025
COMPUTER vs MOODY                                                  217

Q.    But it looks to me to be the Ofcom report that discusses only children in the U.K.; right?

A.    Yes.

Q.    So you don't have any data about how often children in Florida or even in the United States are entering incorrect birth dates?

A.    Only the social medias' own transparency reporting.

Q.    But you don't cite that in this report, do you?

A.    I don't cite that in this, no, but it is publicly available information.  I'm not sure if it's broken down by state.

Q.    But if you didn't cite it in this declaration, you didn't rely on it; is that right?

A.    No, I am not relying on it, no.

Q.    Just mainly for my own curiosity, subsection (d), "Using exponents, such as trial resets or in-app loopholes to access restricted content," what does that even mean?

A.    So when you're operating an app or there's one on a particular mobile device or cell phone, there are, built into the app, the ability to reset them.  And in some cases, that will reset any parental controls or parental passwords that are put



Case 4:24-cv-00438-MW-MAF    Document 63-2    Filed 02/14/25    Page 219 of 307
USCA11 Case: 25-11881    Document: 28    Date Filed: 09/12/2025    Page: 120 of 121

TONY ALLEN                                            January 27, 2025
COMPUTER vs MOODY                                               218

in them.

It depends on the app and the way the app has been coded.  But that is one potential method that can be used to circumvent controls that we've put in place.

Q.   And you don't have any data about how often --

A.   No.

Q.   -- children are using exponents?

A.   No.

Q.   Let's go to paragraph 62, please.

A.   Yeah.

Q.   Mr. Allen, do you have any children?

A.   Yes.

Q.   Is one of them older than the other?

A.   Yes.

Q.   I am guessing that there are probably things you let the older child do that you wouldn't let the younger child do because the older child is older; is that right?

A.   Possibly, yes.  But, yeah, and -- I mean, yeah.

Q.   I'm not trying to trick you.  I mean, this --

A.   There's not -- there's not a great deal of

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy
