No. 25-11881

# United States Court of Appeals
# for the Eleventh Circuit

_____

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION
AND NETCHOICE, L.L.C.,

*Plaintiffs-Appellees,*

v.

JAMES UTHMEIER, ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Florida
Case No. 4:24-cv-00438-MW-MAF

_____

**BRIEF OF *AMICUS CURIAE***
**SOFTWARE & INFORMATION INDUSTRY ASSOCIATION**
**IN SUPPORT OF APPELLEES COMPUTER & COMMUNICATIONS**
**INDUSTRY ASSOCIATION AND NETCHOICE, LLC**

Anne M. Voigts
Pillsbury Winthrop Shaw Pittman LLP
2550 Hanover Street
Palo Alto, California 94304-1115
T: 650.233.4500/F: 650.233.4545
E: anne.voigts@pillsburylaw.com

*Attorneys for Amicus Curiae Software*
*& Information Industry Association*

September 19, 2025

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

*Amicus Curiae* Software and Information Industry Association ("SIIA") certifies under Fed. R. App. P. 26.1 that it has no parent company, it issues no stock, and no publicly held corporation owns a tenpercent or greater interest in it.

*Amicus* also files this Certificate of Interested Persons, pursuant to Eleventh Circuit Rule 26.1-1, 28-1, and 29-2:

Software and Information Industry Association (*amicus*)

Anne M. Voigts (counsel for *amicus*)

Pursuant to Eleventh Circuit Rule 26.1-2(b), this Certificate includes only those persons and entities omitted from the Certificate contained in Appellant's Initial Brief.

*/s/ Anne M. Voigts*
Anne M. Voigts

**TABLE OF CONTENTS**

Page

INTEREST OF *AMICUS CURIAE* ..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.............................2

ARGUMENT..................................................................................................4

I.   This Court Should Reaffirm That Younger Abstention Is The Exception, Not the Rule ...........................................................................4

II.  This Court Should Apply Strict Scrutiny to Florida HB 3 ...............11

III. Florida HB 3 Fails Either Level of Heightened Scrutiny .................19

CONCLUSION.............................................................................................24

CERTIFICATE OF COMPLIANCE .........................................................25

CERTIFICATE OF SERVICE ...................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011)....................................................................... 14, 21

*CCIA v. Uthmeier,*
    No. 25-11881 (11th Cir. Aug. 13, 2025)............................................. 12

*City of Austin v. Reagan Nat'l Advert. Of Austin, LLC,*
    596 U.S. 61 (2022)................................................................................ 17

*Colo. River Water Conservation Dist. v. United States,*
    424 U.S. 800 (1976)........................................................................... 5, 6

*Computer & Commc'ns Indus. Ass'n v. Uthmeier,*
    No. 4:24CV438-MW/MAF, 2025 WL 1570007 (N.D. Fla. June 3,
    2025)....................................................................................................... 7

*Courtright v. Epic Games, Inc.,*
    No. 2:24-CV-04055-BCW, 2025 WL 2319148 (W.D. Mo. Aug. 11,
    2025)..................................................................................................... 18

*Erznoznik v. Jacksonville,*
    422 U.S. 205 (1975).................................................................... 13, 21

*Gonzalez v. Google LLC,*
    598 U.S. 617 (2023)............................................................................... 1

*Hicks v. Miranda,*
    422 U.S. 332 (1975)............................................................................... 6

*HM Fla.-ORL, LLC v. Governor of Fla.,*
    137 F.4th 1207 (11th Cir. 2025) ............................................. 10, 14, 21

*Huffman v. Pursue, Ltd.,*
    420 U.S. 592 (1975)............................................................................... 5

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)............................................................... 1, 12, 13

*NetChoice v. Reyes,*
    748 F. Supp. 3d 1105 (D. Utah 2024) ........................................... 17, 19

*NetChoice, LLC v. Bonta,*
    No. 25-146, 2025 WL 2600007 (9th Cir. Sept. 9, 2025) ............... 18, 19

*New Ga. Project v. Att'y Gen. of Ga.,*
    106 F.4th 1237 (11th Cir. 2024) ...................................................... 5, 6

*New Orleans Public Service, Inc. v. Council of City of New Orleans,*
    491 U.S. 350 (1989) ................................................................................. 4

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .................................................................... 12, 15

*Reno v. ACLU,*
    521 U.S. 844 (1997) .................................................................... 14, 21

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011) ............................................................ 13, 18, 19

*Sprint Commc'ns, Inc. v. Jacobs,*
    571 U.S. 69 (2013) ................................................................... 2, 4, 5

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ......................................................................... 5

*Thunder Studios, Inc. v. Kazal,*
    13 F.4th 736 (9th Cir. 2021) ........................................................... 13

*Tokyo Gwinnett, LLC v. Gwinnett Cnty.,*
    940 F.3d 1254 (11th Cir. 2019) ..................................................... 5, 6

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ............................................................ 11, 12, 20

*Twitter, Inc. v. Taamneh,*
    598 U.S. 471 (2023) ......................................................................... 1

*Younger v. Harris,*
    401 U.S. 37 (1971) .................................................................. *passim*

## Constitution

United States Constitution

First Amendment...........................................................................*passim*

## Statutes and Codes

Florida Statute

Section 501.1736(1)(e)............................................................ 16
Section 501.1736(2)............................................................ 14, 22
Section 501.1736(3)............................................................ 14, 22
Section 501.1736(4)................................................................. 22

## Rules and Regulations

Federal Rule of Appellate Procedure

Rule 29(a)(4)(E)...................................................................... 1

## Other Authorities

https://www.aura.com/.............................................................. 23

https://www.bark.us/ ............................................................... 23

https://www.flhouse.gov/Sections/Documents/loaddoc.aspx?FileNa
    me=h0003z1.RRS.DOCX&DocumentType=Analysis&BillNumb
    er=3&Session=2024 ............................................................ 20

https://www.qustodio.com/en/ ................................................. 23

Note, Florida Passes Law Unconstitutionally Restricting Minors'
    Access to Content on Social Media, 138 Harv. L. Rev. 1161
    (2025) ................................................................................ 19

## INTEREST OF *AMICUS CURIAE*[1]

The Software and Information Industry Association ("SIIA") is the principal trade association for those in the business of information. SIIA's membership includes nearly 400 software companies, platforms, data and analytics firms, and digital publishers that serve nearly every segment of society, including business, education, government, healthcare, and consumers. SIIA protects the rights of its members to use software as a tool for the dissemination of information, and is dedicated to creating a healthy environment for the creation, dissemination, and productive use of information.

SIIA and its members have a particular interest in both the robust and predictable application of the First Amendment and unfettered access to federal courts to vindicate the constitutional rights of its members and their users. SIIA has advocated for those interests as *amicus curiae* in, among others, *Twitter, Inc. v. Taamneh,* 598 U.S. 471 (2023), *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and *Gonzalez v.*

---

[1] The parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

*Google LLC,* 598 U.S. 617 (2023). Consistent application of the constitutional rules of the road—and their timely adjudication—promote free speech and economic growth. Accordingly, SIIA submits this *amicus* brief to address three issues of critical importance to SIIA and its members: first, whether a federal court can consider Plaintiffs-Appellees CCIA's and NetChoice's First Amendment challenge to Florida HB 3; second, what level of constitutional scrutiny should apply to that challenge; and third, whether HB 3 fails that scrutiny. This Court should find the District Court properly reached the First Amendment challenge, apply strict scrutiny to HB 3, and hold that the statute cannot withstand that scrutiny.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Court should affirm the decision below for three reasons.

First, as this Court and others have recognized, abstention under *Younger v. Harris*, 401 U.S. 37 (1971), is a limited exception to federal courts' "virtually unflagging" obligation to hear and decide a case. *Sprint Commc'ns, Inc. v. Jacobs,* 571 U.S. 69, 77 (2013). While the interests underpinning that doctrine warrant abstaining in some circumstances, they don't here. The state's proposed approach would

2

allow the exception to swallow the rule, with sweeping consequences for courts and parties alike. In this case, Florida waited months after this challenge was filed, compelled extensive discovery in federal court, and then (and only then) filed a state enforcement action against one of NetChoice's members hours before a federal filing deadline. The state then used that second-in-time suit against one entity to argue that all the federal proceedings brought by all of the plaintiffs (on behalf of all of their members) had to come to a screeching halt.

Requiring abstention in such circumstances would allow states to derail affirmative challenges to patently unconstitutional statutes at will, to delay adjudication of important federal questions, and to impose unnecessary costs on companies and federal courts. *Younger* abstention is not the equivalent of a reverse removal power that states can invoke willy-nilly, and this Court should reject that sort of governmental gamesmanship.

Second, this Court should apply strict scrutiny to Florida HB 3. The state's attempt to draw a line between purportedly addictive design features on the one hand and content on the other is a distinction without a constitutional difference. How one presents speech is as much

3

an expressive choice as the speech itself, and a regulation like this one, which applies based on whether a platform has made certain expressive choices, is content-based and thus subject to strict scrutiny.

Third, under either strict or intermediate scrutiny, HB 3 falls far short of the constitutional mark. That Florida acted to protect minors does not insulate HB 3's constitutional failings. To be clear, protecting minors is a laudable, important goal—and one that SIIA and its members both share and seek to advance through their own efforts. But the ends do not justify the state's unconstitutional means, particularly where, as here, both the state and private parties have a wide range of constitutional methods available to them. This Court should affirm the decision below.

## ARGUMENT

### I.    This Court Should Reaffirm That *Younger* Abstention Is the Exception, Not the Rule

"In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013); *New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373 (1989) ("[T]here is no doctrine that ... pendency of state judicial proceedings excludes the federal courts.").

4

Accordingly, as the district court correctly recognized, *Younger* abstention is a "limited exception to the usual rule" that federal courts have a "virtually unflagging obligation … to exercise the jurisdiction given them." *New Ga. Project v. Att'y Gen. of Ga.*, 106 F.4th 1237, 1241 (11th Cir. 2024) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

As this Court has repeatedly affirmed, given that obligation, only "the clearest of justifications merits abstention." *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1266–67 (11th Cir. 2019). Where no state enforcement proceeding is pending when the federal complaint is filed, there is no reason to abstain: "federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state courts' ability to enforce constitutional principles." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603 (1975) (quoting *Steffel v. Thompson*, 415 U.S. 452 (1974)).

Indeed, even if there *is* a pending state proceeding at the time a federal suit is brought, that does not necessarily trigger abstention, or categorically excuse federal courts from their obligations. *Sprint*

*Commc'ns, Inc. v. Jacobs,* 571 U.S. 69, 77 (2013) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Instead, *Younger* abstention applies only in three "exceptional circumstances": (1) "ongoing state criminal prosecutions;" (2) "certain civil enforcement proceedings;" and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Tokyo Gwinnett*, 940 F.3d at 1267.

While a proceeding may be "ongoing" for the purpose of this rule even if it was filed *after* the commencement of the federal action, *Hicks v. Miranda*, 422 U.S. 332, 349 (1975), *Younger* abstention is only proper when the state proceedings began "*before* any proceedings of substance on the merits have taken place in federal court." *Id.* (emphasis added). Courts in this Circuit are directed to look to "the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences or hearings held, and any change in the parties' position as a result of the federal litigation" in determining whether abstention is justified. *New Ga. Project v. Att'y Gen. of Ga.,* 106 F.4th 1237, 1241, 1243 (11th Cir. 2024).

No such justification exists here: Florida's action against Snap was removed to federal court immediately, where it remains. With no state proceeding pending, the foundational premise of *Younger*—comity toward state courts—falls away entirely.

More broadly, this case underscores why this Court should reaffirm that *Younger* has no role when a state initiates a late-filed enforcement action after a federal case has already matured. Florida waited months, compelled extensive discovery in federal court, and then (and only then) filed a state enforcement action against Snap just hours before its federal filing deadline. In that time, the parties fully briefed, and the district court ruled on, a motion for preliminary injunction and a motion to dismiss, the parties conducted 11 depositions and exchanged interrogatories, requests for production, requests for admission, and responses to each, as well as initial disclosures, and Plaintiffs filed an amended complaint and a renewed motion for preliminary injunction. *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *4 (N.D. Fla. June 3, 2025).

To allow abstention in such circumstances would be to reward procedural gamesmanship and transform *Younger* into a weapon of

delay. Although removal eliminated the state case here, leaving ambiguity would encourage future attempts by Florida or other states to replicate the tactic.

The policy consequences of such a rule would be especially severe for technology companies and SIIA members. In this industry, product cycles move in months, not years, and constitutional uncertainty affects not only litigation strategy but also fundamental business decisions. Companies must decide whether to redesign products, restrict features, or withdraw services altogether based on whether a new law will withstand constitutional scrutiny. Bringing an affirmative challenge to such a law before it takes effect can minimize the costs, allow for greater predictability, and reduce potential exposure. But if states can derail federal adjudication of those affirmative challenges simply by filing tactical enforcement actions after the fact, companies will be forced to comply with unconstitutional rules in the interim—slowing innovation, discouraging investment, and undermining the competitiveness of smaller and emerging firms that cannot absorb those costs.

And the problem would not be limited to Florida. It is difficult enough that the existing regulatory fragmentation across states imposes conflicting obligations, complicates the development of nationwide compliance strategies, and creates a cloud of uncertainty that risks chilling innovation across the industry. But if other states follow Florida's suit, those difficulties will be magnified by intrastate compliance challenges, as well as interstate ones. Even if companies brought affirmative challenges before a statute's effective date to avoid potentially unnecessary compliance costs, a state could delay proceedings by waiting to file an enforcement action until it later serves their purposes, delaying resolution of those challenges by invoking abstention, and forcing companies to decide whether to incur the costs of compliance (which may ultimately be unnecessary) or risk potential liability and the costs of defending against an enforcement action (even if they are ultimately vindicated). For some smaller members without the resources to defend parallel suits or reengineer products not just across different jurisdictions, but also within them, the resulting burden could prove existential. Moreover, those costs are not borne just by the companies, but also their customers.

Nor are those costs purely financial. For SIIA's members, abstention would also mean silencing lawful speech at scale. As this Court recently acknowledged, "[l]aws can chill speech in at least three ways," all three of which potentially apply here: (1) "A would-be speaker may be unable to tell whether the law actually prohibits her speech, so she may stay silent;" (2) "She may intend to speak in ways that she knows to be legally permissible but fear that the judicial system will 'err, and count speech ... that is permissible as instead not;'" or (3) "she may be confident in winning a potential legal challenge but stay silent to avoid the time and expense of litigation." *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1225 (11th Cir. 2025) (citations omitted). In particular, when federal review is delayed, platforms must err on the side of removing or restricting speech to avoid liability, even if the restrictions ultimately prove unconstitutional. That chilling effect falls not only on the companies but on millions of users who rely on their services to speak, learn, and participate in civic life. Those constitutional costs also weigh in favor of not abstaining.

For these reasons, the district court's refusal to abstain was not only right as a matter of law, but also as a matter of policy. Affirming

that decision—and clarifying that *Younger* cannot be stretched to cover tactical, second-in-time actions—will prevent states from attempting to weaponize abstention against First Amendment plaintiffs in the future, and ensure that SIIA's members and others in rapidly evolving industries receive timely and uniform constitutional guidance.

As noted above, Florida's own conduct underscores that point. Only after months of discovery and federal litigation did the state try to derail the case with a late-filed enforcement action—an effort that looks less like a principled jurisdictional objection and more like an attempt to avoid defending HB 3 on the merits. And for good reason: those arguments do not withstand constitutional scrutiny.

## II.   This Court Should Apply Strict Scrutiny to Florida HB 3

As the district court correctly recognized, "a law triggers the most exacting level of review—strict scrutiny—when it targets speech because of its content." ECF 94 at 34 (citing *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994) ("*Turner I*")). Content-based laws are presumptively unconstitutional and survive only if the government can prove that they are "narrowly tailored to serve a compelling state interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Where, by

11

contrast, a law is "unrelated to the content of speech," it triggers only intermediate scrutiny. *Turner I*, 512 U.S. at 642. In finding that HB 3 was unconstitutional under intermediate scrutiny, the district court reached the right result, albeit by applying the wrong reasoning. Because HB 3's operation depends on content-based criteria, strict scrutiny applies.

Florida resists that conclusion by arguing that HB 3 regulates product design, not children's speech. Brief for Appellant, *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, at 27-35 (11th Cir. Aug. 13, 2025) ("Appellant's Br."). But HB 3 regulates speech in at least two distinct ways.

<u>First</u>, it burdens platforms' expressive choices about what content to present and how to present it. As the Supreme Court recognized in *Moody v. NetChoice, LLC*, 603 U.S. 707, 716–17 (2024), social media services "are indeed engaged in expression." Like traditional publishers and editors, they "select and shape other parties' expression into their own curated speech products." *Id.* at 717. And that, the Supreme Court

held, is unquestionably expressive activity protected by the First Amendment.[2]

Second, HB 3 directly restricts minors' ability to access and engage with protected expression. As courts have consistently recognized, the "right to receive information and ideas, regardless of their social worth, is fundamental to our free society." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021) (quotation omitted). Nor do those rights fall away where minors are concerned. To the contrary, the "values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975). "[O]nly in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 213. Thus, "[e]ven where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786,

---

[2] Those expressive choices also extend to editorial choices about how to present information because "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (citation omitted).

804–05 (2011); *accord Reno v. ACLU*, 521 U.S. 844, 875 (1997) ("[T]he mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children … does not foreclose inquiry into its validity."). This Court's recent precedent likewise confirms that age-tiered speech restrictions and proof-of-age mandates chill lawful expression and increase burdens on access. *See HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1243 (11th Cir. 2025).

Here, Florida HB 3 explicitly regulates (and for those under 14, outright prohibits) minors' access to a wide range of constitutionally protected speech. For covered platforms, as relevant here, it (1) bans users under the age of 14 (and mandates deletion of their accounts); and (2) requires parental consent for those ages 14 and 15 (and mandates deletion of their accounts absent parental consent). Fla. Stat. §§ 501.1736(2)(a), (2)(b)(1), (3)(a), (3)(b)(1). Those provisions operate as a near-total ban on the ability of minors under 16 to access and participate in expressive activity on social media platforms. And that in turn triggers First Amendment protections.

The governing First Amendment framework reinforces that HB 3 is a content-based regulation of speech. The "crucial first step" in

evaluating a First Amendment challenge to a law regulating expression is "determining whether the law is content neutral on its face." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015). A law is facially content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. And "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* (quotation omitted). But even a law that *is* facially content-neutral cannot evade constitutional scrutiny: it will still be considered a content-based regulation of speech if the law "cannot be justified without reference to the content of the regulated speech." *Id.* at 164 (quotation omitted). "Those laws, like those that are content based on their face, must also satisfy strict scrutiny." *Id.*

HB 3 is content-based. As an initial matter, HB 3 does not regulate minors' access to *all* platforms.  Instead, it applies to platforms that allow users to upload content or view other users' content or activity; if (1) 10% or more of daily active users under the age of 16 spend on average 2 hours a day or longer on it on the days that they use

the platform; (2) it employs algorithms that analyze user data or information in selecting content; and (3) it has one or more a "addictive features," including infinite scrolling, push notifications, personal interactive metrics, auto-play functions, and live streaming. Fla. Stat. § 501.1736(1)(e). It does *not* apply to platforms whose exclusive function is email or direct messaging, to platforms whose under-16 users spend less time on the site, or to platforms or sites that use purportedly addictive features, but provide their own content. *Id.*

All of those triggers for statutory coverage target platforms' expressive and editorial choices about what content to present to users and how to present it. There is no distinction between the speech conveyed through these websites and the "addictive" design features— the speech is only "addictive" (i.e., engaging) because of the content on these sites and the expressive design choices in the targeted design features.

Nevertheless, Florida tries to draw a line between that content and how it is presented to argue that HB 3 is not content-based. That distinction collapses when examined more closely because decisions to communicate with users by push notifications, to display the number of

likes, or to allow users to livestream all involve or facilitate expression. All of them are designed for creating content, sharing it, and communicating, and all of them are squarely protected by the First Amendment.

As *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022), and *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1121–23 (D. Utah 2024), make clear, legislators cannot avoid constitutional scrutiny (and in particular classification as a content-based speech restriction) by swapping subject-matter distinctions for "function or purpose" proxies. *Reyes*, 748 F. Supp. 3d at 1121–22. Moreover, as those cases recognized, even "facially content neutral" laws must be considered content-based if, as noted above, they "cannot be justified without reference to the content of the regulated speech," or if they "were adopted ... because of disagreement with the message the speech conveys." *Reyes*, 748 F. Supp. 3d at 1121–22.

Applying these principles, other courts have deemed claims about allegedly addictive design features to be content-based restrictions. Thus, for example, in *Courtright v. Epic Games, Inc.,* 2025 WL 2319148, at *6 (W.D. Mo. Aug. 11, 2025), the plaintiff identified alleged defects

17

that were "all elements of the video games at issue." There, the court recognized, "Plaintiff's claims, in essence, seek to hold the Developer Defendants liable because their video games are made too entertaining by these 'defective' elements." *Courtright*, 2025 WL 2319148, at *6. And that theory, if adopted, would impose "content-based liability that is not permitted." *Id.* at 6 (citing *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 578 (2011)) (holding protected speech cannot be quieted or burdened simply because it is too persuasive). Similarly, as the Ninth Circuit recently held, regulations about how platforms display the number of users who "liked" certain content (i.e., "like counts") "are content based because they are 'speech with a particular content.'" *NetChoice, LLC v. Bonta*, 2025 WL 2600007, at *9 (9th Cir. Sept. 9, 2025) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011)).[3] That is, they are identified based on the message they convey (namely, approbation).

---

[3] While *Bonta* distinguished *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024), and concluded that a focus on social interaction was not enough to make a regulation content-based, (a) that is wrong; and (b) even if it were correct, the coverage definition here includes like counts, which the *Bonta* court concluded *were* content-based. *NetChoice, LLC v. Bonta*, 2025 WL 2600007 at *9 (9th Cir. Sept. 9, 2025).

But even setting aside those design features, courts have correctly found coverage definitions that "divide[] the universe of internet platforms into social media services, defined as websites or applications that "allow users to interact socially with each other," and other internet platforms, such as platforms for "news, sports, commerce, [and] online video games" to be content-based. *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1121–22 (D. Utah 2024). This Court should find the same here. HB 3 is only concerned with content provided by third parties. It makes no attempt to regulate purportedly addictive features where the content is generated by the platform itself. Moreover, HB 3's bill analysis and legislators' comments make it clear that the law was intended to target *specific* content.[4] That in turn triggers strict scrutiny.

## III.  Florida HB 3 Fails Either Level of Heightened Scrutiny

SIIA and its members recognize the importance of the interests at play here and the need for robust protections for minors online. But

---

[4] *See, e.g.,* https://www.flhouse.gov/Sections/Documents/loaddoc.aspx?FileName=h0003z1.RRS.DOCX&DocumentType=Analysis&BillNumber=3&Session=2024 (last visited Sept. 19, 2025); *see also* Note, Florida Passes Law Unconstitutionally Restricting Minors' Access to Content on Social Media, 138 Harv. L. Rev. 1161 (2025).

those interests cannot be leveraged to dilute First Amendment protections, and HB 3 does not pass muster under either form of heightened scrutiny. If, arguendo, intermediate scrutiny applies, the standard is well settled: the law must further an important governmental interest and must not burden substantially more speech than necessary to achieve that interest. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). HB 3 fails that test too.

Setting aside Florida's asserted interests, the statute sweeps far more broadly than necessary and burdens a vast amount of lawful expression. That conclusion follows both from (1) the far-reaching nature of SB 3's restrictions, which operate as a near-categorical ban on minors' speech and access to speech, and (2) the ready availability of constitutional alternatives that would allow the state to pursue its interests without trampling on the First Amendment. The district court was therefore correct to hold that HB 3 cannot survive even intermediate scrutiny—though strict scrutiny is the proper standard.

As noted above, the burden on protected speech is both broad and unmistakable. HB 3 effectively bans minors under the age of 16 from accessing protected speech and engaging in it themselves. This is a

20

significant burden on First Amendment rights, both in terms of the information minors may receive and the speech they may engage in. *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804–05 (2011); *accord Reno v. ACLU*, 521 U.S. 844, 875 (1997).

In addition, the state has eschewed other constitutional, less invasive means of regulation. Amici do not take the position that the state can never regulate in this area. But it must not "wield[] a shotgun when the First Amendment allows a scalpel at most." *HM Fla.-ORL, LLC v. Governor of Fla.,* 137 F.4th 1207, 1213 (11th Cir. 2025). The state can engage in social media literacy campaigns, for example, or regulate in more narrowly tailored ways. Indeed, HB 3 itself contains provisions not challenged here that empower parents directly, such as requiring platforms to honor parental or user requests to delete minors' accounts and associated personal data. *See* Fla. Stat. §§ 501.1736(2)(b)(2)-(4), (3)(b)(2)-(4), (4)(b)(2)-(4). Those provisions demonstrate that narrower approaches are available: Florida can encourage where it cannot compel, and it can reinforce parental authority and improve transparency without silencing an entire category of speakers.

Moreover, parents already have access to a wide array of tools that offer more effective and flexible protections than a one-time parental permission requirement. These tools operate at multiple levels of digital infrastructure, giving parents the ability to tailor their child's online experience to meet individual family needs. For example, device-level controls available on most smartphones and tablets allow guardians to manage screen time, restrict app usage, and block explicit content. Network-level tools provided by internet service providers can filter content across all devices connected to the home Wi-Fi, while browser-level tools enable blocking of certain websites or categories of content regardless of the device being used. At the application level, parents can restrict or monitor usage of specific apps, and most major social media platforms now offer built-in parental supervision features that allow oversight of account activity, friend requests, and time spent on the platform.

Importantly, the market for parental control technology continues to rapidly evolve to meet the real-world challenges families face. Over the last decade, parents have had to navigate a fragmented and often frustrating landscape of device settings, app-specific controls, and

content filters. This exercise can feel like playing whack-a-mole, especially as children engage with multiple platforms, apps, and devices. But new technologies are emerging that simplify this process by offering centralized systems capable of managing a child's digital activity across a wide range of accounts and platforms. A growing number of products, such as Bark, Aura, and Qustodio, provide parents with user-friendly dashboards that allow them to supervise social media activity, detect potentially harmful interactions, and enforce safety settings across multiple platforms simultaneously. *See, e.g.*, https://www.bark.us/ (last visited Sept. 19, 2025); https://www.aura.com/ (last visited Sept. 19, 2025); https://www.qustodio.com/en/ (last visited Sept. 19, 2025).

These tools reflect the fact that the market is actively responding to the needs of modern families. Instead of static, one-time permissions, these tools provide dynamic, real-time oversight that adapt to how children actually use the internet today. Far from requiring government-mandated bans, these private solutions empower parents, provide individualized protection, and avoid sweeping away vast amounts of protected speech.

Because HB 3's prohibitions extend well beyond these constitutional alternatives, it cannot survive.

## CONCLUSION

For these reasons, SIIA respectfully requests that this Court affirm the decision of the district court.

Dated: September 19, 2025

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:  */s/ Anne M. Voigts*
Anne M. Voigts

2550 Hanover Street
Palo Alto, California 94304-1115
Telephone: 650.233.4500
Facsimile:  650.233.4545
Email:
anne.voigts@pillsburylaw.com

*Attorney for Amicus Curiae Software & Information Industry Association*

24

# CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) because it contains 4,506 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Anne M. Voigts

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2025, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Anne M. Voigts