No. 25-11881

# In the United States Court of Appeals for the Eleventh Circuit

_____

COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION; NETCHOICE,

*Plaintiffs-Appellees,*

v.

ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendant-Appellant.*

_____

BRIEF OF AMICUS CURIAE TECHFREEDOM
IN SUPPORT OF APPELLEES AND AFFIRMANCE

_____

On Appeal from the United States District Court
for the Northern District of Florida

_____

Corbin K. Barthold
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorney for Amicus Curiae
TechFreedom*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Amicus Curiae TechFreedom certifies under Fed. R. App. P. 26.1 that it has no parent company, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

In accord with Circuit Rule 26.1-1, TechFreedom submits the following certificate of interested persons:

**Amicus Curiae:**

TechFreedom

**Counsel for Amicus Curiae:**

Corbin K. Barthold

In accord with Circuit Rule 26.1-2(b), this list contains only persons or entities omitted from certificates in previously filed briefs—which TechFreedom believes are complete.

/s/ Corbin K. Barthold

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT......................2

ARGUMENT ...................................................................................4

I.    Strict Scrutiny Applies. ...............................................................4

    A.    HB 3 Is Speaker- and Content-Based. ..............................5

    B.    HB 3 Places Direct Burdens on Speech. ...........................8

II.    Intermediate-Scrutiny Precedents Are Irrelevant......................9

    A.    *Free Speech Coalition v. Paxton*. ......................................10

    B.    *TikTok v. Garland*. ...........................................................15

    C.    *Turner Broadcasting System v. FCC*...............................17

CONCLUSION.................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Booksellers Assoc. v. Hudmut,*
771 F.2d 323 (7th Cir. 1985) ....................................................... 19

*Brown v. Entertainment Merchants Assoc.,*
564 U.S. 786 (2011) .......................................................... 11, 12, 13

*Citizens United v. FEC,*
558 U.S. 310 (2010) ................................................................... 5

*Erznoznik v. Jacksonville,*
422 U.S. 205 (1975) ............................................................. 11, 12

*Free Speech Coal. v. Paxton,*
145 S. Ct. 2291 (2025) ................................. 3, 9, 10, 12, 13, 14, 15

*Ginsberg v. New York,*
390 U.S. 629 (1968) ................................................................. 14

*Miami Herald Publ'g Co. v. Tornillo,*
418 U.S. 241 (1974) ................................................................... 6

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ........................................................... 4, 8, 9

*NetChoice, LLC v. Att'y Gen., Fla.,*
34 F.4th 1196 (11th Cir. 2022) ................................................ 6, 7

*NIFLA v. Becerra,*
585 U.S. 755 (2018) ................................................................... 9

*Packingham v. North Carolina,*
582 U.S. 98 (2017) .......................................................... 6, 10, 11

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*TikTok v. Garland,*
    145 S. Ct. 57 (2025) ........................................................... 3, 15, 16

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ...................................................... 3, 5, 17, 18

**Statutes**

Fla. Stat. § 501.1736(1)(e) ...................................................................... 5

SB 7072 § 1(6) (2021) ............................................................................. 7

**Other Authorities**

Renée DiResta, "The New Media Goliaths," *Noema Magazine*, tinyurl.com/yrwbsavk (June 1, 2023) ............................ 6

Governor Ron DeSantis Press Conference in Miami, YouTube, tinyurl.com/3jx7vsyv (May 24, 2021) .............................. 7

## INTEREST OF AMICUS CURIAE*

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It opposes ever-evolving government meddling in online speech. See, e.g., Br. of TechFreedom, *NetChoice, LLC v. Fitch*, No. 25A97 (U.S., July 24, 2025) (opposing Mississippi social media age-verification law); Br. of TechFreedom, *Bonta v. NetChoice, LLC*, No. 23-2969 (9th Cir., Feb. 14, 2024) (opposing California social media "design" code); Br. of TechFreedom, *Moody v. NetChoice, LLC*, No. 22-277 (U.S., Dec. 7, 2023) (opposing Florida and Texas social media speech codes) Br. of TechFreedom & Prof. Eric Goldman, *Volokh v. James*, No. 23-356 (2d Cir., Sept. 25, 2023) (opposing New York social media "transparency" law).

---

\* No party's counsel authored any part of this brief. No one, apart from TechFreedom and its counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

> In short, he became so absorbed in his books that he spent his nights from sunset to sunrise, and his days from dawn to dark, poring over them; and what with little sleep and much reading his brains got so dry that he lost his wits.
>
> Miguel de Cervantes, *Don Quixote* (1605)

Humans are fascinated by stories and ideas. Perhaps that is why each new medium of communication provokes anxiety about its supposed power to unmoor impressionable minds. Before long, though, the fears about each new medium come to look quaint. Books drive men mad. Pamphlets promote disobedience to authority. Novels seduce the young into idleness. Comic books breed violence. Television breeds violence. Video games breed violence. Every time, we are told that *this* time is different. *This* new medium, unlike the last, is *uniquely* dangerous and corrupting. *This* new medium will rob other people—it's always *other* people; usually children—of reason and virtue.

Now it is social media's turn.

Florida's HB 3 bars minors under 14 from creating social media accounts, and it requires 14- and 15-year-olds to obtain parental consent before doing so. It justifies these measures by claiming that social-media platforms deploy "addictive" design features—really, just basic editorial judgments—such as algorithmic recommendations and unlimited

scrolling. The law presents a bevy of First Amendment problems. The district court correctly blocked it, albeit under intermediate scrutiny. In this brief, we focus on why HB 3 is instead subject to strict scrutiny.

HB 3 is a textbook content- and speaker-based regulation of speech. It singles out platforms where ordinary people speak to one another, disfavoring peer-to-peer content in favor of legacy media's curated product. And it directly regulates platforms' editorial judgments about how to present and organize third-party speech—decisions the Supreme Court has squarely confirmed are protected expression. Both the statute's platform-specific targeting and its interference with editorial functions place it under strict scrutiny. Its de facto requirement that platforms verify users' ages is likewise a direct burden on fully protected speech, triggering strict scrutiny yet again.

Supreme Court precedents applying intermediate scrutiny are of no help to Florida. *Free Speech Coalition v. Paxton*, 145 S. Ct. 2291 (2025), concerned pornography obscene to minors, a category of speech historically unprotected for children and, going forward, only partially protected for adults. *TikTok v. Garland*, 145 S. Ct. 57 (2025), was a national-security case, addressed in an emergency posture, that the Court itself stressed was "narrow" and speaker-specific. And *Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994), involved cable

operators' gatekeeping power to decide who may speak at all—structural control that social-media platforms do not possess. None of these cases gives Florida cover to suppress vast swaths of fully protected social-media speech.

Grounded as they are primarily in fear, reactions to new modes of expression are often reflexive and incoherent. Florida's approach to social media illustrates the point. Just a few years ago, the state tried to force platforms to disseminate content harmful to children, including speech that "glorif[ies] rape" or "encourage[s] teenage suicide." *Moody v. NetChoice, LLC*, 603 U.S. 707, 737 (2024). Now it has swung to the other extreme, seeking to shut minors out of society's most important forums for speech and debate—and erect barriers between adults and those forums in the process. The former effort violated the First Amendment, as the Supreme Court recently ruled. This one does too.

## ARGUMENT

## I. Strict Scrutiny Applies.

HB 3 targets speech based on who is speaking and what is being said, and it directly compels platforms to alter their expressive editorial choices. It therefore must withstand strict scrutiny—which, as appellees explain in detail, it cannot do. See ARB 28-33.

### A.    HB 3 Is Speaker- and Content-Based.

The First Amendment "prohibit[s] . . . restrictions distinguishing among different speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Such distinctions "are all too often"—as here—"simply a means to control content." *Id*.

HB 3 governs only "social media platform[s]" that allow "users to upload content or view the content or activity of other users." Fla. Stat. § 501.1736(1)(e). The district court denied that this is a speaker-based distinction—but in describing the statute, it revealed the opposite. The court acknowledged that HB 3 targets "viewing the content or activity *of peers*." PI.Op. 36 (emphasis added). And it accepted Florida's argument that "youth are particularly interested in what *their peers* are doing and saying." *Id*. (emphasis added).

Rather than refute the statute's speaker-based nature, the court tried to wave it away. Citing *Turner*, 512 U.S. 622, it called the unique appeal of peer speech a "special characteristic" that "render[s] the law content neutral." *Id*. The court misapplied *Turner*, as we shall explain. But in any event, pointing to social-media content's *appeal* as proof of the content's *neutrality* is bootstrapping. Social-media content is *appealing* precisely because of what social-media users have *to say*. What Florida is targeting, therefore, is the distinctive nature of peer-to-peer content.

History confirms the point. Before social media, public discourse was dominated by large corporate newspapers and broadcasters. There was much concern about "the concentration of control of media." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 249 (1974). "The power to inform the American people and shape public opinion" rested "in a few hands." *Id*. at 250. Many believed that corporate media, influenced by government and business interests, offered only a narrow "homogeneity" of acceptable views. *Id*. News and opinion were laundered and sanitized, and "the public ha[d] lost an ability to respond." *Id*. See Renée DiResta, "The New Media Goliaths," *Noema Magazine*, tinyurl.com/yrwbsavk (June 1, 2023) (discussing Noam Chomsky's theory of "manufactured consent"—the notion that "throughout the 20th century, . . . a hegemonic media . . . presented a filtered picture of reality").

Social media disrupted this paradigm. It enabled ordinary people to reach one another directly, thereby opening public debate to a much wider range of viewpoints. The Supreme Court has acknowledged that "social media" is now the most important place "for the exchange of views" among "private citizen[s]." *Packingham v. North Carolina*, 582 U.S. 98, 103, 105 (2017). This Court has said the same: social media "is different from traditional media outlets" in that "every user . . . can be both speaker and listener." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th

1196, 1204 (11th Cir. 2022). Social media platforms foster "different sorts of online communities" with diverse "values and viewpoints." *Id*. at 1205.

Florida itself has recognized the point. As Governor DeSantis has put it:

> Floridians and other Americans go on these platforms to share ideas. . . . [T]hese platforms, they actually were very liberating because you had corporate media, those legacy outlets that many Americans grew to distrust and rightfully so. They no longer had the monopoly on information. You could actually go around the legacy media and share information on these platforms, and that was very positive for millions and millions of Americans.

Governor Ron DeSantis Press Conference in Miami, YouTube, tinyurl.com/3jx7vsyv (May 24, 2021). The Florida legislature likewise has said (but apparently forgotten) that social media plays an important role "in preserving First Amendment protections for all Floridians." SB 7072 § 1(6) (2021).

HB 3 singles out platforms that empower ordinary people to speak to their peers. That is a speaker-based distinction on its face. And it is a content-based distinction as well, because ordinary people want to discuss a wider range of topics, and to express a wider range of viewpoints, than do corporate media outlets.

Because it targets speech using speaker- and content-based distinctions, HB 3 is subject to strict scrutiny.

### B.    HB 3 Places Direct Burdens on Speech.

The "editorial function"—that is, the "selection *and presentation* of content"—is itself speech protected by the First Amendment. *Moody*, 603 U.S. at 731 (emphasis added). As the Supreme Court recently confirmed, this principle holds for social-media platforms as much as for anyone else. Just like "traditional publishers and editors," platforms "select and shape other parties' expression into their own curated speech products." *Id*. at 717. Any law that "curtail[s]" these "editorial choices must meet the First Amendment's requirements." *Id*. This "principle does not change because the curated compilation has gone from the physical to the virtual world." *Id*.

HB 3 regulates features such as algorithmic recommendations, infinite scrolling, autoplay, and live-streaming. These are methods of presenting content—choices about how photos, videos, posts, and replies are ordered and displayed. They are no less editorial than a newspaper's use of large headlines or a novelist's use of cliffhangers.

"[P]latforms make choices about what third-party speech to display and *how to display it*. They include and exclude, *organize and prioritize*—

and in making millions of those decisions each day, produce their own *distinctive compilations of expression*." *Moody*, 603 U.S. at 716 (emphasis added). To force a platform to present content differently is to force it to alter its "distinctive compilation[] of expression" into something else. In practice, HB 3 would pressure platforms to use chronological feeds, to block posts through limits on scrolling or autoplay, and to strip videos of their interactivity by forbidding live-streaming. Each of these changes would amount to the state rearranging the platform's and its users' expression.

Because HB 3 would "alter[] the content" of the platforms' "speech," by changing how—and even which—content is presented, the statute is subject to strict scrutiny. *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018).

HB 3 also effectively mandates age verification. See ARB 23. "[S]ubmitting to age verification is a burden on the exercise of" users' First Amendment rights. *Free Speech Coal.*, 145 S. Ct. at 2309. And because that burden is here imposed in a speaker- and content-based way, the age-verification requirement likewise triggers strict scrutiny.

## II.    Intermediate-Scrutiny Precedents Are Irrelevant.

Florida and the district court invoke three Supreme Court decisions—*Free Speech Coalition*, *TikTok*, and *Turner*—that applied

intermediate scrutiny. But their reliance on these decisions is misplaced. Each involved circumstances far removed from HB 3's broad regulation of fully protected social-media speech.

### A.    *Free Speech Coalition v. Paxton.*

Florida relies heavily on *Free Speech Coalition*, 145 S. Ct. 2291, to argue for intermediate scrutiny. AOB 3, 10, 17, 27, 33, 37-39, 40, 41, 43, 45. But that decision concerned age-gating only for content obscene to minors. It has nothing to say about HB 3, which attempts to age-gate vast quantities of fully protected speech on social media.

To understand *Free Speech Coalition*'s limits, it is useful to examine two other key Supreme Court rulings—one about social media, the other about the rights of minors.

*Packingham v. North Carolina* involved a North Carolina law that made it a crime for a registered sex offender "to access a commercial social networking Web site." 582 U.S. 98, 101 (2017). The Court held that this law violated the First Amendment.

In the modern world, the Court explained, among "the most important places . . . for the exchange of views" are the "vast democratic forums of the Internet"—and of "social media in particular." *Id*. at 103 (cleaned up). Social media "can provide perhaps the most powerful

mechanisms available to a private citizen to make his or her voice heard." *Id*. at 105. And everyone—"even convicted criminals"—can benefit from "access to the world of ideas" that exists online. *Id*. To "foreclose access to social media altogether," therefore, is "to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id*. The Court concluded that, even under intermediate scrutiny (which the Court assumed, without deciding, applied), the North Carolina law impermissibly burdened adult sex offenders' right to send and receive speech.

At issue in *Brown v. Entertainment Merchants Assoc.*, 564 U.S. 786 (2011), was a California law that restricted the sale or rental of violent video games to minors. While it did "not mean to demean or disparage the concerns" behind the state's effort to protect children, the Court readily struck down the law as a violation of the First Amendment. *Id*. at 802.

At the heart of California's statute was an assumption that minors are second-class citizens under the First Amendment. But this, the Court held, is incorrect. "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 793 (quoting *Erznoznik v. Jacksonville*, 422

U.S. 205, 212-213 (1975)). Although a state may protect minors from material that is obscene as to them, the Court observed, "that does not" mean the state has "a free-floating power to restrict ideas to which children may be exposed." *Id*. at 794-95. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable to them." *Id*. at 795. This remains true even if the speech is interactive ("the player [of a video game] participates in the violent action on screen") or disgusting (there exists, in the game, "a racial or ethnic motive for [the] violence"). *Id*. at 799. Nor may the censorship be laundered through a parental-consent mandate (which is really just a government mandate "subject only to parental veto"). *Id*. at 795 n.3. And so the Court concluded that California's law was subject to, yet miserably failed, strict scrutiny.

Back to *Free Speech Coalition*. A Texas law requires age verification on any commercial website more than one-third of which is speech obscene to minors. The Court upheld this law under intermediate scrutiny.

*Free Speech Coalition* addressed precisely the category of speech—material obscene to minors—that *Brown* noted is amenable to special treatment. Minors have no right to view such material. And such

material, *Free Speech Coalition* concluded, is "only partially" protected for adults. 145 S. Ct. at 2315. This means that the Court's First Amendment analysis will wholly differ depending on whether the speech at issue is simply what's found on social media (with its "vast democratic forums" that minors have a "significant" interest in seeing) or is instead what's found on pornographic websites (with their content that minors have no right, and adults, henceforth, only a "partial" right, to see).

How does the analysis differ? *Free Speech Coalition* revealed two key distinctions. *First*, for content obscene to minors, age-verification laws are now treated as akin to regulations on expressive conduct. *Id*. at 2315. When content obscene to minors is at issue, the state's regulatory power "*necessarily includes* the power to require proof of age." *Id*. at 2306 (emphasis added). In the context of adult content, in other words, an age-verification "statute can readily be understood as an effort to restrict minors' access" to speech unprotected as to them. *Id*. at 2309. In the context of social media, by contrast, *no such assumption applies*. Restrictions in that realm remain, as they have always been, presumptively unconstitutional direct regulations on speech. See *Brown*, 564 U.S. 786.

*Second*, for content obscene to minors, a "burden" on speech is now qualitatively distinct, under the First Amendment, from a "ban" on

speech. "When the First Amendment *partially* protects speech"—as is henceforth the case with, and only with, content obscene to minors—"the distinction between a ban and lesser burdens is" now "meaningful." *Free Speech Coal.*, 145 S. Ct. at 2315 n.12. *But* "for *fully protected speech*," now as ever, "the distinction between bans and burdens makes no difference to the level of [First Amendment] scrutiny." *Id.* Even after *Free Speech Coalition*, therefore, restrictions placed on *fully protected* social-media speech amount to a *burden* that triggers *strict scrutiny*.

In short, *Free Speech Coalition* has nothing to say about a *social media* regulation such as HB 3. In fact, *Free Speech Coalition* aligns perfectly with *Brown*. Only categories of historically unprotected speech—such as fraud, incitement, or (yes) obscenity—are outside the First Amendment. And "the obscenity exception does not," *Brown* said, "cover whatever a legislature finds shocking, but only depictions of 'sexual conduct.'" 564 U.S. at 793. So unlike in *Ginsberg v. New York*, 390 U.S. 629 (1968)—a precedent, relied on heavily by *Free Speech Coalition*, involving material obscene to minors sold at brick-and-mortar stores—California's video-game law tried "to create a wholly new category" of unprotected speech (violent speech directed at children). 564 U.S. at 794. Allowing a legislature to do this—even for minors—would, *Brown* concluded, contravene "the judgment of the American people, embodied

in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Id.* at 792 (cleaned up). Creating a new category was improper in *Brown*, as to violence in video games, and it would be improper here, as to the content on social media. *Free Speech Coalition*—which dealt with a category of speech that is historically unprotected—changes nothing.

## B. *TikTok v. Garland.*

Florida also relies heavily on *TikTok v. Garland*, 145 S. Ct. 57. AOB 3, 17, 28, 30-36, 39, 41. Under *TikTok*, in Florida's view, a law is subject to intermediate scrutiny whenever the state can point to something besides speech as the basis for its regulation. In *TikTok*, this "something else" was the statute's "focus" on "control by a foreign government." AOB 33. Here, Florida contends, the "something else" is HB 3's focus on social media "design features." *Id.*

This move fails on its own terms. As already shown, the "design features" in question are in fact *editorial choices* fully protected by the First Amendment. Florida's "something else" is not distinct from speech; it is speech.

In any event, Florida's reading of *TikTok* is far too broad. The Court did not let the government point to just one thing (let alone any old thing),

apart from speech, as an excuse for regulating speech. Nor (as Florida also contends) did the Court let the government justify its law simply by pointing to a "causal step"—an option for TikTok to divest from Chinese ownership—"between the law and the . . . burden on expression." AOB 34. (And anyway, Florida's proposed "causal step"—an option for platforms to stop making the editorial choices, relabeled as "design features," Florida targets—is *itself* a direct speech regulation.)

*TikTok* was about far more than these things. In explaining its decision to apply intermediate, rather than strict, scrutiny, the Court invoked not only TikTok's "susceptibility to foreign control," but also TikTok's "scale," the "vast swaths of sensitive data" it collects, the "Government's national security concerns," and the "expedited time allowed" for the Court's "consideration" of the case. *TikTok Inc. v. Garland*, 145 S. Ct. at 62-64, 68. Naturally, given how many factors played a dispositive role in its decision, the Court repeatedly "emphasize[d] the inherent narrowness" of its "holding." *Id.* at 73 To drive the point home, the Court wrote: "A law targeting *any other speaker* would by necessity entail a distinct inquiry and separate considerations." *Id.* (emphasis added).

*TikTok* is best understood as a one-off. It has nothing to say about whether strict scrutiny applies here (as it does).

### C.    *Turner Broadcasting System v. FCC.*

By the district court's own admission, it was a "close call" whether strict scrutiny should apply. PI.Op. 34. What tipped the balance against strict scrutiny, in its view, was *Turner Broadcasting System v. FCC*, 512 U.S. 622.

The district court erred. *Turner* allowed a speaker-based distinction to receive intermediate scrutiny in the presence of "special circumstances"—cable companies' "bottleneck monopoly power" over what television channels enter a home. The district court conceded that it is not "clear-cut" whether those companies' gatekeeping power over speech is comparable to the design features of social-media platforms. Yet the court offered nothing to bridge that gap.

As *Turner* explained, "a cable operator, *unlike speakers in other media*," can "silence the voice of competing speakers with a mere flick of the switch." 512 U.S. at 656-57 (emphasis added). Cable companies owned the "physical connection between the television set and the cable network." *Id*. at 656. This gave them "bottleneck" control over the "programming delivered into subscribers' homes," *id*.—raw, structural power over who may speak at all. Social media platforms exercise no such control. On the contrary, at issue here are platforms' choices about how

to arrange and display third-party speech on a single website—editorial choices protected by the First Amendment.

Nor does *Turner* support the idea that HB 3 is content-neutral. According to *Turner*, "Congress' overriding objective . . . was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free [broadcast] television programming." *Id*. at 646. In other words, the law was purely about "economic incentive[s]." *Id*. The cable operators, for their part, did little to argue otherwise, raising only "speculati[ve]" "hypothes[es]" about "a content-based purpose" for the law. *Id*. at 652. Here, by contrast, HB 3 is—as the platforms vigorously argue—all about content. It hinders the diverse, comparatively unfiltered speech of ordinary users—and especially young people—in favor of the curated product presented by legacy media. That is the very definition of content discrimination.

*         *         *

In the end, Florida's problem is with the power of speech itself. Minors spend time on social media because, when they're there, they see speech they're *interested in seeing*. Florida is concerned that the speech is *too powerful*. They think minors are like Don Quixote, transfixed by the power of stories and ideas. This problem—if it's a problem—is not for Florida to fix. Under the First Amendment, the *strong effects* of speech

- 18 -

are an *inherent part* of speech—not a ground for regulation. "Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which thoughts are good for us." *Am. Booksellers Assoc. v. Hudmut*, 771 F.2d 323, 330 (7th Cir. 1985) (Easterbrook, J.).

## CONCLUSION

The order granting a motion for preliminary injunction should be affirmed.

September 18, 2025                Respectfully submitted,

                                 /s/ Corbin K. Barthold
                                 Corbin K. Barthold
                                 TECHFREEDOM
                                 1500 K Street NW
                                 Washington, DC 20005
                                 (771) 200-4997
                                 cbarthold@techfreedom.org
                                 *Attorney for Amicus Curiae*
                                 *TechFreedom*

## CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 3,829 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Corbin K. Barthold

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2025, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Eleventh Circuit through the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Corbin K. Barthold</u>