No. 25-11881

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, et al.,

PLAINTIFFS-APPELLEES,

v.

ATTORNEY GENERAL, STATE OF FLORIDA,

DEFENDANT-APPELLANT.

On Appeal from the United States District Court for the
Northern District of Florida
Case No. 4:24-cv-438
Honorable Mark E. Walker, U.S. District Judge

**BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION OF FLORIDA,
ELECTRONIC FRONTIER FOUNDATION, FREEDOM TO READ
FOUNDATION, LGBT TECH, WIKIMEDIA FOUNDATION, AND
WOODHULL FREEDOM FOUNDATION IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

Daniel Tilley
AMERICAN CIVIL LIBERTIES
   FOUNDATION UNION OF FLORIDA
Florida Bar No. 102882
4343 W. Flagler St., Suite 400
Miami, FL 33134
Email: dtilley@aclufl.org
Tel.: (786) 363-2714

Vera Eidelman
Lauren Yu
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

David Greene
Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: davidg@eff.org
Tel.: (415) 436-9333

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, *amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Electronic Frontier Foundation, Freedom to Read Foundation, LBGT Tech, Wikimedia Foundation, and Woodhull Freedom Foundation state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

*Amici* also file this Certificate of Interested Persons, pursuant to Eleventh Circuit Rule 26.1-1, 28-1, and 29-2:

1. Allen, Tony

2. Alter, Adam

3. American Civil Liberties Union (*Amicus curiae*)

4. American Civil Liberties Union of Florida (*Amicus curiae*)

5. Anne M. Voigts (Counsel for *Amicus Curiae* Software & Industry Association)

6. Bailey, Andrew

7. Bell, Daniel

8. Bird, Brenna

9. Boyle, David

10. Brown, Anthony G.

11. Carr, Christopher M.

12. Clark, Charity R.

13. Cleland, Bartlett

14. Clement, Paul D. (Counsel for Appellee)

15. Computer & Communications Industry Association (Appellee)

16. Corbin K. Barthold (Counsel for *Amicus Curiae* Tech Freedom)

17. Costello, David M.

18. DeMott, Joseph J. (Counsel for Appellee)

19. DeSousa, Jeffrey Paul (Counsel for Appellant)

20. District of Columbia

21. Drummond, Gentner

22. Eidelman, Vera (Counsel for *Amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Electronic Frontier Foundation, Freedom to Read Foundation, LBGT Tech, Wikimedia Foundation, and Woodhull Freedom Foundation)

23. Electronic Frontier Foundation (*Amicus curiae*)

24. Fitzpatrick, Hon. Martin A.

25. Freedom to Read Foundation (*Amicus curiae*)

26. Golembiewski, Kevin A. (Counsel for Appellant)

27. Greene, David (Counsel for *Amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Electronic Frontier Foundation, Freedom to Read Foundation, LBGT Tech, Wikimedia Foundation, and

Woodhull Freedom Foundation)

28. Griffin, Tim

29. Guard, John M.

30. Hilgers, Michael T.

31. Jackley, Marty J.

32. Jennings, Kathleen

33. Kautz, Keith G

34. Kilby, Douglas L. (Counsel for Appellee)

35. Knudsen, Austin

36. Labrador, Raúl

37. Lamia, Christine

38. LGBT Tech (*Amicus curiae*)

39. Mackey, Aaron (Counsel for *Amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Electronic Frontier Foundation, Freedom to Read Foundation, LBGT Tech, Wikimedia Foundation, and Woodhull Freedom Foundation)

40. Marshall, Steve

41. McCuskey, John B.

42. Mead, Grace Lee (Counsel for Appellee)

43. Miyares, Jason S.

44. Monson, Darrick W. (Counsel for Appellant)

45. Moody, Ashley

46. Murphy, Erin (Counsel for Appellee)

47. Murphy, Hannah E. (Counsel for Appellee)

48. Murrill, Liz

49. Nessel, Dana

50. NetChoice, LLC (Counsel for Appellee)

51. Pallaki, Mitchell K. (Counsel for Appellee)

52. Patel, Anita (Counsel for Appellant)

53. Paxton, Ken

54. Purser, Stanford (Counsel for *Amici Curiae* 28 U.S. States)

55. Rayfield, Dan

56. Rokita, Theodore E.

57. Schenck, Robert S.

58. Schruers, Matthew

59. Schwalb, Brian L.

60. Software & Industry Association (*Amicus Curiae*)

61. Spears, Sara E.

62. State of Alabama (*Amicus Curiae*)

63. State of Alaska (*Amicus Curiae*)

64. State of Arkansas (*Amicus Curiae*)

65. State of Delaware (*Amicus Curiae*)

66. State of Georgia (*Amicus Curiae*)

67. State of Idaho (*Amicus Curiae*)

68. State of Indiana (*Amicus Curiae*)

69. State of Iowa (*Amicus Curiae*)

70. State of Louisiana (*Amicus Curiae*)

71. State of Maryland (*Amicus Curiae*)

72. State of Michigan (*Amicus Curiae*)

73. State of Missouri (*Amicus Curiae*)

74. State of Montana (*Amicus Curiae*)

75. State of Nebraska (*Amicus Curiae*)

76. State of New Mexico (*Amicus Curiae*)

77. State of North Dakota (*Amicus Curiae*)

78. State of Ohio (*Amicus Curiae*)

79. State of Oklahoma (*Amicus Curiae*)

80. State of Oregon (*Amicus Curiae*)

81. State of South Carolina (*Amicus Curiae*)

82. State of South Dakota (*Amicus Curiae*)

83. State of Texas (*Amicus Curiae*)

84. State of Utah (*Amicus Curiae*)

85. State of Vermont (*Amicus Curiae*)

86. State of Virginia (*Amicus Curiae*)

87. State of West Virginia (*Amicus Curiae*)

88. State of Wyoming (*Amicus Curiae*)

89. Taylor, Treg R.

90. TechFreedom (*Amicus Curiae*)

91. Tilley, Daniel (Counsel for *Amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Electronic Frontier Foundation, Freedom to Read Foundation, LBGT Tech, Wikimedia Foundation, and Woodhull Freedom Foundation)

92. Torrez, Raúl

93. Twenge, Jean

94. Uthmeier, James

95. Veitch, Alexandra N. (Counsel for Appellant)

96. Waczewski, James (Counsel for Appellant)

97. Walker, Hon. Mark (Counsel for Appellant)

98. Whitaker, Henry C. (Counsel for Appellant)

99. Wikimedia Foundation (*Amicus curiae*)

100. Wilson, Alan

101. Woodhull Freedom Foundation (*Amicus curiae*)

102. Wrigley, Drew

103. Wynosky, Kevin J. (Counsel for Appellee)

104. Xi, James (Counsel for Appellee)

105. Yu, Lauren (Counsel for *Amici curiae* American Civil Liberties Union, American Civil Liberties Union of Florida, Electronic Frontier Foundation, Freedom to Read Foundation, LBGT Tech, Wikimedia Foundation, and Woodhull Freedom Foundation)

106. Yost, Dave

Dated: September 25, 2025                    By: /s/ *Vera Eidelman*
                                                  Vera Eidelman

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

STATEMENT OF INTEREST ........................................................................ 1

INTRODUCTION ......................................................................................... 4

ARGUMENT ................................................................................................ 6

    I.  THE ACT REGULATES PROTECTED SPEECH ................................. 6

        A. Minors and Adults Rely on Social Media to Engage in a
           Diverse Range of Protected Expression ........................................... 6

        B. The First Amendment Protects the Vast Majority of Social
           Media Activity for Minors and Adults Alike ................................. 11

    II.  THE ACT VIOLATES MINORS' AND ADULTS' FIRST
        AMENDMENT RIGHTS ................................................................... 14

        A. The Act Impermissibly Prohibits Minors from Accessing
           and Engaging in Protected Speech ................................................. 14

        B. The Act Also Burdens the First Amendment Rights of
           Adults and Minors By Imposing Age Verification ....................... 17

           1. Many Verification Requirements Will Either Chill or
              Entirely Block Access to Lawful Speech ............................ 18

           2. Online Age-Verification Impermissibly Burdens the
              Right to Be Anonymous Online ......................................... 20

           3. Many Age-Verification Systems Put Internet Users'
              Sensitive Data at Risk ........................................................ 22

CONCLUSION ........................................................................................... 24

CERTIFICATE OF COMPLIANCE AND SERVICE ........................................ 26

CERTIFICATE OF SERVICE ....................................................................... 27

i

## TABLE OF AUTHORITIES

### Cases

*ACLU v. Gonzales*,
     478 F. Supp. 2d 775 (E.D. Pa. 2007)...................................................................22

*ACLU v. Mukasey*,
     534 F.3d 181 (3d Cir. 2008) ..............................................................................22

*ACLU v. Reno,*
     31 F. Supp. 2d 473 (E.D. Pa. 1999)...................................................................2

*ACLU v. Reno*,
     929 F. Supp. 824 (E.D. Pa. 1996) .......................................................................2

*American Amusement Machine Association v. Kendrick*,
      244 F.3d 572 (7th Cir. 2001) ..............................................................................14

*American Booksellers Foundation  v. Dean*,
     342 F.3d 96 (2d Cir. 2003) ..................................................................... 18, 20

*American Booksellers v. Webb*,
     919 F.2d 1493 (11th Cir. 1990) .........................................................................12

*Ashcroft v. ACLU*,
     542 U.S. 656 (2004).............................................................................................18

*Brown v. Entertainment Merchants Association*,
     564 U.S. 786 (2011)................................................... 5, 11, 12, 13, 14, 15, 16, 17

*Carey v. Population Services International*,
     431 U.S. 678 (1977)...........................................................................................13

*Erznoznik v. City of Jacksonville*,
     422 U.S. 205 (1975)................................................................................. 13, 17

*Free Speech Coalition, Inc. v. Paxton*,
     145 S. Ct. 2291 (2025)........................................................... 1, 5, 11, 12, 16, 18

*In re Anonymous Online Speakers*,
     661 F.3d 1168 (9th Cir. 2011) ...........................................................................21

ii

*Lamont v. Postmaster General of United States*,
    381 U.S. 301 (1965).......................................................................................6

*Mahanoy Area School District v. B.L.*,
    594 U.S. 180 (2021)...................................................................................1, 7

*Martin v. City of Struthers*,
    319 U.S. 141 (1943).......................................................................................6

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995).....................................................................................21

*NetChoice LLC v. Carr*,
    No. 23-5105, 2025 WL 1768621 (N.D. Ga. June 26, 2025) ........................ 5, 18

*NetChoice, LLC v. Bonta*,
    770 F. Supp. 3d 1164 (N.D. Cal. 2025)..........................................................6

*NetChoice, LLC v. Griffin*,
    No. 5:23-cv-05105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ...................5

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)..............................................................6

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) .........................................................14

*NetChoice, LLC v. Yost*,
    No. 24-00047, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025)..........................5

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)........................................................................... 1, 4, 6, 16

*Pope v. Illinois*,
    481 U.S. 497 (1987).....................................................................................12

*PSINet, Inc. v. Chapman*,
    167 F. Supp. 2d 878 (W.D. Va. 2001).........................................................22

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ................................................................ 18, 21

*Red Lion Broad. Co. v. FCC*,

395 U.S. 367 (1969)......................................................................................6

*Reno v. ACLU*,
521 U.S. 844 (1997)................................................... 1, 13, 16, 18, 21

*Snyder v. Phelps*,
562 U.S. 443 (2011)..................................................................................13

*Stanley v. Georgia*,
394 U.S. 557 (1969)...................................................................................6

*State v. Weidner*,
235 Wis. 2d 306, 611 N.W.2d 684 (2000) ..........................................22

*Tinker v. Des Moines Indepent Community School District*,
 393 U.S. 503 (1969).................................................................................1

*West Virginia. State Board of Education  v. Barnette*,
319 U.S. 624 (1943)................................................................................12

## Statutes

Driver Priv. Prot. Act, 18 U.S.C. §§ 2721–25 .......................................22

Fla. Admin. Code r.2-43.002(3)............................................................ 4, 18

## Other Authorities

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
BBC (Nov. 28, 2020).............................................................................10

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep
Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog
(Dec. 2, 2019) .......................................................................................23

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for
Black Americans*, Pew Research Center (Dec. 11, 2020)...................9

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their
Cultures*, Travel & Leisure (Oct. 21, 2022)........................................9

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew
Research Center (Sep. 17, 2024) .........................................................7

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, New York Times (May 24, 2023) ........................................10

*Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025) ...............................................................................................................23

Douglas A. Blackmon et al., *Birth of a Movement*, Wall Street Journal (Oct. 29, 2010) ...............................................................................................................8

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, New York Times (July 25, 2021)...................................................................................9

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Research Center (Apr. 24, 2023) ...............................................................................................................8

Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian Journal on Aging 26 (2022)..................................................................................................................10

Eur. Digit. Rights*, Position Paper: Online Age Verification and Children's Rights* (2023)........................................................................................................20

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sep. 22, 2022) .............................................9

Identity Theft Resource Center, *2023 Data Brach Report* (2024) ..........................23

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, National Sexual Violence Resource Center (Mar. 1, 2022) .........................................................................................................10

Jackie Snow, *Why Age Verification Is So Difficult for Website*s, Wall Street Journal (Feb. 27, 2022).................................................................................20

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024) .....................................................................................................................8

Javelin, *Child Identity Fraud: A Web of Deception and Loss* (2021) ....................24

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19*

*Pandemic*, 17 Perspective on Psycholigical Sciences 662 (May 2022).............11

Jillian Andres Rothschild et al., University of Maryland Center for
Democracy & Civic Engagement, *Who Lacks ID in America Today? An
Exploration of Voter ID Access, Barriers, and Knowledge* (2024)...................19

Joely Johnson Mork, *Teen's Online Church Draws Young People from
Around the World*, Faith & Leadership (Aug. 23, 2016).......................................9

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People
Online*, Verge (July 27, 2021) .................................................................10

Keith N. Hampton et al., *Disconnection More Problematic for Adolescent
Self-Esteem Than Heavy Social Media Use: Evidence from Access
Inequalities and Restrictive Media Parenting in Rural America*, 41 Social
Science Computer Review 626 (Apr. 2023)...........................................................10

Kenneth P. Brevoort et al., Consumer Financial Protection Bureau, *Data
Point: Credit Invisibles* (2015) .................................................................20

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Research
Center (Sep. 5, 2013) .................................................................................21

Mary Madden et al., Common Sense & Hopelab, *A Double-Edged Sword:
How Diverse Communities of Young People Think About the
Multifaceted Relationship Between Social Media and Mental Health*
(2024)...........................................................................................................7

Michael J. Hanmer & Samuel B. Novey, University of Maryland Center for
Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An
Exploration of the American National Election Studies* (2023)........................19

*Number of Internet and Social Media Users Worldwide as of February
2025*, Statista..............................................................................................7

Press Release, Identity Theft Resource Center, *ITRC 2023 Consumer Impact
Report: Record High Number of ITRC Victims Have Suicidal Thoughts*
(Aug. 23, 2023)...........................................................................................24

Rainier Harris, *How Young People Use Social Media to Engage Civically*,
PBS (Nov. 5, 2020).....................................................................................10

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo*

*Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (May 2020)......................................................................................................8

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sep. 18, 2020) ...........................................9

Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* (2011) .................................................................................24

Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Research Center (June 29, 2023).......................................8

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98 (Feb. 2017)......................................................................................................21

Suzanne Smalley,  *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024) .............................20

*The Robloxian Christians*, Exponential .......................................................................9

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, International Journal for Crime, Justice & Society Democracy, Mar. 2018 ......................................................................................................10

U.S. Census Bureau, CB 25-58, *Quarterly Residential Vacancies and Homeownership: First Quarter 2024* (July 28, 2025).......................................19

Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* (2021) .......................................................................8

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The ACLU of Florida is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) (counsel), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel).

The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization with more than 30,000 active donors that has worked since 1990 to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(c), *amici* certify that no person or entity, other than *amicus*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties consent to the filing of this brief.

verify users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825–27 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno,* 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The Freedom to Read Foundation ("FTRF") is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

LGBT Tech is a nonprofit organization dedicated to promoting technology adoption and advocacy within the lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") community. LGBT Tech encourages the adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic outreach. An important function of LGBT Tech is to advocate for policies that benefit the LGBTQ+ community, including by filing *amici curiae* briefs. LGBT Tech has a significant interest in the outcome of this case and believes that LGBTQ+ individuals, including LGBTQ+ youth, should be able to engage in fully protected expression, free from governmental interference. Specifically, LGBT Tech recognizes that online platforms are crucial for LGBTQ+

individuals, especially youth, to access vital information, community support, and resources that may not be available in their immediate physical environments.

The Wikimedia Foundation is a nonprofit organization based in San Francisco, California, USA, that operates fourteen free-knowledge projects on the Internet, including Wikipedia. The Wikimedia Foundation's mission is to develop and maintain factual and educational content created and moderated by volunteer contributors, and to provide this content to people around the world. Its projects are not funded by advertising and users do not pay to access or contribute any content. It relies on donations and philanthropic grants to provide its services.

The Woodhull Freedom Foundation ("Woodhull") is a nonprofit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull has participated in litigation as a party or *amicus* in cases across the country dealing with free expression. Woodhull is particularly focused on governmental attempts to censor or burden access to online speech, as sexually themed expression is often a target of such efforts. Woodhull is concerned that if the challenged law is not enjoined, the First Amendment will be weakened, and the government will be permitted to engage in unlawful censorship of protected expression.

3

**INTRODUCTION**

People rely on social media to keep up to date on the news, engage with elected officials and religious leaders, connect with friends, create art, and build movements. Social media allows children and adults to discover new perspectives, discuss social and political issues, and develop a better understanding of others' beliefs and opinions. In the words of the Supreme Court, it holds "vast democratic forums" with the "potential to alter how we think, express ourselves, and define who we want to be." *Packingham v. North Carolina*, 582 U.S. 98, 105–06 (2017).

By prohibiting most minors from accessing social media and effectively imposing age verification requirements on everyone, Florida House Bill 3 ("the Act") violates the First Amendment rights of minors and adults. It bans anyone younger than 14 from accessing or engaging in speech on social media, and it does the same for 14- and 15-year-olds absent their parents' consent. For those teenagers whose parents do consent, they and their parents must compromise their anonymity, privacy, and security to prove their requisite relationship and consent. And even adults who have no connection to a minor may well have to identify themselves and risk privacy and security harms because social media services are likely to rely on the Act's "reasonable age verification" defense. *See* Fla. Admin. Code r.2-43.002(3).

The Act will thus block minors and adults from accessing protected speech online—all minors under 14; older minors when they cannot obtain parental consent,

are unable to provide sufficient proof of it, or are unable or unwilling to prove their age; and adults when they cannot verify their age or are unwilling to do so. It will also erase people's ability to speak anonymously online, and increase the risks of privacy invasions and data breaches.

Because the Act applies to speech that is protected for both adults and minors, *Free Speech Coalition, Inc. v. Paxton*, 145 S. Ct. 2291 (2025), does not control. Central to the Supreme Court's analysis in that case was its assessment that the law at issue targeted sexual material that is "harmful to minors," a category of speech that minors have no First Amendment right to view. Because minors suffer no such limitation when it comes to any other speech, including the plethora of political, religious, artistic, and educational content available on social media, *Paxton* is inapposite.

While Florida has a legitimate interest in protecting minors from harm, "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011). Courts have repeatedly struck down similar social media restrictions around the country in part for this reason.[2] The same result is warranted here.

---

[2] *See NetChoice LLC v. Carr*, No. 23-5105, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *NetChoice, LLC v. Yost*, No. 24-00047, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025), *appeal docketed*, No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025), *appeal docketed*, No. 25-

## ARGUMENT

### I.    THE ACT REGULATES PROTECTED SPEECH.

#### A.    Minors and Adults Rely on Social Media to Engage in a Diverse Range of Protected Expression.

The Internet, and social media in particular, play a dominant role in the exercise of First Amendment rights today. The "[f]reedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that . . . it must be fully preserved," *Martin v. City of Struthers*, 319 U.S. 141, 146–47 (1943), and, right now, social media platforms are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 582 U.S. at 107. In addition, social media offers people a space to exercise their right to receive information—to listen to and learn from others. *See, e.g.*, *Martin*, 319 U.S. at 143 (right to receive literature); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307–08 (1965) (right to receive mail); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969). Social media creates "places where [people] can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104; *see also Mahanoy Area*

---

1889 (8th Cir. May 2, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025), *appeal docketed*, No. 25-2366 (9th Cir. Apr. 11, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024), *appeal docketed sub nom.*, *NetChoice, LLC v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024).

6

*Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021) (minors have a right to engage in and receive unpopular, off-campus speech).

As this section details, valuable, positive expression and connection regularly take place on social media. At the same time, people can share distressing or upsetting information or engage in negative interactions. That problem is not unique to social media and, just as the government could not ban minors from reading newspapers (which contain distressing news) or showing up at town hall meetings (which might have heated public debate), the same holds online.

An estimated 5.24 billion people use social media for everything from expressing themselves politically and engaging with elected representatives to learning new dances and finding community.[3]

Users routinely flock to online forums to get their news. For instance, 80% of Black young people, 69% of Latino young people, and 65% of white young people rely on social media to stay informed.[4] And 54% of American adults "at least sometimes" get their news from social media.[5]

---

[3] *Number of Internet and Social Media Users Worldwide as of February 2025*, Statista, https://perma.cc/WHU7-9REA.

[4] Mary Madden et al., Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://perma.cc/4FXU-664F.

[5] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sep. 17, 2024), https://perma.cc/Y8FW-FLVA.

Social media is also central to organizing and participating in political activities, from the Tea Party movement[6] to the #MeToo movement.[7] Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to act, looking up information about rallies or protests, or using hashtags to show support for a cause.[8]

Social media is also a forum for artistic creation. In one study, 71% of teens reported that social media is "a place where they can show their creative side."[9] "In any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[10] In addition, minors and young adults report that the internet helps them learn about art and music history.[11]

---

[6] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), https://perma.cc/DX44-R46A.

[7] Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (May 2020), https://perma.cc/V2KA-JFF2.

[8] Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://perma.cc/CQF7-E6DE.

[9] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/6FC6-L3MA.

[10] Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* 41 (2021), https://perma.cc/2MUC-WT78.

[11] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024), https://perma.cc/SGL7-3YY7.

Places of worship use social media to share information about events, livestream services, and foster community.[12] Social media is a vital source of religious and spiritual community and information for young people.[13] One young person even created "The Robloxian Christians" as a place for kids on the Roblox gaming platform to pray for one another and talk about their faith.[14] It is now a "youth-led virtual church ministry serving upwards of 40,000 young people from over 85 countries."[15]

Finally, social media enables individuals whose voices would otherwise not be heard to make vital and even lifesaving connections, and to share their unique perspectives.[16] For example, people with disabilities use social media to build community, reduce isolation and stigma, and educate others.[17] Survivors of domestic

---

[12] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sep. 18, 2020), https://perma.cc/36HP-CVC3.

[13] *See* Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://perma.cc/8HEX-JJAY.

[14] Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3.

[15] *The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB.

[16] *See, e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://perma.cc/DT56-RGG5; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://perma.cc/N7PT-Z784.

[17] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sep. 22, 2022), https://perma.cc/3SBJ-4K5R; Kait

violence rely on the accessibility and anonymity of online communities to seek advice and resources.[18] Social media use has been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of which face limited mobility and decreased ability to socialize in person.[19] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community and support.[20]

Social media thus helps minors develop their own ideas, learn to express themselves, and engage productively with others in our democratic public sphere.[21]

---

Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://perma.cc/9AWZ-9QDA.

[18] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, Int'l J. for Crime, Just. & Soc'y Democracy, Mar. 2018, at 44, 44–45, https://perma.cc/8ZS7-UV77; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://perma.cc/7J6K-2HTW.

[19] Keith N. Hampton et al., *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 (Apr. 2023), https://perma.cc/YHH8-VQC7; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26, 26–27 (2022), https://perma.cc/J7NL-3UKZ.

[20] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://perma.cc/A4TK-ED3R; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

[21] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/C434-65F4; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through*

### B. The First Amendment Protects the Vast Majority of Social Media Activity for Minors and Adults Alike.

Though Florida seeks to justify the Act through its concerns about the impact of social media on minors, outside of the narrow category of sexually-explicit content that is "harmful to minors," people under the age of 18 generally enjoy the same First Amendment rights and protections as adults. The Supreme Court has expressly held that the government cannot "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 793–94 (rejecting government's argument that it can regulate violent speech communicated to minors just as it can sexual speech).

The Supreme Court's recent decision in *Paxton* is not to the contrary and does not save the Act. There, the Supreme Court held that a law that aimed to block minors' access to content that is obscene as to minors was subject to intermediate scrutiny only because minors have no First Amendment right to access such speech.[22] The law was thus "an exercise of Texas's traditional power to prevent

---

*the Lens of the COVID-19 Pandemic*, 17 Persp. Psych. Sci. 662, 671 (May 2022), https://perma.cc/N8VQ-8A4N ("Social media provides readily-accessible tools for teens to share developing thoughts and experiment with new social identities, particularly without access to traditional methods.").

[22] The Supreme Court left open the question of precisely whose perspective matters when it comes to defining "harmful to minors" content, suggesting for example that, at a minimum, it would make no sense to assess obscenity from the perspective of a pre-adolescent, who would lack any "concept of sexuality." *Paxton*, 145 S. Ct. at 2308 n.7. Under this Court's law, "if any reasonable minor,

minors from accessing speech that is obscene from their perspective" and its "burden [on] adults' rights to access such speech . . . ha[d] 'only an incidental effect on protected speech.'" *Paxton,* 145 S. Ct. at 2306. The Court repeatedly disclaimed any application of its decision to regulations of "fully protected speech." *Id.* at 2310, 2315 n.12, 2316 n.13. Highlighting the narrowness of its ruling, the Court left open the question of whether the Texas law violated the First Amendment as applied to websites that host not only content that is obscene as to minors, but also speech that is protected for both minors and adults. *Id*. at 2308 n.7.

Critically, strict scrutiny remains "the standard for reviewing the direct targeting of fully protected speech." *Id.* at 2310. For that reason, and as explained in further detail below, strict scrutiny is the governing standard here, notwithstanding the fact that "the protection of children is the object." *Brown*, 564 U.S. at 804–05. Indeed, that a speaker or listener is young is reason not for the diminution of their rights, but "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).

---

including a seventeen-year-old, would find serious value, the material is not 'harmful to minors.'" *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990) (citing *Pope v. Illinois*, 481 U.S. 497 (1987)).

As the examples in Section I.A demonstrate, socially valuable speech is abundant on social media. But bedrock First Amendment principles provide that access to social media is protected even if its social value is not obvious, or even when a state deems it to be harmful. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977); *Reno v. ACLU*, 521 U.S. 844, 874–75 (1997). And First Amendment principles apply to new forms of communication regardless of their esthetic and moral value. *See Brown*, 564 U.S. at 790.

For these reasons, notwithstanding societal fears about new technologies and mediums—including the ideas they might expose children to—nearly every time they are introduced, the Supreme Court has struck down legislation seeking to protect kids from their purported dangers, from violent video games, *see Brown*, 564 U.S. at 789, to indecent communications online, *Reno*, 521 U.S. at 874, to drive-in movies, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). Even where the laws are only "intended to regulate expression accessible to minors," they are "overbroad" if they reach beyond speech that is obscene as to minors. *Id.* at 214.

Lower courts have agreed. As the Seventh Circuit explained in striking down a ban on violent video games, "[minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise." *Am. Amusement*

*Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). Otherwise, they "are unlikely to become well-functioning, independent-minded adults and responsible citizens," for "[t]o shield children right up to the age of 18 from exposure to [troubling or potentially harmful ideas] would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id*.

## II.    THE ACT VIOLATES MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS.

### A.    The Act Impermissibly Prohibits Minors from Accessing and Engaging in Protected Speech.

The Act is content-based and therefore subject to strict scrutiny. *See Brown*, 564 U.S. at 799. A website's "choices about whether and how to disseminate user-generated expression 'convey a message about the type of community the platform seeks to foster,'" including "the ideas that: (1) user-generated content is not less valuable than speech authored by the websites themselves; and (2) social interactions and connections . . . have unique value for online communities." *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 953 (S.D. Ohio 2025) (citation omitted).

Florida cannot wholly prohibit people from accessing protected speech, which is precisely what the Act does for minors under 14 years of age. Nor can it allow access only with express parental consent, as the Act does for 14- and 15-year-olds. And it especially cannot do so in a content-based way.

*Brown* is particularly instructive on this point. In that case, the Supreme Court

14

struck down a law that prohibited selling or renting violent video games to minors—enacting a full prohibition like the Act's ban for minors under 14 and, in effect, barring minors' access without parental consent like the Act's treatment of 14- and 15-year-olds. The state had "claim[ed] that the Act is justified in aid of parental authority: By requiring that the purchase of violent video games can be made only by adults, the Act ensures that parents can decide what games are appropriate." *Brown*, 564 U.S. at 802. While recognizing that both this aim, and the legislature's goal of "addressing a serious social problem," were "legitimate," the Court held that, where First Amendment rights are involved, such aims "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive"—and that the statute failed to do. *Id* at 805.

"As a means of protecting children from portrayals of violence, the legislation is seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental . . . veto." *Id.* If the material is indeed "dangerous [and] mind-altering," the Court explained, it does not make sense to "leave [it] in the hands of children so long as one parent . . . says it's OK." *Id.* at 802.

Equally, "as a means of assisting concerned parents," the Court held that the regulation "is seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805. "While some of the legislation's effect may indeed be in support

15

of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought to* want." *Id* at 804; *cf. Reno*, 521 U.S. at 878 (holding that law prohibiting online distribution of certain materials to minors was overbroad in part because it would override parents who wanted their kids to "obtain information on the Internet that [they], in [their] parental judgment, deemed appropriate"). The Court thus rejected the idea "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent,*" for "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.[23]

The Court also expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. "Accepting that position would largely vitiate the rule that 'only in relatively narrow and well-

---

[23] Even if the Court concludes that the law is subject only to intermediate scrutiny, it flunks the First Amendment. A complete prohibition on protected speech cannot satisfy heightened First Amendment scrutiny. *See, e.g.*, *Packingham*, 582 U.S. at 107–08. Nor can the imposition of a novel parental consent requirement that imposes privacy and security risks on children and parents. Equally, while the Supreme Court has held that age verification to access harmful-to-minors content satisfies intermediate scrutiny, its reasoning holds only in that context because First Amendment rights to access such content differ by age. *Paxton*, 145 S. Ct. at 2317. That cannot hold where, as here, the regulated content is protected for all ages.

16

defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik,* 422 U.S. at 212–13).

Each of those holdings governs here: To the extent the Act is an attempt to protect minors from harm, it is "seriously underinclusive . . . because it permits a parental . . . veto," whether through acceptance of parental consent for 14- and 15-year-olds or functionally through parents enabling their younger children to use their accounts. *Id.* at 805. To the extent that the Act is an attempt to "assist[ ] concerned parents," it is "seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think [social media use is] a harmless pastime." *Id*. And it also raises First Amendment concerns because it seeks to punish third parties "*just in case* their parents disapprove." *Id.* at 802.

The Act's parental-consent provision also introduces additional burdens on minors and parents—who must prove both that they have the requisite parent or guardian relationship and that the parent has indeed given consent—that fail to pass constitutional muster. As described in the next section, the types of evidence that will be necessary to prove identity inevitably carry privacy and security risks, and those are likely to only expand when it comes to proof of a legal relationship.

**B.    The Act Also Burdens the First Amendment Rights of Adults and Minors by Imposing Age Verification.**

The Act also violates the First Amendment rights of all social media users by effectively requiring platforms to verify the age of every user. *See* Fla. Admin. Code

r.2-43.002(3) (failure to perform reasonable age verification can constitute willful disregard of a person's age and reasonable age verification is an affirmative defense). Requiring age verification to access protected speech burdens the First Amendment rights of all internet users in several respects. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Paxton*, 145 S. Ct. at 2309 (recognizing that "submitting to age verification is a burden on the exercise of [First Amendment] rights").

Although Florida does not specify how social media services must verify age, it is likely that the Act will "incentivize social media platforms to err toward the side of caution to avoid liability" by "collect[ing] government-issued identification" or comparable means. *Carr*, 2025 WL 1768621 at *14.  Indeed, it is hard to fathom how a parent or guardian could verify their relationship to their child on a social media service for purposes of providing their consent without, at a minimum, providing government-issued documentation.

     **1.**     **Many verification requirements will either chill or entirely block access to lawful speech.**

Should social media companies implement verification via government-issued identification or similar means, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not

have [the necessary form of identification] . . . unable to access those sites"). The same will be true for any 14- or 15-year-old child of such an adult, who will struggle to prove their relationship to their parents or guardian.

About 15 million adult U.S. citizens do not have a driver's license, and about 2.6 million do not have any form of government-issued photo ID.[24] Estimates show another 28.6 million adult citizens use government IDs that lack their current names or addresses.[25]

Non-ID-based methods also burden First Amendment rights. Age verification based on public or private transactional data will exclude many adults (and their teenage children). For example, a service relying on mortgage documents would exclude the nearly 35 percent of Americans who do not own a home.[26] Should credit data be used, 26 million Americans—including over 80 percent of 18- and 19-year-olds—are "credit invisible," meaning they do not have a credit record for age-

---

[24] Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L.

[25] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 5 (2023), https://perma.cc/X7JS-J7R7 ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[26] *See* U.S. Census Bureau, CB 25-58, *Quarterly Residential Vacancies and Homeownership: First Quarter 2024* 5 (July 28, 2025), https://perma.cc/CEE5-SW3U.

verifying vendors to check.[27]

Should social media services be permitted to use data brokers and commercial services to verify their users' ages or their parents' identities and relationship to them, similar problems would arise. These entities purchase and collect massive amounts of private data.[28] But the data often contains inaccurate or outdated information, which could mistakenly block people from accessing social media.[29]

### 2. Online age-verification impermissibly burdens the right to be anonymous online.

Having to provide identifying information to services seeking to comply with the Act—whether for age verification or to check parental relationships and consent—would also impermissibly burden the First Amendment right to anonymity. *See Am. Booksellers Found.*, 342 F.3d at 99 (age verification "require[s] that website visitors forgo the anonymity otherwise available on the internet").

A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific

---

[27] Kenneth P. Brevoort et al., Consumer Fin. Prot. Bureau, *Data Point: Credit Invisibles* 12 (2015), https://perma.cc/N9HQ-F76C.

[28] *See* Eur. Digit. Rights, *Position Paper: Online Age Verification and Children's Rights* 16–17 (2023), https://perma.cc/E4QM-VFTK; Jackie Snow, *Why Age Verification Is So Difficult for Website*s, Wall St. J. (Feb. 27, 2022), https://perma.cc/6DC2-3FYW.

[29] Suzanne Smalley, *'Junk Inferences' by Data Brokers Are a Problem for Consumers and the Industry Itself*, Record (June 12, 2024), https://perma.cc/LD9Y-ZHQY.

people, organizations, or the government."[30] Anonymity is a time-honored, historic tradition that is "an aspect of the freedom of speech protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011).

Without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236–37; *see also Reno*, 521 U.S. at 856. The same is true for minors who must obtain parental consent, and it may well deter parents who do not want to create a record of what kinds of social media their children want to access or they are willing to allow. The absence of anonymity will chill users' ability to dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek help online.[31] *ACLU v. Gonzales*, 478

---

[30] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sep. 5, 2013), https://perma.cc/5BUP-J96F.

[31] *See*, *e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98, 99 (Feb. 2017), https://perma.cc/B9Q4-RRNR.

F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 235 Wis. 2d 306, 320, 611 N.W.2d 684, 690 (2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3. Many age-verification systems put internet users' sensitive data at risk.

Even when users are comfortable foregoing anonymity, legitimate privacy and security concerns may dissuade them from accessing social media. "Requiring Internet users to provide . . . personally identifiable information," whether to verify age or parental relationship, "would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas'" online).

The personal data that platforms may be required to collect is sensitive and often immutable. *See, e.g.*, Driver Priv. Prot. Act, 18 U.S.C. §§ 2721–25. Whereas usernames, passwords, and even credit card information can easily be changed, the information contained in a government-issued ID (such as date of birth, name, and home address) is much more permanent.

22

Although Florida enacted the Act out of concern for children's wellbeing, the law's online age-verification regime will make children and adults less safe given the realities of online advertising and data insecurity. Personal information collected online sells for astonishing profits.[32] Because all online data is transmitted through intermediaries, the information a user shares to verify identity or parental relationship can be transmitted beyond the site.[33] Moreover, third-party trackers managed by data brokers, advertisers, and other companies constantly collect data about a user's browsing activity on nearly every site.[34]

At a minimum, the data will present a potential target for data thieves. A record 3,205 data breaches occurred in 2023, up 78 percent from the year prior, and far exceeding the previous record of 1,860 breaches in 2021.[35] Over 350 million people—more than the entire population of the United States—have been affected, and 69 percent of consumers have been victims of identity crime more than once.[36]

---

[32] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://perma.cc/Y9P9-VZB7 (the U.S. digital advertising market boasted "a revenue of 317 billion dollars in 2024").

[33] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://perma.cc/7B5F-S376.

[34] *Id.*

[35] Identity Theft Res. Ctr., *2023 Data Brach Report* 3 (2024), https://perma.cc/3VUZ-52YF.

[36] *Id.*; *see also* Press Release, Identity Theft Res. Ctr., *ITRC 2023 Consumer*

23

Compounding this concern, children are attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[37] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45 children had personal information exposed in a data breach.[38] The risk of data breach is likely to chill constitutionally protected expression.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order and maintain the preliminary injunction against the Act for violating the First Amendment rights of minors and adults.

Dated: September 19, 2025

By: /s/ *Vera Eidelman*
*Counsel for Amicus Curiae*

Daniel Tilley
AMERICAN CIVIL LIBERTIES
   FOUNDATION UNION OF FLORIDA
Florida Bar No. 102882
4343 W. Flagler St., Suite 400
Miami, FL 33134
Email: dtilley@aclufl.org
Tel.: (786) 363-2714

Vera Eidelman
Lauren Yu
125 Broad Street, 18 Fl.
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
New York, NY 10004
Email: veidelman@aclu.org
Tel.: (212) 549-2500

*Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023), https://perma.cc/26LK-ZRKU.

[37] Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3 (2011), https://perma.cc/RR56-VE2H ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

[38] Javelin, *Child Identity Fraud: A Web of Deception and Loss* 5 (2021), https://perma.cc/Z9P4-2U4B.

David Greene
Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: davidg@eff.org
Tel.: (415) 436-9333

25

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that the foregoing brief of *Amicus Curiae* complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief is printed in proportionally spaced 14-point Times New Roman font, using Microsoft® Word 365 and there are 6025 words in the brief according to the word count of the word-processing system used to prepare the brief (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and with the type style requirements of Fed. R. App. P. 32(a)(6).

Dated: September 25, 2025    By: /s/ *Vera Eidelman*
                              Vera Eidelman

                              *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on September 25, 2025.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: September 25, 2025                  By:  /s/ *Vera Eidelman*
                                                    Vera Eidelman

*Counsel for Amicus Curiae*