No. 25-11881

# In the United States Court of Appeals for the Eleventh Circuit

COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, ET AL.,
*Plaintiffs-Appellees,*

V.

JAMES UTHMEIER, IN HIS OFFICIAL CAPACITY AS FLORIDA ATTORNEY GENERAL,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:24-cv-00438-MW-MAF

## APPELLANT'S REPLY BRIEF

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Deputy Solicitor General*
ROBERT S. SCHENCK
  *Assistant Solicitor General*
ANITA PATEL
  *Special Counsel*

PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*kevin.golembiewski@myfloridalegal.com*

October 3, 2025

*Counsel for Appellant*

*CCIA v. Uthmeier*
*Eleventh Circuit Case No. 25-11881*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant certifies that, to the best of his knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1.    Allen, Tony

2.    Alter, Adam

3.    American Civil Liberties Union

4.    American Civil Liberties Union of Florida

5.    Bailey, Andrew

6.    Barthold, Corbin

7.    Bell, Daniel

8.    Bird, Brenna

9.    Boyle, David

10.   Brown, Anthony G.

11.   Carr, Christopher M.

12.   Clark, Charity R.

13.   Cleland, Bartlett

14.   Clement, Paul D.

15.   Computer & Communications Industry Association

16.    Costello, David M.

17.    DeMott, Joseph J.

18.    DeSousa, Jeffrey Paul

19.    District of Columbia

20.    Drummond, Gentner

21.    Eidelman, Vera

22.    Electronic Frontier Foundation

23.    Fitzpatrick, Hon. Martin A.

24.    Freedom To Read Foundation

25.    Golembiewski, Kevin A.

26.    Griffin, Tim

27.    Guard, John M.

28.    Hilgers, Michael T.

29.    Jackley, Marty J.

30.    Jennings, Kathleen

31.    Kautz, Keith G.

32.    Kilby, Douglas L.

33.    Knudsen, Austin

34.    Labrador, Raul

35.   Lamia, Christine

36.   LGBT Tech Institute

37.   Marshall, Steve

38.   McCuskey, John B.

39.   Mead, Grace Lee

40.   Miyares, Jason S.

41.   Monson, Darrick W.

42.   Moody, Ashley

43.   Murrill, Liz

44.   Murphy, Erin

45.   Murphy, Hannah E.

46.   Nessel, Dana

47.   NetChoice, LLC

48.   Pallaki, Mitchell K.

49.   Patel, Anita

50.   Paxton, Ken

51.   Purser, Stanford

52.   Rayfield, Dan

53.   Rokita, Theodore E.

*CCIA v. Uthmeier*
*Eleventh Circuit Case No. 25-11881*

54.    Schenck, Robert S.

55.    Schruers, Matthew

56.    Schwalb, Brian L.

57.    Software & Information Industry Association

58.    Spears, Sara E.

59.    State of Alabama

60.    State of Alaska

61.    State of Arkansas

62.    State of Delaware

63.    State of Georgia

64.    State of Idaho

65.    State of Indiana

66.    State of Iowa

67.    State of Louisiana

68.    State of Maryland

69.    State of Michigan

70.    State of Missouri

71.    State of Montana

72.    State of Nebraska

*CCIA v. Uthmeier*
*Eleventh Circuit Case No. 25-11881*

73.    State of New Mexico

74.    State of North Dakota

75.    State of Ohio

76.    State of Oklahoma

77.    State of Oregon

78.    State of South Carolina

79.    State of South Dakota

80.    State of Texas

81.    State of Utah

82.    State of Vermont

83.    State of Virginia

84.    State of West Virginia

85.    State of Wyoming

86.    Taylor, Treg R.

87.    TechFreedom

88.    Tilley, Daniel Boaz

89.    Torrez, Raul

90.    Twenge, Jean

91.    Uthmeier, James

*CCIA v. Uthmeier*
*Eleventh Circuit Case No. 25-11881*

92.    Veitch, Alexandra N.

93.    Voigts, Anne M.

94.    Waczewski, James

95.    Walker, Hon. Mark

96.    Whitaker, Henry C.

97.    Wikimedia Foundation

98.    Wilson, Alan

99.    Woodhull Freedom Foundation

100.    Wrigley, Drew

101.    Wynosky, Kevin J.

102.    Xi, James

103.    Yost, Dave

Snap, Inc. (SNAP), Meta Platforms, Inc. (META), and Alphabet Inc. (GOOGL)

are publicly traded companies that have an interest in the outcome of this case or appeal.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................... 1

ARGUMENT .......................................................................................... 3

I.      Plaintiffs' First Amendment challenge is not justiciable. .......................... 3

      A.      Plaintiffs do not have prudential standing to assert the First Amendment rights of children........................................................ 3

      B.      *Younger* will bar Plaintiffs' First Amendment challenge............................. 7

II.     HB3 does not violate children's First Amendment rights. .................... 10

      A.      HB3 regulates addictive design features, not children's speech. ............................................................................................ 11

      B.      HB3 satisfies intermediate scrutiny. .............................................. 15

      C.      At minimum, HB3's protections for children younger than 14 years old are not facially unconstitutional. ............................... 24

III.    Even if Plaintiffs are entitled to a preliminary injunction, the district court exceeded its equitable powers in universally enjoining HB3.................... 25

CONCLUSION .................................................................................... 26

CERTIFICATE OF COMPLIANCE.................................................... 28

CERTIFICATE OF SERVICE ............................................................ 28

i

# TABLE OF AUTHORITIES

## Cases

*Am. All. for Equal Rts. v. Fearless Fund Mgmt.*,
103 F.4th 765 (11th Cir. 2024) ........................................................26

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ...............................................................19, 20

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) ..................................................................2, 4

*CAMP Legal Def. Fund v. City of Atlanta*,
451 F.3d 1257 (11th Cir. 2006) ........................................................5

*Carey v. Population Servs. Int'l*,
431 U.S. 678 (1977) ......................................................................4

*CCIA v. Paxton*,
747 F. Supp. 3d 1011 (W.D. Tex. 2024) ...............................................2

*City of Austin v. Reagan Nat'l Advert.*,
596 U.S. 61 (2022) ......................................................................21

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) ....................................................................18

*Craig v. Boren*,
429 U.S. 190 (1976) ......................................................................4

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ....................................................................26

*Doran v. Salem Inn*,
422 U.S. 922 (1975) ....................................................................10

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ......................................................................7

*For Your Eyes Alone v. City of Columbus*,
    281 F.3d 1209 (11th Cir. 2002) ........................................................... 9

*Free Speech Coal. v. Paxton*,
    145 S. Ct. 2291 (2025) ......................................................... 2, 10, 17, 19

*Gary v. Warner Robins*,
    311 F.3d 1334 (11th Cir. 2002) ......................................................... 12

*Harris v. Evans*,
    20 F.3d 1118 (11th Cir. 1994) ............................................................. 4

*Honeyfund.com v. Gov. of Fla.*,
    94 F.4th 1272 (11th Cir. 2024) ......................................................... 13

*Indigo Room v. Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013) ......................................................... 12

*Kondrat'yev v. City of Pensacola*,
    949 F.3d 1319 (11th Cir. 2020) ........................................................... 4

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ...................................................................... 4, 5

*Lange v. Houston Cnty.*,
    No. 22-13626, 2025 WL 2602633 (11th Cir. Sept. 9, 2025) ...................... 16

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ........................................................................ 14

*Leonard v. Ala. State Bd. of Pharm.*,
    61 F.4th 902 (11th Cir. 2023) ........................................................... 10

*Mata Chorwadi v. City of Boynton Beach*,
    66 F.4th 1259 (11th Cir. 2023) ........................................................... 5

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ........................................................................ 16

*Moody v. NetChoice*,
603 U.S. 707 (2024) .................................................................1, 4, 13, 14, 18, 24

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................ 13

*NetChoice v. Bonta*,
No. 25-146, 2025 WL 2600007 (9th Cir. Sept. 9, 2025) ...........................4, 21

*NetChoice v. Carr*,
No. 1:25-cv-2422, 2025 WL 1768621 (N.D. Ga. June 26, 2025) ................. 2

*NetChoice v. Fitch*,
145 S. Ct. 2658 (2025) .............................................................................24

*NetChoice v. Griffin*,
No. 5:23-cv-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ................. 2

*NetChoice v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024) ........................................................ 2

*NetChoice v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) ....................................................... 2

*New Ga. Project v. Att'y Gen.*,
106 F.4th 1237 (11th Cir. 2024) ................................................................. 9

*Norwegian Cruise Line v. Fla. Dep't of Health*,
50 F.4th 1126 (11th Cir. 2022) .................................................................12

*NRA v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) ...............................................................23

*Pa. Psych. Soc'y v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002) .................................................................6, 7

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ............................................................................ 11, 20

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................. 19

*Speech First v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ................................................ 26

*Students Engaged in Advancing Tex. v. Paxton*,
    765 F. Supp. 3d 575 (W.D. Tex. 2025) ...................................... 2

*Swain v. Junior*,
    961 F.3d 1276 (11th Cir. 2020) .................................................. 8

*TikTok v. Garland*,
    604 U.S. 56 (2025) ........................................ 3, 11, 12, 16, 18, 20

*Tokyo Gwinnett v. Gwinnett Cnty.*,
    940 F.3d 1254 (11th Cir. 2019) .................................................. 9

*Trump v. CASA*,
    606 U.S. 831 (2025) .................................................................. 26

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) .................................................................. 21

*United States v. Bobal*,
    981 F.3d 971 (11th Cir. 2020) .................................................. 11

*United States v. Hicks*,
    100 F.4th 1295 (11th Cir. 2024) ................................................ 6

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (1977) .................................................................. 19

*Virginia v. American Booksellers*,
    484 U.S. 383 (1988) .................................................................... 5

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) .............................................................. 17, 18

*Young Apartments v. Town of Jupiter*,
   529 F.3d 1027 (11th Cir. 2008) ............................................................... 5

*Younger v. Harris*,
   401 U.S. 37 (1971) ................................................................................ 7

**Statutes**

28 U.S.C. § 1442 ........................................................................................ 8

Fla. Stat. § 501.1736 ...........................................................................3, 22

**Other Authorities**

*Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research*,
   Senate Judiciary Comm. (Sept. 9, 2025) ..........................................1, 25

Tacy F. Flint, *A New Brand of Representational Standing*,
   70 U. Chi. L. Rev. 1037 (2003) .............................................................. 7

## INTRODUCTION

Plaintiffs do not even try to defend their members' destructive business practices. They do not deny that the design features regulated by HB3 "overstimulate the reward center in" children's still-developing "brain[s]," causing "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." DE51-9 at 9. They do not dispute that social-media addiction is devastating children's mental health. *See* Init. Br. 3-8. Nor do they dispute that their members refuse "access to [their] data" and "bury evidence" of the harm they are causing children.[1] Plaintiffs' view is that none of that matters: The First Amendment simply does not allow States to regulate platforms' "use" of addictive design "features." Ans. Br. 38. That gives the game away. For Plaintiffs, this case is not about protecting kids' First Amendment rights; it is about Lochnerizing the First Amendment into a shield for platforms to wield against any attempt to regulate their business practices—even when those practices "pose [unique] dangers" to children. *Moody v. NetChoice*, 603 U.S. 707, 733 (2024).

Plaintiffs are wrong about the First Amendment. Even if they had prudential standing to assert children's rights and could dodge *Younger*, their First Amendment challenge fails because HB3 satisfies intermediate scrutiny. Plaintiffs barely defend the

---

[1] DE51-9 at 11; Jason Sattizahn, *Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research* at 1, Senate Judiciary Comm. (Sept. 9, 2025), https://tinyurl.com/37jmj2a8.

district court's intermediate-scrutiny analysis. Instead, they seek refuge in strict scrutiny. They assert that strict scrutiny applies for reasons even the district court found unpersuasive. *See* Ans. Br. 24-28; DE94 at 34-39. They trumpet district-court opinions that considered different statutory schemes and applied strict scrutiny.[2] And although they declare that "HB3 cannot satisfy any level of heightened scrutiny," Ans. Br. 28, their purported intermediate-scrutiny analysis is nothing other than strict-scrutiny arguments under a different name. They rely on strict-scrutiny cases like *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) and argue that HB3 is not the least restrictive means for protecting kids because parental controls are supposedly just as effective. Yet Plaintiffs ignore the Supreme Court's conclusion just last term that a law protecting kids online does not fail intermediate scrutiny simply because parental controls are available. *See Free Speech Coal. v. Paxton*, 145 S. Ct. 2291, 2318 (2025).

HB3 is a quintessential consumer-protection regulation, which clears intermediate scrutiny. It is narrowly tailored to protect Florida's most vulnerable citizens from product designs that are harming their mental health. The law applies only if platforms choose to use design features that manipulate kids into compulsively

---

[2] Ans. Br. 1, 26; *see NetChoice v. Carr*, No. 1:25-cv-2422, 2025 WL 1768621, at *12 (N.D. Ga. June 26, 2025); *NetChoice v. Griffin*, No. 5:23-cv-5105, 2025 WL 978607, at *10 (W.D. Ark. Mar. 31, 2025); *NetChoice v. Yost*, 778 F. Supp. 3d 923, 951 (S.D. Ohio 2025); *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 595 (W.D. Tex. 2025); *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1121 (D. Utah 2024); *CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1034 (W.D. Tex. 2024).

consuming the platforms' products. Fla. Stat. § 501.1736(1)(e)4. Among those platforms, HB3 targets only platforms that present a heightened risk of sustained exposure to the features—platforms on which at least 10% of daily users under age 16 are logged on for more than 2 hours per day. *Id.* § 501.1736(1)(e)2. Even then, HB3 does not prohibit children from accessing the platform. It only limits the platform from contracting with them for accounts so that the platform cannot target them with addictive features. *Id.* § 501.1736(1)(a), (2)(a), (3)(a). That "content-neutral," "conditional" restriction serves Florida's compelling interest in protecting children "in a direct and effective way." *TikTok v. Garland*, 604 U.S. 56, 76-77 (2025). It does not violate the First Amendment.

The preliminary injunction must be reversed.

## ARGUMENT

I. **PLAINTIFFS' FIRST AMENDMENT CHALLENGE IS NOT JUSTICIABLE.**

A. **Plaintiffs do not have prudential standing to assert the First Amendment rights of children.**

**1.** Plaintiffs identify no prudential-standing exception that allows them to assert children's First Amendment rights. Rather than make a case for third-party standing or overbreadth, they rattle off theories that they need not satisfy those exceptions. This Court's precedent forecloses each theory.

Start with their and the district court's "truncated" third-party-standing test. Init. Br. 21. Plaintiffs do not dispute that children face no hindrance to asserting their own

rights—the requirement this Court has said "is the central consideration in the grant of third party standing," even in the First Amendment context. *Harris v. Evans*, 20 F.3d 1118, 1124 (11th Cir. 1994) (en banc). Plaintiffs try to evade *Harris* by saying *Brown* "allowed the association plaintiffs to assert the First Amendment rights of minors." Ans. Br. 44. But Plaintiffs admit that *Brown* "did not specifically address standing." *Id.* And "the Supreme Court has rejected the suggestion that . . . 'implicit drive-by [standing] rulings' carry any 'precedential effect.'" *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1325 n.2 (11th Cir. 2020).[3]

Plaintiffs also claim that they need not show hindrance under *Craig v. Boren*, 429 U.S. 190 (1976) and *Carey v. Population Services International*, 431 U.S. 678 (1977) because HB3 "directly regulates [their] members." Ans. Br. 44-45. But even if *Craig* and *Carey* did not require hindrance, those cases were decided long before *Kowalski v. Tesmer*, where the Supreme Court reined in third-party standing and clarified that plaintiffs must always establish a close relationship and hindrance. 543 U.S. 125, 130 (2004). Plaintiffs

---

[3] Apart from that, *Brown* involved the rights of the associations' members (video-game companies) unlike here, where the district court disclaimed relying on the rights of Plaintiffs' members. *See Brown*, 564 U.S. at 790-94 (considering whether the companies' games qualified for First Amendment protection when "directed at children"). The district court likely did so because whether a social-media platform is engaged in expression is a fact-intensive question that the record here is insufficient to answer. *See Moody*, 603 U.S. at 736 n.5; *id.* at 745 (Barrett, J., concurring); *NetChoice v. Bonta*, No. 25-146, 2025 WL 2600007, at *7, *12 (9th Cir. Sept. 9, 2025) (concluding that the record was inadequate to "adjudicate NetChoice's 'fact intensive' claims" that its members engage in expression).

selectively quote *Kowalski*, suggesting that it endorsed their position on hindrance, *see* Ans. Br. 44-46, but *Kowalski* noted only that the Court had in the past been "forgiving with" the close-relationship and hindrance requirements when the litigant was directly regulated. 543 U.S. at 130. It did not hold that directly regulated litigants are absolved of establishing hindrance. That is why since *Kowalski*, this Court has required directly regulated businesses to establish hindrance. *See Young Apartments v. Town of Jupiter*, 529 F.3d 1027, 1041-42 (11th Cir. 2008) (requiring a landlord that was directly regulated to establish that its tenants were hindered from protecting their own rights).

Unable to establish third-party standing, Plaintiffs gesture at the overbreadth doctrine.[4] Ans. Br. 43-44, 46. Though overbreadth sometimes permits litigants suffering no First Amendment violation to assert the rights of third parties, this Court has held that it applies only when the challenged statute regulates those third parties. *Mata Chorwadi v. City of Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023). HB3 cannot "be enforced against [children], so [Plaintiffs] cannot rely on the overbreadth doctrine" to assert their rights. *Id.*

Having no answer to *Mata Chorwadi*, Plaintiffs reach back 40 years to *Virginia v. American Booksellers*, 484 U.S. 383 (1988), stating that the law there also did not regulate

---

[4] Plaintiffs express bewilderment at the term "overbreadth standing." Ans. Br. 46. Overbreadth serves as an exception that provides prudential standing to assert third-party rights. *See CAMP Legal Def. Fund v. City of Atlanta*, 451 F.3d 1257, 1273-74 (11th Cir. 2006).

the third parties. Ans. Br. 43-44. This Court rejected that exact argument in *Mata Chorwadi*. The plaintiffs in *Mata Chorwadi* too argued that they could rely on overbreadth because "*American Booksellers*" allowed "bookseller organizations" to assert "the rights of non-party potential book buyers," who were not regulated under the challenged law. *Compare* Init. Br. 38-39, *Mata Chorwadi*, No. 20-14694, 2021 WL 1761923 (11th Cir. Apr. 23, 2021), *with* Ans. Br. 43-44. In rejecting that argument, *Mata Chorwadi* applied the overbreadth doctrine as it stands now, decades after *American Booksellers*. Plaintiffs may think that under *American Booksellers*, *Mata Chorwadi* is wrong, but "a perceived defect in [a] prior panel's [decision] as it relates to the law in existence at that time" does not allow a future panel to set the decision aside. *United States v. Hicks*, 100 F.4th 1295, 1300 (11th Cir. 2024) (quotation omitted).

**2.** Even if plaintiffs' *members* would have prudential standing to assert children's rights, *Plaintiffs* do not. Because HB3 does not regulate Plaintiffs, Plaintiffs must rely on associational standing to challenge the law, and they cannot stack that prudential-standing exception and a different exception to assert the rights of children—third parties with whom they have no relationship. *See* Init. Br. 22-23.

Plaintiffs cite no cases from this Court or the Supreme Court holding that such stacking is permissible. Rather, they return to *American Booksellers* and *Brown*—neither of which addressed the question—and cite a few out-of-circuit decisions, including *Pennsylvania Psychiatric Society v. Green Spring Health Services*, 280 F.3d 278 (3d Cir. 2002),

6

Ans. Br. 48, in which the Third Circuit dubbed the standing that Plaintiffs press "derivative standing." *See also* Tacy F. Flint, *A New Brand of Representational Standing*, 70 U. Chi. L. Rev. 1037, 1043, 1065 (2003) (analyzing *Psychiatric Society* and arguing that for policy reasons, "[c]ourts should allow the practice of derivative standing"). But the dissent in *Psychiatric Society* had the better argument: Associations "cannot piggy-back two discrete *exceptions*, to swallow up the long-standing *rule* that litigants must assert their own rights and interests." 280 F.3d at 295 (Nygaard, J., dissenting). Prudential-standing exceptions are not tools that an association can use to commandeer the rights of non-member third parties who have no ability to affect the association's litigation decisions. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379-80 (2024) ("[T]he standing doctrine serves to protect the autonomy of those who are most directly affected so that they can decide whether and how to challenge the defendant's action.").

### B. *Younger* will bar Plaintiffs' First Amendment challenge.

Alternatively, the district court will have to abstain from adjudicating Plaintiffs' First Amendment challenge because the relief that Plaintiffs seek—a permanent injunction barring enforcement against Snap and other members—will interfere with Florida's state enforcement action Snap. *See Younger v. Harris*, 401 U.S. 37, 54 (1971).

Plaintiffs contend that for three reasons, *Younger* will not require abstention. The first reason is new. Plaintiffs claim "there is no basis to abstain from resolving this lawsuit" because the Snap action is currently in federal court. Ans. Br. 48-49. "[T]he

district court denied" Florida's remand motion, so the action, Plaintiffs say, "will remain in federal court for the foreseeable future." *Id.* But the question in this appeal is whether Plaintiffs are "substantial[ly] likel[y] to succeed on the merits" of their facial First Amendment challenge. *Swain v. Junior*, 961 F.3d 1276, 1284 (11th Cir. 2020). If the Snap action is likely to return to state court, then Plaintiffs are not likely to succeed on the merits because the district court will have to abstain.

And the action will return to state court. Removal was improper. *See* Notice of Appeal, *OAG v. Snap*, No. 25-12814 (11th Cir.), ECF No. 1 (challenging the remand ruling on appeal). The district court determined that it has "federal officer removal jurisdiction," finding that Snap acts as a federal officer when it contracts with children for Snapchat accounts because two federal agencies ran limited advertising campaigns on Snapchat. *See* Order at 2 & n.1, *OAG v. Snap*, No. 25-cv-676-MW-HTC (N.D. Fla. Aug. 13, 2025), ECF No. 36. But a social-media platform is not "acting under" the "color of [federal] office" when it does business with kids just because a federal agency has purchased airtime on the platform. 28 U.S.C. § 1442(a)(1); *see also* Init. Br. 17-27, *Snap*, ECF No. 15. Plaintiffs acknowledge as much by arguing only that the enforcement action will be in federal court "for the foreseeable future." Ans. Br. 48-49. Plaintiffs know the action will ultimately return to state court, but they are counting on the appeal in *Snap* to buy them enough time to secure an injunction before abstention is

considered. It would spell the end of *Younger* if abstention could be avoided with a well-timed, meritless removal to federal court.

Next, Plaintiffs say *Younger* will not require abstention because substantial merits proceedings took place before Florida sued Snap. They emphasize that this case was pending for several months, that the district court "resolved[] two motions," and that the parties deposed each other's preliminary-injunction "declarants." Ans. Br. 50. But *Younger* is not a numbers game: It does not "focus" on the "raw time" a case has been pending or the number of depositions. *New Ga. Project v. Att'y Gen.*, 106 F.4th 1237, 1244 (11th Cir. 2024). The question is whether the district court "meaningfully engaged the merits." *Id.* Plaintiffs say it did, relying on *Tokyo Gwinnett v. Gwinnett Cnty.*, 940 F.3d 1254 (11th Cir. 2019) and *For Your Eyes Alone v. City of Columbus*, 281 F.3d 1209 (11th Cir. 2002). Ans. Br. 50-51. But they repeat the district court's mistake: They ignore that in those cases, this Court stressed that the litigation had proceeded past the pleadings stage before the state action began. *See Tokyo Gwinnett*, 940 F.3d at 1272; *For Your Eyes Alone*, 281 F.3d at 1218.

Plaintiffs also overstate the parties' preliminary-injunction discovery. They incorrectly claim that Florida's depositions were not limited. *See* Ans. Br. 50. The depositions were limited to the declarants whom Plaintiffs proffered in support of their preliminary-injunction motion, DE34 at 2-3; they were "limited" in length and scope, DE49 at 1-2; DE51-10 at 20 (instructing Florida to "limit[]" the depositions "to the

subject matter of" each witness's "declaration"); and Florida was unable to obtain document discovery before the depositions, which limited its ability to probe the declarants. Florida even had to submit a list of deposition topics for the district court to pre-approve. *See* DE34 at 2-3.

Last, even though Florida worked collaboratively with Plaintiffs and voluntarily stayed enforcement during the first round of preliminary-injunction litigation, Plaintiffs accuse Florida of bringing the Snap action in bad faith. *See* Ans. Br. 53. The district court expressly found otherwise. DE94 at 12 n.5. It was not bad faith for Florida to enforce HB3 against a business openly violating it. *Younger*'s "bad-faith exception" applies only if the enforcement action was "brought without a reasonable expectation of" success. *Leonard v. Ala. State Bd. of Pharm.*, 61 F.4th 902, 912 (11th Cir. 2023). And Snap chose to violate HB3 "rather than awaiting the normal development of [this] lawsuit." *Doran v. Salem Inn*, 422 U.S. 922, 929 (1975). "Having" done so, Snap and its trade associations "cannot . . . complain" about their "constitutional contentions [being] resolved in a state court." *Id.*

## II. HB3 DOES NOT VIOLATE CHILDREN'S FIRST AMENDMENT RIGHTS.

Plaintiffs say HB3 "obviously implicates the First Amendment," though it takes them more than a dozen pages to explain why. Ans. Br. 18-24, 33-39. But even assuming Plaintiffs are right, HB3 satisfies intermediate scrutiny. Because HB3 zeroes in on platforms that expose children to addictive design features, "it cannot be said that" any

portion—let alone "a substantial portion"—"of the burden that [the law] imposes fails to advance [the Legislature]'s goal[]" of protecting children. *Free Speech Coal.*, 145 S. Ct. at 2318 (quotation omitted). The district court held that HB3 is not sufficiently tailored, but Plaintiffs retreat from the court's analysis. They, for instance, do not defend the district court's conclusion that Florida should have done a "public education campaign" about the risks posed by social media rather than enact HB3. DE94 at 51-52. Plaintiffs instead argue that the district court should have applied strict scrutiny. Their decision to push for strict scrutiny rather than defend the ground on which they won below lays bare that the district court's intermediate-scrutiny analysis is indefensible.

### A.    HB3 regulates addictive design features, not children's speech.

Plaintiffs argue that heightened scrutiny applies because HB3 prohibits "'conduct' necessary to access speech" (entering account-holder contracts with kids). Ans. Br. 3, 34. That "approximate[s] a claim that" HB3 regulates commercial activity but "disproportionate[ly] burden[s]" expression. *TikTok*, 604 U.S. at 68. Yet Plaintiffs ignore the Supreme Court's test for whether a law disproportionately burdens expression. They instead mischaracterize HB3 as a ban on social-media access and say it must implicate the First Amendment under *Packingham v. North Carolina*, 582 U.S. 98 (2017). *See* Ans. Br. 18-19. But unlike the law in *Packingham*, HB3 bans no one from speaking or listening to speech on social media. *See* Init. Br. 30; *United States v. Bobal*, 981 F.3d 971, 977 (11th Cir. 2020) (distinguishing *Packingham* because the law there was

a "complete bar" to social media). Even Plaintiffs eventually recognize that all HB3 does is regulate platforms "that use certain features." *See* Ans. Br. 38.

Plaintiffs therefore argue that even if HB3 is not an access ban, it implicates the First Amendment because it burdens children's access to social media and "it is blackletter law that 'burdens' on protected speech trigger First Amendment scrutiny just as much as 'bans.'" Ans. Br. 35. But no one disputes that laws burdening speech can trigger First Amendment scrutiny. The issue is whether HB3 "disproportionate[ly] burden[s]" speech, not simply whether it burdens speech in some way. *TikTok*, 604 U.S. at 68; *Norwegian Cruise Line v. Fla. Dep't of Health*, 50 F.4th 1126, 1136 (11th Cir. 2022) (Laws "that only incidentally burden[] speech" do "not implicate the First Amendment."). The closest Plaintiffs come to engaging with that question is their attempt to distinguish *TikTok*; *Indigo Room v. Fort Myers*, 710 F.3d 1294 (11th Cir. 2013); and *Gary v. Warner Robins*, 311 F.3d 1334 (11th Cir. 2002).

Their discussion of *TikTok*, however, only proves that HB3 does not disproportionately burden expression. Plaintiffs claim that even though the law in *TikTok* "ultimately" banned access to TikTok, it did not "direct[ly]" regulate access to expressive activity because that ban was just an "incidental effect" of TikTok's decision not to divest. Ans. Br. 37-38. That is precisely the point. That HB3 may "ultimately" prohibit some platforms from entering account-holder contracts with children is an "incidental effect" of platforms' choice to use addictive design features. Just like TikTok

12

could have avoided the ban by divesting, platforms can avoid HB3's contract restrictions by dropping their addictive design features.

And Plaintiffs have never claimed that children have an expressive interest in the features themselves. Whether a child must choose to load more content rather than read an infinite stream, click "play" on a video rather than have it play automatically, or open an app to receive notifications rather than receive them directly on their phones has no effect on their expression. Children have no abstract right of access to social-media content at all, *see Murthy v. Missouri*, 603 U.S. 43, 74-75 (2024), let alone a First Amendment right to particular design features. Because platforms' "action" of using the features is what "matters" under HB3, and the features have nothing to do with "the ideas communicated" on social media, HB3 does not trigger heightened scrutiny. *Honeyfund.com v. Gov. of Fla.*, 94 F.4th 1272, 1278 (11th Cir. 2024).[5]

As for *Indigo Room* and *Gary*, Plaintiffs contend that HB3 is different from laws banning children from entering alcohol-serving establishments because HB3 regulates "websites dedicated to *speech*." Ans. Br. 36. But a law is not constitutionally suspect just

---

[5] Though the district court relied only on children's rights in granting the preliminary injunction, Plaintiffs suggest that HB3 implicates the First Amendment rights of platforms because platforms have an expressive interest in addictive features under *Moody*. Ans. Br. 38. But *Moody* explained that platforms engage in expression when they "use their Standards and Guidelines to decide which third-party" speech to display in curated "feeds" and how the speech "will be ordered." 603 U.S. at 740. Nothing in *Moody* suggests that functions like infinite scroll and autoplay express anything.

because it regulates a speech-related industry. If the regulation is not designed to "suppress[] particular ideas," it will not trigger heightened scrutiny. *Leathers v. Medlock*, 499 U.S. 439, 453 (1991). That is the case here. The district court itself concluded that Florida had reasonable, non-speech reasons to regulate platforms that host user content or activity: Those are the platforms on which use of addictive features is ubiquitous and that pose the greatest threat to children's mental health. DE94 at 35-37; *accord* DE51-2 ¶¶ 19-20; DE51-1 ¶ 6; *Moody*, 603 U.S. at 733 ("[T]oday's social media pose dangers not seen earlier: No one ever feared the effects of newspaper opinion pages on adolescents' mental health.").

That is where Plaintiffs and the district court's open-mic-night hypothetical collapses. Ans. Br. 36. They say that an "apt analogy to" HB3 is not the laws in *Indigo Room* and *Gary* but rather a law that "prohibit[s] youth from entering an alcoholic beverage establishment only if that establishment also host[s] open-mic nights." *Id.* That law would likely constitute a disproportionate burden on expression because there is no conceivable reason to prevent children from exposure to alcohol only on open-mic nights, which suggests that the law "is directed at" open mics, not alcohol. *Leathers*, 499 U.S. at 453. Not so here. Unrebutted record evidence establishes that there is good reason to regulate children's contracting with covered platforms.

Thus, HB3 does not trigger heightened scrutiny simply because it regulates the "use [of addictive] features" or because it applies to a "subset of speech services." Ans.

Br. 38-39. If businesses use product "features that are designed and operate to undermine [kids'] ability to exercise their will," DE94 at 41, and kids "compulsive[ly]" consume the product and suffer harm as a result, DE51-2 ¶ 20, then States can regulate the businesses' use of the features. Unlike a law stopping kids from entering only bars that host open-mic nights, there is nothing "[ir]rational," or constitutionally suspect, about that. Ans. Br. 39.

### B.    HB3 satisfies intermediate scrutiny.

"But the Court ultimately 'need not' decide whether HB3 triggers First Amendment scrutiny because it satisfies scrutiny in any event." Init. Br. 35 (quoting *TikTok*, 604 U.S. at 69). The district court misapplied intermediate scrutiny, subjecting HB3 to something more akin to strict scrutiny. Rather than defend the district court's analysis, Plaintiffs argue that the court should have applied strict scrutiny anyway and that it erred in holding that Florida's interest is legitimate. They are wrong on both scores.

**1.** Though Plaintiffs obtained a preliminary injunction solely because the district court found that HB3 is not sufficiently tailored, Plaintiffs have little to say about tailoring. They start by noting that a law "must not 'burden substantially more speech than necessary to further [its] interests.'" Ans. Br. 30. Yet they never actually apply that standard. They quickly pivot to strict-scrutiny cases, citing "*Ashcroft*," "*Reno*," and "*Brown*" and arguing that any law that "restricts" children's "access" to "'social media'

websites" is unconstitutional. *See* Ans. Br. 30-31. Not even the district court went that far. Plaintiffs' theory, for example, would not just "imperil" the Children's Online Privacy Protection Act (COPPA)—it would *require* enjoining that longstanding federal law because COPPA has the effect of limiting children's access to social-media accounts. Init. Br. 35 n.21.

Plaintiffs then tread down the same path as the district court. They too quibble with the Legislature's policy judgments and ding HB3 because less-restrictive alternatives may exist. First, Plaintiffs "parade a series of alternatives," *TikTok*, 604 U.S. at 77, such as allowing parents to "terminate" their children's accounts and trusting platforms to make effective parental "tools" available. Ans. Br. 32-33. But Plaintiffs ignore nearly all of Florida's evidence that parental controls have proven ineffective at combatting addiction. *See* Init. Br. 7-8. Worse, they do not even acknowledge *Free Speech Coalition*'s conclusion that a law protecting kids online does not fail intermediate scrutiny simply because parental controls are available. 145 S. Ct. at 2318; *see* Ans. Br. 32-33, 41-42. Plaintiffs, however, do invoke *McCullen v. Coakley*, 573 U.S. 464 (2014) (a decision about a "truly exceptional" (at 490) limit on advocacy outside abortion clinics) and *Brown* (a strict-scrutiny case). Ans. Br. 32-33. "[I]t's not clear how" those decisions "trump the plain language of a Supreme Court decision from [three] months ago" specifically considering whether parental controls render a law invalid under

16

intermediate scrutiny. *Lange v. Houston Cnty.*, No. 22-13626, 2025 WL 2602633, at *6 n.2 (11th Cir. Sept. 9, 2025) (en banc).

Second, Plaintiffs suggest that HB3 is too restrictive because it applies even if a social-media platform limits addictive design features on "account[s]" "known to be" held by "youth" or deploys the features only if users "opt in" to them. *See* Ans. Br. 31. That nitpicking ignores that the Florida Legislature had "latitude" in "design[ing]" HB3 because it "address[es] content-neutral interests." *TikTok*, 604 U.S. at 77. The Legislature "could reasonably have determined that its interests overall would be served less effectively" if HB3 regulated only platforms that wield all the features all the time. *Ward v. Rock Against Racism*, 491 U.S. 781, 800-01 (1989). Even if a platform uses just one of the features to manipulate children, regulating that platform "advance[s] [Florida]'s goal[]" of protecting children from compulsive use and the mental-health harms associated with it. *Free Speech Coal.*, 145 S. Ct. at 2318; DE51-2 ¶ 47 ("On its own, each individual feature has the potential to manipulate human psychology and encourage addictive behavior."). And like tobacco or alcohol, an addictive design feature is no less dangerous for kids simply because they "opt in" to it.

Indeed, Plaintiffs never explain how a scheme that encourages platforms to drop all addictive design features burdens "substantially more speech than is necessary." *Free Speech Coal.*, 145 S. Ct. at 2317. It is not even clear what speech Plaintiffs believe HB3 unnecessarily burdens. They identify no platforms that would be unregulated if HB3

17

excluded platforms that limit the features on "youth" "account[s]" or unleash the features only after users "opt in." Ans. Br. 31.

Plaintiffs focus almost entirely on those strict-scrutiny points, bypassing the questions that drive intermediate-scrutiny analysis. Nowhere do Plaintiffs claim that HB3 is not a "direct and effective way" of achieving Florida's interest in protecting children from addiction. *TikTok*, 604 U.S. at 77. They never argue that the Legislature's determination that HB3 is more effective than alternatives like parental controls was unreasonable. *See Ward*, 491 U.S. at 801. Nor do Plaintiffs contest that HB3 "leave[s] open ample" channels for children to communicate on the internet. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). Plaintiffs have never claimed that HB3 applies to platforms such as X, Bluesky, WhatsApp, and so on.

Finally, though Plaintiffs do not deny that they pressed only a facial First Amendment challenge in their "renewed" preliminary-injunction motion, *see* Init. Br. 41 n.24, they overlook the standard for facial challenges. Even if there were some platforms that offered "tools" that were effective at combatting addiction, Ans. Br. 41, and HB3 were insufficiently tailored as applied to those platforms, the law would not be facially unconstitutional. Plaintiffs have made no showing that HB3's purportedly "unconstitutional applications" to such platforms "substantially outweigh" its "constitutional" applications to platforms that are addicting kids. *Moody*, 603 U.S. at 723-24.

HB3 satisfies intermediate scrutiny.

**2.** Doomed under intermediate scrutiny, Plaintiffs grasp for strict scrutiny. Their quest for strict scrutiny has been winding. In their first preliminary-injunction motion, they argued that HB3 is content-based because the Florida "House Speaker" purportedly expressed "concern[] about the *content* minors may encounter on" social media and because the law "singles out a subset of online services for disfavored treatment." DE5 at 24-26. In their "renewed" preliminary-injunction motion, Plaintiffs claimed "that [HB3] should be subject to strict scrutiny" because "by limiting its coverage to platforms where users are allowed to share content or view the content of other[s,] the law singles out 'social' speech." DE94 at 37. Now, Plaintiffs feature an argument that the district court did not even address: They say that strict scrutiny applies because HB3 "effectively *suppresse*[*s*] a large amount of speech." Ans. Br. 24-25.

That is a desperate argument. A law triggers strict scrutiny if it is "content-based." *Free Speech Coal.*, 145 S. Ct. at 2302. "Content-neutral laws, on the other hand, are subject to an intermediate level of scrutiny." *Id.* It does not matter if a content-neutral law affects a lot of speech. Plaintiffs support their novel theory by piecing together language from decisions that considered whether obscenity laws triggered strict scrutiny. Ans. Br. 24-25 (citing *Free Speech Coalition*; *United States v. Playboy Ent. Grp.*, 529 U.S. 803 (1977); *Reno v. ACLU*, 521 U.S. 844 (1997); *Ashcroft v. ACLU*, 542 U.S. 656 (2004)). None of those decisions held that content-neutral laws trigger strict

scrutiny if they affect a lot of speech. All focused on whether the challenged law was content-based. *See Free Speech Coal.*, 145 S. Ct. at 2309 ("H.B. 1181 does not regulate the content of protected speech[.]"); *Playboy*, 529 U.S. at 813 ("Since § 505 is a content-based speech restriction, it can stand only if it satisfies strict scrutiny."); *Reno*, 521 U.S. at 868 ("[T]he CDA is a content-based blanket restriction on speech."); *Ashcroft*, 542 U.S. at 670 ("[T]his case[] involve[s] a content-based restriction designed to protect minors from viewing harmful materials.").

Nor can Plaintiffs' theory be reconciled with *Packingham* and *TikTok*. *Packingham* did not apply strict scrutiny to a law that the Court considered "unprecedented in the scope of First Amendment speech it burden[ed]." 582 U.S. at 107. And in *TikTok*, the Court acknowledged that the law was "an effective ban on a social media platform with 170 million U.S. users," yet it applied intermediate scrutiny. 604 U.S. at 69.

As for whether HB3 is content-neutral, the district court got it right. Even Plaintiffs previously conceded that the law "does not single out any speech." Stay Resp. 12. Still, they allege that HB3 is content-based because the Legislature secretly intended to target speech with "'social' subject matter," whatever that means. Ans. Br. 26. That is so, we are told, because HB3 applies only to platforms that "permit users to upload content or view the content or activity of other[s]." *Id.* But Plaintiffs do not explain why only "social" speech can be "uploaded" or "viewed." As a bipartisan coalition of 27 States and the District of Columbia explained in their amicus brief supporting Florida,

"[s]peech uploaded or viewed might be for any purpose, whether it is looking for a job, buying or selling a bike, asking for help playing a video game, or merely interacting with friends." Multi-State Amicus Br. 12-13.

Regardless, a law aimed at "social" speech would "not single out any topic or subject matter for differential treatment" because social interaction can involve *any* topic or subject matter, from "political messages" to comments about "specific events" to "ideological" debates. *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 71 (2022). Whether a communication is a social interaction depends at most on the time, place, and manner of the communication, not its content. For example, while a statement on a commercial billboard would not constitute social interaction, the same statement to a friend over lunch would. The "substantive message itself is irrelevant." *Id.*

Equally unpersuasive is Plaintiffs' attempt to characterize HB3 as content-based because its "definition of 'social media platform' singles out a subset of online services" and thus "distinguish[es] among different speakers." Ans. Br. 26-27; *see NetChoice v. Bonta*, No. 25-146, 2025 WL 2600007, at *8-9 (9th Cir. Sept. 9, 2025) (rejecting NetChoice's argument that a child social-media law was content-based because it singled out "social media"). Speaker distinctions are not content distinctions unless the "speaker preference reflects a content preference" or the objective of the distinction is "the suppression of certain ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 658-60 (1994). Yet Plaintiffs offer nothing to support their suggestion that HB3's facially

21

content-neutral definition of "social media platform" is really a content regulation. All they say is that HB3 leaves "[s]ervices like Disney+ and Hulu" uncovered even though they "employ" addictive features. Ans. Br. 27. That differential treatment, Plaintiffs claim, can only mean that Florida prefers the content on Disney+ and Hulu. *See id.* But Plaintiffs are wrong that HB3 categorically excludes platforms like Disney+ and Hulu. If Disney+ or Hulu exposes kids to the features "2 hours per day or longer" and allows users to "view the content or activity of other users," Fla Stat. § 501.1736(1)(e), HB3 will apply to them regardless of their content.

**3.** In their final bid to avoid intermediate-scrutiny's more deferential tailoring standard, Plaintiffs say the district court should have held that HB3 is unconstitutional because Florida lacks a "legitimate interest." Ans. Br. 29; *but see* DE51-10 at 17 (Plaintiffs representing to the district court—when attempting to limit Florida's discovery—that they were "assuming" Florida's interest and arguing only that "HB3 is just not narrowly tailored"). According to Plaintiffs, HB3 is aimed not at protecting children's mental health but at speech that children find "especially appealing" because the law does not apply to platforms with "provider-generated news or sports content" or "popular streaming services." Ans. Br. 29-30.

That argument—which is merely Plaintiffs' speaker-based argument repackaged—fails twice over. *See supra* 21; DE76 at 24-26 (advancing the argument as a reason why HB3 is content-based). For one, it misapprehends HB3. HB3 does not

22

on its face exclude platforms that host "provider-generated news or sports content" or "popular streaming services." Ans. Br. 30. If a platform with that content—or any other content—exposed kids to addictive design features for 2 hours per day or longer and allowed users to view each other's activity, HB3 would apply to it. If the platform dropped the features, HB3 would not.

Nothing in HB3, in other words, targets content that children find "especially appealing." Ans. Br. 29. If a platform does not use addictive features, HB3 does not apply to it no matter how "appealing" kids find the content. As the district court put it, there is a difference "in regulating the use of features that are designed and operate to undermine a person's ability to exercise their will" and simply regulating how much time people can engage with speech. DE94 at 41. HB3 targets the former.

More fundamentally, though, even if HB3 applied exclusively to platforms that host "especially appealing" speech, Florida would still have a legitimate interest in the law. HB3 would still limit kids' exposure to addictive features, and Plaintiffs do not dispute that the features foster compulsive use—particularly for children, whose still-developing brains make them more vulnerable to the features. *See* DE51-2 ¶¶ 46-47; *NRA v. Bondi*, 133 F.4th 1108, 1151 (11th Cir. 2025) (en banc) (Rosenbaum, J., concurring).

In sum, children are suffering untold harm from intentionally addictive design features. Florida has a compelling interest in stopping that harm, and it did its level best

to do so by enacting—through lopsided bipartisan votes—a content-neutral regulation aimed at the features and platforms posing the greatest risk to children. Plaintiffs are not entitled to an injunction barring enforcement of that regulation while their lawsuit is pending. *See NetChoice v. Fitch*, 145 S. Ct. 2658 (2025) (allowing Mississippi's child social-media law to go into effect pending NetChoice's lawsuit even though the district court held that strict scrutiny applied to the law).

## C. At minimum, HB3's protections for children younger than 14 years old are not facially unconstitutional.

Plaintiffs at the very least have not met their burden for their facial challenge to Section 501.1736(2) because they have not established that its supposedly unconstitutional applications "substantially outweigh" its constitutional applications. *Moody*, 603 U.S. at 724. That provision can be validly enforced against covered platforms when they provide accounts to children of tender years because States have greater power to protect those children and they have narrower First Amendment interests.

Plaintiffs respond by slaying a strawman: They suggest that Florida believes Section 501.1736(2) is facially constitutional because young children altogether "lack[] rights." Ans. Br. 42 n.6. But Florida's point is only that young children's First Amendment interests are "more limited" than teenagers' and adults'. Init. Br. 42. To Plaintiffs, by contrast, the First Amendment operates the same for all children—from birth to age 18. *See* Ans. Br. 42 & n.6; DE51-8 at 43 (denying that "one year olds" lack

a First Amendment interest in social-media accounts). Centuries of history, tradition, and precedent contravene that view. *See* Init. Br. 41-45. The First Amendment gives States more room to protect young children, and Section 501.1736(2) is a valid exercise of that power.

Plaintiffs also suggest—without citing any evidence—that platforms providing young children accounts is fantastical. Ans. Br. 46 (denying that "some substantial number of five-year-olds are creating accounts on 'social media' services"). Yet the Senate Judiciary Committee recently reported that in 2022, "nearly $2 billion" of social-media platforms' "ad profits [were] derived from users age 12 and under,"[6] and the Surgeon General has concluded that "nearly 40% of children ages 8-12 use social media." DE51-9 at 4.

## III. EVEN IF PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION, THE DISTRICT COURT EXCEEDED ITS EQUITABLE POWERS IN UNIVERSALLY ENJOINING HB3.

Plaintiffs concede that the district court erred in universally enjoining HB3, Ans. Br. 55 n.9, but they argue that this Court should leave in place a preliminary injunction that "benefit[s]" all their members. Ans. Br. 53-55. Plaintiffs, however, have no answer to the Supreme Court decisions concluding that federal courts only have equitable

---

[6] Statement of Sen. Amy Klobuchar at 18:43-19:04, *Hidden Harms: Examining Whistleblower Allegations that Meta Buried Child Safety Research*, Senate Judiciary Comm. (Sept. 9, 2025), https://tinyurl.com/y5wtez98.

authority to remedy "the injury in fact that the plaintiff has established." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); *Trump v. CASA*, 606 U.S. 831, 851 (2025). Plaintiffs claim that under *Speech First v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) and *American Alliance for Equal Rights v. Fearless Fund Management*, 103 F.4th 765 (11th Cir. 2024), associations are entitled to injunctions that "benefit" "*all* [their] members" even if those members suffered no injury and face no irreparable harm. Ans. Br. 54. But neither decision even addressed scope of relief. *See Cartwright*, 32 F.4th at 1129; *Fearless Fund Mgmt.*, 103 F.4th at 780.

Any injunction this Court leaves in place must be no "broader than necessary to provide complete relief to" parties that would have "standing to sue." *CASA*, 606 U.S. at 861.

## CONCLUSION

This Court should reverse the preliminary injunction.

26

Dated: October 3, 2025                     Respectfully submitted,

                                           JAMES UTHMEIER
                                             *Attorney General of Florida*

                                           */s/ Kevin A. Golembiewski*
                                           JEFFREY PAUL DESOUSA
                                             *Acting Solicitor General*
                                           KEVIN A. GOLEMBIEWSKI
PL-01, The Capitol                           *Senior Deputy Solicitor General*
Tallahassee, FL 32399-1050                 DARRICK W. MONSON
(850) 414-3300                               *Deputy Solicitor General*
*kevin.golembiewski@myfloridalegal.com*    ROBERT S. SCHENCK
                                             *Assistant Solicitor General*
                                           ANITA PATEL
                                             *Special Counsel*

27

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,469 words.

2. This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on October 3, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

*/s/ Kevin A. Golembiewski*
Senior Deputy Solicitor General

28